```
 1                  UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION


 3


 4    UNITED STATES OF AMERICA, )
                                )
 5             PLAINTIFF,       )
       -VS-                     ) DOCKET NO. 1:19-CR-00297-ELR-JSA
 6                              ) VOLUME 1
      TODD CHRISLEY, also known )
 7    As MICHAEL TODD CHRISLEY, )
      et al.,                   )
 8                              )
               DEFENDANTS.      )
 9
                      TRANSCRIPT OF SUPPRESSION PROCEEDINGS
10                   BEFORE THE HONORABLE JUSTIN S. ANAND
                        UNITED STATES MAGISTRATE JUDGE
11                       WEDNESDAY, APRIL 14, 2021


12
      APPEARANCES:
13
      ON BEHALF OF THE GOVERNMENT:
14          THOMAS J. KREPP, ESQ.
                  -and-
15          ANNALISE KATHLEEN PETERS, ESQ.
            Assistant United States Attorneys
16

17    ON BEHALF OF THE DEFENDANT TODD CHRISLEY:
            BRUCE HOWARD MORRIS, ESQ.
18

19    ON BEHALF OF THE DEFENDANT JULIE CHRISLEY:
            STEPHEN MICHAEL FRIEDBERG, ESQ.
20
      ON BEHALF OF GEORGIA DEPARTMENT OF REVENUE:
21          ALEX F. SPONSELLER, ESQ.

22    ON BEHALF OF THE DEFENDANT PETER TARANTINO:
            DANIEL PATRICK GRIFFIN, ESQ.
23

24               VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
                        OFFICIAL COURT REPORTER
25                   UNITED STATES DISTRICT COURT
                          ATLANTA, GEORGIA
```

```
 1                          I N D E X

 2    WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS

 3    BILL RAWLINGS                   8      15        22
      PATTY ANN BEZZATI              24      43        55
 4    STEPHEN RYSKOSKI               62      67
      KATHLEEN MELISSA VANCIL   73, 104     123       204       214
 5    SCOTT PURVIS                  218     226
      STACI GUEST                   229     237
 6    LARRY ARROW                   245

 7


 8
      EXHIBITS                                             EVIDENCE
 9    Defendant's Exhibit 94                                  32
      Defendant's Exhibit 5                                   34
10    Government's Exhibit 7                                  49
      Government's Exhibit 1                                  53
11    Government's Exhibit 237                                76
      Government's Exhibit 205                                88
12    Government's Exhibit 101                                91
      Government's Exhibit 200                                93
13    Defendant's Exhibit 15                                  98
      Government's Exhibit 226                                99
14    Defendant's Exhibit 36                                 111
      Government's Exhibits 8 through 11                      113
15    Government's Exhibits 215                               120
      Defendant's Exhibit 3                                  131
16    Defendant's Exhibit 9                                  134
      Defendant's Exhibit 14                                 146
17    Defendant's Exhibit 12, 13, 16, 17, 19, 27, 28, 30, 31, 148
      32, 33, 34
18    Defendant's Exhibit 18                                 156
      Defendant's Exhibit 21                                 159
19    Defendant's Exhibit 18                                 161
      Defendant's Exhibit 26                                 162
20    Defendant's Exhibit 29                                 171
      Defendant's Exhibits 7 & 9                             172
21    Defendant's Exhibit 37                                 180
      Defendant's Exhibit 40                                 186
22    Defendant's Exhibit 41                                 190
      Government's Exhibits 102, 103 and 104                 255
23

24

25
```

```
 1                    (HELD IN OPEN COURT AT 9:30 A.M.)

 2           THE COURT:  All right, this is the case of the United

 3   States of America v. Todd and Julie Chrisley and Peter Tarantino,

 4   Case Number 1:19-CR-297.  We have assistant United States

 5   attorneys Thomas Krepp and Annalise Peters for the government.  We

 6   have Mr. Morris and Mr. Friedberg and Mr. Griffin for the

 7   defendants.  We're here for an evidentiary hearing on the pending

 8   motions to suppress.

 9           Before we begin, a couple of things.  Mr. Griffin, I

10   know I had promised you the opportunity to have some words first

11   on your motions which are not related to any evidence to be

12   presented here today.  I think with great apologies I think I have

13   to rescind that and have you reschedule your oral argument for a

14   different time, given the amount of evidence and the anticipated

15   timeframe I understand we have here today and motions to suppress.

16   We have witnesses and out-of-town folks, to my understanding, and

17   I'm told we may go all day today and tomorrow on the evidence of

18   the motions.  And so it strikes me as -- I don't want to risk that

19   we not get all that done in the most efficient time possible, and

20   I think it might be the most efficient thing to do, since your

21   motions are not ones -- or even any motions here today that I'm

22   going to rule on here today or in some cases even can rule on here

23   today, to have you come in at a separate time for oral argument on

24   your motions.

25           So I mean, I'll hear you if you have great objection to
```

```
 1   that, but I think that's what I have to do by way of an efficient
 2   way to manage this hearing here today.
 3           MR. GRIFFIN:  I totally understand, Your Honor.  Any
 4   time you want to reschedule is fine with me, but I was not
 5   intending to stay for this suppression hearing if it really
 6   doesn't affect Mr. Tarantino.  So with your permission, may I be
 7   excused?
 8           THE COURT:  You may, and I apologize since I did promise
 9   you this and you're here and you've got on a suit and everything
10   for this.  And I apologize, but hearing now the volume of what
11   we've got going on, I think that's what we have to do.
12           MR. GRIFFIN:  There was literary dust on the shoulders.
13           THE COURT:  Fair enough.  Fair enough.  Well, what we'll
14   do maybe, I'm sorry about this, after we conclude maybe later
15   today or tomorrow or Friday, we'll be in touch by e-mail with you
16   and counsel for the government for scheduling that.
17           MR. GRIFFIN:  Thank you.  Okay.
18           THE COURT:  Thank you very much.
19           MR. GRIFFIN:  Good luck to everybody.
20           THE COURT:  All right.  So by way of some ground rules.
21   We've got the witness stand here.  I had, I guess, thought that
22   maybe the Plexiglass would be this way.  I mean, I don't need
23   it -- well, we'll figure that out.  The -- if anybody -- any
24   witness while testifying or any counsel while asking questions, if
25   you have been fully vaccinated, meaning more than the sufficient
```

1  time past the last injection, so whatever, the 7 or 14 days

2  depending on the medication, the witness or lawyer may, but you're

3  not required to, take off your mask while testifying or while

4  asking questions.  I'll still have everyone wear a mask regardless

5  while sitting.  Many of you are sitting in close proximity, and I

6  think it's still prudent to wear the masks, but if you've been

7  fully vaccinated and you're speaking, meaning, at counsel table or

8  at counsel podium with the protective Plexiglass or the witness,

9  then I think it would be okay at this juncture in the pandemic to

10  dispense with the mask if you wish during that period.  Any

11  objections to that?

12          MR. MORRIS:  No, Your Honor.  Thank you.

13          THE COURT:  Okay.  I guess, let's move it because I

14  don't need it.  I've personally been fully vaccinated, but I'm

15  going to still wear the mask.  Why don't you angle it that way so

16  it protects the court reporter.

17          Anything we need to take up before we begin?

18          MR. KREPP:  Not from the government, Your Honor.

19          MR. MORRIS:  No, sir.

20          THE COURT:  All right.  So I understand we're going to

21  begin with the defense presenting their case on standing.  I don't

22  know if Mr. Morris, Mr. Friedberg, I don't know who is going to be

23  begin, you may call your first witness.

24          MR. MORRIS:  If it please the court, if we'll do this:

25  First, I believe Your Honor said there were three -- three issues

```
 1   to determine today:  One was standing to contest the search and
 2   seizure, two was IRS involvement in the search and seizure, and
 3   three was Georgia's Department of Revenue efforts or intent to
 4   assist or enlist the IRS.  We're prepared to do that.  Mr.
 5   Friedberg will start with standing, and then, presumably, the
 6   government will present its case, and I'll take part in the
 7   cross-examination there.
 8           We do have for the court, we have all of our exhibits
 9   electronically loaded so that we don't have to approach the
10   witness, and I have a booklet for the court and for the government
11   with all of the exhibits in there, if you would like to have
12   those.
13           THE COURT:  That would be, I think, most helpful, if
14   that's okay.  Normally, I would be fully conversant with the
15   electronic myself, but since this is not my courtroom, it's a
16   little bit -- I don't want to risk the inefficiency where I'm
17   fumbling with the electronics.  So yes, that would be helpful if
18   you would hand that up since you already have it.
19           MR. MORRIS:  May I approach?
20           THE COURT:  You may, yes.
21           MR. MORRIS:  Thank you, Your Honor.
22           THE COURT:  Mr. Friedberg, you may call your first
23   witness.
24           MR. FRIEDBERG:  My first witness will be Bill Rawlings.
25           MR. KREPP:  Judge, before we proceed, we would request
```

1  that the rule of sequestration be invoked.

2          THE COURT:  All right.  So if there are any anticipated

3  witnesses in the courtroom, you must take a recess at this time

4  and wait outside until you are called, and I'll admonish any

5  potential witnesses not to speak to anyone else who has been in

6  this courtroom -- I'm sorry, you may take your seat, sir -- about

7  any testimony or evidence that has incurred inside the courtroom.

8          I'll ask counsel for all sides to monitor who comes in

9  and out of the courtroom.  Make sure none of your anticipated

10 witnesses are present before their testimony, and to pass along

11 the admonishment to each of them that they are not to speak to

12 anyone who has testified or has been inside the courtroom to learn

13 what's reoccurred.

14         MR. KREPP:  We are going to be calling the FBI special

15 agent in the case, as we discussed.  He is still in the courtroom.

16         THE COURT:  So the exception, of course, would be case

17 agent and if -- I'll allow therefore -- and, of course, the

18 defendants themselves, if they wish to testify, or certainly not

19 included in this restriction but with that exception, the rule of

20 sequestration will apply.

21         Mr. Friedberg, I'm sorry, you may begin.

22         MR. FRIEDBERG:  Thank you, Your Honor.  And if it please

23 the court, I have been fully vaccinated as of March the 10th.  So

24 if I may take off my mask?

25         THE COURT:  You may.  And, sir, as I said before, anyone

1   that has been fully vaccinated, meaning that you're passed the

2   sufficient time past your second shot, while at witness table or

3   witness chair or counsel podium, you may choose, if you wish, to

4   take off your mask, but you don't have to.

5               THE DEPUTY CLERK:  Please stand and raise your right

6   hand.

7               You do solemnly swear or affirm that the statements that

8   you're about to make in this case now pending before the court,

9   are the truth, the whole truth, and nothing but the truth?

10              THE WITNESS:  I do.

11              THE DEPUTY CLERK:  Thank you.  Could you please state

12   and spell your full name for the record.

13              THE WITNESS:  Bill Rawlings, and that's R-A-W-L-I-N-G-S.

14              THE DEPUTY CLERK:  Thank you.

15                              ******

16                          BILL RAWLINGS,

17          having been duly sworn, testified as follows:

18                              ******

19   DIRECT EXAMINATION

20   BY MR. FRIEDBERG:

21   **Q.**   Thank you.  Mr. Rawlings, how are you?

22   **A.**   Good morning.  How are you?

23   **Q.**   I'm well.  Thank you for asking.

24       What is your occupation, please, sir?

25   **A.**   I'm a real estate broker with Atlanta Fine Homes Sotheby's

1  International Realty.

2  **Q.**  And how long have you been so employed, please, sir?

3  **A.**  I've been in the industry since 2003.  I've been in my current

4  role for about ten years.

5  **Q.**  And are you mainly residential or commercial or both?

6  **A.**  While my license would allow me to do both commercial and

7  residential, my expertise is in the residential field.

8  **Q.**  All right, sir.  Do you know any members of the Chrisley

9  family?  And if so, how do you know them, please, sir?

10  **A.**  Yes, I do.  I probably know just about every member of the

11  Chrisley families.  I meet the Chrisleys as they became clients of

12  mine back in 2004; and over the period of time since 2004, we have

13  done multiple, multiple real estate transactions both in Georgia

14  as well as across the country.  I have served as a consultant to

15  them on many of those things, and really become close family

16  friends as well.  So I have been -- literary them before the

17  children had even been born, so...

18  **Q.**  All right, sir.  Thank you.  And do you recall having a

19  conversation with either Todd or Chrisley -- excuse me, Todd or

20  Julie Chrisley regarding a request of your services for leased

21  space?

22  **A.**  Yes, I do.

23  **Q.**  And do you remember approximately when that was?

24  **A.**  It was approximately 2016.

25  **Q.**  All right, sir.  And what was your role in that?

**A.**   So as I mentioned earlier, I worked as a consultant helping

them out really, with any real estate transactions that were going

on.  So I received a call from Todd saying, Hey, you know, the

house is sold, we really have all this furniture that we've got to

get appraised as we've got to pay the taxes, basically, with it.

And so can you help me locate a warehouse space that we can have

for 30 days that is completely secure, that nobody can get into

where we can actually have the furniture placed as though it were

in rooms.  So we're going to need about 10,000 square feet.

**Q.**   All right, sir.  And so without going into that conversation

explicitly, what, if anything, did you do to accomplish that task?

**A.**   To accomplish that, as I mentioned, I was a residential agent,

not a commercial agent.  But I do have resources to find it.  And

LoopNet is a website that most commercial properties are listed

on.  It's kind of like the Zillow of the commercial world.  And so

I was looking for sublease space.  Certainly, I know enough about

the industry to know that you're not going to get a long-term

lease on a space like that.  So we were looking for somebody that

had available space that would not -- where they would not be

restricting them from any other type of lease, but would have

availability for about 30 days somewhere within a radius around

where the home was located.

**Q.**   All right, sir.  Were you familiar -- you've already testified

regarding some furniture, but were you familiar with what the

requirements were in regard to the amount of space you would need

1  and things of that nature?

2  **A.**   Yes.   The house that we -- that I had helped them sell is

3  about a 30,000-square-foot house.   As we were guesstimating how

4  much space we needed, we were targeting 10,000 square feet of

5  warehouse space in order to be able to take the furniture that had

6  been filling that -- that home to be able to lay it out as though

7  it were rooms.   In other words, we were not looking for a storage

8  facility, we were looking for a place where furniture could be

9  laid out to be appraised for value for each individual piece.

10  **Q.**   And do you have of your own, personal knowledge who any of

11  this furniture and other belongs belonged to?

12  **A.**   Well, as it was in the house that I had sold and had for many

13  years, you know, it's natural that it was the Chrisleys'

14  furniture.

15  **Q.**   All right, sir.   And without going into any conversation with

16  anyone, did you contact any particular warehouse?   And if so, how

17  did you go about meeting the requirements that you just testified

18  to in regard to privacy and security?

19  **A.**   Okay.   So in doing that initial search, the truth, there were

20  only three properties that actually came back even potentially

21  meeting the criteria.   And so I was able to just by picking up the

22  phone, calling and reaching out to the person who had the space

23  that I thought was best suited for it.   We had a phone call where,

24  again reiterating, what our need was, hey, I'm looking for a

25  sublease for approximately 30 days.   We need it to be very secure,

1  for only my client and you as an owner would have access to it.

2  So the public would not be there.  And I was very specific with

3  her saying we needed to have it separate from any other space that

4  she may have.  She came back saying, yes, the space, while the

5  building is larger than 10,000 square feet, it is divided off with

6  a chainlink fence.  So that this area would be separate and it

7  would be secure for your clients to do this.

8  **Q.**  And what --

9  **A.**  At this point, by the way, I would also add that I certainly

10  didn't tell them who the clients were, it was irrelevant as to

11  what it was.  We were just simply needing a place for -- to

12  display furniture appropriately.

13  **Q.**  And how familiar are you with this leased space?

14  **A.**  So I have never been to the lease space because it was such a

15  simple matter of putting the two pieces together that it didn't

16  mandate me going to see anything.

17  **Q.**  Okay.  But you ended up having to appear at the warehouse at

18  some point, did you not, in order to accomplish the task of

19  staging and things of that nature?

20  **A.**  I was not involved at that piece at all.  My role was just to

21  identify the space that would work.  Once we found the right

22  space, then Julie was the one who was able to execute the lease on

23  their behalf.

24  **Q.**  All right, sir.  Did you personally get involved in the

25  execution of the lease itself?

1  **A.**   The execution of the lease was a very, very simple process.

2  So technically I did the negotiating verbally.  But because this

3  was a sublease of a 30-day space, it was not the exhaustive

4  process that Julie would normally go through.

5  **Q.**   All right, sir.  So you weren't there and have no idea who

6  actually signed the lease or anything of that nature?

7  **A.**   That's correct, I was not there.

8  **Q.**   Okay, sir.  Thank you.  And so what was done, without you

9  attending at the warehouse, in order to accomplish the showing as

10 you indicated of the furniture and other items?

11 **A.**   There was -- they do -- there's an individual that had worked

12 with the Chrisley, Bill Abbott, who was facilitating a lot of

13 support for them due to their busy lifestyle.  So Bill and I had a

14 quick conversation, just kind of telling him what I knew about the

15 space so he could help facilitate the movement of furniture into

16 that space.

17 **Q.**   All right, sir.  So you never had a key; correct?

18 **A.**   I never had a key.

19 **Q.**   Okay.

20 **A.**   There was no need for me to have a key.  I had never been to

21 the space, so as I said, there was no need to have it.

22        MR. FRIEDBERG:  Your Honor, may I have a moment to

23 confer with counsel?

24        THE COURT:  Yes.

25        MR. FRIEDBERG:  One last question, please sir.

1          THE WITNESS:  Sure.

2    DIRECT EXAMINATION

3    BY MR. FRIEDBERG (CONTINUED):

4    **Q.**  You had indicated in your testimony that only when you were

5    negotiating the lease on behalf of the Chrisleys, that only you

6    and your clients would have a key.  Who do you mean by your

7    clients?

8    **A.**  Todd and Julie Chrisley.

9    **Q.**  All right.

10          MR. FRIEDBERG:  If I may have just one more moment, Your

11   Honor.

12          That's all I have of this witness, Your Honor.

13          MR. FRIEDBERG:  Excuse me, another question, please,

14   sir.

15          THE WITNESS:  That's okay.

16   DIRECT EXAMINATION

17   BY MR. FRIEDBERG (CONTINUED):

18   **Q.**  Do you know where the warehouse was and what it was called?

19   **A.**  Offhand, I honestly do not know.

20   **Q.**  Okay.

21   **A.**  Again, I would reiterate for everybody's knowledge here that

22   there were three spaces that came up within a 15-mile radius of

23   the home that were even potential possibilities, and this one

24   worked out with all the criteria that was important at that point

25   in time.  So I don't remember the name, because it wasn't material

1  to needing to know it at that point of time.

2  **Q.**  So it was within 15 minutes of what house?

3  **A.**  15 miles.

4  **Q.**  15 miles, excuse me.

5  **A.**  Of the house in Roswell that we sold around that time.

6  **Q.**  Thank you, sir.

7  **A.**  And that criteria was only put in as an initial search because

8  of knowing there is the cost of transporting furniture, I didn't

9  want to look in places that would cause them greater expense to

10 transport furniture.

11          MR. FRIEDBERG:  Thank you very much.

12          THE WITNESS:  Thank you.

13          THE COURT:  Cross-examination?

14          MS. PETERS:  Yes, Your Honor.

15 CROSS-EXAMINATION

16 BY MS. PETERS:

17 **Q.**  Good morning, Mr. Rawlings.

18 **A.**  Good morning.  How are you?

19 **Q.**  Good.  Can you hear me okay?

20 **A.**  Great, yes.

21 **Q.**  Okay.  Great.  How did you first meet the Chrisleys?

22 **A.**  I actually met Todd in 2004.  I met him when I had a property

23 under contract for an investor.  This investor was looking for an

24 individual who would back him in a deal to flip a home on Woodland

25 Brooke in Vinings, and this builder who was doing it, his normal

```
 1  investor was not interested in taking on my project.  So he
 2  reached out to his attorneys just to say, hey, do y'all know
 3  anybody who is looking to do an investment, and the attorneys --
 4  which by the way, I do not know who that attorney was, suggested
 5  Todd Chrisley.  So at that point once they decided to do that, I
 6  then had to do an assignment of the contract from the original
 7  buyer to Todd, because Todd was then the one who was going to be
 8  purchasing the land.  Well, as I -- actually, the lot, not the
 9  land, there was a house on it.  The -- because I then was going to
10  be representing this person as a client, just as you would do in
11  your industry, you, obviously, need to know who it is you are
12  meeting.  So I took it upon myself to call Mr. Chrisley, introduce
13  myself to him and go meet him in person to have this contract
14  executed.  And at that point they had an office in Alpharetta,
15  Roswell, and I don't recall exactly just because that area -- I
16  think it was called Milton -- but met him at the office at that
17  point in time.
18  Q.  Got it.
19  A.  And as part of that conversation, he started talking about
20  some other residential properties and things that he had interest.
21  And then that's really when I started working with him on
22  residential things outside of investment --
23  Q.  Got it.
24  A.  -- properties.
25  Q.  And how many -- how many residential deals or transactions
```

1  would you say that you assisted the Chrisleys on?

2  **A.**  Well, through the businesses that I've worked with, as well as

3  the Chrisleys, it's well over $100 million worth of real estate.

4  For personal properties, we've done three or four transactions for

5  them as a family, personally.  But again, things that were

6  investment properties and others, the numbers would be endless.

7  **Q.**  Okay.  And you said that you had become friends with Todd and

8  Julie; is that correct?

9  **A.**  That's correct, yes.

10  **Q.**  Do you guys socialize?

11  **A.**  When -- well, obviously, the Chrisleys do not live in Georgia

12  anymore.  When they were in Georgia, we would see each other maybe

13  once a year in person.  Todd and I would maybe occasionally go to

14  lunch.  But it was a friendship where it still was primarily based

15  on a business relationship.  So as you do with a very valuable

16  client, you're staying in regular contact and communications and

17  that's probably more phone calls --

18  **Q.**  Okay.

19  **A.**  -- than anything and text messages.

20          MR. FRIEDBERG:  Your Honor, if it please the court, I'm

21  so sorry to interrupt you, Ms. Peters, could I ask Ms. Peters

22  because I'm in the corner, could you speak up just a little bit.

23          MS. PETERS:  Sure.

24          MR. FRIEDBERG:  I can't clearly hear your questions.

25  Thank you so much.

```
 1            MS. PETERS:  Is that better?

 2            MR. FRIEDBERG:  Thank you, much better.

 3            MS. PETERS:  Okay.

 4  CROSS-EXAMINATION

 5  BY MS. PETERS (continued):

 6  Q.  Mr. Rawlings, you testified that at some point in 2016, Mr.

 7  Chrisley reached out to you about finding a warehouse space; is

 8  that correct?

 9  A.  I believe it was 2016.

10  Q.  Sure.

11  A.  I do not have that -- approximately.  Again, as we have had a

12  business relationship for a long time, we probably have never gone

13  more than two or three weeks without having some kind of

14  conversation.  So it's really hard for me to ascertain the exact

15  date.

16  Q.  And what he told you was, I think you said, that he was

17  looking for a space to store furniture for a short period of time

18  to get it appraised?

19  A.  No, I did not say store furniture.  What we needed to do, we

20  needed to find a warehouse to actually lay out furniture and

21  display it so that it could be appraised properly.  And certainly

22  he knew, umm -- whereas, if he had reached out to a regular

23  commercial agent, they wouldn't have known what the furniture was.

24  I had intimate knowledge of what this furniture was, how it needed

25  to be done, et cetera.
```

**Q.** Okay.  And you said that the reason -- what he told you is that the furniture needed to be appraised because they wanted to sell it to pay off taxes?

**A.** For evaluation for taxes.  And the reason I know that even more specifically is, there were a couple -- when they were moving and downsizing from a 30,000-square-foot house to a 10,000-square-foot house, obviously, being in the business, I know that there is furniture that is extra.  There were a couple of pieces of furniture, in particular, a kitchen table that I admired quite a bit.  And so I said to him, I said, hey, anyway I can get that table, I'll buy that table from you.  He said, hey, buddy, I would love to do that for you but I can't because we have to have this appraised for taxes.  So it was said not once but twice with affirmation because of the fact that I could not get that table.

**Q.** Did he make on -- did Todd Chrisley make any other statements to you about needing to pay his taxes or about using the furniture to pay off the taxes?

**A.** You know, obviously, there were conversations around that whole time knowing that that was going to be going on, but I can't give you with any specificity as to what that is.

**Q.** Okay.  And --

**A.** But I would be naive to say we didn't -- never talked about that, because, again, we did business dealings for years.

**Q.** You said that you verbally negotiated the terms of the lease?

**A.** Um-hum.

**Q.**  What were the terms, as you recall it?

**A.**  Again, I cannot express enough how simple this was.  So a normal lease would have a letter of intent, where you're going through and talking about tenant improvements and things like that.  We literally were talking about what is the price she would charge for 30 days for this secured locked space.  I do not recall offhand what that dollar amount was.

**Q.**  What was -- what was your understanding of who would be the -- the renter, was it Todd and Julie, was it an entity?

**A.**  No, it was Todd and -- it was Todd and Julie.  Now, whether or not it was going to be ultimately signed by an entity, would be, you know, an unknown, being that I did not sign the lease.

Now, I will say as I mentioned prior, the number of transactions that I have done with them have been numerous and, therefore, we wrote offers and bought properties in multiple different LLCs, which is, frankly, normal for somebody with their stature.

**Q.**  But that wasn't part of what you negotiated with the owner of the property?

**A.**  Correct.  There was no need -- the owner of the property didn't have an interest at that point in time or wasn't inquiring. She was losing money on an empty space and was happy to have somebody who was willing to take it for 30 days to bring in some kind of revenue.  So it really wasn't a negotiation.  It was simply putting Party A and Party B together.

1   **Q.**   And you have never been, to this day, you have never been to

2   this warehouse; correct?

3   **A.**   That is correct.  I had no need to ever go to that space.

4           MS. PETERS:  One moment, Your Honor.

5           THE COURT:  Yes.

6   CROSS-EXAMINATION

7   BY MS. PETERS (continued):

8   **Q.**   Mr. Rawlings, did Todd ever tell you who owned the furniture

9   that they wanted to move to get it appraised?

10  **A.**   Again, it would be my assumption it was them.  It was in their

11  personal home for years.

12  **Q.**   Did you ever have any conversations with Julie about this

13  process of needing a warehouse and moving the furniture?

14  **A.**   What is typical in the relationship with me and Todd

15  professionally is, we nail down everything and there are times

16  where Julie may be the one to execute something.  That was simply

17  what happened here.  It was as simple as, hey, this space sounds

18  perfect in the conversation Todd and I had, do you mind giving

19  Julie the information so she can go ahead and get it executed and

20  get it done.  It was that simple.

21      So I couldn't even tell you whether or not I actual had a

22  conversation with Julie or a text.  Because it was literally --

23  there was nothing to discuss.  It was just trying to put the two

24  parties together.

25          MS. PETERS:  Okay.  Thank you.

1           THE WITNESS:  Thank you.

2           MR. FRIEDBERG:  If I may on redirect, Your Honor?  Thank

3  you.

4  REDIRECT EXAMINATION

5  BY MR. FRIEDBERG:

6  **Q.**  Mr. Rawlings, do you have personal knowledge as to whether or

7  not they leased this space, meaning the Chrisleys?

8  **A.**  I know that only because of, you know, Todd and Julie thanking

9  me for doing it, but I was not involved in actually seeing it or

10  doing anything.  And like I said, I was never at the space.  I

11  couldn't even tell you what the address is today of where the

12  space was.

13           MR. FRIEDBERG:  Yes, sir.  Thank you.

14           THE WITNESS:  Sure.

15           THE COURT:  Let me ask you a question, if I could.  So

16  you mentioned keys.  Did you say you had a key?

17           THE WITNESS:  No, I did not mention keys.  I believe I

18  was asked that question.

19           THE COURT:  Okay.

20           THE WITNESS:  But with regards to access to the space,

21  when the criteria of what I was looking for for them was a space

22  that would be secure, where there would not be anybody with access

23  to the space outside of the Chrisleys, as well as the owner of the

24  property, and that was one of the things that I was assured.

25           THE COURT:  So you didn't have a key or other --

 1          THE WITNESS:  No, never been to the space, never had a

 2    key.  As a matter of fact, I don't even know if there was a key

 3    because it could it have been accessed through other means versus

 4    an actual manual key.

 5          THE COURT:  Okay.

 6          THE WITNESS:  We just needed to know that there was

 7    nobody else that had access to that space.  And that's a criteria

 8    in looking for the property.  So that was something that came up

 9    in the conversation with the owner of the property when I called

10    them.

11          THE COURT:  Okay.  That's all I have.  All right, you

12    may step down.

13          THE WITNESS:  Thank you.

14          THE COURT:  You may call your next witness.

15          MR. MORRIS:  May the witness be excused, Your Honor?

16          THE COURT:  Yes.

17          MR. FRIEDBERG:  Ms. Bezzati.

18          THE DEPUTY CLERK:  Please stand and raise your right

19    hand.

20          You do solemnly swear or affirm that the statements that

21    you're about to make in this case now pending before the court,

22    are the truth, the whole truth, and nothing but the truth?

23          THE WITNESS:  I do.

24          THE DEPUTY CLERK:  Thank you.  Could you please state

25    and spell your full name for the record.

1     THE WITNESS:  Patty Ann Bezzati.

2     MR. MORRIS:  Would you spell last name, please, ma'am.

3     THE WITNESS:  B-E-Z-Z-A-T-I.

4     THE DEPUTY CLERK:  Thank you.

5     THE COURT:  You may be seated, ma'am.

6     The rule that we're following here is, if you've been

7  fully vaccinated, meaning, you had a sufficient amount of days

8  after the second shot or whatever the last shot is for COVID-19,

9  then you may, if you wish, but you're not required to, testify

10  with your mask off.

11     THE WITNESS:  I have not.

12     THE COURT:  Okay.

13                    ******

14                PATTY ANN BEZZATI,

15     having been duly sworn, testified as follows:

16                    ******

17

18  DIRECT EXAMINATION

19  BY MR. FRIEDBERG:

20  Q.  Good morning, how are you?

21  A.  Good.  How are you?

22  Q.  I'm well.  Thank you for asking.

23     Are you gainfully employed?  And if so, in what capacity?

24  A.  I am self-employed.  I own -- Printers & Parts Warehouse is my

25  company name.

**Q.** And where is that located, please, ma'am?

**A.** In Buford, Georgia.

**Q.** Can I ask you just to speak up just a little bit --

**A.** Buford Georgia.

**Q.** -- because you're talking through your mask.  Duluth, Georgia?

**A.** I'm in Buford, Georgia right now.

**Q.** Okay.  Thank you.  And what are your responsibilities there?

**A.** I sell, ship, pack.  I'm the owner of the company.

**Q.** And do you personally know any members of the Chrisley family?

**A.** Umm, I know of them.

**Q.** And how do you know of them?

**A.** They lease some space from me.

**Q.** And have you ever seen them before?

**A.** At my warehouse.

**Q.** And who have you seen at your warehouse that are members of the Chrisley family, if you recall?

**A.** Todd, his wife, I've seen their son there, his mom, and their daughters, I believe.

**Q.** All right.  And do you have any recollection at all of speaking with someone on behalf of the Chrisleys in order to lease that space?

**A.** Yes.

**Q.** And can you recall what that entailed, please, ma'am, as far as the negotiations, if there were any?

**A.** I put an ad on Craigslist, and he had responded to it.

1  **Q.**  And were there any special requirements that were communicated

2  to you in regard to this leased area?

3  **A.**  Yes.  About it being secure and -- basically, if it was secure

4  and if it was open to the public.

5  **Q.**  And can you describe this space, if you will?

6         MR. FRIEDBERG:  And I'm going to ask them to pull up the

7  schematic, if you will.

8         MR. MORRIS:  Your Honor, I think you have to allow us to

9  use the electronics.

10         THE COURT:  Oh, yes.  Any objection?  Yes, that's

11  allowed.

12         You have to bear with us because it's not our courtroom.

13         MR. FRIEDBERG:  Sure.  No problem.  Thank you, Your

14  Honor.  We appreciate your assistance.

15  DIRECT EXAMINATION

16  BY MR. FRIEDBERG (continued):

17  **Q.**  Ms. Bezzati, if you will look at that schematic, and I would

18  ask you if you would identify that, ma'am?

19  **A.**  Suite 110 was my warehouse.

20  **Q.**  Could you speak into the microphone?  I'm so sorry.

21  **A.**  Suite 110 was my warehouse.

22  **Q.**  And do you know who prepared that?

23  **A.**  That was prepared before I moved into the warehouse, because I

24  had leased 10,000 square feet to another company before we had

25  moved in.  So we had had a gate put up.  So that was the schematic

1  that the -- the people that I had leased from had sent over about

2  how the fence was going to be put up.

3  **Q.** Does this truly and accurately portray the lease space at your

4  warehouse?

5  **A.** Yes.

6  **Q.** Could you kind of take us through it in regard to where the

7  storage area was and whether the storage area was secure and how

8  it was secured, please, ma'am?

9  **A.** So, let's see.  This side, I believe, of the warehouse --

10  there was 10,000 square feet on one side, and I had, I think, 15

11  or 20 on my side.  So you can see where it says rolling gate?

12  **Q.** Yes, ma'am.

13  **A.** There was one gate there and then, umm -- there was another

14  gate -- let's see.  That would be right here.

15  **Q.** Okay.  And the -- how was the gate secured, if at all?

16  **A.** It was secured to the floor.

17  **Q.** And how high was the fence, please, ma'am, if you know?

18  **A.** Eight feet.  Eight feet tall.

19  **Q.** And to enter either one of those means of ingress or egress,

20  did you have to have some mechanism or a key of some sort?

21  **A.** Yes.

22  **Q.** And how many people, if you know, were given keys or who would

23  have had access with keys?

24  **A.** I was the only one that had keys.

25  **Q.** And at the time the space was leased, how many keys did you

1  give out, if you recall?

2  **A.**   Two.

3  **Q.**   And who did you give them to?

4  **A.**   Julie.

5  **Q.**   All right.  And was this space accessible to anyone else,

6  like, employees or general public or anything like that at all?

7  **A.**   I kept the front part where the office space was locked at all

8  times.  The only way to get at that -- we used my back dock door

9  to get in.  I had padlocks on three other doors that entered into

10  their space, and I left one door open for them to access if they

11  came in the front door to come in to get to their space.  My space

12  was on the other side that was locked with -- with --

13  **Q.**   And where is the bathroom in relation to that space?

14  **A.**   So this rolling gate right here, that was the only one that

15  would open and then -- so they would just walk across to the first

16  door and open it, and then there was a bathroom right there.

17  **Q.**   All right.  So who would have -- let's assume that someone had

18  to use the restroom, say, from the general public, would you allow

19  them into that space?

20  **A.**   No one was allowed into my building from the general public.

21  **Q.**   All right.  So no one was allowed.  What about your employees

22  there?

23  **A.**   My employees.

24  **Q.**   Your employees what, were they allowed to enter the area?

25  **A.**   They were allowed to enter the area to use the restrooms.

1  **Q.** And what security measures did you have besides the gate and

2  people having keys and things of that nature?

3  **A.** I had complete video security in there.

4  **Q.** And so are you saying, and I don't mean to put words in your

5  mouth, that in order for your employees to use the restroom, they

6  were allowed to access the space?

7  **A.** Yes.

8  **Q.** And how did they access the space without a key?

9  **A.** They went through the rolling gate that I opened every day

10 when I got there.

11 **Q.** Okay.  And how close was that to the bathroom?

12 **A.** I think -- from the gate?

13 **Q.** Yes, ma'am, from where they would enter.

14 **A.** Okay, probably ten feet to enter the door to go into the

15 bathroom.

16 **Q.** And would that still allow employees to have access to any of

17 the items that were stored?

18 **A.** I mean, I guess they could.  They walked through the space.

19 **Q.** How did you advice your clients, if at all -- excuse me, your

20 employees, if at all, in regard to what their obligations were

21 when they went to the bathroom?

22 **A.** Well, I had leased the space to several other people before

23 that.  So they were well aware that -- that was the rule, that

24 they walked through the space, they opened the door and they

25 didn't bother what was on the other side of the gate.

**Q.**   All right.   And then would the gate be locked or would it remain open for them to use the restroom during the day?

**A.**   It would remain open so they could use it during the day.   At nighttime when we left it was locked.

**Q.**   So you how was it monitored at times that it was open during the day, if it was?

**A.**   Well, I could see where the -- I could see through the gate.

**Q.**   So you had a key?

**A.**   I had a key.

**Q.**   And you would open it at -- maybe when the day began?

**A.**   When the day began, I'd open it.

**Q.**   And when would it be closed and locked again?

**A.**   When I left the building.

**Q.**   And when about would that be, normally?

**A.**   I mean, just whenever I would leave.   After a day's work, I'd lock it up, lock the gates.

**Q.**   Would it be, say, at the end of the day --

**A.**   Yes.

**Q.**   -- in the middle of the day?

**A.**   End of the day.

**Q.**   Okay.   So no one had a key other than you and Julie, supposedly?

**A.**   Not -- not a key to the gates.   She had a key to the front door.

**Q.**   I see.

1  **A.**   Not -- not to the gates.

