```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION


 3


 4   UNITED STATES OF AMERICA, )
                               )
 5            PLAINTIFF,        )
      -VS-                      ) DOCKET NO. 1:19-CR-00297-ELR-JSA
 6                             ) VOLUME II
     TODD CHRISLEY, also known )
 7   As MICHAEL TODD CHRISLEY, )
     et al.,                    )
 8                             )
              DEFENDANTS.       )
 9

10                  TRANSCRIPT OF SUPPRESSION PROCEEDINGS
                    BEFORE THE HONORABLE JUSTIN S. ANAND
11                    UNITED STATES MAGISTRATE JUDGE
                         THURSDAY, APRIL 15, 2021
12


13
     APPEARANCES:
14
     ON BEHALF OF THE GOVERNMENT:
15        THOMAS J. KREPP, ESQ.
               -and-
16        ANNALISE KATHLEEN PETERS, ESQ.
          Assistant United States Attorneys
17

18   ON BEHALF OF THE DEFENDANT TODD CHRISLEY:
          BRUCE HOWARD MORRIS, ESQ.
19

20   ON BEHALF OF THE DEFENDANT JULIE CHRISLEY:
          STEPHEN MICHAEL FRIEDBERG, ESQ.
21
     ON BEHALF OF GEORGIA DEPARTMENT OF REVENUE:
22        ALEX F. SPONSELLER, ESQ.

23


24              VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
                     OFFICIAL COURT REPORTER
25                  UNITED STATES DISTRICT COURT
                        ATLANTA, GEORGIA
```

1                            I N D E X

2    WITNESS                 DIRECT    CROSS    REDIRECT    RECROSS

3    LARRY ARROW                  4      31          70
     BETTY CARTER               74      84          94
4    LaSHAUN WRIGHT             96   98, 128       147

5

6

7

8                            EXHIBITS

9
     Government's Exhibit 105                              9
10   Government's Exhibits 106 and 107                    12
     Government's Exhibits 108 and 109                    15
11   Government's Exhibits 124, 125, 110, 111 & 112       19
     Government's Exhibits 113, 114, 115, 116, 117 &      22
12   118
     Government's Exhibit 118                             25
13   Government's Exhibit 119                             29
     Government's Exhibits 53 & 54                        39
14   Defendant's Exhibit 118                              57
     Government's Exhibit 230                             78
15   Government's Exhibit 123                             81
     Government's Exhibit 207                            136
16

17

18

19

20

21

22

23

24

25

```
 1                    (HELD IN OPEN COURT AT 9:30 A.M.)

 2            THE COURT:  Anything to take up before we resume?

 3            MS. PETERS:  Not from the government.

 4            MR. MORRIS:  Nothing from defense.  If you would remind

 5   everyone about the rule of sequestration.

 6            THE COURT:  Yes.  I'll ask counsel if there are any

 7   prospective witnesses in the room currently?

 8            MS. PETERS:  Not that we're aware of.

 9            THE COURT:  All right.  Other than as we discussed

10   yesterday, the case agent and the defendants.

11            I'll ask counsel to monitor the room and make sure that

12   no prospective future witnesses wander in, and everyone --

13   witnesses are instructed not to be present in the room to observe

14   testimony or to speak to any witnesses or any other -- anyone else

15   who has been inside of the courtroom as to the substance of what's

16   been occurring.

17            But with that, we'll resume with the testimony of Agent

18   Arrow.

19            Agent Arrow, I'll remind you that you are still under

20   oath.

21            THE WITNESS:  Understood.

22            THE COURT:  You may begin.

23            MS. PETERS:  Thank you, Judge.

24                            ******

25                       LARRY ARROW,
```

1                    having been previously sworn,

2               resumes the stand and testified as follows:

3                            ******

4    DIRECT EXAMINATION

5    BY MS. PETERS (continued):

6    **Q.**  Agent Arrow, yesterday afternoon we were just starting to talk

7    about your involvement in the Chrisley investigation.  So I'm

8    going to start this morning there.

9       Are you aware, generally, of the allegations that the Chrisley

10   defendants have made in their motion to suppress, about IRS

11   involvement in the OSI seizure of various items from the Printer &

12   Parts Warehouse?

13   **A.**  OSI seizure?

14   **Q.**  I'm sorry.  I'm sorry, from the Department of Revenue seizure

15   from the Printer & Parts?

16   **A.**  Yes.

17   **Q.**  Okay.  Did you instruct the Department of Revenue to seize the

18   Chrisleys items from the Printer & Parts in March 2017?

19   **A.**  No.

20   **Q.**  To your knowledge, did anyone at the IRS instruct the

21   Department of Revenue to seize items from the Printer & Parts

22   Warehouse in March of 2017?

23   **A.**  No.

24   **Q.**  Were you personally involved in any way in going to the

25   Printer & Parts Warehouse in March 2017?

1  **A.**   No.

2  **Q.**   Did anyone at the Department of Revenue ever tell you that

3  they were going to do a seizure at that warehouse in March 2017 to

4  help you out?

5  **A.**   No.

6  **Q.**   Do you any personal knowledge of why -- what the Department of

7  Revenue's motive was in making those seizures?

8  **A.**   Motive of making those seizures?

9  **Q.**   Do you have personal knowledge?  Were you involved in the

10 decision to seize items from that warehouse?

11 **A.**   No.

12 **Q.**   Okay.  When did you first become aware of the possibility of

13 an IRS criminal investigation into the Chrisleys?

14 **A.**   As a lead on an e-mail that my manager Todd sent to me.

15 **Q.**   Okay.  And if you could take a look at Exhibit 102.

16        MS. PETERS:  I believe we admitted 102 through 104 at

17 the end of the day yesterday.

18 DIRECT EXAMINATION

19 BY MS. PETERS (continued):

20 **Q.**   Agent Arrow, is this e-mail, Exhibit 102, the e-mail that you

21 were just talking about?

22 **A.**   Yes, ma'am.

23 **Q.**   All right.  And on Page 3 of this exhibit, it looks like

24 there's an e-mail from Michael Walfield to you and one other

25 individual.  Who was Michael Walfield?

1  **A.**   Michael Walfield was my manager at the time.

2  **Q.**   Okay.  And who is the other person listed there?

3  **A.**   Yakieshal Scott was a peer of mine.

4  **Q.**   So this e-mail is dated March 24th of 2017; correct?

5  **A.**   Correct.

6  **Q.**   All right.  This -- did you review the linked news article at

7  the time?

8  **A.**   Yes, yes.

9  **Q.**   All right.  And is that the article that is attached on the

10  next page to this exhibit titled, "Records show reality TV star

11  likely evaded state income taxes in Georgia?"

12  **A.**   Yes.

13  **Q.**   All right.  So following these e-mails, what steps did you

14  take?

15  **A.**   Sure.  As I would for any other lead from the FBI or even from

16  the DEA, as an agent my job is to follow-up on a lead and make

17  contact with the agency being referenced on the news article.

18  **Q.**   Okay.  And as part of the next steps that you took, did you

19  reach out to OSI at the Department of Revenue?

20  **A.**   Yes.  Up until that point, I had been working with Yakieshal

21  Scott for almost a year.  So it was reasonable for me to contact

22  her and ask about it, I guess.

23  **Q.**   Was it common for you to contact her in a case like this where

24  you may have gotten information that there were also state issues?

25  **A.**   Yes.  I also contacted her on a lead that my agency got back

1    in October 2016 as well from the news article.  So it's very

2    common.

3    **Q.**  Okay.  And did you have a conversation with Ms. Wright when

4    you reached out to her?

5    **A.**  Yes.

6    **Q.**  What did she tell you?

7    **A.**  I asked if she knew anything about the case at the time.  I

8    asked her -- I just got a lead from my manager about Todd

9    Chrisley.  Is this case in your group, that's what I normally ask

10   her.  She said no, she knows -- she doesn't have any personal

11   knowledge of the case.  It's not a case that OSI was working, but

12   she'll look into it and see who can actually help me out with it.

13   **Q.**  And did she refer you to someone else within the Department of

14   Revenue?

15   **A.**  Yes.

16   **Q.**  Who did she refer to?

17   **A.**  A gentleman by the name of Rufus.  I don't recall his last

18   name.  And then Rufus referred me to someone else.

19   **Q.**  And if you could take a look at Exhibit 103.

20   **A.**  Okay.  Okay.

21   **Q.**  Is this where Ms. Wright referred you to Rufus Payne?

22   **A.**  Yes.

23   **Q.**  If you could flip to Exhibit 104.  All right.  And that bottom

24   e-mail there is an e-mail from you to Katie Colvin saying that you

25   were referred to her by Rufus Payne.  Does that refresh your

1  recollection as to who you were referred to ultimately?

2  **A.**   Yes, ma'am.

3  **Q.**   Was it Katie Colvin?

4  **A.**   Yes, ma'am.

5  **Q.**   Did you speak with Katie Colvin at this point in time, which

6  looks like it was in April of 2017?

7  **A.**   No, did not get a chance to speak with her.

8          MR. MORRIS:  I'm sorry, I'm sorry, I didn't understand

9  that.

10  DIRECT EXAMINATION

11  BY MS. PETERS (continued):

12  **Q.**   Could you repeat that, Agent Arrow?

13  **A.**   Yes.  I said no, I did not get a chance to speak to her.

14  **Q.**   Do you recall exchanging voicemails with her?

15  **A.**   Yes.

16  **Q.**   Do you recall speaking to someone at the Department of Revenue

17  around this time --

18  **A.**   Yes.

19  **Q.**   -- when you and Katie did not connect?

20  **A.**   Yes.

21  **Q.**   Who did you speak with?

22  **A.**   A gentleman by name of Merrill Jacobson.

23  **Q.**   And what do you recall about that conversation?

24  **A.**   Shortly after I left a message for Katie, rather than getting

25  a call from Katie, I got a call from Merrill.  The initial phone

1  call was not very pleasant.  Again, only because I was calling

2  from my desk number, our desk number, it normally has an area code

3  901.  And I believe from the area code -- it's a Tennessee area

4  code, I think it was Memphis or something, Merrill thought I was

5  associated with the defendant and was not very kind to me, trying

6  to talk to him on the phone.  So the first call ended very

7  abruptly.

8  **Q.**  Okay.  Did you receive any information from Merrill Jacobson

9  on that call about their investigation or about the Chrisleys?

10  **A.**  No, not on the initial call.  On the subsequent call he called

11  me back and, umm, he indicated that they had some things, records

12  they were trying to turn over to our civil side.  That's the best

13  of my recollection of the conversation.  Nothing was given to me

14  in as far as the investigation to use, no.

15  **Q.**  Okay.  What steps did you take next in the investigation?

16  **A.**  Sure.  As with anything else, umm, after I made research

17  online, as well as a news article, we -- I initiated what we call

18  the primary investigation.

19  **Q.**  Okay.  And if you --

20          MS. PETERS:  Well, at this time the government would

21  move for admission of Exhibit 105.

22          THE COURT:  Any objection?  It's admitted.

23          (Government's Exhibit 105 was marked in evidence as of

24  this date.)

25  DIRECT EXAMINATION

1  BY MS. PETERS (continued):

2  **Q.**  All right, Agent Arrow, if you could take a look at Exhibit

3  105.

4  **A.**  Yes, ma'am.

5          MR. MORRIS:  I'm sorry, what number?

6          MS. PETERS:  105.

7  DIRECT EXAMINATION

8  BY MS. PETERS (continued):

9  **Q.**  What is this document, Agent Arrow?

10     I'm sorry, Agent Arrow, okay, Exhibit 105, do you recognize

11  this document?

12  **A.**  Yes.

13  **Q.**  What is this?

14  **A.**  It's -- we refer to this as a primary investigation initiation

15  memo.

16  **Q.**  And is this something that you routinely create when you start

17  a primary investigation?

18  **A.**  Yes.

19  **Q.**  All right.  And it says here on the first line of the memo,

20  "The case is predicated on information received from the local

21  news media as well as the Georgia Department of Revenue."  Could

22  you explain what you meant --

23  **A.**  Sure.

24  **Q.**  -- in writing that?

25  **A.**  Sure.  In retrospect, essentially what I meant on this was

1  information received from the local media, as well as information

2  that local media attributed to the Department of Revenue as the

3  source, which a lot of articles did that.

4  **Q.**  So at this time you had not received any substantive useful

5  information from the Department of Revenue?

6  **A.**  No, ma'am.

7  **Q.**  All right.  And if you could flip black to Exhibit 101.  It

8  should be the very first document in that binder.  It should be at

9  the very front.

10 **A.**  At the very front?  All right.

11 **Q.**  So on the bottom of that page -- it should be the ICS history

12 transcript.

13 **A.**  I'm looking for it.  I'm sorry.

14 **Q.**  And if you can't find it, that's okay, I'm just going to read

15 you something from the ICS transcript history --

16 **A.**  Sorry.

17 **Q.**  That's okay.

18     -- which is Exhibit 101.

19     So on February 7th of 2017, Betty Carter entered an ICS note

20 saying that "RO received phone call from Katie Coleman" -- that

21 should be Katie Colvin -- "with the Georgia Department of Revenue.

22 RO was advised that she's working the state case for TP, and that

23 she would like to work the case as a joint agency investigation."

24     Were you on a call with Betty Carter and Katie Colvin in

25 February of 2017?

1   **A.**   No, ma'am.

2   **Q.**   Okay.  I'm sorry, Agent Arrow, that was not Betty Carter, that

3   was a previous revenue officer.  Were you on a phone call with

4   Betty Carter and Katie Colvin?  Were you on a phone call with

5   anyone from the IRS and Katie Colvin in February of 2017?

6   **A.**   No, ma'am.

7   **Q.**   Did you have any contact with Katie Colvin in February of

8   2017?

9   **A.**   No, ma'am.

10  **Q.**   All right.  At some point did you schedule an in-person

11  meeting with the Department of Revenue to discuss the Chrisleys?

12  **A.**   Yes.  Umm, a meet and greet.

13          MS. PETERS:  And at this time we move for admission of

14  Government's Exhibit 106 and 107.

15          MR. MORRIS:  No objection.

16          THE COURT:  All right, they're admitted.

17          (Government's Exhibits 106 and 107 were marked in

18  evidence as of this date.)

19  **Q.**   If you could take a look at Exhibit 106, Agent Arrow?

20  **A.**   Yes, ma'am.

21  **Q.**   Is this e-mail between you and LaShaun Wright, the top two

22  e-mails, is that discussing the meet and greet that you had

23  scheduled?

24  **A.**   That's what I was referring to, correct.

25  **Q.**   And just to be clear, that bottom e-mail where you're talking

1  about judgment and Griffin and some restitution to the Department

2  of Revenue, was that a different case?

3  **A.**   That was a totally different case, correct.

4  **Q.**   And that communication that you sent to LaShaun Wright, was

5  that a typical communication you'd have with her based on the

6  types of investigations you were running?

7  **A.**   Yes, ma'am.

8  **Q.**   Okay.  All right.  Did that meet and greet that was scheduled

9  for sometime around late April 2017 happen?

10  **A.**   No.

11  **Q.**   Do you recall why it didn't happen?

12  **A.**   I believe Merrill himself actually cancelled it.

13  **Q.**   All right.  If you could turn to Exhibit 107.  These are

14  e-mails between initially between you and Deneen Robinson.  Who is

15  Deneen Robinson?

16  **A.**   Deneen Robinson would be a special agent with our

17  Disclosure -- IRS Disclosure Unit.

18  **Q.**   Is that on the CI side or civil side?

19  **A.**   Civil side.

20  **Q.**   And she reached out to you saying that she talked with Merrill

21  Jacobson and he wanted some more information about a high-profile

22  case and was referring it to you.  At this point, had you already

23  talked to Merrill Jacobson --

24  **A.**   Yes.

25  **Q.**   -- once?

1   **A.**   Yes, once.

2   **Q.**   Okay.  And the second call you mentioned with Merrill

3   Jacobson, was it after this e-mail?

4   **A.**   No, the second call with Merrill Jacobson, when he called to

5   talk about referring the leads over to our civil counterpart,

6   would have been sometime in April as well.  It was before this

7   e-mail.

8   **Q.**   Okay.  So in June of 2017, did you have a conversation with

9   Merrill Jacobson?

10  **A.**   No.

11  **Q.**   All right.  And did it -- does this e-mail stick out to you --

12  **A.**   Yes, it does.

13  **Q.**   -- as you look back?

14       Why is that?

15  **A.**   As you can see at the bottom, it starts off with an e-mail

16  that I sent to Deneen because Deneen had actually left me a

17  message about someone that I was supposedly working with at DOR.

18  At first, my initial impression was she was referring to an agent

19  at OSI, as you can see in my initial e-mail at the bottom.  So I

20  sent her an e-mail back thinking that she was referring to an

21  agent that I worked with at OSI, and low and behold when she sent

22  me the information back, from her e-mail as you can see in the

23  middle of the page, it was no.  And that caught me off guard,

24  because, again, when Deneen and I spoke, she indicated it was

25  someone who indicated that he was working with me or they were

1  working with me.  So when I saw the name Merrill, that kind of

2  caught me off back a little bit, like, I don't understand why he

3  would have indicated to our disclosure unit that he was working

4  with me.  So I forwarded the e-mail to LaShaun, like, I'll call

5  you about this to discuss.

6  **Q.**  Okay.  And did you call LaShaun Wright about that?

7  **A.**  Yes, as we would normally do.  I communicate with her a lot

8  about a lot of things.  So I forwarded this e-mail to her to kind

9  of give her the information, why would this guy be calling our

10  disclosure unit indicating that he was working with me when it's

11  note even true, and in jest LaShaun just kind of, I think -- I

12  recall that she just kind of chuckled about it.  There wasn't any

13  kind of in-depth conversation about it.

14  **Q.**  Okay.  And did you ever call Merrill Jacobson or e-mail him or

15  reach out to him?

16  **A.**  No, not on this matter.

17  **Q.**  Okay.  At some point after you started this primary

18  investigation, did IRS CI receive a referral from the IRS civil?

19  **A.**  Yes.

20          MS. PETERS:  And at this time we move for the admission

21  of Government Exhibits 108 and 109.

22          MR. MORRIS:  No objection.

23          THE COURT:  All right, they're admitted.

24          (Government's Exhibits 108 and 109 were marked in

25  evidence as of this date.)

DIRECT EXAMINATION

BY MS. PETERS (continued):

**Q.**  If you could take a look at Exhibit 108, Agent Arrow.

**A.**  Yes, ma'am.

**Q.**  What is that document?

**A.**  It's what we call the referral form that normally comes from our civil side with referral cases.

**Q.**  Okay.  And is this a referral from the civil side for a criminal investigation into the Chrisleys?

**A.**  Correct.

**Q.**  All right.  And do you see on page 2 who is listed as the initiator of this referral?

**A.**  The RO is Betty Carter.

**Q.**  Okay.  And this was in July of 2017; correct?

**A.**  Correct.

**Q.**  So at this point in time when CI received this referral, were you already working on a primary investigation into the Chrisleys?

**A.**  I already had the primary initiation.

        MR. MORRIS:  Agent Arrow, would you keep your voice up just a little here.  I can't here you quite clearly.

        THE WITNESS:  Sure.

DIRECT EXAMINATION

BY MS. PETERS (continued):

**Q.**  At this point in time, Agent Arrow, when this case was referred in July 2017, was CI already working a primary

1  investigation into the Chrisleys?

2  **A.**   I already had the primary initiation open, but there wasn't a

3  whole lot of investigation going on yet.

4  **Q.**   Okay.  And is it unusual to receive a referral from the civil

5  side when you're already working on or have already opened a

6  criminal investigation?

7  **A.**   No, it's not.

8  **Q.**   Okay.  What happened after you received that referral form?

9  **A.**   Sure.  Per policy when we get referrals from civil, we have, I

10 believe, up to 30 days to review the referral, and if we cannot

11 timely review the referral, then we have to ask for an extension

12 to evaluate the referral.

13 **Q.**   Okay.  And did you request an extension in this case?

14 **A.**   Yes.

15 **Q.**   All right.  If you could take a look at Exhibit 109.  Is this

16 a memo where you all were requesting the extension of time to

17 evaluate the referral?

18 **A.**   Yes, ma'am.

19 **Q.**   Why were you requesting additional time?

20 **A.**   Because as you could probably read on the memo, I was

21 preoccupied with other cases at the time that I was actually

22 working together with OSI, and I was also scheduled to be on

23 leave.  So I just didn't have any time to spare to review the

24 referral, I mean, yeah, to review the referral.  So I asked for an

25 extension.

1  **Q.**  Okay.  And it says sort of near the top of the memo that you

2  all had a five-way meeting with the referring revenue officer, the

3  group manager and the RO fraud technical advisor to discuss the

4  referral.

5      Can you explain what that five-way meeting is?

6  **A.**  Sure.  It's another one of our policies.  When we get a

7  referral from civil, we have to schedule what we call a five-way

8  meeting within 30 days of the referral.  And that's what it is.

9  Basically, we just talk about the referral, get an idea of what

10 the case is about, get an idea of what civil has to indicate fraud

11 from the referral.  Basically, it's our -- it's our time to learn

12 more about what civil has done on the case before referring it to

13 us.

14 **Q.**  Was the Department of Revenue involved in that five-way

15 meeting in any way?

16 **A.**  No, ma'am.

17 **Q.**  Okay.  You said you had a lot of other things going on.

18 **A.**  Right.

19 **Q.**  What was the next time that you were able to turn your

20 attention to the Chrisley investigation?

21 **A.**  Shortly after this -- this would have been August.  Shortly

22 after this I went on detail in Birmingham.  So the first I recall

23 having any time substantive on this case, would have been sometime

24 in October when -- with grand jury, I believe.

25 **Q.**  Okay.  And at some point in time --

```
 1              MS. PETERS:  Well, at this time we move fore admission
 2    of Exhibits 124, 125, and then 110.
 3              MR. Morris:  120?
 4              MS. PETERS:  124, 125, 110, 111, and 112.
 5              MR. MORRIS:  Hold on one second.
 6              Can you show me what those are?
 7              MS. PETERS:  Sure.
 8              MR. MORRIS:  No objection.
 9              THE COURT:  All right, they're admitted.
10              (Government's Exhibits 124, 125, 110, 111, and 112 were
11    marked in evidence as of this date.)
12    DIRECT EXAMINATION
13    BY MS. PETERS (continued):
14    Q.  All right, Agent Arrow, if you could take a look at Exhibit
15    124.
16    A.  Okay.  Got it.
17    Q.  At some point in late 2017, was a grand jury subpoena issued
18    to the Georgia Department of Revenue requesting various
19    information related to the Chrisleys?
20    A.  Yes.
21    Q.  All right.  And following the issuance of that subpoena, was a
22    meeting set up at the Department of Revenue where Assistant U.S.
23    Attorney Krepp and you and other members of the federal
24    prosecution team went and met with Department of Revenue
25    officials?
```

**A.**   Yes.

**Q.**   Okay.  And did AUSA Krepp bring and serve an additional grand jury subpoena at that meeting at the Department of Revenue?

