IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>TODD CHRISLEY (A/K/A MICHAEL TODD CHRISLEY) AND JULIE CHRISLEY | Criminal Action No.<br><br>1:19-CR-297-ELR-JSA |

**United States' Post-Hearing Brief in Response to the Chrisley Defendants' Motion to Suppress Evidence**

The United States of America, by Kurt R. Erskine, Acting United States Attorney, and Thomas J. Krepp and Annalise K. Peters, Assistant United States Attorneys for the Northern District of Georgia, files this Post-Hearing Brief in Response to the Chrisley Defendants' Motion to Suppress Evidence.

## INTRODUCTION

In March 2017, the Georgia Department of Revenue ("DOR") levied a sizable amount of personal property that belonged to defendants Todd and Julie Chrisley to satisfy a large state tax debt owed by the Chrisleys. The DOR seized the property from the Printer & Parts Warehouse in Duluth, Georgia, where the Chrisleys were leasing space.[1] The property consisted primarily of furniture—

---

[1] For purposes of the Chrisleys' motion to suppress, the Government concedes that the Chrisley defendants had a reasonable expectation of privacy in the storage space at the warehouse. (*See generally* T-I at 8-61.) (The transcript from the evidentiary hearing is cited as T-I (day one of the hearing) and T-II (day two of the hearing).)

about seven houses worth of furniture filling 10,000 square feet of storage space—and 20 to 25 boxes containing documents and other small items. (T-I at 27, 155.) Although the DOR issued a tax assessment, filed levy paperwork, and served the Chrisleys with notice before seizing the property, the DOR failed to take the additional necessary step of obtaining a judge-issued seizure warrant in advance.

Ten months later, the Honorable Catherine M. Salinas authorized two search warrants for the Chrisleys' previously-levied property based on information presented by IRS Special Agent Larry Arrow in a sworn affidavit. (Gvt. Exs. 113, 114.) On February 7, 2018, federal agents executed the search warrants and seized about 21 boxes of paperwork from the DOR. (T-I at 65-66; Gvt. Exs. 115, 116.)

Among the materials seized by federal agents are at least three physically cut-and-pasted, doctored-up financial documents that the Chrisley defendants sent in furtherance of the wire fraud conspiracy and wire fraud scheme allege in Counts Seven and Eight of the Indictment. Specifically, the Indictment alleges that during a lease application process, the Chrisleys sent copies of these fabricated documents, which had been cut and then glued or taped together. (Doc. 1, ¶ 29.) Julie Chrisley sent an email to the homeowner attaching a falsified City National Bank account statement, a falsified BB&T account statement, and a hyperlink to a Google Drive folder containing a falsified Equifax credit report. (Doc. 1, ¶¶ 30-31.) Federal agents found the physical copies of these cut-and-

pasted documents in the boxes that the DOR had levied from the Printer & Parts Warehouse.[2]

The Chrisleys' moved to suppress these physical documents. (Docs. 36, 41.) During briefing on the Chrisleys' motion, the Government conceded that the DOR's levy of the Chrisleys' property without a seizure warrant violated the Fourth Amendment but argued that the exclusionary rule should not be invoked. (Docs. 44, 57.) The Court held a two-day evidentiary hearing on the motion on April 14 and 15, 2021. (Docs. 92, 93.) The Chrisley defendants filed their post-hearing brief on June 7, 2021 (Doc. 96), and the Government now responds.

## BACKGROUND

### A. Background on the Georgia Department of Revenue and the IRS

*1.  Georgia Department of Revenue ("DOR")*

The DOR is the Georgia state agency responsible for enforcing state tax laws. (T-I at 74-76.) The Compliance Division is under the civil umbrella of the DOR and is responsible for collecting state taxes owed by Georgia taxpayers. (T-I at 74-75.) The Office of Special Investigations ("OSI") is DOR's criminal component and is responsible for investigating and bringing criminal charges against individuals who are evading payment of taxes and/or engaging in fraudulent activities against the DOR. (T-I at 76.) The two divisions have separate chains of command that ultimately report to the Commissioner of the DOR. (Gvt. Ex. 237.)

---

[2] The emails and attached and linked electronic versions of these documents were independently located and seized from the electronic search warrants that the Chrisleys are seeking to suppress on other grounds. (Doc. 52.)

When an individual fails to file a state income tax return, the Compliance Division can take measures to assess and collect the tax amount owed by the taxpayer. (T-I at 78.) There are two ways the DOR can perform the tax assessment. One option is for the Audits Division, which is also on the civil side of DOR, to generate a tax return for the taxpayer based on information in the DOR's data warehouse system, GENTX. (T-I at 78, 82, 127.) GENTX pulls all of the financial information available on a given taxpayer that has been reported to the DOR by banks, the IRS, and other sources. (T-I at 82.) The other option for assessing a tax amount owed is for a DOR Compliance Agent to investigate by issuing subpoenas, gathering financial information other than what is in GENTX, attempting to locate assets, and then passing it on to the Audits Division to create a tax return. (T-I at 78-79.)

Once the Audits Division creates a tax return for a taxpayer who has failed to file a return, the DOR will issue a tax assessment and notify the taxpayer of the amount of state taxes owed based on the prepared return. (T-I at 79.) After the assessment is issued, the DOR can levy the taxpayer's property in order to satisfy the taxes owed. (T-I at 79-80.) The DOR can levy funds directly from the taxpayer's bank accounts or levy real or personal property, auction it off, and apply the proceeds to the outstanding tax balance. (T-I at 79-80.) The Compliance Division works to locate assets that can be levied. (T-I at 96.)

Finally, when the DOR believes that a taxpayer is either hiding money from the state or planning to leave the state (which would render the DOR unable to collect back taxes owed), it can perform a jeopardy assessment by filing a lien in

the county where the taxpayer resides, which allows the DOR to levy property in that county and auction it off to satisfy the taxpayer's tax debt. (T-I at 80-81.)

Sometimes, the Compliance Division will turn to OSI for assistance in civil collection matters. For instance, Compliance Division employees will occasionally ask for OSI's assistance in locating taxpayers from whom the Compliance Division is attempting to collect back taxes. (T-I at 81.) Similarly, OSI law enforcement officers will often accompany Compliance Division employees for safety reasons when a taxpayer's property is being levied or seized. (T-I at 105.) However, the entire tax assessment and tax collection process is run and controlled by the civil side of DOR—not by OSI. (T-I at 208-209.) By contrast, when OSI pursues a criminal investigation into a taxpayer, the Compliance Division's civil collection process is stayed. (T-I at 225.)

 2. *The Internal Revenue Service ("IRS")*

The IRS is the federal agency responsible for the administration of federal tax laws. Like the DOR, the IRS has separate civil and criminal components that perform separate functions. (T-I at 247.) On the civil side, Revenue Agents and Revenue Officers are responsible for assessing and collecting, respectively, federal taxes owed by taxpayers. (T-I at 247-248.) They are not law enforcement officers and are not part of the criminal side of the IRS. (T-II at 74.) On the criminal side, known as IRS Criminal Investigation ("IRS-CI"), special agents conduct criminal investigations into potential violations of the Internal Revenue Code and other financial crimes. (T-I at 247-248.)

There are numerous ways that an IRS-CI special agent may obtain a case lead that results in opening a criminal investigation. (T-I at 248.) For instance, a special agent may obtain a criminal case lead from media outlets and news articles, from a confidential informant, or from the IRS's law enforcement partners. (T-I at 248.) It is also common for special agents to receive internal case referrals from the civil side of the IRS when a revenue officer suspects that a delinquent taxpayer's behavior is criminal. (T-I at 248.) In an internal referral, IRS-CI will receive a package from the IRS revenue officer with information about the taxpayer and suspected criminal conduct. (T-I at 249; Gvt. Ex. 108.) After an IRS-CI special agent is assigned and he or she reviews the referral, the special agent and the referring civil employees will meet to discuss the referral. (T-I at 249.) If IRS-CI opens a criminal investigation, the special agent will have ongoing communication with the revenue officer so that IRS-CI can obtain information on the taxpayer that is relevant to the investigation. (T-I at 249-250.)

