**IN THE UNITED STATES OF AMERICA
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| **v.** | : | **CRIMINAL CASE NO.** |
| **TODD CHRISLEY and** | : | **1:19-CR-297-ELR-JSA** |
| **JULIE CHRISLEY,** | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENATION ON MOTIONS TO SUPPRESS EVIDENCE FROM WARRANTLESS SEARCH

In March 2017, the Georgia Department of Revenue ("DOR") forced its way into a locked storage facility leased by the Chrisley Defendants (hereinafter, "Defendants'"[1]) without a warrant. The DOR seized and searched through financial records, and then later disclosed the contents of those records to the IRS and FBI. The Court easily finds, and the Government concedes, that these actions by the DOR violated the Defendants' Fourth Amendment rights. Defendants thus move to suppress the incriminating materials found therein. *See* Motions [36][41].

Although the Government concedes that the DOR violated the Defendants' Fourth Amendment rights, the Government contends that suppression should be denied. The Government argues that the state civil investigators that it contends

---

[1] The third Defendant, Tarantino, is not a movant. Thus, the term "Defendants" as used herein refers solely to the Chrisley Defendants.

were primarily in charge of the operation would not have been deterred by the prospect of evidence being suppressed in this separate federal criminal case, and that the purposes behind the exclusionary rule would not be served here.

After a two-day evidentiary hearing, the Court finds, importantly, that the federal personnel handling the instant case did not participate in any violations themselves. Nevertheless, the remaining facts strongly support application of the exclusionary rule. Whatever the immediate purposes of the search, the prospect of a potential future criminal case was at least clearly foreseeable and within the interests of the relevant DOR officials, which included DOR's most senior criminal investigative agents. Indeed, as the facts established in the hearing showed, the line between criminal and civil within the DOR was substantially blurred in this case. The Court thus finds that the prospect of suppression of evidence would have deterred the officers involved in the search from violating Defendants' rights, or at least would deter reasonable officers in the future. The exclusionary rule should apply, and the Court **RECOMMENDS** that the Motions be **GRANTED**.

I.     **FACTS**

The instant motions relate to a search of a warehouse at a business referred to as Printers and Parts, located in Duluth, Georgia, at which the Defendants were

leasing secured space to store personal items as of March 2017 (the

"Warehouse").[2]

The tax investigations by Georgia's DOR began in approximately 2014. Josh

Waites, then the Director of DOR's Office of Special Investigations ("OSI"),

learned that the Defendants, who were "Reality TV" celebrities, may have failed to

report income. He asked fellow DOR employee Katie Vancil to investigate. Tr.

[92] ("Tr. I") at 81-82. OSI is the criminal investigative unit within the DOR,

whereas Vancil worked under the Compliance Division, which conducts civil tax

assessment, delinquency and collection functions. Tr. I at 74-76. Vancil has always

worked in a civil function at the DOR, whereas Waites was the chief criminal law

enforcement officer in charge of investigating violations of Georgia's criminal

laws against tax evasion and related offenses. Waites has since been terminated by

DOR for unrelated misconduct.

Vancil's initial computer checks determined that Defendants were indeed

delinquent in their taxes, but Vancil otherwise suspended any further inquiry

because the pending bankruptcy case impacted DOR's ability to recover. *Id.* at 83.

---

[2] The record includes substantial testimony and other evidence as to the
Defendants' leasing of the Warehouse and the ways in which the materials stored
there by Defendants were kept secure. *See* Generally Tr. [92] ("Tr. I") at 8-61. The
Court has considered the evidence on this point and finds that the Defendants have
established sufficient expectations of privacy vis-à-vis the Warehouse to seek
redress against alleged unconstitutional intrusions. The Court declines to discuss
this issue in more detail as the Government does not contest Defendants' standing.

