```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3
    UNITED STATES OF AMERICA,        )
 4                                   )
                    Plaintiff,       )   CRIMINAL ACTION FILE
 5           v.                      )   NO. 1:19-CR-00297-ELR-JSA
                                     )
 6   TODD CHRISLEY a/k/a MICHAEL     )
     TODD CHRISLEY, JULIE CHRISLEY,  )
 7   and PETER TARANTINO,            )
                                     )   PRETRIAL CONFERENCE
 8                   Defendants.     )
    _____  )
 9

10

11   ------------------------------------------------------------

12            BEFORE THE HONORABLE ELEANOR L. ROSS

13              TRANSCRIPT OF PROCEEDINGS

14                    APRIL 14, 2022

15   ------------------------------------------------------------

16

17

18      Proceedings recorded by mechanical stenography
           and computer-aided transcript produced by
19

20            WYNETTE C. BLATHERS, RMR, CRR
                 Official Court Reporter
21                1714 U.S. Courthouse
                 75 Ted Turner Drive, SW
22              Atlanta, Georgia  30303
                    (404) 215-1547
23

24

25
```

```
 1   APPEARANCES:

 2
     For the Plaintiff:          THOMAS J. KREPP
 3                               ANNALISE K. PETERS
                                 AMY PALUMBO
 4                               Office of the U.S. Attorney
                                 Northern District of Georgia
 5                               600 United States Courthouse
                                 75 Ted Turner Drive SW
 6                               Atlanta, Georgia  30303

 7   For the Defendant:          BRUCE H. MORRIS
                                 Finestone Morris & White
 8                               3340 Peachtree Road NE
                                 2540 Tower Place
 9                               Atlanta, Georgia  30326

10                               CHRISTOPHER S. ANULEWICZ
                                 JONATHAN R. DELUCA
11                               Attorneys at Law
                                 Balch & Bingham LLP
12                               30 Ivan Allen Jr. Boulevard NW
                                 Suite 700
13                               Atlanta, Georgia  30308

14                               STEPHEN M. FRIEDBERG
                                 Attorney at Law
15                               Resurgens Plaza
                                 945 East Paces Ferry Road
16                               Suite 2250
                                 Atlanta, Georgia  30326
17
                                 DANIEL P. GRIFFIN
18                               Attorney at Law
                                 Griffin Durham Tanner & Clarkson
19                               75 14th Street
                                 Suite 2130
20                               Atlanta, Georgia  30309

21

22

23

24

25
```

```
 1                    Thursday Morning Session

 2                      April 14, 2022

 3                        10:00 a.m.

 4                         -  -  -

 5                 P R O C E E D I N G S

 6          COURTROOM SECURITY OFFICER:  All rise.  This

 7 Honorable Court is again in session.

 8          THE COURT:  Thank you.  Good morning.  Please be

 9 seated.  All right.  My apologies that we are starting a

10 little late.  Our last hearing ran over just a little bit.

11          So I now call the case of United States of America v.

12 Mr. Todd Chrisley a/k/a Michael Todd Chrisley, Julie Chrisley,

13 and Peter Tarantino.  This is Case 19-CR-297.  We are here, of

14 course, for a pretrial conference in anticipation of trial to

15 begin Monday May 16th, 2022.

16          On behalf of the government, please announce your

17 appearance for the record.

18          MR. KREPP:  Good morning, your Honor.  Thomas Krepp

19 and Annalise Peters for the United States, and also at

20 counsel's table we have our paralegal, Ms. Shannon

21 Dyer-Vencill, and our three case agents, Agents Chip Cromer,

22 Steve Ryskoski, and Brock Kinsler.

23          THE COURT:  All right.  Thank you so much.

24          Paralegal, repeat your name for me, please.

25          MS. DYER-VENCILL:  Ma'am, Shannon Dyer-Vencill.
```

```
1              THE COURT:  Vencill.  Okay.  Thank you.  I don't
2    think I've had you in court before, so I don't think we've met
3    before.  Good morning to all of you.
4              All right.  And on behalf of each defendant in the
5    order in which I call them, Mr. Chrisley, Ms. Chrisley, and
6    Mr. Tarantino, please announce your appearance for the record.
7              MR. MORRIS:  Good morning, your Honor.  Bruce Morris
8    for Michael Todd Chrisley.
9              THE COURT:  All right.  Good morning.
10             MR. FRIEDBERG:  Good morning, your Honor.  Steve
11   Friedberg on behalf of Julie Chrisley.
12             THE COURT:  Good morning.
13             MR. ANULEWICZ:  Good morning.  Chris Anulewicz and
14   Jonathan DeLuca on behalf of both Mr. and Mrs. Chrisley.
15             THE COURT:  Good morning to both of you.  And,
16   counsel in the back, please pronounce your name one more time
17   for me.
18             MR. ANULEWICZ:  Sure.  Anulewicz.
19             THE COURT:  I'll probably mess that up the first
20   couple of times, but I'll get it before the end.  Thank you.
21             MR. GRIFFIN:  And I'm Danny Griffin, your Honor.  I
22   represent Peter Tarantino.
23             THE COURT:  Good morning to you too.  And are your
24   clients here or have they waived their presence?  I'll begin
25   with you, Mr. Morris.
```

1           MR. MORRIS:  Mr. Chrisley waives his presence for

2   purposes of the pretrial conference, your Honor.

3           THE COURT:  All right.  Mr. Friedberg.

4           MR. FRIEDBERG:  Same announcement as to

5   Mrs. Chrisley, your Honor.

6           THE COURT:  One more time, do you pronounce -- oh,

7   oh, no.  I don't need a pronunciation.  Yes.

8           MR. GRIFFIN:  As does Mr. Tarantino.  He waives.

9           THE COURT:  Okay.  Didn't need it that time.  All

10  right.  Thank you so much.

11          Okay.  First things first.  We are scheduled to begin

12  at 9:00 a.m. on May 16th, but before I mention this let me do

13  it now before I mention it later -- before I forget to mention

14  it later.  There is a possibility that we will not start until

15  1:30 that day, and that is because although a lot of our

16  Covid-related restrictions have been lifted, one that has not

17  is the number of jurors that we can bring in at one time.  And

18  there is one judge ahead of us who if his trial does go

19  forward, our jurors cannot be processed until the afternoon.

20  So we'll keep that in mind.

21          It may work well for us since there is an issue of a

22  questionnaire that still needs to be completed possibly.  But

23  just keep in mind that we may not be going forward at 9:00.

24  We may be waiting until 1:30.  We'll know before trial begins.

25          Okay.  Just a couple of housekeeping things before we

1   get to the substantive issues that are before the Court.  I'd

2   like to find out from each side whether you are ready for

3   trial and who you identify as lead counsel.  So starting with

4   the government.

5           MR. KREPP:  Yes, your Honor.  The government is ready

6   for trial on May 16th, and I will be lead counsel.

7           THE COURT:  All right.  Defense in the same order

8   that we've been proceeding.

9           MR. MORRIS:  Please the Court, Bruce Morris for

10  Mr. Chrisley.  We are ready for trial on May 16th.

11          THE COURT:  All right.

12          MR. FRIEDBERG:  Steve Friedberg on behalf of Julie

13  Chrisley.  We'll be ready on the 16th as well, your Honor.

14          THE COURT:  All right.

15          MR. GRIFFIN:  Danny Griffin on behalf of

16  Mr. Tarantino.  We're ready for trial.

17          THE COURT:  All right.  Sounds good.  Thank you so

18  much.

19          All right.  Government, who on behalf of the

20  government will read the indictment?  Believe it or not I've

21  had a couple of cases where the government forgot to bring

22  their copy of the indictment.  Not a big deal, but in this

23  case because of the nature of the indictment and the length,

24  we need to have, first of all, a redacted indictment that does

25  not include the forfeiture language because I'm assuming that

1   would be bifurcated.  And then, second, for long or for

2   lengthy indictments like this, I usually ask the parties to

3   jointly submit a condensed version that is more along the

4   lines of what I would read in terms of a synopsis for my civil

5   trials.

6        So, government, first of all, who will be presenting

7   the indictment at trial?

8        MR. KREPP:  I'll present the indictment, your Honor.

9        THE COURT:  All right.  So, Mr. Krepp, later during

10  this pretrial conference when I do discuss deadlines, by the

11  applicable deadline, which is probably going to be May 9th,

12  the Court would ask to receive -- and all of this will be

13  memorialized in the pretrial order that we'll issue after this

14  conference.  But I will ask you to submit both a redacted one

15  that does not have the forfeiture language, which would be the

16  one to go back with the jurors, and also a condensed one,

17  which would be for the -- for you to read to the jury panel

18  prior to voir dire.

19       All right.  I'd like to also get an estimate from

20  each side as to how long you think the case will last.  I

21  understand in asking this, the defense, your response is based

22  largely on what the prosecution says and presents.  So I

23  understand that it's harder for you to give me your best

24  estimate, but clearly I just need to know some idea for

25  scheduling purposes.  I am not trying to bind anyone to these

1   estimates.  So government.

2           MR. KREPP:  We believe our case in chief will take

3   two and a half weeks, your Honor.

4           THE COURT:  All right.  And defense in the same order

5   if you have any idea of any presentation on your part.  But,

6   again, I understand that that is a difficult question for you

7   at this posture.

8           MR. MORRIS:  Judge, I would say at the outside five

9   days.

10          THE COURT:  Okay.

11          MR. MORRIS:  At the outside.

12          THE COURT:  All right.

13          MR. FRIEDBERG:  Same announcement on behalf of Julie

14  Chrisley, your Honor.

15          THE COURT:  Okay.

16          MR. GRIFFIN:  And one day for Mr. Tarantino.

17          THE COURT:  Okay.  Now, let me ask you, Mr. Morris

18  and Friedberg, when each of you says five days, are you saying

19  for your individual clients?  Are you estimating jointly

20  because you've discussed that or what, Mr. Morris?

21          MR. MORRIS:  I was including.

22          MR. FRIEDBERG:  It's cumulative, your Honor.

23          THE COURT:  Got it.  Okay.  That may be a little

24  longer than I thought initially, and I just want to -- let me

25  look at my calendar real quickly just to make sure where we

1    are because I think that will take us through the Memorial Day

2    weekend definitely.  Okay.  All right.  We may end up having

3    to push back the civil trial that I have scheduled immediately

4    after this one, but that won't be a problem.

5           All right.  Let's go ahead and discuss some motions,

6    the outstanding motions.  I'm going to start with the

7    non-motions in limine, and then we will get to the motions in

8    limine.  And then we'll get back to some more of the

9    housekeeping matters.  I'll give you some handouts, which also

10   will be emailed to you, but just to let you know how this

11   Court proceeds.  Some of what we'll discuss a little bit later

12   may be a little different since there is a request to use a

13   questionnaire, but we'll get to that in just a moment.

14          So the first thing I'd like to discuss is I did not

15   include the document here -- not the document number here, but

16   there was something that was just filed yesterday for the

17   government's determination of attorney-client privilege

18   information, and I believe I didn't include the document

19   number because what I got was a courtesy copy email.  Let me

20   see.

21          MR. KREPP:  Your Honor, just before the Court says

22   anything on the record, AUSA Amy Palumbo is in the courtroom.

23   She is a filter AUSA.  Ms. Peters and I and nobody on this --

24          THE COURT:  I understand.  It's Document 180, and I'm

25   not going to get into the substance of it.  But I will just

1  say -- and where is Ms. Palumbo?  Come on up.  Good morning to

2  you.

3          MS. PALUMBO:  Good morning, your Honor.

4          THE COURT:  And I'll note for the record Ms. Tarvin

5  is also in the courtroom.  You also are part of the filter

6  team; is that correct?

7          MS. TARVIN:  No, your Honor.  I'm just watching.

8          THE COURT:  Gotcha.  All right.  Come on up to the

9  podium, Ms. Palumbo, please.  And, again, I understand how

10 this works, that the filter team is separate and independent

11 from the trial team, so we won't discuss any substance.  And

12 I'll tell you I've not even reviewed any of the emails.  My

13 concern at this point is the timing of this.  This Court, of

14 course, has set in place deadlines for filing certain motions

15 so that I can rule on things in an appropriate time for trial.

16 And yesterday I got this, and I had been told April 5th.  And

17 that's when I learned for the first time that this was even an

18 issue.  But even then I was told that the filing would be made

19 in two days, April 7th.  It wasn't.  It was made yesterday

20 about 4:00 o'clock.

21          And so the Court is concerned, first of all, about

22 how I can go about scheduling to go through these emails that

23 need my review, and then, second, how I could schedule the

24 filing of any motions in limine and responses and all that

25 might come from the attorneys.  And I don't see a way to do

1   that without delaying this trial.

2           So I'd first ask you, is there some reason that this

3   filing wasn't made until yesterday?  Did you just get -- did

4   the government just get these emails recently?

5           MS. PALUMBO:  No, your Honor.  This has been an

6   ongoing project, and it has been an ongoing discussion with

7   counsel.  We've made great efforts to come to agreement on all

8   of the volume of emails that were provided to the filter team.

9   We did come to an agreement on about a thousand emails, your

10  Honor, and we have still been working on the outstanding

11  thousand emails to make sure that it's not an issue.  These

12  were just a discrete number that we've been discussing up

13  until --

14          THE COURT:  I understand all of that.  I'm asking

15  specific -- thank you.  And I don't mean to cut you off.  I'm

16  asking specifically about the timing and also the fact that

17  the Court wasn't made aware of this until April 5th, and so I

18  did not realize until then that I might need to account for

19  that in my timeline.  And so it's put me at a disadvantage

20  because I have no idea when I would review it and what kind of

21  briefing schedule I would allow for any motions to be filed.

22          And so at this point I understand everything that

23  you've said, and I appreciate that and appreciate that you

24  laid that out in your pleadings.  I don't know how often you

25  all do this and how often you all have filter teams, but is it

1  when you do it, do you adhere to the Court's scheduling or do

2  you just submit it whenever you all have finished your review?

3  And I don't mean to be a smart aleck by asking that.  I'm just

4  trying to figure out how we got here a little bit.

5       MS. PALUMBO:  Your Honor, I would have to defer to

6  someone who knows better.  This is my first filter review.  I

7  would obviously have preferred to comply with your Honor's

8  briefing deadline.  I was actually not aware of them.

9  Obviously, I had not filed a notice on this case, and that is

10  my fault that I was not aware of your schedule.

11       THE COURT:  Okay.  I will just tell you I don't know

12  how other judges do, but, I mean, I would imagine all of us do

13  the same thing.  We have to have some deadline in place so

14  that we can rule in time for court.  So I just think that if

15  you're on a filter team for a particular case, you've got to

16  familiarize yourself with the Court's deadlines so that you

17  don't put the Court at a disadvantage for reviewing these.

18       I am open to hear what suggestion you have, but,

19  again, it is my position and I appreciate the agreements on

20  this large number, but with respect to these 13 remaining, it

21  is my -- I'm open to hear your suggestion for me in terms of

22  how I manage this from the Court's perspective without

23  delaying my trial.

24       MS. PALUMBO:  Well, your Honor, I think there are

25  two -- well, without going into the substance of --

1          THE COURT:  Okay.  Then I'd ask the trial team to

2    remove yourselves briefly.  Thank you so much.  We won't take

3    long on this, but I want to go ahead and get to the heart of

4    this now.

5          (Whereupon, the trial team exited the courtroom.)

6          MR. GRIFFIN:  Your Honor, so I don't think this

7    involves Mr. Tarantino, and it does involve privileged

8    material.  I don't know that I should be here either.

9          THE COURT:  Okay.  I'll take your word on that --

10          MR. GRIFFIN:  I'm happy to be here and listen --

11          THE COURT:  I'll leave that to you all.  I won't get

12    involved in that.  I don't know if it involves him or not.  I

13    don't know much about these at all, so I'll leave that to the

14    attorneys.

15          MR. MORRIS:  I have no objection to Mr. Griffin

16    staying as long as that doesn't constitute a waiver of any

17    attorney-client privileged materials.

18          THE COURT:  Mr. Friedberg.

19          MR. FRIEDBERG:  Same announcement, your Honor.

20          THE COURT:  Anything from you, Ms. Palumbo, with

21    respect to Mr. Tarantino's attorneys --

22          MS. PALUMBO:  I take no position, your Honor.

23          THE COURT:  Okay.  All right.

24          MS. PALUMBO:  So, your Honor, my brief is set up in

25    two portions.  There's two distinct set of documents here.

1   The first relates solely to Julie Chrisley and Todd Chrisley's

2   emails that relate to the count for obstruction that is very

3   relevant and material to this case.  So if your Honor needed

4   to concentrate on one issue, that would be the one I would

5   suggest because I think those go to the heart of account

6   here --

7            THE COURT:  Let me start -- and I apologize.  I'm

8   just trying to manage our time the best way.  I'm not asking

9   you to make argument for the relevance or admissibility, why

10  they're needed.  I'm asking you strictly how am I supposed to

11  do this and keep my trial on time, just, you know, I don't

12  know how else to ask that.  But I am more than willing to work

13  overtime, so to speak, to plug this into my schedule to review

14  these.  But then I assume -- and you tell me if I'm assuming

15  incorrectly -- that the defense will probably want some time

16  to lodge some objections or motions in limine, and then there

17  might be some responses and replies.

18           So have you thought through some kind of proposed

19  timeline so that I won't have to delay this trial?

20           MS. PALUMBO:  Well, your Honor, my understanding --

21  not my understanding.  I know that defense has had these.

22  We've been talking about them.  I do believe two weeks would

23  be sufficient for any response, and I could do a two-day

24  response to that, if necessary.