2  **Q.**   So no one else could access the gate?

3  **A.**   Correct.

4  **Q.**   And you had indicated earlier that the general public was not

5  allowed in the warehouse?

6  **A.**   There was no need.  I wholesale product.

7  **Q.**   So let's say you had a potential customer who wanted to look

8  inside of the warehouse to see the space, how would you handle

9  that in order to maintain the security and the private area that

10 you had fence around?

11 **A.**   Are you referring to when they were in the building?

12 **Q.**   Did you allow anybody as a prospective customer to come in the

13 building?

14 **A.**   No.  My customers came in my dock door to pick their product

15 up.

16 **Q.**   I see.  So they didn't have to go through that area?

17 **A.**   No.

18 **Q.**   And if they needed to use the facilities, would they be

19 allowed to?

20 **A.**   No.

21 **Q.**   Okay.  And that was always the case?

22 **A.**   Always.

23 **Q.**   Okay.  Did you enter into a lease with anyone on behalf of the

24 Chrisleys or the Chrisleys themselves?

25 **A.**   Yes.

1            MR. FRIEDBERG:  All right.  I'm going to ask that the

2    lease -- two leases be pulled up, please.

3            MR. MORRIS:  Identify the exhibit by number, please.

4            MR. FRIEDBERG:  Five.  And what number was the

5    schematic?

6            A VOICE:  94.

7            MR. FRIEDBERG:  Excuse me one moment.

8            Your Honor, the schematic that was up previously was

9    Exhibit 96, and I would move at this time --

10           A VOICE:  94.

11           MR. FRIEDBERG:  94, excuse me, I'm sorry.  And I would

12   move that it be entered into evidence at this time.

13           THE COURT:  Any objection?

14           MS. PETERS:  No, Your Honor.

15           THE COURT:  All right, it's admitted.

16           MR. FRIEDBERG:  Thank you.

17           (Defendant's Exhibit 94 was marked in evidence as of

18   this date.)

19   DIRECT EXAMINATION

20   BY MR. FRIEDBERG (continued):

21   Q.  I'll ask you to look at this exhibit that is in front of you

22   currently, and ask you are familiar with it?

23   A.  Yes.

24   Q.  And could you describe it to the court?

25   A.  That is the lease that was drawn up when they leased the

1  space.

2  **Q.**  And was this the initial lease?

3  **A.**  Yes.

4  **Q.**  Okay.  And did you sign it?

5  **A.**  Yes.

6  **Q.**  And who else signed it?

7  **A.**  I believe Julie did.

8  **Q.**  All right.  Did you witness her signing it?

9  **A.**  No.

10 **Q.**  Okay.  So it was just signed and sent back to you?

11 **A.**  Correct.

12 **Q.**  Okay.  Did you ever have any conversations with

13 Ms. Chrisley -- Mrs. Chrisley in regard to this lease space in

14 terms of signature or anything like that that you needed?

15 **A.**  Umm, we just drew the lease up and they signed it.

16 **Q.**  Okay.  Thank you.

17     And this is the accurate lease that she signed, this truly and

18 accurately portrays the lease that she signed?

19 **A.**  Yes.

20 **Q.**  Okay.

21         MR. FRIEDBERG:  Your Honor, I would move that this also

22 be -- Exhibit 5 be admitted into evidence.

23         MS. PETERS:  No objection.

24         MR. FRIEDBERG:  Thank you.

25         THE COURT:  All right, it's admitted.

1          (Defendant's Exhibit 5 was marked in evidence as of this

2    date.)

3          MR. FRIEDBERG:  Would you pull up the second lease,

4    please.  Thank you.  And what is the number of this exhibit?

5    Still Exhibit 5.

6          This is part of Exhibit 5, Your Honor.

7    DIRECT EXAMINATION

8    BY MR. FRIEDBERG (continued):

9    **Q.**  And, Ms. Bezzati, if you would look at this particular

10   document and ask you if you are familiar with it?

11   **A.**  Yes.

12   **Q.**  And can you describe what it is?

13   **A.**  It was another lease.

14   **Q.**  And what was the purpose of having another lease signed?

15   **A.**  I didn't ask.

16   **Q.**  I'm sorry?

17   **A.**  I didn't ask them.

18   **Q.**  Okay.  Well, how did it come about, if you know?

19   **A.**  I don't.

20   **Q.**  Okay.  And who is this family trust, if you know?

21   **A.**  I don't.

22   **Q.**  Okay.  Do you know who signed this lease?

23   **A.**  I believe it was the mom.

24   **Q.**  Okay.  And you had indicated earlier you had met her in the

25   premises, also?

**A.**   I had seen here there, yes.

**Q.**   Okay.  Or seen her, excuse me.

**A.**   Yes.

**Q.**   Does this truly and accurately portray the lease that is kept in the normal course of business for this lease space?

**A.**   Yes.

**Q.**   Okay.

MR. FRIEDBERG:  Your Honor, I would move that this be entered into evidence as well.

THE COURT:  I guess technically that exhibit has already been entered.

MR. FRIEDBERG:  Okay.  Thank you.

THE COURT:  We'll just note for the record that this document is part of that exhibit.

MR. FRIEDBERG:  Okay.

DIRECT EXAMINATION

BY MR. FRIEDBERG (continued):

**Q.**   So you indicated earlier that there were not only an eight-foot gate, did the gate as it was depicted in the earlier exhibit, did it go all the way to the wall?

**A.**   There were two gates.  No, it didn't.  One was a roll gate that only opened, I believe, four feet.  Enough to get a skid through.

**Q.**   I see.  Okay.  And were there cameras all around, is that what you testified?

1  **A.**   Yes, I had cameras everywhere.

2  **Q.**   Do you monitor those cameras during the day?

3  **A.**   I do.

4  **Q.**   Okay.  And so was the entire lease space surrounded by fence

5  and enclosed?

6  **A.**   Yes.

7  **Q.**   Okay.  Thank you.

8      And from time to time would others who were there with

9  apparent authority from the Chrisleys to enter the residence who

10  had a key -- excuse me, to enter the lease premises who had a key

11  be allowed to come in?

12  **A.**   Yes.

13  **Q.**   Okay.  And do you know of any occasions where that occurred?

14  **A.**   Yes.  But I always made sure if I didn't know who it was, I

15  would contact them and ask if it was okay.

16  **Q.**   And you always got permission to allow them to come in as a

17  representative of the Chrisleys?

18  **A.**   Yes.

19  **Q.**   Thank you, ma'am.

20      So let's assume that the gate was locked and the dock was

21  locked or the door was locked, how would someone enter, any old

22  way?

23  **A.**   They entered through my dock door on my side.

24  **Q.**   All right, and if that was locked how would they entered?

25  **A.**   Nobody entered because that meant I wasn't there.

1  **Q.**   I see.  So there was no way for anybody to get in at all?

2  **A.**   No.

3  **Q.**   Okay.  What if they climbed the fence?

4  **A.**   They would have to get through a door to climb the fence.

5  **Q.**   Okay.  And how difficult would it have been to get through

6  that door?

7  **A.**   The front door?

8  **Q.**   Yes, ma'am.

9  **A.**   I mean, you'd have to break the glass unless you had a key.

10  **Q.**   I see.  So only those with a key could do that?

11  **A.**   Correct.

12  **Q.**   Okay.  And the only people that had the key, you already

13  indicated; correct?

14  **A.**   Yes.

15  **Q.**   All right.  Were you ever contacted by any representatives of

16  the Georgia Department of Revenue and/or the FBI --

17  **A.**   Yes.

18  **Q.**   -- regarding this leased space?

19  **A.**   Yes.

20  **Q.**   Could you describe the contact that you had, if you will,

21  initially.

22  **A.**   They came into my warehouse with a piece of paper and said

23  that they were there to seize the Chrisleys' property, and I told

24  them that weren't touching anything until I figured out what was

25  going on.  Just because you have a piece of paper, I wasn't just

1  going to take that and let them take everything.  So I tried to

2  get in touch with the Chrisleys, and at first I wasn't able to get

3  in touch with them.  And the women that first came in was, you

4  know -- she said, we're not leaving here until we seize this

5  property, and then another guy came in and started, basically,

6  harassing me.

7  **Q.**  In what ways?

8  **A.**  Huh?

9  **Q.**  In what way or ways do you feel harassed?

10  **A.**  Well -- well, they told me they aren't leaving my property

11  until they took that stuff out and being very -- just aggressive.

12  And when I told them that I was going to call the police because I

13  felt like I was being attacked, he told me that he was the police

14  and if I didn't cooperate that he was going -- he was going to put

15  me in handcuffs and take me to jail.

16  **Q.**  Do you have any idea who the identity of this person was?

17  **A.**  His name was Josh.

18  **Q.**  His name was what?

19  **A.**  His name was Josh.

20  **Q.**  Josh?

21  **A.**  Yes.

22  **Q.**  Do you know a last name?

23  **A.**  I don't recall it right now.

24  **Q.**  Okay.  And how was he dressed, please, ma'am, if you recall?

25  **A.**  I believe he was in khakis and a collared shirt.

1  **Q.**  All right.  And could you describe the -- the environment that

2  was going on during this period of time?

3  **A.**  Umm, a whole bunch of people started showing up and walking in

4  the warehouse.  They started videoing.

5  **Q.**  Say that again.

6  **A.**  They started videoing my warehouse, taking pictures and --

7  yeah, it was a little crazy.

8  **Q.**  And were you there actually for the entire seizure?

9  **A.**  Yes, I was.

10       MS. PETERS:  Your Honor, we object at this point.  We

11  understand she has been called as a witness on the standing issue,

12  and this goes beyond of the scope of a standing witness.

13       MR. MORRIS:  I'm sorry, I couldn't understand.

14       MS. PETERS:  We would object at this time just on

15  relevance because we understand the witness has been called to

16  speak on standing, and this goes beyond the scope of standing.

17       MR. FRIEDBERG:  Your Honor, I think it does deal with

18  standing in terms of what took place and how they gained access

19  and things of that nature and how long they were there.

20       THE COURT:  I'm going to overrule it because I

21  think standing is ultimately a question of authority -- over the

22  premises I think is irrelevant to that.  But I think you need to

23  keep it to what is relevant to standing.  But so far what I've

24  heard is relevant.  So I'll overrule the objection.

25       MR. FRIEDBERG:  All right.

1  DIRECT EXAMINATION

2  BY MR. FRIEDBERG (continued):

3  **Q.**  Were you there the entire time until everything was cleared

4  out?

5  **A.**  Yes.

6  **Q.**  Was there anything left?

7  **A.**  Yes, a mess.

8  **Q.**  A what?

9  **A.**  A mess.  They did leave stuff and they left a mess.

10  **Q.**  They left a mask?

11  **A.**  A mess.

12  **Q.**  A mat?

13  **A.**  Mess.

14  **Q.**  Can you spell that?

15  **A.**  M-E-S-S.

16  **Q.**  Oh, okay.  Thank you.

17      Did you ever employ an individual by the name of Demetrius

18  Oliver?

19  **A.**  Yes.

20  **Q.**  And could you explain when he was employed and when he was no

21  longer employed there?

22  **A.**  He was employed, I believe, from June 29, to August 25.

23  **Q.**  And what year would this have been?

24  **A.**  2017.

25  **Q.**  Okay.  And was he ever there during the period of time that

1  the items were stored in the leased premises?

2  **A.**  No.

3  **Q.**  Not at all?

4  **A.**  Never.

5  **Q.**  All right.  How familiar are you with the contents within that

6  leased space?

7  **A.**  I'm pretty familiar.  I've seen it every day.

8  **Q.**  And would you be in a position having seen it every day to

9  determine whether or not there was any gym equipment or fitness

10  equipment located in that leased premises?

11  **A.**  I never seen any gym equipment.

12  **Q.**  If it was there, would you have seen it?

13  **A.**  Yeah, it was an open space.

14  **Q.**  Okay.

15          MR. FRIEDBERG:  Your Honor, if I could have just a

16  moment.

17          THE COURT:  You may.

18          MR. FRIEDBERG:  Thank you, Your Honor.

19  DIRECT EXAMINATION

20  BY MR. FRIEDBERG (continued):

21  **Q.**  Ms. Bezzati, what is the address of that warehouse?

22  **A.**  It was 3270 Summit Ridge Parkway.

23  **Q.**  And where is that located, in Duluth or where?

24  **A.**  Duluth.  Duluth, Georgia.

25          MR. FRIEDBERG:  All right, thank you.  And if you will

1  pull up schematic number 96, please.  Exhibit 96, excuse me.

2         I'll ask you to look at that, Ms. Bezzati, and ask you

3  if you can identify that?

4  **A.**  A lot of that stuff doesn't look real familiar, actually.

5  **Q.**  Okay.  So you're not able to identify that?

6  **A.**  No.

7  **Q.**  All right.

8         MR. FRIEDBERG:  Can you pull up the tag --

9  **Q.**  If you'll start looking at the other photographs, and I'll ask

10  you if any of that looks familiar in terms of what's contained

11  therein?

12  **A.**  No.

13  **Q.**  Okay.  Can you go through the photographs, please.  Thank you.

14     Were you there for any of the tagging done by anyone on behalf

15  of the Chrisleys?

16  **A.**  Yes, I was.

17  **Q.**  Does that accurately and truly portray what you have seen

18  before in that warehouse or were you not present?

19  **A.**  No, I was always present when someone was in the warehouse.

20  Nobody was in the warehouse unless I was there.

21  **Q.**  Okay.  Were you ever involved in terms of maybe going through

22  there to use the restroom and saw any of this furniture or

23  anything like that?

24  **A.**  There were tons of furniture there.

25  **Q.**  Okay.

```
 1  A.   So I can't remember it all, but there were tons of furniture

 2  there.

 3          MR. FRIEDBERG:   Okay.   All righty.   Excuse me one

 4  moment.

 5  DIRECT EXAMINATION

 6  BY MR. FRIEDBERG (continued):

 7  Q.   If you know, is that the manner in which the furniture was

 8  tagged?

 9  A.   Umm, yes, I remember seeing the Post-it notes on it.

10  Q.   Okay.   Thank you so much.

11      Did you ever have any knowledge of who the furniture belonged

12  to?

13  A.   I assumed it was the Chrisleys since they were leasing the

14  space.

15  Q.   Okay.

16          MR. FRIEDBERG:   Thank you very much.

17          THE COURT:   Cross-examination?

18          MS. PETERS:   Yes, Your Honor.

19  CROSS-EXAMINATION

20  By MS. PETERS:

21  Q.   Good morning, Ms. Bezzati.

22  A.   Good morning.

23  Q.   Am I pronouncing your last night right, Bezzati?

24  A.   Yes.

25  Q.   My name is Annalise Peters.   I'm the attorney for the
```

1  government.  How are you doing?

2  **A.**  Fine.

3       MS. PETERS:  Would you mind up pulling up defense

4  Exhibit No. 94.  Thank you, I appreciate that.

5  CROSS-EXAMINATION

6  BY MS. PETERS (continued):

7  **Q.**  I've got just a couple of questions.  I want to make sure I

8  understand what was where here on this chart.

9       So I guess first things first.  You said that your area was

10 Suite 110; correct?

11 **A.**  Correct.

12 **Q.**  So was Suite 100, which is over to the left here, was that a

13 different office space?

14 **A.**  It's the whole area, that whole area.  It was 40,000 square

15 feet.

16 **Q.**  So the 40,000 square feet, is it that middle -- sorry, let's

17 take a step back.

18      I see the labeling on the left that says Suite 100, and then

19 the big space says Suite 110?

20 **A.**  Correct.

21 **Q.**  Was Suite 100 also part of your space?

22 **A.**  No, no.

23 **Q.**  Okay.  And then to the right of Suite 110, it looks like there

24 is a separate 8,000-square-foot space?

25 **A.**  No, that was not my space.

1  **Q.**   Got it.  So the space that was yours is just that middle

2  section in Suite 110?

3  **A.**   It was the whole -- whole thing.

4  **Q.**   Got it.  And just to be clear, the space that the Chrisleys

5  were renting from you, was it to the right of the fencing area or

6  to the left of the fencing area?

7  **A.**   You know, I'm not really good with looking at pictures like

8  this.  I gave somebody pictures of actually the warehouse with the

9  fence up, and I can explain it a lot better to you that way on

10 whose side was what, because I get confused looking at this.

11 **Q.**   Okay, and we'll take a look at some pictures in a minute.  I'm

12 not trying to confuse you, I'm trying to understand as well.

13      The rolling gate that's marked there, was that the only way to

14 walk through the fencing space or were there other gates as well?

15 **A.**   There was two gates.

16 **Q.**   And where was the other gate?

17 **A.**   If you can pull up the other picture, I can show you, because

18 I'm note sure how this goes.  The other gate is by -- closer to

19 the dock doors, if that makes sense.

20 **Q.**   Okay.  And the loading docks, are they at the bottom of this

21 schematic?

22 **A.**   See, that's -- that's what I can't answer unless I see the

23 pictures.

24 **Q.**   Okay.  All right.  You have a binder in front of you, Ms.

25 Bezzati.  If you could open it up, and, unfortunately, it's not

1  tabbed, but towards the front there should be some photographs

2  that look like this.

3  **A.**   Yes.

4  **Q.**   Sorry for the flipping.

5  **A.**   That's all right.

6          MR. MORRIS:  We're still at 94?

7          MS. PETERS:  Yes.

8          Great, thank you.  That's been marked as Government's

9  Exhibit No. 7, and it should be -- let's see -- it should be eight

10 photographs there.  So if we could maybe go to seventh photograph

11 that looks like this one.

12         MR. MORRIS:  Is there a way to put that up?  Go ahead.

13 This is Government 7?

14         MS. PETERS:  Government 7.  If you have it handy, sure.

15 Thank you so much.

16         THE WITNESS:  Okay.

17 CROSS-EXAMINATION

18 BY MS. PETERS (continued):

19 **Q.**   All right.  Could you explain --

20         MS. PETERS:  And, actually, I'm sorry.  Could you guys

21 go back to Defense Exhibit No. 94?  I think that may be helpful to

22 have that up while we're looking at the photographs.  Thank you.

23 CROSS-EXAMINATION

24 BY MS. PETERS (continued):

25 **Q.**   All right, Ms. Bezzati, does it help at all to use this

1  photograph to sort of point out on the chart where the loading

2  docks were?

3  **A.**   Those -- those were the loading docks on the Chrisley side.

4  The outside of the fence was my side.  And if you look at that

5  picture where that fence is, you can't see the gate, but that's

6  where the gate -- other gate was.

7  **Q.**   I see.  That's where the second gate was?

8  **A.**   That was where the second gate was.

9  **Q.**   And just to be clear, I want to make sure I follow.  The

10  side -- the left side of the fence here, which is the majority of

11  this photograph --

12  **A.**   Yes.

13  **Q.**   -- is that the Chrisley space or your space?

14  **A.**   Chrisley's.

15  **Q.**   And then your space was on the -- to the right of the fence?

16  **A.**   Correct.

17  **Q.**   So is it fair to say there were two loading docks that backed

18  up to the Chrisley space?

19  **A.**   I -- yes.

20  **Q.**   Okay.

21  **A.**   Yes.

22  **Q.**   Okay.  And then if you could turn to the second photograph in

23  this exhibit, which looks like this?

24  **A.**   Yup.

25          MS. PETERS:  And if we could pull back up 94, please.

1    Thank you.

2    CROSS-EXAMINATION

3    BY MS. PETERS (continued):

4    **Q.**  All right.  Is this a fair and accurate representation of what

5    it looked like when you owned the warehouse?

6    **A.**  Yes.

7    **Q.**  All right.  And is this the -- so looking at the chart here,

8    Exhibit 94 which is on the screen, would you say that the point

9    where the fence bends in the "L" shape, is that -- if you're

10   looking at the chart on Exhibit 94 starting at the bottom where

11   the fence is on the screen -- sorry, on that one.  So starting at

12   the bottom where the fence is where it goes straight up and bends,

13   is that where -- does that reflect Exhibit Government 7, this

14   photograph?

15   **A.**  Yes, that's how the fence went.  And if you looked at the

16   other pictures, you can see when I moved out, that I took pictures

17   of exactly how it was, that long -- over here, and it went off the

18   dock.

19   **Q.**  And if you could take a look at the other photographs in there

20   and let me know if they all appear to be a fair and accurate

21   representation of the warehouse space?

22   **A.**  Right.  If you look at the one that you were just looking at,

23   you can see the two guys standing there, that's where the other

24   fence was that I opened at the end.  That's the fence I opened.

25   **Q.**  So the other fence stayed closed?

1  **A.**   Yes.

2  **Q.**   Got it.  And if you could just skim through the photographs

3  and let me know if they appear to be an accurate representation of

4  the warehouse at the time.

5  **A.**   Yes.

6        MS. PETERS:  Your Honor, I would move for Government's

7  Exhibit No. 7.

8        THE COURT:  Any objection?

9        MR. MORRIS:  No objection.

10        MR. FRIEDBERG:  No objection, Your Honor.

11        THE COURT:  It's admitted.

12        (Government's Exhibit 7 was marked in evidence as of

13  this date.)

14        THE COURT:  Just for efficiency, I'll just assume unless

15  someone pipes up otherwise, there is no objection to the admitting

16  of exhibits which is just for the purposes of the suppression

17  hearing, not for the actual trial.

18        MR. MORRIS:  Thank you.

19        THE COURT:  Okay, it's admitted.

20  CROSS-EXAMINATION

21  BY MS. PETERS (continued):

22  **Q.**   Thank you, Ms. Bezzati.  That was helpful.

23     How many employees did you have back in 2016 at this

24  warehouse?

25  **A.**   In 2016?  Two, three.

1  **Q.**  Okay.  And did those employees come in pretty much every day

2  that you were there?

3  **A.**  My employees never were in my warehouse unless I was there.

4  **Q.**  How many days a week did you go into the warehouse?

5  **A.**  They came in five days a week.  I worked whenever I needed to.

6  **Q.**  Okay.  Were there ever instances where you had, you know, you

7  were on vacations or were sick and couldn't go in but you needed

8  employees to be there to receive a delivery?

9  **A.**  It -- I -- I always arrange my stuff if I wasn't going to be

10  there, that that wouldn't happen, so...

11  **Q.**  So there was never any instance where you needed to hand off

12  the key to an employee or another person to open things up?

13  **A.**  No.

14  **Q.**  Okay.  All right.  The lease that we were taking a look at

15  earlier --

16        MS. PETERS:  If we could pull up the first page of

17  Defense Exhibit 5.

18  CROSS-EXAMINATION

19  BY MS. PETERS (continued):

20  **Q.**  All right, Ms. Bezzati, I think you testified that the

21  Chrisleys drafted this lease, is that correct, or did you put this

22  together?

23  **A.**  I believe I put that together.

24  **Q.**  Okay.  And is this similar to an agreement you used in the

25  past when you rented this space?

1  **A.**   Yes.

2  **Q.**   Who did you deal with and talk to when you were going through

3  this process with the Chrisleys?

4  **A.**   His name was Bill Rawlings, I believe.

5  **Q.**   Okay.  At some point when you were dealing with the document

6  itself, did you begin communicating directly with the Chrisleys?

7  **A.**   No, I -- I dealt with Bill.

8  **Q.**   Okay.  So you never had any conversation with the Chrisleys

9  before you -- before this was signed?

10 **A.**   No, other than to give them the keys.

11 **Q.**   And where did you meet them to give them the keys?

12 **A.**   At my warehouse.

13 **Q.**   Was that after this was signed or did you sign the lease at

14 the same time?

15 **A.**   I can't recall when it was.  I assume after they signed it.

16 **Q.**   And is it fair to say that what was being stored in the space

17 was primarily a ton of furniture?

18 **A.**   Yes.

19 **Q.**   At some point did the Chrisleys ask you to amend this lease or

20 make a different lease?

21 **A.**   Yes.

22 **Q.**   Who asked you to do that?

23 **A.**   Umm, I think -- I can't recall.  I just remember them sending

24 over another one and I signed it and they signed it, so...

25 **Q.**   So did someone else draft the second lease?

1  **A.**  I think so.  I'm not sure.  I'd have to look at it again.

2           MS. PETERS:  Can we go to page 2 of Defense Exhibit 5.

3  Thank you.

4  CROSS-EXAMINATION

5  BY MS. PETERS (continued):

6  **Q.**  Does this help refresh your memory as to who drafted it?

7  **A.**  It looks like the same lease to me as the first one just with

8  a different entity on it.

9  **Q.**  So there was no reason given to you about why they wanted to

10 change the lease?

11 **A.**  No.

12 **Q.**  Did this lease supersede the first lease?

13 **A.**  I would assume since it came afterwards.

14 **Q.**  And you don't recall having any conversations with Todd

15 Chrisley about changing the lease?

16 **A.**  No.

17 **Q.**  Do you recall having any conversations or e-mails with Julie

18 Chrisley about changing the lease?

19 **A.**  No.

20 **Q.**  Do you recall having any conversations or e-mails with

21 Elizabeth or Faye Chrisley about changing the lease?

22 **A.**  No.

23 **Q.**  All right.  If we could take a look at -- actually, Ms.

24 Bezzati, if you could take a look at Government's Exhibit 1 in the

25 binder.  I'm sorry you're flipping back and forth between the

1  screens and the binder.  It should be the first page in the

2  binder.  And are you looking at -- is it an e-mail from you to

3  Julie Chrisley?

4  **A.**  Yes.

5  **Q.**  And then if you would to flip a couple of pages it should have

6  that lease agreement, amended lease agreement attached to it.  Do

7  you see that?

8  **A.**  Um-hum.

9  **Q.**  All right.  And then if you flip one more page there should be

10 an e-mail from Julie Chrisley to you responding, saying, "Thanks

11 Patty, you're the best"?

12 **A.**  Right.

13 **Q.**  Do these appear to be e-mails -- well, do you recall these

14 e-mails and being on them, and sending and receiving them?

15 **A.**  Sure.

16         MS. PETERS:  Okay.  Your Honor, we would move for

17 admission of Government's Exhibit No. 1.

18         THE COURT:  All right.  It's admitted.

19         (Government's Exhibit 1 was marked in evidence as of

20 this date.)

21 CROSS-EXAMINATION

22 BY MS. PETERS (continued):

23 **Q.**  Did you ever communicate with Faye Chrisley or -- I know she

24 goes by Faye or Elizabeth Chrisley?

25 **A.**  No.

1  **Q.**  I think -- did you testify earlier that she was at the

2  warehouse --

3  **A.**  I seen her at the warehouse.

4  **Q.**  But you never had any conversation with her?

5  **A.**  I might have said hi to her.

6  **Q.**  Okay.  You said that when the Department of Revenue finished

7  taking things out of the warehouse that they left a mess?

8  **A.**  Yeah.

9  **Q.**  Did they leave some of the Chrisleys items behind?

10  **A.**  Yeah.  I think they left, like, some beds, they left some

11  chairs -- you should have pictures of it.  I believe I took a few

12  pictures of what was left behind.

13  **Q.**  Okay.  Did they take the vast majority of what was there,

14  though?

15  **A.**  Yes.

16  **Q.**  How many times do you recall seeing Todd Chrisley at the

17  warehouse?

18  **A.**  Maybe twice.

19  **Q.**  How about Julie?

20  **A.**  Probably the same.

21  **Q.**  And how about Faye Chrisley?

22  **A.**  Once.

23  **Q.**  And you -- just to be clear, you don't remember ever having

24  any specific conversation at all on the phone with Todd Chrisley?

25  **A.**  In reference to?

1  **Q.**  At all.  About anything.  Did you ever have phone conversation

2  with Todd Chrisley?

3  **A.**  Yes, I have.

4  **Q.**  What were they about?

5  **A.**  I -- I mean, if -- if it's pertaining to this, I was calling

6  him trying to get in touch with him when they were in my

7  warehouse.  He had not had his key on him one time and the door

8  got shut and he got locked in there.  Yeah, they were just

9  conversations about, you know, people trying to contact me and

10 stuff like that.

11 **Q.**  Okay.  And did you have phone conversations with Julie

12 Chrisley as well?

13 **A.**  A few times.

14 **Q.**  Was that about the same types of things?

15 **A.**  Yes.

16 **Q.**  You have no -- no recollection at all of ever being contacted

17 or given a reason why they wanted to change the lease?

18 **A.**  No.

19 **Q.**  Okay.

20         MS. PETERS:  Nothing further.  Thank you.

21         THE COURT:  Any redirect --

22         MR. MORRIS:  May I ask a few questions, Your Honor?

23         THE COURT:  Sure.

24 REDIRECT-EXAMINATION

25 BY MR. MORRIS:

1  **Q.**  Hi, Ms. Bezzati.

2  **A.**  Hi.

3  **Q.**  If you could again loudly, because I couldn't hear you, could

4  you give me the address of the warehouse where the Chrisley

5  furniture was stored?

6  **A.**  3270 Summer Ridge Parkway in Duluth, Georgia.

7  **Q.**  Okay.  And when we look at Government's Exhibit No. 7, those

8  photographs you were looking at the inside of the warehouse --

9  **A.**  Okay.

10  **Q.**  -- these photos, are these taken after the Chrisleys' property

11  has been removed, that is, at some later date?

12  **A.**  No, no, this is way before.

13  **Q.**  This is before?

14  **A.**  Way before.  That's when I first moved in.

15  **Q.**  Okay.  So this doesn't show the Chrisleys' furniture?

16  **A.**  No.

17  **Q.**  But you see the fence when you talk about the eight-foot

18  fence?

19  **A.**  Um-hum.

20  **Q.**  Is that the fence that the Chrisley furniture was inside of?

21  **A.**  On the other side of that.

22  **Q.**  Okay.  But inside the fence?

23  **A.**  Inside the fence.

24  **Q.**  Fenced in?

25  **A.**  Fenced in.

1  **Q.**  Not available to anybody without either climbing the fence or

2  having permission to go through the gate?

3  **A.**  Well, there would be no reason to climb the fence if I was

4  there working because I had the gate open, and nobody else had a

5  key except them and myself.

6  **Q.**  Okay.  The picture of the loading dock, please, ma'am.  I

7  don't know which one it is.  Again, it's part of number seven.  It

8  looks like this.

9  **A.**  Oh, that one?  Yeah.

10  **Q.**  Is that the outside of the loading dock outside of the

11  warehouse?

12  **A.**  Yeah, that's not my -- that's not my space.  That was somebody

13  else's.

14  **Q.**  That is somebody else's?  Okay.

15  **A.**  Yeah.

16  **Q.**  So then let's look at the one that is your space.  Is this the

17  one where you're looking at the inside?

18  **A.**  Yeah.

19  **Q.**  That's your space?

20  **A.**  Yeah.

21  **Q.**  Okay.  And I say your space, this is the space that you could

22  gain entry into your warehouse and ultimately into where the

23  Chrisley furniture was?

24  **A.**  That is the space where the Chrisley furniture was.  My dock

25  doors were on the other side.  You can actually see one of the

1    dock doors open on that side.  That was my side.

2    **Q.**  Okay.  Are those loading dock doors left open for anyone to

3    walk in?

4    **A.**  No.

5    **Q.**  They are always closed?

6    **A.**  100 percent closed.

7    **Q.**  And is that for purposes for securing of what is inside it?

8    **A.**  Absolutely.

9    **Q.**  Okay.  On the day that these folks came to pick up the

10   furniture, I think you described a woman and a man named Josh, was

11   the place open for them to just walk into?

12   **A.**  No.  If you look at -- if you look at that photo that had that

13   loading dock.

14   **Q.**  The photo that has the loading dock that's not yours?

15   **A.**  Correct.

16   **Q.**  Okay.

17   **A.**  That's the door.  You see that door right there?

18   **Q.**  Yes.

19   **A.**  That's the only way any could gain access into my warehouse,

20   and that's the door they came through.

21   **Q.**  They came in that door?

22   **A.**  Correct.

23   **Q.**  Okay.  Otherwise, was there any access to your warehouse and

24   the Chrisley space without a key?

25   **A.**  No, there wasn't.

1    Q.  Okay.

2              MR. MORRIS:  Thank you.

3              THE WITNESS:  Um-hum.

4              THE COURT:  Ms. Bezzati, you may step down.  Thank you

5    very much.  Any objections to excusing this witness?

6              MR. FRIEDBERG:  Not at all, Your Honor.

7              THE COURT:  You're excused.  You may go about your day.

8              Mr. Friedberg, do you have y'all have one more witness,

9    is that right, on the issue of standing?  Is that correct?

10             MR. MORRIS:  If we could have a quick comfort break,

11   we'll discuss whether we need the next witness or not.

12             THE COURT:  Okay, very good.  We'll take a ten-minute

13   break.

14             (Whereupon, a break was taken.)

15             THE COURT:  All right.  Where do we stand on the

16   standing issue?

17             MR. MORRIS:  Pardon the pun.  We stand firmly and have

18   completed our presentation on the evidence on the standing, Your

19   Honor.

20             THE COURT:  I did not intend the pun, but I'll take

21   credit for the cleverness.

22             MR. MORRIS:  I assume we'll address the issue further in

23   briefs, Your Honor.

24             THE COURT:  Well, let me ask.  Do y'all have any

25   witnesses on this issue?

1          MR. KREPP:  No, Your Honor.

2          THE COURT:  My inclination is to argue this in briefs

3   later on with everything else.  I know we had talked about before

4   the possibility of getting a ruling on this before we know we have

5   to get into the rest.  I'm not inclined to do that for all the

6   reasons I've explained before when we've spoken, but, you know, I

7   think while I'm not making a final ruling by any means here, I

8   need to look at the cases and the briefs, I think.  There is

9   certainly sufficient evidence that I can't say that there's

10  clearly a lacking of standing such that it would be futile to keep

11  going.

12         So I think in the interest of efficiency and because I

13  don't have authority to rule definitively anyway on this issue, I

14  would be inclined to go forward.

15         So I don't know if you were wanting to be heard on the

16  legal issues at this point?  You're shaking your head, so we'll

17  just go forward then on the main issues.

18         MR. KREPP:  We agree, Your Honor.

19         THE COURT:  All right, all right.  So then you may call

20  your next witness on that issue.

21         MR. KREPP:  Thank you, Your Honor.  Your Honor, the

22  government calls FBI Special Agent Steve Ryskoski.

23         THE COURT:  Let me just state for the record, while --

24  Mr. Ryskoski, while you take the stand, and I know counsel knows

25  this, but, you know, I was an Assistant U.S. Attorney for many

1   years.  I've been on the bench for nine years almost, and before

2   that was an Assistant U.S. Attorney many years in the fraud

3   section of the U.S. Attorney's Office.  So I, obviously, am not

4   familiar with this case because I've been away from the office for

5   nine years, but I did have other unrelated cases with both Agent

6   Ryskoski and Agent Cromer, who is in the back here, and I just

7   want to make sure that that was known.  And I think counsel

8   understands that, but that was known.  So I've worked with both of

9   these agents before many years ago on other unrelated cases when I

10  was an Assistant U.S. Attorney.  So that to me does not raise any

11  issues of requiring recusal or conflict of interest or anything of

12  that sort, but I wanted to make sure at least that was known.

13          MR. KREPP:  Thank you, Your Honor.

14          THE COURT:  All right.

15          MR. MORRIS:  I ask that you don't hold it against him

16  any bad experiences you had with him.

17          THE COURT:  Very good.

18          THE DEPUTY CLERK:  Please raise your right hand.

19          You do solemnly swear or affirm that the statements that

20  you're about to make in this case now pending before the court,

21  are the truth, the whole truth, and nothing but the truth?

22          THE WITNESS:  I do.

23          THE DEPUTY CLERK:  Thank you.  Could you please state

24  and spell your full name for the record.

25          THE WITNESS:  Yes.  So my first name is Stephen,

1   S-T-E-P-H-E-N, last name Ryskoski, R-Y-S-K-O-S-K-I.

2              THE DEPUTY CLERK:  Thank you.

3                         ******

4                    STEPHEN RYSKOSKI,

5          having been duly sworn, testified as follows:

6                         ******

7   DIRECT EXAMINATION

8   BY MR. KREPP:

9   **Q.**  Good morning, sir.

10  **A.**  Good morning.

11  **Q.**  Would you please tell us how you're employed?

12  **A.**  I'm a special agent with the FBI.

13  **Q.**  And how long have you been an FBI special agent?

14  **A.**  Just over 11 years.

15  **Q.**  Are you assigned to a particular squad?

16  **A.**  Yes.  I work on the Complex Financial Crime Squad.

17  **Q.**  And what are your duties and responsibilities as an FBI

18  special agent?

19  **A.**  So investigating financial crime-type cases, wire fraud, mail

20  fraud, investment schemes, mortgage fraud, that sort of thing.

21  **Q.**  And can you briefly go through your educational background?

22  **A.**  Yes.  I attended college in Wisconsin.  After college, I

23  worked in public accounting.  I received the -- I passed the CPA

24  exam, and then after that I joined the FBI.

25  **Q.**  All right.  And can you briefly go through any training you've

1  had that's relevant to your current duties?

2  **A.**   Yes.  I spent five months in Quantico, Virginia training to be

3  an FBI special agent.

4  **Q.**   All right.  Can you estimate how many physical -- meaning, not

5  e-mail or electronic, but how many physical fraud-related search

6  warrants have you executed during the course of your career?