**A.**   It's my recollection, yes.

**Q.**   Okay.  All right, if you could turn to Exhibit 112.

**A.**   Okay.

**Q.**   Is this the memo you prepared after that meeting at the Department of Revenue?

**A.**   Yes, ma'am.

**Q.**   All right.  And the people who are listed there under participants, are those the people who attended that in-person meeting?

**A.**   Yes, ma'am.

**Q.**   Had you met Katie Colvin in person before that meeting?

**A.**   No, ma'am.

**Q.**   All right.  What did you learn -- well, what was discussed at that meeting?

**A.**   As indicated on the memo, the discussion was --

         MR. MORRIS:  I'm going to object, Judge.  I don't think the memo is an admissible exhibit at this point.  And if he remembers what happened, that's fine.  If he would like to use it to refresh his recollection, so be it.  But I object to the memo being read into the record.

         THE COURT:  Can you rephrase?

         MS. PETERS:  Sure.  I wasn't asking him to read -- I

1  think it's already been admitted, I believe, as an exhibit.

2  DIRECT EXAMINATION

3  BY MS. PETERS (continued):

4  **Q.**  I guess if you need to -- if we need to refresh your memory,

5  let me know, Agent Arrow, but without reading from your memo --

6  **A.**  Sure.

7  **Q.**  -- what did you learn or what was discussed at that meeting in

8  January 2018?

9  **A.**  Sure.  We were told how the seizure came about.  I think --

10  **Q.**  When you say the seizure, you mean the Department of Revenue's

11  seizure --

12  **A.**  Correct.

13  **Q.**  -- from 2017?

14  **A.**  Correct.  We were also told about how the case originated at

15  the time as well.  That's all I can remember.

16  **Q.**  Okay.  Do you recall whether anything was discussed about what

17  types of documents and materials may have been part of that

18  seizure back in 2017?

19  **A.**  Yes.  Sometime during the meeting, correct.

20  **Q.**  Okay.  And after that meeting at the Department of Revenue,

21  did you obtain, or did the IRS obtain, federal search warrants to

22  seize and search some of the materials that the Department of

23  Revenue had seized from the Printer & Parts Warehouse?

24  **A.**  Yes, ma'am.

25           MS. PETERS:  All right.  At this time we would move for

1   the admission of Exhibits 113, 114, 115, 116 and 117 and 118?

2            MR. MORRIS:  Just tell me what they are.

3            MS. PETERS:  It is the two search warrants, the returns

4   for those search warrants, and Agent Arrow's memorandum

5   documenting the execution of the search warrants, and an IRS

6   document about a quarterly joint work plan meeting.

7            MR. MORRIS:  I'm sorry, may I see the last one?

8            MS. PETERS:  Sure.

9            MR. MORRIS:  Thank you.  No objection.

10           THE COURT:  They're admitted.

11           (Government's Exhibits 113, 114, 115, 116, 117 and 118

12   were marked in evidence as of this date.)

13   Q.  And just to clarify, has Exhibit 112 been admitted?

14           THE DEPUTY CLERK:  Yes.

15           THE COURT:  Yes.

16           MS. PETERS:  Thank you.

17           MR. MORRIS:  I objected to 112.

18           THE COURT:  You did?

19           MR. MORRIS:  Yes.

20           THE DEPUTY CLERK:  I didn't hear that.

21           THE COURT:  I think we admitted it and then you may have

22   objected after that.  So this is the memo which you --

23           MR. MORRIS:  I believe, Your Honor, he testified from

24   his memory, and there is no reason to put in the memo.  It's

25   self-serving and not written by him, I don't believe.

 1          MS. PETERS:  It was, Your Honor, and hearsay should be

 2 admissible.

 3          MR. MORRIS:  Okay, well...

 4          THE COURT:  Is there -- is there something beyond his

 5 testimony about this meeting that's pertinent, that is included in

 6 the memorandum?

 7          MS. PETERS:  Yes, Your Honor.  Let me find it.  One

 8 moment.  The memo generally discusses who was present at the

 9 meeting.  It was prepared shortly after the meeting.  It

10 discusses -- it summarizes what was discussed at the meeting, that

11 they were served with a subpoena.  It, basically, is a summary of

12 what happened, and I'm happy to ask Agent Arrow additional

13 questions about it, if it's being withdrawn from admission, to

14 admit it.

15          THE COURT:  Well, I'm going to overrule the objection.

16 I mean, you know, the rules of evidence don't strictly apply to

17 suppression hearings, although I still have discretion to assess

18 the reliability of evidence that's being offered, and, of course,

19 the weight applied to anything is not at issue right now.  That's

20 something that we would -- y'all would argue in briefs, if

21 necessary.  And even if the hearsay rules apply, this would still

22 be admissible to explain the conduct and decisions and information

23 and the context in which subsequent investigative actions occur.

24 So I'm going to overrule the objection.

25 DIRECT EXAMINATION

1   BY MS. PETERS (continued):

2   **Q.**   And, Agent Arrow, if you could actually turn back to

3   exhibit -- well, let's do this.  If you could take a look at

4   Exhibit 228 which was admitted yesterday.

5          MR. MORRIS:  228?

6   **A.**   Okay.

7   **Q.**   The release of levy there.  Do you see the date that this was

8   signed, on March 29, 2017?

9   **A.**   Yes, ma'am.

10  **Q.**   Okay.  Would you agree that, likely given that this is the

11  release of levy date here signed, that likely the -- the seizure

12  from the Printer & Parts Warehouse happened before this date here?

13  **A.**   I would suppose so.

14  **Q.**   Okay.  And if you could turn back to Exhibit 112.

15  **A.**   Okay.

16  **Q.**   Page 2.  Paragraph two you write that the seizure took place

17  from the warehouse in -- well, I'm sorry, it's actually paragraph

18  six that -- I'm sorry, it is paragraph two.  That in July 2017,

19  "Department of Revenue did a jeopardy assessment and issued a lien

20  with a levy to collect from the Chrisleys in July of 2017."

21       Do you think that could have been just a typo or a

22  typographical error on your part?

23  **A.**   It could have been.

24  **Q.**   Okay.  All right.  So you testified that you obtained two

25  federal search warrants to seize the items that the Department of

1  Revenue had previously seized from the warehouse.  Why did the IRS

2  obtain two different warrants?

3  **A.**  Because it was for two separate locations.

4  **Q.**  Okay.  And were you present when those search warrants were

5  executed?

6  **A.**  Yes, I was.

7  **Q.**  And did you prepare a memo afterwards documenting the

8  execution of the two search warrants?

9  **A.**  Yes, I did.

10         MS. PETERS:  Your Honor, we move for the admission of

11  Government Exhibit 118.

12         MR. MORRIS:  I'm sorry, what?

13         MS. PETERS:  118.

14         MR. MORRIS:  115.

15         MS. PETERS:  118.

16         MR. MORRIS:  I'm sorry, if you could speak a little

17  slower for me, I can't hear.  Thank you.

18         THE COURT:  Any objection?

19         MR. MORRIS:  Same objection as before.  It's just a

20  memorandum that he's written, and his testimony would be the best

21  evidence of what occurred.

22         THE COURT:  Well, I'll overrule the objection on the

23  grounds as previously stated.

24         (Government's Exhibit 118 was marked in evidence as of

25  this date.)

1  **Q.**  All right.  Agent Arrow, who was present when you executed the

2  search warrant?

3  **A.**  It was personnel from my agency, DOR, OSI and FBI.

4  **Q.**  Okay.  Was Josh Waites present?

5  **A.**  Yes, Josh Waites was my point of contact at that point.

6  **Q.**  All right.  And Josh Waites was also present at the meeting

7  with the Department of Revenue in January of 2018; correct?

8  **A.**  Correct, correct.

9  **Q.**  Had you had much communication with Josh Waites about the

10  Chrisleys prior to that meeting?

11  **A.**  No, I never spoke to him at all.

12  **Q.**  Was that meeting in January 2018 the first time you had met

13  Josh Waites?

14  **A.**  Yes.

15  **Q.**  Okay.  Did Josh Waites ever feed you improperly -- did Josh

16  Waites ever improperly feed you information about the Chrisley

17  investigation?

18  **A.**  No, ma'am.

19  **Q.**  All right.  After the search warrant was executed at the two

20  different places, what steps did you take next in the

21  investigation?

22  **A.**  At that point I just went about doing the job of investigating

23  whole thing with the FBI.

24  **Q.**  All right.  And if you could take a look at Exhibit 119.

25  **A.**  Okay.

1  **Q.**  All right.  What is this document?

2  **A.**  This is a quarterly joint work plan.  And, essentially, if you

3  have a civil counterpart who was the assistant on the case which

4  in this case I had both an RO and a revenue agent assisting with

5  the case, we have a policy where we have to have a quarterly

6  meeting to, basically, keep our civil counterpart abreast of the

7  progress of the referral, of the investigation.  So that's what we

8  did.

9  **Q.**  Okay.  And so when was this document prepared?

10 **A.**  It would have been prepared -- this was prepared actually by

11 the revenue agent.  It was not prepared by me.

12 **Q.**  Where it says, "Quarter ending March 31, 2018?"

13 **A.**  Correct, but I don't see a specific date here wherein we

14 actually held it.

15 **Q.**  Would it have been sometime around then --

16 **A.**  Yes.

17 **Q.**  -- in the spring of 2018?

18 **A.**  Yes, it would have been in the spring.

19 **Q.**  All right.  And where it says, "Special agent," it says

20 "discussions held with AUSA Thomas Krepp."  Was AUSA Krepp

21 involved in the investigation way back in March and April 2017

22 when you opened the case initially?

23 **A.**  No, no.

24 **Q.**  Was it sometime after that, in the following months that he

25 joined the case?

1  **A.**  I think the case went to the grand jury; that was the point

2  that AUSA Krepp got involved with it.  That would have been

3  October, November 2017-ish.

4  **Q.**  Okay.  And it says here that -- this is the second line from

5  the bottom -- it says, "Gathering other information from FBI/State

6  of Georgia also involved in the case."  What does -- do you know

7  what that means?

8  **A.**  I'm not sure.  Because as I said, I did not prepare this memo.

9  This was prepared by the cooperating agent at the time, I guess

10 based on his understanding of whatever it is, but I can't speak to

11 that.

12 **Q.**  Someone on the civil side prepared it?

13 **A.**  Correct, correct.  It was not the revenue agent.

14 **Q.**  Okay.  Was the IRS's criminal investigation into the Chrisleys

15 ever a joint investigation with OSI?

16 **A.**  From my recollection, OSI was never involved in this case at

17 all.

18 **Q.**  Okay.

19        MR. MORRIS:  Could you speak up just a bit.  I couldn't

20 hear that.

21        THE WITNESS:  I said, from my recollection OSI was never

22 involved in this case at all.

23        MR. MORRIS:  Thank you, sir.

24        MS. PETERS:  One moment, Your Honor.

25        I will move to admit Government Exhibit 119.

1          MR. MORRIS:  Which one?

2          MS. PETERS:  119.

3          MR. MORRIS:  No objection.

4          THE COURT:  Okay, it's admitted.

5          (Government's Exhibit 119 was marked in evidence as of

6     this date.)

7     DIRECT EXAMINATION

8     BY MS. PETERS (continued):

9     **Q.**   Just a couple more questions for you, Agent Arrow.

10    **A.**   Sure.

11    **Q.**   Do you recall an incident in 2012 where it was determined that

12    you had failed to follow established leave procedures at the IRS?

13    **A.**   Yes.

14    **Q.**   Did you report to the IRS -- well, in the IRS time and

15    attendance system, that you would be at work on a certain date and

16    then not appear in the office that day?

17    **A.**   Correct.

18    **Q.**   Did you receive a one-day suspension for that error?

19    **A.**   Yes.

20    **Q.**   Has there been any findings like that one since 2012?

21    **A.**   No.

22    **Q.**   And are you aware of a pending investigation by the Treasury

23    Inspector General for Tax Administration into allegations that you

24    improperly accessed another IRS agent's computer and made

25    misleading statements about it?

**A.**   Yes.

**Q.**   Have you also been made aware that Tim Temple (phonetic)
believes that there are no merits to this investigation?

**A.**   Yes.

**Q.**   But just to be clear, that investigation is pending; correct?

**A.**   Yes, ma'am.

**Q.**   Did you improperly access another agent's computer?

**A.**   No, ma'am.

**Q.**   Did you make any misleading statements about that?

**A.**   No, ma'am.

**Q.**   Is that the first time that that particular employee has made
allegations against you that are untrue?

**A.**   No, it's not.

**Q.**   Okay.  And were the findings of the prior investigation
that those previous allegations also lacked merit?

**A.**   Yes, ma'am.

**Q.**   Agent Arrow, just one more time:  Did you play any role at all
in the Georgia Department of Revenue's decision to seize a bunch
of furniture and other items from the Printer & Parts Warehouse in
March of 2017?

**A.**   No, ma'am.

          MS. PETERS:  Thank you.

          THE COURT:  All right, Mr. Morris.

          MR. MORRIS:  Thank you, Your Honor.

CROSS-EXAMINATION

1  BY MR. MORRIS:

2  **Q.**  Good morning, Mr. Arrow.

3  **A.**  Good morning.

4  **Q.**  I don't ask you this question to embarrass you, but I ask this

5  question to understand it.  Is my understanding in 2012,

6  basically, you lied to the IRS?

7  **A.**  No, I did not.

8  **Q.**  You told them you were going to be at work you and you didn't?

9  **A.**  That is correct.

10  **Q.**  That wasn't true, was it?

11  **A.**  It was not true, correct.

12  **Q.**  Okay.  And the pending investigation involves you improperly

13  accessing somebody else's machine?

14  **A.**  Correct.

15  **Q.**  And lying about it?

16  **A.**  No, ma'am -- no, sir.

17  **Q.**  Beg your pardon?

18  **A.**  I did not lie about it.

19  **Q.**  No, the investigation concerns whether you lied about it;

20  correct?

21  **A.**  No, sir.

22  **Q.**  I beg your pardon?

23  **A.**  No, sir.

24  **Q.**  That's not the way you understand it, because that's the way

25  it was reported to us, that is, that the employee who says you

1    improperly invaded or manipulated her electronics, lied about it;

2    is that part of the allegation?

3    **A.**   The employee alleged that I lied --

4    **Q.**   Yes.

5    **A.**   -- about the reason why.

6    **Q.**   Currently under investigation?

7    **A.**   Correct.

8    **Q.**   Okay.  All right.  Now I understand.

9        What was your first professional recognition of the Chrisleys?

10   **A.**   The e-mail from my manager.

11   **Q.**   In April of 2017, that's your testimony?

12   **A.**   March.

13   **Q.**   Pardon me?

14   **A.**   March of 2017.

15   **Q.**   March 20?

16   **A.**   '17.

17   **Q.**   2017.  That's the first knowledge you have of Todd and Julie

18   Chrisley?

19   **A.**   Correct.

20   **Q.**   You had never discussed them with LaShaun Wright?

21   **A.**   Not to my recollection.

22   **Q.**   Pardon me?

23   **A.**   Not to my recollection.

24   **Q.**   Well, you know, help me here.  When you say not to your

25   recollection, that suggests that you may have but you don't recall

1   it.  So help us here.  Did you or did you not?

2   **A.**  No.  LaShaun Wright and I were not even working on the

3   Chrisleys at all.

4   **Q.**  Did you ever discuss whether you were working on it or not,

5   and I know what you mean by working on it, that's a joint

6   investigation.

7   **A.**  Correct.

8   **Q.**  Was she giving you information discussing with you the

9   Chrisleys?

10  **A.**  No.

11  **Q.**  All right.  Were you aware of the Georgia Department of

12  Revenue meeting in December of 2016 to discuss Todd Chrisley?

13  **A.**  No, sir.

14  **Q.**  You were not aware that there was such a meeting on

15  December 6, 2016?

16  **A.**  No, sir.

17  **Q.**  Okay.  Did you know LaShaun Wright at the Georgia Department

18  of Revenue in December of 2016?

19  **A.**  Yes, sir.

20  **Q.**  But she did not inform you of the meeting on December 6?

21  **A.**  2016?

22  **Q.**  Yes.

23  **A.**  No, sir.

24  **Q.**  Are you aware that she called you on December 7, 2016, the day

25  after the meeting?

1   **A.**   LaShaun calls me almost multiple times a week.

2            MR. MORRIS:  May I have document Exhibit No. 53, please.

3            Judge, I think we need --

4            A VOICE:  One second.

5            MR. MORRIS:  It may take them a minute to find it.

6   We'll come back to that one in a minute.

7            THE WITNESS:  Sure.

8   CROSS-EXAMINATION

9   BY MR. MORRIS (continued):

10  **Q.**   Just for the record, and I don't want to -- I don't want to

11  announce anything that would be private and should not be in the

12  record, so if you will allow me, I'll give your area code and the

13  last four numbers of what I believe are your telephone numbers,

14  and will you tell me if that's correct?

15  **A.**   Sure.

16  **Q.**   If you prefer, I will give you the whole number, but I didn't

17  want to say it into the record.

18  **A.**   It's your preference.

19  **Q.**   My preference?  Okay.  In 2016 and in 2017, was your personal

20  cell phone number area code --

21           THE COURT:  I think I would rather it just be the last

22  four digits.

23           MR. MORRIS:  Okay, I'll do it.

24           THE COURT:  Otherwise, we would have obligations for

25  redaction in the transcript.  I think it will be easier, if there

1  is no objection, if you're okay with it, we'll do it that way.  I

2  appreciate you flagging that.

3            MR. MORRIS:  That's why I asked, and I'll be more than

4  happy to, Judge.

5  CROSS-EXAMINATION

6  BY MR. MORRIS (continued):

7  Q.  Is it correct that your cell phone, 2016 and 2017, was area

8  code 214- with three numbers and then -3015?

9  A.  Correct.

10  Q.  Was your work cell number area code 409- ending in -2686?

11  A.  Area code 469.

12  Q.  That's what I said, 469?

13  A.  Correct.

14  Q.  And was your work number 678- ending in -9458?

15  A.  Correct.

16  Q.  Okay.  So you don't recall LaShaun Wright calling you the day

17  after the GDOR meeting that was held to discuss the Chrisleys?

18  A.  No, sir.

19  Q.  Do you recall a call from her again the very next day on

20  December 8, 2016?

21  A.  No, sir.  About Chrisleys?

22  Q.  About the Chrisleys?

23  A.  No, sir.

24  Q.  Were you aware that the meeting that was to be held in

25  December was actually held on December 19, 2016?  Were you aware

1  of that meeting?

2  **A.**   No, sir.

3  **Q.**   Do you know who Jodie Fleischer is?

4  **A.**   Jodie Fleischer?  That name doesn't ring a bell.

5  **Q.**   She's the WSB reporter associated with the article that you

6  said you read when it was sent to you?

7  **A.**   Okay.

8  **Q.**   Does that name ring a bell now?

9  **A.**   I could look at the article.  I didn't pay attention to who

10  the reporter was.

11  **Q.**   Have you ever met that reporter, to your knowledge?

12  **A.**   No, sir.

13  **Q.**   Okay.  If I told you that that story about the Chrisleys ran

14  on March 6, 2017, were you aware of that at the time?

15  **A.**   The same story in the link?

16  **Q.**   Yes.

17  **A.**   I did not pay attention to the dates.

18  **Q.**   Okay.  Is the first knowledge you had of that story when it

19  was included in the link in March of 2017?

20  **A.**   The first knowledge I had of that story was the e-mail that my

21  manager sent to me, correct.

22  **Q.**   So you didn't know about it when it ran?

23  **A.**   No.

24  **Q.**   Okay.  Did you discuss the Chrisleys in a telephone

25  conversation the day it ran with LaShaun Wright, that would be on

1  February 6 of 2017?

2  **A.**  I don't believe so.

3          MR. MORRIS:  Okay, can you pull up that February 6,

4  2017, document, 53?  Can we blow that up just a little bit.  Okay.

5  CROSS-EXAMINATION

6  BY MR. MORRIS (continued):

7  **Q.**  I tell you, sir, that these are phone records that had been

8  provided to the government, and they reflect communications

9  between you and LaShaun Wright.  Do you see there on 2/6/17 there

10 is a phone call?

11 **A.**  Yeah.

12 **Q.**  Is one of those numbers yours?

13 **A.**  Yes.

14 **Q.**  Okay.  On 2/6, below that there is another phone call that is

15 between you and LaShaun Wright, is it not?

16 **A.**  Yes.

17 **Q.**  Okay.  On February 8, do you recall having four phone calls

18 and texts with LaShaun Wright?

19 **A.**  I don't recall it, but I can see them.

20 **Q.**  You can see them; correct?

21 **A.**  Correct.

22 **Q.**  And this, you tell us, did not relate to the Chrisleys?

23 **A.**  I don't believe so.

24 **Q.**  You don't believe so.  You said that several times now.

25 **A.**  Okay.

1  **Q.**  When you say you don't believe so, is that the same as no?

2  **A.**  Correct.

3  **Q.**  Okay.  After this phone call on the 8th, are you -- were you

4  aware that Katie Colvin called IRS Agent Kamesh Golden (phonetic)

5  to discuss the Chrisleys?

6  **A.**  No, sir.

7  **Q.**  Okay.  And I believe we looked at that document dated February

8  7, 2017.  You were unaware of that?

9  **A.**  Correct.

10  **Q.**  Were you aware that Josh Waites, who you know is with OSI at

11  GDOR -- you know him?

12  **A.**  I know him, correct.  I know of him, I don't know him

13  personally.

14  **Q.**  Were you aware before March of 2017, that Mr. Waites had

15  reached out to ICE for information on the Chrisleys?

16  **A.**  No, sir.