   3.   _Working Relationships Between the DOR and the IRS_

The DOR and the IRS are essentially tasked with the same functions: assessing and collecting taxes and investigating criminal tax conduct. The two entities regularly coordinate and communicate to execute their functions. For example, when a DOR revenue agent is working to collect on a state tax lien and learns that the IRS has a superior tax lien against the same taxpayer (a common situation given that people who do not pay their state taxes tend to not pay their federal taxes), the DOR revenue agent will reach out to the assigned IRS revenue officer in an effort to negotiate a settlement between the IRS and DOR regarding

any assets that the DOR may locate and collect. (T-I at 90.) Likewise, on the criminal side, it is common for IRS-CI special agents and OCI special agents to work together and share information in criminal investigations as law enforcement partners. (T-I at 248; T-II at 6-7, 147.)

**B. The DOR's Civil Tax Assessment of and Collection Efforts from the Chrisleys**

    1. *The DOR Begins the Civil Tax Assessment Process*

At the evidentiary hearing, DOR employees provided a detailed account of the initial stages of the civil tax assessment process against the Chrisleys.

DOR Compliance Division employee Katie Vancil had primary responsibility for the collection of the Chrisleys' delinquent state taxes. (T-I at 77.) Ms. Vancil testified that she has worked for the Compliance Division for a decade. (T-I at 74.) Since her hire date, she has been a civil employee and has never served as a law enforcement officer or OSI employee. (T-I at 75.)

In 2014, Ms. Vancil was assigned to assess and collect state taxes owed by the Chrisley defendants. (T-I at 81.) Josh Waites, the then-OSI Director, had recently learned that the Chrisleys had not filed state taxes in a number of years and had filed for bankruptcy, so he asked Ms. Vancil to look into the situation. (T-I at 81-82.) Ms. Vancil testified that this was a relatively common occurrence and did not necessarily mean that there would be an OSI criminal investigation into that taxpayer. (T-I at 84.) Ms. Vancil checked GENTX (a standard practice) and confirmed that the Chrisleys had not filed state taxes in a number of years. (T-I at 82.)  However, because the Chrisleys were in an active bankruptcy proceeding

(which would stay any collection efforts), Ms. Vancil recommended that the DOR not pursue collection efforts against the Chrisleys at that time. (T-I at 83.)

At some point in 2016, Waites notified Ms. Vancil that the Chrisleys' bankruptcy had been discharged, so she recommended her assessment and collection efforts. (T-I at 84.) Ms. Vancil subpoenaed bank records from financial institutions and as well as information from the Chrisleys' bankruptcy trustee (a standard practice). (T-I at 85, 87.) From that information, Ms. Vancil estimated the Chrisleys' adjusted gross income for each year that they had not filed a tax return. (T-I at 87.) According to her research at that time, Ms. Vancil calculated that the Chrisleys owed more than $1 million in state taxes. (T-I at 158.) During Ms. Vancil's investigation, Josh Waites and Lashaun Wright, another OSI employee, would check in for updates on what Ms. Vancil was working on, and she would tell them. (T-I at 130-131.)

Around December 2016, the DOR held a meeting to discuss how the civil collection effort would proceed. (T-I at 84, 128.) Five employees from the civil side of DOR attended: Ms. Vancil, Merrill Jacobson (Compliance Division attorney), Staci Guest (Chief Tax Officer), Carlton Askew (Compliance Director), and Chester Cook (Audits Director). (T-I at 77, 84.) Josh Waites was the only OSI employee in attendance. (T-I at 84-85.) During the meeting, it was decided that the Audits Division would generate a tax assessment based on the financial information Ms. Vancil had compiled. (T-I at 85.) The case was assigned to auditor Rufus Payne, and Ms. Vancil provided him with the information she had

subpoenaed and her estimations of the Chrisleys' adjusted gross income for their non-filing years. (T-I at 85, 87.)

In early 2017, Waites informed Ms. Vancil that one of Todd Chrisley's estranged children, Kyle Chrisley, had reached out to the DOR and wanted to assist the DOR with its collection efforts against the Chrisleys. (T-I at 88-89.) Ms. Vancil subsequently had multiple calls with Kyle Chrisley and Kyle's then-wife, Alexus Chrisley, who informed Ms. Vancil that the Chrisleys had moved to Tennessee but still had personal property stored in Georgia somewhere. (T-I at 88-89.) Waites and Compliance Division attorney Merrill Jacobson joined at least one of those calls. (T-I at 153-154.)

    *2. <u>Ms. Vancil Establishes Contact with IRS Civil Revenue Officers</u>*

On February 7, 2017, Ms. Vancil reached out to civil IRS revenue officer Camishe Golden, who was assigned to collect federal taxes owed by the Chrisleys to the IRS. (T-I at 90-91; Gvt. Ex. 101.) Ms. Vancil knew that the IRS also had a tax lien against the Chrisleys—a lien that was superior to the DOR's lien—and that the IRS had been working to collect delinquent federal taxes owed by the Chrisleys. (T-I at 90-93.) Because the DOR believed that the Chrisleys owed more than $1 million in state taxes, Ms. Vancil wanted to start negotiating with the IRS, which was a common practice for her. (T-I at 90-133.) Ms. Vancil testified that she took these steps so that the DOR wouldn't have to delay auctioning property if they successfully located and seized the property that Kyle Chrisley had told her about. (T-I at 90, 133.) No one from IRS-CI or OSI was involved in the communication, and Ms. Vancil did not request or suggest that the IRS

should open a criminal investigation. (T-I at 92.) And even during Ms. Vancil's communications with the IRS revenue officer, the IRS played no role whatsoever in the DOR's assessment process and did not influence the process. (T-I at 114-115, 134-136.)

   3.  *DOR Leadership Confirms the Chrisley Investigation Will Remain a Civil Collection Case*

On February 15, 2017, the DOR held an internal status meeting about the Chrisleys "to go over the info so that Audits can prepare the assessments" and discuss other outstanding issues, including "whether [the DOR] can identify and seize [Todd Chrisley's] assets." (Gvt. Ex. 200; T-I at 93-94, 138-139.) A number of civil employees attended, including Ms. Vancil, Merrill Jacobson, Chester Cook, Carlton Askew, Rufus Payne, Scott Graham, and Staci Guest (Chief Tax Officer, who oversaw the entire Compliance and Audits Divisions). (T-I at 94-95; Gov. Ex. 237.) Waites also attended. (T-I at 94-95.) In addition to discussing next steps in the civil collection process, they discussed whether OSI could or should begin a criminal investigation into the Chrisleys, and Ms. Guest definitively decided and announced that the Chrisleys' case "will not be a criminal case" and "would stay as a civil collection case."[3] (T-I at 95-96, 233.)

---

[3] At the evidentiary hearing, Ms. Guest did not recall the exact timing of this meeting, but she recalls making and announcing the decision that OSI was not going to open a criminal investigation into the Chrisleys. (T-I at 232-233.)

4. *OSI Misuses the Treasury Department's Financial Crime Investigation Program*

Despite Chief Tax Officer Staci Guest's mandate that the case "will not be a criminal case" and "would stay as a civil collection case," (T-I at 95-96, 233), Waites continued to take an interest in the Chrisleys, (T-I at 101-102), which ultimately led to DOR's misuse of a U.S. Department of Treasury investigative tool. After the February 15, 2017, internal DOR meeting, Ms. Vancil continued her efforts to locate assets belonging to the Chrisleys using standard Compliance Division techniques (*e.g.*, subpoenas, financial analysis). (T-I at 96.) At a certain point, Kyle Chrisley had reported to Ms. Vancil that he believed his parents may have an offshore bank account in the Cayman Islands where they were hiding a significant amount of money. (T-I at 98.) Offshore account information is not typically available through ordinary Compliance Division research, so Ms. Vancil asked Waites if he knew of a way to look for the account. (T-I at 99.) Waites told Ms. Vancil that she could submit a request through the United States Department of Treasury, Financial Crimes Enforcement Network ("FinCEN"), the so-called "314(a) request." (T-I at 98-99, 140-141.) FinCEN's 314(a) program is an "extraordinary law enforcement tool" that is designed to further either terrorist or "significant money laundering" investigations. (Gov Ex. 226 at 3.)