Waites kept tabs on the matter, however, and in 2016 instructed Vancil to recommence her inquiry upon the termination of the bankruptcy case. *Id*. at 84. Vancil proceeded to engage in tasks such as subpoenaing bank records, gathering information from the bankruptcy trustee, and analyzing Defendants' financial situation. Tr. I at 84-87. Through these efforts, Vancil determined that Defendants were delinquent to the state to the tune of over $1 million. Tr. I at 158.

Although Vancil's role within DOR was solely on the civil tax collection side, Waites and another OSI criminal investigator, LaShawn Wright, asked Vancil for periodic updates. Tr. I at 130-131. Waites also participated in the Compliance Division's meetings about this investigation, including in December 2016 and February 15, 2017. *Id*. at 85-87, 93-5. Indeed, Vancil believed that Waites was taking an unusual interest in this case and at one point she complained to one of her supervisors. *Id.* at Tr. 122-123. Vancil even felt like she was being used as a "puppet" by Waites. *Id*. at 143. It was also apparently known within DOR, despite the case purportedly being a civil matter, that Waites had a photograph of Defendant Todd Chrisley on a dartboard in his (Waites's) office. *See id.* at 201

Vancil and several other employees and supervisors from the civil enforcement side of DOR's operations attended the February 2017 meeting, including Staci Guest, an attorney who oversaw the Compliance and Audit Divisions. Waites also attended. Among the topics discussed at the meeting was

whether OSI would formally open a criminal investigation into the Defendants. Despite the clear and obvious interest from OSI and Waites, Guest answered that question in the negative, stating that the inquiry "would remain a civil collection case" and would not be a criminal case, at least at that time. *Id*. at 95-96, 233. However, apparently unknown to at least Guest, Waites and another OSI officer opened a criminal investigative file anyway in the days immediately after the meeting. *Id*. at 140; Gov't Exs. 200, 226.

During this time, Waites and other OSI criminal investigators exerted substantial direction over the purportedly civil tax collection investigation. A few days after Guest declared that the matter would remain a civil one, Waites participated in a witness interview in which he fed Vancil questions to ask the witness. *Id*. at 153-155. Shortly thereafter, Waites also caused Vancil to request information about Defendants' finances from the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCen"). *Id*. at 140-142[3]. Waites provided the FinCen form to Vancil and instructed her as to how to fill it out, because she had never used this tool and was unfamiliar with it. *Id*. (Which is not

---

[3] FinCen was created in furtherance of Section 314(a) of the USA Patriot Act of 2001 (P.L. 107-56), and its implementing regulations, 31 CFR Part 1010.520. The applicable provisions generally require financial institutions to search their records and identify if they have responsive information in response to a request from a law enforcement agency regarding a subject reasonably suspected based on credible evidence, of engaging in terrorist acts or money laundering activities.

surprising, since Vancil was a civil officer involved in collecting debts, and the FinCen database is accessible only to "[a] law enforcement agency investigating terrorist activity or money laundering," 31 C.F.R. 1010.520(b)).

At Waites's direction, and despite Guest's declaration that this case was solely a civil matter, Vancil stated on the form that the request was for purposes of a "tax evasion" investigation. *Id*. But as noted above, even this arguably false representation would not have been sufficient to obtain information from FinCen, because the information in this highly confidential database is only available for investigations of "terrorist activity or money laundering." Thus, apparently unbeknownst to Vancil, another OSI agent subsequently altered the form to say that DOR was also investigating the Defendants for "money laundering." *Id*. at 142; Gov't Ex. 226. All of this occurred in the days after Guest declared that the Chrisley investigation was solely a civil tax collection matter.

Ultimately, Vancil's and Waites's joint witness interviews revealed that the Defendants stored materials at unknown storage facilities, which Defendants were planning on liquidating. *Id*. at 154-155. Vancil immediately began discussing the matter with Waites via text message. *Id.* at 154-157; Def. Ex. 18. At one point, Vancil discussed steps to try to identify the location of the facility, and Waites responded, "Awesome, Me and some agents can go look!!" Def. Ex. 18.