25           THE COURT:  Okay.  So the Court has to at this time,

1  again, allow for some time to review these.

2          MS. PALUMBO:  Yes, your Honor.

3          THE COURT:  And it's about how many pages?  I know

4  it's about 13 emails.

5          MS. PALUMBO:  It's 13 emails, and the total of the

6  emails themselves, including their attachments, your Honor,

7  are 113 pages.

8          THE COURT:  Okay.  So I need to review 113 pages that

9  I was not aware of before last week, I believe, and then the

10 defense, you're suggesting, get two weeks --

11         MS. PALUMBO:  Yes, your Honor.

12         THE COURT:  -- to file any motions in limine.  Then

13 you get two days to respond, and then they may want some time

14 to reply.  Okay.  I'll tell you what, thank you for that,

15 Ms. Palumbo.  Before I hear from you further, let me hear from

16 the defense now on what your thoughts are here.  Mr. Morris,

17 I'll start with you.

18         MR. MORRIS:  Thank you, your Honor.  Please the

19 Court --

20         THE COURT:  Yes, sir.

21         MR. MORRIS:  -- I don't want the Court to think that

22 Ms. Palumbo has not been acting diligently.  She has.

23         THE COURT:  Yes.

24         MR. MORRIS:  Our concern is we identified what we

25 believed were privileged communications between either

1   Chrisley and an attorney, and we made very clear we believe

2   these are privileged.

3          THE COURT:  Ms. Palumbo, you can take your seat while

4   he's talking.

5          MS. PALUMBO:  Thank you.

6          MR. MORRIS:  The government disagreed but until

7   recently didn't say why.  Recently they announced, well, we

8   think it's all nonprivileged because of crime fraud exception.

9          THE COURT:  And when you say recently, give me a

10  better idea, not exact date necessarily but a better idea.

11         MR. MORRIS:  By telephone and email within the last

12  week formally identifying in the pleading that was filed

13  yesterday at 5:00 p.m.  But we knew we had the disagreement,

14  and we worked through as many of them as we could.  What was

15  filed yesterday is the remainder, but while the defense

16  carries the burden of establishing an attorney-client

17  relationship, we believe the emails on their face establish

18  that.

19         The burden then shifts to the government to show the

20  crime fraud exception, and that's where the difficulty is

21  going to come in.  That's going to take time before your Honor

22  I'm afraid.  I mean, it really is.  We've -- we're familiar

23  with the emails.  I haven't read the pleading, so I don't know

24  what the government says about the crime fraud exception.  But

25  I don't think it's going to be an easy decision for your

1  Honor, and I certainly am not excited about moving the trial

2  date.  By the same token I'm concerned, as concerned as I can

3  possibly be, about attorney-client communications coming into

4  evidence.

5       THE COURT:  All right.  Thank you.

6       MR. MORRIS:  So I can respond within two weeks if

7  that's what the Court wants.  My concern is that after the

8  Court gets the responses, it's going to require more.

9       THE COURT:  So you're concerned about my ability to

10  get to them timely.

11       MR. MORRIS:  I'm concerned that I know your Honor

12  wants to give it the attention it needs, and there may not be

13  enough days between now and then considering the fact that

14  both sides are continuing to prepare for trial.

15       THE COURT:  Yes, sir.

16       MR. MORRIS:  I do have travel to do to interview and

17  subpoena witnesses and prepare folks to testify along with we

18  want to get our exhibits to Ms. Beck in an orderly fashion

19  electronically so that all that is straightened out before we

20  appear before the Court.

21       THE COURT:  Thank you.  Mr. Friedberg.

22       MR. FRIEDBERG:  It would just be cumulative, your

23  Honor.  Mr. Morris and I have discussed this at length.

24       THE COURT:  All right.  Mr. Griffin.

25       MR. GRIFFIN:  I don't have anything to add, your

1   Honor.

2        THE COURT:  No bone in -- that's right.  You told me

3   that earlier.  Okay.  All right.  I cannot honestly say that I

4   can work within these parameters to get this done, and I

5   cannot honestly say that I am willing to reschedule this trial

6   that has been scheduled for some time and, I think, already

7   rescheduled.  And so, quite honestly, I do not like the idea

8   of putting anyone in this position, but it would be my

9   position that I would not allow this evidence in because it's

10  untimely.  That would be my position, and I'm willing to hear

11  from everyone in that regard.

12       And, again, I'm certainly not saying that anyone has

13  not been diligent.  I don't really know how or why this

14  happened.  I can just say that if I had known earlier that

15  this was an issue, I would have taken it into account in my

16  deadlines and certainly worked to resolve it.  But, again, the

17  first I knew of it was April 5th.

18       I didn't quite understand what was going on, but the

19  email I got on April 5th reflected that the filing would be

20  made by April 7th.  So I said I'll just see what's filed then

21  and how involved it is.  Nothing was filed April 7th.  It

22  wasn't filed until yesterday, 4:00 or 5:00 p.m.  I think I got

23  my courtesy copy by email at 4:00.  It may have been docketed

24  by 5:00 and so I -- again, I don't know that I can get this

25  done.  I do agree with Mr. Morris that it is going to be

1  involved.  And although no request has been made yet to move

2  the trial, if one were made, I'm not sure how amenable I would

3  be to that.

4           So, Ms. Palumbo, I'll go back to you, ma'am.

5           MS. PALUMBO:  And, your Honor, I am not asking you to

6  move this trial by any means.  I would find that unreasonable

7  based on what's going on here.  I would request, if possible,

8  a discussion with Mr. Morris about maybe whittling this down

9  to a way that we could come to an agreement of what your Honor

10 should review in a more limited capacity than the 13 emails.

11          There is one email that I do believe is pertinent to

12 the findings of the jury in this case, and that would be the

13 one that I would ask to be able to move forward on.  It would

14 be a much more limited issue than the 13 emails before your

15 Honor.

16          Also, your Honor, if I could --

17          THE COURT:  Sure.

18          MS. PALUMBO:  -- I do apologize it didn't come until

19 yesterday.  I was seeking the Court's permission to do it

20 under seal and never heard back about that.  So I was waiting

21 on that, but then I didn't want to blow this pretrial

22 conference --

23          THE COURT:  I didn't quite understand your email, and

24 I told Ms. Beck.  And the two of us tried to figure it out

25 together the way that it was worded.  And I don't want to take

1   issue with you but -- does the Court need me to move for this

2   or may I go ahead and file it under seal?  By move for it, I

3   mean, I wasn't sure why you just didn't file it, yet file it

4   provisionally under seal.  I wasn't sure what you were asking,

5   so I apologize for not understanding.

6          What I told Ms. Beck -- Ms. Beck came and asked me if

7   I understood this and how she should respond, and I said, I

8   don't know what she's asking.  Let's just see what she does by

9   April 7th or if we hear back from her.  So perhaps both sides,

10  you and our office, were kind of having some confusion.  I

11  don't know.

12         But I'll tell you what, at this point because I don't

13  want to take up anymore time from the things that are before

14  the Court, I would just leave to you whether you and defense

15  counsel have a discussion and submit something to the Court in

16  time for the Court to work within its deadlines for trial.  So

17  thank you so much for appearing, and we're going to move on.

18  And if you don't mind having your colleagues to re-enter the

19  courtroom.

20         MS. PALUMBO:  Of course.  Thank you, your Honor.

21         THE COURT:  Thank you so much.

22         (Whereupon, the trial team re-entered the courtroom.)

23         THE COURT:  All right.  For the record we are back in

24  place with the trial team.  The filter team is no longer

25  before the Court, and we are going to move to Document 162.

1    The response is 178.  This is Todd and Julie Chrisley's motion

2    to require proof of admissibility.  So let's discuss this.

3          As an initial matter -- and I'm not picking with

4    anyone -- I'm not sure if this motion was given its best

5    title.  It seems to me to just be another, or at least an

6    extension of an earlier motion to suppress evidence, evidence

7    from the warehouse perhaps that the government seeks to admit

8    on a different source than -- an independent source from one

9    that was litigated before the magistrate judge.

10         So my understanding is that this motion concerns the

11   same warehouse search that has been found to be illegal, but

12   the issue again is now whether the government can get the

13   fruits of this search into evidence using an independent

14   source.  And I will tell you that after reviewing the

15   pleadings, I do agree with the government's position in its

16   response that the true purpose and spirit of the exclusionary

17   rule tells us to hold on before suppressing this evidence.

18         My concern is, though, that when Judge Anand

19   specifically pointed out in his R & R, which I adopted, that

20   the government didn't appear to be asserting an independent

21   source argument, the government took no action to correct this

22   impression.  And if that belief is correct -- and I'll give

23   you an opportunity to respond to that in a moment -- I think

24   it would be reasonable for the defense to assume that no

25   independent source would be asserted, and so for the

1   government to now say that the defense's motion is untimely is

2   a little curious to me.  So let me start with the government

3   and where we are there.

4           MS. PETERS:  Yes, your Honor, Annalise Peters.  Good

5   morning.

6           THE COURT:  Good morning again.

7           MS. PETERS:  So Judge Anand's report and

8   recommendation noting that the government had not asserted any

9   independent source for the materials from the warehouse was

10  not saying that we hadn't found the materials somewhere else

11  previously.  In other words, the government had not presented

12  any evidence to say that there was some other independent

13  source that led us to the physical documents in the warehouse,

14  and that's true.  We never made that argument.  That was not

15  the case.

16          The only way that the government learned about the

17  documents in the warehouse was through the Department of

18  Revenue.  That was our only source, and so we were not

19  claiming that the evidence in the warehouse should have been

20  admissible because we learned about it from, you know, the

21  warehouse owner or something like that.  That's what Judge

22  Anand was talking about in his report and recommendation.

23          The government made very clear in our briefing, prior

24  to Judge Anand issuing that report, that we had found

25  electronic versions of that evidence in the email search

1  warrant returns.  So we made that plain before Judge Anand

2  ruled on the motion to suppress in our briefing, and so it's

3  our position -- and we really believe Judge Anand was not

4  referring to the electronic evidence.  He was referring to the

5  fact that we hadn't presented any argument or evidence that we

6  found the DOR materials, that is, the physical evidence from

7  some other source.

8           And as set forth in our briefing, your Honor, we

9  believe that the defendants, specifically the Chrisleys, have

10 had notice since Day 1 of this case, that the government

11 intended to introduce the electronic evidence, specifically

12 the emails and the fraudulent attachments to those.  It was

13 shortly after Judge Anand issued his report and recommendation

14 that we presented a superseding indictment to the grand jury.

15 It contained the same language about those emails and

16 electronic versions of evidence, and there was no discussion

17 from the Chrisley defendants at that time about, you know, but

18 wait, this has already been suppressed.

19          We believe they've known well full that we intended

20 to introduce that evidence, and certainly no one on the

21 prosecution team ever read Judge Anand's order the way that

22 the Chrisleys have construed it in this late motion.

23          THE COURT:  Okay.  I will hear from the defense.  But

24 I will tell you, Judge Anand, when he reached out to me,

25 seemed surprised that the government was asserting an

1   independent source.  So maybe I misunderstood him.  But he

2   emailed me and said that, you know, it needed to be determined

3   whether, in fact, the government was.  He said it was unclear

4   to him.

5          So perhaps that didn't come through in his R & R, but

6   from my conversation with him, he certainly seemed unsure or

7   curious as to why if the government were doing that, it hadn't

8   been made clear before now.  And I understand it, and he told

9   me that there was some kind of pretrial conference because I

10  was asking him, hey, why are you having a pretrial conference

11  on this case that's already been certified to me?  Not like

12  that.  I mean, he understood the way I was asking it, but I

13  can tell you again he seemed surprised that an independent

14  source was being asserted.  But maybe I misunderstood him.

15         MS. PETERS:  I'm sure you didn't.  I'm sure then that

16  we -- it sounds like ultimately this is a big misunderstanding

17  between the parties and the Court, and I didn't mean to

18  presume what Judge Anand meant.  But that is certainly what we

19  thought he meant.

20         So in that case, we'd certainly withdraw our

21  arguments about the untimeliness of their motion, but we did

22  make very explicit in our post hearing briefing before Judge

23  Anand's R & R that we did have an independent source for the

24  documents from the email search warrant.  So we believe that

25  we put that in the record.  And as we said in our motion,

1   we're certainly, you know -- we do think there was an

2   independent source.

3        We would ask the Court, in light of Eleventh Circuit

4   briefing, to have a very limited evidentiary hearing on the

5   issue.  And, you know, the Chrisleys demanded that we do it

6   before today, but we are prepared to put a case agent on the

7   stand today, if that's convenient for the Court, and think it

8   wouldn't take longer than 10 minutes.

9        THE COURT:  Yeah, but my issue was not whether or not

10  you really have one.  I want to make that clear.  My issue

11  again, as with the last issue with Ms. Palumbo, is timing.  So

12  I would allow you to put an agent on the stand if it comes to

13  that, but my issue is not whether or not you can actually

14  establish an independent source.  It's strictly the timing.

15       Tell me again -- and I'm sorry if I misunderstood

16  this -- if you in your briefing did make clear that there was

17  an independent source.  The reason that when Judge Anand made

18  that assertion in his R & R that I adopted, that you didn't

19  respond, even if you had no technical objections is what?  So

20  that I understand.  I just want to make sure I'm clear.

21       MS. PETERS:  Yes, your Honor.  One moment.

22       (Brief Pause.)

23       MS. PETERS:  Your Honor, excuse me.  The way that we

24  understood that order -- and as the Court is aware, we did not

25  file any objections.  We accepted the Court's ruling of

1  suppressing the DOR materials.

2          THE COURT:  Sure.

3          MS. PETERS:  But that order was suppressing just the

4  physical Department of Revenue materials.  That's what the

5  whole hearing was about, was the physical materials seized

6  from the Department of Revenue.  That's the only issue that

7  was being litigated, and so when we read Judge Anand's report

8  and recommendation and we read his comment that the government

9  had not asserted that there were any independent sources, what

10 we believed is that, what is the truth, which is that we

11 hadn't claimed we learned about those physical evidence --

12 that physical evidence from any source other than the

13 Department of Revenue.  But we're here --

14         THE COURT:  So what additional evidence are we

15 talking about?  Something related to a phone; correct?  I

16 can't remember now.  What non-DOR materials are before the

17 Court now?  I guess I'm not clear.

18         MS. PETERS:  So we're basically talking about two

19 versions of the same evidence, but they are distinct and

20 different evidence.  So there were physical materials taken

21 from the Department of Revenue.  In those physical materials

22 were a handful, maybe four or five, physically cut and pasted

23 or taped together fraudulent financial documents.  That is

24 what the Chrisleys moved to suppress, was those.  That is what

25 we litigated for two days, and that's what Judge Anand said

1  you cannot use, these physical cut and pasted suppressed

2  materials.

3        Separately the United States obtained email search

4  warrants, three of them in total, for a variety of email

5  accounts used by the Chrisleys, a couple of gmail accounts and

6  one AOL account.  That happened maybe a year or so after the

7  Department of Revenue materials were seized.

8        In executing those electronic search warrants, once

9  Google and AOL provided information to the United States, as

10 the prosecution team was reviewing and seizing specific

11 materials set forth in Attachment B of the email search

12 warrants, there were -- well, I will say that Google produced

13 more than 200,000 records in response to the search warrant.

14 When agents reviewed and seized specific, you know, materials

15 responsive to the warrant, there were over 20,000 items

16 seized.

17        Among those 20,000 items seized were electronic

18 versions of the physical cut and pasted documents that had

19 been found in the warehouse and that had been, you know --

20 were later suppressed.  And so it is in some ways the same

21 evidence, but it is also not the same evidence.  The physical

22 copies of the documents have been suppressed.  Agents

23 independently found these physical or -- excuse me -- the

24 electronic versions of some of those documents among emails in

25 addition to thousands of other financial related documents and

1  bank statements.

2          THE COURT:  So a different format of the same

3  evidence almost, an electronic version of what had been

4  suppressed.

5          MS. PETERS:  That's right, your Honor.

6          THE COURT:  Okay.  Mr. Morris.

7          MR. MORRIS:  Thank you, your Honor.

8          MS. PETERS:  Just one -- maybe I need to clarify

9  one --

10          THE COURT:  Well, go ahead.  And, Mr. Morris, I'll

11  come back to you.

12          MR. MORRIS:  The problem with the government's

13  argument, your Honor has found it.  The evidence presented to

14  Magistrate Judge Anand showed that the documents in question

15  were illegally seized.  They were then shown to the government

16  and the government obtained -- the government looked at them,

17  but the email warrants that the government claims provide the

18  independent source post date the illegal search and the

19  government's learning of the documents in question.

20          And when we filed our motion to suppress and the

21  judge granted it, he said not only those documents but all

22  fruits derived therefrom.  I mean, that's what a motion to

23  suppress addresses, that particular evidence of anything

24  derived therefrom.

25          And the Court is correct in its interpretation of the

1  judge's order, and I have it on top here if the Court will

2  just indulge me to read one page:  The Court acknowledges that

3  the federal investigators obtained a formal warrant to allow

4  them to take the material that was in the DOR's possession,

5  but the fact that the FBI or IRS obtained an after-the-fact

6  warrant does not resolve or cure the original Fourth Amendment

7  violation that led to the material being in DOR custody in the

8  first place.  Indeed, the federal warrant application itself

9  expressly references what DOR told the agents about the

10  contents of the seized material, that is, forged bank records.

11      In other words, IRS only knew what these documents

12  showed because DOR illegally seized them from private premises

13  in the first place and then told the IRS what those documents

14  contained.  On these facts the federal warrant was hardly

15  independent of the illegality, and its issuance simply has no

16  impact on the deterrence effect.