7  **A.**   I'd say a minimum of 25.

8  **Q.**   And when executing a search warrant involving physical

9  evidence, have you ever used a moving company such as Two Men and

10 a Truck?

11 **A.**   Never.

12 **Q.**   Why not?

13 **A.**   Part of the -- when you're gaining evidence for a case, a big

14 part of that is chain of custody and maintaining that chain of

15 custody.  Therefore, we wouldn't use any outside -- Two Men and a

16 Truck to move any type of items that we believe are evidence.

17 **Q.**   All right.  And are you one of the case -- the FBI case agents

18 assigned to the matter before the court today?

19 **A.**   Yes, I am.

20 **Q.**   Is Agent Chip Cromer the other FBI agent on the case?

21 **A.**   Yes, he is.

22 **Q.**   All right.  Now, are you aware broadly of the general nature

23 of the allegations that have been made by the Chrisley defendants

24 in their motion to suppress evidence?

25 **A.**   Yes.

1  **Q.**  All right.  Can you tell us in 2017, did you personally or to

2  your knowledge Agent Cromer, instruct the Georgia Department of

3  Revenue to seize materials from Printer & Parts Warehouse?

4  **A.**  No.

5  **Q.**  And, to your knowledge, did anybody from the FBI instruct the

6  Department of Revenue to seize those materials?

7  **A.**  No.

8  **Q.**  Were you involved in any way in going to the Printer & Parts

9  Warehouse and deciding what to take in 2017?

10  **A.**  No.

11  **Q.**  To your knowledge, was Agent Cromer or anyone else from the

12  FBI involved in going to the Printer & Parts Warehouse, again, in

13  2017 to seize those materials?

14  **A.**  No.

15  **Q.**  And just so we're clear, do you have any personal knowledge,

16  meaning, not based on witness interviews or what you've learned

17  during the investigation, did you have any personal knowledge of

18  what Georgia Department of Revenue's motive was in taking those

19  items?

20  **A.**  No.

21  **Q.**  Now, during the course of your investigation, did you take

22  part in the execution of two federal search warrants at the

23  Georgia Department of Revenue?

24  **A.**  Yes.

25  **Q.**  And was that for materials that we're here about today?

**A.**   Yes.

**Q.**   Do you recall about when this was?

**A.**   February of 2018.

**Q.**   All right.  Why were there two different search warrants?

**A.**   There was one location at Century Center.  So that was location one.  Location two was a warehouse I think operated by Georgia Department of Revenue in southwest Atlanta.

**Q.**   Again, not the Printer & Parts Warehouse?

**A.**   Correct.

**Q.**   Which was something that was either leased or owned by the Georgia Department of Revenue?

**A.**   Correct.

**Q.**   And what's at Century Center?

**A.**   Century Center, I mean, that's where the Georgia Department of Revenue operated out of.

**Q.**   Georgia Department of Revenue, one of their main offices; is that right?

**A.**   Yes.

**Q.**   Let's talk about the Century Center location.  Again, just broadly speaking, what did you seize from that location?

**A.**   So from that location there was approximately, I'd estimate, about 20 Bankers Boxes of financial and business records that we seized.

**Q.**   And that was pursuant to the search warrants authorized by Judge Salinas?

1  **A.**  Correct.

2  **Q.**  And let's talk about the second location.  What did you seize

3  from the second location?

4  **A.**  The second location I believe it was just one box of business

5  or financial records and a thumb drive.

6  **Q.**  All right.  So if I'm hearing you correctly, so roughly, 20 or

7  21 boxes from different locations?

8  **A.**  Boxes, yes.  I mean, there were some other -- like a thumb

9  drive, that sort of thing, that are separate from the boxes,

10  correct.

11  **Q.**  Can you describe for Judge Anand the second location, was it

12  just boxes of documents that were there?

13  **A.**  No.  So walking into that warehouse, it was just -- all I

14  could see was furniture.  So when you walked in -- I mean, there

15  was a -- it was more than a walking path, but it was a path to

16  kind of walk through all of the furniture, but as you walk through

17  it's just furniture stacked on top of each other, you know, in

18  some cases six feet high of all of the different furniture of --

19  dozen of chairs, lamps, end tables, coffee tables, pots, pans,

20  dishes, pillows, books, rugs.  Just -- it looked like stuff you

21  take out of a normal, you know, in this case multiple normal

22  houses and moved it all into a warehouse.

23  **Q.**  All right.  In your experience as an FBI agent, are these

24  materials, the end tables, pots, pans, dishes, are those materials

25  you would generally seize for development in a fraud

1  investigation?

2  **A.**   No.

3  **Q.**   All right.   Can you estimate what proportion of the materials

4  that you saw in Georgia Department of Revenue's total possession,

5  meaning, the two different locations, what proportion are we

6  talking about that was the furniture, the dishes, the end tables,

7  and what proportion are these boxes or materials you ultimately

8  wound up seizing?

9  **A.**   I mean, I'd estimate at a minimum it was over 90 percent

10  furniture, household items, that sort of thing, what I saw between

11  the two locations.

12         MR. KREPP:   Thank you.   Just one moment, Your Honor.

13  That's all I have, Your Honor.   Thanks, Agent Ryskoski.

14  CROSS-EXAMINATION

15  BY MR. MORRIS:

16  **Q.**   Hello, Agent Ryskoski.   How are you?

17  **A.**   Good morning.

18  **Q.**   Good morning to you.

19      Just to get dates down to make sure we're talking about the

20  same thing, what day was the federal search warrant executed at

21  Century Boulevard?

22  **A.**   The exact -- I believe it was February 2018.   I'm not sure of

23  the exact date.

24  **Q.**   Okay.   If I told you on or about February 7, would that sound

25  about right to you?

1   **A.**   It sounds generally about right.

2   **Q.**   Okay.  When you went to Century Center, I think you've

3   described there were some 20 boxes or so of -- excuse me, Bankers

4   Boxes with business records, business and financial records; is

5   that correct?

6   **A.**   Correct.

7   **Q.**   Was there anything else there that is allegedly property of

8   the Chrisleys?

9   **A.**   Umm, after the fact, I mean not that day, but I was aware of

10  other property that was at that location.

11  **Q.**   All right.  Well, could you tell us what it is since we're

12  moving to suppress it all?

13  **A.**   At a later date, not that day, I went to the basement of

14  Georgia Department of Revenue at Century Center and there was a

15  section of -- I'd say mostly exercise equipment that Georgia

16  Department of Revenue had in the basement of their facility.

17  **Q.**   Anything else?

18  **A.**   Other than the boxes and the exercise equipment at that

19  Century Center, no.

20  **Q.**   Okay.  And the boxes that we're discussing, are those the same

21  boxes that you were kind enough to show us at the FBI building

22  some time later?

23  **A.**   Correct.

24  **Q.**   No additions, no deletions?

25  **A.**   No.

1  **Q.**   Okay.  No, I'm correct?

2  **A.**   Yes, you are correct.  Same boxes.

3  **Q.**   Okay.  Do you know other than having picked up those boxes at

4  1800 Century Center, do you know where they were taken from to be

5  put there, of your own personal knowledge?

6  **A.**   No.  All I know is we picked up the boxes at the Century

7  Center.

8  **Q.**   Okay.  You don't know -- you don't have any personal knowledge

9  of where they came from?

10  **A.**   Personal knowledge, no.

11  **Q.**   Okay.  I know it's been reported to you --

12  **A.**   Yeah, I understand.

13  **Q.**   -- I'm just asking personal -- okay.

14      The furniture, do you have any personal knowledge of where

15  that came from?

16  **A.**   No.

17  **Q.**   Okay.  The box of documents from the warehouse that was not at

18  Century Center, was that a box of financial documents?

19  **A.**   Financial or business records, yes.

20  **Q.**   Is -- is that box also at FBI headquarters with the other

21  boxes that you were kind enough to allow me to visit?

22  **A.**   That's correct.

23  **Q.**   Okay.  And is it -- can you distinguish it from the ones that

24  came from 1800 Century Center?

25  **A.**   Yes.

**Q.**  Okay.  Do you know where that box came from, where it was taken from?

**A.**  No.  No, no personal knowledge.

**Q.**  Okay.  Do you have any knowledge of why that one box is at the warehouse with the furniture and all the other boxes are at 1800 Century Center?

**A.**  No, I do not.

**Q.**  Do you know who made that decision?

**A.**  No, I do not.

**Q.**  Not even firsthand have you been told who made the decision of what went to Century Center and what went to the warehouse?

**A.**  No.

**Q.**  Okay.  The boxes of documents at 1800 Century Center, those -- strike that.

When you arrived to execute the warrant at Century Center, was agent -- IRS Special Agent Larry Arrow already there?

**A.**  I do not recall.

**Q.**  Am I correct or incorrect, if you know, that the documents were first provided by the Georgia Department of Revenue people to Agent Arrow before they were given by Agent Arrow to the IRS?

**A.**  Can you say that again?  I'm sorry.

**Q.**  I'll restate it and make it easier.

Your chain of custody, do you consider that you obtained the boxes of documents from Agent Arrow or from the Georgia Department of Revenue?

**A.**   So the IRS executed the search warrant, and then chain of
custody was given to us, whether Larry Arrow was the IRS agent
signing custody over, I do not know.  But it was IRS.

**Q.**   Okay.  So to get this straight, you technically did not
execute the search warrant, the FBI?

**A.**   The IRS did, but we were present, correct.

**Q.**   Who was there from the IRS?

**A.**   I -- I couldn't tell you all the names.

**Q.**   Was Mr. Arrow there?

**A.**   Yes.

**Q.**   Okay.  Okay.  Okay.  The documents --

          MR. MORRIS:  If I can have just one moment, I think that
may be it.

               That's all I have.  Thank you very much.

          MR. KREPP:  No redirect, Your Honor.

          THE COURT:  All right, Mr. Ryskoski, you may step down.
You can call your next witness.

          MR. KREPP:  Thank you.  The government calls Katie
Vancil.

               Just so the court knows, this is Alex Sponseller from
the Georgia Attorney General's Office.  He's representing all the
Georgia Department of Revenue witnesses who will be here today.

               To the extent there is an issue that comes up or he
needs to object based on any state privilege, he asked me ahead of
time to let the court know that's who he is.

```
 1              THE COURT:  Very good.  Thank you very much.

 2              What is your name, sir?

 3              MR. SPONSELLER:  Alex Sponseller.

 4              THE COURT:  Alex Sponseller.  Very good.

 5              THE DEPUTY CLERK:  Please stand and raise your right

 6    hand.

 7              You do solemnly swear or affirm that the statements that

 8    you're about to make in this case now pending before the court,

 9    are the truth, the whole truth and nothing but the truth?

10              THE WITNESS:  Yes, Kathleen Melissa Vancil.

11              THE DEPUTY CLERK:  Can you spell it, please?

12              THE WITNESS:  K-A-T-H-L-E-E-N, M-E-L-I-S-S-A,

13    V-A-N-C-I-L.

14              THE DEPUTY CLERK:  Thank you.

15              THE COURT:  Ms. Vancil, you may have a seat.

16              The rule we're applying here is if you've been fully

17    vaccinated, meaning, you know, a sufficient amount of time after

18    the last shot, then you may, if you wish, take your mask off to

19    testify.  Otherwise, I ask you to keep it up.

20              THE WITNESS:  I have not been vaccinated.

21              THE COURT:  Very good.

22              MR. KREPP:  As the court knows, I'm keeping mine on.

23    I'm supposed to have my second one tomorrow.  Just so the court

24    knows.

25              THE COURT:  Very good.  Even if you've been -- I
```

1   emphasize, it's still a choice.  I was making no conclusions as to

2   your status otherwise.

3                              ******

4                      KATHLEEN MELISSA VANCIL,

5            having been duly sworn, testified as follows:

6                              ******

7   DIRECT EXAMINATION

8   BY MR. KREPP:

9   **Q.**  Good morning, ma'am.  It's been a while since we've seen each

10  other, and I know we've talked on the phone a bunch, but I'm Tommy

11  Krepp.  I'm one of the prosecutors on the case.

12      Could you please tell the court how you're employed?

13  **A.**  With the Georgia Department of Revenue.

14  **Q.**  All right.  And we talked about this ahead of time, it's my

15  understanding you just had a baby; right?

16  **A.**  Yes, three weeks ago.

17  **Q.**  All right.  Congratulations.

18  **A.**  Thank you.

19  **Q.**  Boy or girl?

20  **A.**  Girl.

21  **Q.**  We talked to the court ahead of time, and I think it's our

22  understanding that if you need to step out for any reason

23  whatsoever, just let us know.  All right?

24  **A.**  Thank you.

25  **Q.**  So could you please let us know, do you work for a specific

1  division within the Georgia Department of Revenue?

2  **A.**   The Compliance Division.

3  **Q.**   What does the Compliance Division do?

4  **A.**   We collect back taxes that are owed for individuals, income

5  tax, business, corporate, sales tax and withholding.

6  **Q.**   And how long have you worked for the Georgia Department of

7  Revenue?

8  **A.**   Ten years.

9  **Q.**   Have you always worked for the Compliance Division?

10 **A.**   Yes.

11 **Q.**   What's your current title?

12 **A.**   Financial examiner.

13 **Q.**   All right.  Have you always had the same title?

14 **A.**   No.

15 **Q.**   All right.  So walking back chronologically from when you were

16 first hired, could you tell the court what your various titles

17 were at the Georgia Department of Revenue?

18 **A.**   I started as a Revenue Agent I and worked up through II and

19 III, which were promotions.  Then we were changed over to legal

20 analyst specialists and then financial examiner.

21          MR. MORRIS:  I'm sorry, what was the final one?

22          THE WITNESS:  Financial examiner.

23 DIRECT EXAMINATION

24 BY MR. KREPP (continued):

25 **Q.**   And that brings us up to date today; is that right?

**A.**   Yes.

**Q.**   What are your duties and responsibilities as a financial examiner?

**A.**   I collect taxes that are owed.  I also work with offers in compromises, payment plans, I help with bankruptcies, and assist taxpayers.

**Q.**   All right.  So most of my questions are going to be about the 2016 to 2017 time frame.  All right?  Can you please tell us your title during that time frame?

**A.**   Legal analyst specialist.

**Q.**   Were your duties and responsibilities roughly the same then as they are now?

**A.**   Yes.

**Q.**   All right.  Are you currently a law enforcement officer?

**A.**   No.

**Q.**   Have you ever been a law enforcement officer?

**A.**   No.

**Q.**   Do you have the authority to conduct search and arrest warrants?

**A.**   No.

**Q.**   Are you familiar with the part of the Department of Revenue called the Office of Special Investigations?

**A.**   Yes.

**Q.**   Or is the acronym OSI?

**A.**   Yes.

1  **Q.**  So what is the Office of Special Investigations?

2  **A.**  They're our Criminal Division.

3  **Q.**  And what are they responsible for?

4  **A.**  They bring criminal charges against people who have not paid

5  their taxes or have other fraudulent activities against the

6  department.

7  **Q.**  All right.  And there is a binder right there.  What we're

8  going to do, if you could flip it open and let's go to the very

9  last page, actually.

10         MR. KREPP:  And I apologize, Your Honor, that these are

11  not tabbed.  And Your Honor I'm going to move for the admission of

12  Government Exhibit 237, which is an organizational chart of the

13  Georgia Department of Revenue.

14         THE COURT:  It's admitted.

15         MR. MORRIS:  That's not what I have as 237, but okay.

16         MS. PETERS:  Here.

17         (Government's Exhibit 237 was marked in evidence as of

18  this date.)

19  **Q.**  Just so we can help the court understand how the hierarchy

20  works.  So if you look here, the commissioner -- and this is

21  the -- date here is January 1, 2017; is that correct?

22  **A.**  Yes.

23  **Q.**  All right.  So let's make sure we understand here, can you

24  walk the court through where you fit in in this organizational

25  chart?

**A.**   I am under Carleton Askew over here on the left.

**Q.**   Okay.  All right and what was -- that's the furthest blue box
on the left; right?

**A.**   Yes.

**Q.**   Okay.  And Carleton Askew at the time was Director of
Compliance?

**A.**   Yes.

**Q.**   Was there a deputy director or assistant director at that
time?

**A.**   Yes.

**Q.**   Do you remember who that was?

**A.**   Scott Purvis.

**Q.**   Scott Purvis.  Okay.  All right.  So where is the Office of
Special Investigations compared to where you are?

**A.**   They're in the middle section under Josh Waites.

**Q.**   At the time was Josh Waites the Director of the Office of
Special Investigations?

**A.**   Yes.

**Q.**   All right.  Thank you.  So now as part of your duties with the
Compliance Division, were you at one point assigned to collect
state taxes from the defendants Todd and Julie Chrisley?

**A.**   Yes.

**Q.**   All right.  We're going to talk about your assignment and
steps you took during the collection process in a bit.  But first
I want to take a step back and just talk about state taxes and the

1 | collection process in general.  Okay?

2 | **A.**  Okay.

3 | **Q.**  All right.  So can you -- first, just give the court some idea

4 | of the types of -- the ways that different cases are assigned to

5 | you.

6 | **A.**  Umm, excuse me, you can be assigned a case through our system,

7 | our tax system that holds all of the accounts and all of the

8 | information about taxpayers, through your own research through

9 | that system.  We have a "get next" task button that you can click

10 | that will assign a case to you.  Sometimes managers will give you

11 | cases or other offices, other regional offices will call and ask

12 | for assistance on cases.

13 | **Q.**  So let's talk a little bit about steps that you within the

14 | Compliance Division might take when dealing with individuals who

15 | have failed to file state income taxes, right, or I should say,

16 | state income tax occurrence.  Let's take a hypothetical taxpayer

17 | who has failed to filed.  What steps can the department take to

18 | file taxes even though there are no tax returns on file?

19 | **A.**  There's a couple of different ways that they would be assessed

20 | a tax amount.  One is through our audit department, which is an

21 | auditor would look through, sometimes our system will take the

22 | information that has been given to us through our data warehouse

23 | and create a tax return, and then there are other times where

24 | agents like I will gather information and pass that onto audit to

25 | look at the financial information to create a tax return.

1  **Q.**  Okay.  And then a tax return is created even though the

2  taxpayer didn't create it themselves?

3  **A.**  Yes.

4  **Q.**  Am I reading it correctly?

5  **A.**  Yes.

6  **Q.**  All right.  Are you familiar with the term assessments?

7  **A.**  Yes.

8  **Q.**  What does that mean?

9  **A.**  That's where we tell the taxpayer this is the tax balance we

10  think is due based on financial information and deductions that

11  we've allowed.

12  **Q.**  So the department might have ways for reviewing financial

13  records to determine what a valid tax due and owing is for a

14  particular taxpayer; is that right?

15  **A.**  Yes.

16  **Q.**  Are you familiar with the term levy?

17  **A.**  Yes.

18  **Q.**  What is a levy?

19  **A.**  There's a couple of different types of levies.  There is a

20  financial levy where we would send a document, a levy document to

21  a bank, a financial institution, a bank, something like that, and

22  request up to the balance that's owed to be turned over to the

23  state to pay the tax balance.  We can levy on objects, like a car,

24  a house, furniture, physical objects that we would later on

25  auction off and take that money and apply it to the tax balances

1   owed.

2   **Q.**  All right.  So you took the words right out of my mouth.  So

3   the purpose of a levy, just to summarize, when the department

4   levies, whether it's a bank account or physical item, what is the

5   purpose of that levy?

6   **A.**  It's to pay the tax balance that is owed to get -- financial

7   money to get you to pay the tax balance.

8   **Q.**  All right.  So we've talked about assessments, we've talked

9   about levy, are you familiar with the term jeopardy assessment?

10  **A.**  Yes.

11  **Q.**  What is a jeopardy assessment?

12  **A.**  A jeopardy assessment is where we believe the taxpayer is

13  either hiding their money from the state or is planning to leave

14  the state altogether where we have no financial ability to collect

15  on them.

16  **Q.**  Okay.  And how is a jeopardy assessment filed against an

17  individual who fails to file Georgia State income tax returns?

18  **A.**  We file a tax lien in the courthouse.

19  **Q.**  Which courthouse would you go to?

20  **A.**  Whatever -- whatever county they're in or we believe that

21  they're in.  But once the levy -- I'm sorry, a lien has been

22  filed, we can -- basically it starts the process where we can

23  enforce against them.

24  **Q.**  Enforce, meaning you can start taking things?

25  **A.**  Taking things, yes.  The county only matters if it's a piece

1   of property, a house.

2   **Q.**   Okay.   The county, you mean where it's filed; is that right?

3   **A.**   Yes.

4   **Q.**   So do you -- in the course of your duties, do you regularly

5   interact with the Office of Special Investigations?

6   **A.**   Yes.

7   **Q.**   All right.   And every now and then we'll -- you help OSI or

8   the Office of Special Investigations with criminal investigations?

9   **A.**   Yes, I did.

10  **Q.**   And vice versa, you'll reach out to the Office of Special

11  Investigations at times for assistance in finding -- finding

12  defendants, let's say, of where they might be located?

13  **A.**   Yes.

14  **Q.**   All right.   And is that true even if a case is not going to be

15  prosecuted criminally?

16  **A.**   Yes.

17  **Q.**   All right.   Let's turn now to the defendants.   Again, you were

18  assigned at one point to collect taxes from the defendants; is

19  that right?

20  **A.**   Yes.

21  **Q.**   All right.   How did the Chrisley defendants -- I'll refer to

22  them as the Chrisley defendants, but you understand who I'm

23  talking about, right, Todd and Julie Chrisley?

24  **A.**   Yes.

25  **Q.**   How did they first come to your attention?

**A.**  Back in 2014 Josh Waites came to me and said to me that he had found some people that had not filed taxes and asked me to look into the account to see if it was a valid claim.

**Q.**  All right.  Did Josh Waites tell you why he was -- how he had found the Chrisley defendants or how they came to his attention?

**A.**  I think at the time they had filed bankruptcy, and that's how they found out about it through the bankruptcy information.

**Q.**  And what steps did you take?  Did you conduct a preliminary investigation, did you open it up?  Tell the court what you did back in 2014.

**A.**  I opened up their accounts to see that they had not filed in quite some time.  I researched through our data warehouse system to see if there had been income reported to the state, and I looked into their bankruptcy documents through PACER to see where -- at what stage they were at in their bankruptcy.

**Q.**  All right.  What is data warehouse?

**A.**  It's a -- it's within our ITS, our GENTX system.  It pulls all of the financial information that's been reported to us through banks, IRS, 1099s, W-2s.

**Q.**  So is something that you routinely use in the Compliance Division?

**A.**  Every day.

**Q.**  All right.  And is that true whether it's a criminal case or a civil case?

**A.**  Yes.

1  **Q.**  So what did you -- what did you find in 2014?

2  **A.**  I found there was little income at the time.  There was a

3  little bit, but since they were in bankruptcy, we would have to

4  file motions in the bankruptcy.  It would be a very arduous

5  process to go through, and, typically, we trust that the trustee

6  will come to us if they need something like that or to file

7  motions on that.  So my suggestions in 2014 is that we not pursue

8  it at the time and wait for them to be out of bankruptcy to see

9  how the bankruptcy settled.

10  **Q.**  What impact, let's say, would a bankruptcy, whether it's

11  Chapter 7 or Chapter 11, what impact would the bankruptcy

12  proceeding have on Georgia Department of Revenue's ability to

13  collect delinquent taxes?

14  **A.**  None, because they didn't file.

15  **Q.**  I'm talking broadly.

16  **A.**  Oh, broadly.

17  **Q.**  Yes.

18  **A.**  It would have stuck.  While they're in bankruptcy there's an

19  automatic stay.  So we can't collect or enforce against anyone

20  while they're in bankruptcy.

21  **Q.**  All right.  So did you close your investigation back in 2014?

22  **A.**  Yes.

23  **Q.**  And do you call them investigations or --

24  **A.**  Research.  Just my research.

25  **Q.**  All right.  Now, did there come a time again where the

1  Chrisleys were again assigned to you?

2  **A.**   Yes.

3  **Q.**   Can you tell us about that?

4  **A.**   It was in 2016 after their bankruptcy had been discharged.

5  **Q.**   And what happened?

6  **A.**   Josh came again and said their bankruptcy had been discharged

7  and had -- asked me to look at it again to see what, if any, taxes

8  would be due.

9  **Q.**   Okay.  And would Josh at times come to you with requests like

10 this?

11 **A.**   Yes.

12 **Q.**   And would that necessary mean that the case was going to be

13 brought criminally?

14 **A.**   No.

15 **Q.**   All right.  Now, do you recall if there was a meeting in 2016

16 about the Chrisley defendants?

17 **A.**   Yes.  We had a large meeting with a lot of the managers at the

18 time about whether or not we wanted to pursue this case.

19 **Q.**   All right.  And who was at that first meeting?

20 **A.**   Merrill Jacobson, Josh Waites, Staci Guest, Carleton Askew,

21 and I think Chester Cook.

22 **Q.**   Okay.  Let's take them in order so the court knows who we're

23 talking about.  Josh Waites was there?

24 **A.**   Yes.

25 **Q.**   We talked about him already.  He's the director of the Office

1  of Special Investigations; is that right?

2  **A.**  Yes.

3  **Q.**  Who is Merrill Jacobson?

4  **A.**  At the time I think he was counsel, general counsel for the

5  Compliance Division.

6  **Q.**  All right.  And you said Carleton Askew was there?

7  **A.**  Carleton Askew, yes.

8  **Q.**  All right, he was your Director of Compliance?

9  **A.**  Yes.

10  **Q.**  Who else was there at that meeting?

11  **A.**  Chester Cook who is the Director of Audits.

12  **Q.**  Director of Audits.  All right.  And was there a decision made

13  about what the department was going to do and who was going to

14  take the lead moving forward?

15  **A.**  Yes.  We decided that we were going to pursue due to financial

16  information we had, that Audit was going to take over and do

17  the -- audit the tax returns and create the tax assessment based

18  off the financial information I had found.  I think it was

19  assigned -- it was assigned to Rufus Payne.

20  **Q.**  I'll just stop you right there.  Where did Rufus Payne work at

21  the time?

22  **A.**  Audit.

23  **Q.**  Not the Office of Special Investigations?

24  **A.**  No.

25  **Q.**  And what was Rufus Payne's role?

**A.**   At the time -- I know he's an auditor.  I don't know if he was

a supervisor at the time.  He is now.

**Q.**   And what was his role with respect to the Chrisley defendants?

**A.**   Just to audit the tax returns to create the assessments.

**Q.**   To create the assessments?

**A.**   Yes.

**Q.**   Because there were no tax returns that had been filed; right?

**A.**   Correct.

**Q.**   So did you -- what type of steps -- did you work with Rufus

Payne to determine whether or not assessments were proper?

**A.**   We shared information, yes.

**Q.**   Okay.  And what types of steps did you and to your knowledge

Rufus Payne take to create these assessments?

**A.**   He took my evaluation of what the income would have been for

each year.

          MR. MORRIS:  Excuse me, Your Honor, with the greatest

respect, the government conceded at the time of the pretrial

conference that they would not contest the legality of the levies

and assessments.  So I don't know why we're going into this.

          MR. KREPP:  I think this is background.  This is all

part of the motion, Your Honor.  We're trying to explain how it is

this witness was assigned to the Chrisley case, and we're

ultimately going to get to the point where we're at the Printer &

Parts Warehouse.  So I believe based upon the defense exhibits,

frankly, there's going to be lengthy impeachment on whether this

1  was a civil investigation or criminal investigation.  So if we're

2  not going to talk about anything that happened in February or

3  March to 2017, that's fine, but we won't do it on cross

4  examination either.

5          MR. MORRIS:  I wouldn't mind if that's his purposes.  I

6  just want to make sure we're not delving into the legality of how

7  it was assessed.

8          THE COURT:  I think there is, you know, general

9  relevance to context and, of course, purpose and intent.  So I'm

10  going to overrule the objection.

11          MR. KREPP:  Thank you.

12  DIRECT EXAMINATION

13  BY MR. KREPP (continued):

14  **Q.**  I'll just back up.

15      So what steps did you and Mr. Payne take to determine whether

16  or not the Chrisley defendants owed the State of Georgia taxes?

17  **A.**  So I subpoenaed bank records, I subpoenaed the trustee, and an

18  attorney that was representing one of the banks in the bankruptcy

19  for documents, and then pulled the information from those

20  documents best I could to create what I would thought would be

21  there -- their AGI, adjusted gross income for each year.  And then

22  I passed that information on to Rufus.

23  **Q.**  And is this through the normal course of business for you, is

24  this what you would do with other delinquent taxpayers as well?

25  **A.**  Yes.

1   **Q.**   So let's turn back to the binder, and, again, my apologies

2   that it is not tabbed.  At the very bottom, though, you'll see --

3   if you flip back toward the middle, we're going to go to Exhibit

4   No. 205.  In the bottom header you'll see that.

5       It is an eight-page e-mail.  We're not going to read the

6   entire e-mail.

7   **A.**   Um-hum.

8   **Q.**   Okay.

9           MR. KREPP:  Your Honor, I'm going to move for the

10  admission of Government Exhibit 205.

11          THE COURT:  Any objections?  All right, it's admitted.

12          MR. MORRIS:  One second.  No objection.

13          THE COURT:  All right.

14          (Government's Exhibit 205 was marked in evidence as of

15  this date.)

16  **Q.**   All right.

17      So this e-mail was in March of 2017; right?  Can you tell the

18  court who Alexus Chrisley was or is?

19  **A.**   She was the wife of Kyle Christopher.

20  **Q.**   Who is the Kyle Chrisley?

21  **A.**   The Chrisleys' oldest son.

22  **Q.**   So you're having e-mail communications with a relative of Todd

23  and Julie Chrisley; right?

24  **A.**   Yes.

25  **Q.**   Can you tell us how it is that started and set the stage of

1  why you were talking to Alexus?

2  **A.**  I was told by Josh that -- I don't know or I can't remember

3  the actual date that it started, but I was told by Josh that Kyle

4  had reached out and wanted to speak with us about his father and

5  the taxes and what was going on during that time period.  I did

6  have a phone call with him, I had multiple phone calls with Kyle

7  and Alexus about their residency, Georgia residency and the taxes.

8      At some point Kyle started telling me about how there was a --

9  he was told that there was a storage building that was filled with

10 furniture that was the last asset that his father had here in

11 Georgia since they had moved to Tennessee, and that they were

12 planning on auctioning it, and he knew actually where it was

13 because he had been there a couple of times back when he was still

14 good with his family.

15 **Q.**  Was Kyle -- I'll just stop you for a second.

16     So was it -- at that point was Kyle estranged from his family?

17 Is that what he said?

18 **A.**  Yes.

19 **Q.**  And was it significant to you that items were going to be

20 auctioned?

21 **A.**  Yes.  If that -- if those were the last objects that were here

22 in Georgia, we would want that money to go towards the tax balance

23 that is owed.

24 **Q.**  What impact of an auction of those items have on your ability

25 to collect delinquent taxes?

**A.**   We wouldn't be able to collect on them in an easy manner.   It would have to be a very convoluted levy.

**Q.**   All right.   So during that time frame -- so again, we're in February/March 2017 time frame.   Did you begin to have communications with the Internal Revenue Service as well?

**A.**   Yes.   We had just come off of another case where I had auctioned off a house where the IRS had a superior tax lien to ours and we had to go through negotiations with them for percentages of the -- of the amount of the balance that we collected, because it was -- the balance we collected would not be enough to cover the total tax lien.

**Q.**   Okay.

**A.**   So I -- we reached out to the IRS to try to start those negotiations earlier, because I knew the Chrisley had a tax lien with the IRS that would be superior to ours so we wouldn't have to delay if we did go to auction if we found something.

**Q.**   I'm going to ask you to go to Exhibit 101, please.

THE COURT:   What was that number?

MR. KREPP:   101.

I believe we have a stipulation to this, so I'm going to move for the admission of Government's 101.

MR. MORRIS:   Isn't this the IRS transcript?   Is that what this is?   She's not with the IRS.

MR. KREPP:   I know.

(A discussion is held off the record.)

```
 1              MR. MORRIS:  No objection.

 2              THE COURT:  It's admitted.

 3              (Government's Exhibit 101 was marked in evidence as of

 4    this date.)

 5    Q.  So again, these are not Georgia Department of Revenue records

 6    we're looking at; right?

 7    A.  No.

 8    Q.  Okay.  So it says here on the bottom -- I'll just read this to

 9    you.  "RO received phone call from Katie Coleman." And your name

10    right now is Vancil; right?

11    A.  Yes.

12    Q.  Was your name at the time -- I should have established this

13    earlier, your name at the time was Coleman; right?

14    A.  Colvin.

15    Q.  Colvin, I'm sorry.  Colvin.  All right.  But Kate Colvin with

16    the Department of Revenue.  "RO was advised he was working the

17    state case for TP."  Does that appear to be taxpayer?

18    A.  Yeah.

19    Q.  And I see, "Would like to work the case as a joint agency

20    investigation."

21        So the date here on the record is February 7, 2017.

22        So does this appear to be in line with what you're talking

23    about, the conversations you were having during that time frame

24    with the IRS?

25    A.  Yes.
```

1   **Q.**  So during this -- you understand similar to the Department of

2   Revenue, IRS has a both criminal and a civil function?  You

3   understand how that operates?

4   **A.**  Yes.

5   **Q.**  All right.  So during this time frame, again before we're

6   going to get to Printer & Parts Warehouse and things that happened

7   afterwards, but during this specific time frame, were you having

8   conversations with anybody, to your knowledge, with the Criminal

9   Investigation Division of the IRS?

10   **A.**  No.

11   **Q.**  All right.  And when you reached out to the IRS during this

12   time frame, what was your intent?

13   **A.**  To start the negotiation side of -- if we didn't collect, what

14   they would be paid versus what we got paid.

15   **Q.**  Were you hoping to begin or cause the federal government to

16   begin a federal criminal investigation?

17   **A.**  No.

18         THE COURT:  Let me just interject.  This is probably

19   very obvious, but was there a Katie Coleman?

20         THE WITNESS:  No.

21         THE COURT:  Do you infer that this was probably a typo,

22   that they're referring to you?

23         THE WITNESS:  Yes.

24         THE COURT:  Okay.  I just wanted to make sure.  Sorry.

25   DIRECT EXAMINATION

1  BY MR. KREPP (continued):

2  **Q.**  All right.  So we talked about the initial meeting you had in

3  2016 with your upper management?

4  **A.**  Um-hum.

5  **Q.**  After you and Rufus Payne had worked together and had done,

6  you know, figured out that the Chrisley defendants might owe money

7  to the state, was there a subsequent meeting with upper

8  management?

9  **A.**  Yes.

10 **Q.**  Can you tell us, to your knowledge, about what time frame

11 we're talking about?

12 **A.**  It was either late 2016 or early 2017.

13         MR. MORRIS:  I'm sorry what was that?

14         THE WITNESS:  It was late 2016 or early 2017.

15 DIRECT EXAMINATION

16 BY MR. KREPP (continued):

17 **Q.**  Let's go to Government Exhibit 200 now.  This is the Georgia

18 Department of Revenue e-mail.  I'll move for its admission.

19         MR. MORRIS:  You said 217?

20         MR. KREPP:  200.

21         MR. MORRIS:  I'm sorry.  Go right ahead.

22         MR. KREPP:  I'm moving for the admission of Exhibit 200.

23         MR. MORRIS:  No objection.

24         THE COURT:  It's admitted.

25         (Government's Exhibit 200 was marked in evidence as of

1  this date.)

2  **Q.**  So you're not on this e-mail, but at the very bottom it's

3  Merrill Jacobson e-mailing Chester Cook and Carlton Askew.  So

4  again, we talked about him, but who was Merrill Jacobson at this

5  time?  What was his title at the time frame, do you know, or where

6  he worked?

7  **A.**  He worked at the Compliance Division.  I think at this time he

8  was our general counsel.

9  **Q.**  And Chester Cook and Carlton Askew, where did they work?

10  **A.**  Compliance.

11  **Q.**  So just reading right here, "We have identified the periods,

12  amounts and persons to assess.  I scheduled a meeting for next

13  Thursday morning with Steven Rufus and Katie to go over the info

14  so that Audits can prepare the assessments.  If all amounts hold,

15  we have mid-high six figures."

16      So this e-mail was sent February 15, 2017.  So does this give

17  you -- does this meeting we're talking about here, does it seem to

18  be the meeting that you were just testifying about --

19  **A.**  Yes.

20  **Q.**  -- the second meeting?

21  **A.**  Yes.

22  **Q.**  All right.  So what was -- who was at this second meeting with

23  upper-level management?

24  **A.**  It became a lot more than just Stephen, Rufus, and I.  Staci

25  Guest was there, Josh Waites, Scott Graham, Carlton Askew, those

1  are the ones that I can remember off the top of my head.

2  **Q.**   Okay.  So there are a few new names there.  So let's go back

3  to the end of the binder again, that organizational chart.

4       So you said Staci Guest and Scott Graham were there; right?

5  **A.**   Yes.

6  **Q.**   So this is a -- from the organizational chart, these are, at

7  the time, pretty high-ranking people; is that right?

8  **A.**   Yes.

9  **Q.**   Is that -- do you have weekly meetings with them with all your

10  cases?