17          MR. MORRIS:  By the way, we move the admission of

18  documents -- of Defendant's Exhibits 53 and 54, which are the

19  phone and text records, Your Honor, of LaShaun Wright and Larry

20  Arrow.

21          THE COURT:  Any objection?

22          MS. PETERS:  No objection.

23          THE COURT:  I'll provisionally admit them, but they do

24  have personal identification on there and telephone numbers.  So

25  if you would submit -- I mean, if there's a necessity for

1  evidentiary purposes to these full numbers, then we put those

2  under seal but then you would have to submit for the public record

3  a redacted version.  If there is no necessity to that evidentiary

4  detail, we don't have to bother with that.  We don't have to

5  replace this with the redacted version.  I think redacted the same

6  way you asked your questions.

7            MR. MORRIS:  We'll do that, Your Honor.

8            THE COURT:  Okay.

9            MR. MORRIS:  We'll be happy to, because there is no

10  question he identified that they're his numbers.

11            THE COURT:  Okay.

12            MR. MORRIS:  And I believe Ms. Wright will as well.

13            (Government's Exhibits 53 & 54 were provisionally marked

14  in evidence as of this date.)

15  CROSS-EXAMINATION

16  BY MR. MORRIS (continued):

17  Q.  Okay.  I'm sorry, I think I asked you if were you aware that

18  Mr. Waites had reached out to ICE for information on the

19  Chrisleys?

20  A.  No, sir.

21  Q.  Were you aware that he received that information on February

22  23, 2017?

23  A.  No, sir.

24  Q.  You had telephone conversations with LaShaun Wright on

25  February 24, 2017.

1          MR. MORRIS:  Would you place that on the screen, please.

2    CROSS-EXAMINATION

3    BY MR. MORRIS (continued):

4    **Q.**  Do you see those?

5    **A.**  Yes, sir.

6    **Q.**  Those are with you, are they not, and LaShaun Wright?

7    **A.**  That is correct.

8    **Q.**  At any point during those conversations, was there any

9    discussion of the Chrisleys or information relating to the

10   Chrisleys?

11   **A.**  No, sir.

12   **Q.**  Okay.  What was the first request for information from GDOR by

13   the IRS that you are aware of?

14   **A.**  A request?

15   **Q.**  A request for information on the Chrisleys.

16   **A.**  I'm not sure what you mean by that.

17   **Q.**  Well, I -- I understand from you that there's cooperation

18   among and between GDOR and the IRS; correct?

19   **A.**  Investigations that we're working together, correct.

20   **Q.**  Pardon me?

21   **A.**  On investigations that we worked together?

22   **Q.**  Yes.

23   **A.**  Yes.

24   **Q.**  Okay.  What's the first request for information from the

25   Georgia Department of Revenue regarding the Chrisleys that you are

1  aware of from the IRS?

2  **A.**   I'm not aware of any such requests.

3  **Q.**   You never made any requests for information from GDOR?

4  **A.**   I called the Department of Revenue, as my e-mail indicated, to

5  find out what the case was about.  But I never got to speak to

6  anyone.  I called LaShaun.  LaShaun indicated that she had no

7  knowledge of what's going on, that's why she referred me to the

8  other individual.

9  **Q.**   You never got any information from GDOR other than as a result

10  of the search warrants?

11  **A.**   Correct.

12  **Q.**   Okay.  Well, you identified some grand jury subpoenas.  Did

13  you get any documents in response to the grand jury subpoena?

14  **A.**   The grand jury subpoena happened much later on during the

15  year.

16  **Q.**   Well, you're telling me the search warrant came first?

17  **A.**   No, the search warrant came later, but the grand jury subpoena

18  happened October of 2017.

19  **Q.**   Of '17?

20  **A.**   Correct, grand jury.

21  **Q.**   Is that the first request for information that you're aware

22  of?

23  **A.**   That would be the first official request other than my

24  communication, my e-mail communication in the early part of March

25  and April.

1  **Q.**  And your testimony is that you got nothing in the way of

2  substantive information as a result of your e-mail requests --

3  **A.**  Correct.

4  **Q.**  -- or your telephone calls?

5  **A.**  Correct.

6  **Q.**  Was your first receipt of information related to the Chrisleys

7  in response to the grand jury subpoenas in the fall of 2017?

8  **A.**  Correct.

9  **Q.**  And what did you get?

10  **A.**  I take that back, I'm sorry.  My first information related to

11  the Chrisleys came from the fraud referral that we got from our

12  civil side in July 2017.

13  **Q.**  And other than that exhibit we saw where it discusses a

14  referral, did you get any other information?

15  **A.**  From our civil counterpart, yes.

16  **Q.**  You did?

17  **A.**  Correct.

18  **Q.**  All right.  Were any of those documents received from the

19  Georgia Department of Revenue?

20  **A.**  I would assume so, but not by me.  It's between our civil

21  counterpart and Georgia Department of Revenue.

22  **Q.**  I understand there is a division between civil and criminal.

23  **A.**  Correct.

24  **Q.**  But it's all the IRS; isn't it?

25  **A.**  They're all in the IRS.

1  **Q.**  Okay.

2  **A.**  There are several divisions within the IRS.

3  **Q.**  Okay.  So the referral you got from civil included information

4  obtained by civil IRS from GDOR?

5  **A.**  That's my assumption.

6  **Q.**  That's your assumption?

7  **A.**  I don't know that for a fact.

8  **Q.**  Well, your memos says, "The information from the Georgia

9  Department of Revenue," doesn't it?

10  **A.**  That's what I was told.

11  **Q.**  That is what you were told by whom?

12  **A.**  By our civil counterparts.

13  **Q.**  Okay, okay.  And you don't have any reason to believe your

14  civil counterpart would lie to you?

15  **A.**  I don't have any reason to believe they would.

16  **Q.**  Okay.  Do you recall what the information was?

17  **A.**  It was some of their collection activities.  I think certain

18  things related to liens.

19  **Q.**  What?

20  **A.**  Liens, like federal tax liens and, perhaps, some records they

21  gathered, "they" as in our collections division, pertaining to

22  properties that the Chrisleys may have.  That's my recollection.

23  **Q.**  You recollect what, of what you just named, came from GDOR?

24  **A.**  That would be what I would assume, correct.

25  **Q.**  Okay.  Okay.  Anything else you can remember?

1  **A.**  No, sir.

2  **Q.**  Okay.  Were you aware that on February 23, 2017, LaShaun

3  Wright accessed Todd Chrisley's tax account at GDOR?

4  **A.**  No.

5  **Q.**  And that was at -- if I told you that was at 11:37 a.m., would

6  that in any way refresh your recollection?

7  **A.**  No, sir.

8  **Q.**  Okay.  After accessing that 11:37 a.m., she called you at

9  12:08 p.m., immediately thereafter.  Do you recall that

10  conversation on February 23, 2017?

11  **A.**  No, sir.

12  **Q.**  No?  Do you see it on the screen?

13  **A.**  I see a call took place, that's correct.

14  **Q.**  Okay.  And your testimony is it had nothing to do with the

15  Chrisleys?

16  **A.**  Correct.

17  **Q.**  Do you know what GENTX is?

18  **A.**  No, sir.

19  **Q.**  Okay.  LaShaun Wright didn't give you any information from

20  GENTX?

21  **A.**  No, sir.

22  **Q.**  Okay.  When did you first learn of GDOR's outreach to the IRS

23  RO Golden?

24  **A.**  On the ICS history, probably sometime in 2018 when I was going

25  through it.

1  **Q.**  Okay.  What about the GDOR's outreach to Agent Carter, RO

2  Carter?

3  **A.**  That would be the same thing, probably in the ICS history when

4  I was going through the record.

5  **Q.**  Okay.  That information was not provided to you when the

6  transfer from civil to criminal occurred?

7  **A.**  Would have it been -- possibly could have been part of the

8  package, but as far as when I recall it, that would have been

9  sometime in probably 2018 when I was reading the history.

10 **Q.**  All right.  When did you first learn of the IRS meeting among

11 GDOR representatives and IRS RO Carter and another IRS person

12 named Carter, Joanna Carter?  That meeting -- I want to give you a

13 time frame.

14 **A.**  Sure.

15 **Q.**  That meeting occurred March 9, 2017.  When did you first learn

16 of that?

17 **A.**  If I can go back for a second --

18 **Q.**  Sure.

19 **A.**  -- as far as your previous question?

20    My first knowledge of civil receiving any information from

21 GDOR came from Merrill when he indicated that they

22 transferred -- well, they gave some information to our civil

23 counterpart.  That would have been April of 2017.  That was the

24 very first knowledge that I had of that.

25 **Q.**  Of what?

1  **A.**   Of -- of GDOR giving information to our civil counterpart.

2  **Q.**   So you knew in April?

3  **A.**   Yeah, of 2017 when Merrill indicated that to me.

4  **Q.**   All right.  So you didn't know of the meeting on March 9,

5  2017?

6  **A.**   My recollection, again, it's been a while since I spoke with

7  Merrill, but I do recall him indicating that whatever record they

8  had, had been given to someone on our civil side.

9  **Q.**   Okay.  May I see -- you have it, thank you.  If you would look

10 at your screen again, this is Exhibit -- is this 53 or 54?  53.

11     Do you see that on that same day of the meeting with GDOR, you

12 have text messages with LaShaun Wright; correct?

13 **A.**   Yes, I do.  Correct, I see it.

14 **Q.**   But that had nothing to do with the meeting concerning the

15 Chrisleys; is that your testimony?

16 **A.**   Yes, sir.

17 **Q.**   Okay.  This was, I believe, at 8:45 a.m. -- well, 8:44 and

18 8:46 a.m., and the meeting was at 10:30.  Just coincidence, as you

19 see it?

20 **A.**   Yes, sir.

21 **Q.**   Okay.  So on --

22         MR. MORRIS:  May I see Document 55, please.  Blow that

23 up just a little bit.  Okay.

24 CROSS-EXAMINATION

25 BY MR. MORRIS (continued):

1   Q.   Mr. Arrow, is your first knowledge of -- I'm sorry, I can't

2   see it.  Help me.  There we go.  Can you see that one?

3   A.   Yes, sir.

4   Q.   That's the Michael Walfield e-mail?

5   A.   Yes, sir.

6   Q.   Is this your very, very first knowledge of any IRS criminal

7   interest in the Chrisleys?

8   A.   Yes, sir.

9   Q.   And that's March 24, 2017.  When did you first learn of the

10  GDOR search and seizure of the Chrisleys storage facilities?

11  A.   It's my recollection that would be during the meeting January

12  of 2018.

13  Q.   So in following up on the March 24, 2017, e-mail from Mr.

14  Walfield, you did not learn anything about the GDOR search and

15  seizure of the storage facility until long after that?

16  A.   That's my recollection, sir.

17  Q.   Okay.  Well, you certainly knew by April 19, didn't you?

18  A.   By April 2019?

19  Q.   April 19, 2017?

20  A.   Of what?  I'm sorry.

21  Q.   Of the search and seizure.

22  A.   No.  I was not aware of that until the meeting in January

23  2018, that's my recollection.

24          MR. MORRIS:  All right, can I see Document 56, please.

25  Blow that up just a little bit.

1  CROSS-EXAMINATION

2  BY MR. MORRIS (continued):

3  **Q.**  Does this reflect a communication between you and LaShaun

4  Wright?

5  **A.**  Yes, it does.

6  **Q.**  Okay.  You're -- you're contacting her --

7  **A.**  Um-hum.

8  **Q.**  -- to get information about the Chrisley case; correct?

9  **A.**  That is correct.

10  **Q.**  And this is April 28, 2017?

11  **A.**  Correct.

12  **Q.**  And is it your testimony that you had no idea there had been a

13  search and seizure of the Chrisley property on this date?

14  **A.**  Correct.

15  **Q.**  And is it my understanding also that you spoke to Katie Colvin

16  by phone?

17  **A.**  I called Katie Colvin by phone.  I wasn't able to talk to her.

18  I left her a message to call me back.

19  **Q.**  Did you leave her -- did you communicate to her -- well, did

20  you talk to her at any time thereafter?

21  **A.**  No, not until January 2018 in person.

22  **Q.**  In April of 2017, did you tell her you wanted everything she

23  had on the Chrisleys?

24  **A.**  I never got to speak to Katie.  I did not speak to Katie in

25  April of 2017.

1   **Q.**   Well, did you speak, did you e-mail, did you text and tell her

2   you wanted everything?

3   **A.**   No.  I don't recall that.  I don't really -- I don't think so.

4   **Q.**   Did you leave her a voice message that you were upset with

5   her?

6   **A.**   No.

7   **Q.**   You deny that?

8   **A.**   I deny it, correct.

9   **Q.**   Did you leave her a message or tell her that you wanted to

10  meet with her as soon as possible?

11  **A.**   I don't recall that, but that's possible during the early

12  stages of that investigation.

13  **Q.**   I'm sorry?

14  **A.**   That's possible during the early stages of that investigation,

15  because I had no reason not to ask her that because I really

16  didn't know what the structure was at the time.

17  **Q.**   How did you ask her if you didn't talk to her?

18  **A.**   Leave her a message.

19  **Q.**   Okay.  Did you leave her a message saying you wanted

20  everything on the Chrisleys?

21  **A.**   As I indicated, that's possible.  I don't recall it.

22  **Q.**   All right.  As I understand one of the exhibits you have seen,

23  you sought approval for formal investigation on April 21, 2017;

24  correct?

25  **A.**   Within my agency?

1  **Q.**  Yes, within your agency.

2  **A.**  Yes, sir.  Yes, sir.

3  **Q.**  And that is Exhibit -- hang on a second.

4         MR. MORRIS:  Can I see 59, please, Defense Exhibit 59.

5  Blow it up just a bit.

6  CROSS-EXAMINATION

7  BY MR. MORRIS (continued):

8  **Q.**  Okay.  This is your memo, correct, of April 21, 2017?

9  **A.**  Yes, sir.

10 **Q.**  And it states in there, "This case is predicated upon

11 information received from the local news media."  That would be

12 that link that was sent to you; correct?

13 **A.**  Primary link, correct.

14 **Q.**  Well, have you seen other coverage from it from the media?

15 **A.**  It was over all the Internet.

16 **Q.**  All over the Internet?

17 **A.**  At the time, correct.

18 **Q.**  As well as the Georgia Department of Revenue -- well, at this

19 time had you talked to Katie Colvin -- well, you never talked to

20 Katie Colvin, had you?

21 **A.**  Not at this time.

22 **Q.**  What information did you have from the Georgia Department of

23 Revenue and from whom does it comes?

24 **A.**  Nothing.  As I indicated earlier, that was a badly-worded

25 memo.  I did not have information from the Georgia Department of

1   Revenue.

2   **Q.**  You did not have any information from the Georgia Department

3   of Revenue, but you say this case is predicated upon information

4   from the Georgia Department of Revenue?

5   **A.**  It says predicated upon information received from the local

6   media as well as Georgia Department of Revenue, correct.

7   **Q.**  But you hadn't received anything from the Georgia Department

8   of Revenue?

9   **A.**  That's correct.

10  **Q.**  So when I asked you what information did you have from the

11  Georgia Department of Revenue, the answer is none?

12  **A.**  None.  Not at that time.

13  **Q.**  Okay.  On May 23 and May 24 of 2017, are you aware that the

14  Georgia Department of Revenue searched through documents that had

15  been seized from the Chrisleys?

16  **A.**  No, sir.

17  **Q.**  You weren't told that?

18  **A.**  I was not told that.

19  **Q.**  Did LaShaun Wright tell you that in conversations with you

20  three days later, on May 27, 2017?

21  **A.**  No, sir.

22          MR. MORRIS:  May I have Exhibit 53, please, May

23  23 -- excuse me, May 27, 2017.  You guys are jumping around on me.

24  May 27.

25          A VOICE:  We don't have that one.

1          MR. MORRIS:  Don't have that one here?  Sorry.  Withdraw

2    that request.  If you don't remember it, that's fine.

3    CROSS-EXAMINATION

4    BY MR. MORRIS (continued):

5    Q.  When did you first learn that there were documents relevant to

6    the Chrisleys in the possession of GDOR?

7    A.  It would have been the conversation when Merrill indicated

8    that they turn over whatever they had to our civil counterpart

9    during April of 2017.

10   Q.  Were you -- did he mention documents, financial documents?

11   A.  I would assume because that's the only thing IRS would work

12   with as far as records.  That's my assumption.

13   Q.  And you learned of that in your conversation with Merrill

14   Jacobson --

15   A.  Correct.

16   Q.  -- on or about April?

17   A.  April 2017.

18   Q.  27th?

19   A.  No, April 2017.

20   Q.  April 2017?

21   A.  Correct.

22   Q.  About the time that we saw those e-mails where you're reaching

23   out to Katie?

24   A.  That's correct.

25   Q.  But never reached her?

**A.**   Correct.

**Q.**   When was the first time you saw any of those documents?

**A.**   On a referral when it was referred to CI in July of 2017.

**Q.**   Do they just hand them to you?

**A.**   It normally comes with a referral package --

**Q.**   Okay.

**A.**   -- when we get referrals from our civil counterparts.

**Q.**   All right.  Let's look at Exhibit 53 again.  I asked you about a telephone conversation with LaShaun on May 27, 2017, following the searches of the warehouse.  Do you see that conversation?

**A.**   Yes, sir.

**Q.**   That is between you and LaShaun?

**A.**   That is correct.

**Q.**   Okay.  But your testimony is that had nothing to do with the Chrisleys and the search?

**A.**   Correct.

**Q.**   Just another coincidental timing?

**A.**   I had conversations with LaShaun all the time.

**Q.**   All right.  There is a meeting on July 31, 2017, Government's Exhibit 109.  If you have that in front of you, I think.  Do you have that?

**A.**   109?

**Q.**   I think that's what it is?

**A.**   Sure.

**Q.**   That's the one where you were asking for the extension; is

1    that right?

2    **A.**   Yes.   Extension to evaluate the referral, correct.

3    **Q.**   Okay.   And then the next event I think you've testified

4    about -- well, strike that.

5        You learn from meeting with GDOR representatives before you

6    seek a search warrant, that the Chrisleys are challenging the

7    legality of the levies and the seizure of their property; correct?

8    **A.**   Repeat that question again?

9    **Q.**   Before you sought a search warrant for the documents in the

10   possession of GDOR, you knew it had been reported to you that the

11   Chrisleys had challenged the legality of the levy and the seizure

12   of their property?

13   **A.**   From my recollection, that was information that I gathered

14   from public records; Internet and news coverage, I believe.   It

15   wasn't from any personnel.

16   **Q.**   Do you recall in the meeting that you attended with GDOR

17   representatives in January of 2018 --

18   **A.**   Correct.

19   **Q.**   -- being told that the Chrisleys had challenged the levy and

20   the seizure of their property?

21   **A.**   Correct.   During the meeting, correct.

22   **Q.**   You were aware of that?

23   **A.**   During the meeting, that's correct.

24   **Q.**   On January 4, 2018, you, among others, met with GDOR

25   representatives; is that right?

1   **A.**   Correct.

2   **Q.**   And that same day did you speak with LaShaun Wright by phone

3   about that meeting?

4   **A.**   Not to my recollection.

5   **Q.**   Pardon me?

6   **A.**   Not to my recollection.

7   **Q.**   Not to your recollection?

8   **A.**   No.

9   **Q.**   Okay.  If you will look at Exhibit 53, please, on the screen.

10  Are those communications between you and LaShaun Wright on

11  January 4, 2018?

12  **A.**   Yes.

13  **Q.**   They are?

14  **A.**   Correct.

15  **Q.**   And they're after the meeting, aren't they?

16  **A.**   They appear so, correct.

17  **Q.**   I beg your pardon?

18  **A.**   It appears so.

19  **Q.**   Okay.  Well, you're not doubting the records, are you?

20  **A.**   I'm not doubting the record.

21  **Q.**   Okay.

22  **A.**   I doubt the purpose of the call, though.

23  **Q.**   All right.  And then on February -- well, strike that.

24       Yes, on February 1, 2018, you seek the search warrant;

25  correct?

1  **A.**   Correct.

2  **Q.**   And the day before that you spoke with LaShaun Wright, didn't

3  you?

4  **A.**   Yes, I did.

5  **Q.**   Did you tell her you were obtaining a search warrant for the

6  property that GDOR had of the Chrisleys?

7  **A.**   Not to my recollection.

8  **Q.**   Not to your recollection?  You don't deny talking to her, do

9  you?

10  **A.**   I talked to LaShaun a lot of times.

11  **Q.**   If you'll look at the screen and identify that and just verify

12  that you had such conversation?

13  **A.**   I conversed with her.  I'm not sure what the context of the

14  conversation was about.

15  **Q.**   So the answer is, yes, you did?

16  **A.**   I did talk to LaShaun, correct.

17  **Q.**   All right.  And on February 1, was the application for the

18  search warrant; yes?

19  **A.**   Correct.

20  **Q.**   February 7 is the day you executed the search warrant?

21  **A.**   According to the memo, yes.

22  **Q.**   Is that correct?

23  **A.**   I'm looking for the memo that I wrote on that.  I believe so.

24  What exhibit was the memo that I wrote?

25  **Q.**   Why don't you just look at the search warrant.

1   **A.**   Let's see.  Here.

2   **Q.**   That is Exhibit --

3   **A.**   The search warrant was issued on the 1st of February.

4   **Q.**   I beg your pardon?

5   **A.**   The search warrant was issued on the 1st of February.

6   **Q.**   Executed on the 7th.  Look at your return.

7   **A.**   Yes.

8           MR. MORRIS:  102?

9           A VOICE:  118.

10          MR. MORRIS:  118?  Your Honor, I move Exhibit 118.

11  Thank you.

12          (Defendant's Exhibit 118 was marked in evidence as of

13  this date.)

14  CROSS-EXAMINATION

15  BY MS. MORRIS (continued):

16  **A.**   Yes.

17  **Q.**   Am I correct?

18  **A.**   That's correct.

19  **Q.**   Okay.  And you spoke with LaShaun Wright on the 7th several

20  times?

21  **A.**   Correct.

22  **Q.**   As shown on the screen, on 53; correct?

23  **A.**   Correct.

24  **Q.**   I should say Exhibit 53.

25          Did you discuss with her the execution of the search warrant

1  in the Chrisley case?

2  **A.**  Whenever I'm over at DOR, I would normally text her that I'm

3  out there just to see what her schedule for the day looks like.

4  So I may have communicated with her, but as far as telling her

5  exactly what I was doing, no.

6  **Q.**  Okay.  And on February 8th you talked with LaShaun Wright.

7  Was that about the Chrisley case?

8  **A.**  Was that about the Chrisley case -- February -- I don't

9  believe so.

10  **Q.**  Do you see that on Exhibit 15 -- excuse me, Exhibit 53?

11  February 8.  Do you see that on Exhibit 53?

12  **A.**  Yes, sir.