Pursuant to Waites' suggestion, Ms. Vancil filled out a 314(a) request and turned it over to OSI employee Scott Santillie to be submitted to FinCEN. (T-I at 142-143.) Unbeknownst to Ms. Vancil, when Santillie submitted the 314(a) request on February 20, 2017, he falsely certified that the DOR had a "significant money laundering" investigation into the Chrisleys. (T-I at 99-101, 140-142; Gvt.

11

Ex. 226 at 3.) Ms. Vancil confirmed on multiple occasions during the hearing that the 314(a) request did not lead to the discovery of the warehouse leased by the Chrisleys. (T-I at 102-103, 148.)

      5.   _Ms. Vancil Locates the Printer & Parts Warehouse_

Around March 1, 2017, Alexus Chrisley called Ms. Vancil and reported that the Chrisleys had a warehouse in Georgia filled with seven houses worth of furniture that they were planning to auction off to get an IRS lien removed from one of their properties. (Def. Ex. 18; T-I at 89, 155.) Ms. Vancil knew that once the Chrisleys sold that furniture, it would be nearly impossible for the DOR to collect on any of the Chrisleys' delinquent state taxes, especially given that the Chrisleys had moved to Tennessee. (T-I at 89-90.) Alexus provided some potential landmarks that she thought the warehouse was near, but Ms. Vancil was unable to locate it that day. (Def. Ex. 18.)

On March 6, 2017, although Ms. Vancil had not yet located the suspected warehouse with the abundance of furniture, the DOR began the jeopardy assessment and levy paperwork, and Ms. Vancil notified IRS revenue officer Betty Carter that they planned to seize and auction off some furniture (assuming they could locate it).[4]  (T-I at 97, 157; Def. Exs. 18, 21.) Three days later, Ms. Carter and another IRS civil employee met with Ms. Vancil and Merrill Jacobson to negotiate how the funds from the potential furniture auction would be shared

---

[4] A few weeks earlier, Ms. Carter had been assigned to take over for revenue officer Camishe Golden in leading the IRS's tax collection efforts from the Chrisleys. (T-II at 75.)

or allocated between the IRS and the DOR. (T-I at 170-171; T-II at 78, 90-91, 94-95.) No one from IRS-CI or OSI attended or participated in the meeting. (T-II at 95.) Pursuant to IRS policy, Ms. Carter did not share any information with the DOR or disclose any information about the IRS's collection efforts. (T-II at 77-79.) Likewise, Ms. Carter did not ask the DOR to attempt to levy any assets or seize any assets or property from the Chrisleys. (T-II at 79.) The next day, March 7, 2017, Josh Waites drove to Tennessee and served the levy paperwork on the Chrisleys at their home. (T-I at 108, 159.)

Ultimately, later that month, Ms. Vancil located the Chrisleys' furniture at the Printer & Parts Warehouse, located at 3270 Summit Ridge Parkway in Duluth, Georgia, on her own: She found a copy of a check from the Chrisleys made out to the Printer & Parts Warehouse with a memo line noting "furniture storage" in some Bank of America records she had subpoenaed. (T-I at 96, 103-105, 207-208.)

6. *DOR Seizes the Chrisleys' Property from the Printer & Parts Warehouse to Satisfy State Tax Debt*

Once Ms. Vancil located the Printer & Parts Warehouse through the subpoenaed Bank of America records, she received permission from her supervisor to go the warehouse to determine whether the furniture was still there. (T-I at 105.) Around March 27, 2017, Ms. Vancil visited the warehouse with Davin Fort, another Compliance Division analyst, and, consistent with DOR practice, two OSI employees, Brian Crisp and Ansley Martin, came along for safety reasons. (T-I at 105-106, 172-173.) When they arrived, they met with the building manager, who confirmed that the Chrisleys had furniture stored in

10,000 square feet of warehouse space. (T-I at 106-107.) Ms. Vancil did not expect to locate such an enormous volume of furniture, so she called Compliance Division attorney Merrill Jacobson, who then came to the warehouse with Josh Waites. (T-I at 107, 109.) Like OSI employees Brian Crisp and Ansley Martin, Waites came to the warehouse for security. (T-I at 108.) In short, the volume of furniture was "overwhelming," and given that it was already the afternoon, they decided to come back the next morning. (T-I at 108-109.)

The following day, the DOR employees returned and started trying to catalog all the Chrisleys' property, but it was too much to do on site. (T-I at 109-110, 173-174.) Ms. Vancil called Scott Purvis, Assistant Director of the Compliance Division, to see whether they should seize all of the property in the warehouse and whether they had the means to transport and store it. (T-I at 220-221.) Mr. Purvis, in turn, talked with Scott Graham, the Deputy Commissioner, and Becky East, the Chief Financial Officer who could approve expenditures like hiring movers. (T-I at 221.) Mr. Graham ultimately decided that the DOR would take everything in the warehouse, and Ms. East approved hiring Two Men and a Truck, a professional moving company. (T-I at 223.) That day, eight professional movers and five large moving trucks transported all the Chrisleys' property from the Printer & Parts Warehouse to the DOR's South-Metro warehouse on Welcome All Road. (T-I at 112, 163, 224; Gvt. Exs. 7-11.) The seized property was nearly all furniture, but there were also a relatively small number of boxes containing papers. (T-I at 234, 240.)

14

At the time they inventoried all the Chrisleys' furniture, Ms. Vancil and Davin Fort, another Compliance Division agent, took the boxes of documents that had been seized and moved them from the South-Metro Warehouse to a locked office in DOR's main office at Century Center, to which Ms. Vancil had the key. (T-I at 162, 164, 180, 197; Def Ex. 26.) That way, Ms. Vancil could look through the boxes for additional banking information that may lead to more assets as well as non-document items that count be auctioned off, such as a camcorder that they located in one box. (T-I at 166; Def Ex. 26.)

While Ms. Vancil and Mr. Fort were looking through the boxes of documents at Century Center, they located cut-and-pasted fraudulent financial records in one of the boxes. (T-I at 117, 167.) Although Ms. Vancil knew that was an indicator of fraud, she did not ask OSI to open a criminal investigation because they had been "living by the mantra that this will never be a criminal case." (T-I at 122.) Ms. Vancil did not turn over the cut-and-pasted documents to Waites, Lashaun Wright, or anyone at OSI. (T-I at 206.)

After the DOR seized and inventoried the Chrisleys' property, Ms. Vancil called and notified IRS revenue officer Betty Carter about the seizure. (T-II at 79-80.) Ms. Vancil told Ms. Carter that that there was some tax information and receipts among the property that had been seized, but she never mentioned anything about cut-and-pasted or fabricated documents, nor did she send or show Ms. Carter any of the seized documents. (T-II at 80-81.) Ms. Vancil never told Ms. Carter that the DOR was going to start a criminal investigation, nor did

15

she ask or even suggest to Ms. Carter that Ms. Carter should refer the case to IRS-CI. (T-II at 80.)

Although the DOR planned to auction off the seized property quickly, it was not able to do so because the Chrisleys filed a tax tribunal case challenging their tax assessment just a few weeks after the seizure, which stayed the DOR's ability to auction off the items. (T-I at 119-120, 180.) Several years later, the Chrisleys settled their tax tribunal case with the DOR, and the DOR returned the Chrisleys' furniture. (T-I at 196.)