To begin the process of being able to seize and levy on any such materials, if they could be found, Vancil prepared civil levies and jeopardy assessments, Def. Ex. 24-25, which Waites personally took the initiative to drive to Tennessee to serve on Defendants. *Id*.; Def. Ex. 21. Vancil explained that it was unusual for a DOR OSI agent to serve such paperwork. *Id*. at 159-160. Nevertheless, Vancil throughout this time seemed to readily accept and even reach out for the support of Waites and OSI. In text messages apparently discussing the service of this paperwork or related matters, Vancil texted Waites to say, "Don't leave the building without talking to me. We are hatching a plan," to which Waites responded, "I hope the plan includes me being in Nashville [where the Chrisley Defendants resided] at 9:00 am cause I'm meeting a sergeant there at 9:00." Def. Ex. 18. When Waites reported to Vancil on the day of the incident in Nashville that they only used "2 unmarked cars" to confront and serve the Chrisleys, Vancil responded, "no lights? Disappointing." Def. Ex. 18.

Shortly thereafter, through a review of bank records, Vancil identified the Warehouse as a location potentially housing the material referred to by the witness. Tr. I at 96, 103-105, 207-208. She and other Compliance Division employees went to the facility on March 27, 2017 with their levy, and Vancil reported the address to Waites via text. *Id*.; Def. Ex. 18. Waites stated that he dispatched another OSI agent. Def. Ex. 18 ("Brian is on the way"). At the outset, two OSI officers, not

initially including Waites, were present, ostensibly for "security." *Id.* at 105-106, 172-173. Upon learning of the volume of materials potentially present at the storage facility, however, Waites also arrived. *Id*. at 104-107. Waites with his police lights flashing, but then told fellow DOR officers to lie, by "tell[ing] people he had not been there." *Id*. at 173.[4]

The Defendants' property stored at the Warehouse was behind locked gates and mostly not visible from the outside of the facility. *See* Tr. at 27-38. It is undisputed that the DOR possessed no warrant, and the Government does not claim that DOR entered the facility based on consent or any other exception to the warrant requirement, or any other legal basis. The Government's witnesses, including Vancil, offered very few details as to how the DOR gained access to the inside of this locked facility.

The property manager of the Warehouse provided more detail as to what happened:

> They came into my warehouse with a piece of paper and said that they were there to seize the Chrisleys' property, and I told them that they weren't touching anything until I figured out what was going on. Just because you have a piece of paper, I wasn't just going to take that and let them take everything. So I tried to get in touch with the Chrisleys, and at first I wasn't able to get in touch with them. And the woman that first came in was, you know -- she said, we're not leaving here

---

[4] There is no indication that anyone lied about Waites presence, as he apparently asked people to do.

until we seize this property, and then another guy came in and started, basically, harassing me.

Q. In what ways?

A. Huh?

Q. In what way or ways do you feel harassed?

A. Well -- well, they told me they aren't leaving my property until they took that stuff out and being very -- just aggressive. And when I told them that I was going to call the police because I felt like I was being attacked, he told me that he was the police and if I didn't cooperate that he was going -- he was going to put me in handcuffs and take me to jail.

Q. Do you have any idea who the identity of this person was?

A. His name was Josh.

Q. His name was what?

A. His name was Josh.

Tr. at 36-38.

Apparently based on these threats and the purported authority of some "piece of paper" that was not a warrant, the DOR, including its chief criminal investigator, "Josh [Waites]," who represented himself as "the police," forced their way into the facility and thereby accessed the substantial amount of property and other materials stored by Defendants inside.

Because they were unprepared to take custody of such a massive amount of material, Vancil and her colleagues returned the following day with a private moving company (Two Men and a Truck) to seize and haul off the contents. *Id*. at

106-110, 220-223. Most of the seized material consisted of furniture and other personal property, but the DOR also seized approximately 20 boxes containing documents and other materials, some of which ended up containing what was later determined to be incriminating, forged bank records. *See* Tr. at 117, 163, 167. It was unusual to seize the entirety of all materials found at a location, including mere documents, for purposes of a civil tax collection levy. *Id*. at 174. There is no indication that DOR obtained any warrant or obtained consent to re-enter the facility on that following day to seize the contents.