17      Footnote -- and I quote -- indeed, the government

18  does not assert an independent source argument, that is, that

19  the IRS or FBI were aware of the existence of these documents

20  and the probable cause basis for seizing them independently in

21  the information learned from DOR, including the information

22  provided as to the contents of the forged bank records -- end

23  quote.

24      The problem with the government's argument and their,

25  quote, independent source being what they got from the email

1   warrants, is the email warrants themselves were based in part

2   on what was seen at the DOR documents.  It specifically says

3   in the affidavit, which post dates the illegal seizure, in

4   those documents seized by DOR were forged bank records and

5   other documents justifying our application for the search

6   warrant.

7          So they knew about it.  They used it.  They exploited

8   it.  It is tainted.  It is derived from.  And the government

9   in its brief says, well, there's nothing in the affidavits for

10  the email warrants that relies on anything that was found in

11  that illegal search.  Well, that's just not true because it's

12  quoted in the affidavit.  These documents were found by DOR,

13  seized by DOR, and contained these forged documents, and

14  that's part of our probable cause for seeking these warrants.

15         When the judge granted our motion, we assumed that's

16  that.

17         THE COURT:  When did you realize that wasn't that?

18         MR. MORRIS:  March 28th.

19         THE COURT:  On the phone conference?

20         MR. MORRIS:  March 28th.

21         THE COURT:  Phone conference?

22         MR. MORRIS:  Pardon me?

23         THE COURT:  Was that the phone conference?

24         MR. MORRIS:  That was the phone conference.  And

25  during the conference it was, well, what do you mean you have

1    an independent source?  First time the government said

2    anything about it.  And then after that telephone conference,

3    Mr. Krepp and I had a conference, just the two of us by

4    phone -- I don't think it was intended to be confidential --

5    and Mr. Krepp said, well, we have an independent source.  If

6    you've got a problem with that, I don't think you ought to

7    wait to raise this with Judge Ross.  I think you ought to

8    raise it before the pretrial conference.

9         So I immediately filed what I titled, maybe not

10   beautifully, the motion that we did file, Document 162.  But I

11   wanted to bring it to the Court's attention, as Mr. Krepp

12   suggested, so that you would know that we were expecting

13   Magistrate Judge Anand's order to be followed, as it was

14   adopted by the Court and not objected to by the government.

15        THE COURT:  All right.  Again, Mr. Friedberg anything

16   additional from you?

17        MR. FRIEDBERG:  Your Honor, I don't want to sound

18   like a recording, but it's cumulative --

19        THE COURT:  Recordings are find with me.  All right.

20        Mr. Griffin, anything from you?  I don't know if this

21   concerns you or not, but I'm just going to, just to be safe,

22   ask an attorney for each party.

23        MR. GRIFFIN:  Nothing from me, your Honor.

24        THE COURT:  All right.  Thank you.  Again, I am

25   curious as to how, if this didn't come up clearly until the

1  recent phone conference, it could be stated that this motion

2  by the defense is untimely.  I'd just for the government to --

3  perhaps it was just really a misunderstanding, but at this

4  point I am inclined to exclude this evidence unless there --

5  you know, I considered different things to do.  And, again,

6  I'm open to suggestions because the underlying facts have been

7  presented to and litigated before Judge Anand, and he has made

8  an offer to me to basically do an R & R on it at this point,

9  which, you know, would have to go through a period, an

10  objection period of 14 days, or whatever, and before I could

11  determine whether or not to adopt it.  That's one possibility.

12           But at this point while it is before me, since this

13  case is certified, I'm looking at it as untimely on the

14  government's part, and so I'm open to suggestions.  And,

15  again, the issue for me is not whether there actually is an

16  independent source.  It's the timing of when that was made

17  clear so that it could be litigated pursuant to the Court's

18  deadlines.

19           MS. PETERS:  Yes, your Honor.  May I be heard on

20  that?

21           THE COURT:  Definitely.  Definitely.

22           MS. PETERS:  Let me just start by saying truly we are

23  all flabbergasted, and I think this must be simply just a

24  misunderstanding because what we said in our response to the

25  Chrisleys' motion about the untimeliness is truly that is what

1   we all believed.  And I want to explain why to the Court.

2          So just to take a step back as an initial matter,

3   when the grand jury initially returned the indictment in this

4   case over two years ago, the Chrisleys filed two pretrial

5   motions.  One was to suppress the Department of Revenue

6   materials, which ultimately was granted.  The other motion was

7   to suppress the email search warrants.  It wasn't the motion

8   that they filed last week, though.  It was based on a variety

9   of other grounds that, you know, the scope was too broad, we

10  executed it too broadly.  They made a variety of other

11  arguments about why the email should be suppressed.

12          There was no hearing on that motion, but it was

13  briefed in full.  And the Court denied that motion, which is

14  relevant, your Honor, because once the Court denied that

15  motion, everyone was under the understanding that that

16  evidence, the evidence we're talking about now, would be

17  admissible at trial because that motion was denied.

18          The language --

19          THE COURT:  I'm sorry.  So what evidence -- you were

20  under the impression that what or understanding that what

21  evidence would be admissible at trial?

22          MS. PETERS:  The exact evidence that the Chrisleys

23  have now moved to suppress because they've already moved to

24  suppress that evidence, but it was on different grounds.  They

25  didn't claim it was fruit of the poisonous tree.  They never

1   made that argument before.  They argued instead that the scope

2   of the warrant was too broad, that we had executed it

3   improperly and things like that.

4            THE COURT:  And what evidence again if I may ask?

5            MS. PETERS:  Yes, your Honor.  It's the three emails

6   that are specifically described in the indictment in Count 7

7   of the superseding indictment, as well as the attachments and

8   links thereto, which are the electronic versions of fraudulent

9   materials.  And then there are some 404(b) documents, I think

10  one of which is a fraudulent document, that was also found in

11  the DOR materials.

12           THE COURT:  Okay.

13           MS. PETERS:  So that is the evidence they previously

14  moved to suppress, and the Court denied that motion.

15           When we were litigating the motion to suppress the

16  Department of Revenue materials, we were singularly focused on

17  the physical documents that were seized from the Department of

18  Revenue.  That was all that was before the Court.  It wasn't

19  about any electronic versions of anything or any other pieces

20  of evidence.

21           Yes, and at some point this sort of becomes a

22  circular discussion because, you know, you have a physical

23  version of a document and an electronic version of a document.

24  So the information is the same, but the pieces of evidence are

25  different.  So if the physical evidence had not been

1  suppressed, we would have admitted that evidence as Exhibit 1,
2  and we would have admitted the electronic version as
3  Exhibit 2.  We were only talking about Exhibit A and all of
4  the other physical documents during that motion to suppress
5  the Department of Revenue materials.  That's all we were
6  focused on.

7          So there was no reason for -- we weren't trying to
8  hide the ball on the fact that we had this material in an
9  electronic version.  That was obvious from the face of the
10 indictment in Count 7 of the superseding indictment where it
11 lays out the fact that, hey, we have these emails that Julie
12 Chrisley sent attaching or linking the fraudulent documents
13 that the Chrisleys also know we got in the Department of
14 Revenue materials.

15         So they have -- they have known from Day 1 that we
16 had electronic versions of the Department of Revenue physical
17 materials, but there was no reason to talk about or to --
18 there was just -- it just wasn't relevant.  None of the
19 electronic stuff was relevant to the question of whether to
20 seize or -- excuse me -- to suppress the Department of Revenue
21 materials, so we were not trying to hide the ball at all.  It
22 just didn't seem relevant.

23         And to the contrary, we wanted to make it clear to
24 the Court and to the Chrisleys, although they were already on
25 clear notice from the face of the indictment, that we planned

1  to use the electronic versions of those documents and the

2  emails that went with them, which we got from the email search

3  warrants.

4         THE COURT:  And so you made that clear to them at

5  what point?  You made extra steps to make that clear to them

6  when?

7         MS. PETERS:  Yes, your Honor, in Document 98 at page

8  3, Note 1.  That is a one --

9         THE COURT:  I'm sorry.  I asked when.

10        MS. PETERS:  After -- I don't know the date that we

11 filed that, but it was in the post suppression hearing

12 briefing on their motion to suppress the Department of Revenue

13 materials.

14        THE COURT:  I'm sorry.  What was the document number?

15 And I'll look at my own docket then.

16        MS. PETERS:  Yes, your Honor.  It's Doc 98.

17        THE COURT:  98.  Okay.  July 7th, 2021, you made

18 clear to them that you were still proceeding on the electronic

19 versions of this --

20        MS. PETERS:  That's right, your Honor.  And so,

21 again, I raised that because, just to point out the United

22 States was not at all trying to hide the ball, that we had

23 this electronic version of the physical cut and pasted

24 documents and emails that went with them.  We didn't -- it

25 didn't come up at the suppression hearing, again because to us

1   it wasn't relevant.  We were talking about the physical bucket

2   of Exhibits A, B, C, not the electronic versions of those

3   things.

4          And in that July filing on the post hearing briefing

5   where we wanted -- although the Chrisleys absolutely knew

6   already that we had these things from the email search

7   warrant, we specifically put in that brief the following:  The

8   emails and attached and linked electronic versions of these

9   documents, meaning the fraudulent cut and pasted documents,

10  were independently located and seized from the electronic

11  search warrants that the Chrisleys are seeking to suppress on

12  other grounds.

13         So we made that absolutely plain in an abundance of

14  caution, put that in there even though we think at that point

15  they absolutely already know we intended to use the evidence

16  from those email search warrants.

17         And, your Honor, it's in part, you know, precisely

18  because of that footnote and generally our mindset going into

19  that, to litigating that issue about the physical evidence,

20  that when we got Judge Anand's report and recommendation

21  saying the United States hasn't claimed any independent

22  source, we said, yep, that's right, we never said that we

23  found these physical documents from anybody other than the

24  Department of Revenue who went in and turns out seized

25  everything without a warrant.  That was the only way we found

1   out about those documents.

2          THE COURT:  Can you point me to -- and I don't want

3   to catch you off guard, but I'm looking quickly through

4   Document 107, which appears to be Judge Anand's R & R on this.

5   Is there language that you know of that could help me see that

6   his R & R referred only to the version that you agree was

7   suppressed and not any other version, including the electronic

8   version?

9          MS. PETERS:  Nothing specifically, your Honor, and I

10  don't have his report in front of me.  But I can say,

11  generally speaking, the only evidence presented at our -- we

12  had a two-day very fulsome hearing on the Chrisleys' motion to

13  suppress, and the only evidence that was presented at the

14  entire hearing was about the physical documents.

15         A variety of Department of Revenue employees

16  testified.  The discussions or -- excuse me -- the testimony

17  from the two federal case agents was about the execution of

18  the Department of Revenue search warrants.  Even the language

19  that Mr. Morris quoted from this morning claiming that, you

20  know, everything came from the Department of Revenue, those

21  were from the search warrants to seize the materials from the

22  Department of Revenue.  It wasn't about the email search

23  warrants.  They're conflating the issues and not hearing Judge

24  Anand, and his entire report and recommendation was about the

25  physical evidence from the Department of Revenue.

1          THE COURT:  Okay.  Anything else?

2          MS. PETERS:  Just one moment, your Honor.

3          THE COURT:  Sure.

4          (Brief Pause.)

5          MS. PETERS:  Just a couple other notes.  You know,

6   this Court has already denied their motion to suppress the

7   email evidence that I've just described that they're now

8   moving again to suppress.  They filed that motion on different

9   grounds.  It was already denied.

10          And, finally, your Honor, once Judge Anand just -- if

11  there was any confusion and any misunderstanding about the

12  United States' intent to introduce evidence obtained from the

13  email search warrants, it should have been abundantly clear to

14  the Chrisleys when after Judge Anand issued his report and

15  recommendation suppressing the Department of Revenue

16  materials, which we did not object to, after that, the grand

17  jury returned a superseding indictment, and it contained the

18  same language in Count 7 about those three emails from Julie

19  Chrisley and the electronic versions of the evidence attached

20  to it.

21          We have yet to hear from Mr. Morris or anyone

22  associated with the case on the defense side of why at that

23  point, if they really thought that all of the email evidence

24  had been suppressed, why they didn't immediately pick up the

25  phone and call us and say what are you doing, that stuff has

1   already been suppressed.  It wasn't until much, much later,

2   you know, ten days after the Court's deadline, that they filed

3   this motion.  So, again, we're -- we think that they have had

4   notice, that the Court has already denied it on that email

5   search warrant.

6           And if the Court is inclined to get to the merits, we

7   do have ample evidence that we can present very concisely, in

8   under ten minutes, on the independent source doctrine.

9           THE COURT:  Thank you.  Anything else, Mr. Morris?

10          MR. MORRIS:  Very briefly, your Honor.  The problem

11  with the government's argument is that Document 98, which was

12  filed in July of 2020, was filed as part of the briefing along

13  with the hearings that went on in front of Magistrate Judge

14  Anand.  Magistrate Judge Anand's order was issued August 30th,

15  2021, after consideration of the arguments that were set forth

16  in Document 98, and specifically said no independent source.

17  So --

18          THE COURT:  Well, the government is saying no

19  independent source of just the DOR records.

20          MR. MORRIS:  Of what was found in -- there was no

21  independent source for knowing those documents existed.

22  Thereafter -- well, I shouldn't say thereafter.  In the

23  affidavit in support of the warrant for the DOR documents, the

24  agent said, when reviewing the search warrant materials

25  obtained through the Department of Revenue, investigators --

1   I'm sorry.  This was the application for the email warrant.

2   When reviewing the search warrant materials obtained from the

3   Department of Revenue, investigators found cut and pasted 2014

4   bank statements in the name of Julie Chrisley and 7C's and

5   other documents.  And now I'm quoting.  The affidavit

6   supporting the search warrant further admitted, quote, agents

7   have not determined whether or not these cut and paste 2014

8   banking statements were ever sent to a financial institution,

9   end quote.

10      So, obviously, that's looking at them from the

11   illegal search is what prompted them to issue the warrant.

12   They say so.  We found these things.  We didn't know about

13   them ahead of time.  And we don't know if they were submitted

14   to the bank, so we want to look at the emails to see if they

15   were.  That is an exploitation of the illegality and doesn't

16   constitute an independent source.

17      And when Judge Anand issued his order in August of

18   2021, the defense has no reason to believe that even though

19   they said they had an independent source back in 2020, that

20   they did because Judge Anand said they didn't, and we relied

21   on that.  And we didn't hear otherwise until March 28th in

22   that telephone conference, and Judge Anand was as shocked as

23   we were.  So, A, we are timely, and, B, I believe we are right

24   on the facts and the law.

25      THE COURT:  All right.  Thank you so much.  All

1    right.  I'm going to take that under advisement.  But,

2    Ms. Peters, let me know now.  Give me a proffer of what your

3    agents would say regarding the independent source.  I'm not

4    going to hold a hearing based on how I think this is going to

5    come out, but just give me a proffer.

6              MS. PETERS:  Yes, your Honor.  If an agent were to

7    testify, what he would say is that --

8              MR. MORRIS:  Excuse me.  May I ask which agent it is?

9              MS. PETERS:  All of the agents would testify, but the

10   United States intends to put up Special Agent Chip Cromer with

11   the FBI and is prepared to do so today if the Court would

12   like.  But essentially what Agent Cromer would testify to is

13   that he joined the investigation in 2017 and Agent -- let me

14   back up and say this:

15             Special Agent Larry Arrow with the IRS testified at

16   length during a two-day evidentiary hearing, that he opened an

17   investigation into the Chrisleys in 2017 based on multiple

18   sources, including public information from the news, as well

19   as an internal referral from the civil side of the IRS from a

20   revenue officer who had been attempting to collect the

21   Chrisleys' outstanding taxes and was having a difficult time

22   doing so.  And based on her investigation on the civil side,

23   she thought the Chrisleys might be committing tax fraud, so

24   she referred the case for potential investigation over to IRS

25   criminal investigations.  As a combination of those things,

1   Special Agent Larry Arrow opened up a formal investigation

2   into the Chrisleys.

3          On February 1st of 2018 and February 2nd, the

4   investigation went overt.  On those dates the grand jury

5   issued a number of subpoenas, including to the Chrisleys'

6   production company, 7C's Productions, as well as to Defendant

7   Tarantino's company, CPA Tarantino.  Those subpoenas were

8   served on February 2nd of 2018.  In response to those

9   subpoenas, both Tarantino and the Chrisleys produced thousands

10  of documents consisting primarily of emails.  Those emails, an

11  agent would testify, are what prompted agents to seek the

12  email search warrant or the email search warrants.

13         In fact, every single one of the emails that is

14  specifically cited in Agent Arrow's affidavit for the email

15  search warrants from jchrisley1, mchrisley1@gmail.com and

16  @aol.com -- excuse me -- just the gmail ones, all of those

17  emails were produced to the United States by either the

18  Chrisleys themselves or by Tarantino or some other third party

19  in response to a subpoena.

20         Those emails are specifically set forth in a chart in

21  our response on the briefing on page 5 and 6.  That's Docket

22  No. 178.  And it lists every email in the affidavits in

23  support of probable cause for the email search warrants and

24  also the source of those emails, all of which are generally

25  7C's Productions and Tarantino or another third party.  An

1    agent would testify that those emails in response to the

2    subpoena issued on February 1st are what prompted them to get

3    the email search warrants.