11  **A.**   No.

12  **Q.**   All right.  Can you tell us what was discussed at this

13  meeting?

14  **A.**   We discussed the balances, how we got to them, and what our

15  next steps would be.

16  **Q.**   All right.  Was the topic of a potential criminal

17  investigation of the Chrisley defendants discussed at this

18  February meeting?

19  **A.**   Yes.

20  **Q.**   Can you tell us what was decided and -- what was first

21  discussed and then what was decided?

22  **A.**   They discussed about whether or not it could go or -- could or

23  should go criminal.  And I know the ended result was that we would

24  not be taking this to a criminal case.  It would stay civil and it

25  would stay as a civil collection case.

1  **Q.**  And do you recall who was saying that?

2  **A.**  Staci Guest.  She -- she was the one that said it will not be

3  a criminal case.

4  **Q.**  All right.  And Staci Guest was -- your boss was Carleton

5  Askew reported to Staci Guest; is that correct?

6  **A.**  Yes.

7  **Q.**  And Staci Guest reported up the chain to the commissioner of

8  the department?

9  **A.**  Yes.

10  **Q.**  All right.  So once you left that meeting, what was your plan?

11  **A.**  To start the second part of my research, which is to find

12  assets, and to continue doing what we do with every case, to bring

13  it to compliance.

14  **Q.**  Now, did Kyle and Alexus continue to provide information to

15  you?

16  **A.**  Yes.

17  **Q.**  And in that e-mail we saw with Alexus, there was discussion

18  about a building.  So why were you discussing a particular

19  building with Alexus Chrisley?

20  **A.**  Kyle had told me that that's where the furniture was being

21  stored and being prepared for auction.

22  **Q.**  And prepared for auction by who?

23  **A.**  By Todd and Julie and the other family members.

24  **Q.**  So in early March 2017, based upon the information you got

25  from Kyle Chrisley, did you take any steps to try to levy and

1  seize any assets?

2  **A.**  We started the jeopardy assessment process because we were

3  told once this auction happened, that was it.  And that was pretty

4  concurrent with what I could find through my research, there was

5  no -- nothing else for us to take at the time.

6  **Q.**  So did you go to the building on -- in early March, March 7,

7  2017?

8  **A.**  Yes.  We drove to the building, and Merrill Jacobson and Davin

9  Fort and I went to the building.  It was in a strip mall-type

10  place, but there was nothing there.  The windows had, like,

11  butcher's paper over the windows and you really couldn't see

12  anything inside.

13  **Q.**  Could you repeat that?  You couldn't what?

14  **A.**  You couldn't see inside the windows.  There was butcher's

15  paper -- sorry, there was butcher's paper up on the windows, and

16  nobody answered the door when we knocked.

17  **Q.**  All right.  So even though you weren't able to locate anything

18  on that particular day, were you still interested in finding

19  property or assets owned by the Chrisleys afterwards?

20  **A.**  Yes.  My research still continued until they're either paid in

21  full, an installment payment agreement or an offer to compromise

22  with us.

23          MR. KREPP:  I don't know if you have defense exhibits

24  there.  Would it be possible if we have -- you'll have your

25  exhibits -- Defense Exhibit 15, could you put that up?

1          MR. MORRIS:  I'm sorry, what?

2          MR. KREPP:  15.  Your exhibit.  One five.

3          MR. MORRIS:  Thank you.  Defendant's exhibit.

4    DIRECT EXAMINATION

5    BY MR. KREPP (continued):

6    **Q.**  All right.  So let's go to -- I know it's a little blurry, but

7    there's an e-mail here with Josh Waites --

8          MR. KREPP:  Let me move for the admission, I guess, of

9    Defendant's Exhibit 15 with their permission?

10          THE COURT:  It's admitted.

11          (Defendant's Exhibit 15 was marked in evidence as of

12   this date.)

13   DIRECT EXAMINATION

14   BY MR. KREPP (continued):

15   **Q.**  So there's discussion here about where you had e-mailed Josh

16   Waites, and he's e-mailing back about flight information for the

17   Chrisleys.

18       Oh, I'm sorry, this was an e-mail between the Department of

19   Homeland Security and Josh Waites, but do you know why Josh Waites

20   was e-mailing, trying to get flight information at this time?

21   **A.**  So in light of our conversations, Kyle had told me that there

22   was a possibility of a Cayman Island bank account that his father

23   had been depositing money into and it was a significant amount of

24   money.  That's not something that I can typically see in my

25   research, because it's not within the United States, like

1  our -- what's reported to our side.  So I had asked Josh if he

2  knew of a way that we could see any Cayman bank accounts or

3  anything like that.

4  **Q.**  And what did Mr. Waites tell you?

5  **A.**  He told me we should file a FinCEN.

6  **Q.**  File a FinCEN.  Did he tell you what that meant?

7  **A.**  He told me that it was a report that you would send out or

8  that you would file with the FinCEN people that would send out a

9  request to every single financial institution within that network,

10  and they would send back an answer of whether they have an account

11  or not.

12  **Q.**  And FinCEN, do you know, is that the Financial Crimes

13  Enforcement Network of the U.S. Department of the Treasurer?

14  **A.**  Yes.

15  **Q.**  If we could turn now to Government Exhibit 226.  That's in the

16  binder.

17          MR. KREPP:  And I'll move for the admission of 226.

18          MR. MORRIS:  I have no objection.  Just give me a moment

19  to get there.  Thank you.  No objection.

20          THE COURT:  All right.  It's admitted.

21          (Government's Exhibit 226 was marked in evidence as of

22  this date.)

23  DIRECT EXAMINATION

24  BY MR. KREPP (continued):

25  **Q.**  So if you can turn -- you can see there are various page

```
 1  numbers on the bottom.  We're going to look at the third page
 2  there.  So it says at the top, a 314(a) request for FinCEN;
 3  correct?  Did you know that the Department of Revenue at the time
 4  was certifying that there was an active criminal investigation
 5  into the Chrisley defendants?
 6  A.  No.
 7          MR. KREPP:  And, Your Honor, so the court knows, I
 8  talked to the courtroom deputy about this, it's 11:55 and I have a
 9  status conference with Judge Jones at 12:15.
10          THE COURT:  I have a note of that, and we'll stop at
11  12:15.  I was thinking that -- I mean, we take a break at noon so
12  you have about five minutes.
13          MR. KREPP:  Right.  Thank you, Your Honor.  I appreciate
14  that.
15          THE COURT:  Or whenever is a natural spot.
16          MR. KREPP:  I will think five minutes is perfect.
17  DIRECT EXAMINATION
18  BY MR. KREPP (continued):
19  Q.  All right.  Were you surprised to learn later on that because
20  of this FinCEN request, the department opened a preliminary
21  criminal investigation into the Chrisley defendants?
22  A.  Yes.
23  Q.  Why was that surprising to you?
24  A.  Because we had been living by the mantra that this will never
25  be a criminal case.
```

1             MR. MORRIS:  I'm sorry, I couldn't hear that answer.  I

2  apologize.

3             THE WITNESS:  We were living by, this will never be a

4  criminal case.

5             MR. MORRIS:  I still can't hear that.

6             THE WITNESS:  We had been living by the fact that this

7  will never be a criminal case, this statement that was made at the

8  original meeting.

9             MR. MORRIS:  It's sounding garbled to me.  I can't

10 understand it.  Can I ask the court reporter to -- well, she's got

11 a mask on, too.

12            THE COURT:  I'll try it.  I think she says they were

13 living by the mantra that this would never be a criminal case.  Is

14 that an accurate statement?

15            THE WITNESS:  Yes.

16            MR. MORRIS:  Thank you.

17 DIRECT EXAMINATION

18 BY MR. KREPP (continued):

19 Q.  That is what you heard at that February meeting?

20 A.  Yes.

21 Q.  Did it seem like Josh Waites was playing -- did he seem

22 interested in looking to the Chrisleys?

23 A.  Yes.

24 Q.  All right.  Did it seem -- was he constantly talking to you

25 about it?

**A.**   Yes.

**Q.**   Did that seem odd to you?

**A.**   Not really.  Josh talked to me about all of the cases that we would talk about or work together, but he was particularly interested in this one.

**Q.**   All right.  Tell us what role, though, information from the FinCEN request played in locating the warehouse, the Printer & Parts Warehouse?

**A.**   None.

**Q.**   What role did Josh Waites play or information from Josh Waites in locating the Printer & Parts Warehouse?

**A.**   None.

**Q.**   All right.  Can you tell us whether any of Josh Waites employees, in other words, Office of Special Investigation, agents or analysts were using law enforcement methods to help you locate the Printer & Parts Warehouse?

**A.**   No, none of them.

**Q.**   Now, did you come to learn from the government in the past two days that a former Office of Special Investigation employee was over the past year and a half or so recording -- secretly recording conversations with you?

**A.**   Yes.

**Q.**   And was that hard for you to hear?

**A.**   Yes.

**Q.**   And on those conversations -- again, you haven't listened to

1  those conversations; right.

2  **A.**   No.

3  **Q.**   But you know -- you have an idea of who was recording the

4  conversations based upon conversations with the government and the

5  FBI yesterday?

6  **A.**   Yes.

7  **Q.**   All right.  Were you having candid conversations with that

8  employee about Josh Waites and -- let's just call them problems?

9  **A.**   Yes.

10 **Q.**   All right.  And, again, did -- we're going to turn to this

11 after lunch, but let's just set the stage.

12    How is it that you located the Printer & Parts Warehouse that

13 we're here about today?

14 **A.**   I found them in a bank account that I had subpoenaed.

15 **Q.**   Did Josh Waites or OSI play any role in subpoenaing those

16 records?

17 **A.**   No.

18 **Q.**   All right.  Was any criminal process used to subpoena those

19 records?

20 **A.**   No.

21 **Q.**   Was that the common process you did as a compliance -- or as a

22 financial examiner within the Compliance Division?

23 **A.**   Yes.  Yes.

24 **Q.**   All right.

25          MR. KREPP:  Your Honor, I think if the court is all

1  right, I'm going to segue to the actual location.  This would be a

2  good stopping point.

3        THE COURT:  This is a good point.  We'll reconvene at

4  1:00.

5        I admonish you not to discuss the substance of your

6  testimony with anyone during the time of the break, and we'll

7  reconvene at one.

8           (Whereupon, a lunch break was taken.)

9                          *****

10                      AFTERNOON SESSION

11                         ******

12                   KATHLEEN MELISSA VANCIL,

13        resumes the stand and testified as follows:

14                         ******

15        THE COURT:  Good afternoon.  All right, Ms. Vancil, I'll

16  remind you that are still under oath.  You may continue.

17        MR. KREPP:  Thank you, Your Honor.

18  DIRECT EXAMINATION

19  BY MR. KREPP:

20  Q.  All right, so we left off we were getting to the point where

21  we were talking about the Printer & Parts Warehouse.

22     So, again, just so we're all on the same page, how is it that

23  you identified -- you first identified the Printer & Parts

24  Warehouse?

25  A.  I found a check in one of the bank accounts that was made out

1   to Printer & Parts Warehouse with a memo of storage, furniture

2   storage.

3   **Q.**   Okay.  All right.  And what did you do after you saw that

4   information?

5   **A.**   I went and asked my manager if I could go into the field and

6   go look around and see if I could see if the furniture was there

7   or not.

8   **Q.**   Who was your manager at that time?

9   **A.**   Vladimir Durandin.

10   **Q.**   And what did he say?  Were you allowed to go?

11   **A.**   Yes.

12   **Q.**   All right.  Did you go with anyone else?

13   **A.**   I took Davin Fort who was also a legal analyst and who was

14   helping me with the case, and I asked for someone from OSI to go

15   with me as well and that's for safety purpose.

16   **Q.**   All right.  Who was it that went with you from OSI?

17   **A.**   Brian Crisp and Ansley Martin.

18   **Q.**   They were two OSI agents?

19   **A.**   Brian Crisp was an OSI agent, Ansley Martin was an analyst at

20   the OSI.

21   **Q.**   And is it common that you'll bring OSI agents when you're

22   executing levies?

23   **A.**   We'll bring either an OSI agent or one of our Alcohol &

24   Tobacco agents for safety reasons.  People get pretty angry when

25   you start taking things.

1   **Q.**   All right.  Are those two different law enforcement arms --

2   **A.**   Yes.

3   **Q.**   -- of the Department of Revenue?

4   **A.**   Yes.

5   **Q.**   All right.  And does the presence of OSI signify that this is

6   a criminal investigation?

7   **A.**   No.

8   **Q.**   Did you go to the warehouse, the Printer & Parts Warehouse?

9   **A.**   Yes.

10  **Q.**   Tell us if you met with anybody there.

11  **A.**   I did.  When I walked inside, I asked to speak to the manager,

12  and a women came out and identified herself as the manager.

13          MR. MORRIS:  I'm sorry, I can't understand her behind

14  her mask.

15          THE COURT:  I think she just said that a woman came out

16  and identified herself as the manager.

17          MR. MORRIS:  Thank you.

18  DIRECT EXAMINATION

19  BY MR. KREPP (continued):

20  **Q.**   And did you have any paperwork with you?

21  **A.**   I did.  We brought levy paperwork with us just in case we did

22  come across what we were looking for.

23  **Q.**   All right.  And what did you see there once you were inside

24  the warehouse?

25  **A.**   We actually first saw what we thought was a couch from outside

1 of the warehouse, which is what prompted us to go ahead and enter

2 the building.  The door was open when we went in.  Like I said, I

3 asked for the manager.  She came out and said she was the manager,

4 and I explained that she probably heard on the news or through the

5 grapevine that the Department of Revenue was looking into Todd

6 Chrisley, and I had it on good authority that she had furniture of

7 his.  She looked at me and said, yes, I did.  I do.  It's all back

8 there.  And we took a moment to step outside and call our

9 managers, because we weren't prepared to find it that day.

10 **Q.**  Okay.  You said the news.  Was it in the media by this point

11 that the Department of Revenue was looking into Todd Chrisley?

12 **A.**  Yes, there had been some Channel 2 news stories about that.

13 **Q.**  Okay.  And you said you stepped outside and made a phone call?

14 **A.**  Yes.

15 **Q.**  Can you tell us what happened?

16 **A.**  I -- I called Merrill Jacobson to let him know that we did

17 find the furniture, and that -- I'm sorry, I left out, she said

18 there was about 10,000 square feet of it, which was much more than

19 we were expecting.  So I called Merrill Jacobson to ask him what

20 the next steps were because I knew we were not prepared to take

21 that much that day.  Merrill came eventually and so did Josh

22 Waites.  I started handling the outside of -- trying to find if we

23 had enough revenue agents to come and help us move things and what

24 type of storage trucks we had.

25 **Q.**  All right.  So Josh Waites was there again?

1  **A.**   Yes, he was there.

2  **Q.**   And if we back up, the first time you went to the first

3  storage facility, Josh actually drove up to serve the paperwork on

4  Todd Chrisley; is that right?

5  **A.**   In Tennessee, yes.

6  **Q.**   In Tennessee, yeah.

7  **A.**   Yes.

8  **Q.**   All right.  Did that strike you as odd?

9  **A.**   It was out of the norm, yes.

10  **Q.**   So going back to that day at the warehouse, what role was Josh

11  Waites playing at the warehouse?

12  **A.**   I mean, he came for protection reasons.  We're talking about a

13  whole lot more items than we were expecting so we need more

14  people, and it's going to be more than just one person that needs

15  protection, for a better word.

16  **Q.**   Was he telling you what to take and what not to take?

17  **A.**   No.

18  **Q.**   So were there discussions that you had with the Department of

19  Revenue management about whether you were going to take things

20  from the storage facility?

21  **A.**   Yes.

22  **Q.**   Can you tell us about those discussions?

23  **A.**   Once we were able to finally get in and look at everything

24  that was there, it was overwhelming how much was there, how much

25  furniture, how much -- just stuff was there.  There was something

1  in every single drawer, every single armoire.  So we made the

2  decision that we were just -- it was brought up, what should we

3  take, what shouldn't we take.  And ultimately, one of the upper

4  management made the decision that we were just going to take

5  everything and sort through it later.

6  **Q.**  Was this now -- you were there on the first day?

7  **A.**  The first day, yes.

8  **Q.**  Did you wind up taking everything that particular day?

9  **A.**  No, we decided not to take anything or look through anything

10  the first day, at least I didn't look through anything the first

11  day.  And we were going to come back the next day so we would have

12  a full day.  It was later on in the afternoon on the first day

13  that we found everything.  There was just not enough time in the

14  day.

15  **Q.**  To bring in whoever you needed --

16  **A.**  Yes.

17  **Q.**  -- to move everything out of there?

18  **A.**  Yes.

19  **Q.**  Can you describe for the court -- by this time you're in the

20  warehouse.  Can you describe for the court the types of things

21  that were in there?

22  **A.**  I mean, it literally looked like somebody packed a house up,

23  multiple houses and just put it in a warehouse.  There were beds,

24  there were couches, plants, there were some office furniture,

25  bedroom suits or suites, there there -- suites.  There were bags

1  of personal items like toothbrushes, makeup, books, anything that

2  you would think as you're moving, what you would take with you,

3  but it was inside this warehouse.

4  **Q.**  All right.  So then did you come back the second day?

5  **A.**  Yes.

6  **Q.**  All right.  And what happened on the second day?

7  **A.**  The second day is when we started actually trying to go

8  through things and catalog what was there, what was -- and what we

9  were going to try to take.  And the second day is the day that

10  they made the decision somewhere later on that we were going to

11  take everything.

12  **Q.**  Do you know why that decision was made?

13  **A.**  I think it was just because there was too much stuff to sit

14  there and go through and sort through everything.  We were on the

15  third party's time.  I mean, we were in somebody else's place.

16          MR. KREPP:  All right.  And if we could, with the

17  assistance of counsel, could we pull up Defendant's Exhibit 36?

18  Unless if it's easier, do you have the defendant exhibits, Your

19  Honor?

20          THE COURT:  I do.

21          MR. KREPP:  Whatever is easier.  If we look at the

22  second page.  If we look at the screen right there.

23  DIRECT EXAMINATION

24  BY MR. KREPP (continued):

25  **Q.**  All right.  Does this document look familiar to you?

1   **A.**   Yes.

2   **Q.**   And what is Defendant's Exhibit 36?

3   **A.**   This is our inventory list that we made.

4          MR. KREPP:  All right.  And I move for the admission of

5   Defendants' Exhibit 36.

6          MR. MORRIS:  Certainly.

7          THE COURT:  No objection.  It's admitted.

8          (Defendant's Exhibit 36 was marked in evidence as of

9   this date.)

10  **Q.**   Again, who was responsible for completing this inventory list?

11  **A.**   Ultimately, I was responsible for it, but there were multiple

12  parties that helped me put this together.  They were all revenue

13  agents.

14  **Q.**   All right.  And you say revenue agent; what's that?

15  **A.**   It was the people who are equal to my position or Compliance

16  Division people.

17  **Q.**   Not from the outside?

18  **A.**   No.

19  **Q.**   All right.  Is this different from what, to your knowledge, is

20  this different paperwork that OSI would fill out after a search

21  warrant?

22  **A.**   Yes.

23          MR. MORRIS:  I'm sorry, I couldn't hear the question.

24          MR. KREPP:  I'll repeat it.

25          THE COURT:  Okay.

1   DIRECT EXAMINATION

2   BY MR. KREPP (continued):

3   **Q.**   Is this document right here, is this different, to your

4   knowledge, than what OSI personnel would typically complete after

5   executing a search warrant?

6   **A.**   Yes.

7   **Q.**   Okay.  Were videos made -- well, let me back up.

8       Were movers hired at one point?

9   **A.**   Yes.  We ended up hiring the Two Men and a Truck company to

10  move all of the objects from the Printer & Parts Warehouse down to

11  our South-Metro warehouse.

12  **Q.**   All right.  Were certain videos of the movers moving things

13  into the truck?

14  **A.**   Yes.  We set up a stationary video camera to video the movers

15  putting things on the truck, and then there were other pictures

16  that were taken with cameras of items that looked to be damaged or

17  had some kind of markings on them that we wanted to make sure that

18  we documented that that wasn't us that did it.

19  **Q.**   Why were you doing this, the videos and the pictures?

20  **A.**   To document for Compliance's safety that we didn't do the

21  damage or we weren't the ones moving, like, the revenue agents

22  weren't the ones moving it.

23          MR. KREPP:  Your Honor, I'm going to move for the

24  admission of Government's Exhibits 8 through 11.  Those are the

25  four videos that are at issue here.

1          MR. MORRIS:  No objection.

2          THE COURT:  They're admitted.

3          (Government's Exhibits 8 through 11 were marked in

4    evidence as of this date.)

5          MR. KREPP:  Are we able to switch over to Peter's

6    computer from this?  If not, it's not the end of the world.

7          THE DEPUTY CLERK:  I switched it over.  Is it working?

8          MR. KREPP:  Your Honor, the court will have it.

9    DIRECT EXAMINATION

10   BY MR. KREPP (continued):

11   **Q.**  I'll just ask you, were there videos showing individuals with

12   Two Men and a Truck on their back --

13   **A.**  Yes.

14   **Q.**  -- moving items back and forth into -- into moving trucks?

15   **A.**  Yes.

16   **Q.**  Were those OSI personnel --

17   **A.**  No.

18   **Q.**  -- the guys with the Two Men and a Truck on them?

19   **A.**  No.

20   **Q.**  Who were they?

21   **A.**  They were the Two Men and a Truck that we had hired.  They're

22   movers.

23   **Q.**  In your experience would OSI after executing a search warrant,

24   would they typically use third-parties like Two Men and a Truck --

25   **A.**  No.

1  **Q.**  -- to bring back evidence?

2  **A.**  No.  They use their own people.

3  **Q.**  When you say their own people, what do you mean?

4  **A.**  Their own OSI special agents and there are, like, assistants

5  that they had.  Analysts, not assistants.  I'm sorry.

6  **Q.**  All right.  Did -- can you tell me -- we already talked about

7  the IRS civil component; right?  Can you tell me up until this

8  point, what role, so again we're in the late March 2017, all

9  right, the day of the seizure of the materials from the warehouse,

10  what role was the Internal Revenue Service civil side playing in

11  your investigation?

12  **A.**  None.  I mean, we were having a problem at one point getting

13  copies of the IRS tax returns that they had filed.  I did ask or I

14  did call Betty at one point, the IRS agent and ask if they could

15  help facilitate that, and got nowhere with that.  But we were not

16  really working in tandem at all.

17  **Q.**  What role did the IRS civil side -- is that Betty Carter?

18  **A.**  Yes.

19  **Q.**  What role did Ms. Carter or anyone else on the IRS civil side

20  play in identifying the warehouse?

21  **A.**  None.

22  **Q.**  What role did the IRS civil side play in deciding to take

23  materials from the warehouse?

24  **A.**  None.

25  **Q.**  What role did the IRS civil side play in deciding what not to

1  take from the warehouse?

2  **A.**   None.

3  **Q.**   And were any IRS personnel on the civil side on-site that day?

4  **A.**   No.

5  **Q.**   As of this date, all right, the day of the seizure, had you

6  had any personal conversations with anybody from the Criminal

7  Investigation Division of the IRS --

8  **A.**   No.

9  **Q.**   -- about the Chrisley defendants?

10  **A.**   No.

11  **Q.**   All right.  Did you tell anybody from IRS, and I'll use the

12  acronym CID, did you tell anyone from IRS CID that you were going

13  to be taking materials from the Printer & Parts Warehouse?

14  **A.**   No.

15  **Q.**   Did anybody from the IRS, whether civil or criminal, did

16  anybody request you to take items from the Printer & Parts

17  Warehouse?

18  **A.**   No.

19  **Q.**   All right.  Did there come a time afterwards -- well, we'll

20  get to that in just one moment.

21      What did you do with everything once -- Two Men and a Truck

22  loaded everything up.  Where did it go?

23  **A.**   They took it to our South-Metro warehouse.  It's also an

24  office, but we have a large warehouse space down there.

25  **Q.**   We being the Department of Revenue?

**A.** Yes.  And the Two Men and a Truck men unloaded it into our

warehouse space, and then over the course of the next few days, I

would go down to the South-Metro along with Davin Fort and we

would go through what we could to see what we had and started

doing the inventory.

**Q.** All right.  And again, Devan, is he an OSI agent?

**A.** No, he was a legal analyst specialist just like me.

**Q.** So who had control within the Department of Revenue, what

entity or division was responsible for the materials that were

seized from the Printer & Parts Warehouse?

**A.** Compliance.

**Q.** Did OSI agents, such as the director Josh Waites or anybody

else, help you or work with you to review the records at the

South-Metro facility?

**A.** No.

**Q.** All right.  Now, was it fair to say at a certain point you

found there were boxes of documents and that sort of thing?

**A.** Yes.

**Q.** Did you realize that the day of the actual -- when the Two Men

and a Truck were there?

**A.** Yes, we did.

**Q.** And why did you decide just to take everything, including

boxes of documents?

**A.** We -- it's easier to just take everything and give things

back, excuse me, and the longer that it is to try to sit there and

1    sort through when it's taking hours to begin with.

2              MR. MORRIS:  I'm sorry.  I just couldn't hear that

3    answer.

4              THE WITNESS:  It's easier for us to just take things,

5    take everything and to give things back later on when asked of us

6    than it is to sit there for hours and try to sort through back and

7    forth.

8    DIRECT EXAMINATION

9    BY MR. KREPP (continued):

10   **Q.**  Okay.  Did you eventually see cut-and-pasted bank statements

11   there?

12   **A.**  Yes.

13   **Q.**  Did you know that when you were at the warehouse?

14   **A.**  No.

15   **Q.**  Was that later on that you saw the cut-and-pasted statements?

16   **A.**  Yes.

17   **Q.**  All right.  Now, let's turn back to the IRS.

18        At a certain point did IRS Special Agent Larry Arrow reach out

19   to you on behalf of the IRS?

20   **A.**  Yes.

21   **Q.**  Right.  Was this before or after the seizure from the

22   warehouse?

23   **A.**  It was after.

24   **Q.**  All right.  And did you have a discussion with Agent Arrow?

25   **A.**  A brief one, yes.

1  **Q.**  Okay.  And can you tell me briefly about that discussion?

2  **A.**  My discussion with him was very short.  He asked if we

3  did -- we had taken the Chrisleys' warehouse documents and what

4  was there.  Eventually, Merrill Davidson took over the phone

5  conversation.

6  **Q.**  Merrill Jacobson?

7  **A.**  Yes.

8  **Q.**  All right.  Before the execution of the federal search

9  warrant -- so going forward, going forward a number of months,

10  there was a meeting where I was there and Agent Ryskoski had met

11  with you and your management at the Department of Revenue; right?

12  **A.**  Yes.

13  **Q.**  That was in January 2018?

14  **A.**  Yes.

15  **Q.**  And then later, several weeks after that, there were a federal

16  search warrant served on the Department of Revenue; correct?

17  **A.**  Yes.

18  **Q.**  Before that time, did you provide those cut-and-pasted

19  statements to Agent Arrow?

20  **A.**  No.

21  **Q.**  Afterwards you turned over -- when I say everything, you

22  turned those documents along with other documents over to the

23  federal agents; is that right?

24  **A.**  Yes.

25  **Q.**  Okay.  To your knowledge, what role did Agent Arrow play in

1  seizing materials from the Printer & Parts Warehouse?

2  **A.**   None.

3  **Q.**   Now, we talked about those secretly-recorded conversations,

4  right, that were just disclosed to you.  Again, you haven't

5  reviewed them; right?

6  **A.**   No.

7  **Q.**   But would it be fair to say at times there was gossip at the

8  Department of Revenue about Agent Arrow?

9  **A.**   Yes.

10 **Q.**   All right.  Do you have any personal knowledge -- by personal

11 knowledge, I mean direct conversations with Agent Arrow about when

12 he got access to any materials?

13 **A.**   No.

14 **Q.**   To the best of your knowledge, as a person who was in charge

15 of those materials, when were they turned over to the IRS and the

16 FBI?

17 **A.**   The day you came to serve a search warrant.

18 **Q.**   If we could go -- we can look at that binder now.

19     So what was the purpose of seizing these items from Printer &

20 Parts Warehouse?

21 **A.**   The main goal was for us to be able to auction the furniture

22 and any other valuable items for -- to pay back the taxes that

23 were owed.

24 **Q.**   You said main goal.  Was there any other goal?

25 **A.**   No.

**Q.**   So was -- did you successfully auction the items to pay off any tax debt?

**A.**   No, we did not.

**Q.**   Why wasn't an auction done as you indicated you wanted to?

**A.**   The Chrisleys had filed what we -- a tax tribunal case.  And when a tax tribunal case is filed, that stops all collection and any auction.  We'll just hold on to whatever the case is about is settled.

**Q.**   Okay.  So again, what effect does filing an action in the tax tribunal have on Department of Revenue's ability to auction items?

**A.**   It brings everything to a halt.  We just -- we stop.

**Q.**   All right.  Is that the reason the items were still there when the IRS and the FBI served a search warrant?

**A.**   Yes.

**Q.**   So if you could turn to Exhibit 215 in your binder, two one five.

          MR. KREPP:  And I move for the admission of Government's Exhibit 215.

          MR. MORRIS:  No objection.

          THE COURT:  All right it's admitted.

          (Government's Exhibits 215 was marked in evidence as of this date.)

DIRECT EXAMINATION

BY MR. KREPP (continued):

**Q.**   So there's a back and forth with LaTrisha Dolson from the

1  Compliance Division here, and in the e-mail back to you saying

2  that -- the part I want to highlight is about the Todd Chrisley

3  account, right, this e-mail.  And in the second paragraph you say,

4  "Sorry.  I'm so embedded in this case that I'm a little passionate

5  about it.  I just know that he will twist everything that we say

6  to his advantage, so we have to be very careful and mindful of

7  what is said about this account."

8  **A.**  Yes.

9  **Q.**  All right, so what did you mean by this?

10 **A.**  This is me explaining to LaTrisha that I was not trying to get

11 her agent who had messed up, basically, by talking and not reading

12 our text notes.  That I'm not trying to get them in trouble, but

13 this is a case that is mine and I'm working on it and I'm not

14 trying to come down on anybody.  I'm trying to lighten the blow to

15 LaTrisha that her person -- I'm not angry or mad at her person,

16 just trying to take it back on myself.  I was trying to be a

17 little passionate about things.

18 **Q.**  And you're talking about the last part about watching what you

19 say given the celebrity nature of the case?

20 **A.**  Absolutely.

21        MR. KREPP:  One moment, Your Honor.

22 DIRECT EXAMINATION

23 BY MR. KREPP (continued):

24 **Q.**  Okay.  So you said earlier it was in those discussions you

25 were having with your colleagues, is it fair to say, that you

1   believed that Josh was taking -- call it an unusual interest in

2   the Chrisleys?

3   **A.**   Yes.

4   **Q.**   Having said that, what role did anybody at OSI play in

5   reviewing the records that you took from the storage facility?

6   **A.**   None.

7   **Q.**   Did you ever turn custody of those items over to OSI?

8   **A.**   No.

9   **Q.**   When you found the cut-and-pasted bank statements eventually,

10  do you agree that could potentially be an indicator of fraud?

11  **A.**   Yes.

12  **Q.**   Did you go and request that OSI open a criminal investigation?

13  **A.**   No.

14  **Q.**   And why not?

15  **A.**   Because we -- again, we'd been living by the mantra that this

16  will never be a criminal case.

17  **Q.**   And was that your mantra until you met with federal agents?

18  **A.**   Yes.

19  **Q.**   To your knowledge, do you consider yourself part of the

20  federal investigation?

21  **A.**   No.

22  **Q.**   And did anybody -- did anybody at OSI, Josh Waites or anybody

23  else, ask you to go to the Printer & Parts Warehouse to take those

24  materials?

25  **A.**   No.

1  Q.  Okay.  Thank you.

2          MR. KREPP:  That's all I have, Your Honor.

3          THE COURT:  Mr. Morris?

4          MR. MORRIS:  I have a few questions, Your Honor.

5  CROSS-EXAMINATION

6  BY MR. MORRIS:

7  Q.  Hi, Ms. Vancil.  I'm Bruce Morris.  Do you know my name?

8  A.  No.

9  Q.  Okay.  You're represented by Mr. Sponseller who is here today?

10  A.  Yes.

11  Q.  Did Mr. Sponseller tell you that I asked for the opportunity

12  to speak to you before this hearing?

13  A.  Yes.

14  Q.  And you declined to do that?

15  A.  Yes.

16  Q.  Okay.  I have a few questions for you.

17      Let's go back to the beginning here in 2014.

18      Am I correct that you learned in 2014 that Todd Chrisley's

19  former business partner had contacted Josh Waites at the Georgia

20  Department of Revenue?

21  A.  No.

22  Q.  What did Josh Waites tell you?

23  A.  To the best of my memory, Josh had heard about this reality

24  star that was in Georgia but had filed bankruptcy, but had not

25  filed any tax returns for the State of Georgia, and he wanted me

1   to look into it.

2   **Q.**   Did he state where he had heard that?

3   **A.**   I can't remember.

4   **Q.**   Okay.  And Josh Waites is the director of the Criminal

5   Division?

6   **A.**   Yes.

7   **Q.**   Office of Special Investigations?

8   **A.**   He was, yes.

9   **Q.**   At the time?

10  **A.**   At the time.

11  **Q.**   We'll refer to that as OSI; is that okay with you?

12  **A.**   Yes.

13  **Q.**   You have seen e-mails that later came from a lawyer to Merrill

14  Jacobson about Josh Chrisley; correct?

15  **A.**   I'm sorry, about?

16  **Q.**   About, excuse me, Todd Chrisley?  I'll restate that.

17      Merrill Jacobson received some e-mails from a lawyer

18  representing Todd Chrisley's former business partner about Todd

19  Chrisley; correct?

20  **A.**   There were several e-mails from several different lawyers.

21  So...

22  **Q.**   And you saw those?

23  **A.**   I've seen many e-mails about -- or with different lawyers.

24  **Q.**   Okay.  Well, I'm referring specifically about the ones that

25  were sent to Merrill Jacobson regarding Todd Chrisley from a

1  lawyer?

2  **A.**   Which attorney?   There are many --

3  **Q.**   The time is in 2016.

4  **A.**   Am I cc'd on these e-mails?

5  **Q.**   Do you remember?

6  **A.**   Sir, there were a lot of e-mails that went back and forth

7  about this.   Without knowing which one, which attorney you're

8  talking about, I don't know.

9  **Q.**   Okay.   Do you remember on one of these -- by the way, the tape

10  recordings were made by Beverly Wright; correct?

11  **A.**   Yes, sir.

12  **Q.**   You heard these tapes; correct?

13  **A.**   Yes, sir.   Oh, no, no.   I have not heard these tapes.   I heard

14  about them.

15  **Q.**   You haven't heard the tapes at all?

16  **A.**   No, I have not.

17  **Q.**   You haven't been shared with the transcript?

18  **A.**   No, I have not.

19  **Q.**   Okay, okay.   If I told you that you said on one of the tapes

20  to Beverly Wright, that you saw the e-mails that Merrill had

21  received about starting an investigation of Todd Chrisley back in

22  2016, would that refresh your recollection?

23  **A.**   Still without knowing which attorney you're speaking about,

24  no.

25  **Q.**   Okay.   How about Mr. Bomar does that ring a bell?

1  **A.**  I -- I do know the name Bomar, yes.

2  **Q.**  Okay.  And he is a lawyer who contacted Mr. Jacobson about

3  Todd Chrisley, wasn't he?

4  **A.**  Yes.

5  **Q.**  Okay.  And that was about 2016; correct?

6  **A.**  Yes.

7  **Q.**  Okay.  Now, Josh Waites brings Todd Chrisley to your attention

8  as a celebrity who may not have filed his returns and this is in

9  2015?

10  **A.**  '14.

11  **Q.**  Sorry?

12  **A.**  '14.

13  **Q.**  '14.  And you look into it and Mr. Chrisley is in bankruptcy

14  you said?

15  **A.**  Yes, sir.

16  **Q.**  Did you check on Mrs. Chrisley?

17  **A.**  Yes.

18  **Q.**  Was she in bankruptcy?

19  **A.**  She was not.

20  **Q.**  Okay.  But you did not choose to go forward against

21  Ms. Chrisley?

22  **A.**  Because they were married filing joint in their last tax

23  return.  So we would assume that they were still married filing

24  joint.

25  **Q.**  So at that point you decided not to go against either one?

1  **A.**  Correct.

2  **Q.**  Okay.  And then Mr. Waites brought this matter back to your

3  attention once he believed Mr. Chrisley was out of bankruptcy; is

4  that right?

5  **A.**  Yes, sir.

6  **Q.**  Okay.  And did you check and determine he was, indeed, out of

7  bankruptcy?

8  **A.**  Yes, sir.

9  **Q.**  Okay.  At that point in time, are you aware that Josh Waites

10 had accessed information on Todd and Julie Chrisley through GENTX?

11 **A.**  I assume he would.  We all have access through GENTX.

12 **Q.**  My question was:  Were you aware that Josh Waites at that

13 point in time had accessed information on the Chrisleys from

14 GENTX?

15 **A.**  No.

16 **Q.**  Okay.  Could you tell us what GENTX is?