13  **Q.**  Conversations with LaShaun Wright?

14  **A.**  Yes, sir.

15        MS. PETERS:  Your Honor, we object.  This is from 2017.

16        MR. MORRIS:  That's what I said, February 2017, February

17  8.

18        MS. PETERS:  The search warrant was 2018.

19        MR. MORRIS:  You know, you're right.  My bad.  That has

20  nothing to do with the execution of the search warrant.  I'm

21  sorry.  I gave you the wrong date.  2/7/2018, please.  I'm sorry,

22  February 8, 2018.

23        MS. PETERS:  And, Your Honor, at this point we would

24  object just to the relevance of this.  I don't think that Agent

25  Arrow is disputing that any of these phone calls happened at all.

1    It sounds like we sort of flushed out -- he says they were not

2    about the Chrisleys, and he's not disputing that they happened.

3    And we've already been admitted the records into evidence.

4           THE COURT:  Well, I'm going to overrule the objection.

5    I think Mr. Morris is entitled to ask him about the conversations.

6    He's going through it methodically.  He's entitled to do that.

7    He's now asking about these conversations, and it may be the same

8    answer but I think he's entitled to ask this.  So I will overrule

9    the objection.

10          MS. PETERS:  The one other point I wanted to make, all

11   of these things that he's going through now happened a year or so

12   after the seizure.  So we think it's irrelevant for that as well.

13          THE COURT:  I understand.  Well, again, when it comes to

14   relevance and weight, that's a different issue.  I think that's

15   sufficient, arguably relevance to admit it or to overrule your

16   objection.  I mean, what -- really what weight to be applied, if

17   any, and what ultimate conclusions are to be drawn from this and

18   any other facts, are to be argued subsequently.  So I'm going to

19   overrule the objection.  That doesn't mean I'm ultimately finding

20   there is any significance to it.  That's a different issue for

21   later.

22          MR. MORRIS:  Thank you, Your Honor.  I'll let that go

23   for the moment.

24          The grand jury subpoena.  It's right here somewhere.

25   CROSS-EXAMINATION

1   BY MR. MORRIS (continued):

2   **Q.**  If I'm reading this correctly, the grand jury subpoena for the

3   records in the possession of GDOR that related to the Chrisleys is

4   dated December 14, 2017, to be produced January 16, 2018.  That's

5   Exhibit No. 124; is that correct?

6   **A.**  I don't believe I'm aware of the subpoena.

7   **Q.**  124?  Government's Exhibit 124?

8   **A.**  I see it, but I don't think it involved anything that I did.

9   **Q.**  I'm sorry?

10   **A.**  I see it.  I don't think I served it, though.

11   **Q.**  No, I didn't ask you --

12   **A.**  Oh, okay.

13   **Q.**  -- I'm asking you to look at it for a moment.

14   **A.**  Sure.

15   **Q.**  It's dated December 14, 2017; correct?

16   **A.**  Correct.

17   **Q.**  So the grand jury subpoena for Chrisley information is served

18   on the Georgia Department of Revenue in 2017; correct?

19   **A.**  According to this document, correct.

20   **Q.**  Okay.  So the grand jury has already subpoenaed the documents,

21   yet you get a search warrant in February of 2018; correct?

22   **A.**  Correct.

23   **Q.**  For the same stuff?

24   **A.**  Yes, sir.

25   **Q.**  Why?

1  **A.**   I have no clue.  That's --

2  **Q.**   You have no clue?

3  **A.**   That's a legal decision we arrived at during the meeting,

4  during the meeting in January 2018.

5  **Q.**   Who arrived at it?

6  **A.**   I'll refer to the AUSA on that.

7  **Q.**   Okay, don't tell me anything they said.  That's when you

8  believe that decision was made?

9  **A.**   Correct.

10 **Q.**   Okay.  Were the documents, to your knowledge, already in the

11 possession -- strike that.

12    Had anyone from the IRS or from the U.S. Attorney's Office

13 seen any of the documents that were ultimately obtained by the

14 search warrant?

15 **A.**   Say that again?

16 **Q.**   Before the search warrant was executed.  Between December 14,

17 2017, when the grand jury subpoena was served for that

18 information --

19 **A.**   Okay.

20 **Q.**   -- and when you seized it on February 8, 2018 --

21 **A.**   Okay.

22 **Q.**   -- had anyone seen any of those documents that you know of

23 from IRS or the federal government?

24 **A.**   Not to my knowledge.

25 **Q.**   Not to your knowledge?

1  **A.**   No.

2  **Q.**   Okay.  But some of those documents were described to you when

3  you met with the GDOR folks?

4  **A.**   Yes.

5  **Q.**   Okay.  In the search warrant affidavit itself and in a

6  document Ms. Peters asked you about that you said was probably a

7  typo -- let's look at the search warrant affidavit, if we could.

8  **A.**   Sure.

9  **Q.**   You have that before you?

10  **A.**   Which exhibit is that?  I'm sorry.

11  **Q.**   Pardon me?

12  **A.**   Which exhibit is it?

13  **Q.**   Well, let's put it on the screen.

14          Exhibit 45 please, Defense Exhibit No. 45 which is

15  identical, I believe, to a government exhibit that is already in

16  there, which may be Government 113.  Would you look at yours and

17  see if it is the same document.

18  **A.**   Okay.

19  **Q.**   Is that the affidavit for the search warrant?  Is that the

20  same thing?

21  **A.**   Hang on.  I think this might be the application itself.  I'm

22  not sure.

23  **Q.**   Okay.  Well, let's -- let's go to paragraph 13.  This is your

24  affidavit; correct?

25  **A.**   Correct.

1  **Q.**  Given under oath?

2  **A.**  Correct.

3  **Q.**  You swore to its accuracy, did you not?

4  **A.**  Correct.

5  **Q.**  Okay.  Is paragraph 13 a discussion of the planned auction?

6     Nope, that's not the right paragraph.  So I've got the wrong

7  document.  Let me look at 112.  Okay, it's not the right paragraph

8  number.  My apologies.  Oh, it's page 13.  I'm sorry, not

9  paragraph -- if I could read my own handwriting.

10     Let me ask you to look at page 13, please, of that exhibit.

11  This is the -- I believe that's correct.  You state that in -- if

12  I'm in the right place -- July of 2017 GDOR learned of a planned

13  auction of Chrisley furniture; is that correct?

14  **A.**  I'm not sure I can -- on this page?

15  **Q.**  Okay, I'm going to find it.  I apologize.

16          A VOICE:  There are two different page numbers on that

17  exhibit.

18          THE COURT:  Why don't we do this.  We've been going for

19  about an hour and a half anyway.  It's probably time for a

20  comfort-type break.  Why don't we take a ten-minute break, and it

21  can have a side benefit of maybe getting to the page you're

22  looking for.  So we'll reconvene at 10:10.

23          So, Agent Arrow, I'll remind you, you're not to speak to

24  anyone about the substance of your testimony over the break.

25          (Whereupon, a break was taken.)

1          THE COURT:  Okay.  For planning purposes, I was thinking

2    we'd go until 12:30 before a lunch break.

3          So with that -- Mr. Arrow, I will remind you, you are

4    still under oath and Mr. Morris you can proceed.

5          MR. MORRIS:  Thank you.

6    CROSS-EXAMINATION

7    BY MR. MORRIS (continued):

8    Q.  Mr. Arrow, at several points in the search warrant affidavit,

9    you state that GDOR learned of a planned auction of property at

10   the storage facility in July of 2017.  Your inclusion of July 2017

11   is not correct, is it?

12   A.  No.  That was my understanding during the meeting.  I might

13   have misunderstood it.

14   Q.  I'm sorry?

15   A.  That was my understanding during the meeting.  I might have

16   misunderstood that.

17   Q.  So any reference that you made to July 17 -- July of 2017, is

18   a mistake?

19   A.  Correct.

20   Q.  Okay.  Would you look at -- I believe it's paragraph 12.  Yes.

21   Paragraph 12.  Are you there?  Can you read paragraph 12.  Not out

22   loud.  I mean, can you see it?

23   A.  Sure.

24   Q.  Okay.  You say, "Per IRS records, it appears that the

25   Chrisleys have not personally made any payments towards the

1  above-listed taxes."

2      Have you looked at those records?

3  **A.**  Yes.  As far as records are concerned within the IRS, they are

4  normally pulled by our professional staff.  So I normally rely on

5  whatever our professional staff pulls for us.

6  **Q.**  And were you aware that in 2012, which is one of the years

7  noted above, $36,459 had been paid?  Were you aware of that?

8          MS. PETERS:  Your Honor, I just ask that Agent Arrow be

9  permitted to look at the above-listed chart as he's asked

10  questions about it.

11          MR. MORRIS:  I believe they put the affidavit into

12  evidence.  I just have two questions about this particular part.

13          THE COURT:  I'm going to overrule the objection.

14  Obviously, Agent Arrow is able to indicate what else he has to

15  look at to answer the question for himself.  So I would overrule

16  the objection.

17  CROSS-EXAMINATION

18  BY MR. MORRIS (continued):

19  **A.**  Going back to this affidavit?  Umm, I don't recall if I

20  included that or if that might have actually been something that I

21  saw at the time of the affidavit.  I may have been aware of it

22  during this affidavit or afterwards, but I don't recall that

23  exactly.

24  **Q.**  So you're saying you're aware they made payments, but you said

25  in the affidavit they had not made any payment?

**A.** No, sir.  I'm saying that I was aware that they made payments afterwards.  As far as payments towards the taxes are concerned, that I was aware of.  But whether or not they made payment during this time, what I was aware of during this time is exactly what I indicated in my affidavit.

**Q.** Correct me if I'm wrong, this time is 2018; right?

**A.** Correct.  This was --

**Q.** You're looking at IRS records of the Chrisleys?

**A.** IRS record that was delivered to me by our professional staff, correct.

**Q.** Covering tax years 2009 through 2012; correct?

**A.** Correct.

**Q.** And are you telling me you knew that they had put -- they had made in 2012, $36,000 -- I'm sorry, that they had made payments towards 2012 taxes of $36,459, you knew that but didn't include it?

**A.** That's not what I'm saying, sir.

**Q.** Tell me.

**A.** What I'm saying, I don't recall what their payment dates were. I don't have it in front of me to indicate when they made a payment.  I'm aware they made a payment at some point during the investigation, but whether or not it was before or after this, I don't know that as a matter of fact.

**Q.** Well, upon what information did you base the fact that they had not made any payments?

**A.**   The information that I had in our system at the time.

**Q.**   I see.  Okay.  And that's the only way we'll be able to know is to access your system; is that right?

**A.**   Unfortunately.

**Q.**   When you open a primary investigation, which I believe you did on April 21, 2017?

**A.**   Correct.

**Q.**   I think you testified you searched the IRS database and learned that RO Carter had the civil investigation; is that right?

**A.**   Say that again?

**Q.**   When you opened the primary investigation on April 21, 2017 -- is that right or wrong?

**A.**   Correct.

**Q.**   Pardon me?

**A.**   I said that's correct, April 21, 2017.

**Q.**   Did you search the IRS database to see who in civil had the investigation?

**A.**   I would not have been able to search -- I cannot search the IRS database.  We're not allowed to search as agents the IRS database.

**Q.**   How did you find out that RO Carter had the investigation?

**A.**   It came from the referral.

**Q.**   And --

**A.**   In July.

**Q.**   In July?

1    **A.**   Correct.

2    **Q.**   You had no contact with RO Carter between -- strike that.

3          You had no contact with RO Carter about the Chrisleys prior to

4    July of 2017?

5    **A.**   I don't recall that.

6    **Q.**   Is that a yes or no?

7    **A.**   I don't recall that, sir.

8    **Q.**   You don't recall that you did?

9    **A.**   I mean, I talked to RO Carter on other matters.  I talked to

10   employees in her group on other matters.  Whether or not I talked

11   to her about it, I don't believe I did but I can't say it as a

12   matter of fact.

13   **Q.**   Okay.  So you may have but you don't specifically recall?

14   **A.**   No, sir.

15   **Q.**   Is that right?

16   **A.**   That is correct.

17   **Q.**   Okay.  When the search warrants were executed on February 7,

18   one of them was at 1800 Century Boulevard?

19   **A.**   The main building?  Yes.

20   **Q.**   And you were there?

21   **A.**   Yes, sir.

22   **Q.**   And there were some 25 boxes of documents that were seized?

23   **A.**   I don't recall the number of boxes, but there were some boxes

24   that were seized, correct.

25   **Q.**   Well, they're in the inventory; is that right?  Can we look at

1  Government's Exhibit 116 you have there.  Tell me how many boxes

2  there were.

3  **A.**  25, correct.

4  **Q.**  Okay.  And when you went -- by the way, do you have any

5  personal knowledge of where those boxes came from prior to your

6  getting them at GDOR headquarters, personal knowledge?

7  **A.**  Other than from the meeting on January 2018, no.

8  **Q.**  Okay.  And after you visited 1800 Century Boulevard on

9  February 7, you went over to Welcome All Road, to the other GDOR

10  warehouse?

11  **A.**  Correct.

12  **Q.**  And you seized one box of documents there; is that correct?

13  Government's Exhibit 15, I believe, 115.

14  **A.**  It shows two boxes.

15  **Q.**  Pardon me?

16  **A.**  It shows two boxes here.

17  **Q.**  One box of documents, one box of something else?

18  **A.**  Correct, correct, correct.

19          MR. MORRIS:  Thank you, Agent Arrow.  That's all I have.

20          THE WITNESS:  Okay.

21          THE COURT:  Any redirect?

22          MR. MORRIS:  Hang on a minute here.  We've had a

23  disaster.  It's not going to go back.

24          THE COURT:  It's government property.

25          Any redirect?

1          MS. PETERS:  Yes, Your Honor.

2    REDIRECT EXAMINATION

3    BY MS. PETERS:

4    **Q.**  Agent Arrow, Mr. Morris asked you about a heated call, do you

5    remember having a heated call with Katie Colvin.  You testified

6    that you do recall having a heated phone call with Merrill

7    Jacobson; correct?

8    **A.**  Correct.

9    **Q.**  Is it possible that Katie Colvin could have also been on that

10   phone call that you had with Merrill?

11   **A.**  She might have been in the background.  I'm not sure.

12   **Q.**  Agent Arrow, in executing physical search warrants, meaning,

13   like the ones that we've been talking about here in this case,

14   have you ever used a professional moving company like Two Men and

15   a Truck to move and transport items that you're seizing?

16   **A.**  No.

17   **Q.**  All right.  The payments towards federal income taxes that Mr.

18   Morris was asking you about, were those payments -- do you know if

19   those were payments made by the sale of property, or from liens

20   that were being released, or whether they were voluntary payments

21   made by the Chrisleys?

22   **A.**  During the course of the investigation, towards the end, there

23   were some payments, to my recollection, that was paid through, I

24   believe, the sale of the Ensign (phonetic) property, and there

25   were also payments that were made subsequent to my report, to my

1  recollection.  They were just payments made to the IRS by the

2  defendants.

3  **Q.**  Okay.  And would have been after these search warrants were

4  obtained?

5  **A.**  Yes, ma'am.

6  **Q.**  All right.  Mr. Morris asked you a lot of questions about

7  phone calls and communications you had with LaShaun Wright.  Did

8  you get an opportunity to review those phone records that were

9  admitted into evidence today in the last couple of days?

10  **A.**  Yes.

11  **Q.**  At the time frame that Mr. Morris was asking you about, which

12  is 2016 and 2017, were you working multiple investigations with

13  LaShaun Wright at that time?

14  **A.**  I had about five investigations going on with LaShaun Wright

15  at that time.

16  **Q.**  All right.  And without naming any taxpayers or any of the

17  defendants, can you give us the idea of the nature of those

18  investigations you were working with LaShaun Wright?

19  **A.**  Right, they were all IRS-related investigations, and they were

20  all in the middle district as well.

21  **Q.**  Okay.

22  **A.**  They're just your typical IRS investigations,

23  prepared -- preparing bad returns, individuals in the middle

24  district committing stolen identity, refund fraud-type cases.

25  Those were typically the type of cases that I was working with her

1  at the time.

2  **Q.**  And were they relatively -- would you consider them to be

3  relatively complex --

4  **A.**  Some of them.

5  **Q.**  -- investigations?

6  **A.**  Some of them, yeah.

7  **Q.**  And all of those were during the same time frame that you were

8  working with her?

9  **A.**  All of them, correct.

10 **Q.**  So is it surprising to you that you had a lot of phone calls

11 with LaShaun Wright during that time frame?

12 **A.**  No.

13 **Q.**  And were the cherry-picked calls that Mr. Morris highlighted

14 today, the only calls between you and LaShaun Wright during that

15 time frame?

16 **A.**  No.  LaShaun Wright and I communicated a lot, even almost on a

17 daily basis at times, about work-related stuff, personal

18 matters -- just -- we just talked, communicated about a lot of

19 stuff like that.  So those weren't the only text messages, no.

20 **Q.**  And did she feed you any information about an OSI

21 investigation into the Chrisleys?

22 **A.**  No.  Again, from my recollection, with LaShaun, she on more

23 than one occasion indicated to me that OSI was not working the

24 case.  She had no knowledge of what was going on, which is the

25 reasons why she referred me to the individual in the first place

1    back in April.  So I'm not sure how she got the information and

2    knowledge, outside of what she told me.

3             MS. PETERS:  Thank you.  Nothing further, Your Honor.

4             THE COURT:  Agent Arrow, you may step down.  May this

5    witness be excused?

6             MS. PETERS:  Yes, Your Honor.

7             THE COURT:  You may go about your day, Mr. Arrow.  Thank

8    you very much.  And you may call your next witness.

9             MR. KREPP:  Thank you, Your Honor.  The government calls

10   Betty Carter.

11            THE COURT:  Okay.

12            THE DEPUTY CLERK:  Please raise your right hand.  You do

13   solemnly swear or affirm that the statements that you're about to

14   make in this case now pending before this court, are the truth,

15   the whole truth, and nothing but the truth?

16            THE WITNESS:  I do.

17            THE DEPUTY CLERK:  Thank you.  Would you state and spell

18   your full name for the record?

19            THE WITNESS:  Betty Carter.

20            THE DEPUTY CLERK:  Could you spell it for me, please.

21            THE WITNESS:  B-E-T-T-Y C-A-R-T-E-R.

22            THE DEPUTY CLERK:  Thank you.

23                          * * * * * *

24                        BETTY CARTER,

25            having been duly sworn, testified as follows:

```
 1                              * * * * * *
 2   DIRECT EXAMINATION
 3   BY MR. KREPP:
 4   Q.  Good morning, ma'am.
 5   A.  Good morning.
 6   Q.  Could you please tell us how you're employed.
 7   A.  I'm a Revenue Officer with the Internal Revenue Service.
 8   Q.  And can you tell the court what a revenue officer does?
 9   A.  We collect taxes and tax returns, outstanding tax returns.
10   Q.  All right.  When we're talking about the IRS, are you familiar
11   with the IRS Criminal Investigation Division?
12   A.  Yes.
13   Q.  Are you a part of the IRS -- I'll call it IRS CI?
14   A.  I am not, no.
15   Q.  Are you a law enforcement officer?
16   A.  I am not.
17   Q.  Do you carry a gun or a badge?
18   A.  I carry a badge.  I do not carry a gun.
19   Q.  A federal badge --
20   A.  A federal badge.
21   Q.  -- right, identifying you as a revenue officer --
22   A.  Yes.
23   Q.  -- but not a law enforcement badge?
24   A.  No.
25   Q.  Okay.  Are you familiar with the defendants, Todd and Julie
```

1  Chrisley?

2  **A.**   Yes, I am.

3  **Q.**   And at one point were you assigned to collect taxes owed,

4  federal taxes owned by the Chrisleys?

5  **A.**   I was, yes.

6  **Q.**   Okay.  Were you the only revenue officer assigned to the

7  Chrisleys?

8  **A.**   There had been several other revenue officers assigned prior

9  to me.  Then I received the case in mid-February of '17.

10  **Q.**   All right.  And could you just give the court a bit of

11  background information, how long have you been a revenue officer

12  with the IRS?

13  **A.**   I've been with Internal Revenue Service for about 37 years.

14  **Q.**   Have you always been a revenue officer?

15  **A.**   I've had details in between, but I've always been in that job

16  series, yes.

17  **Q.**   And at times would you make referrals of potential criminal

18  fraud cases to IRS CI?

19  **A.**   Yes, I did.

20  **Q.**   And is there a procedure in place to do so?

21  **A.**   Yes, there is.

22  **Q.**   All right?  So let's talk about the Chrisleys.

23       MR. KREPP:  And can we use the ELMO?  Do you know if

24  that works?  One moment, Your Honor.

25  DIRECT EXAMINATION

BY MR. KREPP (continued):

**Q.**  Sorry about that.  All right, so I'm going to show you what had previously been admitted as Government Exhibit 101.  It should show up on the screen next to you.

**A.**  Um-hum.

**Q.**  Now, just to be clear, this "create ID" right there, is that the unique identifier to identify whatever revenue officer is writing?

**A.**  That's correct.

**Q.**  All right.  Is that your particular one?

**A.**  That is not.

**Q.**  Do you know who it is?

**A.**  I believe that's Kanesha Garden (phonetic).

**Q.**  Who is that?

**A.**  A prior revenue officer that had the case.

**Q.**  Okay.  So this is written on February 7, 2017?

**A.**  Correct.

**Q.**  Was it transferred from Kanesha sometime after this entry?

**A.**  Yes, it was.

**Q.**  All right.  And it says here RO, is that an acronym for revenue officer?

**A.**  Revenue officer, yes.

**Q.**  And it talks about a call with the Georgia Department of Revenue indicating that they are working the state case and would like to work the case as a joint agency investigation.  All right.

1  Can you tell us if you've had -- once you were assigned to the

2  case, did you have any contact with the Georgia Department of

3  Revenue?

4  **A.**   Yes, I did.

5  **Q.**   Can you tell us about that contact?

6  **A.**   I got the case mid-February and the State of Georgia had

7  already made contact, I think, Kanesha Garden and had spoken to

8  them.  They also reached out to our manager of our advisory unit,

9  and I was, basically, following up on that lead for information

10  from the state.  And I believe I spoke with -- with someone from

11  the state and also met with them once.

12  **Q.**   Do you remember who?

13  **A.**   Katie Colvin.

14  **Q.**   All right.  Do you know what the Office of Special

15  Investigations does at the Department of Revenue?

16  **A.**   Not really, no.