**E.  The Federal Criminal Investigation into the Chrisleys**

IRS-CI Special Agent Larry Arrow first became aware of the Chrisleys around March 24, 2017, when he received an email from his supervisor with a link to a news article about the Chrisleys' potential state tax evasion. (T-I at 254; T-II at 5-6, 32-33, 36, 47; Gvt. Ex. 102.) As was standard practice, Special Agent Arrow treated that email as a potential case lead. (Tr-II at 6.) He reviewed the article discussing the Chrisleys' delinquent state taxes, and then reached out to his OSI contact, LaShaun Wright. (T-II at 6, 99.) Agent Arrow had a working relationship with Ms. Wright (who was an OSI supervisor) and regularly communicated with her about criminal cases and potential case leads, but he had never previously talked with her about the Chrisleys. (T-II at 6-7, 39-41.) When they spoke, Ms. Wright told Agent Arrow that neither she nor OSI was working the case, that she had no personal knowledge about the case, and she referred Agent Arrow to Rufus Payne, the DOR auditor who had been assigned to perform the Chrisleys'

tax assessment.[5]  (T-II at 7, 33, 41; Gvt. Ex. 103.) Agent Arrow was then referred to Ms. Vancil, for whom he left a voicemail. (T-I at 7-8; Gvt. Ex. 104.) Agent Arrow testified that he recalls receiving a call back from Compliance Division attorney Merrill Jacobson, who informed him that the DOR was working on turning over some records to the civil side of the IRS, but Mr. Jacobson and the DOR never provided Agent Arrow with any useful information for the IRS's criminal investigation until many months later in response to a grand jury subpoena. (T-II at 8-9, 41-42.) Ms. Vancil recalls being on that phone call with Mr. Jacobson and Agent Arrow, and that Agent Arrow asked for "everything" that the DOR had on the Chrisleys. (T-I at 212.) Ms. Vancil recalls that Agent Arrow was not specific about what he wanted, but she believed that he had learned from Ms. Wright that the DOR had recently seized property belonging to the Chrisleys. (T-I at 212.) In any event, the DOR did not send Agent Arrow any information or documents after that initial phone call. (T-II at 10-11.)

And at the time of that phone call, around late March 2017, Ms. Vancil did not yet know that there were cut-and-pasted financial documents in the seized boxes because they had not yet looked through the boxes in detail. (T-I at 165.) Ms. Vancil testified that she did not focus on the materials in the boxes until they

---

[5] Agent Arrow and Ms. Wright were already communicating regularly around this time about five other criminal investigations that Ms. Wright was assisting the IRS with, and Agent Arrow does not recall Ms. Wright sharing any substantive information with him about a supposed OSI investigation into the Chrisleys.  (T-II at 53, 71-73.)

were moved back to the DOR main office several weeks after the March 28, 2017 levy. (T-I at 163.)

Without having received any useful information from the DOR, Agent Arrow prepared a primary investigation initiation memo on April 21, 2017. (T-II at 10-11, 49-51; Gvt. Ex. 105.) Agent Arrow scheduled a meet-and-greet with Mr. Jacobson in late April 2017, but it was canceled. (T-II at 13; Gvt. Ex. 106.) Agent Arrow does not recall receiving any useful information from Mr. Jacobson or anyone else at the DOR during this timeframe. (T-II at 8-9, 41-42.) Ms. Wright testified that she talked with Agent Arrow about the Chrisleys, but she did not keep him abreast of what was happening with the DOR's investigation into the Chrisleys because she was not working an OSI investigation into them and did not have any information about an OSI investigation into them. (T-II at 101-102.) However, Ms. Wright did provide Agent Arrow with information about the Chrisleys when Agent Arrow requested it, which was customary. (T-II at 121.)

In July 2017, IRS revenue officer Betty Carter referred the Chrisleys' case to IRS-CI for a possible criminal investigation. (T-II at 16; Gvt. Ex. 108.) After reviewing the Chrisleys' financials, which were obtained through an IRS civil summons and IRS collection records, Ms. Carter determined that the Chrisleys were making sufficient income that they could have been paying towards the federal taxes they owed and were not doing so. (T-II at 83-84, 94.) As a result, she referred the case to IRS-CI for a fraud investigation. (T-II at 84.) Ms. Carter testified that her assessment of the case and decision to refer it to IRS-CI was

completely unrelated to and uninfluenced by the DOR and any information the DOR had provided to her. (T-II at 84.)

At that point, although he had opened a primary investigation into the Chrisleys, Agent Arrow had not yet started working on the investigation because he was busy on other investigations (five of which involved OSI). (T-II at 16-17, 71.) After a 30-day extension to review the civil referral, Agent Arrow attended a standard referral meeting with IRS civil employees and was provided some information about the Chrisleys by civil IRS employees. (T-II at 18, 42-43, 53; Gvt. Ex. 109.) The DOR was not involved in that internal IRS meeting. *(T-II at 18.)*

Shortly after that meeting, in August 2017, Agent Arrow went on a detail to Birmingham, Alabama for a period of time and did not spend any substantive time on the Chrisley investigation until he returned to Atlanta sometime around October 2017. (T-II at 18-19.)

## F. January 2018 Meeting with Federal Prosecution Team and DOR

The U.S. Attorney's Office and the FBI became involved in the federal criminal investigation sometime in late 2017.[6]  (T-II at 27.) Around that time, a federal grand jury subpoena was issued to the DOR, and a meeting was set up at the DOR for January 4, 2018. (T-II at 19.) Agent Arrow, AUSA Thomas Krepp, FBI Special Agent Steve Ryskoski, six civil DOR employees, and Josh Waites attended. (T-II at 20; Gvt. Exs. 110-112.) That meeting was the first time Agent Arrow had ever spoken to or met Josh Waites, and it was the first time Agent

---

[6] The FBI had a prior investigation into the Chrisleys for bank fraud that was re-opened.

Arrow recalls learning that the DOR had seized property belonging to the Chrisleys from the Printer & Parts Warehouse nearly ten months earlier. (T-II at 26, 47.) During the meeting, DOR employees discussed how the seizure of the Chrisleys' property came about as well as how the DOR's civil collections case originated. (T-II at 21; Gvt. Ex. 112.)

### G. Federal Agents Obtain and Execute Federal Search Warrants

After the January 2018 meeting, the Government obtained federal search warrants to search the two locations where the DOR was storing the Chrisleys' seized property—at Welcome All Road and at 1800 Century Boulevard. (T-I at 65; T-II at 21-22, 24-25; Gvt. Exs. 113-117.) When the IRS executed the search warrants on February 7, 2018, numerous people were present: Agent Arrow, Agent Ryskoski, and additional personnel from IRS-CI, DOR, OSI, and the FBI. (T-II at 25-26; Gvt. Ex. 118.) Federal agents seized approximately 20 to 25 bankers boxes of documents from the DOR's main office located at 1800 Century Boulevard. (T-I at 65-66; T-II at 68-69.) At the Welcome All Road warehouse, where the DOR was still storing all of the seized furniture, federal agents seized just one or two boxes of documents and a thumb drive. (T-I at 65-66; T-II at 68-69.)

The materials seized during the federal search warrant execution had not been previously provided to Agent Arrow, Agent Ryskoski, or anyone else at the IRS or FBI. (T-I at 119.) The day the warrants were executed was the first day that federal agents laid eyes on the materials. (T-I at 119.)

## ARGUMENT

### A. Legal Authority

The United States does not dispute that the Chrisleys have established standing or that the DOR Compliance Division conducted a warrantless seizure in violation of the Fourth Amendment. *See G.M. Leasing v. United States*, 429 U.S. 338, 355, 97 S. Ct. 619, 630 (1977); *Retirement Care Associates, Inc. v. United States*, 3 F. Supp. 2d 1434, 1443 (N.D. Ga. 1998) ("Where IRS agents enter private premises to find and levy upon property of a taxpayer, that entry must be pursuant to a valid warrant."). But that is not the end of the inquiry.