Sometime in the days or weeks after the seizure, Vancil discovered the obviously-forged bank records as among the records that were obtained. Although she had generally kept Waites updated and coordinated with him on various issues throughout the investigation, she claimed that she made no efforts to engage OSI about this clear evidence of fraud, because Guest had previously stated that this matter would remain only a civil case. Tr. at 112, 206.

For some time even prior to the Warehouse search, Vancil was also aware that the IRS had filed a federal tax lien against the Chrisleys. Vancil had been in touch with civil IRS officials back in February 2017 to negotiate a coordinated collection effort. Tr. I at 90-93, Gov't Ex. 101. Vancil also informed an IRS Revenue Officer about the intent to seize and auction off materials from the storage facility. Tr. 1 at 97, 157; Def Exs. 18, 21. After the Warehouse search, Vancil

notified her civil investigative counterparts at the U.S. Internal Revenue Service about the developments, although she initially did not discuss the incriminating bank records. Tr. II [93] at 80-81.

These initial discussions with IRS were with civil collection officials. At some point in late March 2017, shortly after the Warehouse seizure, Vancil also received a telephone call inquiring about the case from IRS Criminal Investigations Special Agent Larry Arrow. Vancil testified that Arrow demanded "everything" that the DOR had on the Defendants.  Tr. I at 212. Arrow testified that he was asked to investigate the matter from his supervisor, and that his office had initially learned about the potential matter from public news reports about the Defendants' financial problems. Tr. I at 254; Tr. II at 6, 32-33, 36, 47. Arrow regularly communicated and coordinated with counterpart agents within OSI, and received case leads and other assistance from OSI, because of the large number of overlapping cases and investigations that inherently involve the jurisdictions of these related agencies. Tr. II at 6-7, 39-41, 53, 71-73. Indeed, the testimony shows that IRS and OSI criminal investigators were jointly working several overlapping investigations and cases together during this time. Arrow testified, however, that he had not received any specific tips or leads from OSI about this case at least until later in the investigation. Tr. II at 7, 33.

In the March 2017 conversations between Arrow and Vancil and her supervisors, DOR did not share any specific information learned in the investigation including the existence of forged documents (which Vancil explained she was not yet aware of at that time). Tr. I at 165.

Arrow shortly thereafter opened a preliminary IRS criminal investigation into the Defendants, which then was upgraded to a formal investigation after receipt of a referral from an examiner in the civil section of the IRS in July 2017. Tr. II at 16-17, 71. Eventually, in or about January 2018, Arrow, along with representatives of the FBI and U.S. Attorney's Office, met with DOR officials, including Waites, and learned about the Warehouse search and the materials seized, including the forged bank records. Tr. II 19-27, 47. The federal agents then sought and obtained search warrants, from another U.S. Magistrate Judge, allowing them to seize these materials from DOR's possession. Tr. I at 65-69, Tr. II at 21-25. The federal agents had evidently been told by DOR prior to obtaining these warrants about the incriminating contents of the seized financial records, as Agent Arrow's affidavit applying for the warrants described the forged bank records that he expected to find.  *See* [36-4] at pages 24-26.

**A. DISCUSSION**

**1.** *Legal Standards*

A warrantless entry by government officers into a home, or other premises in which an individual has a protected Fourth Amendment privacy interest, is presumptively unreasonable. *See United States v. Tovar-Rico*, 61 F.3d 1529, 1534 (1995). The Supreme Court has long held that even where Government officers have the legal right to seize and levy on a person's property, for debt collection or repossession purposes, the officers must separately obtain a warrant to enter protected premises for purposes of doing so. *See G.M. Leasing v. United States*, 429 U.S. 338, 355, 97 S. Ct. 619, 630 (1977); *Retirement Care Associates, Inc. v. United States*, 3 F. Supp. 2d 1434, 1443 (N.D. Ga. 1998) ("Where IRS agents enter private premises to find and levy upon property of a taxpayer, that entry must be pursuant to a valid warrant."). The Government here concedes that Defendants possessed a protected Fourth Amendment privacy interest in the Warehouse, and that the DOR violated Defendant's Fourth Amendment rights by forcing its way into the Warehouse without a warrant, even if just to seize property for collections.