4           Agent Cromer would also testify that nothing in the

5    Department of Revenue materials prompted them to get the

6    search warrant.  The search warrant at Department of

7    Revenue -- well, I'll say this.  I'll put it more simply.

8    Agents went and seized the materials from the Department of

9    Revenue on February 7th of 2018.  That's six days after the

10   grand jury issued their subpoenas to Tarantino and to the

11   Chrisleys.

12          Agent Cromer would testify that nothing that they saw

13   in those materials, which they got after they issued the

14   subpoenas to begin with, nothing in the Department of Revenue

15   materials prompted or even influenced their decision to get --

16   to go after the email search warrants.  Agent Cromer would

17   testify that it's very common in white collar investigations

18   to seek email warrants just like these and that this case

19   wasn't any exception to that.

20          Finally, your Honor, it is true when you look at

21   the -- at Special Agent Arrow's affidavit in support of the

22   email search warrants, there are a couple of mentions of the

23   Department of Revenue materials.  It's two paragraphs.  It's

24   really one and a half paragraphs.  The bottom of paragraph, I

25   think, 26 and then paragraph 27 mention some fraudulent cut

1   and pasted documents that were found in the Department of

2   Revenue materials.  But none of that information about the

3   Department of Revenue even mentions -- not only does it not

4   mention any specific email address, it doesn't even mention

5   email generally.

6          In hindsight, you know, we wouldn't have put it in

7   there, but, frankly, if you excise those one and a half

8   paragraphs from the email search warrant affidavits, there is

9   ample probable cause for them to have issued based on all of

10  the other emails that are listed and cited and described in

11  the affidavit, all of which came from the Chrisleys

12  themselves, from Tarantino, and/or from other third parties.

13         And so, frankly, your Honor, under the independent

14  source doctrine, not only did the emails not -- excuse me.

15  Not only did the Department of Revenue materials not prompt

16  agents to get the email search warrant, there was nothing in

17  there that even influenced their decision to seek the email

18  search warrants.

19         THE COURT:  Got it.  Okay.

20         MR. MORRIS:  May I briefly respond to it?

21         THE COURT:  Yes.  Give me one second just so I can

22  take note of my understanding of the argument.

23         (Brief Pause.)

24         THE COURT:  Okay.  Yes.

25         MR. MORRIS:  I think, obviously, the significance

1  here is that the grand jury subpoenas issued on February 1,

2  2018, post date not only the illegal search and seizure by

3  GDOR, but they post date GDOR's having shared the information

4  regarding those alleged documents with the government.

5       Now, the FBI agents are good folks.  I know them.

6  I've met them.  I've dealt with them.  Larry Arrow, who is the

7  affiant on the affidavit, Larry Arrow who was the IRS criminal

8  investigator who initiated the warrants and who saw the

9  illegally seized documents before the grand jury subpoenas

10 were issued, is not here to testify that, gee, I didn't take

11 that into consideration.  And I think one of the reasons he's

12 probably not here is in the affidavit he cites to those

13 documents.

14      So to say that they don't corrupt what comes later,

15 it's clearly a classic *Wong Sun v. United States* fruit of the

16 poisonous tree and has to be suppressed, just as judge --

17 justice -- Magistrate Judge Anand said and upon which we

18 relied until March 28th.

19      THE COURT:  All right.  I will take that one under

20 advisement too, Document 162, that is, Ms. Beck.  There was

21 104 -- that wasn't the right one.  180 was the first one with

22 Ms. Palumbo.  This one is 162.  Those are both under

23 advisement.

24      Okay.  Moving on, Document 177 is basically a motion

25 for another *Garcia* hearing.  Counselor, with all that has been

1  said, counselor next to Mr. Griffin, I'm sorry, but I've

2  forgotten the correct pronunciation of your name.  But this is

3  the last time I'm going to have to ask you, so if you will say

4  it loudly and slowly for me, I will write it down

5  phonetically.  I promise.

6         MR. ANULEWICZ:  It's Anulewicz, like annul a

7  marriage, and then a wits.

8         THE COURT:  Thank you.  Okay.

9         MR. ANULEWICZ:  I've given that explanation a lot.

10        THE COURT:  Anulewicz.  Okay.  Got it.  All right.

11  My understanding is that because Mr. Anulewicz and Mr. DeLuca

12  have recently filed an entry of appearance on the Chrisley

13  defendants, the government feels it's necessary to have

14  another *Garcia* hearing.

15        Obviously, the Chrisleys are not here today.  My

16  feeling, though, was that because at the previous hearing they

17  had been admonished as to what it means to have conflict-free

18  counsel and Judge Anand had gone through all of that with

19  them, that they could be -- that that right could be

20  reiterated and simply their waiver in that respect with

21  respect to these two attorneys now could be put on the record.

22        Government, let me hear from you as to whether you

23  think that is insufficient and whether you really do think

24  that we need to have another full blown hearing.  Mr. Krepp.

25        MR. KREPP:  Yes, your Honor.  I do think that we do

1   need to have another hearing.  The Chrisleys have been advised

2   of their right.  The previous issue before the Court was that

3   Mr. Morris had represented Julie Chrisley during the grand

4   jury investigation --

5            THE COURT:  Right.

6            MR. KREPP:  -- and Mr. Friedberg had represented

7   Mr. Chrisley during the grand jury investigation.  And then,

8   obviously, Mr. Morris is representing Mr. Chrisley now and

9   Friedberg Ms. Chrisley.  Under Rule 44(c) there now seems to

10  be a joint representation, so that wasn't the issue before the

11  Court.  And I think the inquiry does -- I don't think it needs

12  to be a lengthy hearing, but I do think to perfect the record

13  and to preserve the rights of defendants, it is essential that

14  they be advised of the danger of joint representation at trial

15  because that wasn't something that was addressed.

16           THE COURT:  Okay.  So before the issue dealt with

17  representation both during grand jury proceedings and post

18  grand jury proceedings.  Now we're talking about joint

19  representations.

20           MR. KREPP:  Correct.

21           THE COURT:  Okay.  All right.

22           MR. MORRIS:  I might want to correct that.

23           THE COURT:  Okay.  That wasn't -- okay.  Go ahead.

24           MR. MORRIS:  Before indictment Mr. Friedberg and I

25  represented Mr. and Mrs. Chrisley.

1              THE COURT:  Jointly.

2              MR. MORRIS:  Jointly.

3              THE COURT:  Right.

4              MR. MORRIS:  And I responded to certain subpoenas on

5    behalf of 7C's.  I responded to subpoenas for Chrisley

6    personally, and there was no definition, no division between

7    Mr. and Mrs.  And that concerned the government, so Magistrate

8    Judge Anand held a very lengthy hearing on do you understand

9    your rights, a 44(c) hearing, and they clearly understood it.

10             Mr. Anulewicz and Mr. Deluca would like to join and

11   represent both.  I'm authorized to tell the Court that my

12   client, Todd Chrisley, says on the morning of trial if the

13   Court wants to inform him again of the same possibility of

14   conflicts by having joint representation, as Magistrate Judge

15   Anand did, he's happy to do that.  He has no objection to

16   that.  And we're prepared to do that very first thing, if the

17   Court wants to do that the morning of trial.  But he's had the

18   exact same admonishment and just different names.

19             THE COURT:  That was my understanding.  So I may have

20   a misunderstanding, but that's the understanding I had.

21             Mr. Friedberg.

22             MR. FRIEDBERG:  It would be the same announcement on

23   behalf of Mrs. Chrisley, your Honor.

24             THE COURT:  Okay.  Mr. Krepp, if I were to be more

25   safe than sorry and just do a hearing, what is your position

1    with respect to, especially since to some extent they have

2    been admonished of some rights, even if you say it's a

3    different context, if I did it the first day of trial knowing

4    that there is still some possibility that based on how it

5    comes out we might not be able to go forward at trial?  But

6    what's your position there?

7            MR. KREPP:  We have no objection to that, your Honor.

8            THE COURT:  Okay.  Especially in light of what I said

9    earlier, that there is a chance that we might not be able to

10   begin jury selection until the afternoon, that may be

11   something that we can take up that morning.  I see it as being

12   something brief, either an admonishment or if we want to do it

13   more in the form of a hearing, that's fine.  But I still don't

14   think it would be a lengthy hearing.

15           Okay.  So, Ms. Beck, again 177 I will say -- I will

16   just say granted.  I will go ahead and do a hearing, but it

17   will be at the start of trial.

18           Okay.  And Document 179 is simply the government's

19   motion for excess pages as it relates to 178, which is their

20   response to 162, that is granted.  So 179 is granted.

21           Okay.  I think those are the only outstanding motions

22   before we proceed to motions in limine.  We're at 11:09.

23   Anyone need to take a quick stretch break or anything before

24   we go further?

25           MR. MORRIS:  Please the Court, do you want to do the

1  jury questionnaire thing?  We can do that pretty quickly.

2          THE COURT:  No, I'm going to keep it in the order

3  that I have it.  We're going to do motions in limine and then

4  voir dire.

5          But anybody want that stretch break or are we good to

6  go forward?

7          MR. GRIFFIN:  I would like one, your Honor.

8          THE COURT:  You've got it.  If just one says yes, we

9  do it.  That's my policy.  All right.  We'll be back in about

10  10 minutes.  Okay.

11          (Brief recess.)

12          COURTROOM SECURITY OFFICER:  All rise.  This

13  Honorable Court is again in session.

14          THE COURT:  All right.  Thank you, sir.  Thank you.

15  Please be seated.

16          We'll go forward now.  I will just tell you -- I

17  won't hear further argument right now.  I did give Judge Anand

18  a call on that break, and he says he would have to go back and

19  look at some stuff too.  But from what he recalls, basically

20  similar to what Ms. Peters says, that a separate motion was

21  filed regarding the emails, and it was never argued in that

22  motion that any emails there were a fruit of anything from the

23  illegal warehouse search.  But, again, I'll go back and look

24  at all of the notes, and I will talk to him further.  That

25  remains under advisement.

1            Okay.  We'll go forward with motions in limine.  I'll

2    start with Document 154 -- the response is at 169 -- which is

3    Defendant Tarantino's motion in limine to exclude reference to

4    a crooked accountant regarding email communications by Todd

5    Chrisley directing someone to find a crooked accountant.  I

6    remember that this was also at issue with reference to the

7    motion to sever.  And the government proposes a limiting

8    instruction changing the word "accountant" to "professional,"

9    et cetera, so that there is no assumption by the jurors that

10   this find a crooked accountant is connected to the subsequent

11   hiring of Tarantino.

12           I will hear from the government because I am inclined

13   to grant this based on 403.  I think that there is really no

14   way to avoid such an assumption by the jury.  You know, the

15   government benefited from my ruling to deny severance, I

16   think, but now that we're here at trial, I really don't think

17   there's a way to clean it up so that the jury doesn't attach

18   this or link this directly to Tarantino.  So, government?

19           MR. KREPP:  Yes, your Honor.  Your Honor, I'm fully

20   understanding the Court's comments.  We think that if we

21   change the word from "accountant" -- that's really the -- our

22   understanding, from talking to Mr. Griffin, is it's that word

23   "accountant" which is the buzz word.  So if we were to alter

24   that word to "professional" or "person," we don't see --

25   person is a noun --

1          THE COURT:  Are there other positions besides

2    accountants that the Chrisleys used that will come out?  I

3    mean, certainly based on the nature of the case, it will be

4    discussed at length that they hired and used accountants,

5    especially since the third defendant is an accountant.  But

6    are there other occupations that will be at issue so that that

7    presumption or assumption wouldn't be made, if you understand

8    what I'm saying?

9          MR. KREPP:  Absolutely, your Honor.  There's going to

10   be talk about real estate Realtors.  There's going to be talk

11   about attorneys.  I think there is going to be talk about

12   subordinates that worked for the Chrisleys so I think -- I

13   don't have an itemized list of -- the short answer is that a

14   definitive -- an affirmed yes, your Honor, there's going to

15   be -- this is not just a case about Todd and Julie Chrisley

16   and accountants.

17         THE COURT:  Got it.  Okay.  Mr. Griffin.

18         MR. GRIFFIN:  Whether it's accountant or

19   professional, it is smoking hot as to us.  Person would be

20   better.  I'd like crooked out of the whole thing but --

21         THE COURT:  They hired folks.

22         MR. GRIFFIN:  They hired people.  But it's not -- I

23   think if you'd change it to professional, an accountant or CPA

24   is a professional too.  It's just -- it is too prejudicial,

25   hire that crooked person.  But then it goes on to say, you

1  know, in part, to say who does so and so use.  So it's talking
2  about some third party who's got some training, in my view,
3  and it's highly prejudicial.  We are on the right track.  I
4  don't think -- we can't say crooked accountant, especially --
5  I don't even know that anybody was hired or retained to do
6  what is alleged in this statement here.

7          THE COURT:  Okay.  All right.  Anything else from the
8  government?

9          MR. KREPP:  The only other word that we're trying to
10  come up with, if it's a crooked guy.

11          THE COURT:  Okay.  Thank you for the attempts.  I'm
12  going to go ahead and grant that based on 403.

13          Okay.  Document 155, the reply is 169 -- excuse me.
14  The response is 169.  The reply is 171.  This is Defendant
15  Tarantino's motion in limine to prohibit IRS witnesses from
16  describing Tarantino as being evasive, knowing more than he
17  wanted to know, because, according to defense, giving opinion
18  based on impressions invades the jury's province.

19          I'll hear from you, Mr. Griffin, because I am
20  inclined to deny this and find that the agents can give
21  opinion testimony based on their investigative training,
22  especially to explain why they proceeded a certain way.  And
23  then defense is free to cross-examine them on, you know, why
24  those interpretations should not have existed.  So I'll hear
25  from you on that, but I'm inclined to deny it.

1          MR. GRIFFIN:  Thank you.  Your Honor, I'm going to

2     try to change your mind.

3          THE COURT:  Okay.  It's been done a couple of times.

4          MR. GRIFFIN:  So what we have here is we have revenue

5     agents who communicated with Mr. Tarantino.  My concern isn't

6     what did Mr. Tarantino say, what did your investigation

7     uncover.  It is the going further and opining.  This is the

8     case.  The count that I'm concerned about is were alleged to

9     be in the conspiracy with the Chrisleys to impede and impair

10    the lawful functions of the IRS.  And so it's a Klein

11    conspiracy.  The essence of a Klein conspiracy is impede and

12    impair by deceitful means.

13         What we're -- what I'm really concerned about is, is

14    we have these revenue agents and maybe other agents who will

15    say I spoke to him.  He was lying.  I spoke to him.  I thought

16    he was holding something back.  That, you might as well say I

17    spoke to him.  He was attempting to impede and impair me from

18    doing my job, my collection efforts.  And I feel -- my best

19    case is *Hawkins*.  It does give a lot of warnings about that.

20         And then I think the case that really stands out in

21    the government's response is *Jeri*, and that's a drug deal --

22    drug courier in an airport where the agent was allowed to say

23    that he thought in the interview that the defendant lied.

24         THE COURT:  Not Klein.  It wasn't a Klein case.

25         MR. GRIFFIN:  No, it wasn't a Klein case.  But, also,

1   it didn't go to the heart of what the guy was being charged

2   with, which was being a drug courier, a drug dealer.

3        Here this goes to the very heart of impede and impair

4   and I don't -- I mean, if they're allowed to give opinions

5   about their dealings with Mr. Tarantino, yes, I can

6   cross-examine them, but they're -- they are, in fact, the

7   summary of witness because that's who Mr. Tarantino talked to,

8   and then they're going to say and I conclude that he wasn't

9   being honest with me.  He was holding things back.  He wasn't

10  sharing information with me.  And, like I said, he might as

11  well say and he was impeding or impairing my ability to do my

12  job.

13       THE COURT:  All right.

14       MR. GRIFFIN:  This is very important.  I think Mr. --

15  1 in the commentary also says, you know, the rule is designed

16  so that you're not telling the jury to choose -- this is how

17  you choose sides.

18       THE COURT:  Okay.  Thank you.  Mr. Krepp or

19  Ms. Peters.

20       MR. KREPP:  Yes, your Honor.  We think the *Jeri* case

21  is directly on point, and we don't think the distinction that

22  defendant is making there really is applicable.  The fact that

23  in the *Jeri* case he was charged with drug trafficking, the

24  Eleventh Circuit didn't hinge their opinion on that, and I'll

25  just go through the question and answer there that the

1   Eleventh Circuit affirmed.  Question, in this case based on

2   your training and experience, was the defendant truthful in

3   his interview with you?  Then there's an objection, and the

4   Court allowed him to answer it.  He said, he was not truthful.

5   Why do you say that?  Throughout the interview it was obvious

6   that he had long pauses.  Some of the answers he was evasive.

7   I've been around long enough and done plenty of interviews to

8   be familiar with those types of behaviors.

9           Now, I'm not suggesting that's verbatim what our

10  revenue officers are going to testify to, but I do believe at

11  least one revenue officer is going to testify that it was

12  difficult to get Mr. Tarantino to respond to things and that

13  he was acting evasive when she would try to get him to answer

14  clearly as to whether or not -- certain discrete questions

15  about the Chrisleys and as corroborated, frankly, by some

16  email correspondence we're going to move to admit between the

17  Chrisleys and Tarantino.

18          So we do believe that this is perfectly permissible

19  lay witness testimony, and the defendant has every opportunity

20  to cross-examine the witness as to why it is she or he are

21  reaching that conclusion.

22          THE COURT:  All right.  Thank you.  Anything in

23  rebuttal or as final words, Mr. Griffin?

24          MR. GRIFFIN:  Just the reply brief we filed where the

25  Eleventh Circuit pointed out that the question and answer that

1  they allowed was wholly -- was a wholly subsidiary block of

2  fact that did not squarely and directly answer the ultimate

3  question that was being asked of the jury.