17 **A.**  It's our -- it's our system where we store information, we

18 make assessments.  It's where all of our paperwork is on each

19 individual taxpayer.  When you file a tax return, it files into

20 GENTX.

21 **Q.**  So you as an employee of GDOR can access GENTX and get

22 information about people?

23 **A.**  Yes.

24 **Q.**  And that would include Todd and Julie Chrisley?

25 **A.**  Yes.

**Q.** And are you telling me you don't know that Mr. Waites accessed GENTX?

**A.** I know that he has access to GENTX. I can't see what Josh has accessed.

**Q.** I'm just asking you if you know from Mr. Waites or any other source that he, indeed, accessed GENTX about Todd and Julie Chrisley in late 2016, early 2017?

**A.** I have no personal knowledge of that.

**Q.** I didn't ask you if you had personal knowledge. I said, do you have any information that he did, even if I tell you that?

**A.** I'm sure at some point they did.

**Q.** All right. So you're aware of that.

Now, you personally looked at Todd's and Julie Chrisley's information in GENTX; correct?

**A.** Yes.

**Q.** Now, you referred to a meeting that you went to, a large meeting I think you described it, that was in December of 2016; correct?

**A.** Yes, sir.

**Q.** Okay. And at this meeting was the Deputy Commissioner of GDOR, Mr. Scott Graham; correct?

**A.** Yes.

**Q.** Staci Guest?

**A.** Yes.

**Q.** Merrill Jacobson?

1   **A.**   Yes.

2   **Q.**   Carleton Askew?

3   **A.**   Yes.

4   **Q.**   And you?

5   **A.**   Yes.

6   **Q.**   And you're from the Civil Audit or Civil Compliance?

7   **A.**   I'm from Compliance, yes.

8   **Q.**   Okay.  And Josh Waites is also there?

9   **A.**   Yes.

10  **Q.**   He's from Criminal OSI?

11  **A.**   Yes.

12  **Q.**   Was LaShaun Wright there?

13  **A.**   I don't remember.

14  **Q.**   And she's also Criminal OSI, is she not?

15  **A.**   Yes.

16  **Q.**   Okay.  And you are certain --

17              MR. MORRIS:  May I see Exhibit No. 7, please.

18              THE COURT:  Do we have to switch it over?

19              MR. MORRIS:  There we go.

20  CROSS-EXAMINATION

21  BY MR. MORRIS (continued):

22  **Q.**   I show you what has been marked as Defendant's Exhibit No. 7.

23  Can you take a look at that for me for a minute?

24  **A.**   Yes.

25  **Q.**   Okay.  Is that the meeting invitation that you received for

1   the setup of this meeting?

2   **A.**   No.

3   **Q.**   You didn't receive that?

4   **A.**   No.

5   **Q.**   How were you summoned there?

6   **A.**   By a different meeting for the 9th floor.

7   **Q.**   Okay.  So this is a separate meeting than the one you went to?

8   **A.**   Yes, sir.

9   **Q.**   Okay.  In December -- were you aware of this December 19th

10  meeting?

11  **A.**   No.

12  **Q.**   Okay.  Thank you.

13          MR. MORRIS:  You can take that one down now.

14  **Q.**   When you met, this was a meeting to discuss an investigation

15  of the Chrisleys; correct?

16  **A.**   Yes.

17  **Q.**   And representing the criminal side was Josh Waites?

18  **A.**   Yes.

19  **Q.**   And, perhaps, LaShaun Wright, you're note sure; is that right?

20  **A.**   Yes, sir.

21  **Q.**   Okay.  And throughout your investigation of the Chrisleys

22  beginning in late 2016, isn't it true that both Josh Waites and

23  LaShaun Wright were constantly asking you for information from

24  your investigation about the Chrisleys?

25  **A.**   They were asking me for updates, yes.

1  **Q.**  Updates is information, isn't it?

2  **A.**  They wouldn't ask me specifics, they would ask me how it was

3  going.

4  **Q.**  And you would give them information about what you had found

5  and what you were doing, didn't you?

6  **A.**  I would tell them, yes.

7  **Q.**  On February 7, 2019, you accessed Todd Chrisley's tax

8  accounts, do you recall that?

9  **A.**  No, but I'm sure I did.

10 **Q.**  Okay.  The GENTX logs would show that; correct?

11 **A.**  Yeah, the logs would show exactly when we accessed things.

12       MR. MORRIS:  Can I see Defendant's Exhibit No. 3,

13 please.  Okay.

14 **Q.**  These are GENTX logs, are they not?

15 **A.**  Yes.

16 **Q.**  Good.  Okay.

17       MR. MORRIS:  Move into evidence Defendant's Exhibit No.

18 3, please.

19       MR. KREPP:  No objection.

20       THE COURT:  Okay, it's admitted.

21       (Defendant's Exhibit 3 was marked in evidence as of this

22 date.)

23 CROSS-EXAMINATION

24 BY MR. MORRIS (continued):

25 **Q.**  Those log shows whenever a GDOR employee accesses the internal

1  system about a particular person; correct?

2  **A.**  Yes.

3  **Q.**  So when we see Michael Chrisley --

4  　　　　MR. MORRIS:  And could you take us back to 2017 on that

5  document, please, Mr. Sing.

6  CROSS-EXAMINATION

7  BY MR. MORRIS (continued):

8  **Q.**  Okay.  So when we see in February of 2017, for instance, and

9  I'm just picking a time, in February 23, 2017, at 11:15,

10  kmcolvin - K. Vancil, is that you?

11  **A.**  That's me.

12  **Q.**  Okay.  So every time somebody enters that system it records

13  it; correct?

14  **A.**  Yes.

15  **Q.**  So on February 7, 2017 --

16  　　　　MR. MORRIS:  Would you show us that one, please.

17  February 7.

18  CROSS-EXAMINATION

19  BY MR. MORRIS (continued):

20  **Q.**  You are more than once addressing the GENTX system to obtain

21  information about one or the other of the Chrisleys; correct?

22  **A.**  Yes.

23  **Q.**  On that same date after you obtain this information, you

24  reached out to IRS Agent Betty Carter; correct?

25  **A.**  Yes.

1  **Q.**  And you inform her of GDOR's investigation of the Chrisleys;
2  correct?
3  **A.**  Yes.
4  **Q.**  And you tell her you would like the IRS to join you in a joint
5  investigation; correct?
6  **A.**  That's what she wrote down.  I mean, I -- I reached out for
7  negotiation purposes, if we did.
8  **Q.**  I'm sorry?
9  **A.**  That's what was in her notes.  I reached out with the purpose
10  of negotiating if we did find anything to sell or if we had found
11  financial means to pay off the taxes that were owed, knowing that
12  they had a superior tax lien to ours.
13  **Q.**  Do you deny saying to her I want to do a joint investigation?
14  **A.**  I don't remember saying that.  I don't deny it, but I don't
15  remember it.
16  **Q.**  All right.  And did you tell her of GDOR's plan to seize
17  property?
18  **A.**  Yes.
19  **Q.**  All right.
20          MR. MORRIS:  May I see Defendant's Exhibit No. 9,
21  please.
22  **Q.**  I think we have seen this document as a government exhibit,
23  but do you recognize this as something you saw earlier today?
24  **A.**  Yes, sir.
25  **Q.**  And you identified it?

1          MR. MORRIS:  I move the admission of Defendant's Exhibit

2  No. 9.

3          MR. KREPP:  No objection.

4          THE COURT:  All right, it's in.

5          (Defendant's Exhibit 9 was marked in evidence as of this

6  date.)

7  **Q.**  You will see here it's dated February 7, 2017; yes?

8  **A.**  Correct.

9  **Q.**  And Katie Coleman worked at Department of Revenue, we believe

10  that is meant is to be Katie Colvin, would you agree?

11  **A.**  Yes, sir.

12  **Q.**  And that is the day that you called Betty Carter; correct?

13  **A.**  Yes.

14  **Q.**  It says, "RO received phone call from Katie Coleman wit (sic)

15  the Georgia Department of Revenue.  RO was advised that she is

16  working the state case for taxpayer and that she would like to

17  work the case as a joint agency investigation."

18      You're not telling me that she made that up, are you?

19  **A.**  I'm not saying she made it up.  That was not our -- we don't

20  work cases like that.  So my intention was to negotiate with them

21  about the taxes that were already owed to the IRS versus what we

22  knew was coming if we did collect furniture or any other assets

23  that would need to be sold.  Because their tax lien attaches to

24  that in priority over ours.  We knew that ours would not come in

25  first place.

1  **Q.**  I understand exactly what you just said.  However, my question

2  was:  Did you ask for a joint agency investigation?

3  **A.**  I don't think I used those words.

4  **Q.**  Okay.  Okay.  And you provided her with a list of LLCs related

5  to the Chrisleys, didn't you?

6  **A.**  Yes.

7  **Q.**  And isn't one of the purposes of that, that you get money from

8  it, you're hoping she's going to investigate and share information

9  with you and you're going to investigate and share information

10  with her and you're going to get some money out of it?  And when I

11  say you, I'm talking about GDOR.

12  **A.**  I mean, I -- if you want to interpret it that way, okay.

13  **Q.**  Well, the reason you gave her the identity of these LLCs, was

14  so she could investigate; correct?

15  **A.**  If they also owed money, yes.

16  **Q.**  And get -- and you wanted that information shared with you;

17  yes?

18  **A.**  Yes, so that we would know how much money would need to go to

19  the IRS.

20  **Q.**  So you could recover money from the Chrisleys; that is the

21  purpose of this, isn't it?

22  **A.**  Yes, that is the purpose.

23  **Q.**  And the IRS could help you with that purpose and you could

24  help the IRS?

25  **A.**  If they have a tax lien that is superior to ours, I have a

1  duty to negotiate with them.  Otherwise, they could take all of

2  the money that we receive if it's more than what's owed to them.

3  **Q.**  And is your giving her all this list of LLCs a negotiation of

4  getting all of the money?

5  **A.**  No, that's public record.  I had already done the research and

6  found all of those LLCs, so I was giving them to her so she would

7  know what other entities we were looking at that possibly owed

8  money.  If they have a tax lien or if they're owed money on those

9  LLCs as well, we need to know that before we enter into

10  negotiations.

11  **Q.**  And if she was going after tax money, you wanted to go

12  after tax money -- excuse me, money together in some fashion?

13  **A.**  No, it's a negotiation.  We don't have to do it together.

14  **Q.**  Negotiation?

15  **A.**  Yes.

16  **Q.**  Negotiation, I mean agreement?

17  **A.**  We're not doing it together, though.  It's not a joint

18  situation.  I didn't call her on the day of to say, I found it,

19  let's go.

20  **Q.**  No, but you did call her before you went to the warehouse,

21  didn't you?

22  **A.**  The first location, yes.

23  **Q.**  We'll get to that in just a second.  Well, let's get to it

24  now.

25      What was the first location?

1    **A.**   The first location was the strip warehouse on -- I think it

2    was Satellite Boulevard that Todd Chrisley had told me

3    specifically about.

4    **Q.**   What's the name of that place?

5    **A.**   I don't know.

6    **Q.**   When did you go to CubeSmart?

7    **A.**   Weeks after we went to the Printer & Parts Warehouse.

8    **Q.**   You went to Printer & Parts Warehouse first and then after

9    that to CubeSmart?

10   **A.**   We went to Printer & Parts Warehouse second, then CubeSmart

11   third.

12   **Q.**   So it's your testimony you did not go to CubeSmart before you

13   visited Printer & Parts?

14   **A.**   Correct.

15   **Q.**   You specifically state that you never visited CubeSmart in

16   February of 2017?

17   **A.**   As far as I remember, no.  We -- because we had run out of

18   space at the warehouse at South-Metro to put the CubeSmart

19   property.  We had to take it back to Century Center.

20   **Q.**   I'm sorry, I couldn't understand that.

21   **A.**   We had run out of our space at our warehouse at South-Metro by

22   the time I had found the CubeSmart stuff.  So we had to go to

23   CubeSmart afterwards.

24   **Q.**   Well, when you went to CubeSmart, did Brian Crisp go with you?

25   **A.**   Yes, he did.

1  **Q.**  Did he break off the lock?

2  **A.**  He -- yes, he sawed it off.

3  **Q.**  Sawed it off.  And when was this?

4  **A.**  It was sometime after.  I don't know exact dates.

5  **Q.**  So if the lock was missing in February of 2017, that wasn't

6  from you and Brian Crisp?

7  **A.**  No.

8  **Q.**  Okay.  All right.  Okay, back to Ms. Carter.

9     You've asked her for, in her words, a joint agency

10  investigation.  And you provide her a list of the Chrisley assets?

11  **A.**  Of the LLCs, yes.

12  **Q.**  Okay.  And you did not enter CubeSmart on February 7; correct?

13  **A.**  Correct.

14  **Q.**  Okay.  On February 20, 2017, you are asked to fill out a Form

15  314; is that right?

16  **A.**  Are you talking about the FinCEN?

17  **Q.**  Yes, I am.

18  **A.**  Yes, sir.

19  **Q.**  Well, actually before we get there.  You tell me that

20  on -- strike that.

21     I believe you testified that on February 15, 2017, there is a

22  meeting involving you and Staci Guest and Scott Purvis and who

23  else?

24  **A.**  Is this the big meeting?

25  **Q.**  I beg your pardon?

1  **A.**  Is this the large meeting?

2  **Q.**  It's -- I believe it's Government 200.  Government Exhibit

3  200.

4  **A.**  Yes.

5  **Q.**  Okay.  Is that right?

6  **A.**  Yes.

7  **Q.**  And Josh Waites is at this meeting; correct?

8  **A.**  Yes.

9  **Q.**  From OSI?

10  **A.**  Yes.

11  **Q.**  And I believe you told us that Staci Guest said at this

12  meeting, well, it's going to stay civil, it's not going to go

13  criminal; correct?

14  **A.**  Correct.

15  **Q.**  And she's in the civil side?

16  **A.**  Yes.

17  **Q.**  Okay.  So that was what she said?

18  **A.**  Yes.

19  **Q.**  Okay.  She's not OSI; correct?

20  **A.**  No.

21  **Q.**  And five days later a criminal case is, in fact, opened, isn't

22  it?

23  **A.**  I had nothing to do with that.

24  **Q.**  That's not what I asked you.

25  **A.**  So I didn't know at the time.

1  **Q.**  I understand.  Now you know that on the 15th, even though

2  Staci Guest said this is not going to go criminal, a criminal case

3  was opened, wasn't it?

4  **A.**  Yes.

5  **Q.**  And it was opened by Josh Waites and Scott Santillie; correct?

6  **A.**  Yes.

7  **Q.**  Now, both Josh Waites and Scott Santillie asked you to fill

8  out this FinCEN application; correct?

9  **A.**  Not Scott Santillie, Josh Waites.

10 **Q.**  Okay.  And Josh Waites is on the criminal side; right?

11 **A.**  Yes.

12 **Q.**  And he asked you to fill out a FinCEN; right?

13 **A.**  He didn't ask me to.  He told me it was a tool to be able to

14 locate a Cayman Islands' bank account that I could use.

15 **Q.**  He brought you a form, which is a 314(a) FinCEN application

16 and said, fill this out; correct?

17 **A.**  He said you can fill this out and we can find the Cayman

18 Islands bank account.

19 **Q.**  And you filled it out?

20 **A.**  Yes.

21 **Q.**  You never done one of these before, have you?

22 **A.**  No.

23 **Q.**  Never done one since, have you?

24 **A.**  No.

25 **Q.**  Not something that the civil side does, it's something the

1  criminal side does; right?

2  **A.**  Correct.

3  **Q.**  And he asked you to fill it out and you did, and you dutifully

4  put down in there that this was a tax evasion investigation;

5  correct?

6  **A.**  Yes.

7  **Q.**  Because that's what it was for you; right?

8  **A.**  Yes.

9  **Q.**  Okay.  And do you know or do you know -- do you know what

10  FinCEN stands for?

11  **A.**  Not off the top of my head.

12  **Q.**  If I told you that it stood for Federal Financial Crimes

13  Enforcement Network, would that make sense to you?

14  **A.**  Yes.

15  **Q.**  Short for FinCEN?

16  **A.**  It's an acronym.

17  **Q.**  And it's a federal database; right?

18  **A.**  Yes.

19  **Q.**  And it's administered by the United States Treasury

20  Department; right?

21  **A.**  Yes.

22  **Q.**  Are you aware that it was created under the Patriot Act?

23  **A.**  No.

24  **Q.**  Are you aware that its purpose is to allow law enforcement

25  agents to obtain all of the suspect's financial accounts and

1  financial transactions?

2  **A.**   I am now.

3  **Q.**   Okay.  And were you aware then or do you know now, that to

4  query the FinCEN system, you must certify that you are

5  investigating for involvement in terrorists acts or money

6  laundering?

7  **A.**   I am now.  I was not aware then.

8  **Q.**   You did not know that then, did you?

9  **A.**   No.

10 **Q.**   And so you put down dutifully, when you were directed to fill

11 it out by Mr. Waites, this is a tax evasion investigation?

12 **A.**   Yes.

13 **Q.**   Right?  And you send them the paperwork?

14 **A.**   Yes.

15 **Q.**   And you find out that Mr. Santillie changes your tax evasion

16 to money laundering; correct?

17 **A.**   Yes.

18 **Q.**   You didn't know that at the time?

19 **A.**   No.

20 **Q.**   You're running what you believe is a civil investigation, and

21 Josh Waites and Scott Santillie are doing things on the criminal

22 side behind your back; correct?

23 **A.**   Yes.

24 **Q.**   And you find out later, you didn't know at the time, you find

25 out later that, in fact, a formal criminal case is opened by Scott

1  Santillie?

2  **A.**   Yes.

3  **Q.**   Now, as you testified on direct, you expected this to stay a

4  civil matter because that's what Staci Guest said; right?

5  **A.**   Yes.

6  **Q.**   And this criminal stuff is going on and you don't know about

7  it?

8  **A.**   Correct.

9  **Q.**   You are -- my words, but I think you used it in one of your

10  conversations, you're being used by Josh Waites as a puppet,

11  aren't you?

12  **A.**   Yes.

13  **Q.**   Okay.  It later comes out about the FinCEN.  You find out

14  about the fact that they change the form that you prepared, and

15  you correct me if I'm wrong, but you are told by Scott Santillie

16  to say that, oh, we do this FinCEN as a standard thing; correct?

17  **A.**   I don't think he instructed me.  I was told that it was a

18  standard thing that they did.

19  **Q.**   And you knew that wasn't true, didn't you?

20  **A.**   I didn't at the time.  I do now.

21  **Q.**   And you had never done one?

22  **A.**   No.

23  **Q.**   It wasn't standard for you?

24  **A.**   No.

25  **Q.**   This is what Santillie was trying to get you to say?

1  **A.**  I don't remember if it was Santillie or Waites.

2  **Q.**  One or the other?

3  **A.**  One or the other.

4  **Q.**  Both on the criminal side?

5  **A.**  Yes.

6  **Q.**  Just telling you what to say, whether you knew it to be true

7  or not?

8  **A.**  Again, I don't think they told me to say anything.  They just

9  told me this was their standard practice.

10  **Q.**  It wasn't standard practice for you?

11  **A.**  No.

12  **Q.**  Okay.  After the FinCEN is run, Scott Santillie sends those

13  documents, the information that is returned from FinCEN to you;

14  correct?

15  **A.**  Through e-mails, yes.

16  **Q.**  There are a series of e-mails, are there not?

17  **A.**  Yes.

18  **Q.**  And that is document -- FinCEN returns?

19        A VOICE:  14.

20        MR. MORRIS:  May I see Defendant's Exhibit 14, please.

21  **Q.**  Okay, would you take a look at these.  I think there are

22  several pages of them.

23  **A.**  Yes.

24  **Q.**  Would you take a look at them.  Do you see where it says from

25  Martin Ansley to Katie Colvin from Kathie Colvin to Martin Ansley?

1    **A.**   Yes.

2             MR. MORRIS:  Can we see the next page?

3    **Q.**   This is all regarding the FinCEN; yes?

4    **A.**   Yes.

5    **Q.**   Okay.  Next page?  Now, if you look at this part of

6    Defendant's Exhibit 14, this is an e-mail from Scott Santillie to

7    you with a PDF file; correct?

8    **A.**   Yes.

9    **Q.**   And that PDF file is No. 2?

10   **A.**   Okay.  Yes.

11   **Q.**   All right.  The next page, please.  Is that No. 3?

12   **A.**   Yes.

13   **Q.**   Next page, please.  Is that No. 4?

14   **A.**   Yes.

15   **Q.**   Next page, please.  Nos. 5 and 6?

16   **A.**   Yes.

17   **Q.**   So there are at least, what, six PDF files of information Mr.

18   Santillie gets from FinCEN and forwards on to you for your use;

19   correct?

20   **A.**   Yes, sir.

21   **Q.**   And you do use it?

22   **A.**   Yes.

23            MR. MORRIS:  I move the admission of 14, if you will,

24   please.

25            MR. KREPP:  No objection.

1          THE COURT:  All right.  It's admitted.

2          (Defendant's Exhibit 14 was marked in evidence as of

3 this date.)

4 **Q.**  And you do use it?  In fact, you send out some subpoenas,

5 don't you?

6 **A.**  Yes.

7 **Q.**  And you sent a subpoena -- by the way -- strike that.

8     Before this time Mr. Santillie shared the FinCEN information

9 with you, had you ever had FinCEN information shared with you

10 before?

11 **A.**  I don't know.

12 **Q.**  You can't think of a time, can you?

13 **A.**  No.

14 **Q.**  Okay.  Okay.  You send out various subpoenas.

15          MR. MORRIS:  May we see Document 12, please, Defendant's

16 Exhibit No. 12.

17 **Q.**  This is a subpoena to Angel Oak Home Loans, and you'll see

18 that it's dated February 8, 2017, and I think below that I think

19 you can see that it came from you.  If you could raise that a

20 little bit.  There we go.

21     So you send out that subpoena; correct?

22 **A.**  Yes.

23          MR. MORRIS:  And let's see number 13, please?

24 **Q.**  Same thing, you send out this subpoena, this one goes to

25 Greater Atlanta Christian School?

1  **A.**  Yes.

2          MR. MORRIS:  The next one please.  Which one is this?

3  That's Greater Atlanta Christian school.  May I see 16, please.

4  CROSS-EXAMINATION

5  BY MR. MORRIS (continued):

6  **Q.**  That is to 7C's Productions, is that right, or Bank of

7  America?

8  **A.**  That's to Bank of America.

9  **Q.**  Bank of America.  There we go.  And then 17, Printer & Parts

10  Warehouse; right?

11  **A.**  Yes.

12  **Q.**  And there are others.

13          MR. MORRIS:  In fact, I'll move to admit those that I

14  just identified, which I think are 12, 13, 16, 17.  I'll also move

15  19, 27, 28, 30, 31, 32, 33, and 34.  Those are all previously

16  provided there and they are all subpoenas issued by Ms. Coleman.

17          (Whereupon a discussion is held off the record.)

18          MR. MORRIS:  I believe it's 12, 13, 16, 17, 19, 27, 28,

19  30, 31, 32, 33, 34.

20          THE COURT:  Any objections?

21          MR. KREPP:  Excuse me.

22          THE COURT:  Yeah, sure.

23          MR. KREPP:  They're all subpoenas.

24          MR. MORRIS:  All subpoenas.

25          MR. KREPP:  No objection, your Honor.

1           THE COURT:  They're admitted.

2           (Defendant's Exhibit 12, 13, 16, 17, 19, 27, 28, 30, 31,

3  32, 33, 34 was marked in evidence as of this date.)

4  CROSS-EXAMINATION

5  BY MR. MORRIS (continued):

6  **Q.**  Okay.  You sent out a bunch of subpoenas after you got this

7  information; right?

8  **A.**  Yes.

9  **Q.**  And you gathered information from the folks who responded to

10 the subpoenas; right?

11 **A.**  Yes.

12 **Q.**  Now, I think you testified on direct that nothing Agent Waites

13 gave you was used in pursuing the Printer & Parts Warehouse search

14 and seizure?

15 **A.**  Correct.

16 **Q.**  Okay.  You said you found out about that from the subpoena to

17 Bank of America?

18 **A.**  Yes.

19 **Q.**  Okay.  Let's look at document Exhibit No. 16, please.  Can we

20 see 16?  Do you see that one?

21 **A.**  Yes, sir.

22 **Q.**  That is a subpoena to the Bank of America; correct?

23 **A.**  Yes.

24 **Q.**  Dated February 27, 2017?

25 **A.**  Yes.

1   **Q.**   Could we now see Exhibit No. 17.  That is the subpoena to

2   Printer & Parts Warehouse; correct?

3   **A.**   Yes.

4   **Q.**   And it's dated February 28?

5   **A.**   Yes.  It's also not signed by my manager.

6   **Q.**   I beg your pardon?

7   **A.**   It's not signed by my manager.

8   **Q.**   Does that mean it was never sent?

9   **A.**   Yes, sir.

10  **Q.**   Well, let me ask you this question.  If you found out from

11  Printer & Parts Warehouse -- oh, I'm sorry.

12      If you found out about the Printer & Parts Warehouse from the

13  Bank of America, if you served the Bank of America on February 27,

14  how would you know about Printer & Parts Warehouse on February 28?

15  **A.**   Can you go back to the Bank of America?  Because I believe

16  that is a different time period.

17  **Q.**   I'm sorry, a different what?

18  **A.**   If you'll go back to the Bank of America subpoena real quick.

19  **Q.**   Got back to the Bank of America -- 16, please.  Yeah?

20  **A.**   So this is on 7C's Productions.

21  **Q.**   Yes.

22  **A.**   I was sending multiple subpoenas at any given time based off

23  of the information I was finding.

24  **Q.**   Okay.

25  **A.**   While I can't state to this directly, exactly which one this

1  was, I know that the check I found was in Bank of America.  So it

2  was probably from a Bank of America account I had previously

3  before the subpoena.

4  **Q.**  So it wasn't from a subpoena?

5  **A.**  It was either from the subpoena or Bank of America or the

6  subpoena from the trustee.  I'm sorry, the trustee or the attorney

7  that was in the --

8  **Q.**  I thought you said you found it in bank records that you

9  received in response to a subpoena?

10  **A.**  Those would be bank records that I found in a subpoena.

11  **Q.**  Okay.

12  **A.**  If I subpoenaed the trustee -- the subpoena I sent to the

13  trustee, was for all of the documents that were inside of the

14  bankruptcy court.

15  **Q.**  Okay.

16  **A.**  And the subpoena I sent to the attorney that was -- an

17  attorney for one of the banks from inside the bankruptcy, also

18  gave me bank records as well.

19  **Q.**  You don't happen to have those subpoenas with you?

20  **A.**  No, sir, they would have been in my binder somewhere.

21  **Q.**  We haven't been provided that.  So I can't -- I can't ask you

22  any more about that.

23      Okay.  Now, is it correct that you also accessed Todd

24  Chrisley's tax accounts on February 23, 2017, because we saw that

25  in the GENTX logs?

1    **A.**   Yes, sir.

2    **Q.**   You don't think anybody else accesses this information in your

3    name other than you; is that a fair statement?

4    **A.**   Oh, that's fair.

5    **Q.**   Okay.  And OSI is sharing the FinCEN information with you, and

6    you are at least reporting to Josh Waites and LaShaun Wright the

7    progress of your investigation; you testified to that?

8    **A.**   Yes.

9    **Q.**   Okay.  I believe you said in one of the telephone

10   conversations that David got very upset about the FinCEN

11   information and how it came to you.  Who is David?

12   **A.**   Are you talking about David Ward?

13   **Q.**   I don't know.  Who are you talking about?

14   **A.**   David Ward would be the only David I knew at the time.

15   **Q.**   And he was upset?

16   **A.**   Yes.

17   **Q.**   Because it wasn't right?  There's a mantra, civil/criminal

18   separate; correct?

19   **A.**   Yes.

20   **Q.**   And you didn't know they weren't being separated, did you?

21   **A.**   No, I did not.

22   **Q.**   Okay.  Are you aware that Josh Waites pulled GCIC records on

23   the Chrisleys?

24   **A.**   Yes.

25   **Q.**   And that he contacted ICE -- you know what ICE is?

1  **A.**   Yes, I know what ICE is.

2  **Q.**   Federal agency?

3  **A.**   Yes.

4  **Q.**   He contacted ICE to get travel records on the Chrisleys;

5  correct?

6  **A.**   I know that now, yes.

7  **Q.**   Didn't know that at the time; it was behind your back?

8  **A.**   I knew about the GCIC reports because he gave them to me.

9  **Q.**   He got GCIC reports he gave to you, he got travel information

10 from ICE that he did not share with you?

11 **A.**   Did he not give me any records.  I know he made mention to it

12 in passing at one point.

13 **Q.**   But you weren't personally involved in that, but you know it

14 happened?

15 **A.**   Yes.

16 **Q.**   Now, you didn't ask him for the GCIC information, just gave it

17 to you; correct?

18 **A.**   Correct.

19 **Q.**   Okay.  Did you also come to learn that the case number that

20 Josh Waites put on the FinCEN, didn't match the case number that

21 he put on the GCIC request?

22 **A.**   Much later on, yes.

23 **Q.**   You didn't know at the time?

24 **A.**   No.

25 **Q.**   Going on behind your back?

1  **A.**   Yes.

2  **Q.**   By GCIC, would you tell us what that means just for the

3  record?

4  **A.**   I just know it's the criminal background that they run.

5  **Q.**   Georgia Criminal Information Center; correct?

6  **A.**   Yes.

7  **Q.**   Provides you state information on human beings, their criminal

8  records, automobiles, and the like?

9  **A.**   Right.

10  **Q.**   Okay.  Now, during this time, in February of 2017, you and

11  Josh Waites are getting information from Kyle Chrisley and Alexus

12  Chrisley; is that right?

13  **A.**   Yes.

14  **Q.**   On March 1 -- well, strike that.

15        In February you have a Zoom call with Alexus and Kyle

16  Chrisley; correct?

17  **A.**   It was actually a Skype call, yes.

18  **Q.**   Skype, okay.  I don't know this stuff.  Skype is where you can

19  see them and hear them and they can see you and hear you?

20  **A.**   Yes, sir.

21  **Q.**   Okay.  And you're on the call with Kyle and Alexus?

22  **A.**   Yes, sir.

23  **Q.**   Kyle is the son, Alexus is the daughter-in-law?

24  **A.**   Yes, sir.

25  **Q.**   And also on the call is Merrill Jacobson?

**A.**  In a way.  Merrill was on a phone and Josh was on a phone.  So

they could hear.

**Q.**  So you have Merrill Jacobson and Josh Waites involved in this

conversation that you are Skyping with Kyle and Alexus?

**A.**  Yes.

**Q.**  So they can hear Kyle and Alexus?

**A.**  Yes.

**Q.**  And you are acting, in part, as the facilitator; what

questions Josh has, you're conveying to Kyle and Alexis?

**A.**  Yes, they were aware that Josh and Merrill were on the phone.

**Q.**  Yes?

**A.**  Yes.

**Q.**  And the purpose of your facilitating that is Josh and Merrill

had questions and they wanted information from Alexus and Kyle?

**A.**  It was actually I had questions for Alexus and Kyle and opened

it up at the end, do you guys have any other questions.

**Q.**  That's exactly what they do, they feed you the questions to

ask Kyle and Alexus; correct?

**A.**  Yes, because they couldn't hear.  The way the computer set up

was, I didn't have a way to patch them in.

**Q.**  I'm not accusing you of anything.  You just -- because they

didn't talk directly to them --

**A.**  Correct.

**Q.**  -- they told you what questions they wanted you to ask for

information they wanted?

**A.**   Yes.

**Q.**   And you did it?

**A.**   Yes.

**Q.**   And then following up on that, Alexus tells you on or about March 1, 2017, that there's a warehouse with seven houses of furniture in it?

**A.**   Yes.

**Q.**   And that the Chrisleys intend to auction it off to pay their taxes to the IRS; correct?

**A.**   Yes.

          MR. MORRIS:  Can I see Document 18, please.  Defendant's Exhibit 18.

**Q.**   Do you recognize Defendant's Exhibit No. 18?

**A.**   Yes.

**Q.**   These are text messages between you and Josh Waites; is that right?

**A.**   Yes.

**Q.**   The "J" in red is Josh, and the ones that are aren't "J" are you?

**A.**   Yes.

**Q.**   Okay.  And is this your language at the top, "Lexi just called me, it is an auction for the IRS?"

**A.**   Yes.

**Q.**   They are trying to raise money for to (sic) pay the lien off. Seven houses of furniture.  The information is coming from

1  Lindsey?

2  **A.**  Yes.

3  **Q.**  Okay.  And that refers, what you now understand, is the seven

4  houses worth of furniture that was at PPW?

5  **A.**  Yes.

6  **Q.**  That was going to be auctioned off and sold to pay federal

7  taxes?

8  **A.**  Yes.

9  **Q.**  Okay.  And so ultimately what you do is prevent them from

10  paying their federal taxes by grabbing them by the state?  In

11  essence, that's what happens; right?

12  **A.**  If you want to put it that way.

13  **Q.**  Okay, I do.

14      And so you learn of this, and on -- this is March 1, 2017.

15  You have no reason to believe that that's not a correct date, do

16  you?

17  **A.**  No.

18          MR. MORRIS:  I move the admission of 18, please.

19          MR. KREPP:  No objection.

20          THE COURT:  It's admitted.

21          (Defendant's Exhibit 18 was marked in evidence as of

22  this date.)

23  CROSS-EXAMINATION

24  BY MR. MORRIS (continued):

25  **Q.**  On March 6, 2017 you testified you started drafting these levy

1  documents?

2  **A.**   Yes.

3  **Q.**   To seize the furniture that you believe to be in the storage

4  warehouse; right?

5  **A.**   Yes.

6  **Q.**   But you don't know where the storage warehouse is?

7  **A.**   No, and this is not printers and warehouse.  We didn't know it

8  was Printer & Parts then.

9  **Q.**   Just wherever it is, we're going to go get it?

10 **A.**   Yes.

11 **Q.**   And on the same day you called the IRS to inform them of your

12 plan to seize the furniture; correct?

13 **A.**   Yes.

14        MR. MORRIS:  Can we see Defendant's Exhibit 21, please.

15 **Q.**   Have you seen this before?

16 **A.**   No.

17 **Q.**   Okay.  "Katie Colvin with GDOR called to see if we were taking

18 any type of enforcement against the taxpayer today, and this is

19 dated March 6, 2017."  Do you see that, where it says "action

20 date"?

21 **A.**   Yes.

22 **Q.**   Okay.  She stated that they received a tip, the taxpayer had

23 placed about seven houses worth of furniture, personal property in

24 a storage building rented by one of his friends and were about to

25 sell the stuff.  So they were on their way out to seize the

1  property; right?

2  **A.**   Yes.

3  **Q.**   Is that what you told her?

4  **A.**   Yes.

5  **Q.**   Okay.  And you said that you had over a million dollars in

6  assessments on the Chrisleys?

7  **A.**   Yes.

8  **Q.**   Is that what you believed you had at the time?

9  **A.**   Yes.

10  **Q.**   It turned out not to be; isn't that right?

11  **A.**   After adjustments were made, yes.

12  **Q.**   Considerably less; correct?

13  **A.**   Yes.

14  **Q.**   Okay.  You also stated that the warehouse where they were

15  storing the furniture that they had planned to auction and you

16  were trying to get access to the storage facility, and she says

17  that you said, "Ms. Colvin stated she would provide me with

18  information about the case.  Potential meeting this Thursday.

19  Will discuss with the FTA;" is that accurate?

20  **A.**   Yes.

21  **Q.**   Okay.  So you're calling her to let her know that you're

22  moving in on this furniture.  This is the IRS?

23  **A.**   Yes.

24  **Q.**   Betty Carter?

25  **A.**   Yes.

1  **Q.**  And you offer to provide additional information to the IRS?

2  **A.**  Yes.

3  **Q.**  And you even agree to set up a meeting with the IRS?

4  **A.**  Yes.

5  **Q.**  And you discuss that maybe the meeting will be later that

6  week; right?

7  **A.**  Yes.

8  **Q.**  Is that right?

9  **A.**  Yes.

10  **Q.**  Okay.  That's on the 6th?

11  **A.**  Yes.

12  **Q.**  On the 7th, Josh Waites drives to Tennessee to serve these

13  levies; yes?

14  **A.**  Yes.

15       MR. MORRIS:  Okay, and I think that's Defendant's

16  Exhibit 18.  If we could look at that.

17       By the way, I move 27 into evidence if I did not -- I'm

18  sorry 21.  21.

19       THE COURT:  Any objections?

20       MR. KREPP:  No objection.

21       THE COURT:  No objection to 21?

22       MR. KREPP:  No, Your Honor.

23       THE COURT:  It's admitted.

24       (Defendant's Exhibit 21 was marked in evidence as of

25  this date.)

1           MR. MORRIS:  Is there a second page to that?

2    CROSS-EXAMINATION

3    BY MR. MORRIS (continued):

4    **Q.**  This is March 6, 2017, a Monday, and does this text exchange

5    between -- is it a text exchange between you and Josh Waites?

6    **A.**  Yes.

7    **Q.**  And he's going to Nashville to serve the Chrisleys with your

8    notices?