17  **Q.**   Okay.  Were you aware that they were a law enforcement arm

18  similar to IRS CI, that the Department of Revenue had that

19  capability?

20  **A.**   I'm sure there is, yes.

21  **Q.**   Do you recall if you were meeting with -- what appeared to be

22  the equivalent of IRS special agents?

23  **A.**   All I knew is we were gathering information.  I had just began

24  the investigation.  I had not even done an initial analysis.  So

25  they were offering us information, and that's, basically, what we

1  were there for, is to gather information from them.  We can't

2  share any information because of disclosure.

3  **Q.**  And what do you mean by that?

4  **A.**  We can't -- we had a -- had a federal tax lien on file which

5  is public record.  Other than that, we can't share with them any

6  contacts, any information really about the case.  We were really

7  there to gather information on what they offered to supply to us.

8  **Q.**  Okay.  I'm going to show you what has been

9  admitted -- actually, I don't know.  Government Exhibit 230?

10          MR. KREPP:  I move for admission Government Exhibit 230.

11          MR. MORRIS:  Thank you.

12          (Government's Exhibit 230 was marked in evidence as of

13  this date.)

14  DIRECT EXAMINATION

15  BY MR. KREPP (continued):

16  **Q.**  So this is showing you an Internal Department of Revenue

17  calendar invite between Katie Colvin and Merrill Jacobson, and it

18  says, "Chrisley IRS meeting March 9, 2017."  Does that seem to be

19  about when you met?

20  **A.**  Yes.  It was the day we met with them, yes.

21  **Q.**  Now, you said, is it fair to say, it's sort of a one-way

22  street at this meeting?

23  **A.**  Yes.

24  **Q.**  Okay.  Can you tell us, during this meeting did you ask the

25  State of Georgia Department of Revenue folks to try to go and

1  locate property owned by the Chrisleys?

2  **A.**   No.

3  **Q.**   Did you ask the State of Georgia to go and try to levy any

4  assets, whether it be bank accounts, furniture or boxes of

5  documents from the Chrisleys?

6  **A.**   No.

7  **Q.**   Would you ever do that?

8  **A.**   No.

9  **Q.**   Why not?

10  **A.**   That's not -- that's not our procedure, how we do our job.  So

11  no, that would not be -- again, we were there -- we'll certainly

12  take any information they would want to share with us, but we

13  can't disclose or discuss the case with them in any way.

14  **Q.**   Now, did the -- Georgia Department of Revenue try to elicit

15  information from you during that meeting?

16  **A.**   Not that I remember, no.

17  **Q.**   Did it appear to be a fairly standard meeting?

18  **A.**   Yes.

19  **Q.**   Have you had these types of meetings before with the

20  Department of Revenue officials?

21  **A.**   It's seldom, but I have.  Again, we were just there to gather

22  information.  I had just -- I had not even done an initial

23  analysis on the case, so I really didn't -- I was just

24  beginning -- coming into the case pretty much cold at that point.

25  **Q.**   Okay.  All right.  Did you come to learn later on that the

1   Georgia Department of Revenue had seized a bunch of things from a

2   warehouse?

3   **A.**   Yes, I did.

4   **Q.**   Do you know how you learned that?

5   **A.**   Katie Colvin called me.

6   **Q.**   Was that before or after the fact of the procedure?

7   **A.**   It was after the fact.

8   **Q.**   And what types of information did Ms. Colvin relay to you?

9   **A.**   She had just identified some assets that they had found.  I

10  believe it was in our warehouse, and said something about there

11  was some tax return information, receipts, that kind of thing.

12  **Q.**   Did Ms. Colvin indicate if she wanted to start a state

13  criminal investigation based upon what she found at that location?

14  **A.**   She did not say that to me, no.

15  **Q.**   Did she ask you to make a referral to IRS CI --

16  **A.**   She --

17  **Q.**   -- to make a criminal investigation?

18  **A.**   She did not, no.

19  **Q.**   And did she ever, after that time, pass the physical

20  information to you either by e-mail or directly --

21  **A.**   No.

22  **Q.**   -- the information that had been seized?

23  **A.**   No, I think that was the last conversation that I had with

24  her.

25  **Q.**   Did the topic of cut-and-pasted bank statements come up at

1  all?

2  **A.**  I'm sorry, say that --

3  **Q.**  Sure, I'm sorry.

4      Did the topic of cut-and-pasted bank statements come up?

5  **A.**  No.

6  **Q.**  Is that the kind of thing that you think you would remember?

7  **A.**  Oh, definitely, yes.

8          MR. KREPP:  I move for the admission of Government's

9  Exhibit 123.

10          THE COURT:  Any objection?

11          MR. FRIEDBERG:  No objection.

12          THE COURT:  It's admitted.

13          (Government's Exhibit 123 was marked in evidence as of

14  this date.)

15  DIRECT EXAMINATION

16  BY MR. KREPP (continued):

17  **Q.**  So we'll go forward a couple of months here, June 2017.  And

18  just so we're clear, these -- these records we're looking at here,

19  it says here, "ICS history transfer."  What is that?

20  **A.**  It's integrated collection system.  This is how we keep up

21  with our histories, histories of the case.

22  **Q.**  Are these documents that are written by IRS special agents on

23  the criminal side?

24  **A.**  No.

25  **Q.**  Who were they written by?

**A.**   Mostly collection.

**Q.**   On the civil side?

**A.**   On the civil side, yes.

**Q.**   So June -- it states here that -- now, looking here at the "create I.D."  Is that your identifier?

**A.**   It is not.

**Q.**   It is not?  Okay.  Do you know who that is?

**A.**   That is Patricia Crow, she's the advisory -- at that time, was the Advisory Group manager.

**Q.**   It states here that another call was made from Katie Colvin to DOR, and were there still ongoing discussions with the Department of Revenue about assets the defendants may have?

**A.**   I had no contact with them talking about assets, especially in this time, no.

**Q.**   Okay.  Are you aware of any other types of conversations from Katie Colvin, leaving you voicemail or trying to encourage to take any steps?

**A.**   No.

**Q.**   Did she ask you for guidance on reviewing materials that had been seized from the warehouse?

**A.**   No.

**Q.**   To your knowledge, was she contacting anybody else within your group to ask for assistance in reviewing records that Georgia Department of Revenue took from the warehouse?

**A.**   Not to my knowledge, no.

**Q.**  Now, at a certain point you made a fraud referral; is that correct?

**A.**  Right.

**Q.**  I'm showing you what has been previously admitted as Government Exhibit 108.  So is this a form that you would fill out when you're making a fraud referral to IRS CI?

**A.**  Yes.

**Q.**  It says here referral is Michael Todd Chrisley.  Do you know if you filled this one out?

**A.**  I believe that I did, yes.

**Q.**  And if you go to the next page, Group 5A, it says initiator's name Betty Carter?

**A.**  Yes.

**Q.**  That's you, correct?

**A.**  Correct.

**Q.**  Does initiator mean you're the one who is initiating the fraud referral?

**A.**  That's correct.

**Q.**  Was Georgia Department of Revenue feeding you information that caused you to believe a fraud referral was appropriate?

**A.**  No.

**Q.**  Okay.  Why did you make the fraud referral?

**A.**  Basically, what I identified as evasion of payment.

**Q.**  Evasion of state payment or federal payment?

**A.**  Federal payment.

1  **Q.** All right.  And how did you reach that conclusion?

2  **A.** Bank statements, prior ICS histories from when the case was

3  worked.  It had been in the field for years, just -- just seeing

4  what the bank statements, the amount of money that was being made

5  and could have been paid towards the taxes that were not.

6  **Q.** And did Georgia Department of Revenue play any role in your

7  decision to make a fraud referral?

8  **A.** No.

9  **Q.** Did anything Georgia Department of Revenue seized or didn't

10 seize play a role in your decision to make a fraud referral?

11 **A.** No.

12 **Q.** All right.

13         MR. KREPP:  Just one moment, Your Honor.  Thank you,

14 Ms. Carter that's all I have, Your Honor.

15         THE COURT:  All right.  Cross-examination?

16 CROSS-EXAMINATION

17 BY MR. MORRIS:

18 **Q.** Hi, Ms. Carter.

19 **A.** Hi, how are you?

20 **Q.** When Katie Colvin spoke with you, did she tell you that the

21 reason they were seizing the property is because the Chrisleys

22 were going to auction and sell the property to pay their taxes to

23 the IRS?

24 **A.** She -- she didn't say that.  She told me that they

25 had -- initially, they had a warehouse of what they thought were

```
 1  seven houses of furniture.  They were going to be -- the Chrisleys
 2  were going to sell, and I'm not sure what they were going to do
 3  with the money.
 4  Q.  She didn't tell you they were going to sell it to pay the IRS?
 5  A.  No.
 6  Q.  There were payments from the Chrisleys on their taxes
 7  during -- strike that.
 8      There were payments of the Chrisleys' 2009 through 2012 --
 9  poorly worded.  Let me start over.
10      You were investigating the Chrisleys' taxes owed for the years
11  2009 through 2012?
12  A.  Correct.
13  Q.  Some payments had been made; correct?
14  A.  Yes.
15  Q.  And you have what's -- there can be in your system something
16  called an account transcript?
17  A.  Correct.
18  Q.  Let me show you what has been marked as Defendant's Exhibit
19  71.
20          MR. MORRIS:  Could I see that on the screen, please.  I
21  think it's 71.
22  CROSS-EXAMINATION
23  BY MR. MORRIS (continued):
24  Q.  Can you see that on your screen?
25  A.  It's a little fuzzy.  That's better.
```

**Q.**  Is this for the Chrisleys?

**A.**  I don't know the -- I don't see a name.  I don't know their Social Security numbers by heart.

**Q.**  Well, if I -- if I tell you that --

**A.**  Oh, there we go.  Yes.

**Q.**  Okay.  Thank you.  Thank you very much.

The first page covers the December 31, 2009, tax period; is that right?

**A.**  Yes.

**Q.**  Okay.  Can you tell me, and you're going need help scrolling through, I think, can you tell me if payments were made on the 2009 taxes?

**A.**  If you can scroll down.  You have account balance of zero here, so yes.

**Q.**  Okay.  You know, why don't I give you the hard copy and let you look.

**A.**  All right that may be better.

THE COURT:  Mr. Morris, you can hand her the paper, but I'll hear the objection before any answer.

MR. KREPP:  I would object on the ground of relevance. If Mr. Morris can state what the relevance is.

MR. MORRIS:  Sure.  The relevance is that Agent Arrow said no payments had been made in the affidavit and swore to that on the stand and payments were, in fact, made.

THE COURT:  Well, what relevance does it have to the

1  issues?

2          MR. MORRIS:  Only to Agent Arrow's credibility, which

3  will be an issue.

4          THE COURT:  We're not going to accept intrinsic

5  evidence.  It is one thing to cross them as to those facts, but to

6  inquire as to a separate witness as to issues solely as to

7  credibility of another witness, is something that -- I'm going to

8  sustain the objection.

9          MR. MORRIS:  Well, I'm also asking her, Judge -- she's

10  testified about actions she took because taxes were owed.  I think

11  I have the right to say taxes were paid.

12          THE COURT:  I think you can ask her why she took the

13  actions she did, but whether those -- whether taxes were paid at a

14  particular point in time, I'm not sure I'm understanding the

15  significance.

16          MR. MORRIS:  All right, I'll do it another way.

17          THE COURT:  Okay.

18  CROSS-EXAMINATION

19  BY MR. MORRIS (continued):

20  Q.  Ms. Carter, in making your recommendation for a referral for

21  criminal prosecution, did you take into consideration that taxes

22  were owed?

23  A.  Yes.

24  Q.  Did you also determine if the taxes had been paid?

25  A.  Well, in collection I'm looking at the outstanding liability.

1 **Q.**  But --

2 **A.**  That's what I was looking at then.

3 **Q.**  -- as part of that, had you determined that taxes had, indeed,

4 been paid?

5 **A.**  Well, I knew there were prior installment agreements that had

6 been defaulted.  So I knew that installment agreements had been

7 set up; whether or not, you know, anything had been paid really

8 was irrelevant.  There was an outstanding liability, and I was

9 asking for that money.

10 **Q.**  Okay.  If it would help you to refresh your recollection,

11 would you look and see if there were taxes paid?

12 **A.**  To my knowledge, I'm sure --

13            THE COURT:  There is another objection.

14            MR. KREPP:  Objection, Your Honor.  My questions were

15 geared toward, did the Georgia Department of Revenue play a role

16 in the fraud referral or something within IRS, that's it.  If

17 we're going to have a whole trial on this issue, I'm not sure of

18 the relevance of it.

19            THE COURT:  I'm going to sustain the objection.  I don't

20 hear anything that goes to the issues of the motion to suppress.

21            MR. MORRIS:  Okay.  Thank you, Your Honor.  I'll take it

22 back.

23 CROSS-EXAMINATION

24 BY MR. MORRIS (continued):

25 **Q.**  Ms. Carter, as I understand your testimony, you were first

1  assigned the Chrisley matter, I think you said, in mid-February of

2  2017?

3  **A.**  Correct.

4  **Q.**  And the revenue officer -- officer that served immediately

5  before you was Kamesha Golden?

6  **A.**  Kamesha Golden is her name now, yes.

7  **Q.**  Was Ms. Gagella (phonetic) the previous RO to her?

8  **A.**  Correct.

9  **Q.**  And if I understand your testimony, the exhibit you saw with

10  regard to the communication from Katie Colvin to the IRS on

11  February 7, 2017, was to Ms. Golden, not to you?

12  **A.**  Correct.

13  **Q.**  So that was right before you took over the case?

14  **A.**  Correct.

15  **Q.**  And she made the note that you looked at in that exhibit?

16  **A.**  Yes, that was her history entry, yes.

17  **Q.**  Okay.  And you could tell from that note, if I can see that

18  again, that is Government's Exhibit -- no, it's not.  I apologize.

19         MR. MORRIS:  Can I see Defendant's Exhibit 9, please.

20  There we go.  There we go.

21  CROSS-EXAMINATION

22  BY MR. MORRIS (continued):

23  **Q.**  Okay, we're looking at it.  This is the note we're talking

24  about from February 7; correct?

25  **A.**  Yes.

1   **Q.**   Okay.  And the note states that Ms. Coleman, who we now know

2   is Ms. Colvin, wanted to work the case as a joint agency

3   investigation; correct?

4   **A.**   That's what it says, yes.

5   **Q.**   Okay.  And it mentions that there are warehouses containing

6   personal property the state intended to seize; yes?

7   **A.**   Yes.

8   **Q.**   That the Chrisleys intended to auction; is that right?

9   **A.**   That's what it says, yes.

10  **Q.**   Okay.  And then you were contacted by Ms. Colvin in -- March 6

11  concerning the Chrisleys?

12  **A.**   Correct, yes.

13  **Q.**   And that was to invite you to a headquarters meeting at GDOR

14  with Ms. Colvin and others?

15  **A.**   Yes.

16  **Q.**   And you went there; right?

17  **A.**   That's correct.

18  **Q.**   Along with Joanna Carter who was from the fraud section of the

19  IRS?

20  **A.**   Correct.

21  **Q.**   And you met on March 9, 2017?

22  **A.**   Correct.

23  **Q.**   And I think you testified today when you went there, you went

24  for the purpose that they, GDOR was offering the IRS information

25  about the Chrisleys?

1  **A.**   Correct.

2  **Q.**   And you were there to gather information about the Chrisleys?

3  **A.**   Correct.

4  **Q.**   And you went to the meeting?

5  **A.**   Correct.

6  **Q.**   And did they give you information about the Chrisleys?

7  **A.**   They did, yes.

8  **Q.**   Did you -- what did you learn?

9  **A.**   Again, we were merely there to gather information.  It was

10 discussed, the liabilities that they were owed by the state.  It

11 was discussed that there was this warehouse they were trying to

12 get access to with a lot of personal property that they would like

13 to seize and sell.

14 **Q.**   Did they tell you they had gotten some kind of levy?

15 **A.**   They told us a lot of information.  Like I said, I had just

16 gotten the case.  I didn't -- I wasn't up to speed.  I had not

17 done my initial analysis.  So we were, basically, there just

18 gathering information.

19 **Q.**   Did you take any notes from this meeting?

20 **A.**   Very few notes.  I know they gave us some information that,

21 you know, we turned over to the criminal side.

22 **Q.**   When did you turn it over to the criminal side?

23 **A.**   That would have been after the referral was made and accepted.

24 **Q.**   Okay.  And what about the notes from your meeting, where are

25 those?

**A.**   The notes from my meeting I actually put into a memorandum of file.   Again, it was -- it was, basically, just who was there, the date and the time.   I had a computer crash, and that memorandum, I cannot locate it.

**Q.**   Okay.   Did Ms. Carter, the other Ms. Carter take notes?

**A.**   She did not.

**Q.**   Okay.   And ultimately you say the information you obtained from Katie Colvin and the others in the meeting, was turned over to CID?

**A.**   They would have been, yes.

**Q.**   Okay.   When was your first discussion with Larry Arrow about the Chrisleys?

**A.**   The general procedure is we go through our fraud technical adviser, which would have been Ms. Carter.   We -- she worked with me on getting all the things together that I'll need to -- to prove the fraud, and at that point we make the referral to the criminal investigation.   Then we have a meeting with criminal investigation, and then they'll decide if they'll take the case or not.   So I'm going to say that was probably June or July of '17.

**Q.**   Okay.   Did I also understand your testimony that after GDOR agents seized the property from the warehouse, that you got a call from Katie Colvin to tell you what they had found?

**A.**   Yes.

**Q.**   And it included some documents as well?

**A.**   Included something related to tax returns or receipts.

1  **Q.**  Okay.  When CID -- strike that.

2      Were you aware that CID began an investigation of the

3  Chrisleys in March of 2017?

4  **A.**  I was not, no.

5  **Q.**  Once a CID preliminary investigation begins, are you supposed

6  to be notified to stop what you're doing?

7  **A.**  It would have to be -- well, I don't know where there -- at

8  that point where their referral came from.  So possibly, no.

9  **Q.**  Possibly, no?

10  **A.**  Possibly, no.

11  **Q.**  So once a criminal investigation is opened, does the civil

12  investigation stop?

13  **A.**  The civil investigation will stop.  We can act as cooperating

14  revenue officers, which I did, but at that point we would only be

15  acting on direction from Criminal Investigations.

16  **Q.**  And that didn't occur until July?

17  **A.**  We spoke with them in July.  I think the -- that case was

18  actually accepted sometime after that.

19  **Q.**  Right, but your earliest communication, your testimony is, is

20  July of 2017?

21  **A.**  June or July, yes.

22  **Q.**  Okay.  So between March 24, 2017, and July of 2017, you still

23  have an active investigation --

24  **A.**  Yes.

25  **Q.**  -- of the Chrisleys ongoing?  Okay.

1      You mentioned you obtained some information -- you, IRS

2 civil -- from bank statements.  How did you obtain the bank

3 statements?

4 **A.**  By summons.

5 **Q.**  By summons?

6 **A.**  Yes.

7 **Q.**  Okay.  Did you receive any bank statements prior to July of

8 2017?

9 **A.**  I did.

10 **Q.**  Excuse me, from GDOR?

11 **A.**  I did not.

12 **Q.**  Okay.  Okay.

13      MR. MORRIS:  I think that may be all, Your Honor, if I

14 may have just a moment.

15      Thank you, that's all I have.

16      THE COURT:  Any redirect?

17      MR. KREPP:  Very briefly, Your Honor.

18 REDIRECT EXAMINATION

19 BY MR. KREPP:

20 **Q.**  Just to be clear, Joanna Park, she was there with you at that

21 meeting with Georgia Department of Revenue?

22 **A.**  On March the 9th, yes.

23 **Q.**  On March the 9th.  All right.  Is she an IRS CI special agent?

24 **A.**  She is not.

25 **Q.**  Does she work in civil or criminal?

1  **A.**  She's on the civil side.

2  **Q.**  So even though she has the title fraud technical adviser,

3  she's still on the civil side?

4  **A.**  Correct.

5  **Q.**  Was anyone with IRS CI with you at that March meeting with the

6  Georgia Department of Revenue?

7  **A.**  No.

8       MR. KREPP:  All right, thank you.  That's all I have,

9  Your Honor.

10       THE COURT:  Any objection to excusing this witness?

11       MR. MORRIS:  No, Your Honor.

12       THE COURT:  You are excused.  You may step down.  You

13  may go about your day.  You can call your next witness.

14       MR. KREPP:  That's all the government has, Your Honor.

15  Sorry, I want to make sure we get admitted what we need to.

16       MR. MORRIS:  I have no objection if we cleanup our

17  exhibits that are admitted or not admitted at the end.

18       THE COURT:  Yeah, it's not a formal trial, so we can

19  work that out, I think --

20       MR. KREPP:  With that, we're good.  Nothing else, Your

21  Honor.

22       THE COURT:  Very good.

23       Mr. Morris, you may call your first witness.

24       MR. MORRIS:  Thank you, Your Honor.  I call LaShaun

25  Wright, please.

1          THE COURT:  And again, just for your planning purposes,

2    it's about 11:50 now, I was thinking about 12:30 for lunch, like I

3    said.  So I'm guessing you won't be done with your direct by then.

4    So I'll just, as we get closer, remind you and you can -- you

5    know, if it's a few minutes and it's a natural stopping point,

6    I'll let you have that discretion to say this is a good time to

7    stop.

8          MR. MORRIS:  Thank you, Your Honor.

9          THE DEPUTY CLERK:  Please raise your right hand.  You do

10   solemnly swear or affirm that the statements that you're about to

11   make in this case now pending before the court, are the truth, the

12   whole truth, and nothing but the truth?

13         THE WITNESS:  I do.

14         THE DEPUTY CLERK:  Thank you.  Could you please state

15   and spell your name for the record.

16         THE WITNESS:  Sure.  L-A-S-H-A-U-N, last name is

17   W-R-I-G-H-T.

18                        ******

19                   LaSHUAN WRIGHT,

20        having been duly sworn, testified as follows:

21                        ******

22   DIRECT EXAMINATION

23   BY MR. MORRIS:

24   Q.  Ms. Wright, if you have had your shots more than two weeks

25   ago --

1  **A.**  My second one was yesterday.

2        THE WITNESS:  I don't mind keeping it on, Your Honor.

3        THE COURT:  What I've been saying is if you've been a

4  sufficient number of days after your second shot, you may take it

5  off.

6        THE WITNESS:  I just got my second shot.

7        THE COURT:  Why don't we see how it goes.  If your

8  uncomfortable or there's an issue with hearing.  I may reconsider

9  that under the circumstance, because I think probably that's good

10 enough, but my general rule would be waiting until the end of the

11 two-week or whatever that period.  So let's -- if you would, let's

12 see how it goes with the mask.