The Supreme Court has repeatedly recognized the "often substantial" costs of the exclusionary rule in explaining that "'application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.'" *United States v. Ceccolini*, 435 U.S. 268, 275, 98 S. Ct. 1054, 1060 (1978) (internal citation omitted). Accordingly, a court's finding that a search or seizure violated the Fourth Amendment "does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140, 129 S. Ct. 695, 700 (2009). "The Eleventh Circuit has emphasized that 'suppression of evidence has always been a last resort, not a first impulse.'" *Fountain v. Hyundai Motor Co.*, No. 1:15-CV-00446-ELR, 2016 U.S. Dist. LEXIS 119604, at *12-13 (N.D. Ga. Mar. 29, 2016); *id.* ("Indeed, '[t]he Supreme Court has consistently recognized that unbending application of the exclusionary sanction would impede unacceptably the truth-finding functions of judge and jury, and it has repeatedly emphasized that the rule's costly toll upon truth-seeking and law enforcement

objectives presents a high obstacle for those urging its application.'") (citing *United States v Herring*, 492 F.3d 1212, 1216-17 (11th Cir. 2007).

"[T]he general 'purpose of the exclusionary rule is to deter misconduct by law enforcement officers, not other entities,' and there would be little 'significant deterrent effect in excluding evidence based upon the mistakes of those uninvolved in or attenuated from law enforcement.'" *United States v. Davis*, 598 F.3d 1259, 1266 (11th Cir. 2010) (citing *United States v. McCane*, 573 F.3d 1037, 1044 (10th Cir. 2009)). Because the purpose of the exclusionary rule is to deter "police misconduct," "one must first identify those who are to be deterred." *United States v. Janis*, 428 U.S. 433, 448, 96 S. Ct. 3021, 3029 (1976); *see also United States v. Laist*, 702 F.3d 608, 615 (11th Cir. 2012) ("*Leon* instructs us that the identity of the responsible party is indispensable to determining whether courts should apply exclusion as a remedy."). "[T]he deterrent effect of the exclusion of relevant evidence is highly attenuated when the 'punishment' imposed upon the offending criminal enforcement officer is the removal of that evidence from a civil suit by or against a different sovereign." *Janis* 428 U.S. at 458, 96 S. Ct. at 3034. As the *Janis* Court put it, the question is whether the subsequent prosecution "falls outside the offending officer[s'] *zone of primary interest*." *Id* (emphasis added); *see, e.g., United States v. Medina*, 181 F.3d 1078 (9th Cir. 1999) (affirming denial of motion to suppress evidence where offending officers "had no knowledge or anticipation of Medina's subsequent prosecution for armed bank robbery. In other words, they did not have the bank robbery charges within their zone of primary interest."); *United States v. Lopez-Martinez*, 725 F.2d 471, 476

22

(9th Cir. 1984) (affirming denial of motion to suppress evidence that had been previously suppressed in a case eight years earlier, finding that the agents who acted in 1974 "did not have the later 1982 proceedings in their 'zone of primary interest'"); *United States v. Bates*, No. 16-20044, 2016 WL 11479286, at * (W.D. Tenn. June 28, 2016) (holding that invocation of the "exclusionary rule was not justified" where evidence at issue in federal criminal case was originally seized without a warrant pursuant to a civil writ of execution); *cf. United States v. Cordero-Rosario*, 252 F. Supp. 3d 79, 92 (D.P.R. 2017) ("All things considered, the Court finds that the flagrancy of the not-so-independent federal investigation constitutes the type of behavior the exclusionary rule aims to deter.").

### B. The DOR Compliance Division Levied Property from the Printer & Parts Warehouse to Satisfy the Chrisleys' Substantial Tax Debts—Not as Part of a Criminal Investigation.

Contrary to the Chrisleys' speculative claims, the DOR Compliance Division levied items from the Printer & Parts Warehouse for one reason and one reason alone: to satisfy a tax debt. The evidence at the suppression made this clear.

*First,* while the Chrisleys spend much of their brief speculating as to Josh Waites' role in executing the levy, *every* DOR witness confirmed that the Compliance Division executed its levy to collect the Chrisleys' back taxes and that OSI and Waites had nothing to do with it. Former DOR Assistant Compliance Director Scott Purvis testified that Katie Vancil "had discovered a large amount of furniture in a storage facility, and the intent was to seize that furniture, and [Ms. Vancil] needed to know if we had the means to transport the furniture." (T-I at 220.) Mr. Purvis coordinated with Deputy Commissioner of

DOR Scott Graham as well as DOR Chief Financial Officer Becky East. (T-I at 221-223.) Mr. Graham issued a direct order "to get every fucking thing they have." (T-I at 223.) Notably, neither Waites nor anyone from OSI took part in these discussions. (T-I at 222-224.) Mr. Purvis testified that there was "no reason" for OSI to have been involved in these discussions because

> this was simply a civil matter. It was a recorded lien for an established liability, and the seizure was based on that lien. We – the division that I worked in, the Compliance Division, we don't have search warrants. We don't have criminal – we don't have any type of criminal capability or post-certified people. So ours was strictly a civil action that would have been based on that lien that we had issued.

(T-I at 224.) Chief Tax Officer Staci Guest confirmed that the levy was done for civil purposes. Ms. Guest stated, "We handled it from the beginning with the levy, we handled it through – a little bit of case work, and then it was turned over to the Audit Division, which is under me, for an audit." (T-I at 232-233.) Ms. Guest confirmed that no one from OSI played a role in this process and that she did not observe Waites making any decisions whatsoever with respect to the levied items. (T-I at 232, 236.) Katie Vancil repeatedly testified that the only reason she levied these materials was because she hoped to auction them so the proceeds could be used satisfy the six- or seven-figure tax debt that the Compliance Division believed the Chrisleys owed. (T-I at 119, 158.) She had no intent of building a criminal case, let alone a federal wire fraud prosecution because of Ms. Guest's directive that the case "will not be a criminal case" and "would stay as a civil collection case." (T-I at 95-96, 122, 233.) Finally, the Chrisleys' own witness, former OSI supervisor Lashaun Wright, confirmed that

she never directed Ms. Vancil to execute the levy and that she had no knowledge that *anyone* at OSI did so. (T-II at 138-139.)

**Second,** the use of a third-party moving company confirms that DOR did not intend for these items to be used to further a criminal investigation. Multiple witnesses confirmed that the DOR used professional movers from "Two Men and a Truck" to load and move the property that had been seized pursuant to the levy. (T-I at 112-114.) Indeed, DOR's videos of this process confirm that private movers – and not law enforcement – moved all of the property into the trucks. (Gvt. Exs. 8, 9, 10, 11.) Both FBI Special Agent Ryskoski and IRS Special Agent Larry Arrow confirmed that they had *never* used a professional moving company to transport items that might be used to further a criminal investigation. (T-I at 63; T-II at 70.) As Agent Ryskoski explained, "[w]hen you're gaining evidence for a case, a big part of that is chain of custody and maintaining that chain of custody. Therefore, we wouldn't use any outside – Two Men and a Truck to move any type of items that we believe are evidence." (T-I at 63.) The Chrisleys' witness, former OSI supervisor Lashaun Wright, confirmed that when trying to preserve chain of custody for use in a criminal investigation, she never hired Two Men and a Truck movers "because that would, to me, mess up the chain of custody when you involve someone who was not an employee of the government to move things." (T-II at 141.) And Ms. Vancil confirmed that OSI had a separate inventory process, which was not followed here. (T-I at 110-112 (Def. Ex. 36.)

The Chrisleys claim that the "chain of custody of these boxes is nonexistent, as they were not accounted for in any inventory of the [warehouse] seizure and GDOR cannot definitively say where the boxes came from." (Doc. 96 at 2 n.3.) That may be, but it proves the Government's point: DOR did not intend for these items to be used to further a criminal investigation. Improper chain of custody is an argument the Chrisleys can make at trial but not in a pre-trial motion to suppress evidence. *See generally United States v. Lopez*, 758 F.2d 1517, 1521 (11th Cir. 1985) ("[A] challenge to the chain of custody goes to the weight rather than the admissibility of the evidence.").