What the Government contests, rather, is the remedy demanded by the Defendants for this illegal seizure of evidence, that is, suppression of the evidence at trial. Suppression is the usual remedy for a Fourth Amendment violation. *See Mapp v. Ohio*, 367 4 U.S. 643, 645 (1961). Nevertheless, "that a Fourth

Amendment violation occurred … does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140-141 (2009).

Among other things, courts look to the extent of official misconduct, because "'the deterrent value of the exclusionary rule is most likely to be effective' when 'official conduct was flagrantly abusive of Fourth Amendment rights.'" *Id*. at 143 (*quoting Brown v. Illinois*, 422 U.S. 590, 610-611 (1975)). The courts also assess the proximity or remoteness between the "offending officer's zone of primary interest" and the subsequent use of that evidence that the defendant seeks to suppress. *United States v. Janis*, 428 U.S. 433, 458 (1976).  Most fundamentally, the "benefits of deterrence" by applying the exclusionary rule in a given scenario, in terms of preventing future violations, must outweigh the societal costs, that is "the rule's costly toll upon truth-seeking and law enforcement objections …." *United States v. Leon*, 468 U.S. 897, 908 (1984); *Herring*, 555 U.S. at 141.

### 2. *Application Of The Relevant Factors*

The Court has already noted that it finds no culpability at the hands of any members of the federal prosecution or investigative team. This is important. Nevertheless, the Government may still bear the cross of the DOR's prior illegal actions. Where a state law enforcement agency obtains evidence in violation of an individual's constitutional rights, the exclusionary rule cannot be avoided by simply providing that evidence to counterpart federal authorities. *See Elkins v.*

*United States*, 364 U.S. 206 (1960) (exclusionary rule generally applies where illegally-obtained evidence provided, as if on a "silver platter," from offending state agency to innocent federal agency); *Preston v. United States*, 376 U.S. 364, 366 (1964) ("The question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers.")

Thus, the Court must focus on whether the DOR's actions should trigger the exclusionary rule. In other words, the Court looks to whether the prospect of suppression here would deter DOR (or a similar agency) from committing, and/or prompt it to take better care to prevent, future constitutional violations of this sort.

As noted above, the *Herring* factors start with assessing the extent of the misconduct. That factor weighs strongly in favor of suppression. That state officers cannot just force their way into locked premises to seize property—with no warrant—is not a close call. Whether for purposes of civil or criminal enforcement, or both, the actions of DOR here were clearly in violation of Defendants' Fourth Amendment rights. Even without any further aggravating evidence as to the circumstances of the search, this clear intrusion weighs strongly in favor of applying the exclusionary rule.

There is additional aggravating evidence in the record, however. According to the Warehouse property manager, the investigators waved some "piece of paper" in front of her in a false claim of lawful authority, asserted that they "would not leave" without taking Defendants' property, and even went so far as to threaten to arrest her if she did not cooperate.  The Government, which generally bears the burden of proof to show the reasonableness of warrantless police conduct, does not specifically contradict these assertions or offer a substantially different version of events. The uncontradicted facts in the current record therefore suggests that these officials forced entry into protected premises through threats and bogus claims of authority. This would easily show the sort of willful, reckless, or at least grossly negligent conduct for which the exclusionary rule is most effective to deter.

Whether the Government's current use of this evidence in this criminal case is within the offending DOR officers' "primary zone of interest" is a more factually complicated question. The Government asserts that the decision to enter the Warehouse without a warrant was made by Vancil and other civil employees, who were not generally responsible for or interested in preserving evidence for use in a criminal case. More specifically, according to the Government, Guest had previously declared, and Vancil believed, that this investigation was to be exclusively civil. The Government thus argues that Vancil and other civil officials

did not or could not have even foreseen the use of this evidence in this future, related criminal case.