4         THE COURT:  All right.  For 155 I'm going to deny

5  that and allow those agents to testify in that regard.

6         Okay.  156 -- response is 169 -- this is Defendant

7  Tarantino's motion in limine to exclude testimony and argument

8  characterizing his statement concerning whether Todd Chrisley

9  received income from 7C's Production Company as false because,

10  according to the defense, it was literally true.

11        I am again inclined to deny this and find that the

12  government's witnesses can opine that they took his statement,

13  they interpreted his statement to be false.  And from what

14  I've reviewed, there does seem to be enough evidence to

15  support such an opinion or position.  And if the defense feels

16  the statement was true, literally true, the government's

17  witnesses, again, can be cross-examined in that regard.

18        So, Mr. Griffin, I will hear from you again there.

19        MR. GRIFFIN:  The question that is alleged in the

20  indictment isn't really what was responded to in the brief.

21  The question is where did he get his income.  So the response

22  was, in effect, he doesn't get income from 7C's.  Julie

23  Chrisley owns 100 percent of 7C's.  There is no income paid to

24  Mr. Tarantino -- I mean Mr. Chrisley.

25        So, your Honor, here's the example that I would give:

1  Whether it's an accounting firm or a law firm, if you have an
2  associate who is billed out to a client and the client gets
3  the bill, pays that bill, that doesn't mean that the associate
4  hasn't received income.  The associate has to get paid.  The
5  employee has to get paid.  Family business that runs a
6  restaurant, they're working.  People are paying their bills
7  for their meals, but if the family members don't get paid,
8  there is no income.  And that's what is happening in the 7C's
9  context.  That is the point I'm making.
10          And what I'm trying to say is if you can't be charged
11  with making a thousand and one, making a false statement
12  because it's literally true, you ought not be able to have to
13  go to trial and have the government argue, well, this was
14  false if it was literally true.  And I will raise this in the
15  trial too before it goes to the jury.  I don't -- it is not
16  fair to say, well, our interpretation is that that is a false
17  statement, and I will be objecting if the agent is allow -- I
18  asked him that, that was a lie.  I don't think that that is
19  appropriate.
20          THE COURT:  Okay.  Government?
21          MR. KREPP:  I don't want to repeat my prior argument,
22  your Honor, but it's pretty much the same.  We think that the
23  agent can testify as to steps they took to confirm or
24  corroborate Mr. Tarantino's statement.  We think that
25  everything Mr. Griffin said just now is perfectly appropriate

1   argument to make to the jury in closing argument, but we think
2   there's a good faith basis, first of all, for us to ask these
3   questions, as your Honor already pointed out.  There's
4   certainly facts that we've pointed out in our brief that show
5   that Mr. Tarantino knew exactly how Todd Chrisley was being
6   paid, and this so-called literal truth defense, if he wants to
7   raise it, that is a defense to be made in front of a jury at
8   trial.
9            THE COURT:  All right.  I agree.  156 is denied.
10           All right.  Document 157, which is the government's
11   consolidated motion in limine, and we have as responses 165
12   and 166, and the reply is 175.
13           I will note as an initial matter -- and I think the
14   government acknowledges this in the reply -- that most of
15   these aren't true motions in limine, not as the Court
16   perceives them.  Most of them are simply asking the Court to
17   follow the rules of evidence at trial with law explaining why
18   these rules are in place.  For instance, number one asks the
19   Court to preclude defendants from introducing self-serving
20   hearsay at trial.
21           Well, I mean, we just have to wait until trial to see
22   if hearsay objections are made and then see if there are
23   exemptions or exceptions.  So I wouldn't even know how to rule
24   on that at this point without specific statements being
25   presented to the Court.

1          Now, in the reply the government does give an example

2     that the defense cannot simply introduce the 71-page complaint

3     of Julie Chrisley's lawsuit against Mr. Braddock, and I agree

4     with that.  I mean, who knows whether Julie Chrisley is taking

5     the stand.  But just to introduce that would not be able to be

6     done.  So that I can look at.  But other than that, I would

7     have to say that this motion is denied as vague because

8     hearsay objections would have to be lodged as the evidence is

9     presented.  Anybody wish to be heard further on that?

10          And, Ms. Beck, 157 is going to being granted in part,

11     denied in part.

12          No. 2 deals with -- oh, goodness, did I not -- okay,

13     inadmissible good conduct.  Again I'd have to say denied as

14     vague at this time, although I do note that in its reply the

15     government has no objection to defense's proffer of certain

16     good faith evidence, like payment of taxes, repayment of

17     loans.  So I'd note that, but beyond that, denied as vague.

18          3, defendants should be required to notify the

19     U.S. -- and I'll come back or I should do these one at a time.

20     Anybody have anything to add on 2?

21          MR. MORRIS:  I'm sorry.  What was that document

22     number?  I apologize.

23          THE COURT:  This is Document 157, and it is broken up

24     into 7 parts.  So that was part 2.

25          Okay.  So 3 is that the defendants should be required

1  to notify the government if they intend to waive the

2  attorney-client privilege no less than three weeks before

3  trial.  That is granted without objection, is my

4  understanding.

5       MR. MORRIS:  Yes, ma'am.

6       THE COURT:  Okay.  4 -- and if I'm going too fast or

7  not giving somebody an opportunity to speak up, just feel free

8  to yell out.  4 is as to any argument about penalties or

9  assessing punishment.  I grant with respect to punishment --

10  possible punishment for the defendants being discussed, but

11  from what I recall, there may have been some other discussions

12  in there about penalties.  And I just don't remember at this

13  time.  Mr. Krepp.

14       MR. KREPP:  I think the defendant raised -- and we

15  agree -- that they should be able to cross-examine witnesses,

16  and particularly Mark Braddock who received immunity about

17  possible punishments he received.

18       THE COURT:  Right.

19       MR. KREPP:  And to the extent that's

20  cross-examination, that, of course, is fair game.  Our only

21  thing we wanted to flag to the Court is because of the

22  similarity between the charges, we may be raising an objection

23  if we think that the cross-examination is going too far to --

24       THE COURT:  To hint --

25       MR. KREPP:  Exactly.

1          THE COURT:  -- what the defendants on trial might

2     get.

3          MR. KREPP:  Exactly, your Honor.

4          THE COURT:  Okay.  So I will grant only as to

5     argument about penalties or assessing punishment for these

6     defendants on trial but understanding that if the government

7     feels like that's the direction it's going, I'm going to be in

8     tune with that because I think that would be improper.

9          Okay.  No. 5, precluding jury nullification

10    arguments, I would say at this time denied as vague because

11    I'd have to hear the arguments to determine if that's what

12    they actually are.  But since a reference to the Georgia

13    Department of Revenue's investigation has come up, I will

14    grant the government's request that the defense proffer what

15    you intend to get into here.  And I can't remember if it was a

16    particular -- I can't remember which defense attorney or which

17    defendant that applied to.

18         Mr. Krepp, you asked for a proffer, but I can't

19    remember as it applied to DOR.

20         MR. KREPP:  Yes.  I think it was as to the Chrisley

21    defendants, that they just said in their response brief that

22    they think -- in our initial brief we said that that should be

23    excluded, Department of Revenue investigation.

24         THE COURT:  The entire investigation.

25         MR. KREPP:  Yes.  We believe it was irrelevant.  In

1    their response brief they said a limited -- I'm paraphrasing.

2    I believe the phrase was limited evidence concerning DOR's

3    investigation should be admitted, and that's too vague for us

4    to even know what that means.  We think the issue of -- we

5    think the entire issue is irrelevant as to whether or not the

6    defendants committed tax crimes.

7          Obviously, this was, as we just talked about, a live

8    issue in front of Judge Anand for suppression purposes, but we

9    do think before opening statements the defendants should give

10   a proffer as to the relevance as to DOR's investigation and

11   why they intend -- what they intend to get into and why it's

12   relevant to the charges in the superseding indictment.

13         THE COURT:  Okay.  So let me ask first -- and I'll go

14   through each defendant -- if you do intend to get into the DOR

15   investigation.  And particularly now I am concerned about

16   opening statement.  We can, you know, discuss at a later point

17   if something has come up that makes you feel like you can do

18   that in closing, but right now I'm more concerned about

19   starting off with it.

20         So, Mr. Morris, anything from you at this time?  And

21   if you're not prepared to tell me, I'd ask that you raise it

22   again when we get there.  But, government, you would probably

23   have to remind me to bring it up.  But Mr. Morris?

24         MR. MORRIS:  Thank you, your Honor.  I can do it very

25   briefly.

1           THE COURT:  Yes, sir.

2           MR. MORRIS:  The government's primary witness in this

3    case is a gentleman by the name of Mark Braddock, and it's our

4    position -- and I believe the evidence bears it out -- that

5    any income tax investigation of the Chrisleys began when Mark

6    Braddock went to the Georgia Department of Revenue and said

7    I've got information that this guy made lots of money and

8    didn't report his income.  And that started the investigation.

9    So I intend to question him about that, and I expect that he

10   will say, yes, he did reach out to the Georgia Department of

11   Revenue.

12          And we would also call a witness from the Georgia

13   Department of Revenue by the name of Katie Vancil, and I

14   expect, among other things, that she will testify that she is

15   the one who initiated the seizure of the Chrisleys' property

16   in the warehouses that we have discussed.  And that is

17   absolutely germane because the evidence part of the defense in

18   our failure to pay taxes is that we intended to sell that

19   property for whatever we could get for it and then donate the

20   balance of that property to charity to get tax deductions and

21   to use the money from the sale to pay taxes.  And we were

22   precluded from doing that because of the GDOR action.

23          That is basically all we have to do at this time.  If

24   I intend to expand that, I'll certainly bring it to the

25   government's attention and the Court's.

1          THE COURT:  Okay.  Anybody else on defense side?

2    Mr. Friedberg?

3          MR. FRIEDBERG:  I was just going to say that I echo

4    what Mr. Morris says, and if we do intend to tender any

5    evidence, we will certainly make the Court aware and the

6    government aware prior.

7          THE COURT:  Okay.  Thank you.  And I don't know how

8    applicable it is, but, Mr. Griffin, anything from you there?

9          MR. GRIFFIN:  No, your Honor.

10         THE COURT:  Okay.

11         MR. MORRIS:  I should note one other thing --

12         THE COURT:  Yes, Mr. Morris.

13         MR. MORRIS:  -- and I've already notified the

14   government.  I intend to introduce into evidence in our case

15   in chief a videotape, brief videotape, of the property in the

16   warehouse that was seized.

17         THE COURT:  All right.  Mr. Krepp, let me hear from

18   you.

19         MR. MORRIS:  That's for the purpose of showing it was

20   real, it was valuable, and had we been able to sell it or

21   donate it, it would have helped us in paying our taxes because

22   we --

23         THE COURT:  And you think the jurors can ascertain

24   that from just seeing this video?

25         MR. MORRIS:  I beg your pardon?

1          THE COURT:  You think that the video is needed for

2   the jurors to see there was a real warehouse and it was worth

3   something so that --

4          MR. MORRIS:  Yes.  I think for somebody to get on the

5   witness stand and say, well, yes, I intended to pay a whole

6   lot of my taxes by selling this property and giving the money

7   to the IRS, that's worth nothing when they see the vastness of

8   this warehouse and the amount of furniture.  That's going to

9   have an effect.  I believe it does.

10          THE COURT:  Okay.  It may.  I'm not sure if that

11   makes it admissible in this trial.  But Mr. Krepp.

12          MR. KREPP:  So on the first point, we have no

13   objection to the questions to Mr. Braddock.  On the second

14   point, the questions to Ms. Vancil as it was proffered by

15   Mr. Morris, we don't have any objection.  But we do have an

16   objection if it goes into what he just proffered now.

17          And let me just add that we just spent a long period

18   of time talking about their motion to suppress items from the

19   warehouse, and now they want to show pictures of the things

20   that were suppressed.  So I'm a little perplexed right now and

21   wondering if that opens the door to us using -- I have to

22   research this -- suppressed evidence.  So I'm not in a

23   position to say one way or another right now but if they -- it

24   would seem inappropriate.

25          I think we'd have a Rule 403 argument on just

1  pictures of things that were seized, but if they're going to

2  get into pictures of things that were seized from the

3  warehouse that Judge Anand, as we've said, suppressed, then we

4  think it should be fair game for us to get into things that

5  were seized as well, which would include cut and pasted bank

6  statements.

7        THE COURT:  I am likely to not allow the video, and I

8  understand why, Mr. Morris, you would want to use it.  I just

9  don't know how you would lay a proper foundation for its use

10 in this particular trial in the way that you've mentioned.  So

11 I'm not likely to allow that, but we can talk about the DOR

12 stuff that you intend to use in opening -- before opening

13 again.  I'll make a note of it, but, again, I can't promise

14 that a note will remind me.  So, government, you will need,

15 since it's your motion, you'll need to remind me of that.

16       At this time, though, I am going to, on that part,

17 deny as vague.  And, Ms. Beck, you need not worry about the

18 individual rulings within this.  Just deny it in part and part

19 for 157.

20       Okay.  No. 6, cross-examining or impeaching witnesses

21 with investigative reports the witness has not signed or

22 otherwise adopted.  I know what this is getting at.  I've seen

23 this happen before in trials, but at this time I'm going to

24 deny as vague, although there certainly is law that supports

25 what the government is trying to get at here.  Whether or not

1  a witness has actually adopted a particular statement, whether

2  that statement is actually being used to impeach versus to

3  refresh recollection or some other purpose, it's something

4  that would need to be determined statement by statement.  And,

5  again, no specific statement at this time has been presented

6  to the Court in connection with this motion in limine, so at

7  this time I'm going to deny that as vague.

8          And 7 denied as vague.  This goes to precluding

9  defendants from using evidence in their case in chief that has

10  not been provided in reciprocal discovery.  I have no idea, as

11  I sit here, what all has been presented in discovery by either

12  side, so any ruling I would give here would be pointless

13  because we'd have to still establish whether or not it was

14  something provided to the other side.  I also note that at the

15  time these motions were filed, there was an agreement to

16  exchange further discovery, so I'd ask if anyone needs to be

17  heard further on this at this time.  Government?

18          MR. KREPP:  No.  We've had ongoing discussions since

19  our initial motion, your Honor, so we're hopeful that we'll be

20  able to resolve this.  But if it becomes an issue, I'll raise

21  it before we start trial.

22          THE COURT:  All right.  Defense and anyone who has an

23  issue want to be heard, please just stand.

24          MR. MORRIS:  No, your Honor.

25          THE COURT:  Okay.  All right.  158, which is

1   Defendant Todd and Julie Chrisley's omnibus motion in limine,

2   the response is 170, the reply 172.  Quite honestly, and I'm

3   sorry.  I apologize for this, but I was not certain after

4   reading this lengthy motion, which starts with a discussion

5   over the admissibility of 404(b) evidence, I wasn't sure what

6   specifically was at issue.  Best I could tell we're talking

7   about something related to a list of 14 lenders and 6

8   allegedly fraudulent documents to include 4 invoices and 2

9   documents to financial institutions, which I believe are the 6

10  extrinsic acts the government seeks to admit as 404(b)

11  evidence.  But, again, I read this motion a couple of times,

12  and it just wasn't clear to me.

13          I note that the government argues that these 6

14  extrinsic acts, though, are inextricably intertwined with the

15  charges before us, that they are being offered for some

16  purpose other than character, specifically for intent, plan,

17  knowledge, absence of mistake, and lack of accident.  The

18  government also argues that it can prove these 6 acts by a

19  preponderance of the evidence and that there will be no 403

20  violation by their admission.

21          Just as an initial point to understand exactly what

22  we're talking about, I need to hear a little bit more.  So

23  this was from the Chrisleys, so if one of you wants to be

24  heard.

25          MR. DELUCA:  Yes, your Honor.

1          THE COURT:  Yes.  And I'm sorry.  Remind me of your

2    name as you come up, counselor.

3          MR. DELUCA:  Jonathan DeLuca.

4          THE COURT:  DeLuca.  That's right.

5          MR. DELUCA:  And, your Honor, along with Chris

6    Anulewicz, we jointly represent Todd and Julie Chrisley.

7          THE COURT:  Okay.

8          MR. DELUCA:  Your Honor, the Chrisley's motion in

9    limine, as you've correctly pointed out, essentially tries to

10   exclude two categories of evidence.  The first one is the

11   404(b) evidence identified in the government's March 14th and

12   March 30th letters to the Chrisley defendants.  The second set

13   of -- the second category of evidence, your Honor, deals with

14   the so-called unrelated acts or uncharged acts with these

15   financial institutions.

16         Regarding the 404(b) evidence, as your Honor is well

17   aware, in order for it to be part of a plan, intent, motive,

18   and the other carve-outs under Subsection 2 of 404(b), they

19   have to show that it is -- excuse me.  I apologize.  They have

20   to be able to show, one, that the evidence -- by a

21   preponderance of the evidence that the defendants committed

22   these acts.  On that point alone the evidence fails.

23         We expect the testimony at trial, if it's admitted,

24   to show that there is a dispute whether the Chrisleys even

25   submitted these invoices or the emails in question.  We

1   expect, at least to some of these 404(b) items, that the

2   witnesses related to these entities themselves, at least one

3   in particular, will testify that these are actually correct

4   invoices.

5          And then with regard to the two sets of emails to the

6   financial institutions which are, I believe, the fifth and

7   sixth items on the 404(b) list -- that's the emails to the

8   banks -- the emails that the government cites in their motion

9   do not show what the government contends they show.  On one

10  they claim that Defendant Chrisley, Defendant Michael Todd

11  Chrisley, improperly edited an email.  The minor child's --

12  the minor child's name was removed from one of the emails, but

13  it's not clear who did it.  And at the end of the day, the

14  minor child's name is on the subject line of the email, and so

15  there's nothing material about that change.