9    **A.**  Yes.

10   **Q.**  Okay.  And I think you said on direct examination that it was

11   not normal for him, Josh Waites, to be doing this?

12   **A.**  Correct.

13   **Q.**  What do you mean by that?

14   **A.**  It was not normal for them to -- for anyone from OSI to serve

15   civil documents.

16   **Q.**  Because of the mantra civil and criminal are separate, aren't

17   they?

18   **A.**  Yes.

19   **Q.**  But Josh Waites personally went up there to serve Mr.

20   Chrisley; correct?

21   **A.**  Yes.

22   **Q.**  Okay.

23           MR. MORRIS:  Move the admission of 18, please.

24           MR. KREPP:  No objection.

25           THE COURT:  It's admitted.

1            (Defendant's Exhibit 18 was marked in evidence as of

2  this date.)

3            MR. MORRIS:  Now, could I see Document 25, please.

4  Exhibit 25.

5  CROSS-EXAMINATION

6  BY MR. MORRIS (continued):

7  **Q.**  This is your entry of levy for 470 Satellite Boulevard,

8  Suwanee, Georgia; right?

9  **A.**  Yes.

10 **Q.**  It is dated 3/7; is that right?

11 **A.**  I can't see the date.

12 **Q.**  Let's see the date.

13 **A.**  Yes.

14 **Q.**  March 7.  Is that your signature?

15 **A.**  Yes.

16 **Q.**  Did you go there on March 7?

17 **A.**  Yes.

18 **Q.**  That's CubeSmart?  That's CubeSmart?

19 **A.**  Is it?

20 **Q.**  Yeah.  Do you want to know how I know?

21 **A.**  Sure.

22 **Q.**  Okay.  I'm going to tell you.

23     Well, I was going to tell you until I couldn't find it.  Okay.

24 Strike that.  Strike it.

25     Where is that 477 Satellite Boulevard?

1  **A.**  To the best of my knowledge, that's the strip mall.

2  **Q.**  Okay, that's what you refer to as the strip mall?

3  **A.**  Yeah.

4  **Q.**  Okay.  Okay.  So you go to the strip mall on the 7th and you

5  can't see what's in there?

6  **A.**  No, you cannot.

7       MR. MORRIS:  Can I see Exhibit 26, please.

8  **Q.**  Do you recognize Defendant's Exhibit 26?

9  **A.**  Yes.

10  **Q.**  What is Defendant's 26?

11  **A.**  It's an inventory list of the different boxes that we brought

12  back.  Apparently, a leather bag or totes.

13  **Q.**  I'm sorry?

14  **A.**  That we brought back from our South-Metro warehouse so that

15  Devan and I could go through them.

16       MR. MORRIS:  So move the admission of Defendant's 26,

17  please.

18       MR. KREPP:  No objection, Your Honor.

19       (Defendant's Exhibit 26 was marked in evidence as of

20  this date.)

21  **Q.**  So this document is, correct me if I'm wrong, an inventory of

22  what you took from Printer's warehouse, moved to the South-Metro

23  warehouse, and then took from the South-Metro warehouse back to

24  GDOR's offices?

25  **A.**  To our main office where Devan and I work, yes.

**Q.**   Which is where?

**A.**   Century Center.

**Q.**   Okay.  Are these the same objects that were given to the
federal agents?

**A.**   I don't know if all of them were given to them, but, yes, some
of the documents that came from these boxes were given to them.

**Q.**   Well, correct me if I'm wrong, but they ended up with, like,
20 boxes of stuff?

**A.**   Yes.

**Q.**   Is this -- is this that stuff?  Maybe -- strike that.

       Does this include that stuff?

**A.**   Yes.

**Q.**   Okay.  So all of the documents that were given to the feds
from GDOR that came from the Chrisleys are on this list somewhere?

**A.**   Yes.

**Q.**   Okay.  Thank you.

       And your testimony is -- when did you create this list?

**A.**   It was weeks later when we were going through -- specifically,
going through each little box.

**Q.**   Well, you seized everything on March 29, 2017, and took it all
the way to -- I believe it's called Welcome All Road; correct?

**A.**   Correct, our South-Metro office on Welcome All Road.

**Q.**   And everything was put there?

**A.**   Yes.

**Q.**   Okay.  When is the first time you went through any of the

1 boxes and found something other than furniture or personal

2 property?

3 **A.**  It would be a couple of weeks after it was put into that

4 location.

5 **Q.**  After what?

6 **A.**  After it was put in the Welcome All Road location.

7 **Q.**  Okay.  Did you go through any documents there?

8 **A.**  Briefly, not in, like, a really going through them until we

9 brought them back to Century Center.

10 **Q.**  Okay.  Let's talk about that.  What day did you bring them

11 back?

12 **A.**  I have no idea.

13 **Q.**  Was it in March?  You seized them on March 29.

14 **A.**  No, it was not in March.

15 **Q.**  A couple of weeks later it would be April, is that when you

16 seized them?

17 **A.**  April or May, yes.

18 **Q.**  Well, it was before Agent Arrow reached out to you; correct?

19 **A.**  Going -- no, it was not.

20 **Q.**  So Agent Arrow contacted you and already knew about these

21 documents you hadn't gone through?

22 **A.**  No, he didn't know specifically what documents he had.  He

23 asked -- actually, I don't know what he asked.  You'll have to ask

24 Merrill.

25 **Q.**  Well, you talked to him.

1  **A.**   Very briefly.

2  **Q.**   I beg your pardon?

3  **A.**   Very briefly did I talk to Mr. Arrow.

4  **Q.**   Well, what did you ask him when you talked to him briefly?

5  **A.**   Did we take furniture.  But he knew that we had taken

6  furniture.

7  **Q.**   Did he ask about documents?

8  **A.**   He asked if there were boxes of documents.

9  **Q.**   What did you say?

10  **A.**   Yes.

11  **Q.**   Did you tell him anything about what was in the boxes?

12  **A.**   No.

13  **Q.**   Did you know what was in the boxes?

14  **A.**   Not specifically, no.

15  **Q.**   Did you know generally what was in the boxes at that time?

16  **A.**   Yes.

17  **Q.**   How did you know?

18  **A.**   Because we had briefly looked at things when we were putting

19  them into South-Metro.

20  **Q.**   So on the 29th your testimony is that you looked through some

21  of the documents in the boxes?

22  **A.**   Briefly, yes, just to see what was in them.

23  **Q.**   Well, let me ask you a question.  This is definitely off

24  script, but it's a question.

25      You're seizing the property to sell to satisfy a tax

1  assessment; yes?

2  **A.**   Yes, sir.

3  **Q.**   How are you going to sell the papers?  Why are you looking

4  through the papers?

5  **A.**   Because inside some of these boxes were not just papers.  Some

6  had -- there was a camcorder in one of them.  Some of them had

7  picture frames -- other objects were all sprinkled throughout

8  everything.  So instead of sitting down and trying to figure out

9  one by one which box and do an inventory on every single little

10  piece of thing, we decided to take everything back to our

11  warehouse so we could properly go through it.

12  **Q.**   Back to your office, you mean?

13  **A.**   South-Metro, yes.

14  **Q.**   So -- wait a minute.  When you were in the Printer & Parts

15  Warehouse, is that what you're talking about, this is when you --

16  **A.**   Yes.

17  **Q.**   -- saw boxes of papers with picture frames?

18  **A.**   Yes.

19  **Q.**   So you made a decision to take them down to the warehouse?

20  **A.**   Yes.

21  **Q.**   Okay.  At this point, you didn't know what the papers were?

22  **A.**   No.

23  **Q.**   So at some point I think you said several weeks later you

24  started looking through the papers?

25  **A.**   Yes.

1  **Q.**  After you took them back to your office?

2  **A.**  Yes.

3  **Q.**  So from the time you picked them up until the time you get

4  them to your office, you don't know what's in those papers?

5  **A.**  No.

6  **Q.**  Is that correct?

7  **A.**  Correct.

8  **Q.**  Okay.  So the first time you know there's any -- my

9  words -- cut-and-paste, is when you're looking through them in

10  your office after they have been at Welcome All and it's a couple

11  of weeks later and you've taken them back to the office?

12  **A.**  Correct.

13  **Q.**  Okay.  Who is with you when you're looking through them?

14  **A.**  Devan Fort.

15  **Q.**  Devan Fort.  Anybody else?

16  **A.**  I'm sure my boss at the time came in.

17  **Q.**  Who is that?

18  **A.**  Vladimir Durnandin or Tiffany Powers, and I know other agents

19  would drop in every now and then but not necessarily go through

20  the paperwork, just come in and talk to us.

21  **Q.**  Okay.  I'm really not interested in coming in and talking to

22  you.  I'm talking about going through the papers; right?

23  **A.**  Yes.

24  **Q.**  Okay.  So you've got these boxes of papers and there are a few

25  items in there.  Did you take the items, like, the picture frames

1  and things out of the them at Welcome All Road before you brought

2  the boxes back?

3  **A.**  Some of them, yes.

4  **Q.**  Why not all of them?

5  **A.**  Because we don't need a very large picture to take back.  We

6  know that that's not...

7  **Q.**  Okay.  But the sole purpose of bringing those boxes back to

8  the headquarters, was to go through them to see what they were?

9  **A.**  Yes.

10 **Q.**  It had nothing to do with selling them to collect tax money?

11 **A.**  Not selling.  I was looking for other banking information.

12 **Q.**  Other banking information?

13 **A.**  Yes.

14 **Q.**  Okay.  And you felt your levy allowed you to do that?

15 **A.**  Yes.

16 **Q.**  Okay.  Okay.  So you go to -- we're back before our Printer &

17 Parts Warehouse entry, and you and Brian Crisp go to what we think

18 is Satellite Boulevard strip center; right?

19 **A.**  No.  Brian Crisp and I went to CubeSmart.

20 **Q.**  CubeSmart?

21 **A.**  Yes.

22 **Q.**  Can you give me the date of that?

23 **A.**  I can't.  Not --

24 **Q.**  But after Printer & Parts is your testimony?

25 **A.**  Yes.

1  **Q.**  Before you had looked at the documents?

2  **A.**  It was during the middle of us looking at the documents.

3  **Q.**  Okay.  And you still haven't talked to Larry Arrow?

4  **A.**  We -- we had talked to Larry Arrow shortly after we took the

5  furniture.  So it was after Larry had made contact with us.

6  **Q.**  Well, again, I don't mean to mix you up, but I'm mixed up.

7  **A.**  No, that's fine.

8  **Q.**  Did Larry Arrow contact you for information you found in the

9  documents before or after you had looked through the documents?

10  **A.**  Before.

11  **Q.**  Okay.  So he knew about them?

12  **A.**  He knew we had documents, yeah.

13  **Q.**  Who told him?

14  **A.**  I don't know firsthand who told him.

15  **Q.**  I beg your pardon?

16  **A.**  Firsthand, I don't know who told him.

17  **Q.**  Secondhand, who do you know?

18  **A.**  LaShaun Wright.

19  **Q.**  Josh Waites was sharing information with him, too, wasn't he?

20  **A.**  I don't.

21  **Q.**  You don't?

22  **A.**  No, I don't.

23  **Q.**  Have you heard that?

24  **A.**  I'm sure I heard it in passing.

25  **Q.**  And you said that, that you understand that Josh was passing

1  information to Larry Arrow?

2  **A.**   I'm sure I have.

3  **Q.**   You have?

4  **A.**   Yes.

5  **Q.**   You didn't lie about that, did you?

6  **A.**   No.

7  **Q.**   At the time you must have believed it; right?

8  **A.**   Yes.

9  **Q.**   So on March 9, 2017, this is after you have made your phone

10  call to Betty Carter and discussed getting together, there was a

11  meeting at GDOR headquarters; correct?

12  **A.**   Yes.

13  **Q.**   With you; right?

14  **A.**   Yes.

15  **Q.**   IRS Agent Betty Carter?

16  **A.**   Yes.

17  **Q.**   IRS Agent Johanna Carter?  She's from the fraud part; correct?

18  **A.**   I don't know.

19  **Q.**   Okay.

20        MR. MORRIS:  May I see Document 21, please.  Exhibit 21.

21  Okay, we've admitted that one.  Exhibit 29.  Can you blow that up

22  a little for us?

23  CROSS-EXAMINATION

24  BY MR. MORRIS (continued):

25  **Q.**   Do you recognize that?

1 **A.**   Yes.

2 **Q.**   Is this setting up the meeting?

3 **A.**   Yes.

4 **Q.**   And this says, "I hope this one doesn't go all night"?

5 **A.**   I said that because I had accidentally set it up from p.m. to

6 a.m. originally.

7 **Q.**   Okay.

8          MR. MORRIS:  Move the admission of 29, please.

9          MR. KREPP:  No objection.

10         THE COURT:  It's admitted.

11         (Defendant's Exhibit 29 was marked in evidence as of

12 this date.)

13 CROSS-EXAMINATION

14 BY MR. MORRIS (continued):

15 **Q.**   Okay.  The purpose of this meeting, you tell me if I'm wrong,

16 is to share information?

17 **A.**   And to talk about negotiations, yes.

18 **Q.**   To talk about what?

19 **A.**   Negotiations.  To negotiate.

20 **Q.**   To negotiate?

21         THE WITNESS:  I'm sorry, but I need to take a break.

22         MR. MORRIS:  How much time -- excuse me, you ask.

23         THE COURT:  Well, it's 2:30 now.  Would 15 minutes,

24 would that be sufficient?  You tell us.

25         THE WITNESS:  It usually takes me about 30 minutes.

1    THE COURT:  That's fine.  How about this:  We'll take at

2 least a 20-minute break, but you take the time you need and just

3 inform, I guess, Mr. Sponseller or whoever when you're ready and

4 then we'll be ready.  If it's earlier than that, that's fine.  So

5 I will ask everyone else to be back in about 20.

6    MR. MORRIS:  Thank you, Your Honor.

7    (Whereupon, a break was taken.)

8    THE COURT:  I'll remind you, you are still under oath.

9 You may continue.

10    MR. MORRIS:  Thank you, Your Honor.

11    Okay.  I think I forgot to ask the court to admit

12 Defendant's Exhibits 7 and 9.

13    MR. KREPP:  One moment, Your Honor.

14    No objection, Your Honor.

15    THE COURT:  All right.  They're admitted.

16    MR. MORRIS:  Thank you.

17 CROSS-EXAMINATION.

18    (Defendant's Exhibits 7 & 9 were marked in evidence as

19 of this date.)

20 BY MR. MORRIS (continued):

21 **Q.**  Okay, we're back.

22    On March 28, 2017, is when you went to Printer & Parts

23 Warehouse to begin your seizure?

24 **A.**  Yes.

25 **Q.**  Brian Crisp and Devan Fort are with you?

1  **A.**  And Ansley Martin, yes.

2  **Q.**  I'm sorry?

3  **A.**  And Ansley Martin, yes.

4  **Q.**  Ansley Martin.  All right.  Originally were you and Devan Fort

5  to determine what items to seize?

6  **A.**  Yes.

7  **Q.**  And I think you said it was so much more than you ever

8  expected, that you alerted Scott Graham?

9  **A.**  I did not personally alert Scott Graham, some of the managers

10 did.

11 **Q.**  Okay.  Am I correct that Josh Waites also joined you there?

12 **A.**  Yes.

13 **Q.**  In fact, I think you described him racing to the warehouse

14 with his lights on?

15 **A.**  Yes.

16 **Q.**  By the way, he also told you to tell people he had not been

17 there; correct?

18 **A.**  Yes.

19 **Q.**  And that would be a lie?

20 **A.**  Yes.

21 **Q.**  And you wouldn't do that?

22 **A.**  No.

23 **Q.**  Okay.  Is it your understanding that Mr. Graham, Mr. Jacobson

24 and Mr. Waites discussed exactly what should be taken?

25 **A.**  I was not a part of that conversation.

**Q.** No?

**A.** But I know ultimately Scott Graham was the one who made the final call.

**Q.** Scott Graham made the final call to just take everything?

**A.** Yes.

**Q.** He might have used an expletive with that?

**A.** Yes.

**Q.** It starts with an "F"?

**A.** Yes.

**Q.** Okay.  Ends with an "ing"?

**A.** Yes.

**Q.** Okay.  Had it been your decision, you would have left the personal items and just taken the furniture that could be sold?

**A.** Yes.

**Q.** Okay.  Taking everything, in your experience, on an assessment or a levy is unusual?

**A.** Yes.

**Q.** Because you only want to take the things that are worthy of sale to get the money to pay the taxes; correct?

**A.** Yes.

**Q.** But somebody, be it Mr. Waites or Mr. Graham, decided let's take it all?

**A.** Yes.

**Q.** And it certainly wasn't to sell papers?

**A.** No.

1 **Q.** While you were there, do you recall that a woman, an attorney

2 by the name of Elizabeth who goes by Beth, Beth Young arrived from

3 Vivian Hoard's office to pick up boxes of Chrisley documents?

4 **A.** Yes.

5 **Q.** She picked up how many boxes, if you remember?

6 **A.** I think it was about two. She specifically asked me for boxes

7 with contents that belonged to Mark Braddock.

8 **Q.** Did you show her other boxes of documents?

9 **A.** Yes.

10 **Q.** And did she say she wanted to take those, she didn't want to

11 take those, or what discussion occurred?

12 **A.** There really wasn't a discussion.

13 **Q.** Okay. Now, inside Printer & Parts Warehouse, am I correct,

14 that the Chrisley property was separated from the other areas of

15 the warehouse by a chain link fence?

16 **A.** There was a fence, but there was not a door that separated the

17 walking area from -- the fence was more like a back wall

18 situation.

19 **Q.** If you came in the loading dock, okay --

20 **A.** Yes.

21 **Q.** -- is there a fence on your left?

22 **A.** Not to my memory, no.

23 **Q.** Okay. Do you have to go through a gate in the fence to get

24 into the property?

25 **A.** Not to my memory.

1    **Q.**   Not to your knowledge?

2    **A.**   No.

3    **Q.**   You don't remember that?

4    **A.**   No.

5    **Q.**   Okay, okay.  Would you agree that the Chrisley property was

6    separated from other property in the warehouse by a fence?

7    **A.**   Yes.

8    **Q.**   Okay.  You made an inventory of what was taken from Printer &

9    Parts Warehouse?

10   **A.**   Yes.

11   **Q.**   When did you make the inventory?

12   **A.**   It was -- it was a little bit after we had got -- or we had

13   taken everything to the Welcome All Road South-Metro location.

14   **Q.**   And before you removed anything from there?

15   **A.**   Yes.

16   **Q.**   Okay.

17          MR. MORRIS:  May I see Defendant's Exhibit No. 36,

18   please.

19   **Q.**   This is the inventory; is that correct?

20   **A.**   Yes.

21          MR. MORRIS:  I think you -- do you have a hard copy of

22   it up there in your government's notebook?  I think you identified

23   it, unless the government put up ours.  I can't remember.

24          I move the admission of 36.  I think you did.  36 is in.

25   And you don't have it in there, the government used ours.  Can you

1  take whatever time you need to look through there and see where

2  you see the 20-some-odd boxes of documents referred to on the

3  inventory list?

4            THE WITNESS:  Is there a way to flip through the pages?

5            MR. MORRIS:  Sure.  Do you want to flip slowly for this

6  nice lady.  Let's do the hard copy, it might be a lot easier.

7  I'll represent to you this is Exhibit 36.

8            THE WITNESS:  Yes, sir.  It looks like we weren't

9  specific about documents on this inventory list.

10  CROSS-EXAMINATION

11  BY MR. MORRIS (continued):

12  **Q.**  Not only does it not look like it's not specific, there is no

13  mention of a single box of documents, is there?

14  **A.**  No, not --

15  **Q.**  Well, didn't you testify earlier that shortly after the

16  property was moved you inventoried it; is that right?

17  **A.**  Yes, sir.  I had about ten agents with me from the civil side

18  helping me inventory so that we could get it done within a day or

19  two.

20  **Q.**  So it was done within a day or two?

21  **A.**  Yes.  I know that's when we moved the boxes that had paperwork

22  in them from here -- from the South-Metro warehouse to Century

23  Center.

24  **Q.**  I'm sorry, from the where to where?

25  **A.**  From the South-Metro warehouse to Century Center.

1  **Q.**  I thought that you said that was several weeks later?

2  **A.**  We started reviewing the boxes, yes.  I had other cases we

3  were looking at.

4  **Q.**  So is it your testimony that everything is loaded into trucks

5  at Printer & Parts Warehouse on March 29 taken to Welcome All Road

6  and then within just a couple of days documents, boxes of

7  documents are removed from Welcome All Road and then taken back to

8  your headquarters?

9  **A.**  No, sir, a couple of weeks.

10  **Q.**  A couple of weeks?

11  **A.**  Yes.

12  **Q.**  The inventory is done while they're there?

13  **A.**  Yes.

14  **Q.**  A couple of days after?

15  **A.**  We went to Welcome All Road, we took everything at Welcome All

16  Road and we left it there.  I was instructed to wait a little bit

17  before we did the inventory to see what was filed.  If we had to

18  give everything back, there's no need to sit down and do a

19  meticulous inventory of things.  When we did go through and did

20  the inventory, I know we pulled boxes of paperwork out that we

21  were going to meticulously go through to see what was inside of

22  those, and those were taken to Century Center at the same time we

23  did the inventory of --

24  **Q.**  Okay.  Well, we know from records that the appeal that you

25  referred to was April 4.  Okay?  So that's less than a week after

1  the March 28, 29 seizures; correct?

2  **A.**   Um-hum.

3  **Q.**   Okay.  So you're telling me the inventory was completed before

4  the appeal, after the appeal?  I thought you said it was before,

5  you waited a few days to see if there would be an appeal and then

6  you started your inventory?

7  **A.**   I know it was a few weeks -- weeks or days after.  We're

8  talking about years ago at this point -- that I was told to wait

9  to inventory.  It was not my decision when to inventory.  One of

10 the upper management made that decision.

11 **Q.**   And you don't remember when it was?

12 **A.**   I don't.  I know it was after we had moved everything to

13 South-Metro.

14 **Q.**   Okay.  And again, since you've sort of had a change in memory,

15 what did you start -- strike that.

16     When you did you move the documents from Welcome All Road back

17 to GDOR headquarters?

18 **A.**   It would be the same day we did the inventory.

19 **Q.**   Which is a couple of weeks later but you don't know when?

20 **A.**   I don't know exactly when, no.

21 **Q.**   Do you know if it was before or after the appeal?

22 **A.**   I don't.

23 **Q.**   Okay.  Okay.  Ultimately, though, the furniture ends up at the

24 South-Metro, South Meadows All Welcome Road -- strike that.

25     Ultimately the furniture ends up at the warehouse in South

1  Atlanta?

2  **A.**   Yes.

3  **Q.**   Okay.  Now, this exercise equipment that you seized from

4  CubeSmart --

5  **A.**   Yes.

6  **Q.**   -- where is it taken?

7  **A.**   It was taken to our Century Center location and it was put

8  in -- downstairs in our basement.

9  **Q.**   Is that where you put the documents as well?

10 **A.**   No, the documents were up on the 18th floor locked in an

11 office.

12 **Q.**   Okay.  And you would agree that on April 4, 2017, the

13 Chrisleys challenged the seizure and the assessments by filing an

14 appeal?

15 **A.**   Yes.

16         MR. MORRIS:  If we could just see Exhibit 37 to confirm

17 that, please.

18         Move for the admission of 37.

19         MR. KREPP:  No objection.

20         THE COURT:  It's admitted.

21         MR. MORRIS:  Thank you.

22         (Defendant's Exhibit 37 was marked in evidence as of

23 this date.)

24 **Q.**   Now, April 20, you had already reached -- you had already

25 contacted IRS Agent Betty Carter requesting assistance in getting

1 2009 tax returns and you were waiting for a response; is that

2 right?

3 **A.**   Yes.

4 **Q.**   Okay.  Now, as all of this is going on in February and March,

5 LaShaun Wright is -- I think it's your word -- bugging you every

6 day for information; correct?

7 **A.**   Yes.

8 **Q.**   On the Chrisleys?

9 **A.**   Yes.

10 **Q.**   And she kept saying, when is the case going to be turned over

11 to me?

12 **A.**   Yes.

13 **Q.**   And she's criminal?

14 **A.**   Yes.

15 **Q.**   Okay.  She actually e-mailed you and asked, you know, "When

16 are you going to share this case with me because I do

17 celebrities?"  Do you remember that?

18 **A.**   I don't, but that doesn't surprise me.

19 **Q.**   Okay.  Now, you know that LaShaun Wright -- and, again, she's

20 in OSI?

21 **A.**   Yes.

22 **Q.**   Was she a supervisor?

23 **A.**   Yes.

24 **Q.**   You know that she knew IRS agent Larry Arrow?

25 **A.**   I knew that afterwards, yes.

**Q.**   You didn't know that at the time?

**A.**   I did not.

**Q.**   Did you know at the time that she was telling Agent Arrow information about the Chrisley investigation?

**A.**   I did not.

**Q.**   But you found out she did?

**A.**   Yes.

**Q.**   Had you ever seen Arrow at the GDOR offices to meet with LaShaun Wright or her assistant Valencia?

**A.**   I mean, no.  I wouldn't have known who he was.  I didn't meet him formally until afterwards.

**Q.**   Okay.  But when you met him formally and realized who he was, did you recognize him as someone who often came by the GDOR office to see LaShaun and her assistant Valencia?

**A.**   I had seen him around.  I didn't know who he was.

**Q.**   No, but you learned who he was?

**A.**   Yes.

**Q.**   And once you now know who he is, he's the same guy who was there with LaShaun Wright a good deal of time --

**A.**   Yes.

**Q.**   -- in early 2017 and before?

**A.**   Yes.

**Q.**   Okay.  And you did not know at the time that LaShaun was the one who told Larry Arrow you had found documents at Printer & Parts Warehouse?

**A.**   No, I did not know.

**Q.**   But you learned that?

**A.**   Yes.

**Q.**   And Larry Arrow started calling you and asking you to give him everything that you had found?

**A.**   I don't know if it was those words, but he called -- I remember one phone call, in particular, with Larry Arrow.  It was the first time he had reached out.  But I did not speak with him for very long, Merrill Jacobson took the call over.

**Q.**   Do you remember him getting upset and screaming at you, "You better give me everything you've got on the Chrisleys"?

**A.**   I don't remember everything he was yelling at me.  He was upset with me for other reasons.

**Q.**   I beg your pardon?

**A.**   He was upset with me for other reason.

**Q.**   He was upset with you about the Chrisleys, wasn't he?

**A.**   That I had left Todd Chrisley's name on his voicemail, yes.

**Q.**   Didn't he -- my word, but you get my meaning -- demand that you give him everything that you had on the Chrisleys?

**A.**   I don't remember those words, in particular.  Like I said, he was yelling a lot at me.

**Q.**   He asked you for information on the Chrisleys; yes?

**A.**   Yes.

**Q.**   He left you a voicemail message to start with because you were in a manager's meeting in Savannah?

**A.**   Yes.

**Q.**   You called him back and left him a voice message?

**A.**   Yes.

**Q.**   That's when he called you back and screamed at you because you had mentioned Todd Chrisley's name on the voicemail?

**A.**   Yes.

**Q.**   And that is when he demanded everything from you that you had on the Chrisleys; isn't that right?

**A.**   I can't 100 percent say yes or no to that at this point.

**Q.**   I beg your pardon?

**A.**   I can't 100 percent say yes or no to that.  Like I said, he was yelling at me, and I don't remember everything he was yelling at me.

**Q.**   Let's break it down.  He was yelling; yes?

**A.**   Yes.

**Q.**   Part of the conversation, he is demanding everything you have on the Chrisleys?

**A.**   Yes.

**Q.**   Okay.  You've already told us that after the fact, because you didn't know at the time it was happening, but after the fact you found out that Josh Waites had been sharing information about the Chrisleys with Larry Arrow?

**A.**   Yes.

**Q.**   And when Merrill Jacobson learned of that, he got very upset, didn't he?

1  **A.**  Yes.

2  **Q.**  And to use your words, he ripped Josh for sharing information

3  with Larry Arrow that he shouldn't have?

4  **A.**  Yes.

5  **Q.**  On May 16, did you go back to CubeSmart?  May 16, 2017, is

6  that when you went to CubeSmart?

7  **A.**  I don't know the dates.  We did visit CubeSmart more than

8  once.

9  **Q.**  Okay.  On May 23, 2017, did GDOR agents, including you and

10  Waites and Santillie, pull information from the GCIC system about

11  the Chrisleys?

12  **A.**  I have no access to GCIC.

13         MR. MORRIS:  May I see -- may I see Document 40, Exhibit

14  40.

15  **Q.**  Do you see Exhibit No. 40 on your screen?

16  **A.**  Yes, so they e-mailed it to me.

17  **Q.**  It's dated May 23, 2017 from Scott Santillie to you?

18  **A.**  Yes.

19  **Q.**  This is information from GCIC, isn't it?

20  **A.**  I honestly don't know.  If this was, it was -- like I said,

21  you can tell it was e-mailed to me.

22  **Q.**  Yeah, it's being provided to you from Scott Santillie on the

23  criminal side?

24  **A.**  Okay.

25  **Q.**  And GCIC -- by the way GCIC, Georgia Criminal Information

1  Center, you understand that information is for use in criminal

2  investigations?

3  **A.**  Yes.

4  **Q.**  And only criminal investigations?

5  **A.**  Yes, I understand that now.

6  **Q.**  And you were given this information, weren't you?

7  **A.**  Yes.

8          MR. MORRIS:  May I move into evidence Defendant's

9  Exhibit 40, please.

10         MR. KREPP:  No objection.

11         THE COURT:  It's admitted.

12         (Defendant's Exhibit 40 was marked in evidence as of

13  this date.)

14  CROSS-EXAMINATION

15  BY MR. MORRIS (continued):

16  **Q.**  It's also shared from -- Josh Waites also has this

17  information; correct?

18  **A.**  Yes.

19  **Q.**  LaShaun Wright has this information?

20  **A.**  Yes.

21  **Q.**  Okay.  On May 23 and May 24, 2017, GDOR agents searched

22  through the seized property for specific items that you had

23  identified; correct?

24  **A.**  I don't remember.

25         MR. MORRIS:  May I see Document 41, please.

1  **Q.**  Would you take a look at Exhibit No. 41, see if this helps

2  refresh your recollection.

3  **A.**  Okay.

4  **Q.**  You notice this purports to be an e-mail from Scott Purvis

5  dated May 19, 2017, to a number of people?

6  **A.**  Yes, sir.

7  **Q.**  And it talks about, "We have to go through the Chrisley's

8  belongings that are stored at South-Metro next week;" right?

9  **A.**  Yes.

10  **Q.**  "Katie will take the lead and explain what we need to be on

11  the lookout for and how to bring it back," et cetera?

12  **A.**  Yes.

13  **Q.**  Does that refresh your recollection --

14  **A.**  Yes.

15  **Q.**  -- that that occurred?

16  **A.**  Yes, that would be inventory they found.

17  **Q.**  I'm sorry?

18  **A.**  That would be inventory-day event, because we're asking for

19  help from our regional offices.

20  **Q.**  Is this the day that you're also saying that you gathered up

21  the boxes of documents and took them back --

22  **A.**  Yes.

23  **Q.**  -- to GDOR?

24  **A.**  To the best of my memory, yes.

25  **Q.**  So this is May 23?

1  **A.**   Yes.  Or May 19.

2  **Q.**   May 19.  And I think it was set up for May 23.  But May 19?

3  **A.**   Yes.

4  **Q.**   If this is the day that you're packing up the boxes to take

5  them back to GDOR, you already testified that Larry Arrow is

6  asking you about those documents back in April; yes?

7  **A.**   I don't think he was asking about documents specifically that

8  we took.  We knew that they were -- I knew that there were

9  documents within those -- within everything, within all of the

10  stuff that we took because we had looked at some of them.  I go

11  back and forth to South-Metro and Century Center a lot during this

12  time period trying to check on it and make sure that nobody is

13  messing around in it and looking through things, because that's

14  part of my job.  I took it; I'm responsible for it.

15  **Q.**   Now, you're looking at documents at various times while

16  they're stored?

17  **A.**   Not specifically at documents, but looking at what we had

18  taken.

19  **Q.**   You know, we're not worried about couches and furniture here,

20  we're talking about these boxes of documents.  Okay?

21  **A.**   Yes.  So I'm slowly going through things by myself, sometimes

22  Devan is there, sometimes not, which is why we ended up asking for

23  more help.  There was just too much stuff for me or Devan to

24  handle by ourself.

25  **Q.**   I understand.

1  **A.**   Yeah.  So that's what this is about.  At this point we are

2  asking for assistance from our regional office managers --

3  **Q.**   That's good.

4  **A.**   -- to help us come and inventory.

5  **Q.**   I'm just trying to establish my timeline.

6  **A.**   I understand.

7  **Q.**   Before this happened, you're already talking to Larry Arrow

8  about giving him some of these documents?

9  **A.**   Like I said, I don't think it was about documents.  Larry

10  wanted everything I had already done.

11  **Q.**   Everything you had?

12  **A.**   That was -- that's my understanding.

13  **Q.**   And he knew about the search and seizure?

14  **A.**   From LaShaun.

15  **Q.**   Okay.  Now, when you took these documents from the South-Metro

16  warehouse to the GDOR headquarters to go through them, your

17  intention was to go through them and find anything that would be

18  valuable to you?

19  **A.**   Yes.  I was looking for banks or some other way for us to,

20  like, levy on either bank account -- something else besides having

21  to go through auctioning.

22  **Q.**   And you fully intended to share that information with the IRS,

23  didn't you?

24  **A.**   If we came -- if we were going to give the furniture back

25  instead of auctioning it?  Yes.

1   **Q.**  If you found information from the documents that led you to

2   other assets, you were -- or bank accounts, you were going to

3   share that information with the IRS?

4   **A.**  Again, if I was going -- if I found something that led me to

5   not auction, yes, I would alert the IRS.  Yes.

6   **Q.**  Okay.  I wanted to make sure that was your intention.

7   On June 7, 2017, Josh Waites sends a text that he's waiting

8   for information from IRS Agent Betty Carter.  Do you recall that?

9   **A.**  I don't.

10          MR. MORRIS:  Let's see Document 18, please.  By the way,

11  did I move into evidence 40 and 41?

12          MR. KREPP:  Just 40.  No objection to 41.

13          MR. MORRIS:  Thank you.

14          THE COURT:  All right, it's admitted.

15          (Defendant's Exhibit 41 was marked in evidence as of

16  this date.)

17          MR. MORRIS:  Now we're looking at 18, I think.

18  CROSS-EXAMINATION

19  BY MR. MORRIS (continued):

20  **Q.**  Is this a text chain between you and Josh Waites on June 7,

21  2017?

22  **A.**  Yes.

23  **Q.**  Okay.  And do you see where you say, "Betty will let me know

24  by the end of the day;" is that Betty Carter?

25  **A.**  I don't know.

1  **Q.**  You don't know?

2  **A.**  I don't.

3  **Q.**  Well, we're talking about the Chrisleys here, aren't we?

4  **A.**  Yes.  So one could assume, but I don't know off -- I don't

5  remember.

6  **Q.**  Okay.  Are there any other Bettys that you and Josh Waites

7  know in common that are related to the Chrisleys?

8  **A.**  I don't know.  I don't.

9  **Q.**  Well, question here.  This communication between you and Josh

10  is, "Any word from Nashville?"  This has to do with whether the

11  Chrisleys are there; correct?

12  **A.**  I don't know.  I really don't remember what this is about.

13  **Q.**  Okay.  If you don't, you don't.  That's okay.

14     All right.  But you admit, although you don't recall that

15  could be a reference to Betty Carter?

16  **A.**  Yes.

17  **Q.**  And you're waiting on information from her?

18  **A.**  Yes.  At this point, it would probably would be missing tax

19  returns that we were trying to get.

20  **Q.**  Is that the likely scenario of what this is?

21  **A.**  Yes.

22  **Q.**  Okay.  You just don't have the particular recollection; is

23  that right?

24  **A.**  Correct.

25  **Q.**  Okay.  January 4, 2018, you and other GDOR agents meet with

1  IRS agents, FBI agents and federal prosecutors to discuss the

2  Chrisley investigation?

3  **A.**   Yes.

4  **Q.**   Josh Waites is there, too?

5  **A.**   Yes.

6  **Q.**   And they deliver you a subpoena for these documents that you

7  have moved from the South-Metro warehouse to GDOR headquarters?

8  **A.**   I don't know.  You would have to show it to me.

9  **Q.**   Oh, okay.

10 **A.**   There were other people driving that meeting.

11 **Q.**   Okay.

12       MR. MORRIS:  If I -- well, may I see Document 44,

13 please.

14 **Q.**   If you look at Document 44, in the middle of that full

15 paragraph, "AUSA Krepp handed over grand jury subpoenas requesting

16 documents pertaining to the case against Michael Todd Chrisley."

17 Does that refresh your recollection?

18 **A.**   Yes.

19 **Q.**   Thank you.

20       MR. MORRIS:  You don't need to put that one into

21 evidence.

22 **Q.**   And did you answer a lot of questions for the agents and the

23 prosecutors that day?

24 **A.**   I did not.