13       THE WITNESS:  Okay, no problem.

14       MR. MORRIS:  I'll see if I can hear you, because I'm not

15 so good with that.

16       THE WITNESS:  Understood.

17 DIRECT EXAMINATION

18 BY MR. MORRIS (continued):

19 **Q.**  Ms. Wright --

20 **A.**  Yes.

21 **Q.**  -- tell us a little bit about your education background.

22 **A.**  I have a bachelor's degree in political science prelaw, and a

23 master's degree in criminal justice, both from Georgia State

24 University.

25       MR. MORRIS:  Could Your Honor tell what school that was?

1  'I couldn't tell.

2          THE COURT:  I will, if you are okay with it, it's almost

3  the witness' choice, I'll permit you to testify without the mask.

4          THE WITNESS:  Okay.

5          MR. MORRIS:  If you don't mind, I'd appreciate that.

6          THE WITNESS:  No problem.

7          MR. MORRIS:  Thank you.

8  DIRECT-EXAMINATION

9  BY MR. MORRIS (continued):

10  **Q.**  Okay, what school was that that you attended?

11  **A.**  Georgia State University.

12  **Q.**  Thank you very much.  Okay, and how are you employed now?

13  **A.**  I am employed at a law firm.

14  **Q.**  Okay.  Prior to your present employment, did you ever work for

15  the Georgia Department of Revenue?

16  **A.**  Yes.

17  **Q.**  For how long?

18  **A.**  Eight years.

19  **Q.**  Okay.  In 2016 and '17, were you working for the Georgia

20  Department of Revenue?

21  **A.**  I was.

22  **Q.**  In what department were you working?

23  **A.**  The Office of Special Investigations.

24  **Q.**  May I call that OSI?

25  **A.**  You sure can.

1  **Q.**  Okay.  In January, February and March of 2017, what was your

2  position in OSI?

3  **A.**  Supervisory special agent.

4  **Q.**  Supervisory special agent.  To whom did you directly report?

5  **A.**  At that time, it was probably Jeff Mitchell and Josh Waites.

6  **Q.**  Okay.  So you know Josh Waites?

7  **A.**  Um-hum.

8  **Q.**  Do you know Katie Colvin?

9  **A.**  Yes.

10  **Q.**  And do you happen to know IRS Special Agent Larry Arrow?

11  **A.**  Yes.

12  **Q.**  Okay.  Now, in July -- strike that.

13      When did you start with the Georgia Department of Revenue?

14  **A.**  July 2010, maybe, if I remember.

15  **Q.**  How long were you there?  When did you leave?

16  **A.**  July 2018.

17  **Q.**  July of 2018?

18  **A.**  Um-hum.

19  **Q.**  Did you leave of your own volition?

20  **A.**  I did not.

21  **Q.**  They terminated you?

22  **A.**  They did.

23  **Q.**  Have anything to do with the Chrisley case?

24  **A.**  I don't think so.

25  **Q.**  Okay.  Okay.  You were with OSI, that is, the criminal side of

1    GDOR?

2    **A.**   Yes.

3    **Q.**   And at that time was the commissioner Scott Graham?

4    **A.**   I don't --

5    **Q.**   Or the deputy commissioner?

6    **A.**   -- remember.

7    **Q.**   Okay, okay.  Which department, OSI or Compliance, was Josh

8    Waites?

9    **A.**   OSI.

10   **Q.**   How about Brian Crisp?

11   **A.**   OSI.

12   **Q.**   Amy Doherty-Heinze?

13   **A.**   OSI.

14   **Q.**   Jeff Mitchell?

15   **A.**   OSI.

16   **Q.**   Scott Santillie?

17   **A.**   OSI.

18   **Q.**   Doug Legg?

19   **A.**   OSI.

20   **Q.**   Beverly Wright?

21   **A.**   OSI.

22   **Q.**   All OSI?

23   **A.**   Um-hum.

24   **Q.**   And on the civil side, would that be Katie Colvin Vancil, on

25   the Compliance --

1   **A.**   I just know her as Katie Colvin, but sure.

2   **Q.**   Okay, if I tell you her name is now Colvin but she used to be

3   -- I'm sorry, is now Vancil, but she used to be Katie Colvin, do

4   you know we're talking about the same person?

5   **A.**   Um-hum, yes.

6   **Q.**   Is that right?

7   **A.**   Yes.

8   **Q.**   And also on that civil side, is that Scott Purvis?

9   **A.**   Yes.

10   **Q.**   Staci Guest?

11   **A.**   Yes.

12   **Q.**   Rufus Payne?

13   **A.**   Yes.

14   **Q.**   Merrill Jacobson?

15   **A.**   Yes.

16   **Q.**   Okay.  Now, with regard to Mr. Arrow, how long have you known

17   Mr. Larry Arrow?

18   **A.**   A couple years.  I couldn't really tell you.

19   **Q.**   Did you know him in 2016 and '17?

20   **A.**   Yes.

21   **Q.**   And his job was IRS CID?

22   **A.**   Yes.

23   **Q.**   Did you work cases with IRS CID as an OSI employee?

24   **A.**   Yes.

25   **Q.**   And did you work from time to time with Larry Arrow?

1  **A.**   Yes.

2  **Q.**   And it would not be -- or strike that.

3      Would it be unusual for you to talk to Larry Arrow about cases

4  you were working together?

5  **A.**   Not at all.

6  **Q.**   Did that happen --

7  **A.**   Yes.

8  **Q.**   -- from time to time?

9  **A.**   Yes.

10 **Q.**   And did you as a GDOR employee share information with Larry

11 Arrow about cases?

12 **A.**   Yes.

13 **Q.**   Did you share information with Larry Arrow in February and

14 March of 2017 about the GDOR investigation of Todd and Julie

15 Chrisley?

16 **A.**   I couldn't tell you the time because I don't remember, but we

17 talked about the case.  I couldn't give you a date, but we talked

18 about it.

19 **Q.**   And you gave him some information?

20 **A.**   We talked about it.  I don't remember if I gave him

21 information or not, like documents, but I know we talked about it.

22 **Q.**   Did you keep him abreast of certain events that were occurring

23 in the Chrisley investigation?

24 **A.**   I can't say yes or no about that, because I didn't really know

25 what was going on in the Chrisley investigation.

1  **Q.**  Well, let's talk about that.

2      Did you discuss the Chrisley investigation with Katie Colvin?

3  **A.**  I cannot say.

4  **Q.**  Well, you took part in the GDOR investigation of Todd and July

5  Christopher, didn't you?

6          MR. KREPP:  Objection, Your Honor.  Leading.

7  DIRECT EXAMINATION

8  BY MR. MORRIS (continued):

9  **Q.**  Did you take part in the investigation of Todd and Julie

10  Chrisley?

11  **A.**  By taking part, I would say that I attended a meeting and

12  maybe looked up something in the system once, but that's pretty

13  much the extent of my taking part in the investigation.

14  **Q.**  On February 21, 2017, did GDOR access the FinCEN system about

15  the Chrisleys?

16  **A.**  I don't know.

17  **Q.**  You don't know?

18  **A.**  Uh-huh.

19  **Q.**  Did you access the tax accounts of Todd Chrisley through GENTX

20  on February 23, 2017?

21  **A.**  I don't know.

22  **Q.**  Well, let's look at document -- excuse me, Defendant's Exhibit

23  No. 3 on our screen, if we could.

24      Do you recognize that?  If you'll look at your screen right

25  there.

1    **A.**   Oh.

2    **Q.**   Do you recognize that as GENTX records?

3    **A.**   No.

4    **Q.**   Well, they've been identified as such.  So let's look at them,

5    and I want you to look at February 23, 2017.  Is LaShaun Wright

6    you?

7    **A.**   That is me.

8    **Q.**   So on February 23, 2017, you accessed GENTX regarding Todd

9    Chrisley; correct?

10   **A.**   If you're saying that this is a record of people accessing

11   GENTX, that is me.  So I'll say, yes.

12   **Q.**   Okay.  And did you see the header on the index that said Todd

13   Chrisley on the first page?  This is about Todd Chrisley.  Michael

14   T. Chrisley.  Do you see that?

15   **A.**   Um-hum.

16   **Q.**   So you accessed the GENTX records in GDOR about Michael T.

17   Chrisley; correct?

18   **A.**   Okay.

19   **Q.**   Is that right?

20   **A.**   Yes.

21   **Q.**   And does it say you did that at 11:37 a.m.?

22   **A.**   It does say that.

23   **Q.**   All right.  And you did that at the direction of Josh Waites,

24   didn't you?

25            MR. KREPP:  Objection, Your Honor.  Leading.

1          MR. MORRIS:  Strike that.

2    DIRECT EXAMINATION

3    BY MR. MORRIS (continued):

4    **Q.**  Did you do that at the direction of Josh Waites?

5    **A.**  I wouldn't have done it for any other reason, I don't think.

6    I wouldn't have any other reason to do it.

7    **Q.**  So the answer is, yes, you did it at the direction of Josh

8    Waites?

9    **A.**  I don't want to say yes because I am not 100 percent sure.  So

10   I don't feel comfortable saying yes emphatically.

11         MR. MORRIS:  Judge, I'm going to ask permission to lead

12   this witness as a hostile witness.  I have interviewed her, and

13   I've had conversations with her and I'm not getting the answers I

14   anticipated.  I would like the opportunity to lead.

15         THE COURT:  I'll allow it.  Also, being that it is a

16   suppression hearing, I think the rules of evidence don't strictly

17   apply.  For sufficiency purposes, I'll allow it.

18         MR. MORRIS:  Thank you.

19   DIRECT EXAMINATION

20   BY MR. MORRIS (continued):

21   **Q.**  Ms. Wright, you recognize me?

22   **A.**  Yes.

23   **Q.**  We met?

24   **A.**  Yes.

25   **Q.**  I interviewed you?

1  **A.**  Yes.

2  **Q.**  Do you recall telling me the only reason you would have

3  accessed Todd Chrisley in the system of GENTX for tax information,

4  was at the direction of Josh Waites?

5  **A.**  Did I say the only reason?

6  **Q.**  Yes, you said the reason.

7  **A.**  Okay.

8  **Q.**  Do you recall that?

9  **A.**  I know that I mentioned that Josh would have asked me to.

10  **Q.**  And you did?

11  **A.**  Yes.

12  **Q.**  Do you also remember telling me that you passed on information

13  from the GDOR investigation about the Chrisleys to Larry Arrow?

14  **A.**  By passing on information, can you be more specific?

15  **Q.**  Did you give Larry Arrow information obtained during the GDOR

16  investigation of Todd and Julie Chrisley?

17  **A.**  I really cannot say.  We talked about -- I don't -- I can't

18  say for sure.

19  **Q.**  Do you recall telling me in an interview that, indeed, you did

20  pass on information obtained in the GDOR investigation about the

21  Chrisleys to Larry Arrow?

22  **A.**  I know that I said that we had conversations.  I don't know

23  specifically what I gave him, because it was 50 million years ago.

24  I don't remember.

25  **Q.**  But it was about the Chrisleys?

1  **A.**  I don't -- I have said this several times, I don't feel

2  comfortable saying something that I'm not absolutely concrete

3  about.  I remember saying that.

4  **Q.**  Do you admit or deny that you passed on information to Larry

5  Arrow regarding the Chrisleys?

6  **A.**  I have had conversations and may have passed on -- I do not

7  know.

8  **Q.**  At 11:37 on February 23, 2017, you accessed information about

9  Todd Chrisley; correct?

10  **A.**  Yes.

11  **Q.**  At 12:08 that same day you spoke with Larry Arrow; do you know

12  that?

13  **A.**  No, I don't know that.

14  **Q.**  Well, let's look at Defendant's Exhibit 53, which are your

15  phone records.

16  **A.**  Okay.

17  **Q.**  Do you see a phone call between you and Larry Arrow?

18  **A.**  If that 214 number is Larry Arrow --

19  **Q.**  Yes, it is?

20  **A.**  -- yes.

21  **Q.**  Do you see that?

22  **A.**  Yes.

23  **Q.**  Do you see what time it is, 12:08 because it's UTC so you

24  subtract 12; right?

25  **A.**  I don't know what UTC is, but I'll trust you.

1  **Q.**  Okay.  Well, this is about 30 minutes after you have accessed

2  this information on the Chrisleys you're talking to Larry Arrow?

3  **A.**  Okay.

4  **Q.**  Did you pass that information on to him?

5  **A.**  I can't say.

6  **Q.**  Is it likely that that would have been the reason you were

7  talking to him shortly thereafter?

8          MR. KREPP:  Objection, Your Honor.  Asked and answered

9  at this point.

10          MR. MORRIS:  It's a different question.

11          MR. KREPP:  It's the same question asked in a different

12  way.  The witness is saying she doesn't know.

13          THE COURT:  I'm going to sustain the objection.  I think

14  we're starting to get in the realm of speculation here.

15  DIRECT EXAMINATION

16  BY MR. MORRIS (continued):

17  **Q.**  The next day you spoke with Mr. Arrow for 20 minutes?

18  **A.**  Okay.

19          MR. MORRIS:  That would be on February 24th.  Can I see

20  that on the screen, please.

21  **Q.**  Do you see that call?

22  **A.**  Yes, sir.

23  **Q.**  Did you discuss the Chrisleys?

24  **A.**  I couldn't tell you.

25  **Q.**  And although you spoke with him about the Chrisleys during

1 this time period, as you've told us, you can't remember

2 specifically what you told them; is that your statement?

3 **A.** Definitely -- definitely not.

4 **Q.** Okay.  Mr. Arrow, asked you for information on the Chrisleys

5 during this time of February and March of 2017, didn't he?

6 **A.** He did ask.  Specifically what he asked, I cannot say.  But I

7 do know that it was a question.

8 **Q.** And you gave him answers?

9 **A.** To the best of my ability.

10 **Q.** That's right, because there is cooperation between your --

11 **A.** Absolutely.

12 **Q.** -- organization and his?

13 **A.** Absolutely.

14 **Q.** Okay.  Now, you attended a meeting in the GDOR building about

15 the Chrisleys in February of 2017?

16 **A.** I can't tell you when it was, but I definitely attended a

17 meeting.

18 **Q.** And Josh Waites was there?

19 **A.** He was.

20 **Q.** Did he ask you to come?

21 **A.** He did.

22 **Q.** Amy Doherty was there?

23 **A.** She was.

24 **Q.** Katie Colvin was there?

25 **A.** I think she was.

**Q.**   Merrill Jacobson?

**A.**   I'm not sure.

**Q.**   Okay.  And the meeting was to discuss the Chrisleys, wasn't it?

**A.**   It was.

**Q.**   And part of that discussion was that the criminal investigation of the Chrisleys would be assigned to Amy Doherty; correct?

**A.**   I don't know if that was part of the meeting; however, she was assigned.  So I can't say that was discussed in the meeting before or after -- time is not necessarily my strong suit at this present moment.

**Q.**   Okay, but around this time the criminal investigation of the Chrisleys is assigned to Amy Doherty?

**A.**   I will say around the time, yes.

**Q.**   Okay.  And Josh Waites is working on it as well; correct?

**A.**   Yes.

**Q.**   In fact, Waites, even though the case was assigned to Amy Doherty, was actually running the criminal investigation, wasn't he?

**A.**   I -- I would say that.

**Q.**   On the morning of March 9, 2017, GDOR people met with IRS Agent Betty Carter and Joanna Carter; were you aware of that?

**A.**   I don't know who those people are.

**Q.**   Okay.  Were you aware of the meeting?

1   **A.**   No.

2   **Q.**   And it's just coincidence that you spoke with Larry Arrow that

3   very day?

4   **A.**   I would say yes.

5   **Q.**   Okay.  Do you recall what it was you spoke about?

6   **A.**   No.

7   **Q.**   Could have been the Chrisleys?

8   **A.**   Could have.

9   **Q.**   On March 28, 2017, GDOR executed a seizure of Chrisley

10  property at a warehouse?

11  **A.**   Okay.

12  **Q.**   You knew that at the time?

13  **A.**   Could you repeat that one more time?

14  **Q.**   Yeah.  On March 28, 2017, and there's no doubt about that

15  date --

16  **A.**   Okay.

17  **Q.**   -- GDOR executed a levy and a seizure of Chrisley property at

18  a warehouse; right?

19  **A.**   Okay.

20  **Q.**   You knew that?

21  **A.**   Yes.

22  **Q.**   And you told Larry Arrow about that?

23  **A.**   I don't know.

24  **Q.**   When I interviewed you, isn't it true that you told me, yes, I

25  told Larry Arrow about it?

1 **A.** Umm, if you -- I do not know. But if you're saying it, sure.

2 **Q.** I'm just asking for your testimony.

3 **A.** I understand. I just can't remember a lot, so...

4 **Q.** So are you saying, yes, you may have and you just don't

5 remember?

6 **A.** Yes.

7 **Q.** Okay. On April 20, 2017, you spoke with Larry Arrow for a

8 good 22 minutes, and that was about the Chrisley case and Katie

9 Colvin being the contact person; do you remember that?

10 **A.** I remember having -- I don't know it. I remember having a

11 conversation with Larry about contacting Katie for anything he may

12 need because I was not the person that could help him with

13 whatever he was asking, or whatever.

14 **Q.** Larry Arrow asked you, I need information on the Chrisley

15 case, and you said, talk to Katie Colvin; is that what you said?

16 **A.** Sure.

17 **Q.** Okay. And if I told you that documentation shows that to be

18 April 20, 2017, would you agree with me?

19 **A.** If you show me documentation, absolutely.

20        MR. MORRIS: Okay. Well, let's see the e-mail -- let's

21 see the e-mail from Mr. Arrow to Katie Colvin, please, do you know

22 what number that is?

23        A VOICE: 38.

24        MR. MORRIS: Okay. Would you blow that up just a little

25 bit. And that's exhibit number?

1            A VOICE:  38.

2  DIRECT EXAMINATION

3  BY MR. MORRIS (continued):

4  **Q.**  Exhibit No. 38, can you see this e-mail from Larry Arrow to

5  Katie Colvin?

6  **A.**  Yes.

7  **Q.**  Okay.  Do you see the date on that, April 20?

8  **A.**  Yes.

9  **Q.**  Is that about the time you spoke with him about Katie Colvin

10 and the Chrisley investigation?

11 **A.**  I don't know.

12 **Q.**  Do you have any reason to believe that it isn't?

13 **A.**  I don't have any reason to believe that it's not.

14 **Q.**  Okay.  And did you give Larry Arrow Katie Colvin's name and

15 contact information?

16 **A.**  I definitely gave him her name.  I don't know if I gave him

17 her contact -- I know that I gave him her name.

18 **Q.**  Were you aware that, indeed, he contacted Katie that same day?

19 **A.**  No, but it wouldn't surprise me that he did.

20 **Q.**  I beg your pardon?

21 **A.**  I was not aware, but it wouldn't surprise me if he did, let's

22 say that.

23 **Q.**  And are you aware that he requested all of the information she

24 had regarding the Chrisleys?

25 **A.**  I was not aware.

1   **Q.**  In June of 2017, were you involved with Josh Waites searching

2   the GCIC database for information on Todd and Julie Chrisley?

3   **A.**  I don't know, but again, if you show me something I can say

4   yes or no.

5            MR. MORRIS:  Exhibit 40, please.

6   **Q.**  Would you take a look at that please, ma'am.

7   **A.**  It's a little blurry.

8   **Q.**  Yes, it is.  It is.

9   **A.**  Okay.

10  **Q.**  Not getting ahead.  GCIC is weird sometimes.  So we're looking

11  at GCIC, aren't we?

12  **A.**  Yes.

13  **Q.**  And that's you?

14  **A.**  Yes.  Uh-huh.

15  **Q.**  And this is about the Chrisleys, isn't it?

16  **A.**  I do not know.  Is there some --

17  **Q.**  Can we scroll a little bit, please.  See where it says, "7C's

18  Productions"?

19  **A.**  Yes.

20  **Q.**  That's a Chrisley company; do you know that?

21  **A.**  I did not.

22  **Q.**  Do you know it now?

23  **A.**  I sure do.

24  **Q.**  Back then you understood this was part of the Chrisley

25  investigation, didn't you?

1  **A.**  If -- if I'm looking it up and he said Chrisley, I -- I'm

2  guessing, so...

3  **Q.**  And this is you and Josh Waites and Scott Santillie and Katie

4  Colvin; correct?

5  **A.**  Yes.

6  **Q.**  And the GCIC search is for -- that's a criminal database,

7  isn't it?

8  **A.**  It is, but you can get things that are not criminal as well.

9  **Q.**  Pardon me?

10 **A.**  You can get things from it that are not criminal as well.

11 **Q.**  I understand --

12 **A.**  Oh.

13 **Q.**  -- but it's for use in a criminal investigation?

14 **A.**  Or a civil one; I mean, it just depends.

15 **Q.**  Do you any reason to believe that Josh Waites is not

16 investigating Chrisleys for the criminal purposes at this point?

17 **A.**  I want to answer correctly.  Can you repeat that again?

18 **Q.**  You said that Amy Doherty was assigned the criminal

19 investigation of the Chrisleys, but that Josh Waites was really

20 running it?

21 **A.**  Yes.

22 **Q.**  Okay.  Well, these e-mails, it's from you to Josh Waites.  You

23 were reporting to him; correct?

24 **A.**  Yes.

25 **Q.**  He's still in charge of this thing; right?

**A.**   Yes, yes.

**Q.**   Okay.  So this is for a criminal investigation, as best you can tell, because it's you and Josh Waites --

**A.**   Yes.

**Q.**   -- who is on the criminal side?  Okay.

Now, in working with the IRS, when GDOR OSI works with the IRS, that cooperation you've already told us includes Special Agent Larry Arrow from time to time, you work on cases with him?

**A.**   Yes.

**Q.**   Other cases, not just the Chrisley case?

**A.**   Yes.

**Q.**   And you share information with him?

**A.**   Yes.

**Q.**   It's no secret?  Okay.  And the main purpose, and you correct me if I'm wrong --

**A.**   Okay.

**Q.**   -- but, again, I believe you told me this, the main purpose in working the joint investigation with the IRS is for the state to get restitution at sentencing if the Feds prosecute; correct?

**A.**   Yes.

**Q.**   When you work jointly, it's expected the IRS is going to bring criminal charges?

**A.**   If all goes well, yes.

**Q.**   And GDOR provides help to the IRS in many ways, including accessing GENTX and giving information that you obtain to the IRS;

1  right?