*Third,* the Compliance Division's levy of mountains of household goods – with no evidentiary value whatsoever – further demonstrates that DOR was not interested in building a criminal case against the Chrisleys. Ms. Vancil described the contents of the warehouse as looking

> like somebody packed a house up, multiple houses and just put it in a warehouse. There were beds, there were couches, plants, there were some office furniture, bedroom [suites]. . . . There were bags of personal items like toothbrushes, makeup, books, anything that you would think as you're moving, what you would take with you, but it was inside this warehouse.

(T-I at 109-110). Agent Ryskoski confirmed that at least 90 percent of the items that were taken were "household items" as opposed to items that would typically be seized in a fraud investigation:

> So walking into that warehouse, it was just – all I could see was furniture . . as you walk through it's just furniture stacked on top of each other, you know, in some cases six feet high of all of the

> different furniture of – dozens of chairs, lamps, end tables, coffee
> tables, pots, pans , dishes, pillows, books, rugs.

(T-I at 66.) Having personally participated in no less than 25 physical search
warrants, Agent Ryskoski confirmed that these were not the types of materials
that would be seized in a fraud investigation. (T-I at 63, 66-67.) Chief Tax Officer
Staci Guest – a former prosecutor – confirmed Agent Ryskoski's assessment,
testifying that it was mostly "furniture" at the warehouse. (T-I at 234.)

In all, the evidence at the suppression hearing established that the
Compliance Division levied the Chrisleys' household goods for simple reason: to
collect their back taxes.

**C. OSI and Josh Waites' Misconduct Played No Role in the Seizure of the Chrisleys' Property and is Thus Irrelevant to the Chrisleys' Motion to Suppress.**

The Fourth Amendment harm that the Chrisleys suffered is that their
personal property was seized from a rented storage space by the Compliance
Division without a warrant. Because that violation by civil actors doesn't warrant
suppression, the Chrisleys focus heavily on *unrelated* misconduct committed by
OSI and its then-Director, Josh Waites, to support their motion to suppress. But
the legal standard for the Chrisleys' motion to suppress focuses on the actions
and motivations *of the actor who seized the property* without a warrant. *See, e.g.*,
*Janis*, 428 U.S. at 458, 96 S. Ct. at 3034. Because OSI had no role whatsoever in the
Compliance Division's decision to levy the Chrisleys' household items, any OSI
misconduct is irrelevant to the Chrisleys' motion.

27

DOR's high-level meetings about the Chrisleys involved the assessment and collection of a tax debt, not a criminal investigation. The first meeting that Ms. Vancil recalled was attended by her, Merrill Jacobson, Staci Guest, Carlton Askew, Ms. Vancil, and potentially Chester Cook – all of whom worked in the Compliance or Audits Divisions – along with Josh Waites. (T-I at 84-85.) The second meeting, which took place in February 2017, was again primarily attended by Compliance and Audits Division personnel, including Carlton Askew, Staci Guest, Rufus Payne, an individual named Steven, and Ms. Vancil. Deputy Commissioner Scott Graham and Waites attended, but it was decided that the case would remain a civil collection case and that it would be referred for a criminal investigation. (T-I at 94-95.) The discussions at these meetings were solely about assessment and collection, which are not within OSI's purview. (T-I at 84-85, 94-95.)

Once Ms. Vancil was assigned to the matter, she found the Printer & Parts Warehouse through good old-fashioned Compliance Division research (a subpoena) and not any OSI efforts. (T-I at 103.) No OSI employees or agents were involved in any communications or decisions about whether to levy property from the warehouse, what property to levy, how to transport it, or where to store it. (T-I at 224-225.) As previously stated, if the levy had been part of a criminal investigation, OSI personnel would have completed separate inventory paperwork, and a private moving company would not have been used. (T-I at 110-12; Def. Ex. 36.) Indeed, if the seizure of the Chrisley's property had been

part of a criminal investigation, Scott Purvis said that he wouldn't have been involved in the process at all. (T-I at 225.)

Likewise, no OSI employees or agents controlled the Chrisleys' property *after* the levy was executed. A few weeks after the Printer & Parts Warehouse levy, Ms. Vancil and about ten other Compliance Division agents catalogued and inventoried the levied items at the South-Metro Warehouse. (T-I at 111, 177-179, 188.) At all times during this process the Compliance Division had control of the levied items—never OSI. (T-I at 116, 122.)

OSI and Josh Waites certainly took improper (and likely, illegal) steps during the timeframe that Ms. Vancil was trying to locate the Chrisleys' assets. As Ms. Vancil testified, Josh Waites was unusually interested in the Chrisleys during this timeframe. (T-I at 101-102.) For instance, Waites insisted on driving to Tennessee to serve the Chrisleys with their tax lien and even had a dart board with Todd Chrisley's face on it. (T-I at 84-85, 94-95, 108, 200-201.) And the Chrisleys make much of the fact that OSI – apparently at Waites' prompting – fabricated information when submitting a request through the U.S. Treasury Department's FinCEN 314(a) program. (Doc. 96 at 7.) But Vancil, who had never previously used this program, testified that she had absolutely no idea that, in order to submit the request, an OSI employee had opened a criminal case file and certified that there was an active criminal investigation into the Chrisleys. (T-I at 100, 138; Gvt. Ex. 226.) Ms. Vancil was stunned to later learn that OSI had opened a criminal case file because they "had been living by the mantra that this will never be a criminal case." (T-I at 100.)

In any event, OSI's own records confirm that the FinCEN 314(a) submission falsely claimed there was an ongoing criminal investigation into the Chrisleys. OSI's "case file" on the Chrisleys consisted of the improper 314(a) request along with notes in a case management spreadsheet that state that the case type was not money laundering but to "assist compliance."  (Gvt. Ex. 226 at 8.) Former OSI supervisor Lashaun Wright, confirmed that the OSI file did not indicate any other investigative steps (such as search warrants or witness interviews) had been taken. (T-II at 134-35.)[7] And Ms. Wright further testified that she did not recall witnessing *anyone* from OSI directing Ms. Vancil to subpoena records, develop evidence, execute levies, or levy the Chrisleys' household items. (T-II at 138-139.) It is undisputed that OSI acted improperly – perhaps in violation of federal law – when its employees falsified information in submitting the FinCEN 314(a) request. But law enforcement misconduct unrelated to a Fourth Amendment violation (*i.e.*, a warrantless seizure) is not the basis for a motion to suppress. *See, e.g., United States v. Lynch*, 934 F.2d 1226, 1234 (11th Cir. 1991)

---

[7] And even assuming, *arguendo*, that the FinCEN 314(a) request had played some role, improperly obtaining financial records cannot form the basis of a motion to suppress evidence. *See United States v. Ghidoni*, 732 F.2d 814, 817 (11th Cir. 1984) (*citing United States v. Miller*, 425 U.S. 435, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976)) ("It is well-established that bank records are not protected from disclosure by any constitutional privilege."). While the Right to Financial Privacy Act, 12 U.S.C. § 3401, et seq., subsequently established measures for the government to obtain financial records, the Chrisleys' motion alleges a constitutional, as opposed to a statutory, violation.  Accordingly, any suppression argument on behalf of the Chrisleys that bank accounts were improperly obtained from the FinCEN 314(a) search is without merit.

(citing *United States v. Calandra*, 414 U.S. 338, 347, 94 S. Ct. 613, 619-20, 38 L. Ed. 2d 561 (1974)) ("The [exclusionary] rule is a judicially created remedy designed to safeguard Fourth Amendment rights through its deterrent effect, rather than a personal constitutional right of the party aggrieved.").