The analysis centers on whether "the particular challenged use of the evidence is one that the seizing officials were likely to have had an interest in at the time." *Tirado v. C.I.R.*, 689 F.2d 307, 311 (2nd Cir. 1982). The Court cannot accept the Government's position that the DOR investigators involved in the Warehouse search would not have sufficiently cared about the potential use of evidence in a later related criminal tax or fraud proceeding brought by DOR or a similar agency. The Court instead finds that the use of the evidence in this case was sufficiently within the DOR's "zone of interest"—and that of its civil enforcement personnel specifically—such as to support application of the exclusionary rule. Several considerations lead to the Court's findings in this regard.

First, that this is a federal case handled by the IRS does not take it out of the DOR's zone of interest. The DOR and IRS are cousin agencies with overlapping missions, and the testimony in this case confirms that they routinely (and appropriately) cooperate and share information in pursuing similar charges and remedies and common subjects. The DOR would not likely be indifferent to its employees committing constitutional violations that would limit its ability to cooperate with its regular partners, such as the IRS.

Second, more specifically, the DOR itself includes both civil and criminal investigative responsibilities under its own roof. It is hardly unforeseeable to the civil side of the DOR "house" that the fruits of its investigations into unpaid taxes and attempts to hide and liquidate assets might end up being used in a future criminal tax evasion or other related criminal cases. And it would be well within the zone of interest of any reasonable and competent DOR investigator—civil or criminal—to ensure that the most egregious tax violations be subject to potential criminal penalties. Anything else would flout the DOR's overall interest in collecting taxes, enforcing tax laws and punishing and deterring violations.

Nor does the Court accept that DOR failed to foresee the possibility of this related criminal case. Vancil and other civil officers may have undertaken the operation for the immediate purposes of the civil case. But the Court does not credit the claim—based on Guest's statement in February 2017 that the case would be "a civil matter"—that a final, irrevocable decision had been made foreclosing any possible criminal involvement. After all, the DOR had already received evidence that the suspects had failed to report over a million dollars of income, were deliberating planning to liquidate assets, and had claimed bankruptcy despite enjoying substantial income. Given the somewhat fine line separating civil and criminal intent, a competent agency necessarily could not have made a final decision as to whether this case warranted criminal action until more facts were

known, including the results of the search. Guest's February 2017 comments therefore must have simply reflected, and would have been understood by reasonable and competent officials as, just a current assessment of the case based on the facts known at that time. For all these reasons, the prospect of a potential criminal case was still foreseeable to, and would have been important to the interests of, DOR at the time of the Warehouse search.

Moreover, and perhaps most importantly on the facts here, it is simply not true that this matter was a purely civil case within the DOR. Waites and other criminal investigators exerted heavy influence over and interest in this case, opened an actual criminal investigation despite whatever Guest otherwise stated, jointly interviewed witnesses, used criminal investigative tools to benefit the investigation, and directly participated in the constitutional violation itself.

Notably, it was Waites who directed Vancil to begin an inquiry in the first place, and then to reopen that inquiry when the Defendants' bankruptcy case terminated. Vancil acknowledged feeling like Waites's "puppet" throughout this saga. Indeed, despite being on the civil side of the DOR, Vancil kept Waites and other criminal agents informed of the investigation, let Waites feed her questions to witnesses, and followed the directions of Waites and/or other OSI agents to fill out a "FinCen" financial crimes investigation form representing (arguably falsely) that the inquiry involved "tax evasion." While Vancil claimed that she believed that the

case would proceed exclusively as a civil collection matter, she herself (Vancil) filled out the FinCen forms just three days after Guest supposedly made that declaration, stating that the case was a tax evasion investigation.