16         With the cashier's checks, which is the sixth item on

17  the 404(b) evidence, the government claims that there was a

18  material alteration, but the real argument is that there was a

19  material omission made by the Chrisley defendants.  But,

20  again, I think the evidence will show that they can't show by

21  a preponderance of the evidence that this occurred at all.  I

22  think there will be testimony by multiple witnesses that the

23  Chrisley defendants did not submit these invoices -- these

24  emails rather, and that the cashier's checks at issue, the

25  money was available.  I mean, there's no evidence in the

1   record that these funds were not at that time in the

2   Chrisleys' bank accounts.

3          And perhaps most importantly with those, these are

4   not prior convictions.  It's not clear that the Chrisley

5   defendants were involved in these submissions.  These are

6   years apart, totally unrelated to the issues inside the actual

7   indictment.  And so for the 404(b) items, we would argue to

8   this Court that they should be deemed inadmissible.

9          With the unrelated acts, as this Court is aware,

10  Count 1 identifies a bank fraud conspiracy scheme, and Counts

11  2 through 6 identify specific instances of bank fraud.  Counts

12  2, through 6 identify individual banks.  Count 1 doesn't

13  specify these banks, but they refer to documents that through

14  discovery we found out are four additional banks.  So in

15  Counts 1 through 6 there are nine banks identified.

16         On March 15th the government provided a lengthy list

17  of financial institutions, some of which were included in the

18  indictment and some of which were not.  I believe it was 22,

19  22 financial institutions.  And the government argues that

20  this is not 404(b) evidence, but it's outside of the purview

21  of 404(b) because it shows it's inextricably intertwined, that

22  it is used to show that it's part of the same transaction or

23  series of transactions or, third, that it is used to show the

24  story or -- the full story of the crime.  And, again, with

25  these, your Honor, we would suggest that neither of these are

1   true.

2          With the first issue it is not the same transaction

3   or series of transactions.  These loans and silos essentially

4   are independent of one another submitted to totally different

5   financial institutions, and they don't refer to each other,

6   don't relate to each other.  The government contends there's

7   some commonality between the alleged fraudulent information in

8   the submittal, but we would disagree with that.  For almost

9   everything except for, I think, one instance there's one

10  factual detail that they contend was in multiple, multiple

11  loans.

12         The main case they cite for this is the *Ford* case,

13  which we think is distinguishable.  In *Ford* there were

14  fraudulent tax returns submitted by the defendant to the IRS,

15  but the point is that in *Ford* the defendant was submitting

16  these to one institution, the IRS.  Here these alleged

17  fraudulent documents were submitted to various financial

18  institutions totally separate and apart from one another.

19         So, your Honor, on those points we would request this

20  Court to deny the government's attempt to admit this evidence.

21         THE COURT:  Okay.  And tell me again succinctly what

22  evidence.

23         MR. DELUCA:  Yes, your Honor.

24         THE COURT:  Not the arguments again.  You've

25  articulated those.  But what evidence in connection with this

1    argument.

2            MR. DELUCA:  On this latter argument?

3            THE COURT:  Just the whole motion.  I'm sorry.

4            MR. DELUCA:  Sure.  Yes, your Honor.  So two

5    categories.  The first one is the 404(b).

6            THE COURT:  Right.  And is that just -- what evidence

7    are we talking about there?

8            MR. DELUCA:  Sure.  So it's six examples.

9            THE COURT:  Okay.

10           MR. DELUCA:  One is the right-hand man of this.

11           THE COURT:  Okay.  So the four invoices and the

12   two --

13           MR. DELUCA:  Sets of emails essentially.

14           THE COURT:  Okay.  So got those six.  So that's the

15   404(b).  And then what else are you -- what evidence are you

16   seeking to exclude?  What about these lenders or what other

17   evidence if I want to just have a list of the specific

18   evidence to which your argument applies?

19           MR. DELUCA:  Sure, your Honor.  So there are five

20   financial institutions identified in Counts 2 through 6.

21           THE COURT:  Okay.

22           MR. DELUCA:  Those obviously on the list are part of

23   the government's case, and, you know, we're not seeking to

24   exclude those.  In addition, in Count 1 the government refers

25   to, not directly in the indictment, but we've since learned

1  the four financial institutions they're referring to in Count

2  1 would be Alpha Bank, Midtown Bank, Supreme Lending, and

3  Crescent Bank.

4          THE COURT:  Okay.  So the four banks listed in Count

5  1 you are asking the Court to do what?

6          MR. DELUCA:  So those are fine too because they're

7  being referred to by the government and that's -- we contend

8  that's part of their indictment.

9          THE COURT:  Okay.  So these are okay.  What is not

10 okay?  What are you seeking to exclude?

11         MR. DELUCA:  Yes, your Honor.  So there's 13 others

12 that are identified.  I believe it's Exhibit C to the

13 government's response to our motion in limine.

14         THE COURT:  13 lenders?

15         MR. DELUCA:  Yes, your Honor.

16         THE COURT:  Okay.

17         MR. DELUCA:  And the list, I believe, shows 22

18 lenders, but when you deduct these, I believe, 9, that leaves

19 13 lenders identified by the government that they'd like to

20 introduce regarding mainly Count 1 but that are not included

21 in the indictment and are uncharged acts.

22         THE COURT:  Okay.  And with respect to these

23 lenders -- and, again, I looked at this motion twice, but it's

24 been some time ago.  And the two times I looked at it I didn't

25 quite absorb it all.  With respect to these lenders, you are

1  seeking to exclude all references to specific documents?  I

2  mean, what exactly is the evidence that you are seeking to

3  exclude?

4          MR. DELUCA:  Yes, seeking all references to these

5  financial institutions.

6          THE COURT:  Okay.  So the 6 acts and 13 lenders in

7  Exhibit C, all references to them.

8          MR. DELUCA:  That's correct, your Honor.

9          THE COURT:  Okay.  Okay.  Thank you.

10         MR. DELUCA:  Thank you, your Honor.

11         THE COURT:  Anything else from the defense before I

12  hear from the government?  Okay.  Government.

13         MR. MORRIS:  The only thing I wanted to add, Judge,

14  is the government gave us discovery that included alleged

15  false documents and communications with more banks than were

16  listed in the indictment.  The four discrete ones in Counts 2

17  through 6, those were identified.

18         In the Count 1 conspiracy, the bank fraud conspiracy,

19  there are references to false documents, but they don't

20  identify the banks.  But we can figure out which four they

21  were talking about.

22         In exchanging information in answer to the bill of

23  particulars and in preparing for trial, the government and the

24  defense have been very open with each other.  So we requested

25  are there any other banks you intend to introduce evidence

1  about that are not named in the Count 1 conspiracy, and the

2  government gave us a list of 22, 13 of which are not named in

3  the indictment or specifically referred to in the indictment.

4  Those are the 13 we're talking about in the motion in limine.

5        THE COURT:  Okay.

6        MR. MORRIS:  Does that -- is that clear?

7        THE COURT:  I think so.  Let me hear from the

8  government.  Okay.  Government, let me hear from you, and

9  please start with what your understanding is of what is --

10 they are seeking to exclude.

11       MR. KREPP:  Yes, your Honor.

12       THE COURT:  Thank you.

13       MR. KREPP:  I'll start with Counts 1 through 6, the

14 inexplicably intertwined argument, if it's all right with the

15 Court.

16       THE COURT:  Yes.

17       MR. KREPP:  So our understanding is that the

18 defendants are seeking to exclude any financial institutions

19 that are not specifically referenced in the speaking

20 superseding indictment.  I think that's the point that

21 Mr. Morris just emphasized right now.  So just if we could

22 back up and look at the charging instrument, these -- I'm

23 sorry.  Your Honor was about to ask a question?

24       THE COURT:  Well, I was going to say, were these not

25 the subject of a bill of particulars?

1          MR. KREPP:  They were, your Honor, and we provided

2     that information.

3          THE COURT:  Okay.  All right.

4          MR. KREPP:  And one of the issues the defendants

5     raised in the motion was they didn't know the dates, they

6     couldn't even tell the dates that things were submitted, and

7     we supplied that as well, the dates that we would contend the

8     fraudulent documents were submitted.  And we are very mindful

9     of the Court's trial calendar, and I promise you that we are

10    not planning on marching in 13 additional bank witnesses.

11         What we're talking about is primarily it would be for

12    Mark Braddock and one of the case agents.  Mr. Braddock would

13    testify about what was going on during this time frame and the

14    multiple financial institutions that the Chrisleys and he were

15    seeking to defraud.  So it's part and parcel on the same

16    story.  It is a heartland inextricably intertwined case.  I

17    could speak with somewhat of authority on the *Ford* case

18    because I tried that case, I remember, with Judge Grimberg in

19    front of Judge Thrash and argued it to the Eleventh Circuit.

20    And in that case, your Honor, the issue was that the

21    defendants were making --

22         THE COURT:  I'm sorry, because I'm not even with you

23    yet.

24         MR. KREPP:  Sure.

25         THE COURT:  What they are seeking to exclude they are

1  doing so on what basis?  Because it is improper 404(b)?

2  Because it's not been specified in the nature of a bill of

3  particulars type argument?  What are we talking about before

4  we get to whatever you tried with Judge Grimberg?

5          MR. KREPP:  I believe --

6          THE COURT:  And I'm sorry for my frustration, but I

7  have looked at this a couple of times.  It's not clear to me

8  what we're talking about here, and perhaps that's just my lack

9  of knowledge of the case.  So I apologize for that.

10          MR. KREPP:  It is a little unclear to us as well,

11  which is why we tackled each prong under *Ford*.  Okay.  That's

12  why I was going to *Ford* and it's -- it was unclear to us.  My

13  understanding is --

14          THE COURT:  The motion is unclear, and I say that

15  with all due respect.  I don't mean to -- I try, as you all

16  can see from this, to go through and understand and carefully

17  think through what's being discussed in each of these, and I

18  attempted to with this one.  And I am just -- I won't say it's

19  unclear.  I take that back.  It perhaps is me.  But I don't

20  understand at all what we're talking about, just very

21  generally, that we're talking about some lenders, six acts,

22  some 404(b), something not identified.  Beyond that, I don't

23  know what we're talking about.  So I don't know what I'm being

24  asked to exclude at all.

25          MR. KREPP:  Okay.  So our understanding is, again, I

1   think it's -- again, just going off our understanding and

2   reading the same brief your Honor has read, is that the

3   defendants are seeking to exclude those additional members

4   that are not referenced in the superseding indictment --

5           THE COURT:  13?

6           MR. KREPP:  Yes, yes.  The basis, and according to my

7   brief, is in part -- and part of the argument is it is

8   impossible to determine if the alleged conduct is even within

9   the conspiracy dates alleged or the applicable statute of

10  limitations.  So in response to that, we provided the list

11  that's been referred to along with the dates that the

12  fraudulent documents were submitted to the bank, and they all

13  fall within the conspiracy period.  So that argument, I

14  believe, has been thoroughly addressed.

15          I believe the defendants are also arguing that

16  because the banks were not named in the indictment, that

17  they're outside the scope of what was charged by the grand

18  jury and should be excluded.  That is how we interpreted their

19  brief.

20          THE COURT:  Okay.

21          MR. KREPP:  We do not read the indictment that way.

22  We do not read binding Eleventh Circuit authority that way.

23  The indictment clearly alleges a conspiracy to defraud, quote,

24  multiple financial institutions.  The defendants properly

25  filed a motion for a bill of particulars looking to know what

1   are you talking about.  The grand jury is not required to

2   itemize every financial institution that was defrauded, and it

3   didn't do so in this case.  And we provided that list along

4   with, after their motion, the dates that the fraudulent

5   documents were submitted.  So we think this fits squarely

6   within the language of Count 1.

7         Going back to the *Ford* case, just drilling down a

8   little bit of details, the issue the Eleventh Circuit was

9   dealing with was the exact issue here.  There was an argument

10  the defendant was making that false tax returns that listed --

11  the way we proved our case was it was called the common

12  address method.  There were certain addresses listed on the

13  tax return, and we were trying to prove the defendant was

14  using the same dummy addresses over and over again.  Defendant

15  made a very similar argument that they're making right now,

16  well, you know, these are outside the scope of the indictment,

17  and Judge Thrash ruled that it was other returns not named in

18  the indictment were inextricably intertwined with the offense

19  based upon the commonalities.

20        So, again, we're going back to the three prongs under

21  *Ford*.  We believe we prevail, that this is an uncharged

22  offense arising out of the same transaction or series of

23  transactions.  Mark Braddock is going to testify to that

24  effect.  It's clearly inextricably intertwined.  That's the

25  second prong of *Ford*.  And, lastly, it really is crucial that

1  the word from *Ford* is necessary to complete the story of the

2  crime.  I'm going to use the word "crucial" for our case

3  because the way this scheme unfolded was it was essentially a

4  bank loan Ponzi scheme.

5        The defendants were bouncing from one bank to another

6  getting fraudulent loans, using some of those loans to pay

7  back other lenders, and then the scheme ultimately collapsed.

8  So it's essential to go through this, through our case agent

9  and through Mark Braddock's testimony, to really tell the full

10  story.

11        THE COURT:  All right.  And what say you with respect

12  to these six so-called extrinsic acts?  Is that --

13        MR. KREPP:  Yes, your Honor.

14        THE COURT:  -- or is that separate from what you've

15  just said?

16        MR. KREPP:  That is separate, your Honor.

17        THE COURT:  Okay.

18        MR. KREPP:  So there are six discrete acts that we

19  believe should be admitted under Rule 404(b).  Again, we are

20  mindful of the Court's time, and I understand the defendant's

21  argument that this is a complicated financial case.  Looking

22  at Count 1 and Count 7 -- I'm sorry -- Counts 1 through 6 and

23  Count 7, Counts 1 through 6 essentially charge the defendants,

24  the Chrisley defendants, with submitting fraudulent documents

25  to banks.  Count 7 alleges that Julie Chrisley submitted

1   fraudulent documents to a Realtor.  The first four invoices

2   speak directly to that issue.

3            Now, the Chrisleys have already publicly stated,

4   they've already publicly stated -- we plan to introduce it --

5   they agree a bank fraud scheme took place.  That's a statement

6   of a party opponent that will come in at trial.

7            THE COURT:  It's just a matter of who's at fault for

8   it?

9            MR. KREPP:  Just a matter of who's at fault.  And

10  what's crucial, your Honor, is Mark Braddock ends, his story

11  ends in 2012.  I don't believe there's going to be any

12  argument whatsoever -- and they can correct me if I'm wrong --

13  that they were in business with Mr. Braddock at the time that

14  these fraudulent invoices were submitted so --

15           THE COURT:  Okay.  I'll come back to you in a second.

16  Thank you so much.

17           MR. KREPP:  And then if you want me to address the

18  last two or --

19           THE COURT:  No, not right now.

20           MR. KREPP:  Okay.

21           THE COURT:  Okay.  Defense, is there anything further

22  in connection with this motion that you want to put on the

23  record?

24           MR. DELUCA:  No, your Honor.

25           THE COURT:  Okay.  I'm going to deny it.  This is 158

1  denied.

2       All right.  159, Defendant Todd Chrisley's motion in

3  limine to suppress evidence.  My understanding is that this

4  motion is due to be granted without objection because it

5  relates to a cell phone recovered from what has been

6  determined at this point to be an illegal search of a

7  warehouse.

8       I also note that the government, I don't believe,

9  filed a response to this motion in limine.  So let me know if

10 my understanding is incorrect, but I think this is due to be

11 granted without objection.  Government?

12      MR. KREPP:  That's correct.  We spoke to Judge Anand

13 about this, your Honor, and we accept that.  And this goes

14 back again, your Honor, to this was the physical material.

15 This was not the email search warrant.

16      THE COURT:  Okay.  All right.  Any Jencks discussion

17 that needs to be held with the Court at this time, government?

18      MR. KREPP:  No, your Honor.

19      THE COURT:  Anyone from the defense stand if the

20 answer is yes.

21      MR. MORRIS:  I'm sorry, Judge.  What was the

22 question?

23      THE COURT:  Anything in connection with Jencks that

24 needs to be brought to my attention right now?

25      MR. MORRIS:  Not to my knowledge, Judge.

1        THE COURT:  Okay.  Do you all intend to have any

2   stipulations at trial, whether to be read or whether to be

3   typed out to go back with the jury or anything like that that

4   we need to discuss?  Government?

5        MR. KREPP:  Yes, briefly, your Honor, there was a

6   lengthy discussion in front of Judge Anand about an email that

7   Mr. Morris sent in his capacity as attorney for 7C's

8   Production.  That email is referenced in the indictment, and

9   it was part of a hearing we had in front of judge Anand.  We

10  have obviously redacted Mr. Morris's name from that email.

11  The Chrisleys acknowledge we were going to be admitting this

12  email as a statement of a party opponent, and we have

13  exchanged emails with all three defendants.  And I believe

14  we're in agreement as to the stipulation that, number one, the

15  email in question was sent by a representative of -- by an

16  attorney for 7C's Production and, number two, that Julie

17  Chrisley provided that information to that attorney.

18        THE COURT:  Anything from the defense, Mr. Morris?

19        MR. MORRIS:  That's correct, your Honor.

20        THE COURT:  Okay.  Mr. Friedberg, anything

21  additional?