25 **Q.**   Okay.  You were just there?

1  **A.**  I answered some questions, but I was not the one driving that

2  meeting.

3  **Q.**  Did anybody ask you about LaShaun Wright's role or Josh

4  Waites' role in the criminal investigations that were going on at

5  GDOR about the Chrisleys during this meeting?

6  **A.**  Not to my memory.

7  **Q.**  Anybody ask you about LaShaun providing information to Larry

8  Arrow?

9  **A.**  Not to my memory.

10 **Q.**  Or Josh Waites?

11 **A.**  No.

12 **Q.**  And on February 7, 2018, the federal search warrant is served

13 on GDOR for the Chrisley documents?

14 **A.**  Yes.

15 **Q.**  And you provide them the documents that were seized you say

16 from Printer & Parts Warehouse?

17 **A.**  Yes.

18 **Q.**  That were moved to South-Metro?

19 **A.**  Yes.

20 **Q.**  That were later moved to the GDOR headquarters?

21 **A.**  Yes.

22 **Q.**  And show up on -- I believe it is Defendant's Exhibit 26?

23        MR. MORRIS:  May I see 26.

24 **Q.**  Yeah, that one.  That's it?

25 **A.**  Yes.

1  **Q.**  Okay.  And those documents were taken with the federal agents?

2  **A.**  Yes.

3  **Q.**  Were there any documents found at CubeSmart?

4  **A.**  I think there were some checkbooks, but nothing -- it was

5  mostly exercise equipment, Halloween costumes, and, like, a few

6  decorative house items.

7  **Q.**  Nothing that was included in what was given to the federal

8  agents in response to the grand jury subpoena or the search

9  warrant?

10  **A.**  Not that I remember.

11  **Q.**  Okay.  Is there an inventory of the CubeSmart seizure?

12  **A.**  If it's not in my notebook, it's not.

13  **Q.**  I don't have your notebook, so I don't know.  Do you recall?

14  **A.**  I don't recall.  It was mainly exercise equipment.  We ended

15  up leaving a lot -- not a lot, but we left a lot of the, like,

16  home-good stuff.

17  **Q.**  Okay.

18           MR. MORRIS:  Getting close.

19  **Q.**  Oh, I have a question again about the subpoenas that you

20  issued that you say you found out about at Printer & Parts

21  Warehouse.  I think you said on cross-examination that you learned

22  about it from documents you got through the bankruptcy?

23  **A.**  It could have been, yes.  I know I already had some Bank of

24  America bank statements, and I know that it came from there.

25  **Q.**  Okay.  Well, the bankruptcy is in at least 2014; correct?

1  **A.**  I think it began in 2012, yes.

2  **Q.**  And it ends in 2015; right?

3  **A.**  I don't -- I don't know.  '16, '15 or '16.

4  **Q.**  Well, when Josh Waites came to you in 2015, I think you said,

5  and told you that the bankruptcy was over and you started looking

6  into it --

7  **A.**  Yes.

8  **Q.**  -- am I right, that's 2015?

9  **A.**  Yes.  I started subpoenaing stuff way back when the case was

10  first given to me based on our warehouse information.

11  **Q.**  You couldn't have gotten Printer & Parts Warehouse information

12  at that time through subpoenas because they hadn't even signed a

13  lease until 2016?

14  **A.**  So I'm not sure which group of subpoenas it came from.  I know

15  it came from Bank of America.  I'm not sure which -- because I

16  know I sent out multiple subpoenas and at multiple different

17  times.

18  **Q.**  The interesting thing is, those subpoenas are in 2017, around

19  the time of the FinCEN; correct?

20  **A.**  If they were, yes.

21  **Q.**  So it could have come from that?

22  **A.**  I mean, yes, it could have, but...

23  **Q.**  I know you don't remember.  It's okay.  It's okay.  It's okay.

24  One thing I'm still confused about, the mantra of civil and

25  criminal are separate.

1    As I understand your position, your testimony is you gather

2    all of this furniture for the purpose of selling it to pay taxes

3    and it's strictly civil; right?

4    **A.**   Yes.

5    **Q.**   But when all is said and done, what you give back is the civil

6    part and you keep the boxes to be used for criminal purposes?

7    **A.**   We didn't give the furniture back until 2019, 2020.  Like, it

8    was a long time before the GGT case -- I'm sorry, the tax tribunal

9    case was settled so we could give things back.  By that time, the

10   search warrant had already been served.

11   **Q.**   I beg your pardon?

12   **A.**   Like, the search warrant -- the other side had already been

13   served.

14   **Q.**   The search warrant was served prior to the settlement with the

15   Chrisleys?

16   **A.**   Yes.

17   **Q.**   Okay.  Okay.  All right.

18       With regard to those documents that you went through when you

19   moved them from South-Metro to GDOR offices, who else looked at

20   those or reviewed those documents other than you?

21   **A.**   Devan Fort, James King.

22   **Q.**   James?

23   **A.**   King.

24   **Q.**   King?

25   **A.**   Yes.

1  **Q.**  How about LaShaun Wright?

2  **A.**  Not -- not with me in the room, no.

3  **Q.**  Not with you.  Who else with you in the room?

4  **A.**  Devan, James.  We would show things to Merrill for context --

5  **Q.**  Okay.

6  **A.**  -- to try to understand some of the lawsuit information.  To

7  the best of my memory, that's everyone that was in the room.  We

8  kept it -- we tried to keep it very close.

9  **Q.**  Were they locked in?

10  **A.**  Yes.  When we were not looking at them, they were locked in a

11  room.

12  **Q.**  Who kept the key?

13  **A.**  I did.

14  **Q.**  Okay.  Okay.

15  You correct me if I'm wrong, but GDOR folks -- when I say

16  folks, I mean pretty much superiors --

17  **A.**  Um-hum.

18  **Q.**  -- were very worried because of their learning of the

19  combination of OSI and Civil Compliance sharing information about

20  the Chrisleys?

21  **A.**  I don't -- I don't know if I understand what you mean.  What

22  do you mean very worried?

23  **Q.**  Well, actually, I'm quoting you from something on the

24  tape-recording.  Just tell me if it refreshes your recollection.

25  MR. KREPP:  Objection.  Your Honor, I'm going to object.

1  It is not proper to refresh her recollection.

2           THE COURT:  I'm going to sustain that.

3           MR. MORRIS:  Well --

4           MR. KREPP:  Your Honor, to the extent that Mr. Morris is

5  going to show transcripts that the witness has never seen

6  before --

7           MR. MORRIS:  I'm not going to show a transcript.  I'm

8  going to play a clip.

9           MR. KREPP:  Well, I'm going to make a pre-objection at

10 this point then.  The witness has never heard these clips before.

11 They were taken without her knowledge or consent.  She doesn't

12 know the context of the full conversation that is going to be

13 played.  It was just provided to the government the day before

14 yesterday.  So I'm not sure this is a proper way of refreshing

15 memory.

16          THE COURT:  Well, I don't have a question put to her

17 yet.  So I'll let you renew her objection once I have a better

18 sense of what's being asked.

19          MR. MORRIS:  Thank you.

20          Clip -- let's try another clip.  Withdraw the question.

21 CROSS-EXAMINATION

22 BY MR. MORRIS (continued):

23 **Q.**  Josh Waites freaked out and told everyone to say he was not at

24 the Printer & Parts Warehouse seizure; correct?

25 **A.**  Yes.

1  **Q.**  I think I asked you when Merrill Jacobson found out that

2  LaShaun Wright told Larry Arrow about the documents you had found,

3  that Merrill ripped into Josh because he had no right to share

4  that information?

5  **A.**  Yes.

6  **Q.**  Okay.  Would you agree or disagree that Mr. Jacobson was

7  worried about the sharing of that information?

8  **A.**  Yes.

9  **Q.**  He was; right?

10  **A.**  Yes.

11  **Q.**  There was also concern because FinCEN had been improperly

12  accessed; correct?

13  **A.**  Yes.

14  **Q.**  And there was concern because Josh Waites had destroyed

15  evidence; correct?

16  **A.**  I didn't know anything about that until later, much later on.

17  **Q.**  But you did learn that Mr. Waites, after he was told to

18  maintain all evidence, he destroyed evidence from his phones and

19  his computer, wiped them clean?

20  **A.**  I heard about that secondhand.

21  **Q.**  Sorry?

22  **A.**  I heard about that, like, secondhand.  I didn't see it first

23  person.

24  **Q.**  No, you just repeated that you had heard?

25  **A.**  Yes.

**Q.**   Do you have any reason to doubt it?

**A.**   No.

**Q.**   Okay.  And is it fair to say that you believed that there was enough concern about what had gone wrong between the civil side being manipulated by the criminal and the sharing of information with the IRS in the Chrisley matter, that people would lie, if necessary, to avoid getting into trouble?

**A.**   Yes.

        MR. MORRIS:  Thank you.  That's all I have.

        THE COURT:  Any redirect?

        MR. KREPP:  Yes.

        MR. FRIEDBERG:  Your Honor, if we could just have a moment?

        THE COURT:  Yes.

        MR. FRIEDBERG:  Thank you.

        MR. MORRIS:  I forgot to ask you something, I apologize.

CROSS-EXAMINATION

BY MR. MORRIS (continued):

**Q.**   You have an office at GDOR, at 1800 Century Center?

**A.**   I have a cubicle, yes.

**Q.**   Did Josh Waites have a cubicle?

**A.**   No, he has an office.

**Q.**   He has a real office?

**A.**   Yes.

**Q.**   Been in his office?

1  **A.**   Yes.

2  **Q.**   Many times?

3  **A.**   Yes.

4  **Q.**   In 2016 and '17, did Josh Waites have a dartboard in his

5  office?

6  **A.**   Yes.

7  **Q.**   Whose face was on the dartboard?

8  **A.**   For a brief moment in time, there was a picture of Todd

9  Chrisley.

10 **Q.**   Todd Chrisley was on the dartboard where he could throw darts

11 at; correct?

12 **A.**   Yes.

13 **Q.**   Did he have a punching bag in his office?

14 **A.**   Not that I remember.

15 **Q.**   You don't remember a punching bag with Todd Chrisley's face on

16 it?

17 **A.**   Not in his office, no.

18 **Q.**   Where was it then?

19 **A.**   I don't remember a punching bag, I'm sorry.

20 **Q.**   You don't remember telling someone that you've actually seen

21 it yourself?

22 **A.**   It's so long ago, at this point I don't remember.  I remember

23 the dartboard.

24 **Q.**   You're not saying it wasn't there, you just don't have a

25 specific memory?

**A.**   Yes, sir.

**Q.**   If I played a tape-recording for you where you said you did

see it, would that help refresh your recollection?

**A.**   If I said I saw it, then I saw it but I just don't remember at

this point.

          MR. MORRIS:  May I have that clip, please?  Is that on a

clip?  Can we identify this by a particular number?

          THE COURT:  Mr. Krepp?

          MR. KREPP:  Before we play it, Your Honor, now I'm going

to object.  If it's a clip being played, we don't know what this

clip is, we don't know the date of the clip.  Typically, when you

have a witness on impeachment, to authenticate the clip, saying

what was taking place.  Apparently, it is just a statement out of

either -- we don't know what was going on around it.  So I think

it's improper, an improper way of -- I think what Mr. Morris is

trying to do is refresh the witness' memory.  I think that's

improper, and I think I'm going to make a 403 objection as well,

because the -- the substantial prejudice here outweighs any

limited probative value.

          THE COURT:  Well, I haven't heard it yet so I'm going to

have full context.  But I think if I understand correctly, what

Mr. Morris is proposing to do is play a clip of a conversation

that the witness was a part of, and I don't think that that is

inherently improper as a potential method of refreshing a

recollection.  It may or may not, I don't know that.  Until we get

1  the question and answer, we don't know.

2          So a 403, I mean, this is not a trial.  We don't have a

3  jury.  I'm not likely to be inflamed or overly prejudiced.  I'm

4  capable of assessing more, I guess, academically for lack of a

5  better -- the weight to be, if any, to any particular quantum of

6  evidence.  So I'm going to overrule the 403 objection.

7          I don't know whether it will properly refresh her

8  recollection.  We'll see.

9          MR. MORRIS:  I have to ask her.

10          Can we have the clip, please.

11          (Whereupon, an audio clip was played for the court.)

12  CROSS-EXAMINATION

13  BY MR. MORRIS (continued):

14  **Q.**  Do you recognize your voice?

15  **A.**  I guess.  It could be me.

16  **Q.**  Does it refresh your recollection about this statement?

17  **A.**  It doesn't.  I'm going to be honest, it doesn't.  But it

18  sounds like me and it sounds like I said it, so...

19  **Q.**  In this courtroom today, only you can tell us.  Would you like

20  to hear it again?

21  **A.**  No, I just don't remember.  I don't.

22  **Q.**  Do you recognize the voice?

23          MR. KREPP:  Your Honor, the witness has answered she

24  doesn't remember.  That's a point of refreshing recollection.

25  That's the whole point of playing that statement.  She said it

 1   doesn't refresh her memory, and Mr. Morris should move on.

 2            THE COURT:  I think I'm going to sustain the objection.

 3   I don't know if you want to, for the record purposes, if you have

 4   for identification purposes some disk or something.

 5            MR. MORRIS:  I would like to -- yeah, we'll substitute

 6   it somehow.  I think we have it available that we can provide it

 7   electronically to the court reporter.

 8            THE COURT:  Okay.

 9            MR. MORRIS:  Thank you.  Let me see if I have anything

10   else, Your Honor.

11            (Whereupon, a conversation took place off the record.)

12            MR. MORRIS:  Thank you, Your Honor.  That's all I have

13   for the moment.

14            THE COURT:  Any redirect?

15            MR. KREPP:  Yes, Your Honor, briefly.

16   REDIRECT EXAMINATION

17   BY MR. KREPP:

18   Q.  All right.  Ms. Vancil, I wanted to follow up on a few of the

19   questions that Mr. Morris had for you.

20        You spoke a bit about LaShaun Wright?

21   A.  Yes.

22   Q.  Do you remember answering questions from Mr. Morris about

23   LaShaun Wright?

24   A.  Yes.

25   Q.  And LaShaun Wright worked with the Office of Special

1  Investigations --

2  **A.**   Yes.

3  **Q.**   -- is that right?

4  **A.**   Yes.

5  **Q.**   Okay.  That's one of the criminal arms of the Department of

6  Revenue?

7  **A.**   Yes.

8  **Q.**   And is it fair to say like Mr. Waites, did she express an

9  interest in the Chrisley case?

10  **A.**   Yes.

11  **Q.**   Okay.  Were you there for any conversations between --

12  reported conversations between LaShaun and IRS Special Agent Larry

13  Arrow?

14  **A.**   No.

15  **Q.**   Do you have any personal knowledge, meaning, were you present

16  or did you hear specific conversations between Agent Arrow and

17  LaShaun Wright about Todd and Julie Chrisley?

18  **A.**   No.

19  **Q.**   What role did LaShaun Wright play in reviewing the records you

20  obtained from the Printer & Parts Warehouse?

21  **A.**   None.

22  **Q.**   What role did LaShaun Wright play in investigating the

23  Chrisleys with the Compliance Division?

24  **A.**   None.

25  **Q.**   So you eventually found cut-and-pasted bank statements;

1  correct?

2  **A.**   Yes.

3  **Q.**   Did you turn them over to LaShaun Wright so she could begin a

4  criminal investigation?

5  **A.**   No.

6  **Q.**   Did you turn them over to Josh Waites so he could begin a

7  criminal investigation?

8  **A.**   No.

9  **Q.**   Did you turn them over to anybody at OSI so they could begin a

10  criminal investigation?

11  **A.**   No.

12  **Q.**   And you were asked about why they weren't returned to the

13  Chrisleys after a settlement in a tax tribunal.  Just to be clear,

14  the Chrisleys entered into an agreement with the Georgia

15  Department of Revenue at a much later date; correct?

16  **A.**   Yes.

17  **Q.**   And then furniture was return to them because of that

18  agreement; is that right?

19  **A.**   Yes.

20  **Q.**   But the Department of Revenue didn't have possession of those

21  documents, including the cut-and-pasted bank statements at that

22  point; is that correct?

23  **A.**   Correct.

24  **Q.**   At that point, the federal warrant had been executed; correct?

25  **A.**   Yes.

1  **Q.**  All right.

2     Now, let's talk about what was going on in early 2017.  We

3  heard a lot of different terminology being thrown around.  GENTX,

4  all right, we talked about that, you talked about that with Mr.

5  Morris at the very beginning.

6     Is there anything wrong with individuals in the Compliance

7  Division accessing and using GENTX to do their work?

8  **A.**  No, that's our system.  That's how we work.

9  **Q.**  All right.  And let's talk about this -- you later learn that

10  it was improper, meaning, not good for the Office of Special

11  Investigations to be submitting this 314(a) request --

12  **A.**  Yes.

13  **Q.**  -- through FinCEN; right?

14  **A.**  Yes.

15  **Q.**  Again, as was explained to you by Mr. Waites, was this

16  something that was meant to find additional bank accounts?

17        MR. MORRIS:  Excuse me, I would appreciate it if he

18  wouldn't lead.  I object to the leading nature of the question.

19        MR. KREPP:  That's fine.  I'll just rephrase, Your

20  Honor.

21  REDIRECT EXAMINATION

22  BY MR. KREPP (continued):

23  **Q.**  We'll just back up.  Tell me what you recall about what Josh

24  Waites told you about the 314(a) reports.

25  **A.**  He told me it was a way to find bank accounts that weren't in

1  our data warehouse.

2  **Q.**  All right.  At that point, tell us whether or not you already

3  knew that the Chrisleys used Bank of America?

4  **A.**  At that point we already knew.  I know we already knew that.

5  **Q.**  All right.  So whether or not -- tell me whether or not if the

6  request came back that the Chrisleys used Bank of America, was

7  that going to be news to you one way or another?

8  **A.**  No.

9  **Q.**  All right.  And again, how did you find the checks that went

10  to the Printer & Parts Warehouse?

11  **A.**  They were in the subpoena answer, and I was going through them

12  or going through the subpoena answer myself at my desk and that's

13  when I came across the checks.

14  **Q.**  And what was the financial institution that the checks were

15  issued off of?

16  **A.**  Bank of America.

17  **Q.**  On cross-examination Mr. Morris asked you, did you know you

18  were being used as a puppet of OSI; do you recall that?

19  **A.**  Yes.

20  **Q.**  So let's talk about that.  All right.

21     Was OSI directing you while you were coming up with an

22  assessment for the Chrisleys?

23  **A.**  No.

24  **Q.**  When I say OSI, I mean, Josh Waites, LaShaun Wright, any other

25  personnel within OSI.  Okay?

1  **A.**  Nobody was directing me in the case.

2  **Q.**  All right.  Were you acting as their puppet to do an

3  assessment of the Chrisleys?

4  **A.**  No, I was doing what my job was.

5  **Q.**  Which was what?

6  **A.**  Was to assess and collect if there was no agreement made.

7  **Q.**  Okay.  And what role did OSI have in deciding to collect

8  against the Chrisleys?

9  **A.**  They didn't have a role.

10  **Q.**  Okay.  Now, you walk in the warehouse, the warehouse at issue

11  where you found the documents, that was in late March 2017; right?

12  **A.**  Yes.

13  **Q.**  Okay.  So Josh Waites was there at -- at the --

14          MR. MORRIS:  Would you rephrase rather than leading her,

15  please.

16          MR. KREPP:  Sure.

17  REDIRECT EXAMINATION

18  BY MR. KREPP (continued):

19  **Q.**  Tell me whether or not Josh Waites was there on that first

20  day?

21  **A.**  Yes.

22  **Q.**  And can you tell me whether or not Josh Waites played a role

23  in deciding to go to the warehouse in the first place?

24  **A.**  No.

25  **Q.**  Can you tell me whether or not LaShaun Wright played a role in

1  deciding to go to the warehouse?

2  **A.**  No.

3  **Q.**  Can you tell me whether or not anybody at OSI played a role in

4  going to the warehouse?

5  **A.**  No.

6  **Q.**  Mr. Morris asked you about, you know, the decision to take it

7  all.  To your knowledge, who made the decision to take it all?

8  **A.**  Scott Graham.

9  **Q.**  So Mr. Morris asked you about -- names were being thrown

10  around quickly there, so I want to make sure the transcript

11  accurately reflects this.  I believe, and correct me if I'm wrong,

12  you talked about seeing people talk together?

13  **A.**  Yes.

14  **Q.**  Scott and Josh were talking together --

15  **A.**  Yes.

16  **Q.**  -- is that right?

17      Based upon your knowledge, who made the ultimate decision to

18  take everything that day?

19  **A.**  Scott Graham.

20  **Q.**  Now, you were asked a number of questions about contact with

21  Betty Carter, contact with the IRS.  Can you tell me in your

22  ten-plus years experience with the Department of Revenue, is there

23  something illegal about the Department of Revenue coordinating

24  matters with the Internal Revenue Service?

25  **A.**  No.  I mean, during this time period I was doing a lot of

1   negotiation with the IRS over properties, over the previous case

2   that I had mentioned before, and partial satisfactions, offers of

3   compromises.  So it was normal for us to call and talk to them.

4   **Q.**  Okay.  All right.  And, again, what role did IRS play in

5   Georgia Department of Revenue's decision to take materials from

6   the Printer & Parts Warehouse?

7   **A.**  None.

8   **Q.**  Now, I believe you talked about a conversation you had with

9   LaShaun Wright about Larry Arrow --

10  **A.**  Yes.

11  **Q.**  -- is that right?  Okay.

12     Can you tell me if anybody has ever told you that Larry Arrow

13  was somehow working behind the scenes to get the Georgia

14  Department of Revenue to somehow seize these materials from the

15  Printer & Parts Warehouse?

16  **A.**  No.

17  **Q.**  All right.  Did anybody -- has anybody ever told you that --

18  anybody from the IRS was working behind the scenes to get a state

19  agency, the Georgia Department of Revenue, to take auctions

20  against Todd or Julie Chrisley?

21  **A.**  No.

22  **Q.**  Now, you were asked a number of questions, you went back and

23  forth with Mr. Morris on, about a conversation with Larry Arrow,

24  and I believe Mr. Morris was -- kept asking you about, "Give me

25  everything;" do you remember him asking you about that?

**A.**   Yes.

**Q.**   All right.  Can you just tell us -- now that you have a
chance, can you just explain a little bit to the best of your
knowledge, and if you don't remember, you don't remember, but just
tell us what you recall being discussed with Agent Arrow at the
time?

**A.**   He was upset when he called me back because I had left him a
voicemail saying that my name was Agent Colvin, I was with the
Department of Revenue, and I was calling him back in regards to
his phone call to me about Todd Chrisley.  He was very upset that
I had left a voicemail like that to him, saying that that's not
how it works in the IRS with the civil and the criminal, you don't
leave -- names on voice mails, and he was yelling at me, going on
and on.  So there was a lot that -- I was not really responding
to -- I was shocked.  And that's when Merrill Jacobson took the
phone call over.  So there was not a lot of me responding to
anything, just being shocked at how I was being spoken to.

**Q.**   Okay.  At any point, can you tell me whether or not Agent
Arrow was demanding records that you had seized from the Printer &
Parts Warehouse?

**A.**   He was never demanding specific things, it was an everything.

**Q.**   So when you say everything, was it sort of -- tell me what you
mean by that?

**A.**   It was just a general.  Just "I want everything.  I want to
know everything."

1 **Q.** All right.  Did Agent Arrow, before the January 2018 meeting

2 and before the federal search warrant was executed, can you tell

3 me whether or not Agent Arrow or anybody from the IRS ever came

4 over to look through all of the records that you had taken from

5 Printer & Parts Warehouse?

6 **A.** Not to my knowledge, no.

7 　　　　MR. KREPP:  One moment, Your Honor.

8 REDIRECT EXAMINATION

9 BY MR. KREPP (continued):

10 **Q.** All right, just to wrap things up, it sounds like there was

11 interest from OSI; is that right?

12 **A.** Yes.

13 **Q.** In the Chrisleys?

14 **A.** Yes.

15 **Q.** Can you tell me whether or not you ever turned records over or

16 fed information to OSI from -- let me take a step back.  I

17 apologize.

18 　　Tell me whether or not you ever turned records over, turned

19 the documents over you took from Printer & Parts Warehouse to OSI

20 agents?

21 **A.** No.

22 **Q.** All right.  And where did the documents remain while they were

23 at the Department of Revenue?

24 **A.** On the 18th floor in the office.

25 **Q.** In whose office?

**A.**   It was an empty office.

**Q.**   Was that within the Compliance Division?

**A.**   Yes, it was right next to my cubicle.

**Q.**   Can you tell me whether or not those records were ever turned over to OSI?

**A.**   No.

        MR. KREPP:   Thank you.   That's all I have, Your Honor.

        MR. MORRIS:   Just briefly, Your Honor.

        THE COURT:   Is there a new scope that was opened up?

        MR. MORRIS:   Beg your pardon?

        THE COURT:   Is there some significantly new scope that was opened up?   We don't normally do recross.

        MR. MORRIS:   Just two questions.

        THE COURT:   All right.   I'll give you a little bit of leeway.

        MR. MORRIS:   Thank you.

        Do you recall -- well, if I have to refresh her recollection, it may be two.

        THE COURT:   That's all right.

RECROSS-EXAMINATION

BY MR. MORRIS:

**Q.**   Do you recall that LaShaun Wright came to the room where you were looking through the documents that had been seized and, quote, I remember her picking stuff up and looking at it and asking what it was?

1  **A.**   Yeah.

2  **Q.**   You do remember that?

3  **A.**   Yes.

4  **Q.**   And those were the documents that were in that room that we're

5  discussing at 1800 Century Center?

6  **A.**   Yes.

7  **Q.**   Okay.  Mr. Krepp asked you, you know, "Did you ever hear

8  LaShaun tell Larry Arrow or Josh Waites tell Larry Arrow," and you

9  said no.  You've testified several times that you know that

10  LaShaun Wright gave information to Larry Arrow about the Chrisleys

11  and so did Josh Waites.  Where did you hear that?  How did you

12  learn that?

13  **A.**   LaShaun had to apologize to me about how Larry spoke to me

14  through Josh's direction, and she told me at that time that she

15  was the one that told Larry.

16  **Q.**   She was the one that what?

17  **A.**   LaShaun was the one that told Larry.

18  **Q.**   So LaShaun had told Larry.  How about Josh, how do you know

19  that he was sharing information with Josh?

20          MR. KREPP:  Objection, your Honor, she already answered

21  this on --

22          THE COURT:  Yeah, I'm going to sustain the objection.

23  We're going beyond the scope on anything new brought up on

24  redirect.

25          MR. MORRIS:  He didn't ask that?  I thought he did.

1          MR. KREPP:  I ask specifically about conversations with

2    LaShaun Wright, unless --

3          MR. MORRIS:  I thought he was asking about Josh --

4          THE COURT:  But, Mr. Morris, it was just not what was

5    asked during redirect, is there anything new that you didn't get a

6    chance to ask about?

7          MR. MORRIS:  It's not new.

8          THE COURT:  Okay, so that's why I'm sustaining the

9    objection.

10         MR. MORRIS:  Thank you, Your Honor.  That's all I have.

11         THE COURT:  In fairness, I have to ask is there any

12   redirect?

13         Ms. Vancil, you may step down.  Thank you very much.  Is

14   this witness to be excused at this time?

15         MR. KREPP:  Yes, Your Honor.

16         THE COURT:  You're excused.  You can go about your day.

17         Call your next witness.

18         MR. KREPP:  The government calls Scott Purvis.

19         THE COURT:  It's four now, I figure we'll go to five.

20   Are we about on track do you think?

21         MR. MORRIS:  Yes, sir.  I think we have one more lengthy

22   witness, well maybe two, but that's it as far as I know.  Mr.

23   Arrow and possibly LaShaun Wright and that's it.

24         THE COURT:  Okay.

25         MR. KREPP:  We're not calling LaShaun.

```
1              MR. MORRIS:  Yeah.

2              MR. KREPP:  You are?

3              THE COURT:  That's helpful just for timing purposes.

4              MR. KREPP:  I think we'll finish tomorrow, is the

5    answer.  What time do you think we're going to today?

6              THE COURT:  I was thinking -- I mean, five is good as

7    anything.  I mean, give or take.  There is no point starting a

8    witness with five minutes to spare.  Going over by five minutes to

9    finish, we'll do that, but generally speaking, it will be five.

10             THE DEPUTY CLERK:  Do you solemnly swear or affirm that

11   the testimony you shall give in this matter now pending before the

12   court, shall be the truth, the whole truth and nothing but the

13   truth so help you God?

14             THE WITNESS:  I do.

15             THE DEPUTY CLERK:  Would you please state and spell your

16   name for the record.

17             THE WITNESS:  My name is Scott Purvis.

18             THE DEPUTY CLERK:  Could you spell it for me, please?

19             THE WITNESS:  I'm sorry?

20             THE DEPUTY CLERK:  Can you spell it for me?  Spell your

21   last name.

22             THE WITNESS:  Sure, P-U-R-V-I-S.

23             THE DEPUTY CLERK:  Thank you.

24             THE COURT:  Mr. Purvis, you may have already been

25   advised about this because I see you taking your mask off.  Just
```

1  to be sure, if you have been fully vaccinated --

2         THE WITNESS:  I have, thank you.

3         THE COURT:  Very good.

4                        ******

5                     SCOTT PURVIS,

6         having been duly sworn, testified as follows:

7                        ******

8  DIRECT EXAMINATION

9  BY MR. KREPP:

10 **Q.**  Good afternoon, Mr. Purvis.  We just spoke I think two weeks

11 ago.  My name is Tommy Krepp.  I'm one of the prosecutors.  We

12 never met, though.  It's nice to meet you in person.

13 **A.**  Thank you, sir.

14 **Q.**  My understanding is that you traveled down here --

15 **A.**  I did.

16 **Q.**  -- from Tennessee, thank you for being here today.

17 **A.**  Absolutely.

18 **Q.**  Will you please tell us how you're currently employed?

19 **A.**  I work for the Tennessee Department of Revenue.  I retired

20 from the Georgia Department of Revenue at the end of February.

21 **Q.**  All right.  That was my very next question.

22     What did you do before this?

23 **A.**  Before that I worked for the Georgia Department of Revenue.  I

24 started October the 1, 1994, and retired February 28, 2021.

25 **Q.**  Retired and decided to head up north and help out Tennessee?

**A.**   I did.

**Q.**   Okay.

**A.**   My whole goal all along was to retire from Georgia and go start another job.  So that's what I did.

**Q.**   Okay.  Congratulations.

**A.**   Thank you.

**Q.**   What was your title when you retired?

**A.**   I was director of the Compliance Division.

**Q.**   And you don't have to go all the way back to 1994, but can you give us an idea of the --

**A.**   Sure.

**Q.**   -- various roles you had at the Department of Revenue?

**A.**   I started as an entry-level revenue agent in 1994.  I worked as a regional office supervisor, regional office manager.  Then I worked as a program manager which oversaw regional offices.  After the program manager, I was the assistant director for about five years and became the director in 20 -- somewhere around 2017, 2018.

**Q.**   Okay.  All right.  And you're familiar with the Georgia Department of Revenue's actions against Todd and Julie Chrisley?

**A.**   I am.

**Q.**   All right.  So we're going to talk about things that happened in early 2017.

**A.**   Okay.

**Q.**   All right?  At that time -- and it might help if you have that

1  binder right in front of you, if you go to the very last page.

2  **A.**  Okay.

3  **Q.**  Just for the record, that is Government's Exhibit 237.  So

4  this is a date as of January 1, 2017, an organizational chart.  So

5  if you look over here on the far left under Staci Guest --

6  **A.**  Correct.

7  **Q.**  -- it says here, Carleton Askew is the Director of Compliance.

8  **A.**  That is correct.

9  **Q.**  So what was your title at that time?

10  **A.**  I was the assistant director at that time.

11  **Q.**  Okay.  Great.  So I want to talk to you a little bit about

12  Georgia Department of Revenue's actions against Todd and Julie

13  Chrisley.

14  **A.**  Okay.

15  **Q.**  So when did you first learn -- when did the Chrisleys first

16  come to your personal attention?

17  **A.**  As I recall, in 2017 I got a call from Agent Katie Vancil and

18  said they were working a case against the Chrisleys, and that they

19  had discovered a large amount of furniture in a storage facility,

20  and the intent was to seize that furniture, and she needed to know

21  if we had the means to transport the furniture.  I was not the

22  decision-maker.  The director was actually on vacation at that

23  time.  So when she reached out to me, she was already at the

24  location where the furniture was being stored.

25  **Q.**  All right.  And what did you do after Ms. Vancil called you?

1  **A.**  She called me because of the -- the massive quantity of

2  merchandise that was involved.  There was no way that DOR

3  personnel could move the merchandise by themselves.  So I reached

4  out to the Deputy Commissioner Scott Graham to try to find out if

5  we could fund having someone move the merchandise because it was

6  going to take several trucks.  There would be liability issues if

7  we tried to use DOR personnel.  So my request was, A, do we want

8  to seize it, and B, do we have the means to have it transported.

9  **Q.**  All right.  And did you have a discussion with Mr. Graham

10  about this?

11  **A.**  I did.

12  **Q.**  All right.  In looking at the organizational chart here, you

13  reported through Staci Guest to the Commissioner --

14  **A.**  Correct.

15  **Q.**  -- at the time, Ms. Riley; is that correct?

16  **A.**  That is correct.

17  **Q.**  What was Mr. Graham's responsibility at the time?

18  **A.**  He also -- I was coordinating with he and Becky East, who is

19  the Chief Financial Officer.  You see there she reported directly

20  to Commissioner Riley.  And the reason that Becky was involved in

21  the conversation was because she, as the Chief Financial Officer,

22  she could approve the expenditure it would take to move the

23  merchandise.  So the conversation that I went to -- at that time I

24  don't believe Commissioner Riley was involved, that's why I went

25  straight to Scott and Becky and we had a discussion about, as I

1  said, A, do we want to seize it, and, two, how can we pay for
2  that.  And that's what Becky's part of the conversation was.
3  **Q.**  Now, were you also having any conversations with the then
4  Director of the Office Special Investigations, Josh Waites?
5  **A.**  I did not talk to Josh at that time.  I knew that Josh
6  had -- they had looked at a case against the Chrisleys, didn't
7  know what it was specifically or any details about their case, but
8  I knew that there was some -- some case that they were working.  I
9  wasn't aware of it.  I wasn't privy to it.  I knew there had been
10 a previous conversation with Josh and myself about a news story
11 that they were running.  That was the -- through e-mail.  He
12 e-mailed me to tell me they were running a news story.  I e-mailed
13 back and said, I don't know that we have recorded liens against
14 the party to do that story.  He responded that Commissioner Riley
15 had seen it, approved it, and that the news story was good to go.
16      Other than that, I didn't really have any knowledge of any of
17 the basis for the assessment, where the liability was created;
18 only that we had a lien, the lien was recorded, they had located
19 the merchandise and wanted to seize it.
20 **Q.**  Okay.  All right.  Let's -- we're just talking about the day
21 of, when you're coordinating movers.  All right?  So let's focus
22 on that.
23 **A.**  Okay.
24 **Q.**  Were you having any conversations with Josh Waites on that
25 day?

**A.**   Not with Josh that day.

**Q.**   All right.  Can you tell me if Josh was part of the discussions between you and -- was it right here, just so we're clear, Becky East, the Chief Financial Officer?

**A.**   I don't recall Josh being part of that discussion as well. Again, I was looking to her to try to find out if we could get the money to pay the movers, and he wouldn't have had any input on that.

**Q.**   Who made the ultimate decision to take everything from the warehouse?

**A.**   Scott Graham.

**Q.**   And how do you know that?

**A.**   He told me specifically to get everything that was located there.

**Q.**   All right.  Did he use a choice word when you had that conversation?

**A.**   He did.  I don't want to offend the court.  His direct order to me was "to get every fucking thing they have."

**Q.**   Okay.  And so what did you do after Mr. Graham said that?

**A.**   After that, Ms. East said that we would make the funds available.  I started calling moving companies to say who could do it today.  That was the important thing.  Called three or four different moving companies, only one had the ability to do it that day.  I recall the name being Two Men and a Truck, or something to that effect.  When I explained to them the amount of merchandise

1  we needed to move, they said they could do it.

2  **Q.**   Do you remember how much it cost?

3  **A.**   I do.  It was a large expense, somewhere around $10,000, as I

4  recall.  I don't recall exact numbers, but I do know it was going

5  to take a lot more than only Two Men and a Truck.  It was going to

6  take eight men and five trucks, is what they finally ended up

7  with.  I never saw the merchandise, never went to the location

8  where it was stored, never did see the trucks that they moved it

9  in.

10 **Q.**   Now, can you tell me whether any OSI person, Office of Special

11 Investigation personnel were involved in your discussions with

12 either Ms. Vancil or Mr. Graham or others about the decision to

13 take items from the warehouse?

14 **A.**   Not that I recall.  There would have been no reason for them

15 to have been involved in the discussion.

16 **Q.**   Why do you say there would have been no reason?

17 **A.**   Well, we try to divide between criminal cases and civil cases.

18 This was simply a civil matter.  It was a recorded lien for an

19 established liability, and the seizure was based on that lien.