2  **A.**  Yes, and vice versa, we share information.

3  **Q.**  Just like you did on the Chrisley matter?

4  **A.**  Um-hum.

5         MR. MORRIS:  If I may have just a moment, Your Honor.

6  Actually, it might be a good time to break.

7         THE COURT:  Okay.  All right, we'll break for lunch.

8  You may step down.  You will -- based on what y'all told me

9  yesterday as to what you had on tap for today, it seems like we're

10 still on schedule, do you think, for wrapping up by the end of the

11 day, like, even if we took an hour-long lunch?  The reason I'm

12 asking, because if not we could do less than an hour.  I'll let

13 everyone have an hour if it looks like we're on track.

14        MR. MORRIS:  How about 45 minutes out of the abundance

15 of caution?

16        THE COURT:  We'll say 45-minute lunch then.  So,

17 Ms. Wright, you're to return and take the stand -- it will be

18 about five after one.

19        THE WITNESS:  Okay.

20        THE COURT:  In the meantime, do not discuss your

21 testimony with anybody.

22        THE WITNESS:  Okay.

23        THE COURT:  And you will remain under oath, and I will

24 remind you of that when you take back the stand.

25        THE WITNESS:  Yes, sir.

```
 1              THE COURT:  All right.  Anything else at this time?
 2              MR. KREPP:  Nothing from the government.
 3              THE COURT:  Okay.  All right, we'll be in recess.  I'm
 4    sorry, don't discuss with anybody -- I'm sorry, do you represent
 5    her at well?  No.  So do you have counsel here?
 6              THE WITNESS:  No, sir.
 7              THE COURT:  I was going to say you can discuss with your
 8    counsel.  You don't have counsel, that's fine.  We'll be in
 9    adjournment until five after one.
10              (Whereupon, lunch was taken.)
11                            *****
12                      AFTERNOON SESSION
13                           ******
14              THE COURT:  So, Ms. Wright, I remind you, you are still
15    under oath.  Mr. Morris, you may proceed when you're ready.
16              MR. MORRIS:  Thank you, Your Honor.
17                           ******
18                      LaSHAUN WRIGHT,
19         resumes the stand and testified as follows:
20                           ******
21    DIRECT EXAMINATION
22    BY MR. MORRIS (continued):
23    Q.  Ms. Wright, I'm going to ask you some questions about two
24    interviews that you gave.  Do you recall meeting with a female by
25    the name of Denise Cox and with me on or about September 1, 2020?
```

**A.**   Yes.

**Q.**   And do you recall that we were asking you questions about the Chrisley case?

**A.**   Yes.

**Q.**   And do you recall stating --

MR. KREPP:  Your Honor, objection.  I object to hearsay.

THE COURT:  Let's just get the question first.

MR. MORRIS:  It's not hearsay.

THE COURT:  Before answering, I'm going to listen to Mr. Krepp's objection, but let's get the question.

MR. MORRIS:  Pardon me?

THE COURT:  I said, let's get the question on the record and then --

MR. MORRIS:  Isn't it true that you said, when asked about information you may have shared with IRS Agent Larry Arrow relating to the Chrisleys, that you acknowledged Arrow asked you for information and you provided it to him; is that true?

THE COURT:  So before answering, Mr. Krepp.

MR. KREPP:  Hearsay, Your Honor.  An out-of-court statement offered for the truth of the matter asserted.  This is a prior statement that the witness presumably gave, not in court, not right here and Mr. Morris is now asking, basically, for her to adopt that prior statement.

MR. MORRIS:  In order to impeach the witness with a prior inconsistent statement, I have to ask her if she made it.

1    If she says yes, the matter is closed; if she says no, I'm allowed

2    to call the witness to impeach her.

3              THE COURT:  I'll allow it for purposes of impeachment.

4              MR. MORRIS:  Thank you.

5              THE COURT:  You may proceed.

6              MR. MORRIS:  Thank you.

7    DIRECT EXAMINATION

8    BY MR. MORRIS (continued):

9    **Q.**  Do you understand the question?

10   **A.**  Can you repeat it again?  There was a lot going on.

11   **Q.**  I will be glad to.

12       On September 1, 2020 when you were interviewed by Denise Cox

13   and me -- and I -- and me, when you were asked about sharing

14   information with IRS Agent Larry Arrow related to the Chrisley

15   case, you acknowledged that Arrow had asked you for information

16   and you did provide it to him?

17   **A.**  Okay.

18   **Q.**  Do you recall saying that?

19   **A.**  Yes.

20   **Q.**  Okay.  And that's true, isn't it?

21   **A.**  It's true that I said it?

22   **Q.**  Both.  It's true you said it and it's true you gave him

23   information we asked you for?

24   **A.**  Right.  Yes.  When we have asked -- when he has asked me

25   questions, I have -- we've had conversations.

1          THE COURT:  There is an objection.

2          MR. KREPP:  She acknowledged she said it in the meeting.

3   She's been impeached.  I think that's the end of the inquiry.

4          THE COURT:  I'm going to overrule the objection.

5          MR. MORRIS:  Thank you.

6   DIRECT EXAMINATION

7   BY MR. MORRIS (continued):

8   Q.  You told Agent Arrow that GDOR was looking into the Chrisleys;

9   correct?

10  A.  Yes.

11  Q.  You told Agent Arrow that Valencia Jacobs also assisted Agent

12  Arrow with the Chrisley case?

13  A.  Can you repeat that again, please?

14  Q.  You also stated that Agent Arrow had Valencia Jacobs assist

15  him with the Chrisley case, with information on the Chrisley case?

16  A.  Yes.

17  Q.  You also told Larry Arrow to contact Katie Colvin for

18  additional information he needed on the Chrisley case?

19  A.  Yes.

20  Q.  Do you recall the second interview on September 29, 2020 at

21  the same -- I'm sorry, I wasn't there on that one.  This is a

22  telephone interview, I believe.  No, I take that back.  4180 Manor

23  Hills --

24  A.  Um-hum.

25  Q.  -- do you recognize that location?

**A.**   I do recognize that location.

**Q.**   On September 29, 2020, were you interviewed by Denise Cox
again?

**A.**   There was another gentleman with her.

**Q.**   I beg your pardon?

**A.**   There was another gentlemen with her.

**Q.**   Yes, yes.  Do you remember that?

**A.**   Yes.

**Q.**   Okay.  And you were again asked about the GDOR and Internal
Revenue Service, both of those things, and that you stated that
both GDOR and IRS CI were investigating the Chrisleys; correct?

**A.**   Yes.

**Q.**   And that GDOR did have an open criminal investigation on the
Chrisleys?

**A.**   Yes.

**Q.**   And that whatever action you took in investigating the
Chrisleys, was at Josh Waites' direction; correct?

**A.**   Yes.

**Q.**   And, again, you stated -- you stated that you did provide
information on the Chrisleys to Larry Arrow; correct?

**A.**   Yes.

**Q.**   You're nodding no but you're saying yes.

**A.**   Because I don't remember exactly what I said.

**Q.**   You don't remember it?

**A.**   I don't remember exactly what I said.

1  **Q.**  Okay.  Well, did you say something like you provided

2  information on the Chrisleys to Larry Arrow?

3  **A.**  Yes.

4  **Q.**  Okay.  And that the information that she provided was at his

5  request?

6  **A.**  That she --

7  **Q.**  You.  I'm sorry.  I'm repeating what was written.

8  **A.**  Okay.  Can you repeat it again?

9  **Q.**  Yeah, you gave him the information because he requested it?

10  **A.**  Because Josh requested it?

11  **Q.**  No, Larry Arrow.

12  **A.**  Can we start again?

13  **Q.**  Let's start again.

14      Did you say that you provided information on the Chrisleys to

15  Larry Arrow?

16  **A.**  Yes.

17  **Q.**  And do you recall also explaining the information you provided

18  to Arrow was at his request?

19  **A.**  Yes.

20  **Q.**  Okay.  Good.  And that most of the activity you were involved

21  in the Chrisley investigation, was informal and not fully

22  documented; correct?

23  **A.**  Correct.

24  **Q.**  That's unusual for an OSI case?

25  **A.**  Not in the beginning stages, per se.

1  **Q.**  Well, do you remember saying the Chrisley case was the only

2  one you had been involved in that was handled in that informal

3  manner?

4  **A.**  I do.

5  **Q.**  Okay.  You also said, I believe, that when Arrow asked you for

6  information, you would have provided information to Arrow via

7  telephone?

8  **A.**  Because it was a phone conversation.

9  **Q.**  Okay.  So the answer is yes, you said it?

10  **A.**  Yes.

11  **Q.**  Okay.  You were asked about a telephone conversation, several

12  calls with Mr. Arrow on February 23, 2017, approximately 20

13  minutes after you had access to Chrisley's federal tax accounts.

14  Do you remember I showed you that on the screen?

15  **A.**  Yes.

16  **Q.**  You were asked about that.

17     Do you recall saying that you couldn't confirm that this was

18  when you provided that information to him, but it was highly

19  likely?

20         THE COURT:  Mr. Morris, hold on one second.  Mr. Krepp?

21         MR. KREPP:  Objection, a continuing objection.  I think

22  the proper order should be, Mr. Morris should ask the question and

23  if he wants to impeach her with a prior statement, that's fine,

24  but what we're doing now is rehashing a prior interview confirming

25  she said that during the interview, and that's not proper

```
 1  impeachment.
 2          THE COURT:  Well, I'm going to sustain the objection to
 3  this question and answer, because I don't think what you just read
 4  was inconsistent with what she had said before the break on that
 5  issue.  So I didn't hear an inconsistency that you had confronted
 6  her with.
 7          MR. MORRIS:  If Your Honor recalls that that's something
 8  she said, it's okay with me.
 9          THE COURT:  Okay.  But Mr. Krepp, you know, is right.
10  For impeachment the relevance is whether what you're confronting
11  her with is inconsistent with what she earlier said.  We're not
12  going to just --
13          MR. MORRIS:  Agreed.
14          THE COURT:  -- read testimony that --
15          MR. MORRIS:  I thought she had not answered it that way,
16  but if you remember it that way --
17          THE COURT:  My recollection is that she said -- but now
18  that she doesn't remember.
19          MR. MORRIS:  But that it was highly likely.
20          THE COURT:  Well, I think there was an objection to that
21  and I sustained that as speculative.  So I don't believe it was
22  inconsistent, that second part had been --
23          MR. MORRIS:  Well then --
24          THE COURT:  Let's move on.
25          MR. MORRIS:  Okay.
```

1    DIRECT EXAMINATION

2    BY MR. MORRIS (continued):

3    **Q.**   If -- is it correct that you stated -- strike that.

4        The telephone -- did the telephone conversations you had with

5    Mr. Arrow where you gave him information, would that have been

6    between October 2016 and April of 2017?

7    **A.**   I'm not sure.

8    **Q.**   Okay.  Do you recall saying --

9            MR. KREPP:  Objection.  This is not going to be

10   inconsistent.

11           MR. MORRIS:  It is.

12           MR. KREPP:  Saying I don't recall --

13           THE COURT:  Let him get the question out first.

14           MR. MORRIS:  The question is, do you recall saying when

15   it was?  That's perfect impeachment.

16           MR. KREPP:  Impeachment is if she says -- if she denies

17   it happening.  Saying I don't recall, you can refresh her

18   recollection if it would help seeing the memo, but we're blending

19   the two rules here.

20           THE COURT:  Well, again, I'll just remind everyone we

21   don't have a jury here.  A lot of these rules are designed to be

22   the gatekeeper as to what the jury hears and how they address it.

23   That's one reason the rules of evidence don't strictly apply in

24   the pretrial hearing before the court.  Mr. Krepp is right, as a

25   strict application of the rules of evidence, and I think where

1   possible we should adhere to that, but if it's significantly going

2   to be inefficiency in the hearing -- I mean, you know, then, I

3   mean, I'm not going to elongate the hearing by an hour while we

4   refresh instead of -- I mean, I get the point.  So why don't you

5   try to rephrase.

6          MR. MORRIS:  My last question -- if you want to do it in

7   a classic fashion, I can say, isn't it true that the information

8   that you passed on to Larry Arrow in telephone conversations would

9   have taken place during the time that you were talking to him on

10  the telephone during this period of September -- excuse me,

11  October 2016 through, approximately, April of 2017.

12          THE WITNESS:  Am I allowed to answer?

13          THE COURT:  Yes.

14          THE WITNESS:  Okay, I'm sorry.  Can you repeat it again?

15  I thought there was going to be some more discussion.  I'm sorry.

16  DIRECT EXAMINATION

17  BY MR. MORRIS (continued):

18  **Q.**  Okay.  Isn't it true that the information you provided to

19  Larry Arrow relating to the Chrisleys, it would make sense to you

20  that this information exchange would have occurred when all of

21  these phone records say you had these calls with each other?

22  **A.**  We could have been talking about anything.  I do not know when

23  those -- I just don't know.

24  **Q.**  In that case, do you recall stating -- this is the

25  impeachment -- do you recall stating on September 29, 2020, that

1 it would make sense that the information exchange would have

2 occurred when the phone records say that the calls did occur?  Do

3 you recall saying that?

**A.**  Sure, it would make sense.

5        MR. MORRIS:  Okay, thank you.  That's all I have, Your

6 Honor.

7        THE COURT:  All right, Mr. Krepp.

8        MR. KREPP:  Thank you, Your Honor.

9        THE COURT:  And, Mr. Krepp, it's your choice, I'll give

10 you the same leeway with Ms. Wright.  I indicated if you're a few

11 days past your second shot but a few days before full compliance,

12 I remember you saying your second shot a few days before full

13 effectiveness, if you wish to take off the mask, that's okay.

14       MR. KREPP:  Oh, me?  I'm still -- I'm supposed to get

15 mine today, but I'm with you.

16       THE COURT:  I'm sorry.

17       MR. KREPP:  I'm just one in, Your Honor.

18       THE COURT:  Okay, great.  All right.

19 CROSS-EXAMINATION

20 BY MR. KREPP:

**Q.**  Good afternoon, ma'am.

**A.**  Good afternoon.

**Q.**  I'm keeping my mask on, just tell me if you can't hear me;

24 okay?

**A.**  No worries.

1  **Q.**  I don't think we ever talked before.  My name is Tommy Krepp.

2  I'm one of the attorney on the case.  This is my colleague

3  Annalise Peters.  I'm going to ask you some follow-up questions.

4       You said you worked in a law firm right now?

5  **A.**  Um-hum.

6  **Q.**  What law firm is that?

7  **A.**  Do I have to answer that?

8  **Q.**  I would like to know.  Well, let me ask you, if you're

9  uncomfortable, is it a law firm associated with the Chrisley

10  defendants?

11  **A.**  Oh, no, no.

12  **Q.**  Are you working for -- do you see any -- look around the

13  courtroom; do you see any of the lawyers at the firm that you're

14  working at here today?

15  **A.**  No.

16  **Q.**  Okay.  That's all I wanted to ask about.  All right.

17       And you left OSI in July of 2018?

18  **A.**  Yes.

19  **Q.**  And were you terminated?

20  **A.**  I was.

21  **Q.**  And you were a supervisor at OSI; is that correct?

22  **A.**  Yes.

23  **Q.**  And as a supervisor, you were familiar with OSI procedures;

24  correct?

25  **A.**  Yes.

**Q.** And that includes search warrant procedures?

**A.** Yes.

**Q.** All right.  Have you taken part in the execution of search warrants?

**A.** Just generally?

**Q.** Yes.

**A.** Yes.

**Q.** Not related to this case --

**A.** Yes.

**Q.** -- just general.

And had you taken part in inventory records from search warrants?

**A.** You said inventory records?

**Q.** Yes.  Like, once you go to the search warrant site, you see computers, papers, you're filling out papers --

**A.** Yes.

**Q.** -- afterwards documenting what you took?

**A.** Yes.

**Q.** Are you familiar with the term "chain of custody"?

**A.** Yes.

**Q.** And did you make sure the chain of custody was properly handled when OSI was conducting an investigation?

**A.** Yes.

**Q.** And why was that important?

**A.** The integrity of the investigation.  You want to keep the

1  integrity of the investigation.

2  **Q.**  All right.  And was that common place for OSI investigations,

3  in your experience?

4  **A.**  To keep the chain of command, yes.

5  **Q.**  The chain of custody?

6  **A.**  Yes, I'm sorry.  Chain of custody.  Yes.

7  **Q.**  And you're also familiar with OSI's steps to document

8  information during a criminal investigation?

9  **A.**  Yes.

10  **Q.**  Record-keeping and keeping supervisors updated on what's going

11  on --

12  **A.**  Yes.

13  **Q.**  -- that sort of thing?

14  **A.**  Yes.

15  **Q.**  You, yourself, were -- if I heard you correctly -- you were

16  not assigned to the Chrisley investigation?

17  **A.**  I was not.

18  **Q.**  Okay.  You never were -- were you ever asked to do anything

19  with the Chrisley investigation aside from these phone calls we've

20  been hearing about?

21  **A.**  Looking something up here or there, like, maybe literarily

22  maybe once or twice.  Very minimum -- very.

23  **Q.**  Were you ever asked to conduct surveillance of Todd and Julie

24  Chrisley?

25  **A.**  No.

1   Q.  Were you ever asked to go --

2           MR. KREPP:  One moment, Your Honor.  We want to make

3   sure we don't see a prospective witness in the courtroom.

4           THE COURT:  Okay.  Yes.

5           MR. KREPP:  With the mask, I wasn't sure.

6           THE COURT:  I appreciate it.

7   CROSS-EXAMINATION

8   BY MR. KREPP (continued):

9   Q.  Just backing up.  So were you asked to go interview

10  individuals in any way for the Chrisley investigation?

11  A.  No.

12  Q.  All right.  Now, I want to show you some documents that have

13  been previously admitted.

14          MR. KREPP:  Can you switch over to the ELMO.  Thanks.

15  CROSS-EXAMINATION

16  BY MR. KREPP (continued):

17  Q.  All right.  So this says right here, "Office of Special

18  Investigations case summary for Todd Chrisley dated February 20,

19  2017, Scott Santillie."  Do you see that?

20  A.  Yes.

21  Q.  All right.  Does this document, even if you haven't seen it

22  before, does this format look familiar to you?

23  A.  Yes, it does.

24  Q.  And what are we looking at?

25  A.  It is the face sheet for a case summary just documenting

1   anything that the agent may have done on the case.

2   **Q.**   Okay.  What type of things would typically be documented in

3   here?

4   **A.**   Interviews -- just any action, telephone calls, search

5   warrants.

6   **Q.**   Steps taken during a criminal investigation?

7   **A.**   Yes.

8   **Q.**   All right.  So if you look here and let me know if this is too

9   hard to see.  I'm going to try with the zoom feature.  So we see

10  that date right there February 20, 2017; correct?

11  **A.**   Yes.

12  **Q.**   And it's a status change, December 25, 2017, closed, no

13  review.  Do you see that?

14  **A.**   Yes.

15  **Q.**   What would that mean, closed, no review?

16  **A.**   That the case is closed.

17  **Q.**   Okay.

18  **A.**   No longer active.

19  **Q.**   And if we look over, it says, "No further criminal

20  investigative research required."  Did I read that correctly?

21  **A.**   Yes.  Um-hum.

22  **Q.**   And that was for the record Government Exhibit 226, page 2.

23       So this is something that -- same Exhibit 226, page 7.  So,

24  obviously, other case numbers have been redacted here.

25  **A.**   Yes.

1  **Q.**  You can see that; right?

2  **A.**  Yes.

3  **Q.**  Does this format look familiar to you, what we're looking at,

4  the spreadsheet where it has case number, case name, suspect, date

5  opened, case type?

6  **A.**  Vaguely familiar.

7  **Q.**  Is this a type of thing that you would have had access to at

8  the Department of Revenue?

9  **A.**  Yeah -- um-hum, yes.

10 **Q.**  The case name here is Todd Chrisley; is that correct?

11 **A.**  Yes.

12 **Q.**  And then we see the date again February 20, 2017?

13 **A.**  Yes, sir.

14 **Q.**  And then it says here -- what was the case title there?

15 **A.**  Assist compliance.

16 **Q.**  All right.  Were there other types of cases that OSI worked

17 when you were there, not just assisting compliance?

18 **A.**  Oh, yes.

19 **Q.**  Can you give us some ideas?

20 **A.**  Umm, give me a second.  Sales tax cases, there would be --

21 **Q.**  Let me help you out.

22 **A.**  Thanks, because I couldn't remember it.

23 **Q.**  Return to preparer cases?

24 **A.**  Yes, that's the one.

25 **Q.**  In other words, tax return preparers filing false returns for

1   their clients?

2   **A.**   Yes.

3   **Q.**   It's a pretty big one; right?

4   **A.**   That's a huge one.

5   **Q.**   That probably took up a lot of time when you were there?

6   **A.**   Yes.

7   **Q.**   And would that be documented different than assist compliance?

8   **A.**   It would.

9   **Q.**   If you scroll through here it says here, "Next step, continue

10  to assist compliance with financial data."  Did I read that

11  correctly?

12  **A.**   Yes.

13  **Q.**   Do we see any other steps here listed aside from assisting

14  compliance with financial data?

15  **A.**   No.

16  **Q.**   If search warrants had been conducted, would you expect to see

17  them documented?

18  **A.**   Absolutely.

19  **Q.**   If witness interviews had been conducted, would you expect to

20  see them documented?

21  **A.**   Absolutely.

22  **Q.**   Do you see those documented here?

23  **A.**   I do not.

24          MR. KREPP:  We move the admission of Government's

25  Exhibit -- I'll make sure I've got the right one here -- 207.

 1             MR. MORRIS:  No objection.

 2             THE COURT:  It's admitted.

 3             (Government's Exhibit 207 was marked in evidence as of

 4  this date.)

 5  **Q.**  You're not on this, e-mail but --

 6  **A.**  I'm sorry, I didn't hear you.

 7  **Q.**  Oh, sure.  You are not on this e-mail -- I'm going to zoom out

 8  and just show it to you; okay?

 9  **A.**  Okay.

10  **Q.**  All right.  So the last name Wright is there, Beverly Wright,

11  but that's not you; right?

12  **A.**  Right.

13  **Q.**  Okay.  Doug Legg, was he a supervisory special agent at that

14  time?

15  **A.**  He was.

16  **Q.**  And it says here, attached is an updated spreadsheet of our

17  current cases.  And if we look at the attachment, again, the date

18  of this e-mail was December 14, 2017; correct?