Finally, it bears emphasizing that OSI and Waites never took steps to further a criminal investigation into the Chrisleys after Ms. Vancil uncovered smoking gun evidence of their fraudulent conduct. While reviewing the Chrisleys' materials with other Compliance Division personnel, Ms. Vancil discovered the cut-and-pasted financial documents. (T-I at 117.) Former OSI supervisor Lashaun Wright testified to the obvious fact that cut-and-pasted financial documents would be important in a fraud investigation. (T-II at 137.) Yet Ms. Vancil never turned these documents over to OSI, and she never requested that a criminal case be opened. (T-I at 122.) If the Chrisleys are correct that Ms. Vancil was an OSI "puppet" and that the Compliance Division's levy was an elaborate ruse for OSI to initiate a criminal investigation, why didn't anyone at the DOR launch a criminal investigation when uncovering smoking gun evidence of fraud? The answer is exactly what Ms. Vancil repeatedly testified to: She sought the levy of the Chrisleys' furniture and other personal items to satisfy an unpaid tax debt and not to begin a criminal investigation.

A problematic agent Josh Waites was (to say the least), but OSI's misuse of criminal investigation tools and Waites' apparent hyper-focus on these reality television stars is not relevant to what occurred at the Printer & Parts Warehouse. The Fourth Amendment harm that the Chrisleys suffered is that their personal

property was seized by civil Compliance Division actors in a regulatory collection case without a proper warrant—not that Ms. Vancil embarked on a criminal investigation or aided OSI in doing so. The record is undisputed that none of Waites' efforts impacted the DOR's decision to levy the Chrisleys' property. Accordingly, any misconduct by OSI and Waites is irrelevant to the Chrisleys' motion.

### D. Federal Agents Played No Role Whatsoever in Locating or Seizing the Chrisleys' Property from the Printer & Parts Warehouse.

The Chrisleys' conspiratorial argument that the IRS and the DOR were engaged in a joint witch hunt at the time of the DOR's warrantless levy rivals that of a John le Carré bestseller. In support of their argument, the Chrisleys have concocted a fanciful tale in which a federal IRS agent directed state tax collection officials to seize voluminous household goods from a 10,000 storage facility in hopes that buried within the mountains of pots, pans, rugs, and lamps, he'd find evidence to use in a federal wire fraud investigation. The Chrisleys' arguments are frivolous. The evidence at the suppression hearing was undisputed:  No one from the prosecution team directed the DOR to seize the Chrisleys' property. No one from the prosecution team took any part in deciding what property to seize or actually seizing that property. And no one from the prosecution team ever laid eyes on the seized property until February 2018—more than *ten months* after the DOR had taken the property from the Printer & Parts Warehouse.[8]

---

[8] The Chrisleys have not argued that the FBI was in any way involved in the DOR's seizure. In any event, Agent Ryskoski testified that, to his knowledge, no

IRS-CI Special Agent Arrow testified that no one from IRS-CI instructed the DOR to seize these materials or were in any way involved in the seizure. (T-II at 4-5.) Indeed, by the time that Agent Arrow first even heard of the Chrisleys, Katie Vancil had already been working for months to locate and seize the Chrisleys' assets. (T-I at 88-89, 254.) And by the time Agent Arrow first talked with Ms. Vancil and Merrill Jacobson, the Compliance Division had already seized the Chrisleys' property. (T-I at 189.) There is simply nothing in the record to suggest that IRS-CI even remotely influenced or touched the DOR's civil collection process—period.[9]

In an attempt to muddy the waters, the Chrisleys sound alarm bells and say that former OSI agent Lashawn Wright "admitted to providing evidence of GDOR's investigation into the Chrisleys" to Agent Arrow in order to assist the IRS-CI in bringing criminal charges against the Chrisleys. (Doc. 96 at 10.) The Court should reject that attempt for three reasons. *First*, the Chrisleys largely misstate the record. Despite repeated prodding from Todd Chrisley's counsel, Ms. Wright testified that she couldn't remember what she spoke to Agent Arrow about. (T-II at 106-107.) It was only after further probing (and improperly

FBI personnel instructed DOR to seize these materials or were in any way involved in the seizure. (T-I at 64.)

[9] The Chrisleys' conspiracy arguments about the DOR and Agent Arrow are particularly nonsensical given how much time elapsed between the date of the seizure (March 28, 2017) and the date of the meeting between federal officials and DOR regarding the Chrisleys (January 4, 2018). If Agent Arrow was working this hard in early 2017 to convince a state agency to seize the Chrisleys' pots and pans, he waited a long time to do get access to the seized property.

"impeaching" Ms. Wright by reading defense counsel's notes back at her) that Ms. Wright said that she had previously made these statements to defense counsel.[10] (T-II at 119-120.) **Second**, even if Ms. Wright *had* provided Agent Arrow with substantive information about the Chrisleys' case, like the fact that the Compliance Division had already seized the Chrisleys' property (information that Agent Arrow has no memory of receiving), *there was nothing improper about Ms. Wright providing him with that information*. Indeed, information sharing from OSI to IRS-CI was a common practice for these law enforcement partners. (T-I at 250-251). **And third**, regardless of whether it was improper for Ms. Wright to give Agent Arrow information (which it wasn't), any information sharing is irrelevant to the issue before the Court. In determining whether to suppress unlawfully seized evidence, the Court should consider the "zone of primary interest" of the actors who seized the evidence (the Compliance Division). *See Janis* 428 U.S. at 458, 96 S. Ct. at 3034. Neither Lashuan Wright nor Agent Arrow had anything to do with the Printer & Parts seizure. Neither OSI nor IRS-CI controlled or directed the seizure, so any communications between Agent Arrow and Ms. Wright are entirely irrelevant to the inquiry.

---

[10] The Government made a standing objection to this testimony because it called for hearsay and was improper impeachment. The Court overruled several of these objections because there was no jury present. (T-II at 126.) At the fact-finding stage, the Court should exercise its discretion to discount much of Ms. Wright's direct examination given that the only *substantive* statements she made (as opposed to statements made while counsel impeached her with her prior statements) came after defense counsel repeatedly read interview notes back at her.

The Chrisley's arguments that the DOR took steps at the behest of civil IRS revenue officers are equally meritless. Katie Vancil testified that the IRS played no role whatsoever in the decision to seize materials from Printer & Parts Warehouse. (T-I at 114-115.) And Ms. Carter similarly testified that she never instructed the DOR to seize these materials and was not involved in the seizure. (T-II at 78-79.) Nevertheless, the Chrisleys double down on their pre-hearing arguments that a stray reference in an internal IRS civil record to a "joint agency investigation" is proof that the Printer & Parts seizure took place because of some joint federal-state investigation. Simply put, there was no "joint investigation" between any part of the IRS and any part of the DOR. In fact, Ms. Carter did not provide any information to Ms. Vancil because IRS policy prohibited her from doing so. (T-II at 79.) The fact that IRS and DOR *collection* officials had communications about recalcitrant tax cheats is neither shocking nor a basis for suppression. Ms. Vancil testified that the sole purpose of her communications with IRS revenue officers was to negotiate a settlement so that the DOR could auction and collect on the Chrisleys' back taxes. (T-I at 90-133.) And finally, any materials that Merrill Jacobson gave to IRS revenue officers would not have made their way to Agent Arrow until July 2017, at the earliest, when Ms. Carter referred the case to IRS-CI. (T-II at 16; Gvt. Ex. 108.) At that point, the Compliance Division's warrantless seizure had happened months prior.

In short, the Chrisleys' specious conspiracy claims are untethered to any of the testimony or exhibits. (Doc. 96 at 12) ("Wright and Arrow's calls line up

exactly with key events in the Chrisley investigation. This is no coincidence.")
This type of analysis might sell novels, but the actual evidence developed during
the two-day suppression hearing makes clear that the IRS played no role
whatsoever in the seizure of household materials from the Printer & Parts
Warehouse. *No one* testified that Agent Arrow, Betty Carter, or anyone at the IRS
was somehow working "behind the scenes" to convince the DOR to seize these
household goods for the simple reason that the IRS had nothing to do with the
DOR's actions.