Waites and/or other OSI criminal agents also personally (and unusually) served the levy paperwork that was the supposed basis for the seizures and were present at the Warehouse search. Their presence was ostensibly for security, but according to the property manager, Waites overtly claimed that he "was the police," and threatened her with arrest if she did not cooperate in allowing DOR into the facility. An unnamed female DOR official who appeared to be in charge (seemingly likely to have been Vancil) similarly threatened that "we aren't going anywhere" without Defendants' property. Waites even went so far as to ask other DOR officials to lie about whether he was even present there, seemingly understanding that his role and actions during the search were not appropriate.

These facts, at a minimum, show a blurring of the ostensible line between the criminal and civil side of the DOR house in this case. The Court does not question that there was a genuine civil investigation, with goals to enforce the civil remedies available to DOR. But this civil investigation was at least partially run by a law enforcement agent as puppet master, who had opened his own criminal investigative file, and likely hoped to one day bring formal criminal charges as well. And the Court cannot find that relevant civil personnel were entirely free

from suspecting that they were being used to further the interests and aspirations of criminal investigators. Indeed, it clearly benefited the purposes of the civil investigation to join hands with OSI, interview witnesses together, use criminal investigative tools together, and gain entry into protected premises together through threats of arrest. Indeed, while Vancil expressed frustration in her testimony as to Waites's unusual interest in the case, the contemporaneous correspondence shows that it was Vancil who reached out to Waites about wanting to "hatch a plan" regarding the potential search and/or service of the paperwork, and who expressed disappointment that Waites did not flash his police lights to intimidate the Defendants.

The Government proposes that the Court now disassociate the civil and criminal sides of the DOR house that became so intermingled during the events of 2016-2017, and find that the civil personnel had no inkling as to or interest in possible future criminal action. The Court simply cannot find on the Government's favor on this record.

Of course, there is nothing inherently wrong with civil investigators cooperating and coordinating with their criminal counterparts, either within the same agency or others. The public interest can be greatly furthered by such cooperation, which as a general matter is entirely appropriate and legal. The Court does not suggest, in other words, that civil and criminal investigators within DOR

or other agencies cannot work together, coordinate, and even take steps such as to jointly interview witnesses.  The instant motions do not challenge, and this Report and Recommendation does not criticize, the propriety of such parallel investigations generally, or even of this one specifically.

The narrower question presented here is simply whether the exclusionary rule would be an effective deterrent to unconstitutional governmental action on the facts of this case. The answer is clearly yes. The exclusionary rule is plainly more likely to deter officers, even ones with exclusively civil roles, who are engaged in overlapping, cooperative inquiries with criminal colleagues. When civil and criminal investigators work so closely to further their complementary missions, in other words, it becomes harder for the civil side to later claim they had no interest in what the criminal side was working on. At a minimum, the dual-purpose agency for whom both civil and criminal sides work would have every incentive to engage in better training and supervision to prevent evidentiary suppression in a case such as this, which directly impacts a case within its clear zone of interest.

The facts here are very different from those cases primarily relied upon by the Government. *Herring*, for example, concerned a search-incident-to-arrest by a particular police department, based on another department's pending warrant, notwithstanding that (without any knowledge on the part of the arresting department), the warrant was supposed to have been withdrawn. 555 U.S. at 137-

138. The Court found this problem to be akin to a mere recordkeeping or clerical error, and that such ordinary negligence would not likely be deterred by application of the exclusionary rule. *Id.* at 136. The case here is not a mere clerical error, but rather a deliberate trespass into Fourth Amendment protected premises. The exclusionary rule would clearly be more effective in a case, such as this, where officers knew or clearly should have known as to the illegal nature of the entry.

In *Janis*, 428 U.S. at 458, the issue was whether evidence originally obtained by local officers in a state criminal gambling investigation, which had already been suppressed in multiple criminal cases, should <u>also</u> be suppressed in a later civil federal tax case. The Supreme Court answered that question in the negative, noting that suppression in an unrelated federal civil case well outside of the subject matter investigated by the offending local police officers would not have mattered to those officers, at least not above and beyond the far more consequential sanction of suppression in the criminal cases. Apart from the superficial similarity of a case also involving the IRS, *Janis* is obviously distinguishable. The suppression of evidence in a criminal tax case would have been far more important to the DOR investigators than the prospect of future civil tax collection problems would have been to a local sheriff investigating gambling.