22        MR. FRIEDBERG:  He's absolutely correct, your Honor.

23        THE COURT:  Mr. Griffin, anything additional?

24        MR. GRIFFIN:  Yes.  That relates to a count that

25  Mr. Tarantino is not involved in, and I did talk to the

1  government about this.  Would it be okay if I just said on the
2  record we do not object to that stipulation rather than sign a
3  piece of paper that Tarantino is agreeing to it?

4        THE COURT:  I don't have a problem.  I won't remember
5  to prompt you to say that, so I don't know that I would say,
6  Mr. Griffin, do you have any objection to this because if it's
7  presented to me as a stipulation, I wouldn't think to say
8  that.  So how do you want to accomplish that?

9        MR. GRIFFIN:  Well, if the stipulation is read to the
10 jury and there's no sig -- we're not presenting anything that
11 without -- I'm concerned about signing something on behalf of
12 Tarantino as if he's somehow connected to this.

13       THE COURT:  Well, government, first of all, how will
14 it be presented, and, second, how would it be made clear to
15 the jury that it is stipulated to just by the Chrisley
16 defendants?

17       MR. KREPP:  So our initial thought was we would
18 handle it like we typically do.  We'd propose and we send over
19 a draft stipulation with signature lines for counsel and for
20 the defendants.  I think the Chrisley defendants were okay
21 signing it and Mr. Tarantino, and I understand why he doesn't
22 want his name on that particular document.

23       My only concern is the Eleventh Circuit pattern
24 instructions on stipulations, when your Honor is instructing
25 the jury, will say that the parties have agreed to certain

1  statements.  You can treat them as facts.  So I do -- I think

2  that document can go back with the jury.  I'm fine with no

3  signatures being on the document, and we can just have

4  everyone orally agree, including the defendants.  That's fine

5  too, and it doesn't need to be in front of a jury.  Then it

6  removes anybody's name from it, and it will just say

7  stipulation and it would just have the two items I listed and

8  then --

9          THE COURT:  Well, I think if that happens, though,

10 what I understand Mr. Griffin to be saying is he wants an

11 opportunity to make it clear to them that his client is not

12 involved, joined in the stipulation.  So I don't know that

13 that's accomplished by nobody reading it or presenting it and

14 it just going back.

15         So, you know, I don't know.  You all can come up

16 with -- so that's why my second question was how would it be

17 made clear to them as to which defendants are participating in

18 this stipulation.  I will leave that to you all to discuss,

19 whatever you all want to present to the Court, then I'm fine

20 with.  But, obviously, that is a concern of his.  You

21 understand why.  I understand why.  So you just need to

22 accomplish a way to present it to the jury so that it's clear

23 to them.

24         MR. KREPP:  Okay.

25         THE COURT:  All right.  I'm going to mark that on my

1  list of notes that I hope that I will remember to review.

2  Okay.  So that's that stipulation.  Tarantino not

3  participating in that.

4          Okay.  Getting there, we're getting there.  All

5  right.  Jury charges.  Again, we do understand that we don't

6  know what the final charges are until all of the evidence is

7  presented, but what this Court directs you to do is to submit

8  a preliminary set of charges.  I think the trial notice says

9  three days before the trial begins.  So whatever date that

10  is -- I think that's that Friday before the 16th -- in Word

11  version to Ms. Beck because we will start preparing, start

12  working on the charge from the beginning of the trial.  But we

13  understand, again, that you may have additional ones and all

14  based on what comes out toward the end of trial.

15          Actually, this is going to be a longer trial.  I'm

16  okay -- you can note this, that we are okay with not getting

17  the preliminary charges, proposed charges, until the first day

18  of trial, but the point being that we start working on them

19  right away, putting them together.

20          I don't know if any of you -- I know some of you but

21  not all of you have had a trial before this Court, so let me

22  tell you how I do the charge conference.  As I said just a

23  moment ago, I start preparing the proposed charge from Day 1.

24  As we get toward the end of the presentation of evidence, I

25  give you a copy of the Court's proposed charge so that

1   hopefully an attorney on your team who may be not preparing

2   for closing argument can begin to look at it.  And then one

3   evening we send the jury home.  You all have an informal

4   charge conference off the record and with one of my law clerks

5   to whittle down your actual objections.  Once it's whittled

6   down, we'll come on the record, and you will have an official

7   or formal charge conference with me.  I just find doing that

8   weeds out a lot of the objections rather than going page by

9   page through everybody's proposed charges.  So that's how we

10  do the charge conference.  Any questions on that, government?

11          MR. KREPP:  No, your Honor.

12          THE COURT:  Anyone from the defense stand up if you

13  have --

14          MR. MORRIS:  No, your Honor.

15          THE COURT:  Okay.  All right.  So the last thing I

16  think we have -- oh.  Also, the Court does give proposed --

17  the Court does give preliminary charges.  The ones I give are

18  a condensed version of the Eleventh Circuit.  So I have

19  handouts here, but I'm also going to give you an electronic

20  version of anything I use.  It will be attached to my trial

21  order so that you'll have an opportunity to send back to me

22  any changes, recommendations or proposals you have to counter

23  what I usually use.

24          So I'll give these handouts in just a second, but one

25  of the things in those handouts is the condensed preliminary

1   charge that the Court gives.  And I will in my trial order

2   tell you that if you have any proposed changes or if perhaps

3   you want me to use the full Eleventh Circuit preliminary

4   charge, to let me know by a date certain, and that will

5   probably be May 9th in this case.  But in here, in this

6   packet -- and it will be sent to you electronically with my

7   order following this pretrial conference -- will be what I

8   give preliminarily.

9          All right.  With voir dire let's talk a little bit --

10  we're almost there -- about what we want to do with voir dire.

11  So I have gotten a questionnaire, and I've also gotten

12  questions along with objections from each side.  I don't know

13  if those were submitted in alternative form.  So, Judge, if

14  you don't give the questionnaire, we can use the questions, or

15  if you want to use the questionnaire and then some of the

16  questions.  I assume the former because some of the submitted

17  questions repeated what was in the questionnaire, so I'm going

18  to go with that.  And I see some heads nodding.

19          So tell me what you'd like to do in terms of the

20  questionnaire and who wants to -- yes, Mr. Morris.

21          MR. MORRIS:  May I, your Honor?

22          THE COURT:  Yes.  I think you were jumping to get to

23  this before we got --

24          MR. MORRIS:  I'm excited --

25          THE COURT:  So the floor is yours.

1          MR. MORRIS:  So excited about it.  Thank you.  All of

2    the parties got together to discuss the possibility of using a

3    questionnaire, and we circulated drafts and received comments.

4    And the hope was that we could come to agreement on a

5    questionnaire from start to finish and that the Court would

6    allow us to use it.  We didn't know if the Court would, so we

7    alternatively filed voir dire questions in hopes that we

8    wouldn't have to deal with this.

9          The government and the defense put all of the

10   questions they wanted after we'd weeded out a few into what I

11   believe is Document 163-1.  And that is the proposed juror

12   questionnaire.  I believe the government has a few objections

13   to some of the questions in the questionnaire, and the defense

14   has a few objections but not many.  If we can work out those

15   objections with your Honor's assistance, our hope would be, as

16   they did in the *Mitzi Bickers* trial, Judge Jones allowed the

17   questionnaire to be used, a similar questionnaire, and the

18   jurors were actually called in the Monday before the trial

19   date.  And they came in and filled out their questionnaires

20   and left and were told to come back the following Monday for

21   jury selection.

22         So the parties had a week to weed through the

23   questionnaires.  And when they actually started voir dire on

24   the morning of trial, what the judge allowed was follow-up

25   questions only to what was in the questionnaire, and they had

1  a jury before the end of the day.  And, again, that was a case

2  where, for lack of a better description, the accused was

3  someone whose name was recognized by people, and we may have

4  that in this situation.  So it would probably be helpful to be

5  able to weed people out quickly before we even start

6  questioning them.

7        If the Court will allow, I'll just jump to the

8  questions that I had particular objections to in the

9  questionnaire.  Would that be okay?

10       THE COURT:  I have that, yeah.  I'll go over that in

11 a moment.  I just wanted to hear at this time --

12       MR. MORRIS:  I think we all agree the use of a

13 questionnaire would be a great idea.  I am prepared, if the

14 Court allows it, just -- we'll figure out which questions need

15 to be taken out.  We'll reprint it and get it back to the

16 Court for the Court's use if the Court will allow it.

17       THE COURT:  Okay.  Sounds good.  Let me ask a couple

18 of questions.  First, Ms. Beck, I'm going to turn my attention

19 to you because one of the things I asked Ms. Beck to do was to

20 talk to someone in Jury Management about this.  And I think

21 it's a great idea to get the questionnaires done a week in

22 advance, but what was presented to me is that they would come

23 in that day and do them, which I thought was cutting it short.

24 I'm surprised that Jury Management didn't mention the *Mitzi*

25 *Bickers* case because that certainly sounds like a more

1    reasonable way to proceed.  So, Ms. Beck, I want to confirm

2    with you that that coming in a week early was not discussed?

3            COURTROOM DEPUTY:  That was not discussed, and I just

4    sent an email to see if it's possible that we could --

5            THE COURT:  If it's done before, it's possible.  And

6    that means it's possible, so that's what we want to do too.  I

7    agree.  So, first of all, yes, both sides agree to use a

8    questionnaire.  Subject to discussion of which questions each

9    side objects to, I'm all for that, so we will talk with Jury

10   Management about getting jurors to come in one week early so

11   that we can get them filled out and get them to attorneys in

12   time to review.

13           Mr. Morris, I understood you to say that during the

14   actual voir dire process, that the attorneys were only

15   permitted to ask follow-up questions then?

16           MR. MORRIS:  Yes, your Honor.

17           THE COURT:  Okay.  What about -- yes.

18           MR. MORRIS:  In response to what they filled out.

19           THE COURT:  Sure.  What about qualifying questions in

20   terms of -- let me see.  Well, because I asked qualifying

21   questions -- there are not that many of them, and this will be

22   in your packet too.  I asked about 17, and so I'm assuming

23   Judge Jones still just did the qualifying questions himself?

24           MR. MORRIS:  Yes, your Honor.

25           THE COURT:  Okay.  I'm going to get that in your

1  packet too, and you can let me know.  So for the qualifying --

2  actually, let me just go ahead and, Ms. Beck, have you hand

3  these out.  How many do I have?  One, two, three, four, five,

4  six, seven.  That should be enough for each of the attorneys.

5  They should get eight.  Let me know if you need an extra.

6  Just take those briefly.  I'm just going to go through that

7  real quick.  Some of it might not be applicable since we're

8  doing the questionnaire.

9       So as you get that, disregard the first page that

10  says background questions.  Disregard that because -- well,

11  no, wait a minute.  Don't disregard that.  And I'm sorry.  I

12  apologize if this is a little bumpy for me, but I have not

13  done a questionnaire as a judge since I've been here so I'm

14  thinking through the mechanics as we're discussing it.

15  Normally what I do for voir dire is we come in, they answer

16  questions as a group, which in this case would have been taken

17  care of through the questionnaire, and then we go to the

18  individual one by one.  We stand Juror No. 1 up.  Juror No. 1

19  introduces him or herself using that first page, which is the

20  background.  So Juror No. 1 goes down that whole script to

21  introduce himself.

22       Then each attorney asks whatever follow-up questions

23  and that's -- and before the whole process begins I would ask

24  what you see as the qualifying questions which, as you can

25  see, still needs to be filled in by you so that I know which

1   attorneys I'm asking about and other people like that that

2   need to be included.

3        So if we did the questionnaire -- and, again, we'll

4   talk about the objections to that in a moment.  The panel

5   would come in.  Juror No. 1 would stand up.  Juror No. 1 would

6   introduce himself using background.  Plaintiff's counsel and

7   then defense counsel, each defense counsel, would have an

8   opportunity to ask follow-up questions, and then we would move

9   to Juror No. 2.  And we would go straight down the line in

10  that manner not stating strikes for cause at that time.

11       I would take appropriate breaks to see if there are

12  any strikes for cause until we qualify the right number of

13  jurors, which in this case, let's see, would be 32, 12 jurors,

14  6 government strikes -- wait a minute.  Nobody has asked for

15  additional strikes, so 10 defense strikes plus the alternates,

16  the 2 alternate strikes and the 2 alternates, that gets us to

17  32 that we need to qualify.

18       So I am going to leave that with you all.  If there

19  are any suggestions, objections, proposals to what the Court

20  uses, I will give you until May 9th to get back to me on them.

21  I'll also send you those handouts in electronic form so that

22  you can easily fill in like the qualifying questions and

23  things of that nature.

24       Anything before we move to discussion of the

25  objections to the questionnaire?  Okay.  Let's talk about

1   those then.  We'll start with defendants' objections which

2   are -- these are at 174, and these are objections to the

3   questionnaire.  Government, regarding Question 68, what is the

4   relevance of asking them about the 2008 economic downturn

5   briefly?

6           MR. KREPP:  I believe we're going to hear testimony

7   that a lot of the banks that were targeted here through the

8   bank fraud scheme ultimately failed, and so we'd like to get a

9   sense from the jury pool were they -- and that was obviously

10  the financial crisis centered around financial institutions

11  during that time frame.  So we'd like to get a sense from the

12  jurors as to whether or not they were impacted by that because

13  I think that when Mark Braddock testifies about how the scheme

14  unfolded, it's going to be clear to the jurors even if we're

15  not -- we're not going to be talking about financial crisis,

16  but it's going to be clear time wise that as the fraud was

17  continuing, that's exactly when banks were collapsing.

18          THE COURT:  So if I were impacted, how does that

19  affect my jury service?  If I were impacted, which many people

20  were during that downturn, how does that affect my ability to

21  be a fair and impartial juror?

22          MR. KREPP:  Well, it could go either way.  So it

23  could be that somebody says that, you know, if I find out

24  somebody was defrauding the bank, there's no way I could be a

25  fair and impartial juror.

1            THE COURT:  Okay.  I'm going to grant the objection

2      there.  I understand and I appreciate that.  I will grant the

3      objection as to relevance and not allow that one.

4            Okay.  Questions 71, 80, 83, 84, 85 and 86, each of

5      these asks, according to the defense, whether potential juror,

6      relative or close friend has had a negative experience with

7      the court system or federal agency, and it should be written

8      to inquire as to whether they have had a positive or negative.

9      Of course, the usual way we would ask is, has anyone had such

10     a negative or positive experience that it might impact or

11     affect your ability to serve.  Because this is a

12     questionnaire, so we'll give them more room to fully answer.

13     I won't limit it to affect your jury service or impact your

14     jury service, but I do think that it's important to include

15     positive and negative and not just suggest negative.

16            So if that is, in fact, how these questions are

17     worded, I'd be inclined to sustain those objections, yeah.

18     Have you had a negative experience with a lawyer or judge?

19     I'm not sure why we're just asking about negative as opposed

20     to negative or positive or any experience that might impact

21     your jury service, so I would grant that as to those

22     questions.

23            Government, do you wish to be heard further on that?

24            MR. KREPP:  No.  We have no problem with that, your

25     Honor.

1          THE COURT:  Okay.  So I'll grant the objection, but

2    that can be easily amended.  And how are we going to do this?

3    Are you all going to work together to do that?  Are you --

4          MR. MORRIS:  I have this in my system.  My suggestion

5    is that we make the changes your Honor suggests.  I'll get it

6    to the government for their approval, and then we'll give it

7    to Ms. Beck.

8          THE COURT:  Okay.  Questions 75, 76, 77 and 78.  And

9    the objection is that they are covered by 74.  This deals with

10   a strong personal or philosophical feeling about the tax

11   system of the United States or the IRS such to the point that

12   you could not serve as a fair and impartial juror.  75 I put

13   was a stretch in terms of the types of questions that I allow.

14   This is a criminal, not a civil proceeding.  Does did anyone

15   feel that violations of federal tax laws should never be

16   prosecuted as crimes of the government?

17          Defense, what's your specific objection there,

18   someone?

19          MR. MORRIS:  Please the Court, 74 asks if the juror

20   holds strong personal or philosophical feelings about the tax

21   system or the IRS to the point that they couldn't serve fair

22   and impartial.  That really covers the waterfront.

23          THE COURT:  Yeah.  Okay.  I agree with that.  If they

24   have strong feeling -- if they have feelings that they

25   shouldn't be prosecuted, that's a strong enough feeling that

1  that would be articulated in 74.

2          Government, what does 75 add that you're trying to

3  get across?

4          MR. KREPP:  Well, again, we --

5          THE COURT:  Feel free -- excuse me -- for this

6  portion, since we're going back and forth, to remain seated.

7  I'm fine with that.

8          MR. KREPP:  You know, on this one, your Honor, we --

9  this is contemporaneous with the joint -- with the

10 government's proposed instructions.  These are the typical

11 instructions we ask in criminal tax cases.  In my experience I

12 have had jurors, from 75 through 78, I have had surprises

13 where jurors wouldn't answer on 74, for instance, but they

14 would answer that they don't think tax crimes should be

15 prosecuted as crimes.  So just --

16         THE COURT:  They don't consider that to be a strong

17 feeling.  They just feel that way, huh?  They have a certain

18 way of feeling in 75 that --

19         MR. KREPP:  Again, I don't know why they didn't

20 answer -- you know, I'm just going off of past -- that's the

21 only reason we included that, just to make sure we're covering

22 the waterfront on anybody who, you know, really has such

23 strong feelings about the IRS.

24         THE COURT:  When I looked at it, I said 75 is a

25 little bit of a stretch from what I normally allow, but I find

1  it to be okay.  So I'm going to stick with that inclination.