20 We -- the division that I worked in, the Compliance Division, we

21 don't have search warrants.  We've don't have criminal -- we don't

22 have any type of criminal capability or post-certified people.  So

23 ours was strictly a civil action that would have been based on

24 that lien that we had issued.

25 **Q.**   Okay.  And can you tell me whether or not you would recall

1  conversations -- sorry, let me rephrase.

2     Can you tell me whether or not if those conversations had

3  taken place, that's the kind of thing -- that items would be used

4  for criminal process, is that the kind of thing that you think you

5  remember today?

6  **A.**  Yeah.  We would not -- we would not try to mix the two

7  criminal and civil cases together.  Normally, if there's a

8  criminal case involved, then we stay our civil action.  We don't

9  try to enforce a lien or anything like that.  So with no knowledge

10  of a criminal case, we move forward with our civil process.

11  **Q.**  Just to be clear, did you ever go out to the warehouse?

12  **A.**  I did not.

13  **Q.**  All right.  But you were aware -- tell me whether or not you

14  knew that movers were ultimately hired?

15  **A.**  That's correct.  I did hire the movers, asked the movers where

16  to report, and coordinated the payment for the movers.  They came

17  to the headquarters at Century Center the next day to pick up a

18  check for their moving expenses.

19  **Q.**  All right.  And can you tell us whether or not you would have

20  gone through those steps to hire movers to assist in a

21  criminal -- to assist in seizing items for criminal purposes?

22  **A.**  We had no interaction with a criminal case whatsoever from my

23  end.  It just wouldn't -- that was not my lien.

24  **Q.**  Were you involved in reviewing the documents or records that

25  were taken from -- from the site?

1  **A.**  I did not.

2          MR. KREPP:  Just one moment, Your Honor.

3          Thank you, Your Honor.  That's all I have.  Thank you,

4  Mr. Purvis.

5          THE COURT:  Any cross?

6          MR. MORRIS:  Thank you, Your Honor.

7  CROSS-EXAMINATION

8  BY MR. MORRIS:

9  **Q.**  Good afternoon, Mr. Purvis.

10 **A.**  How are you today?

11 **Q.**  I'm doing very well.  I'm Bruce Morris.  I have a few

12 questions for you.

13 **A.**  Absolutely.

14 **Q.**  Thank you.

15     I think you said before this move took place, Josh Waites had

16 brought to your attention the Chrisleys?

17 **A.**  Yes, sir.

18 **Q.**  And he mentioned to you that there was a media story coming

19 out that GDOR was going to be a part of?

20 **A.**  Correct.

21 **Q.**  And you were not comfortable with that, were you?

22 **A.**  My -- my question back to Director Waites at the time was from

23 a civil end, from the Compliance Division, we had no reason to run

24 a story.  So I guess to directly answer your question, no, I was

25 not comfortable with that.

1   **Q.**   And I believe you said, I knew Josh had been looking at the

2   Chrisleys?

3   **A.**   Correct.

4   **Q.**   And the case they were working; right?

5   **A.**   Correct.

6   **Q.**   And Josh is on the criminal side?

7   **A.**   Yes, sir.

8   **Q.**   Were you -- strike that.

9      Well, were you aware that on February 7, 2017, a criminal case

10  had been opened by GDOR involving Julie and Todd Chrisley?

11  **A.**   I would not be aware of that, no, sir.  I would have no way of

12  knowing if a criminal case was opened.

13  **Q.**   And if you had known, is it fair to say that that would have

14  been improper to pursue, getting information in a civil manner

15  when there's a criminal case pending?

16  **A.**   Wow.  I don't know that I can answer that, because we would

17  normally stay a civil action in a criminal case.  But that's too

18  much of a way -- I mean, we would normally say if there is a

19  criminal case where evidence has been presented to a DA and they

20  are ready to move forward with the criminal case, then the

21  Compliance Division would not take any action.

22  **Q.**   Or said another way, and I'm paraphrasing from what I believe

23  you said to the federal folks when they spoke with you, if I'm

24  wrong, you correct me, I think what you said is, we don't mix

25  criminal and civil?

1  **A.**   We try not to, correct.

2  **Q.**   If a criminal case is being made, civil would stop

3  immediately?

4  **A.**   Right.

5  **Q.**   Right?

6  **A.**   Yes, sir.

7  **Q.**   If we're gathering information to further a criminal

8  investigation, that would alarm me; is that right?

9  **A.**   It would.

10  **Q.**   And in this particular case, OSI, Josh Waites, anybody else in

11  OSI, they did not tell you that there was a pending criminal case

12  at the time this furniture is being gathered?

13  **A.**   We did not, no, sir.  I had no knowledge of a criminal case.

14  **Q.**   Okay.

15         MR. MORRIS:  Thank you, that's all I have.

16         THE COURT:  Any redirect?

17         MR. KREPP:  No, no redirect, Your Honor.  Thank you.

18         THE COURT:  Mr. Purvis, you may step down.  And may this

19  witness be excused?

20         MR. KREPP:  Yes, Your Honor.

21         MR. MORRIS:  Yes.

22         THE COURT:  You may be excused and go about your day.

23         You may call your next witness.

24         MR. KREPP:  Sorry, Your Honor, Staci Guest.

25         As the court knows, we have Ms. Guest who I think may be

1  a little bit longer than Mr. Purvis, not too much longer.  We're

2  planning on calling Agent Arrow, but we're not going to get done

3  with him today.

4          THE COURT:  Okay.  We'll see where we are after

5  Ms. Guest and whether it makes sense to start or not.

6          THE DEPUTY CLERK:  Do you solemnly swear or affirm that

7  the testimony you shall give in this matter now pending before the

8  court, will be the truth, the whole truth and nothing but the

9  truth so help you God?

10          THE WITNESS:  I do.

11          THE COURT:  Could you state and spell your name for the

12  record.

13          THE WITNESS:  Staci Guest, S-T-A-C-I, G-U-E-S-T.

14          THE COURT:  Ms. Guest, I don't know if you've been

15  informed, but I'm allowing witnesses to testify without their mask

16  if they have been fully vaccinated.  It's also your choice to keep

17  it on in that circumstance.

18          THE WITNESS:  Thank you.

19          THE COURT:  You may proceed.

20          MR. KREPP:  Thank you, Your Honor.

21                          ******

22                        STACI GUEST,

23          having been duly sworn, testified as follows:

24                          ******

25  DIRECT EXAMINATION

BY MR. KREPP:

**Q.**   Good afternoon, Ms. Guest.

**A.**   Good afternoon.

**Q.**   We've spoken on the phone a couple of times.  We never met.
My name is Tommy Krepp, one of the prosecutors on the case.

     Can you please the tell the court how you're currently
employed?

**A.**   I'm a Chief Tax Officer at the Georgia Department of Revenue.

**Q.**   All right.  And there's actually an exhibit in front of you,
it might still be open, an organizational chart?

**A.**   Yes.

**Q.**   This is Government Exhibit 237.  This is from 2017.  But just
what we're referring -- you report directly to the Commissioner?

**A.**   I do.

**Q.**   All right.  And can you tell the court what you do as a chief
tax officer?

**A.**   I have the taxing -- what we call taxing division is under my
jurisdiction.  I have the Processing Center and Taxpayers Services
Division.  I have the Collections, Compliance Division.  And I
have the Audits Division.  So anything I -- whatever touches or
comes into the department, you know, from the mail to collections
and audits.

**Q.**   All right.  And does the Office of Special Investigations, do
they report to you?

**A.**   No.

1  **Q.**  All right.  Do they report -- similarly do they report to the

2  Commissioner?

3  **A.**  To the Commissioner.

4  **Q.**  All right.  Can you please just briefly summarize your

5  educational background for the court.

6  **A.**  I graduated from the University of Georgia, and then I went to

7  law school at the Cumberland School of Law in Alabama.

8  **Q.**  All right.  Can you tell me whether you practice as an

9  attorney?

10  **A.**  Now?

11  **Q.**  Well, previously?

12  **A.**  I did previously, yes.  I was a prosecution -- Assistant DA in

13  Clayton County.

14  **Q.**  All right.  How long were you an Assistant DA?

15  **A.**  Almost eight years, between seven and eight years.

16  **Q.**  And can you tell me whether or not that included becoming

17  familiar with search warrant proceedings during criminal

18  investigations?

19  **A.**  It did.

20  **Q.**  And -- all right.  At a certain point did you become familiar

21  with the defendants Todd and Julie Chrisley?

22  **A.**  Yes.

23  **Q.**  All right.  Can you tell me how it is they first came to your

24  attention?

25  **A.**  The first time I recall hearing about them was when there was

1  property, including furniture, at a warehouse that the people from

2  our Compliance Division wanted to seize.

3  **Q.**  Okay.  Can you tell me --

4  **A.**  Levy on.

5  **Q.**  Levy.  All right.  And can you tell me what you knew at that

6  point?  So was there an assessment that had been done against

7  them, did you come to learn that?

8  **A.**  I think we did an assessment against them, yes.  I believe --

9  what I recall is that they hadn't filed in Georgia, and so we were

10  looking at their -- what they made.  So we were doing a levy on

11  essential property.

12  **Q.**  And do you recall taking part in a discussion with others

13  about whether or not this should be a civil or a criminal case?

14  **A.**  Yes, it was always a civil case.

15  **Q.**  What do you mean by that?

16  **A.**  My team was -- the Compliance Division is the one that came --

17       MR. MORRIS:  Could you talk a little bit louder?  I

18  can't hear you.

19       THE WITNESS:  Sure.  The Compliance Division, which is

20  under me, not investigations, came to me and said they wanted to

21  seize the property.  And they were going to do the paperwork.

22  That was the -- Scott Purvis was the assistant director at that

23  time, and they were going to take care of all of the paperwork and

24  it never left my division.  I mean, we handled it from the

25  beginning with the levy, we handled it through -- a little bit of

1  case work, and then it was turned over to the Audit Division,

2  which is under me, for an audit.

3  **Q.**  Can you tell me if you recall if anybody from the Office of

4  Special Investigations, Josh -- was Josh Waites the director at

5  the time?

6  **A.**  He was.

7  **Q.**  Whether it was Mr. Waites or anybody else, can you tell me

8  whether or not they were insisting on seizing those materials?

9  **A.**  Nobody from OSI was --

10 **Q.**  All right.

11 **A.**  -- at all.

12 **Q.**  And is that the kind of thing you think you'd remember, if

13 those conversations had taken place?

14 **A.**  I would.  I do know Josh and I did have a conversation

15 afterwards.  I don't know -- maybe during the seizure, that this

16 was -- this was going to be a civil case, not -- not criminal.

17 They weren't going to prosecute this as a criminal tax evasion

18 case.

19 **Q.**  What was Mr. Waites' response?

20 **A.**  He understood.

21 **Q.**  And can you tell me whether or not you ever heard about

22 anybody turning documents over that were taken from a storage --

23 back up.

24     You understand that materials were ultimately taken from a

25 warehouse?

**A.**  Correct.

**Q.**  All right.  Can you tell me whether or not you ever heard that documents were being turned over from Compliance Division to OSI for review or anything like that?

**A.**  I do not recall that.

**Q.**  Is that the kind of thing you think you would remember?

**A.**  I should have been informed if it happened, yes.

**Q.**  And can you tell me whether or not -- did you ever go to the warehouse?

**A.**  Yes.

**Q.**  You did?  All right.  Thank you.  What do you recall seeing there?

**A.**  I recall a bunch of furniture.  A lot of furniture, and it was set out in what looks like could be partitions for, like, an auction.  It was grouped like that.

**Q.**  And can you tell me from your experience both now and former experience as an assistant district attorney, when you walked in there did there appear to be items that would be of use in developing a potential fraud, criminal fraud investigation?

**A.**  No.  I mean, it was mostly furniture.

**Q.**  And why was a decision made to seize those items from the warehouse?

**A.**  I -- I don't -- what I can recall is that they might have financial information that showed more physical assets that the Chrisleys --

1          MR. MORRIS:  I couldn't hear that.

2  **A.**  -- that could potential be seized to pay their tax liability.

3          THE COURT:  Mr. Morris?

4          MR. MORRIS:  I apologize, that was very hard to hear.

5  Would you just repeat your answer on that?

6          THE WITNESS:  Yes.

7          THE COURT:  Ms. Guest, if you wouldn't mind maybe

8  pulling -- the microphone is a little finicky, sometimes it makes

9  it worse if it's closer to you, but maybe pull it closer to see if

10  that helps.

11          THE WITNESS:  Is that better?

12          MR. MORRIS:  Yes, ma'am.

13          THE WITNESS:  So the question again?

14  DIRECT EXAMINATION

15  BY MR. KREPP (continued):

16  **Q.**  I'll try to remember.  Can you tell me whether or not -- I

17  believe my question was --

18  **A.**  Documents were seized?

19  **Q.**  Materials or documents were seized from the warehouse, whether

20  or not they appeared to be -- whether or not they appeared to be

21  of criminal evidentiary value?

22  **A.**  I don't know what was in the documents.  What I recall, there

23  were boxes.  So I didn't look in the boxes.  I don't recall

24  looking in the boxes.  I have no idea what was in them.

25  **Q.**  When you were there was anybody saying that they were hoping

1   to use that to build a criminal fraud investigation?

2   **A.**   No.  I do not recall.

3   **Q.**   What would you have advised if those conversations had taken

4   place, is that the kind of thing you think you would recall

5   sitting here today?

6   **A.**   Yes.

7   **Q.**   Can you tell us whether or not you learned recently that a

8   preliminary criminal investigation had been initiated against the

9   Chrisleys?

10  **A.**   By the federal government?

11  **Q.**   Well, obviously the federal government, but the Department of

12  Revenue.  Has that ever come to your attention?

13  **A.**   No.

14  **Q.**   Would that be surprising?

15  **A.**   Yes.

16  **Q.**   And why is that?

17  **A.**   Because all the conversations I have with my staff and with

18  Josh was that this was not going to be a criminal tax evasion, it

19  was going to be civil audit.

20  **Q.**   All right.  Do you -- do you have any personal knowledge of

21  any role that Josh Waites played in deciding what to take from the

22  Printer & Parts Warehouse?

23  **A.**   No, I don't know that he made any decision.

24  **Q.**   Why do you say that?

25  **A.**   I didn't see him make any decisions.

1  **Q.**  And can you tell us whether or not to your knowledge, OSI

2  personnel played any role in reviewing the records that were taken

3  from the warehouse?

4  **A.**  I don't know.  I have no idea.

5           MR. KREPP:  One moment, Your Honor.

6           Thank you, Ms. Guest.  That's all I have.

7           THE COURT:  Mr. Morris?

8  CROSS-EXAMINATION

9  BY MR. MORRIS:

10  **Q.**  Hi, Ms. Guest.

11  **A.**  Hello.

12  **Q.**  I'm Bruce Morris.  Nice to meet you.

13  **A.**  Nice to meet you.

14  **Q.**  Just a few questions.

15      You rein over the civil side; correct?

16  **A.**  Correct.

17  **Q.**  And in 2017 Josh Waites reined over the criminal side; right?

18  **A.**  Well, the tax and motor vehicle.

19  **Q.**  I'm sorry?

20  **A.**  The tax and motor vehicle criminal side, not alcohol and

21  tobacco.

22  **Q.**  I couldn't understand you, I apologize.

23  **A.**  The tax and the motor vehicle stuff, title fraud, Josh was

24  over that.  We have another law enforcement division, it's alcohol

25  and tobacco, he was not over that.

1  **Q.** Gotcha.  Josh is OSI, Director of Office of Special

2  Investigations?

3  **A.** Yes.

4  **Q.** Okay.  And you don't get involved in Office of Special

5  Investigations investigations; correct?

6  **A.** No.

7  **Q.** So whatever he is doing in a particular investigation, you're

8  likely not aware of; correct?

9  **A.** Correct.

10 **Q.** Okay.  So you had discussions with him about this remaining a

11 civil investigation, that is, the Chrisleys; yes?

12 **A.** Yes.

13 **Q.** And you made it clear that was your intention?

14 **A.** Yes.

15 **Q.** And he said he understood?

16 **A.** Yes.

17 **Q.** Were you aware --

18 **A.** I don't remember his exact words, but there was never a

19 contradiction to that.

20 **Q.** Yeah.  Were you aware that in February of 2017 a criminal case

21 was opened by OSI?

22 **A.** No.

23 **Q.** Were you aware that Josh Waites was involved in opening it?

24 **A.** Nope.

25 **Q.** Were you aware that Scott Santillie was involved in opening

1 it?

2 **A.**   No, not then.

3 **Q.**   Do you know who Scott Santillie is?

4 **A.**   Yes.

5 **Q.**   Who was he in 2017?

6 **A.**   He was in the Office of Special Investigations.

7 **Q.**   Okay.  And do you know what a FinCEN is?

8 **A.**   I probably knew more at one time.  What I recall now, it's

9 financial information, I believe.

10 **Q.**   And that is something used by OSI for criminal investigations;

11 correct?

12 **A.**   I don't know.

13 **Q.**   You don't know.  Okay.  It's not something you guys use?

14 **A.**   I don't know.  I don't know.

15 **Q.**   Have you ever used it?

16 **A.**   I have not personally, but I don't really get into the

17 day-to-day runnings of the agents.

18 **Q.**   Okay.  Okay.  Now, mention was made of you being a former

19 prosecutor.  Actually, I think I knew you --

20 **A.**   Oh.

21 **Q.**   -- when you were in Clayton County.

22     Based on your experience as a former assistant district

23 attorney, you would agree that it's not proper to use the civil

24 process to further a criminal case, is it?

25 **A.**   It is not proper.

1  **Q.**  Okay.  And if you had known that was going on, you wouldn't

2  have been accepting of that?

3  **A.**  No.

4  **Q.**  Okay.  When you were at the warehouse, was Merrill Jacobson

5  there?

6  **A.**  I think so.  I've not spoken to him since about it, but I do

7  believe he was there.

8  **Q.**  Katie Vancil?

9  **A.**  Yes.

10  **Q.**  Josh Waites?

11  **A.**  Yes.

12  **Q.**  Big old place?

13  **A.**  Yes.

14  **Q.**  A fenced-in area inside?

15  **A.**  I don't remember.  I know I went through the office to get

16  there, I think.

17  **Q.**  You have to go through an office and then there's a warehouse

18  divided by fences?

19  **A.**  I really don't remember fences.

20  **Q.**  Okay.

21  **A.**  I just remember looking around at furniture.

22  **Q.**  Do you remember seeing a whole lot of property?

23  **A.**  Yes.

24  **Q.**  Did you understand it was the Chrisleys' property?

25  **A.**  Yes.

**Q.** And the purpose was to seize the Chrisleys' property?

**A.** To levy on it.

**Q.** Say again?

**A.** To levy on it.

**Q.** Levy on it.  And you take that to sell it?

**A.** Yes.  Potentially, yes.

**Q.** You don't take documents to sell, do you?

**A.** No, not unless they're valuable pieces of paper.

**Q.** Were you privy between any discussions between Josh Waites and Katie Vancil about FinCEN information or criminal information?

**A.** No.

**Q.** Specifically, do you know what Josh Waites discussed with anyone else about the information that had been gleaned from the seizure of Chrisley property?

**A.** I do not know.

          MR. MORRIS:  That's all I have.  Thank you.  Let me just check and make sure my co-counsel agrees that that's all I have.

          Thank you, that's all I have, Your Honor.

          THE COURT:  Any redirect?

          MR. KREPP:  No redirection.

          THE COURT:  Ms. Guest, thank you very much.  You may step down.  I'm sorry, did you say no?

          MR. KREPP:  No.

          THE COURT:  Sorry.  Thank you very much.  You're excused.  You may go about your day.

 1          MR. MORRIS:  May we consult?

 2          THE COURT:  Yes, sure.

 3          (Whereupon, a conversation takes place off the record.)

 4          MR. KREPP:  Judge, I think we're in agreement, Agent

 5  Arrow is going to be next and I think he's going to be fairly

 6  lengthy.  So it might be a good time to stop.  We do have another

 7  matter we can talk about now before we break.

 8          THE COURT:  As long as we think we're on track for

 9  tomorrow finishing up.  If there were some still risk of that, I

10  would like to get as much done as possible.  But if we think we're

11  in decent shape --

12          MR. MORRIS:  Can I real quickly look at my list of

13  witnesses?

14          THE COURT:  Yes.

15          MR. KREPP:  It is a close call.  We don't object to

16  calling Agent Arrow.

17          THE COURT:  Yeah, and I don't object to waiting.  If the

18  extra 25 minutes would help us make sure we're done in a decent

19  hour tomorrow, then --

20          MR. KREPP:  We only have Agent Arrow and then we may

21  call Betty Carter.  We'll talk about that tonight.  That depends

22  on cross and Agent Arrow.

23          MR. MORRIS:  The way I see it for scheduling, Judge, I

24  will be calling one long witness tomorrow, LaShaun Wright.  I

25  don't know what your cross will be.  I'll be calling Josh Waites.

1   I expect him to be not incredibly lengthy, but significantly

2   lengthy.  And I assume my cross-examination on Larry Arrow will

3   take some time.  Other than that, I may have one or two incredibly

4   short witnesses, but I think we can finish tomorrow.

5           THE COURT:  So stopping now wouldn't prejudice our

6   ability to get it done tomorrow?  I won't ask you to bring your

7   toothbrush and staying in the marshal's lockup if you violate

8   that.

9           MR. MORRIS:  I have no objection if you want to start

10  with Arrow now, but I think we can finish tomorrow.

11          THE COURT:  Well, why don't we -- it really doesn't

12  matter to me.

13          MR. KREPP:  We can start.

14          THE COURT:  Why don't we just start.  It sounds like --

15  are we saying there is going to be a legal issue to take up?

16          MR. KREPP:  There is, Your Honor, yes.

17          THE COURT:  What we could do is convene at 9 tomorrow to

18  discuss that and then have testimony at 9:30, or would it be more

19  needed to have something resolved now?

20          MR. KREPP:  I think -- we're were actually talking with

21  Mr. Morris, I think he's in agreement with what I'm about to say.

22  Based upon the information the Inspector General has provided to

23  the government, as well as what we've heard in court, we think

24  it's appropriate for the court to advise Josh Waites of his rights

25  if he's called tomorrow.  I don't think there is an objection.

1   That's all I had.

2            THE COURT:  All right.  Well, is he represented?  Are

3   you representing him as well?  I know he's a former --

4            MS. McGOVERN:  Your Honor, I'm representing Josh Waites.

5            THE COURT:  I'm sorry, what is your name?

6            MS. McGOVERN:  Annarita Leigh McGovern.

7            THE COURT:  Okay.  Very good.  And that will be tomorrow

8   anyway.  So why don't we go ahead and begin Mr. Arrow, Agent

9   Arrow, and we'll at least be that much further along for purposes

10  of tomorrow.

11           But tell me, Ms. Peters, it looks like you're going to

12  be the one, if you're at a natural stopping point with, let's say,

13  five minutes to go, at that point it might make sense to break

14  rather than make you start something that is going to only break

15  momentum or logic.

16           MS. PETERS:  Sure.  And I'll keep an eye as well on the

17  clock.  We're still aiming for 5-ish?

18           THE COURT:  Right.  Mr. Arrow, you may approach.

19           Just for the court reporter, we didn't get your name.

20  Maybe at the end if you have a card.

21           THE DEPUTY CLERK:  Please raise your right hand.  Do you

22  solemnly swear or affirm that the statements you're about to make

23  in this case now pending before the court, are the truth, the

24  whole truth, and nothing but the truth?

25           THE WITNESS:  I do.

1              THE DEPUTY CLERK:  Thank you could you please state and

2  spell your name.

3              THE WITNESS:  Larry Arrow.  L-A-R-R-Y, last name

4  A-R-R-O-W.

5              THE COURT:  And Agent Arrow, I'm allowing witnesses if

6  they wish to, but it's your choice, to testify without your mask

7  if you have been fully vaccinated.

8              THE WITNESS:  Yes, I have.

9                         ******

10                     LARRY ARROW,

11         having been duly sworn, testified as follows:

12                         ******

13  DIRECT EXAMINATION

14  BY MS. PETERS:

15  **Q.**  Good afternoon, Agent Arrow.

16  **A.**  Good afternoon.

17  **Q.**  Could you tell the court how you're currently employed?

18  **A.**  Sure.  I am the Supervisory Special Agent for IRS Criminal

19  Investigations.

20  **Q.**  What are your duties as the supervisory special agent?

21  **A.**  Basically, managing the day-to-day operations of my agents.

22  **Q.**  How many agents do you currently supervise?

23  **A.**  Currently, I have eight; two currently training, and I have

24  six in the field currently.

25  **Q.**  How long have you been a supervisor?

1   **A.**   Since July of 2019.

2   **Q.**   What did you do before that?

3   **A.**   I was a case agent, a special agent.

4   **Q.**   Okay.  But with the IRS?

5   **A.**   Correct.

6   **Q.**   And how long were you a special agent before you became

7   supervisory special agent?

8   **A.**   I started with IRS in October of 2008.

9   **Q.**   Okay.  And what were your job duties as a special agent?

10  **A.**   Sure.  As an IRS criminal investigation special agent, we

11  investigate potential criminal violations of the Internal Revenue

12  Code and other related financial crimes.

13  **Q.**   All right.  Are you familiar with the Chrisley case that

14  you're here to testify about today?

15  **A.**   Yes, I am.

16  **Q.**   Were you previously the case agent from the IRS assigned to

17  the Chrisley case?

18  **A.**   Yes, I am.

19  **Q.**   And are you presently the IRS case agent assigned to the

20  Chrisley case?

21  **A.**   No, I'm not.

22  **Q.**   Okay.  And when did that change happen?

23  **A.**   When I became a supervisor in July of 2019.

24  **Q.**   Is there another IRS special agent who is now assigned to the

25  Chrisley case as the case agent from IRS?

1  **A.**   Yes, there is.

2  **Q.**   And what's her name?

3  **A.**   Amber Landon.

4          MR. MORRIS:  I'm sorry, can you repeat that?

5          THE WITNESS:  Amber Landon.

6  DIRECT EXAMINATION

7  BY MS. PETERS (continued):

8  **Q.**   So, Agent Arrow, the IRS is a very large federal agency, I

9  know.  What does -- what does the criminal investigation side do?

10  **A.**   Sure.  The criminal investigation, we investigate potential

11  criminal violations strictly of Internal Revenue Code and other

12  financial crimes.

13  **Q.**   Okay.  And is that all that the IRS does?

14  **A.**   No, that's IRS criminal investigations specifically, which is

15  the division that I work for.

16  **Q.**   Okay.  So is there also a civil component to IRS?

17  **A.**   Yes, there is.

18  **Q.**   And can you explain to the court the difference between a

19  revenue officer, a revenue agent, and a special agent?

20  **A.**   Sure.  A revenue officer is tasked with, among other things,

21  collecting tax owed from the public, from taxpayers, and they have

22  several mechanisms they go by doing that.  They can use levies and

23  they can garnish wages.

24     A revenue agent, in general terms, they are the ones

25  responsible for assessing the tax to be owed, that taxpayers

1  actually owe.

2  **Q.**  So are both revenue officers and revenue agents on the civil

3  side or criminal side of IRS?

4  **A.**  On the civil side.

5  **Q.**  How about special agents?

6  **A.**  Special agents are -- essentially, we investigate potential

7  criminal violations of the Internal Revenue Code and anything

8  related to financial crimes, like, money laundering or whatnot.

9  **Q.**  All right.  So are special agents on the criminal side of the

10 IRS?

11 **A.**  Correct, we are.

12 **Q.**  All right.  As a special agent, are there different ways that

13 you come to learn about an open -- new criminal investigations?

14 **A.**  Yes.

15 **Q.**  What are some of the ways that you may learn about an open and

16 new investigation?

17 **A.**  Sure.  We learn about open investigations through the public.

18 Sometimes there are, you know, media outlets and things like that.

19 We also learn about public information through informants.  We

20 learn about public information through internal civil referrals as

21 well, and we learn about public information through our law

22 enforcement partners as well.

23 **Q.**  Okay.  Let's focus on getting referrals internally from the

24 civil side.  Is that uncommon?

25 **A.**  No, it's not.  It's very common.

**Q.**  Could you explain the process of how this civil side of IRS
may refer a case for criminal investigation to CI?

**A.**  Sure.  I'm not sure what all takes place on the civil side,
but I know at a certain point they refer the package over to
criminal investigations, to our side, and we have a certain number
of days to review the referral and make a determination as to
whether or not to accept the civil side for referral.

**Q.**  All right.  And do -- as part of that referral process and
case opening process, is it common for a meeting to occur between
CI special agents and the civil side that's referring the case for
investigation?

**A.**  Yes.  By policy we are mandated to hold a meeting I believe
within 30 days of a referral internally.  So, yes, it is very
common to have a meeting.

**Q.**  Okay.  And let's say the civil side refers a case to CI and CI
opens the case, you have that initial meeting.  Is it common to
have ongoing communication with the civil side of IRS as you move
forward in a criminal investigation?

**A.**  Yes.  Particularly, the referring revenue agent or the
referring revenue officer.

**Q.**  Okay.  And what types of -- what's the purpose of those
ongoing communications between CI and the civil side?

**A.**  Sure.  As you can imagine, they know their body of work better
than CI does, and there are times when we may need some of their
case files to determine certain things on our investigation.  So

1  we refer back to the referring revenue agent or revenue officer

2  for that information.

3  **Q.**   Do you have access to all of the different -- do you have

4  access to everything that the civil side has access to on a

5  particular case?

6  **A.**   No.  We don't use the same system.

7  **Q.**   Okay.  So it sounds like -- can you tell me whether or not you

8  sometimes ask the civil side to provide information that you don't

9  have access to as you're pursuing a criminal investigation?

10  **A.**   We'll refer a case, yes.

11  **Q.**   All right.  Now, I want to ask some questions about your

12  knowledge and involvement with the Department of Revenue for the

13  State of Georgia.

14  **A.**   Sure.

15  **Q.**   In your work as a special agent, do you sometimes communicate

16  with the Georgia Department of Revenue?

17  **A.**   Yes.

18  **Q.**   How frequently do you communicate with them?

19  **A.**   Prior to this case, I worked about a handful of cases with

20  Georgia Department of Revenue.  And even during this case, I still

21  had those cases ongoing with Georgia Department of Revenue.  So

22  there was constantly communication between myself and my colleague

23  or my counterpart over at Georgia Department of Revenue throughout

24  the investigation of these cases.

25  **Q.**   Okay.  When you say you worked cases with the Department of

1  Revenue, do you sometimes have joint investigations with the

2  Department of Revenue?

3  **A.**   Yes.

4  **Q.**   Okay.  And let's be specific, when he's talking about the

5  Georgia Department of Revenue, are you talking about the Office of

6  Special Investigations?

7  **A.**   Yes.  They are, from my understanding, they are the criminal

8  arm of the agency.  They are the ones -- they're special agents

9  and supervisor special agents are the ones we typically deal with.

10 **Q.**   Okay.  So getting back to joint investigations, do you

11 sometimes have joint investigations or what you would call joint

12 investigations with Department of Revenue OSI?

13 **A.**   Yes.

14 **Q.**   And do you also have cases that are not joint investigations

15 with OSI?

16 **A.**   Yes.

17 **Q.**   Do you still communicate with OSI employees about some matters

18 in your cases that are not necessarily joint investigations with

19 OSI?

20 **A.**   As a case agent I did.

21 **Q.**   Yeah, I'm sorry.  When I -- in all of these, I am actually

22 talking about when you were a case agent.

23 **A.**   Yes, I did.

24 **Q.**   Okay.  And could you explain to the court what types of things

25 you may be communicating about with OSI if you were not working on

1 a joint investigation together?

2 **A.**   Sure.   I may be working on a tax lead that may have a state

3 nexus to it.   As y'all can imagine sometimes, when we work taxes,

4 they may be nexus to the state as well.   And we have a memorandum

5 of understanding between IRS and the state and particularly with

6 OSI.   If we feel like there is a possibility of a state nexus on

7 the investigation that I'm working, I reach out to them and ask

8 them questions, are you guys looking at this person as well.

9 Particularly, if the case is what we refer to as an admin case,

10 admin criminal investigation rather than a grand jury criminal

11 investigation, we reach out to them and just talk to them about

12 it.

13 **Q.**   Okay.   So when you were a special agent, and let's focus on,

14 let's say, 2016 and 2017 time period --

15 **A.**   Okay.

16 **Q.**   -- were there times where you were regularly and frequently

17 communicating with your counterparts at OSI?

18 **A.**   Yes.   I had at least a handful of cases going on at that time

19 with OSI.

20 **Q.**   And in your work with OSI, did you become friendly with some

21 of the employees at OSI?

22 **A.**   Yes, the person who I was working those cases with.

23 **Q.**   And who was that?

24 **A.**   A lady by the name of LaShaun Wright.

25 **Q.**   Okay.   And are you aware, have you been made aware that just a

1  couple of days ago, the Chrisley defendants produced to the

2  government a number of secretly-recorded conversations between

3  Department of Revenue employees that took place some time in the

4  last few years?

5  **A.**  Yes.

6  **Q.**  All right.  And are you also aware that on these recorded

7  calls there was some gossip discussed, some secondhand gossip

8  making allegations or statements about you having an inappropriate

9  relationship with LaShaun Wright?

10          MR. MORRIS:  Object to the form of the question.

11          THE COURT:  I'm going to overrule it.

12          THE WITNESS:  Yes.

13  DIRECT EXAMINATION

14  BY MS. PETERS (continued):

15  **Q.**  You are aware of that?

16  **A.**  Yes.

17  **Q.**  Okay.  Agent Arrow, did you have an affair with LaShaun

18  Wright?

19  **A.**  No.

20  **Q.**  Did LaShaun Wright feed you information about the Chrisley

21  case?

22  **A.**  No.  In fact, if I may explain, there were at least on

23  multiple occasions when I asked -- there was an occasion when I

24  asked LaShaun if OSI was working the case and she said no.  And,

25  obviously, when I asked her other questions, she had no knowledge

1  of anything about the case.  So she could not have fed me

2  information if they weren't working the case, I would assume.

3  **Q.**  All right.  So let's talk specifically about your involvement

4  in the criminal investigation that IRS took part in.  And I guess

5  before we dive in, I know you were the case agent for awhile.  At

6  some point did the FBI also become involved in the investigation

7  into the Chrisleys?

8  **A.**  Yes.

9  **Q.**  Okay.  So was it -- is it fair to say it was a joint

10  investigation between the IRS and the FBI?

11  **A.**  Correct.

12  **Q.**  All right.  So focusing on your involvement in the Chrisley

13  case, when did you first become aware of the possibility of a

14  federal criminal investigation into Todd and Julie Chrisley?

15  **A.**  That would be around March of 2017.

16  **Q.**  All right.

17          MS. PETERS:  And at this time we move to admit

18  Government Exhibits 102, 103 and 104.

19          THE COURT:  Any objection?

20          MR. MORRIS:  What was the question?

21          THE COURT:  Exhibits 102, 103 and 104.

22  **Q.**  Agent Arrow, while they're taking a look, the binder in front

23  of you has a number of exhibits in it.  They should be labeled at

24  the bottom.  And if you could flip -- they should be

25  chronological.  So if you could flip to Exhibit 102.  It should be

1  towards the front.

2          THE COURT:  Did we confirm no objection?

3          MR. MORRIS:  No objection.

4          THE COURT:  So they're admitted in.

5          (Government's Exhibits 102, 103 and 104 were marked in

6  evidence as of this date.)

7          THE COURT:  Ms. Peters, I'll leave it to your discretion

8  as to when it's a reasonable or a logical place to stop.  It's

9  about seven minutes more.

10          MS. PETERS:  Okay.

11          THE COURT:  If it's logical to break earlier, I'll leave

12  that to your discretion.

13          MS. PETERS:  This actually may be a good time to break

14  before we start on the documents.

15          THE COURT:  Agent Arrow, we're going to break for the

16  day and we'll resume with your testimony at 9:30 tomorrow.

17          THE WITNESS:  Okay.

18          THE COURT:  You will remain under oath, and I'll remind

19  you of that in the morning.  But also do not speak with anyone

20  about your testimony or about anyone else's testimony in the

21  interim.

22          THE WITNESS:  Okay.

23          THE COURT:  Otherwise, you're excused for the evening.

24  Anything else for us to discuss at this time?

25          MR. KREPP:  No.

1          MS. PETERS:  Nothing from the government, Your Honor.

2          THE COURT:  All right.  We'll be in adjournment.  Then

3    we'll see you all here -- and it sounds like we don't have to meet

4    any earlier than 9:30.  I'll contemplate the matter that you

5    brought up, and so we'll just meet at 9:30.  But I'll be here

6    earlier if you all need something, just let us know.

7          MS. PETERS:  Thank you.

8          (Whereupon the hearing concluded at 4:34 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2

3  UNITED STATES DISTRICT COURT

4  NORTHERN DISTRICT OF GEORGIA

5

6      I do hereby certify that the foregoing pages are a true and

7  correct transcript of the proceedings taken down by me in the case

8  aforesaid.

9      This the 4th day of May, 2021.

10

11

12

13

14                     /s/ Viola S. Zborowski_____
                       VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
15                     OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25