19  **A.**  Yes.

20  **Q.**  Do we see what appears to be that same spreadsheet that we

21  talked about earlier?

22  **A.**  Yes.

23  **Q.**  And does it still say that initiating day in February 20,

24  2017?

25  **A.**  Yes.

1  **Q.**  It still says, "Assist compliance"?

2  **A.**  Yes.

3  **Q.**  It says right here, "Continue to assist compliance with

4  financial data"?

5  **A.**  Yes.

6  **Q.**  And it says, "Complete date estimate December 14, 2017"?

7  **A.**  Yes.

8  **Q.**  So again, do we see anything documented about criminal

9  investigative steps that were taken by OSI on this log?

10 **A.**  No.

11 **Q.**  Would that be the kind of thing that typically would be

12 documented?

13 **A.**  Yes.

14 **Q.**  Search warrants that were conducted, would that be documented?

15 **A.**  Yes, yes.

16 **Q.**  The review of financial information, would that be documented?

17 **A.**  Yes.

18 **Q.**  Finding cut-and-pasted bank statements, do you think that's

19 the type of thing that would be important in a fraud investigation

20 that OSI would run?

21 **A.**  Yes.

22 **Q.**  And is that documented on here?

23 **A.**  Not on that, no, sir.

24 **Q.**  All right.  Now, you testified at length about Katie Vancil

25 and Katie Coleman is her former name; right?

**A.**   Yes.

**Q.**   I'm going to try to refer to her as her current name, Katie Vancil.

**A.**   Okay.  I'll try to focus on that.

**Q.**   All right.  Katie Vancil was in charge of the Department of Revenue's investigation of the Chrisleys; is that fair to say?

**A.**   The civil side for sure.

**Q.**   All right.  And did you ever -- you asked a lot of questions about your interaction with Ms. Vancil --

**A.**   Um-hum.

**Q.**   -- from Mr. Morris.  You never directed her to subpoena records, did you?

**A.**   No.

**Q.**   And you never directed her to gather evidence, did you?

**A.**   No.

**Q.**   You never directed her to execute levies against the Chrisleys?

**A.**   No.

**Q.**   Did anybody from OSI, Josh Waites, Doug Legg, Amy Doherty, anybody else from OSI in your presence direct Katie Coleman -- Katie Vancil to do anything like that?

**A.**   Not that I am aware of or can remember.

**Q.**   Okay.  Did you ever direct Katie Vancil to try to locate furniture or household items so that the Department of Revenue could auction them?

1  **A.**   No.

2  **Q.**   In your presence, and to the best of your memory, did anybody

3  like Josh Waites or Amy Doherty, Doug Legg, anybody else from OSI

4  direct Ms. Vancil to take to try to find household items like

5  furniture to auction?

6  **A.**   Not in my presence that I can remember.

7  **Q.**   Did you ever -- are you aware that eventually the Department

8  of Revenue seized a lot of stuff from the Chrisleys?

9  **A.**   Yes, I'm aware.

10 **Q.**   There was probably a lot of talk about this; right?

11 **A.**   It was.

12 **Q.**   It was a -- fair to say, it was a ton of stuff; right?

13 **A.**   Right.

14 **Q.**   Did you ever go to the warehouse where it was being stored?

15 **A.**   I did not.

16 **Q.**   Okay.  Were you ever present with Ms. Vancil when she was

17 reviewing the records?

18 **A.**   If I was present, it would be to say hi as I walked by her

19 office and maybe she was doing it at the time.  Not that, like,

20 I'm fully aware of.

21 **Q.**   Right.  And that's what I wanted to get to.  So you would see

22 Ms. Vancil throughout the day; right?

23 **A.**   Yes.

24 **Q.**   Say hi?

25 **A.**   Yes.

**Q.**   Did you ever go to lunch with her?

**A.**   No.

**Q.**   But to say hi?

**A.**   Yes.

**Q.**   Did you ever take those records, any records that Ms. Vancil was reviewing for the Chrisleys, did you ever take them away from her?

**A.**   No.

**Q.**   Did you ever make photocopies of them so you could do an investigation?

**A.**   No.

**Q.**   Did you ever try to borrow, ask to even borrow those records?

**A.**   No.

**Q.**   All right.  In your presence, did Josh Waites or anybody else go in and try to take records from Katie Vancil?

**A.**   I cannot say.  I don't remember.

**Q.**   Okay.  You don't recall?

**A.**   I don't recall.

**Q.**   And again, on that warehouse issue, the department eventually -- you became aware, seized furniture, lots of stuff from that warehouse; right?

**A.**   Yes.

**Q.**   And it was being stored somewhere that you never went to.  You weren't there when the items were seized from the warehouse?

**A.**   I was not there.

1  **Q.**  Right.  And, in fact, you had no role whatsoever in locating

2  the warehouse?

3  **A.**  I did not.

4  **Q.**  You had no involvement in deciding whether to take items from

5  the warehouse?

6  **A.**  I did not.

7  **Q.**  No role in deciding what to take from the warehouse?

8  **A.**  I did not.

9  **Q.**  And conversely, no role in deciding what not to take from the

10  warehouse?

11  **A.**  No, sir.

12  **Q.**  All right.  Now, in your experience when trying to preserve

13  chain of custody for use in a criminal investigation, how many

14  times did you hire the moving company Two Men and a Truck to move

15  items that were you thought might later be used at trial?

16  **A.**  Never.

17  **Q.**  Why do you say never?

18  **A.**  Because that would, to me, mess up the chain of custody when

19  you involve someone who was not an employee of the government to

20  move things.

21  **Q.**  All right.  And in your experience as a former OSI supervisor,

22  would you have objected if you knew that the department was taking

23  steps like that to move items that OSI thought might be used in

24  furtherance of a criminal investigation?

25  **A.**  I would definitely question that and speak up about that if I

1  was aware.

2  **Q.**  If you were aware, of course.

3      Now, did ever your sit down and review those -- any of the

4  statements with Ms. Vancil?

5  **A.**  No.

6  **Q.**  Okay.  Did you ever see cut-and-pasted bank statements?

7  **A.**  Not that I can remember.  Not that I can remember.

8  **Q.**  All right.  And even though you had those sort of informal

9  drop-ins with Ms. Vancil where she may have had access to the

10  materials, did you try to begin a criminal investigation off of

11  anything you learned?

12  **A.**  Did I try to?

13  **Q.**  Begin --

14  **A.**  Oh, no.

15  **Q.**  -- or further a criminal investigation?

16  **A.**  No, sir.

17  **Q.**  You testified at length about your interactions with IRS

18  Special Agent Larry Arrow?

19  **A.**  Yes.

20  **Q.**  And let's just talk big picture here.  There is nothing wrong

21  with an IRS agent, an IRS special agent interacting with an OSI

22  special agent; right?

23  **A.**  No.

24  **Q.**  That happens all the time; right?

25  **A.**  All the time.

**Q.**   And, in fact, a lot of times that's how IRS CI can share

information and vice versa about active criminal cases; correct?

**A.**   Yes.

**Q.**   So Larry Arrow heard about it, news articles about the

Chrisleys, and reached out to you to find out more information.

Did that strike you as improper?

**A.**   No.

**Q.**   Was that pretty common place?

**A.**   Very common.

**Q.**   Did Larry Arrow ever tell you to try to convince the

Department of Revenue to seize furniture and other items from the

Chrisleys?

**A.**   No.

**Q.**   What would you have done if he told you that?

**A.**   What would I have done if he tried -- can you repeat it?

**Q.**   Sure.  Larry Arrow called you and said, look, I read this

press article, I need you to go and convince Katie Vancil or

somebody from compliance to go take this stuff and then we're

going to review it and build a criminal case?

          MR. MORRIS:  Objection, relevance.  Speculation.

          MR. KREPP:  It goes to the heart of their motion.

          THE COURT:  Can you repeat the question?

          MR. KREPP:  Sure yeah.

CROSS-EXAMINATION

BY MR. KREPP (continued):

1  **Q.**  What would you have done if Larry Arrow had called you and

2  told you, I want you to get Katie Colvin or the Compliance

3  Division to seize a bunch of stuff from the Chrisleys so we can

4  build a criminal investigation?

5         MR. MORRIS:  Same objection.

6         THE COURT:  I mean, it's -- I'm going to sustain the

7  objection.  I think that calls for speculation.

8  CROSS-EXAMINATION

9  BY MR. KREPP (continued):

10  **Q.**  Do you recall Larry Arrow ever making a call like that to you?

11  **A.**  No.

12  **Q.**  All right.  Is that the kind of thing you think you'd

13  remember?

14  **A.**  Yes.

15  **Q.**  So even though you don't recall a lot of conversations, and to

16  be fair, there were a number of conversations with Larry Arrow;

17  right?

18  **A.**  A number, right.

19  **Q.**  Just like a number of conversations with other agencies;

20  correct?

21  **A.**  Yes.

22  **Q.**  But you think you'd recall something like that?

23  **A.**  I would recall if he asked it like that, for sure.

24  **Q.**  Did Larry Arrow ever tell you to convince the Department of

25  Revenue to issue an assessment against the Chrisleys?

1   A.   No.

2   Q.   Did he ever call you to tell you to convince the Department of

3   Revenue to issue a levy against the Chrisleys?

4   A.   No.

5   Q.   Right.   In fact, by your own testimony, Agent Arrow is just

6   interested in finding out what was going on at the Department of

7   Revenue?

8   A.   Yes.

9   Q.   Just like you did in other cases; correct?

10  A.   Yes, yes.

11  Q.   And, in fact, much of this -- would it be fair to say you were

12  asked about a broad time frame?  You know, I think, Mr. Morris

13  asked you about sometime in 2016 through all the way to 2017;

14  right?

15  A.   Yes.

16  Q.   Much of this happened after Agent Arrow initially reached out

17  to the Department; right?  When he said, hey, I'm trying to find

18  out what are -- the press reports about the Chrisleys, what are

19  y'all working on?

20  A.   I can't tell you what the time frame was, because I really

21  don't remember.  So sorry.

22  Q.   Okay, that's fair.  But irrespective of the time frame, did he

23  ever direct you or direct you to direct others to take steps

24  against the Chrisleys?

25  A.   No.

1              MR. KREPP:  One moment, Your Honor.

2   CROSS-EXAMINATION

3   BY MR. KREPP (continued):

4   **Q.**  Okay.  And you testified that you -- I think on direct, that

5   you did your best to share information with Agent Arrow when you

6   could; right?

7   **A.**  I'm sorry, I didn't hear you.

8   **Q.**  I'm sorry.

9              MR. MORRIS:  I couldn't hear that question.

10             MR. KREPP:  Sorry, I'll rephrase.

11             THE COURT:  He's rephrasing.

12  CROSS-EXAMINATION

13  BY MR. KREPP (continued):

14  **Q.**  You testified you did your best when you could to share

15  information with Agent Arrow?

16  **A.**  Yes.

17  **Q.**  And that's just through your normal operating procedures?

18  **A.**  Yes.

19  **Q.**  With that being said, you didn't personally know much about

20  the Chrisleys; right?

21  **A.**  I did not.

22  **Q.**  Just because you weren't involved in it at all?

23  **A.**  I was not.  I had my own cases.  Even though I'm a supervisor,

24  I still had my own cases, and I had other things to do.

25  **Q.**  All right, thank you.

1          MR. KREPP:  That's all I have, Your Honor.  Thank you.

2          THE COURT:  Redirect?

3          MR. MORRIS:  Just a few.  Thank you, Your Honor.

4   REDIRECT EXAMINATION

5   BY MR. MORRIS:

6   **Q.**  Ms. Wright, when you, right at the end there, when you were

7   talking about speaking with Agent Arrow about sharing information,

8   those -- you share information on cases you're working together;

9   correct?

10  **A.**  Yes.

11  **Q.**  And when I say you, I mean GDOR and the IRS CID?

12  **A.**  Okay, so now could you repeat it again?

13  **Q.**  Yes.  You stated that it is not uncommon for you and Larry

14  Arrow to share information; right?

15  **A.**  Right, correct.

16  **Q.**  And that's on cases you're working together?  By you, I mean

17  DOR and IRS?

18  **A.**  Yes, or potential cases.

19  **Q.**  Or what?

20  **A.**  Or potential cases.

21  **Q.**  Or potential cases.  Okay.  And these are criminal cases?

22  **A.**  Eventually.  Maybe.

23  **Q.**  Cases you work with him are criminal cases, aren't they?

24  **A.**  Yes.

25  **Q.**  We looked at Government Exhibit 226.

1            MR. MORRIS:  Could we see that?  Would you mind?

2    CROSS-EXAMINATION

3    BY MR. MORRIS (continued):

4    **Q.**  Here we are.  It's on your screen, if it's the same one.

5    Okay.  This is Government Exhibit 226.  We just have it in our

6    system differently, but you recognize as being what you identified

7    as the case summary on Todd Chrisley?

8    **A.**  Yes, sir.

9    **Q.**  And this is OSI, this is a special investigation case file;

10   correct?

11   **A.**  Yes, sir.

12   **Q.**  Which you know was opened by -- assigned to Amy Doherty at the

13   direction of Josh Waites?

14   **A.**  To my knowledge, yes.  Um-hum.

15   **Q.**  Okay.  And this is open as of 2/20/2017; that's clear, yes?

16   **A.**  Yes, sir.

17   **Q.**  Okay.

18           MR. MORRIS:  Can we see the next page, please.  Can we

19   blow that up just a little bit.  Okay.

20   CROSS-EXAMINATION

21   BY MR. MORRIS (continued):

22   **Q.**  We know on 2/20/2017 that the case is active, don't we?

23   **A.**  Yes, sir.

24   **Q.**  That means it's open and things are happening?

25   **A.**  Open and things are happening.

1  **Q.** Whatever is happening, as Mr. Krepp pointed out, is not being
2  listed in here, is it?

3  **A.** It is not.

4  **Q.** It's not in there, is it?

5  **A.** It is not.

6  **Q.** Didn't you say earlier in your testimony that this one was
7  sort of handled more informally than any other one that you had
8  done?

9  **A.** With me, yes.

10 **Q.** Yeah.  And if somebody ran a FinCEN investigation on Todd or
11 Julie Chrisley, it should be entered in the activity, shouldn't
12 it?

13 **A.** There might be a summary about it, but you may not see it
14 here.

15 **Q.** Why not?

16 **A.** Because if I am correct, this was from the -- the system where
17 all the cases were input.  So I'm not sure if this is when we were
18 a paper files, if we were --

19 **Q.** Okay.

20 **A.** So I can't --

21 **Q.** So if I'm understanding what you're saying, if this is under
22 the old system, all you have is when you open it and its status,
23 you don't list what you're doing in there?

24 **A.** Yes, sir.

25 **Q.** So it doesn't surprise you not to see any activity in there?

1  **A.**  Well, I don't know, because I don't know when this was --

2  **Q.**  Let's assume it's the old system.  There's no surprise that

3  there is no activity listed; correct?

4  **A.**  Correct.

5          MR. KREPP:  Objection.

6  **Q.**  All you know --

7          MR. KREPP:  It's calling for assumption.

8          MR. MORRIS:  It's not assumption.  It's her knowledge.

9          THE COURT:  I'm going to overrule that.

10  CROSS-EXAMINATION

11  BY MR. MORRIS (continued):

12  **Q.**  If it's the old system, you wouldn't expect to see any

13  activity listed in there; correct?

14  **A.**  No, I would not expect to see anything in there.

15  **Q.**  Good.  Okay.  And if it's the new system --

16  **A.**  Uh-hum.

17  **Q.**  -- were you supposed to put in there what you're doing.

18  **A.**  Yes.

19  **Q.**  And if there had been a FinCEN run, that should have been put

20  in there, shouldn't it?

21  **A.**  In there or a summary about it, depending on what we did.

22  **Q.**  Okay.  And if there had been a GCIC search of the Chrisleys,

23  that should be in there; correct?

24  **A.**  Yes.

25  **Q.**  So if that is being done and if this is the new system, it's

1   empty because nobody is putting it in there; correct?

2   **A.**   It depends on if it was before the case was opened or not.

3   **Q.**   Well, it's active.

4   **A.**   I mean, it depends on when the actions were taken.

5   **Q.**   Right.  If the actions are taken after February 20, 2017 --

6   **A.**   Yes.

7   **Q.**   -- they should be there?

8   **A.**   Yes.

9   **Q.**   Okay.  Your discussion of activities at the warehouse, you

10  were not there; correct?

11  **A.**   I was not.

12  **Q.**   Are you aware that Josh Waites was there?

13  **A.**   I believe -- I believe he was.

14  **Q.**   And he is OSI?

15  **A.**   Yes.

16            MR. MORRIS:  That's all I have.  Thank you.

17            THE COURT:  All right.  You may step down.  Anything

18  else?  Can this witness be excused?

19            MR. MORRIS:  She may be excused.

20            THE COURT:  Your can go about your day, ma'am.

21            THE WITNESS:  Thank you so much.

22            THE COURT:  Mr. Morris, can you call your next witness?

23            MR. MORRIS:  May I confer with opposing counsel?

24            THE COURT:  Yes, of course you may.

25            MR. KREPP:  We need to talk to the next witness'

1    attorney for a moment, Your Honor.  I think they're in the back.

2              THE COURT:  Should we take about a ten-minute break?

3              MR. MORRIS:  Could we have about a ten-minute break?

4              THE COURT:  Yes, that will be fine.

5              (Whereupon, a break was taken.)

6              MR. MORRIS:  If it please the court, we will rest on the

7    evidence as is and ask for the opportunity to set a briefing

8    schedule once the transcript has been prepared.

9              THE COURT:  Okay.

10             MR. MORRIS:  If that's all right with the court.

11             THE COURT:  That is fine.  So no rebuttal evidence?

12             MR. KREPP:  That's correct, Your Honor.

13             THE COURT:  Okay.  All right.  So let me pull up the

14   calendar, and I know this is probably more akin to a short trial

15   than an evidentiary hearing, so let me ask the reporter, about how

16   long do you think for the transcript?  That would be fine.  So she

17   estimates about three weeks.

18             MR. MORRIS:  Sorry?

19             THE COURT:  She estimates three weeks.

20             MR. MORRIS:  I couldn't hear it.

21             THE COURT:  Three weeks.

22             MR. MORRIS:  It will take three weeks?  Can we confer

23   with the court via e-mail once we receive it about a tentative

24   briefing schedule at that point?

25             THE COURT:  Sure.  That will be fine.

1           MR. MORRIS:  Thank you.

2           THE COURT:  So for now I'll leave it at the parties are

3    to, once you receive the transcripts, confer with each other first

4    and then if I consent you can propose to us, an e-mail is fine, a

5    briefing schedule which -- unless I have some major problem with

6    it, if it's consent, I'll likely just enter.  If it's not on

7    consent and y'all want to argue about something, let us know that,

8    too, and I'll have you on a telephone conference.

9           MR. MORRIS:  Thank you, Your Honor.

10          MR. KREPP:  Thank you, Your Honor.

11          Just so I'm clear, live briefing beforehand will just be

12   the defendants supplementing their motion to suppress --

13          THE COURT:  This will be post-trial briefs -- I'm sorry,

14   post-hearing briefs on the motions to suppress the search

15   warrants, meaning, the search -- the warehouse search warrants.  I

16   confess, I didn't go back on the record to remind myself of

17   exactly where all of the other motions stand, but am I right, all

18   of the other motions have been briefed?

19          MR. KREPP:  Yes.

20          THE COURT:  Okay.  So, of course, we had an issue with

21   Mr. Griffin, that we'll schedule an oral argument, a brief oral

22   argument on that at some point in the future, but my intention

23   here is only the post-hearing briefs on the motions at issue here

24   in this hearing.

25          MR. MORRIS:  On the motions, what?  I'm sorry.

```
 1              THE COURT:  On the motions that are at issue in this
 2    hearing, meaning to my recollection that would --
 3              MR. MORRIS:  Yes.
 4              THE COURT:  -- the two motions to dismiss, one from each
 5    defendant, relating to the warehouse searches or the Printer &
 6    Parts search, right, that's the one at issue.
 7              MR. KREPP:  So defendant will file the first brief and
 8    we file a response?
 9              THE COURT:  Well, again, yes, why don't y'all -- and you
10    can talk now about exactly -- I mean, there may be -- there's
11    issues of standing and then the merits which may sort of, I don't
12    know -- I think it's best for y'all to think about it and talk to
13    each other.  I don't have any preset thoughts as to how I want it.
14    So however you agree on it, if you do agree, or if you have
15    conflicting proposals, I'll hear that, too.
16              MR. KREPP:  Thank you, Your Honor.
17              MR. MORRIS:  Thank you.
18              THE COURT:  All right.  So then I'll wait once y'all get
19    the transcripts or you can start talking now about how you want to
20    handle it, but no later than when -- let's say, no later than
21    seven days after the transcript is filed I'll receive from you
22    your, if possible, joint proposal or indication that you need a
23    teleconference on the briefing schedule.  And separately, I'll ask
24    Ms. Evans to e-mail Mr. Griffin and cc counsel for the government
25    and we'll get that matter scheduled as well.  Well, we'll cc all
```

 1  counsel.  It's open court, you have the right to be there, but

 2  those would be motions that would relate only to Mr. Griffin's

 3  client.

 4          MR. MORRIS:  May we be allowed to at least keep the

 5  record open and make sure we've got all of our exhibits in?

 6          THE COURT:  Yes, yes.  For purposes of -- I mean, I'm

 7  not -- yes.  I'm not formally -- there is no jury I'm sending out,

 8  so yeah.  Y'all can clean that up, and if I consent something was

 9  missed, that's not a big deal.  If there is some dispute, again,

10  I'll -- let me know then and we'll take that up.

11          MR. MORRIS:  And we'll substitute the one exhibit.

12          THE COURT:  The redaction.

13          MR. MORRIS:  I think it's Exhibit 53 and 54 that have

14  the full telephone numbers and redact it.

15          THE COURT:  Right.  We just don't want personal

16  identification info, especially if it's a personal phone number,

17  which is what I heard in part, unredacted in the record.

18          MR. MORRIS:  We'll do that.  Thank you.

19          THE COURT:  All right, thanks very much.  We will be in

20  recess then.

21          (Whereupon, the hearing concluded at 2:02 p.m.)

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF GEORGIA

5

6        I do hereby certify that the foregoing pages are a true and

7    correct transcript of the proceedings taken down by me in the case

8    aforesaid.

9        This the 4th day of May, 2021.

10

11

12

13

14                      /s/ Viola S. Zborowski_____
                        VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
15                      OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25