In all, the Chrisleys fail to point to any evidence for their baseless proposition
that Agent Arrow – or any IRS employees or other members of the prosecution
team – somehow convinced DOR officials to seize these materials or were in any
way involved in the seizure.

### E.  Imposing the Exclusionary Rule Would Be Pointless and Unprecedented.

In the end, the Chrisleys seek to jump to the exclusionary role's "costly toll"
because of actions taken by a state tax collection official who is not part of the
prosecution team. However, the Chrisleys fail to cite to a single case in which the
Eleventh Circuit (or any circuit) has excluded evidence from a criminal trial
because of a warrantless seizure by non-law enforcement government actors.
Indeed, it is not even clear that the exclusionary rule should *ever* be invoked
when the actors who seized materials without a warrant are not police or acting
in a law enforcement capacity. *See Davis*, 598 F.3d at 1266 ("[T]he general
'purpose of the exclusionary rule is to deter misconduct by law enforcement

36

officers, not other entities,' and there would be little '*significant deterrent effect in excluding evidence based upon the mistakes of those uninvolved in or attenuated from law enforcement.*'") (emphasis added). Such a drastic remedy runs afoul of the Eleventh Circuit's repeated admonition that the exclusion of evidence is "a last resort, not a first impulse.'" *Fountain*, No. 1:15-CV-00446-ELR, 2016 U.S. Dist. LEXIS 119604, at *12-13; *see also Arizona v. Evans*, 514 U.S. 1, 12-14, 115 S. Ct. 1185, 131 L. Ed. 2d 34 (1995) (The exclusionary rule is "appropriate only if the remedial objectives of the [exclusionary] rule are thought most efficaciously served.").

The federal agents assigned to this investigation had nothing to do with DOR's tax levy. Those same agents obtained valid warrants from Judge Salinas, which is exactly what *Leon* and its progeny encourage. Simply put, the federal case agents committed no misconduct that this Court should seek to deter. *United States v. McGough*, 412 F.3d 1232, 1240 (11th Cir. 2005) (internal citations omitted) ("Since the purpose of the exclusionary rule is to deter unlawful police misconduct, when officers engage in an 'objectively reasonable law enforcement activity' and act in good faith and in reliance on a search warrant from a judge, the *Leon* good faith exception applies."). If this unique chain of events were to occur again, federal investigators would hopefully do exactly what they did in January 2018: obtain a valid warrant from a neutral, detached magistrate.

Moreover, the Chrisleys' argument that OSI and Josh Waites need to be deterred is misplaced. With respect to the cut-and-pasted bank documents – the subject of their motion to suppress – the Chrisleys' constitutional injury was that the documents were seized without a warrant – not that Josh Waites had Todd

37

Chrisley's face on a dartboard. "*Leon* instructs us that the identity of the
*responsible party* is indispensable to determining whether courts should apply
exclusion as a remedy." *Laist*, 702 F.3d at 615 (emphasis added). The responsible
party is the DOR Compliance Division. It was their job to prepare the levy
paperwork and obtain a seizure warrant as part of the civil tax collection process.
And they are the ones that failed to do it – not OSI. As the Chrisleys themselves
highlight, "[i]n examining the *seizing officer's* intent and knowledge, the inquiry is
an objective one and 'not an inquiry into the arresting officers' subjective
awareness.'" (Doc. 96 at 18) (citing *Leon*, 468 U.S. at 922 n.23) (emphasis added).
The "seizing officers" here – from the decision to look for assets to what assets to
take to how to store them until they were auctioned - were Katie Vancil and civil
officials in the Compliance Division – not any OSI law enforcement officers.
Because OSI did not control or influence the warrantless seizure of the Chrisleys'
property, OSI would not be deterred by excluding the seized materials.

The Chrisleys admittedly raise troubling details regarding the manner in
which OSI operated under the leadership of Waites. Law enforcement
misconduct that is not tethered to a constitutional violation may certainly be
addressed through separate processes, such as lawsuits arising under 42 U.S.C.
§ 1983 (which the Chrisleys did in a civil case assigned to Judge May[11]),
termination from the law enforcement position (which happened here, as Waites

_____

[11] Additionally, as Judge May noted in dismissing the Chrisleys' claims under
§ 1983 that Waites improperly disclosed their tax information, the Chrisleys can
avail themselves of 26 U.S.C. § 7431, which sets out a statutory scheme for
damages. *See Chrisley v. Waites*, 478 F. Supp. 3d 1271, 1274-75 (N.D. Ga. 2020).

was terminated for unrelated reasons[12]), and, in certain instances, investigation by other law enforcement officials (which the Chrisleys claim is ongoing). But imposing the last-resort exclusionary rule for materials taken in a warrantless seizure that OSI did not control or influence would be unwarranted and unprecedented.[13]

And finally, imposing the exclusionary rule would not deter the actual seizing officers: Ms. Vancil and the Compliance Division. Although the Compliance Division completed levy paperwork, obtained a jeopardy assessment, and served it on the Chrisleys before seizing their property, it ran afoul of the Fourth Amendment by failing to also obtain a seizure warrant in advance. The DOR's intent in seizing the Chrisleys' property was simply to collect on unpaid taxes from the Chrisleys. (T-I at 94-95.) Ms. Vancil never contemplated that buried in the mountains of furniture they were levying in a state tax proceeding could wind up as key evidence in a federal indictment for wire fraud. The federal wire fraud charges are far outside Ms. Vancil's and the Compliance Division's "zone

---

[12] *See* State of Georgia Office of Inspector General, Press Release https://oig.georgia.gov/press-releases/2020-03-15/revenue-investigations-director-terminated-after-oig-investigation (last visited, July 7, 2021).

[13] The United States notes that the Chrisleys elected not to call Waites even though he had been subpoenaed and was available to testify. (T-I at 243-244). In their post-hearing brief, the Chrisleys allude to the fact that the parties were in agreement that the Court would need to advise Waites of his rights against self-incrimination prior to testifying. (Doc. 96 at 4-5, n.5). If the Chrisleys truly believed the arguments they have made about Waites, they certainly could have put the issue to rest by calling him to the witness stand.

of primary interest," which encompasses merely assessing and collecting state taxes. Accordingly, excluding the evidence in the federal criminal case would serve no purpose. *See Janis*, 428 U.S. at 458, 96 S. Ct. at 3034 *(*"[T]he deterrent effect of the exclusion of relevant evidence is *highly attenuated* when the 'punishment' imposed upon the offending criminal enforcement officer is the removal of that evidence from a civil suit by or against a *different sovereign*.") (emphasis added); *see also United States v. Bates*, No. 16-20044, 2016 WL 11479286, (W.D. Tenn. June 28, 2016) (holding that invocation of the "exclusionary rule was not justified" where evidence at issue in federal criminal case was originally seized without a warrant pursuant to a civil writ of execution).

In short, imposing the exclusionary rule in this case would not deter the actors who performed the warrantless seizure and would unfairly punish federal agents who did nothing wrong. The Chrisleys' motion to suppress should be denied, and the jury should not be prohibited from seeing highly probative evidence of their wire fraud crimes at trial.

**CONCLUSION**

For the reasons stated in this Post-Hearing Brief, the United States' Response Brief and its Sur-Reply, the Chrisleys' motion to suppress evidence should be denied.

Respectfully submitted,

KURT R. ERSKINE
    *Acting United States Attorney*

/s/THOMAS J. KREPP
        *Assistant United States Attorney*
    Georgia Bar No. 346781
    thomas.krepp@usdoj.gov

/s/ANNALISE K. PETERS
        *Assistant United States Attorney*
    Georgia Bar No. 550845
    annalise.peters@usdoj.gov

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Counsel for Todd Chrisley

Counsel for Julie Chrisley

Counsel for Peter Tarantino

July 7, 2021

/s/ THOMAS J. KREPP

THOMAS J. KREPP
*Assistant United States Attorney*