Also distinguishable is *United States v. Medina*, 181 F.3d 1078 (9th Cir. 1999). In that case, a local airport security officer seized a firearm from

Defendant's luggage, and a local police officer seized another firearm pursuant to a traffic stop. When those firearms were later connected to an unrelated federal bank robbery case several months later, the Defendant moved to suppress in that later case, arguing that the original searches and searches were illegal. The Ninth Circuit affirmed denial of the motion without a hearing, because regardless of any original illegality, there were no alleged facts suggesting that the officers undertaking those searches had any connection to or knowledge of or interest in any unrelated, later federal bank robbery case. *Id*. Similarly, *United States v. Bates*, No. 16-20044, 2016 WL 11479286, at *2 (W.D. Tenn. June 28, 2016) concerned whether property initially obtained by county sheriffs in executing a levy for property based on a private civil judgment, including firearms, should be suppressed in a subsequent unrelated federal prosecution. The Court declined to recommend application of the exclusionary rule in that case, reasoning that the county sheriffs clearly had no subsequent federal firearms prosecution in mind, or within any possible zone of interest, as of when they entered the premise.

By contrast to those cases, there is a clear connection here between the intermingled civil and criminal sides of the DOR operation as it related to this investigation, as well as between the DOR and its federal counterpart with overlapping tax prosecution interests, the IRS. The DOR investigators involved in this case – civil and criminal – would have been sufficiently interested in the

potential use of the evidence in subsequent interrelated criminal tax and financial cases to be deterred by suppression. This differs from the factual scenario in *Medina*, *Bates* and other cases relied on by the Government. A somewhat closer factual fit is the district court's opinion in *United States v. Cordero-Rosario*, 252 F. Supp. 3d 79, 92 (D.P.R. 2017). In that case, the Court applied the exclusionary rule in a subsequent federal prosecution based on violations that occurred in a prior state investigation, because the state investigators clearly were not disinterested in the "not so independent" coordinated and related federal investigation. *Id*. Similar principles support suppression here.

The Court acknowledges that the federal investigators obtained a formal warrant to allow them to take the material that was in DOR's possession. But the fact that the FBI or IRS obtained an after-the-fact warrant does not resolve or cure the original Fourth Amendment violation that led to the material being in DOR custody in the first place. Indeed, the federal warrant application itself expressly references what DOR told the agents about the contents of the seized material, that is, forged bank records. In other words, IRS only knew what these documents showed because DOR illegally seized them from private premises in the first place, and then told IRS what those documents contained. On these facts, the federal warrant was hardly independent of the illegality and its issuance simply has no

impact on the deterrence analysis.[5] To the contrary, excusing suppression based on this after-the-fact warrant, that was itself obtained based on the illegally seized information, would if anything eviscerate the deterrent impact of the exclusionary rule. This result would simply re-instate a "silver platter" loophole. *See Elkins*, 364 U.S. at 206.

## III.   CONCLUSION

In the end, the Court has carefully considered the evidence and arguments on this fact-intensive issue and finds that the exclusionary rule should apply in this case.

Thus, the Court **RECOMMENDS** that the Defendants' Motions to Suppress related to the Warehouse search, that is, Motions Nos. [36][41], be **GRANTED**.

**IT IS SO RECOMMENDED** this 30th day of August, 2021.

_____
**JUSTIN S. ANAND**
**UNITED STATES MAGISTRATE JUDGE**

---

[5] Indeed, the Government does not assert an independent source argument, that is, that the IRS or FBI were aware of the existence of these documents and the probable cause basis for seizing them independently of the information learned from DOR, including the information provided as to the contents of the forged bank records.