2  So I'll overrule the objection to 75 and find it's okay.

3        But 76, where it's asking whether you think income

4  tax laws of the United States are unconstitutional, I don't

5  want to get into a discussion of what is and isn't

6  constitutional, what a juror feels is constitutional.  And so

7  I'd be inclined to grant that objection, but, government, I'll

8  hear you briefly on that.

9        MR. KREPP:  My biggest concern is, having prosecuted

10  number of sovereign citizens, that's my biggest concern.  And,

11  again, I understand the Court and Mr. Morris's point that

12  hopefully those individuals would answer to Question 74, but

13  that's sort of my catchall question to make sure we capture

14  anybody who would identify as a sovereign citizen.

15        THE COURT:  And you don't think that the other

16  questions, ones related to tax laws and other ones that are in

17  this questionnaire, would detect sovereign citizens?  Usually

18  their responses come out in just are you going to be able to

19  follow the law, are you going to -- I mean, just more general

20  than that.

21        MR. KREPP:  Right.  And I perfectly understand if the

22  Court is inclined to strike it on that basis.  That's fine.

23        THE COURT:  But I understand these are the ones that

24  you would normally ask.

25        MR. KREPP:  Yeah.

1          THE COURT:  Okay.  I'm going to sustain as to 76, 77,

2    do you feel it's wrong for the United States to try to make

3    its citizens pay their fair share of taxes.  That one I was on

4    the fence with too, but I see it as being a little clearer

5    than unconstitutional because, again, there's so many

6    definitions and interpretations of what constitutes

7    constitutional versus unconstitutional.

8          77, defense, let me hear your specific objection.

9    And I know if it's just that it's already covered by 74 --

10          MR. MORRIS:  It really is covered in 74.  I mean, we

11    can ask everybody questions about taxes.  Do you think tax

12    rates are too high?  Do you think they ought to be lower?  I

13    mean, if you have strong feelings, they're going to tell us in

14    74.

15          THE COURT:  Government, I agree with that point, but

16    I will allow you to do either 75 or 77.  I just don't think we

17    need them both.  You've already asked, 74, about strong

18    feelings.  Then we ask, 75, do you think they should never be

19    prosecuted?  I just think do you think it's wrong to have to

20    pay them gets into overkill, so between 75 and 77 -- and also,

21    let's see, 78, do you disagree with the idea that everyone has

22    a duty to obey the income tax laws as well as other laws of

23    this country?

24          I just think that all three of those are not needed,

25    75, 77, and 78.  And then 79 you ask are you a sovereign

1 citizen.  So, I mean, do you consider yourself to be a

2 sovereign citizen, so that kind of covers what we said

3 earlier.  So I will give you one of those three, and if you

4 don't want to tell me which one right now, I'll give you time

5 for that one.  But 75, 77, and 78, you're really getting too

6 because the one that you choose from the three of them is in

7 addition to 74.

8         MR. KREPP:  Okay.  I think I understand what the

9 Court is saying, yeah.  We'll put our heads together and see

10 if we can figure that out, yeah.

11         THE COURT:  Okay.  So, Ms. Beck, 75 -- wait a minute.

12 76 is out, and the attorneys will decide between 75, 77, and

13 78, but only one of those three will be permitted.

14         Okay.  82 is the next objection.  I don't know what

15 it is, but I just have a big "no" written on my notes.  So

16 let's get there.  Prosecution may call witnesses in this case

17 who have received or hope to receive benefits from the

18 government, like immunity in exchange for their cooperation

19 and testimony at trial.  By this fact alone, would you give

20 them less credibility than other witnesses?

21         My issue with questions like this is there will be

22 specific instructions as to assessing credibility.  The Court

23 will even go as far as certain things to consider by jurors in

24 determining credibility.  So asking a question like this in a

25 vacuum, I think, doesn't include that whole thing, and that

1  concerns me.

2        Government, I'll hear from you briefly on this, but

3  I'm inclined to sustain that objection and not allow that.

4        MR. KREPP:  On this one we took this almost directly

5  from the *Bickers* instructions, just so the Court knows.

6        THE COURT:  Thank you.

7        MR. KREPP:  Yeah, this wasn't a brain child.

8        THE COURT:  Check.  I hear you.  Okay.  Let me hear

9  you.  Okay.

10        MR. KREPP:  Yeah, our biggest concern is, obviously,

11  you know, the cross of Mark Braddock.  We understand.  So

12  immunity does, with certain people, have a buzz word.  It is a

13  triggering event.

14        THE COURT:  I think especially in the *Bickers* trial,

15  though, because with everybody's understanding of how much was

16  going on with that investigation and how some of the people

17  got substantial deals.  I mean, of course, that applies to

18  many cases.  There is immunity in many cases, but I might

19  understand it a little better in a trial of that nature.

20        Again, my concern is that this gets into something

21  that the Court will instruct them on when it comes to

22  credibility because that is for them and them alone to

23  determine, and to highlight just one portion of credibility

24  like immunity as opposed to other things that come into play

25  with credibility concerns me.  It feels like we're

1    highlighting just one aspect of what they have to consider

2    there, so I'm going to sustain that, 82, and not allow that.

3    Okay.

4         87, do you think the federal government has too much

5    power?  That's a little -- I agree with the defense.  That's a

6    little broad and vague.  Too much power to do what?  Too much

7    power in what context?  Is it just related to taxes?  Is it

8    enforcing laws?  Is it everything?  I'm not sure what we're

9    getting at there, but I'm inclined to sustain that as well.

10   Okay.  So I'll sustain 87.

11        All right.  That's defendants.  Why don't I have the

12   government's right here?  Do we know what document that is?

13   Government, do you happen to know what document your --

14        MR. KREPP:  176.

15        THE COURT:  176, I thought, was to the questions.  Is

16   that also to the questionnaire?

17        MR. KREPP:  It is.  I apologize for styling it that

18   way.

19        THE COURT:  You're right.  Okay.  Then I did look at

20   this.  Let me look at my notebook.

21        MR. KREPP:  The same question for both of them.

22        THE COURT:  Okay.  So we're dealing with Question 20,

23   do you believe it is appropriate to rely on your accountant or

24   tax preparer for advice or do you think an individual has a

25   duty to verify their advice independently?  That sounds very

1    argumentative to me.  I am inclined to sustain it, but,

2    defense, I will hear briefly from you on that.

3          But I am inclined to sustain that and the next one,

4    16, do any of you believe that a person is not entitled to

5    rely on their accountant's advice about tax matters or that a

6    person should somehow verify that their accountant's advice is

7    accurate.  You certainly can make those arguments if evidence

8    supports them at the trial, but to ask them in voir dire seems

9    to serve no purpose but to kind of argue what you're going to

10   argue at trial.  So I will find those to be argumentative.

11   Defense?

12         MR. MORRIS:  We're talking about No. 20, your Honor?

13         THE COURT:  20 and 16.  20 is to are they -- yeah, 20

14   and 16.  Oh, I'm not sure of the numbering.  I have 20 to the

15   questionnaire, and then 16 is to Todd Chrisley's proposed voir

16   dire questions.  So since we've said we'll do the

17   questionnaire, maybe it's just 20.

18         MR. MORRIS:  I don't think they match.

19         THE COURT:  You don't?  Okay.  Yes, if I look at 20

20   on the questionnaire, which as you pointed out is Document

21   163-1, No. 20 asks, do you believe it is appropriate to rely

22   on your accountant or tax preparer for advice or do you think

23   an individual has a duty to verify their advice independently?

24   Please explain.

25         MR. MORRIS:  And your Honor believes that is too

1    argumentative?

2         THE COURT:  Yes.  I believe that is just a way of

3    arguing what the defense's case is about.

4         MR. MORRIS:  Then I would -- I'd be happy to reword

5    that to do you believe it's appropriate to rely on your

6    accountant or tax preparer for advice.

7         THE COURT:  Okay.  I'm going to sustain the objection

8    to that, to 20, and won't allow that one.

9         You know, I don't know what will play out in the

10   trial to make the argument that the Chrisleys were in their

11   right position to rely on an accountant or tax preparer, but

12   at this time, again, I find that that's just being put out

13   there to argue a particular point to them.  And so I'm going

14   to sustain that as argumentative.

15        All right.  The verdict form has been jointly

16   submitted, so that's the one that we'll go with.  We'll see if

17   there is anything else on voir dire.  All right.  We talked

18   about forfeiture being bifurcated.  We talked about the form

19   of the indictment.  We need a redacted one that would go back

20   with the jury without forfeiture language and a condensed one

21   that would be read to the panel at the beginning of voir dire.

22        I think that's it.  That's all I have.  Does anyone

23   else have anything for this pretrial conference?  Government?

24   Yes -- hold on one second.  I'm sorry.

25        COURTROOM DEPUTY:  Judge, I did send you their

1    response, so you may want to get that date now from Lucy and

2    Frances.  She said that the jurors came in on, like, a

3    Thursday, March 3rd, and the trial began the 9th.  So if we

4    let them know the date, that's the date that their summons

5    would be, that you want them to come in and actually do the

6    questionnaire.

7            THE COURT:  Okay.  Thank you, Ms. Beck.  So the

8    answer is we can have them come in early.  There was no reason

9    for the attorneys to be present, I'm thinking.  Is that

10   correct?

11           COURTROOM DEPUTY:  I think they will just handle

12   everything, is my understanding.

13           THE COURT:  All right.  Then that's not something I

14   need to discuss with them.  All right.  So we'll do that, and

15   we'll get the questionnaires to you all.

16           Is there anything else at this time for the pretrial

17   conference, government?

18           MR. KREPP:  One housekeeping matter and one

19   additional matter.

20           THE COURT:  Sure.

21           MR. KREPP:  One, just with Covid protocols and all

22   that, I know things are sort of in flux right now.  Can the

23   Court just let us know what the Court's preference is for

24   exhibits?  I know that at a certain point we were supposed to

25   leave exhibits up there for the witness, you know, the binder.

1   As I'm sure the Court can imagine, there's going to be a lot

2   of documents in this case, and we just want to make sure we're

3   giving the Court whatever it needs to --

4           THE COURT:  The way that it's been done, I haven't

5   had a particular protocol that I articulated.  I don't know if

6   someone else did for these attorneys or if they did it just in

7   conjunction with the way they saw other judges doing it, but

8   it's that a notebook was used so that their witness had a

9   notebook with exhibits that stayed up there.  And then,

10  Ms. Beck, did you have a separate notebook for the ones that

11  are actually tendered for the record?

12          COURTROOM DEPUTY:  Right.  As they are admitted, you

13  leave them here, and then the witness had one.  And some

14  people were giving me an extra set for you if you wanted to

15  refer to something.

16          THE COURT:  Okay.  That I don't need.

17          COURTROOM DEPUTY:  So then that's it.

18          THE COURT:  So is that how you've done it too?  Just

19  a notebook for the witness and then a separate one for the

20  documents that stay with Madam Clerk to go into evidence?

21          MR. KREPP:  Yeah, and one for the Court if the Court

22  prefers.  But it sounds like you're good.

23          THE COURT:  No, I'm good.

24          MR. KREPP:  Okay.  Thanks.  And then just one final

25  matter --

 1              THE COURT:  Sure.

 2              MR. KREPP:  -- the Court's indulgence.

 3              MR. MORRIS:  Before we get to that, may I make a

 4    comment on the evidence, on the documents?  It's hard to know

 5    what documents I'm necessarily going to use on

 6    cross-examination, so I really can't pre notebook them.

 7              THE COURT:  I don't really -- I mean, it has been a

 8    problem that I've seen.  I haven't done -- and maybe I should

 9    have, but I haven't done anything differently, honestly, with

10    even documentary evidence like that.

11              MR. MORRIS:  Thank you.  We'll provide the Court as

12    best we can when we know what we're going to use in our case

13    in chief, but for cross-examination purposes it may be tough.

14              THE COURT:  Yeah, yeah.  No, I understand.  I have

15    not done anything differently in that regard.

16              MR. MORRIS:  And just to give an example --

17              THE COURT:  Or I should say I haven't -- that's why I

18    haven't established any protocol.  That's why I was saying

19    earlier maybe the attorneys did stuff the way they have done

20    in other courtrooms, but I have never stated a particular

21    protocol.  I don't have one.

22              MR. MORRIS:  Thank you, Judge.

23              THE COURT:  Okay.

24              MR. KREPP:  And I forgot to mention this with the

25    stipulations, but the three defendants have been very gracious

1  in not making us fly in bank custodians from around the

2  country to authenticate records --

3       THE COURT:  Say that one more time, Mr. Krepp.  Start

4  one more time.

5       MR. KREPP:  Sure, yeah.  The three defendants have

6  been very gracious.  We provided them a list of subpoenaed

7  entities or entities like Goggle and AOL, and they've agreed

8  that we don't need to fly record custodians in from around the

9  country simply for the purpose of authenticating that those

10 were real records.  I don't feel the need to go through that

11 on the record right now.  I take counsel at their word.  But I

12 just want to note our appreciation to them.

13      There is one item that just came to the government's

14 attention, and I'm not asking the Court to do anything about

15 it right now.  But I do want this to be on the Court's radar.

16 We do have a concern about witness intimidation in this case.

17      THE COURT:  Okay.

18      MR. KREPP:  Mark Braddock has begun receiving

19 mailings this week out of the blue.  One of those mailings he

20 received was a letter purportedly from another government

21 witness named Alina Clerie sent -- and there was a photo

22 from -- they haven't spoken in some time -- a photo of her

23 from a website.  And it just said, I miss you, Mark.

24      A second was sent to his office, and it contained

25 highlighted portions of the lawsuit that Julie Chrisley filed

1  against Mark Braddock.  And the highlighted portions were

2  portions that I would presume would be part of

3  cross-examination where the Chrisleys allege Braddock did

4  wrongdoing.  We don't have evidence to date that the Chrisleys

5  were the ones who submitted it, but it does fit a troubling

6  pattern that we have observed, particularly on Todd Chrisley's

7  behalf.

8           After they sued the Department of Revenue, which was

9  their right, they filed their motion to suppress evidence

10  seized by the Department of Revenue.  They weekly had a

11  podcast.  Mr. Chrisley has used a podcast and his Instagram

12  page to belittle, intimidate, and harass state employees.  The

13  Chrisleys received recordings, that I believe were alluded to

14  earlier, that one Department of Revenue employee had made of

15  other employees.

16           A number of these witnesses testified in front of

17  Judge Anand, and on Todd's Instagram page he then mocked one

18  of those officials and said it's -- I'm not going to name

19  her -- but said that she's a head of compliance.  It should

20  concern taxpayers in Georgia that this person is, based on

21  Katie's statement, heavily medicated, is actually calling the

22  shots on what taxpayers owe or whether they are allowed to

23  seize their assets.

24           After the evidentiary hearing, he went down the list

25  calling them, quote, these ass clowns, called one of the

1  government witnesses a rat, and then he mocked an assistant

2  attorney general by claiming that he had a horrible toupee and

3  couldn't believe he walked around that way.

4          We learned on May 26, 2021, that he was going to

5  release information, false information, I want to put on the

6  record, about Special Agent Arrow, who is the IRS special

7  agent assigned to this case.  I was alerted to this,

8  immediately called Mr. Morris, and told him in no uncertain

9  terms that if Mr. Chrisley went through with this, that we

10  would immediately move to revoke his bond.  To his credit he

11  listened and did not go forward with any information about

12  Special Agent Arrow.

13          But I want to remind the Court the grand jury has

14  already found probable cause that Ms. Chrisley knowingly and

15  intentionally obstructed the grand jury proceedings and that

16  we're concerned that the same pattern that occurred before the

17  evidentiary hearing and around the evidentiary hearing, this

18  is the sort of -- the force of many drumbeats that we

19  anticipate coming toward government witnesses.  So I'm not

20  asking the Court to do anything right now, but I just wanted

21  this to be on the Court's radar as a very live and real issue

22  that we're concerned about.

23          THE COURT:  All right.  Anything from anyone else on

24  that?

25          MR. MORRIS:  Just a little response to that, your

1   Honor.

2          THE COURT:  Yes.

3          MR. MORRIS:  There is no evidence Mr. Chrisley has

4   done anything improper in any way, shape or form other than

5   state in a podcast his opinion of anything.

6          As far as something being sent to Mr. Braddock, there

7   is no evidence Mr. Chrisley sent it.  I am confident he

8   didn't, and if there's evidence that he did, it should be

9   presented to the Court.  Otherwise, this is poisoning -- an

10  attempt to poison the air here, and I think it's improper.

11         THE COURT:  All right.  Anyone else?  All right.

12  Then we are adjourned.  Thank you.

13         COURTROOM SECURITY OFFICER:  All rise.  Court stands

14  in recess.

15         (Whereupon, the proceedings were adjourned at 12:50

16  p.m.)

17                          -   -   -

18

19

20

21

22

23

24

25

1          REPORTERS CERTIFICATE

2

3

4          I, Wynette C. Blathers, Official Court Reporter for

5    the United States District Court for the Northern District of

6    Georgia, with offices at Atlanta, do hereby certify:

7          That I reported on the Stenograph machine the

8    proceedings held in open court on April 14, 2022, in the

9    matter of TODD CHRISLEY a/k/a MICHAEL TODD CHRISLEY, JULIE

10   CHRISLEY, and PETER TARANTINO, Case No. 1:19-CR-00297-ELR-JSA;

11   that said proceedings in connection with the hearing were

12   reduced to typewritten form by me; and that the foregoing

13   transcript (Pages 1 through 114) is a true and accurate record

14   of the proceedings.

15          This the 2nd day of May, 2022.

16

17

18

19                              _____

20                         /s/ Wynette C. Blathers, RMR, CRR
                               Official Court Reporter

21

22

23

24

25