IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>TODD CHRISLEY (A/K/A MICHAEL TODD CHRISLEY) AND JULIE CHRISLEY | Criminal Action No.<br><br>1:19-CR-297-ELR-JSA |

**Government's Sentencing Memorandum Regarding
Defendants Todd Chrisley and Julie Chrisley**

The United States of America, by Ryan K. Buchanan, United States Attorney, and Thomas J. Krepp and Annalise K. Peters, Assistant United States Attorneys for the Northern District of Georgia, files this Government's Sentencing Memorandum Regarding Defendants Todd and Julie Chrisley.

## I.  BACKGROUND

### 1.  Procedural History

In 2019, defendants Todd Chrisley, Julie Chrisley, and Peter Tarantino were indicted by a federal grand jury for a variety of crimes. (Doc 1). The grand jury returned a superseding indictment in February 2022. (Doc. 130). During the three-week trial in May and June 2022, the United States presented evidence of the Chrisleys' conspiracy to obtain tens of millions of dollars in loans by defrauding community banks, which they later walked away from when Todd declared bankruptcy. The jury also heard how, despite earning over $6 million

through their entertainment ventures, they evaded paying Todd's 2009 delinquent taxes and failed to timely file their tax returns for 2013, 2014, 2015, or 2016 (or make any timely payments for those years). Finally, the jury heard how the Chrisleys attempted to obstruct the grand jury investigating their criminal conduct. The Chrisleys' defense at trial was to blame others for all their crimes, including their co-conspirator, Mark Braddock, their former employees Alina Clerie and Donna Cash, the Internal Revenue Service, the Federal Bureau of Investigation, their accountants, their lawyers, and Bank of America. The defendants were convicted of all charges. Sentencing is set for November 21, 2022.

## 2.  The Presentence Investigation Reports

U.S. Probation has prepared Presentence Investigation Reports (PSRs) for both Todd and Julie Chrisley (hereinafter T.C. PSR; J.C. PSR). As a threshold matter, the United States believes that there is an evidentiary basis for each of the enhancements enumerated by U.S. Probation. However, based in part upon additional records supplied by the Chrisleys when filing their objections, the United States has elected to take a conservative approach to certain enhancements.[1]

---

[1] Accordingly, the United States is not recommending applying the following enhancements listed in the initial PSRs, all of which relate to the bank fraud offense: (1) a 22-level enhancement for the loss amount (the United States is seeking a 20-level enhancement); (2) a two-level enhancement for number of victims; and (3) a sophisticated means enhancement for Julie Chrisley.

Accordingly, the United States respectfully requests that the Court make the following Guideline calculations:

### Todd Chrisley

| BANK FRAUD | | |
|---|---|---|
| B1.1(a)(1) | base offense level | 7 |
| 2B1.1(b)(1)(K) | loss amount between $9.5M and $25M | 20 |
| 2B1.1(b)(2)(A)(i) | bankruptcy misrepresentation | 2 |
| 2B1.1(b)(9)(B) | sophisticated means | 2 |
| 2B1.1(b)(10)(C) | derived >$1M in gross receipts from one or more financial institutions | 2 |
| 3B1.1(b) | aggravating role | 2 |
| 3C1.1 | obstruction | 2 |
| **TOTAL** | | **37** |
| | | |
| TAX CONSPIRACY | | |
| 2T1.1 | base offense level | 20 |
| 2T1.1(b)(2) | sophisticated means | 2 |
| 3C1.1 | obstruction | 2 |
| **TOTAL** | | **24** |
| | | |
| TAX EVASION | | |
| 2T1.1 | base offense level | 20 |
| 2T1.1(b)(2) | sophisticated means | 2 |
| 3C1.1 | obstruction | 2 |
| **TOTAL** | | **24** |

### Julie Chrisley

| BANK FRAUD | | |
|---|---|---|
| 2B1.1(a)(1) | base offense level | 7 |
| 2B1.1(b)(1)(K) | loss amount between $9.5M and $25M | 20 |

| | derived >$1M in gross receipts from one or more financial | |
|---|---|---|
| 2B1.1(b)(10)(C) | institutions | 2 |
| 3C1.1 | obstruction | 2 |
| **TOTAL** | | **31** |
| | | |
| **TAX CONSPIRACY** | | |
| 2T1.1 | base offense level | 20 |
| 2T1.1(b)(2) | sophisticated means | 2 |
| 3C1.1 | obstruction | 2 |
| **TOTAL** | | **24** |
| | | |
| **TAX EVASION** | | |
| 2T1.1 | base offense level | 20 |
| 2T1.1(b)(2) | sophisticated means | 2 |
| 3C1.1 | obstruction | 2 |
| **TOTAL** | | **24** |

Both defendants are in Criminal History Category I. Under these Guidelines calculations, the final offense levels and sentencing ranges follow:

- **Todd Chrisley** -    Offense Level 37 (210- 262 months)
- **Julie Chrisley**  -    Offense Level 32 (121 - 151 months)[2]

The Chrisleys have objected to nearly everything in their PSRs. Most of their objections are attempts to re-interpret the evidence from trial and re-argue that the testimony and evidence from their witnesses should be credited, despite the jury's unanimous verdict. "The problem with the argument is that the jury was free to disregard the testimony (as it obviously did) and, instead, to credit the contrary evidence presented by the Government's witnesses." *United States v. Maxwell*, 579 F.3d 1282, 1301 (11th Cir. 2009) (citation omitted). "When a

---

[2] For Julie Chrisley, the adjusted tax offense level (24) is seven levels lower than the bank fraud Guidelines (31), resulting in a one-level upward adjustment pursuant to § 3D1.4.

defendant objects to a factual finding that is used in calculating his guideline sentence . . . the government bears the burden of establishing the disputed fact by a preponderance of the evidence." *United States v. Moriarty*, 429 F.3d 1012, 1022 (11th Cir. 2005) (citing *United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005)). To the extent the defendants object to facts in their PSRs that would support their guidelines enhancements, the United States relies on the trial transcript, the exhibits admitted at trial, and its anticipated evidence at sentencing, all of which is described below.

## II.   SENTENCING GUIDELINES ARGUMENT

### 1.  Todd and Julie Chrisley should receive a 20-level adjustment because the actual loss was more than $9.5 million but less than $25 million.

The Chrisleys engaged in a lengthy conspiracy to defraud community banks out of tens of millions of dollars. A reasonable estimate of the actual loss based on the evidence in this case is approximately $20 million, resulting in a 20-level enhancement under § 2B1.1(b)(1)(K). This estimate gives the Chrisleys the benefit of the "credits against losses" they claim to be entitled to and is supported by reliable and specific evidence.

### A.  The Eleventh Circuit requires a reasonable estimate of loss based upon reliable and specific evidence given the available information.

The Guidelines provide that "loss is the greater of actual loss or intended loss." *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011) (citing U.S.S.G. § 2B1.1. cmt. n.3(A)). "Actual loss" is defined as "the reasonably foreseeable pecuniary loss that resulted from the offense," and "intended loss" is defined as "the pecuniary harm that was intended to result from the offense"

even if "impossible or unlikely to occur." *United States v. Bradley*, 644 F.3d 1213, 1289 (11th Cir. 2011) (citing U.S.S.G. § 2B1.1, cmt. n.2(A)(i), (ii)). The Sentencing Guidelines provide for a credit against loss in certain situations. First, the loss must be reduced by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." *United States v. Armas*, 712 F. App'x 923, 928 (11th Cir. 2017) (citing § 2B1.1, cmt. n.3(E)(i))). Additionally, "[i]n a case involving collateral pledged or otherwise provided by the defendant," the loss amount shall be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral." U.S.S.G. § 2B1.1, cmt. n.3(E)(ii); *see United States v. Pouparina*, 577 F. App'x 939, 941 (11th Cir. 2014).

"For sentencing purposes, the loss amount does not need to be precise and may only be a reasonable estimate of the loss based on the available information." *United States v. Ford*, 784 F.3d 1386, 1396 (11th Cir. 2015) (citation omitted). "A reasonable estimate of the loss amount is appropriate because often the amount of loss caused by fraud is difficult to determine accurately." *United States v. Cobb*, 842 F.3d 1213, 1219 (11th Cir. 2016) (quoting *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007)). While the Court must support its loss calculation with "reliable and specific evidence," that requirement "does not demand that the Government and the court sift through years of bank records and receipts to ascertain itemized proof of every single transaction that should be chalked up as a loss to the victim." *United States v. Campbell*, 765 F.3d 1291, 1304 (11th Cir. 2014); *see also United States v. Orton*, 73 F.3d 331, 334-35 (11th Cir. 1996) ("an exhaustive inquiry is not required in every case" involving a complicated

fraudulent scheme in which the loss is difficult to calculate). And the Eleventh Circuit has consistently held that "where a defendant's conduct was permeated with fraud, a district court does not err by treating the amount that was transferred from the victim to the fraudulent enterprise as the starting point for calculating the victim's pecuniary harm." *Armas*, 712 F. App'x at 928 (quoting *Campbell*, 765 F.3d at 1305).

"In calculating the amount of loss attributable to a defendant, a district court may rely on 'trial evidence, undisputed statements in the presentence report, or evidence presented at the sentencing hearing.'" *United States v. Pierre*, 825 F.3d 1183, 1197 (11th Cir. 2016). It "may [also] consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *United States v. Petrie*, 302 F.3d 1280, 1290 (11th Cir. 2002). "Once a district court makes individualized findings concerning the scope of criminal activity undertaken by a particular participant, it can determine foreseeability." *Pierre*, 825 F.3d at 1197.

## B. Investigators used "reliable and specific evidence" to arrive at an actual loss estimate of approximately $20 million.

The United States demonstrated at trial that the Chrisleys engaged in a lengthy conspiracy to obtain tens of millions of dollars in fraudulent loans from community banks. The conspirators' false statements to banks typically contained a personal financial statement (PFS) falsely claiming that Todd Chrisley had $4 million at Merrill Lynch, fabricated or "scrapbooked" banking statements, or false tax returns. (*See, e.g.,* Gov. Exs. 808-810) (compilations of

examples of false statements sent to banks).[3] Once the conspirators obtained those loans, the money was used to either pay back old loans or to fund the Chrisleys' lavish lifestyle.

Before and after trial, the United States thoroughly analyzed the available records to calculate a reasonable estimate of actual loss. These records included more than 60,000 emails and documents from Mark Braddock (Tr. at 1853), records obtained from multiple email search warrants, and financial records from dozens of grand jury subpoenas and from Todd Chrisley's bankruptcy action. Investigators also interviewed bankers and other individuals with knowledge of these loans. (*See generally* Tr. at 2202-07).

While the Chrisleys object to the PSRs' loss calculations as speculative, it should be undisputed that the starting point is the total amount of money that the Chrisleys obtained as a result of their fraudulent submissions to banks. FBI Special Agent Ryskoski testified at trial that the conspirators' fraud scheme resulted in banks either issuing or renewing 29 fraudulent loans amounting to $36,261,695. (Tr. at 1202-06; Gov. Ex. 1220).[4] Agent Ryskoski has prepared a more

---

[3] Citations to exhibits admitted during trial are listed as "Gov. Ex." or "Def. Ex." New exhibits are listed as "Sent. Ex." The United States will make a binder available to the Court of all exhibits cited in this Memorandum.

[4] This number does not include the dozens of fraudulent loan applications that the Chrisleys and Braddock submitted to banks that were never funded. For instance, Government Exhibit 808 is a compilation exhibit of dozens of fraudulent applications the Chrisleys and Braddock submitted to banks that contained the personal financial statement falsely claiming Todd Chrisley had approximately $4 million at Merrill Lynch. Because many of these loan applications were not funded, the United States has not included the sought-after loans under a more expansive "intended loss" theory even though the Eleventh

detailed version of Government Exhibit 1220 to more thoroughly explain this $36 million starting figure. (Sent. Ex. 1). The issuance or renewal of all 29 loans listed in Government Exhibit 1220 and Sentencing Exhibit 1 were directly and proximately caused by the defendants' false statements to the lenders. Accordingly, under binding Eleventh Circuit authority, the starting point for the Court's analysis should be $36,261,695.460. *See Armas*, 712 F. App'x at 928-29.

Following the jury's verdict, investigators contacted the victim banks and the FDIC—which is now the receiver for several banks that later failed—to determine how much money the banks actually lost. In doing so, investigators accounted for all known principal payments made by the conspirators after the loans were issued and how much money the victim banks have been paid back. The victim banks and the FDIC subsequently provided their actual loss calculations. (Sent. Ex. 2) (emails and records from banks and the FDIC regarding actual loss).

The Chrisleys filed objections to the initial loss calculations claiming, in part, that the loss figures were flawed because they failed to account for certain credits against losses under § 2B1.1, cmt. n.3(E). In support of their argument, the Chrisleys produced some records showing payments to lenders or third parties that had acquired the fraudulent loans. To simplify what could be a convoluted matter, Agent Ryskoski took the figures provided by the Chrisleys and deducted those amounts from the loss amount. (Sent. Ex. 3 at 1). The resulting actual loss figure is $20,041,817.67, resulting in a 20-level enhancement under

---

Circuit permits such a theory. *United States v. Greene*, 279 F. App'x 902, 908 (11th Cir. 2008).

§ 2B1.1(b)(1)(K) (20-level enhancement applies for losses between $9.5 million and $25 million). In other words, by using the figures supplied by the Chrisleys, they receive a 20-level enhancement instead of a 22-level enhancement as stated in their initial PSRs. For several of these "credits," the United States has taken the Chrisleys at their word that payments were made and has not been able to find independent evidence corroborating their figures. For instance, they claim without supporting documentation that an entity named "FH Partners" was paid $2.7 million for one of the fraudulently obtained loans. (T.C. PSR, ¶ 37). Agent Ryskoski deducted $2.7 million to avoid a protracted argument on these points. The revised actual loss figure is conservative and should be non-controversial as it is based upon "reliable and specific evidence." *See Campbell*, 765 F.3d at 1304.

Notably, the revised actual loss estimate corroborates the evidence offered during the Chrisleys' cases-in-chief. Their own corporate attorney, Robert Furr, testified that Todd owed $20 million to banks, which was discharged in bankruptcy. (Tr. at 3070-71). The defendants seek to muddy the water by claiming that the loss figures are "speculative" and make convoluted "but for" causation arguments that are difficult to follow. (*See, e.g.* T.C. PSR, ¶ 37) The Court need not overcomplicate the actual loss calculation: But for the conspirators' false loan applications, the victim banks would not have issued the loans. It does not matter that the banks later failed or sold the loans to third parties. Nor does it matter that the Chrisleys "believe" (without offering proof or estimated figures) that third parties may have paid additional sums of money when purchasing these loans. The United States has offered "reliable and specific evidence" that the actual loss amount is approximately $20 million, which is over

double the floor amount of the applicable enhancement. *See* U.S.S.G.
§ 2B1.1(b)(1)(K) ($9.5 million to $25 million).

It bears emphasis that the fraud scheme occurred from 2007 to 2012 and
targeted many community banks that have since shuttered. Agent Ryskoski
testified during trial about the difficulties investigators encountered when trying
to piece together loan documents from failed banks. (Tr. at 2201-02). The
Chrisleys seize on that fact and argue that the loss calculation is unsubstantiated.
(*See* T.C. PSR, ¶ 37). But, as stated, the Eleventh Circuit does not require the
sentencing court or the United States to "sift through years of bank records and
receipts to ascertain itemized proof of every single transaction that should be
chalked up as a loss to the victim." *Campbell*, 765 F.3d at 1304. To the contrary,
"the loss amount does not need to be precise and may only be a reasonable
estimate of the loss *based on the available information*." *Ford*, 784 F.3d at 1396
(citation omitted) (emphasis added). The United States has thoroughly analyzed
the available records from banks that collapsed over a decade ago and has
offered reliable and specific evidence, which takes into account the credits
against losses that the Chrisleys list in their objections. (Sent. Exs. 1, 2, 3). Based
upon this rigorous analysis that gives the Chrisleys every known benefit of the
doubt, the Court should find that the loss amount is more than $9.5 million but
less than $25 million, resulting in a 20-level enhancement under Section
2B1.1(b)(1)(K).

**C. Because the jury found that the Chrisleys acted with the intent to defraud, the Court should reject their arguments that the loss amount is zero.**

Citing the Eleventh Circuit's recent *per curium* decision in *United States v. Ridling,* 2022 WL 4134423 (11th Cir. Sept 13, 2022), the Chrisleys claim that the loss amount is zero dollars because they intended to repay the banks. (*See, e.g.,* T.C. PSR, ¶ 37). This case is nothing like *Ridling*. In *Ridling*, the Eleventh Circuit vacated a sentence where the district court had erroneously calculated the "intended loss" amount using a recklessness standard instead of a purposeful standard. But here, the $20 million figure is the actual loss to victim banks—not the intended loss. Moreover, the Chrisleys' actions show they had no intent to repay as they kept rolling new fraud loans to pay off old ones and eventually sought to extinguish the unpaid debt in bankruptcy. Where the United States has produced "reliable and specific evidence" that banks suffered approximately *$20 million* in losses, the Court should reject the Chrisleys' specious arguments that the loss amount is actually zero dollars.

**D. Julie Chrisley should be held accountable for the total loss amount as she willfully participated in the conspiracy from its inception.**

Repeating her arguments from trial, Julie Chrisley claims there is no evidence she was ever part of the bank fraud conspiracy and thus no loss attributable to her. Her argument is meritless and ignores the weight of the evidence showing her involvement in the fraud scheme.

Under § 1B1.3, "in the case of a jointly undertaken criminal activity," the defendant is liable for "all acts and omissions of others that were— (i) within the

scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(B). There is ample evidence demonstrating that Julie Chrisley was involved in the bank fraud scheme from its inception and, as an active member of the conspiracy, all the losses was "reasonably foreseeable" to her. *See United States v. Shade*, 513 F. App'x 921, 923 (11th Cir. 2013).

As an initial matter, Julie Chrisley was convicted of bank fraud conspiracy and five substantive counts of bank fraud. Braddock testified that Julie was an active member of the conspiracy from its inception:

- Q: Can you tell me, did you commit fraud from 2007 onward just on your own? In other words, was it just you committing fraud?
- A: No. Mr. and Mrs. Chrisley and myself were all three involved.

(Tr. at 1468). Braddock testified that he had conversations about cutting and pasting (or "scrapbooking") bank statements with Julie Chrisley, and that Julie complimented Braddock on his scrapbooking, noting that she had never been able to get her scrapbooked documents to "line up." (*Id*.). Julie Chrisley was also well aware of the sheer volume of loans that the conspirators were taking out. Throughout the conspiracy, Julie drove around metro Atlanta dropping off past-due loan payments, earning herself the nickname "asses on fire." (Tr. at 1539).

The evidence of Julie Chrisley's knowing participation in the bank fraud scheme wasn't limited to Braddock's testimony. Numerous emails and records admitted during trial confirm her involvement from the scheme's inception. (*See, e.g.*, Sent. Ex. 4 at 1, 8; Gov. Exs. 809, 810, 824, 890). Additionally, the fact that Julie Chrisley benefited from the fraudulent loan scheme throughout its existence is further confirmation that the loss was reasonably foreseeable for her. In fact, two of the fraudulent loans were issued to Julie's own company, Select Real Estate Holdings. (Gov. Ex. 1220). All the while that Julie Chrisley drove around Atlanta paying past-due loans and bills, she was profiting off the fraudulently obtained loans. For instance, the conspirators deposited a fraudulent loan in the amount of $231,832.84 into a CAM account on April 24, 2007. (Gov. Ex. 1223). That same day, $35,000 was transferred to a bank account under the control of both Julie and her husband. Similarly, on May 11, 2007, the conspirators deposited $986,456.02 into the CAM account. (Gov. Ex. 1224). By May 25th, $43,000 had been transferred to a bank account under the control of both Julie and her husband. (*Id.*). And from May 11th through May 31st, both Todd and Julie bled through the fraudulently obtained loan proceeds by not just paying back older loans but paying for household expenses, such as maintenance on pools at their various properties or cosmetic work for their children. (*Id.*). By May 31st, only $217,407.43 was left in the account. (*Id.*). In sum, the evidence shows that Julie was involved in and profited from the bank fraud scheme throughout the conspiracy.

Julie Chrisley's claim that the Court should not credit over the United States' evidence from trial is just another attempt to relitigate the case. *See Maxwell*, 579 F.3d at 1301. The jury's unanimous verdict against Julie Chrisley confirms that the jury credited Braddock's testimony and the financial records and email evidence.

While Todd was the ringleader, Julie played an active role in every aspect of the conspiracy. It is immaterial to the loss calculation whether she was involved in or had actual knowledge of each and every fraudulent loan application. *United States v. Danzey*, 842 F. App'x 413, 417-18 (11th Cir. 2021) (rejecting argument that a defendant who had been involved in a stolen identities conspiracy and used those identities to commit a certain fraud should not be held accountable for losses stemming from a different fraud in which he was not involved because it was reasonably foreseeable that the stolen identities might be used for different types of fraud). As the Eleventh Circuit has repeatedly held, "members of a criminal conspiracy need not be involved in—or even aware of—losses inflicted by other members of the conspiracy for those losses to be reasonably foreseeable." *Id*. at 417 (citing *United States v. Mateos*, 623 F.3d 1350, 1371 (11th Cir. 2010)); *see also United States v. Hall*, 996 F.2d 284, 285-86 (11th Cir. 1993). The Court should reject her efforts to relitigate her failed trial arguments and hold her accountable for the entirety of the fraudulent funds that she and her husband obtained during the course of their conspiracy.

15

**2. Todd Chrisley should receive an enhancement because the bank fraud scheme involved a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding.**

Where a bank fraud offense involves a "misrepresentation or other fraudulent action during the course of a bankruptcy proceeding," a two-point sentencing enhancement is warranted. U.S.S.G. § 2B1.1(b)(9)(B). It is irrelevant whether the defendant was charged with bankruptcy fraud or some other fraud scheme. *See, e.g., United States v. Boyle*, 723 F. App'x 111, 113 (3rd Cir. 2018) (applying the two-level enhancement in a non-bankruptcy fraud case and noting that "the enhancement would be nonsensical if it only applied to bankruptcy fraud"); *see also, e.g., United States v. Grant*, 320 F. App'x 898, 904 (11th Cir. 2008) (affirming enhancement application where defendant was not charged with bankruptcy fraud); *United States v. Coyle*, 154 F. App'x 173, 175 (11th Cir. 2005) (same); *United States v. Simpson*, 796 F.3d 548, 551, 555–56 (5th Cir. 2015) (same).

Moreover, "[t]he filing of [a] bankruptcy petition after the fraud scheme end[s] [does] not . . . preclude[] the trial court from imposing the enhancement." *Boyle*, 723 F. App'x at 113. "In applying the sentencing guidelines, the trial court is to consider the defendant's relative culpability based on all relevant conduct…. Conduct that occurs 'in the course of attempting to avoid detection or responsibility for that offense' is relevant conduct to be considered when applying the sentencing guidelines. U.S.S.G. § 1B1.3(a)." *Id.* In *Boyle*, the Third Circuit concluded that "the timing of the bankruptcy petition [was] immaterial [because] the record demonstrates Boyle's misrepresentations to the bankruptcy court were an attempt to evade detection of his fraudulent scheme." *Id.* Similarly,

16

in *United States v. Tanke*, the Ninth Circuit held that a defendant's "false testimony in the bankruptcy proceeding may not have occurred in preparation for or during the commission of the offense, but it plainly occurred 'in the course of attempting to avoid detection or responsibility for that offense.'" 743 F.3d 1296, 1306-07 (9th Cir. 2014) (quoting U.S.S.G. § 1B1.3(a)(1)).

Here, Todd Chrisley's PSR correctly includes a two-level enhancement pursuant to § 2B1.1(b)(9)(B) because he acted fraudulently and made misrepresentations during his Chapter 7 bankruptcy proceedings in an effort to conceal his involvement in the crime and to keep his ill-gotten gains from the fraud scheme. (T.C. PSR ¶¶ 122-26).

At trial, the jury found the Chrisleys guilty of committing a bank fraud scheme that lasted until approximately 2012, during which they obtained tens of millions of dollars in fraudulent loans. (Tr. at 1471-74, 1482-83, 1518-20, 1673-79). The Chrisleys were using new loans to pay back old loans, and when the fraud scheme eventually collapsed, Todd filed for bankruptcy, where over $20 million of debt owed to defrauded banks was discharged. (Tr. at 1492-93; Sent. Ex. 5 (bankruptcy final accounting)). During the bankruptcy proceeding, Todd hid the fact that the millions of dollars in loans that he was seeking to have wiped away had been fraudulently obtained. That fraudulent bankruptcy action triggers the two-level enhancement. *See Tanke*, 743 F.3d at 1307; *Boyle*, 723 F. App'x at 113.

Todd Chrisley didn't just "fail to disclose" his involvement in the fraud. He made multiple material misrepresentations during the bankruptcy proceedings to cover up his crimes. In July 2012, the Chrisleys began blaming Mark Braddock

17

for the whole bank fraud scheme and their financial problems, and Todd touted this lie during the bankruptcy action. During a July 16, 2013, bankruptcy deposition, Todd was asked a series of questions about Braddock and falsely stated under oath that he relied on "nothing" that Braddock said to him after 2010, when he "discovered" that Braddock was "doing things inappropriately." (Sent. Ex. 6 at 162-67) (deposition transcript)). Chrisley further falsely stated that in 2010, "I confronted [Braddock] and he denied – he denied every allegation and put – placed the blame on Donna Cash." (*Id.* at 166). This was all a lie. The jury found that Todd Chrisley was not only aware of the fraud, but was committing it with Julie and Braddock. Braddock testified at length about Todd's involvement, and the jury saw numerous emails in which Todd was directing the conspiracy. (*See, e.g.,* Gov. Ex. 839) (When Braddock reported that he would have difficulty scrapbooking because the bank had legitimate copies of the tax returns, Todd responded, "stop telling me this shit, create them like you always have, if i don't get her these then want renew the loans."); (Gov. Ex. 832, 833) (After receiving a false PFS, Todd emailed Braddock "you are a fucking genious!!!! just make it show 4 mil+").

Todd Chrisley also lied about the ownership structure of CAM during the bankruptcy proceedings to protect the ill-gotten gains from committing bank fraud and from draining every penny from CAM during the bank fraud scheme.[5]

---

[5] Todd Chrisley's bankruptcy action was replete with lies, and the United States focuses here only on the lies that relate to the bank fraud scheme. Notably, he also lied about his involvement with 7C's Productions, which he and Julie used as a shell company to hide millions of dollars from the IRS. During the July

As it became clear that Todd would have to file for bankruptcy, the Chrisleys began backdating documents and forging notary dates falsely showing that Julie Chrisley was a 60% owner of CAM. (Tr. 1464-65, 1596-98, 1609, 1842-43; Gov. Exs. 751, 873; Sent. Ex. 7 (emails about CAM ownership)). On multiple occasions during the bankruptcy proceedings, Todd Chrisley lied about the ownership structure of CAM, claiming that Julie Chrisley had always owned 60% of the company, and he owned only 10% of CAM. (Sent. Ex. 6 at 145-49 ("It's my understanding that [Grimsley] has known from always that Julie had 60 percent."); Sent. Ex. 8 at 13-14 (April 30, 2013 interview transcript) ("I own 10, my wife Julie owns 60 percent, and Mark owns 30. That's the way it was always supposed to be.")). In reality, Todd Chrisley owned 70% of CAM, and Julie Chrisley was never an owner of the company. (*See*, *e.g.* Tr. at 1609).

As Braddock testified, this had been Todd Chrisley's plan all along: "And it was beginning in 2012, he said he was going to plan a bankruptcy because that was the only way out." (Tr. at 1600). Braddock also explained why they backdated sham documents claiming that Julie owned 60% of CAM: so that Todd Chrisley could protect all of his ill-gotten gains from creditors during

---

16, 2013, deposition, Todd played dumb about 7C's Productions, claiming that the entity was "just an LLC that was set up but was never used," that he had no involvement in the company, and that he had no knowledge of money going to a 7C's bank account at Chase. (Sent. Ex. 6 at 134-35). But emails from the few weeks before that deposition show that Todd was well aware of and involved in the formation of 7C's Productions, Inc. and that he sent and received emails about the new 7C's Chase bank account. (*See, e.g.*, Sent. Ex. 9) (email compilation about 7C's).

bankruptcy. (Tr. at 1602) ("So he -- if he was planning bankruptcy, he couldn't have assets in his name, so he needed to shift his assets to his wife's name or to Mrs. Chrisley before bankruptcy.").

In short, Todd Chrisley filed a fraudulent bankruptcy action for the purpose of discharging tens of millions of dollars of debt that he owed to community banks from fraudulently obtained loans. And, like the defendants in *Boyle* and *Tanke*, Todd made false statements during the bankruptcy proceedings in an attempt to conceal his and his wife's crimes and blame Braddock, who had helped them commit fraud. *Boyle*, 723 F. App'x at 113; *Tanke*, 743 F.3d at 1307. Accordingly, Todd's objection that the enhancement should not apply because "all bank loans predated the bankruptcy filing in 2012" is meritless. (T.C. PSR Obj. at 9). Those fraudulent loans are the very reason Todd filed for bankruptcy and lied during the proceedings. *Boyle*, 723 F. App'x at 113; *Tanke*, 743 F.3d at 1306–07. Todd Chrisley was already allowed once before to use the bankruptcy system to duck responsibility for his involvement in the bank fraud scheme. He should not be allowed to do so again by claiming that his bankruptcy action occurred after his massive bank fraud scheme imploded.

### 3. Todd Chrisley should receive an enhancement because the bank fraud scheme involved sophisticated means.

The United States agrees with Todd Chrisley that the two-level sophisticated means enhancement under U.S.S.G. 2B1.1(b)(10)(C) applies as "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."

The Guidelines commentary explains that the enhancement applies, among other times, when there was "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, cmt. n.9(B). As an example, the commentary explains that, "in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means." *United States v. Feaster*, 798 F.3d 1374, 1380 (11th Cir. 2015) (quoting § 2B1.1(b)(10)(C), cmt. n.9(B)). "Regardless of whether the defendant undertook affirmative acts of concealment, the scheme itself may be designed in a sophisticated way that makes it unlikely to be detected, allowing it to continue for an extended period and to impose larger losses." *United States v. Feaster*, 798 F.3d 1374, 1381 (11th Cir. 2015).

Todd Chrisley does not object to the application of this enhancement, nor should he. The evidence at trial confirms that Todd Chrisley orchestrated and led a six-year, $40 million bank fraud scheme, during which he directed the repeated, calculated submission of false personal financial statements (PFSs), false corporate audit reports, and false tax returns to numerous banks for the purpose of obtaining tens of millions of dollars in secured and unsecured business and personal lines of credit and mortgages. (Tr. 1471-74, 1482-83, 1518-20, 1673-79). Multiple loans were issued to shell companies, such as Auto Express LLC, LKC LLC, Michael Todd Design LLC, and the Chrisley Family Trust. (Gov. Ex. 1220; Tr. 1530-31, 1575, 1593-95). Other loans were issued to Todd Chrisley's business, Chrisley Asset Management, to him personally, to Julie Chrisley's

business, Select RE Holdings LLC, and to supposed real estate ventures that never went forward, such as Lot 46 Watersound and South Fulton Land Investments. (Gov. Ex. 1220).

In all, Todd Chrisley orchestrated, directed, and led a lengthy, extensive, and sophisticated fraud scheme involving the use of numerous shell companies, LLCs, and bank accounts, and he directed the preparation and submission of multiple types of false financial documentation to banks, including corporate audits, tax returns, and PFSs, often referring back to previously submitted false documents to ensure that new false documents aligned with the previous lies. Todd Chrisley should receive the two-level sophisticated means enhancement. *See, e.g., United States v. Dawson*, 588 F. App'x 890, 893 (11th Cir. 2014) (affirming sophisticated means enhancement where wire fraud took place over five-year period, and defendant used managerial position and specialized knowledge to commit fraud); *United States v. Clarke*, 562 F.3d 1158, 1166 (11th Cir. 2009) (affirming a "sophisticated means" determination where the scheme "covered a three-year period and required intricate planning"); *United States v. Martin*, 549 F. App'x 888, 890 (11th Cir. 2013).

**4. Todd and Julie Chrisley should receive a two-level enhancement because they derived more than $1 million in gross receipts from one or more financial institutions.**

The initial PSRs for the Chrisleys included a four-level enhancement on the basis that their bank fraud scheme "substantially jeopardized the safety and soundness of a financial institution." U.S.S.G. § 2B1.1(b)(17)(B). However, the

United States is seeking the lesser, two-level enhancement pursuant to § 2B1.1(b)(17)(A), which applies where "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." U.S.S.G. § 2B1.1(b)(17)(A). "Gross receipts from the offense" is defined as "all property … which is obtained directly or indirectly as a result of [the] offense." *Id.* cmt. n.13(B).

Any objection to this two-level enhancement would be meritless. As set forth above, the Chrisleys received more than $1 million from at least seven banks in the course of the bank fraud scheme. (Gov. Ex. 1220). Notably, this enhancement concerns "gross receipts," and Agent Ryskoski testified at trial that the fraudulent loan applications caused banks to issue the conspirators over $36 million in fraudulent loans. (Tr. at 1202-06; Gov. Ex. 1220).

**5.  Todd Chrisley should receive a two-level aggravating role enhancement.**

The United States agrees with Todd Chrisley that he should receive a two-level aggravating role enhancement under U.S.S.G. § 3B1.1(c) as he was "an organizer, leader, manager or supervisor" in any criminal activity that did not involve five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1(c). The evidence at trial established that Todd Chrisley was an organizer, leader, manager, or supervisor of the bank fraud scheme.[6]

---

[6] Notably, the initial PSR included a four-level role enhancement for Todd Chrisley. There is an argument that he deserves the four-level enhancement since the bank fraud scheme was so extensive and involved the unknowing services of many outsiders. *See United States v. Zada*, 706 F. App'x 500, 509 (11th Cir. 2017) (citing § 3B1.1 cmt. n.3) ("[A] fraud that involved only three participants but

Braddock testified that Todd Chrisley directed him on what to send banks, (Tr. at 1483-84, 1525), which is corroborated by this sampling of emails admitted at trial:

- In April 2007, Todd emailed Braddock, "these two are great but we need to find another 15,000 to make my numbers work, so do an invoice for the architect and you can tag it for revisions, TRY TO MAKE THIS HAPPEN TODAY SO THAT I DO NOT HAVE ANYTHING BOUNCING, Copy me on what you send Simone." (Gov. Ex. 813).

- In another April 2007 email, Todd told Braddock, "[Y]ou can either tell him that they are from a land deal or you can say that they were transferred from WAMU and then create another bank statement." (Gov. Ex. 816).

- After receiving a false PFS, Todd emailed Braddock, "you are a fucking genious!!!! just make it show 4 mil+" (Gov. Exs. 832, 833).

- In April 2008, when Braddock reported that he would have difficulty scrapbooking as the bank had legitimate copies of the tax returns, Todd stated, "stop telling me this shit, create them like you always have, if i don't get her these then want renew the loans." (Gov. Ex. 839).

- When one banker reached out about the outstanding loan payments, Todd directed Braddock to "deal with this bitch!!!!" (Gov. Ex. 840).

Todd also repeatedly sent these types of directives to Julie as the bank fraud scheme unfolded, including emails like this one:

---

used the unknowing services of many outsiders could be considered extensive.'"). But the United States only seeks the two-level enhancement under § 3B1.1(c) (which Todd Chrisley appears to agree applies).

- "[P]lease take care of getting her the new insurance information and Mark will get her the new pfs as well as getting her the new tax returns." (Gov. Ex. 824) (October 15, 2007, email from Todd to Julie, CC'ing Braddock).

In his objections to the PSR, Todd Chrisley concedes that "two points at most should be assessed for [his] role in the offense." (T.C. PSR Obj. at 10). The United States agrees that he should receive a two-level role enhancement.

### 6. Julie Chrisley should not receive a mitigating role reduction.

Contrary to her objections, Julie Chrisley is not entitled to a mitigating role reduction under U.S.S.G. § 3B1.2. (J.C. PSR, ¶ 124). The mitigating role provision permits a two-level reduction if the defendant was a "minor participant" or a four-level reduction if the defendant was a "minimal participant." U.S.S.G. § 3B1.1(a)-(b). "The defendant, as the proponent of the downward adjustment under § 3B1.2, bears the burden of proving her mitigating role in the offense by a preponderance of the evidence." *United States v. Martin*, 803 F.3d 581, 591 (11th Cir. 2015) (citation omitted).

The commentary to § 3B1.2 provides an example of a situation where a fraud defendant would be entitled to this reduction:

> [A] defendant who is accountable under § 1B1.3 for a loss amount under § 2B1.1 [] that greatly exceeds the defendant's personal gain from a fraud offense or who had limited knowledge of the scope of the scheme may receive an adjustment under this guideline. For example, a defendant in a health care fraud scheme, whose participation in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the loss amount, may receive an adjustment under this guideline.

U.S.S.G. § 3B1.2, app. n.3(A). That is far from what occurred here. As outlined above, Julie didn't just receive a small portion of the fraud scheme. She and her husband took home tens of millions of dollars from defrauding the banks, and Braddock testified that Julie Chrisley was involved throughout the conspiracy.

The Eleventh Circuit has repeatedly held that defendants like Julie Chrisley are not entitled to a minor or minimal role reduction simply by virtue of the fact that others in the conspiracy played larger roles. *See Martin*, 803 F.3d at 591 ("Even if a defendant played a lesser role than the other participants, that fact does not entitle her to a role reduction since it is possible that none are minor or minimal participants.") (quotation marks omitted); *see also United States v. Tabares*, 2021 WL 5279404, at *9 (11th Cir. Nov. 12, 2021) ("While Quintero gave Tabares direction, the record makes clear that Tabares's actions were important to the laundering. Tabares filed the incorporation documents for the shell company, set up the bank account, and cashed the checks. Thus, even though Quintero also participated in [money] laundering [], it does not follow that Tabares played a minor role."); *United States v. Jones*, 705 F. App'x 859, 861 (11th Cir. 2017) (district court did not clearly err in declining to apply the reduction where the defendant "understood the scope and structure of the criminal activity" and "stood to benefit from the criminal activity"); *United States v. Rabuffo*, 716 F. App'x 888, 905 (11th Cir. 2017) (district court did not err by declining to apply adjustment when "everybody had a part here, and she played an integral and essential part to the success of the scheme while it was ongoing.

So to that extent, there is no—she's hardly a damsel in distress. She was in for a penny and for a pound.").

Julie Chrisley played an integral role in the bank fraud conspiracy and significantly profited from the fraudulently obtained loans. She was "hardly a damsel in distress" and is not entitled to the mitigating role reduction. *Id.*

**7.  Todd and Julie Chrisley should receive an enhancement for using sophisticated means to commit the tax offenses.**

For tax-related offenses, a two-level enhancement applies where the offense involved sophisticated means. U.S.S.G.  § 2T1.1(b)(2). Under the Guidelines, "sophisticated means" includes

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means.

U.S.S.G. § 2T1.1, cmt. n.5. The Guidelines further provide that, "[a]lthough tax offenses always involve some planning, unusually sophisticated efforts to conceal the offense decrease the likelihood of detection and therefore warrant an additional sanction for deterrence purposes." *Id.*, cmt. (backg'd).[7]

---

[7] Between 1998 and 2001, the language for this enhancement was changed from "sophisticated means" to "sophisticated concealment" as part of a separate Sentencing Commission effort to clarify that the enhancement broadly applies with respect to overall offense conduct; the language in § 2T1.1 reverted back to "means" in 2001 to clarify that the enhancement applies to the execution of the offense as well as its concealment. *See* U.S.S.G. App. C, Amend. 617, Reason for Amend; U.S.S.G. App. C. Amends. 219-223, Reason for Amends.

Merely making misrepresentations on a tax return likely does not justify an enhancement for sophisticated means. *See, e.g., United States v. Powell*, 124 F.3d 655, 666 (5th Cir. 1997); *United States v. Rice*, 52 F.3d 843, 849 (10th Cir. 1995) (enhancement inapplicable because defendant only claimed that he had paid taxes which he had not); *see also United States v. Stokes*, 998 F.2d 279, 282 (5th Cir. 1993) ("There is nothing sophisticated about simply not disclosing income to your accountant").

On the other hand, the "essence" of sophisticated conduct "is merely deliberate steps taken to make the offense … difficult to detect." *United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001). And while it is apparent that some degree of concealment is inherent in every tax fraud case, "'sophistication' [in the Guideline does not refer] to the elegance, the 'class,' the 'style' of the defrauder – the degree to which he approximates Cary Grant – but to the presence of efforts at concealment that go beyond … the concealment inherent in tax fraud." *Id.* The enhancement "does not require a brilliant scheme, just one that displays a greater level of planning or concealment than the usual tax evasion case." *United States v. O'Doherty*, 643 F.3d 209, 220 (7th Cir. 2011). Even if certain acts would not constitute sophisticated means when considered in isolation, such acts may constitute sophisticated means when viewed in the aggregate. *United States v. Tandon*, 111 F.3d 482, 491 (6th Cir. 1997) (taken together, defendant's actions demonstrated "a sophisticated and multi-pronged effort to deceive the IRS and evade paying taxes"); *see also United States v. Ghaddar*, 678 F.3d 600, 602-03 (7th Cir. 2012) (defendant's actions "when viewed as a whole constituted a

sophisticated scheme"). The fact that a defendant could have used "even more elaborate mechanisms to conceal" the fraud does not defeat a finding of sophisticated means. *United States v. Bickart*, 825 F3d. 832, 837 (7th Cir. 2016). "Even if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme." *United States v. Laws*, 819 F.3d 388, 393 (8th Cir. 2016). The Guideline commentary "provides a nonexclusive list of examples of sophisticated means of concealment," and the use of offshore bank accounts and fictitious business entities is not necessary to constitute sophisticated means. *United States v. Campbell*, 491 F.3d 1306, 1315-16 (11th Cir. 2007).

Here, the Chrisleys should both receive a two-level enhancement pursuant to § 2T1.1(b)(2) because their tax conspiracy and tax evasion scheme involved sophisticated means. (J.C. PSR ¶¶ 136, 141; T.C. PSR ¶¶ 134, 139). The Chrisleys earned millions of dollars from 2013 through 2017 from *Chrisley Knows Best* and other media ventures that they directed into bank accounts for 7C's Productions. (Tr. at 1047-52; Ex. 1202). They used 7C's as a shell company by keeping Todd Chrisley's name off of the company and its bank accounts in an effort to shelter their income from the IRS to evade paying hundreds of thousands of dollars of delinquent taxes that Todd owed for the 2009 tax year, as well as to evade paying taxes for 2014, 2015, and 2016. (Tr. at 828-833, 1053). When the Chrisleys learned that the IRS was looking for their bank accounts, they took immediate steps to distance themselves from 7C's and further shelter their income. One day after the defendants were notified that the IRS was looking into accounts controlled by

Julie, Julie transferred ownership of the 7C's corporate bank account to Todd's mother, Faye Chrisley, and opened a new account only in Faye Chrisley's name. (Tr. at 477-523, 540-46; Gov. Exs. 100, 101, 102A, 103, 103A, 103B, 104, 104A, 105). To effectuate those changes, Julie provided false documents to Bank of America, showing that Faye was the sole owner of 7C's, despite the fact that she had never owned the company and had no involvement in it. After the Chrisleys opened the new 7C's bank account in Faye's name, the Chrisleys directed their income into that new account. (Gov. Ex. 107A). Moreover, at the Chrisleys' direction, Peter Tarantino sent tax returns to banks and other third parties that in reality had never been filed with the IRS. (Tr. at 645-49; Gov. Exs. 500, 507, 509, 510, 514).

Numerous courts have found that actions like the Chrisleys' warrant the sophisticated means enhancement. For instance, it has been applied where the defendant used a shell company or deposited funds into a bank account not directly attributable to the defendant, just as the Chrisleys used 7C's Productions. *See, e.g., United States v. Paradies*, 98 F.3d 1266, 1292 (11th Cir. 1996) (affirming enhancement where defendant used shell corporation to hide funds); *Campbell*, 491 F.3d at 1315-16 (affirming enhancement where defendant deposited funds into bank accounts not directly attributable to him); *United States v. Barakat*, 130 F.3d 1448, 1457 (11th Cir. 1997) (agreeing that the defendant's practice of filtering funds through his attorney's trust account constituted a sophisticated means of concealing tax evasion). Similarly, the creation and use of false documents like the ones Julie provided to Bank of America (falsely stating that Faye Chrisley owned 7C's) and to third parties (tax returns that were never filed) has also been

found to warrant the sophisticated means enhancement. *See, e.g., United States v. Lundberg*, 990 F.3d 1087, 1097 (7th Cir. 2021) (affirming application of enhancement where defendant doctored a third party's tax forms to support a lease application); *United States v. Melton*, 870 F.3d 830, 843 (8th Cir. 2017) (affirming application of enhancement where defendant wrote a memo falsely stating that "he was working with the IRS, and then presenting doctored IRS Forms [] alleging he had paid [] taxes"); *see also United States v. Ghertler*, 605 F.3d 1256, 1268 (11th Cir. 2010) (creation of false documents and the use of third parties for money transfers may constitute sophisticated means under § 2B1.1).

In all, Todd and Julie Chrisley took a protracted and calculated series of steps to hide their money from the IRS for years using a shell company and bank accounts that they distanced from Todd Chrisley, and when the IRS dug deeper, they fabricated documents and changed and opened new bank accounts in a third party's name, all to further evade the IRS's reach. "The totality of the[ Chrisleys'] activities carried out over an extended period of time" warrants the sophisticated means enhancement. *Ghertler*, 605 F.3d 1256, 1267-68 (11th Cir. 2010).

### 8. Todd and Julie Chrisley should receive an obstruction enhancement for the bank fraud scheme and the tax offenses.

Pursuant to § 3C1.1, a two-level enhancement applies if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct

related to (A) the defendant's offense of conviction and any relevant conduct; or

(B) a closely related offense." U.S.S.G. § 3C1.1. The commentary provides a non-

exhaustive list of examples of the types of conduct to which this adjustment

applies, including the following:

- threatening, intimidating, or otherwise unlawfully influencing a … witness, … directly or indirectly, or attempting to do so;

- committing, suborning, or attempting to suborn perjury…; [and]

- producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding.

U.S.S.G. § 3C1.1, cmt. n.4(A)-(C). In this case, the Chrisleys committed all three

forms of obstruction, warranting an obstruction enhancement for the bank fraud

and tax offenses.

### a. Todd and Julie Chrisley submitted a sham document to the grand jury in response to a grand jury subpoena issued to 7C's Productions.

"'Producing or attempting to produce a false, altered, or counterfeit document

or record during an official investigation' is a type of action that warrants a two-

level obstruction of justice enhancement." *United States v. Shannahan*, 135 F.

App'x 253, 259 (11th Cir. 2005) (quoting U.S.S.G. § 3C1.1, cmt. n.4(c)). The

Guidelines commentary states that when a defendant "is convicted both of an

obstruction offense … and an underlying offense," the two offenses group, and

the adjusted offense level "will be the offense level for the underlying offense

increased by the 2-level adjustment" for obstruction (unless the obstruction

Guidelines are higher). U.S.S.G. § 3C1.1, cmt. n.8. Notably, the Guidelines "do[]

not contain any qualifier that the production of a document materially misleads federal authorities." *Shannahan*, 135 F. App'x at 259.

For Julie, the analysis is cut and dry. She was convicted by a jury of obstruction of justice for submitting the sham, backdated 7C's corporate resolution to the grand jury during its investigation into the Chrisleys' fraud schemes. (Gov. Exs. 104, 195, 196, 197, 198).

Todd was not charged in the superseding indictment with obstruction of justice, but the United States learned in the middle of trial that he too participated in sending the bogus corporate resolution to the grand jury. During opening statements, Julie's attorney told the jury that he and Todd's attorney forwarded the bogus corporate resolution to the grand jury:

> Now, a copy was originally made for Julie by Bill Abbott. As it turned out, Julie apparently had left this corporate resolution -- and this is where the alleged obstruction comes. -- in the trunk of her car. She cooks every meal. Believe it or not, she does. She's an outstanding cook. And she had a helper at the house that day when she came back from the grocery store. His name is Chad Bryant. And you will hear from him personally. Chad offered to help bring the groceries out of the trunk. He goes in, he brings all the groceries. He brings them in the kitchen. Brings them all in the kitchen.
>
> As she's unloading the groceries, she sees this plastic bag that definitely has crumped up papers, like it's a trash bag. And inside she finds the corporate resolution. What does she do? Does she try to hide it? No. What she tries to do is do the right thing. She calls our investigator, Bill Silinski. And what does Bill tell her? Send it to me immediately, which she does. And then both Mr. Morris and I review it and really determine that this would be responsive to that same grand jury subpoena. So what do we do? We turn it over to the Government.

(Tr. at 418-19).[8] Based upon this opening statement, the Chrisleys reached an agreement with the United States' assigned filter team and disclosed an email to the prosecution team showing what actually led to the Chrisleys transmitting this sham document to the grand jury. (Doc. 212; Gov. Ex. 199).

On January 9, 2019, Julie scanned and emailed Todd and defense investigator Bill Salinski a copy of the sham, backdated corporate resolution. (Sent. Ex. 11).[9] The next day, January 10, was the day that Faye testified before the grand jury. (Gov. Ex. 197). That morning, Todd drafted an email to himself outlining the bogus story of how Julie and his mother went to "add" Faye as a signer on the Bank of America account:

[8] The United States took great care before trial to ensure that the evidence presented on obstruction would not include the jury learning that Mr. Morris was the attorney who facilitated the production of the false document. However, Mr. Friedberg directly injected himself and Mr. Morris into the case during his opening statement. Despite his opening statement, the United States referred to Mr. Morris only as the "7C's Productions' attorney" during trial.

[9] A redacted version of the email was admitted at trial as Government Exhibit 199.

**From:**       Michael Chrisley
**Subject:**   The lady at the bank told mama and Julie that they
**To:**
**Sent:**       January 10, 2019 8:03 AM (UTC-05:00)

The lady at the bank told mama and Julie that they should open a TN account because the GA account wasn't tied to her branch so it wouldn't show up on her report if there was ever an issue, mama was to be a signer that was added and Julie was the only signer on the GA account so Julie thought they just added mama to the new account and that she would've automatically been added because of the GA account , the bank added the new account to Julie's profile linking the GA and TN account, Julie and mama were told that the bank needed minutes or corporate docs showing mama as an officer or giving her authority to be a signer , Julie and mama left the bank , went back to the house and Julie pulled together a document showing mama as an owner and emailed that to benjiman at the bank , after getting a call telling asking her if mama was the owner Julie said "no" she corrected the document by drawing a line through mamas name ,signed her name and stated she owned 100% and then mama signed the document under the change , dated it then noted on the document " Change Made " March 8th 2017, mama and Julie took the document back up to the bank on March 8th, the lady they had worked with was at lunch or out so another woman made a copy of the document and have Julie the copy and said she would make sure the woman who opened the new account got the original, on March 13 benjiman emailed Julie telling her that they wanted to make sure that both Julie and mama had access to the accounts and the had identified some issues and would correct them. The new account was added to Julie's profile and the GA and TN account was linked together on Julie's profile , NOT on mamas profile , the remote caption machine was sent to 806 Lynnwood Blvd attention Julie and a voicemail was left from the banking center confirming that Julie received it and if she had any questions to call the person leaving the voicemail , Julie contacts BofA when the investigation started and recorded the conversation and states " when I added Faye as a signer to "MY" account what documents do you have ? " so Faye is just signer correct" Faye isn't the owner ? NO, 7C's owns the account . Why hasn't the IRS seized the funds in the GA account ? Why hasn't the IRS never notified 7C's if they are holding funds for Michael TODD chrisley to remit to the IRS?

(Sent. Ex. 10). On January 11, the day after Faye testified before the grand jury, Todd forwarded the backdated document to his defense team with this email:

From:        Michael Chrisley <mchrisley1@gmail.com>
To:          ███████████████████████████████████████
Cc:
Bcc:
Subject:     Fwd: Scan Jan 9, 2019 at 7.54 PM
Date:        Fri Jan 11 2019 07:54:01 EST
Attachments: Scan Jan 9, 2019 at 7.54 PM.pdf

Yesterday my mother was testifying in front of the GJ, krepp presented her with a document from the
bank that said she was a 100% owner of 7C's but he didn't present her with this document that was
taken to the bank the very next day after opening the new account which is the same document but
corrected in Julie's handwriting and mamas signature , dated etc, krepp doesn't know about this
document or he didn't want to present it to the GJ because it would have killed his theory that Julie had
given mama the account in order to help me avoid paying my 2009 taxes , when should krepp be made
aware that we all have this document ? Should it go with the info you are sending Tuesday to the DOJ?
What's your recommendation as to how to let krepp know about this ? ██████████

Sent from my iPhone

Begin forwarded message:

> From: jchrisley1@gmail.com
> Date: January 9, 2019 at 7:55:07 PM CST
> To: mchrisley1@gmail.com, ███████████████
> Subject: Scan Jan 9, 2019 at 7.54 PM

(Gov. Ex. 199).[10] Five months later, the Chrisleys produced the sham and

obstructive corporate resolution to the grand jury through their attorney with the

lie that Julie and Faye had hand delivered the resolution to Bank of America.

(Gov. Exs. 194, 195).

Todd and Julie knew full well that the document was a fraud and that the

representation they caused their attorneys to make was false. As representatives

from Bank of America confirmed during trial, the bank never received this so-

called amended corporate resolution, and the attorney's explanation to the grand

jury (which the Chrisleys stipulated came from Julie Chrisley) was patently false.

---

[10] If the United States had known about Government Exhibit 199 (Sent. Ex. 11)
prior to trial, it would have presented a second superseding indictment to the
grand jury that included Todd in the obstruction charge.

(Tr. at 487-89) (testimony of Bank of America manager Lisa Stone); (Gov. Exs. 100, 103, 104) (internal Bank of America records confirming the statement to the grand jury was false).

In fact, on March 6, 2017, Tarantino emailed the Chrisleys that the IRS was asking for information about bank accounts in their names, prompting Todd to email Julie, "Get this taken care of asap." (Gov. Ex. 109). While Julie and Faye went to Bank of America the next day to move the 7C's account into Faye's name, Todd emailed a production company, "Please refrain from sending any deposits to the account you have on file as that account has been compromised, we will be sending you another NEW account number tomorrow or Thursday morning." (Gov. Ex. 119). Todd and Julie Chrisley have made a career of committing fraud together: from bank fraud to wire fraud to tax evasion to submitting the sham corporate resolution to the grand jury with a lie that the jury did not believe.

The Chrisleys' argument that a two-level enhancement should not apply to the bank fraud offense because the sham document was related to the tax offenses is meritless. They submitted a false document in an attempt to obstruct the grand jury's investigation into all of their crimes. When they submitted the false document in June 2019, they knew that the grand jury was investigating their bank fraud scheme. In the midst of the back-and-forth about the obstructive document, the Chrisleys' attorneys had been provided with multiple interview reports of Mark Braddock in which the bank fraud scheme was described in great detail. (Sent. Ex. 12). In fact, the United States disclosed two of these

interview reports on June 4, 2019—two days before Julie Chrisley signed the business record certification falsely attesting that the fraudulent corporate resolution was a legitimate 7C's Productions business record. (Gov. Ex. 194). When the Chrisleys sent a false document to the grand jury, they knew that the same grand jury was actively investigating the bank fraud scheme.

They cannot now split hairs and claim they were "only" trying to obstruct the tax investigation in a transparent effort to reduce their Guidelines range. Because Todd Chrisley's offense level for the bank fraud scheme is more than nine levels higher than any of the other offenses, his bank fraud Guidelines alone will control his total offense level. If an obstruction enhancement is not applied to the bank fraud Guidelines, they would both "receive[] a free pass with respect to providing false documents to the grand jury." *United States v. Thorson*, 633 F.3d 312, 320 (4th Cir. 2011). The Chrisleys submitted a sham document for the purpose of impeding and hindering an official investigation, and they should be penalized for their obstruction, as the Guidelines state.

### b. Todd and Julie Chrisley suborned the perjury of Faye Chrisley and Donna Cash.

"By knowingly facilitating the presentation of false testimony before the court, a defendant does more than just allow a witness to give perjured testimony; rather, he acts in a manner that obstructs the administration of justice." *United States v. Bradberry*, 466 F.3d 1249, 1255 (11th Cir. 2006). Accordingly, when a defendant suborns perjury, the obstruction enhancement applies. *Id.* "Perjury, for purposes of applying this enhancement, has been

defined by the United States Supreme Court as 'false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Singh*, 291 F.3d 756, 763 (11th Cir. 2002) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). A person suborns perjury when he "procures another to commit any perjury." 18 U.S.C. § 1622; *see also* § 3C1.1, cmt. n.9 ("the defendant is accountable for his own conduct and for conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused.").

During their cases-in-chief, Todd and Julie Chrisley knowingly called two witnesses, Faye Chrisley and Donna Cash, to falsely testify about issues material to their defense strategy. After using Todd Chrisley's 77-year-old mother to commit tax evasion, the Chrisleys put her on the stand at trial to lie about key events. Faye Chrisley falsely testified that Julie asked her to be a "signer" on their account because they were moving to California to film a show and that when she and Julie went to Bank of America, Julie told the bank employee that they wanted to "add me on as a signee, a signatory." (Tr. 2891-94). Faye also falsely testified that she and Julie went back to the bank and hand delivered a "corrected" copy of the business resolution with handwritten changes showing that Julie owned 7C's Productions instead of Faye, and that a bank employee made a copy of the "corrected" business resolution and gave it to them before they left. (Tr. 2896-98).

Faye Chrisley's story was patently false and material. The Chrisleys put Faye on the stand to tell the same lie they got their attorney to tell the grand jury when

they produced the sham document. But Bank of America manager Lisa Stone unequivocally testified that Julie went into the Bank of America branch to remove her name from the 7C's bank account and place her mother-in-law on the account instead. (Tr. at 487-89). Bank of America's internal records confirmed that Faye Chrisley thereafter became the sole owner of the 7C's account. (Gov. Exs. 100, 103, 104). And, as stated, the crux of the United States' obstruction case was the fact that Julie Chrisley submitted that sham, backdated corporate resolution to the grand jury and had never delivered it to Bank of America. (Gov. Exs. 195, 196, 197, 198).[11]

Equally egregious was the false testimony of former CAM employee Donna Cash. The Chrisleys put up Cash to falsely "confess" to the entire bank fraud scheme. Nearly everything that Cash said on the stand was a lie. Most importantly, Cash falsely testified that she and Braddock were the ones who committed the massive, six-year-long bank fraud scheme *behind* Todd and Julie's back and *for* Todd and Julie's benefit, by doing things such as hacking into the Chrisleys' home voicemail system and deleting voicemails from banks. (Tr. at 2494-2506). She even testified that the Chrisleys did not know that Braddock was filing false BP Oil spill claims—despite the audio recording of Julie Chrisley calling to ask when she would receive a check from their filed claim. (Tr. 2495; Gov. Exs. 1205, 1207).

---

[11] Again, the fact that these lies concerned the transaction at Bank of America (and not the bank fraud scheme) is irrelevant for Guidelines purposes.

According to Cash, it wasn't just the bank fraud that she and/or Braddock were responsible for; she was apparently also responsible for Todd's unpaid 2009 taxes, for Julie's wire fraud, and for three other fabricated and emailed documents that the United States introduced as Rule 404(b) evidence. Cash testified that on two occasions, Braddock had her tell Todd that a $250,000 payment was being made on his 2009 taxes and that Braddock fabricated a check showing that the payment had been made when it hadn't. (Tr. at 2512-14). Cash testified that when the Chrisleys were applying to lease a house in California, it was she—not Julie—who fabricated the two bank statements and credit report and emailed them to the leasing agent using Julie's Gmail account without Julie's knowledge. (Tr. at 2525-27).[12] Cash also testified that she fabricated invoices from Pineapple House, Ken Knight Interiors, and Delta Airlines without the Chrisleys' knowledge or consent (but for their financial benefit). (Tr. 2527-31).

Donna Cash's testimony was absurd. It was a deliberate effort to mislead the jury. This was not just a witness who made some contradictory statements while testifying. Cash directly contradicted the recorded statements she had previously made to the defense team. On the stand, she admitted to the wire fraud scheme. But on the audio recordings supplied by the defendants, she said the opposite. (Sent. Ex. 13).

---

[12] On cross examination, Cash admitted that she did not even know what Google Drive was, despite that the fabricated credit report was sent via Google Drive link. (Tr. at 2535).

In short, the Chrisleys put Donna Cash on the stand and let her falsely confess to nearly every crime that they were charged with. On this point, there can be dispute:  the Chrisleys knew that Cash was committing perjury, and they put her up to do it.

The Chrisleys' objections that Faye Chrisley's and Donna Cash's testimony was not false or material is incredulous, as is their claim that they didn't "facilitate" the perjury. (T.C. Obj. at 10; J.C. Obj. at ¶ 127). The jury's guilty verdict speaks to the falsity of their testimony, and it is difficult to conceive of testimony more material than a confession to committing a crime that someone else has been charged with. Additionally, the Chrisleys' claim that they did not facilitate the perjury is belied by the facts that they called these witnesses in their case-in-chief and that there are audio recordings of their investigator talking to Donna Cash about her testimony. Instead of taking the stand and perjuring themselves, the Chrisleys' put up their own mother and former assistant to do it for them. If this level of suborned perjury does not warrant the obstruction enhancement, it's unclear what would.

### c. Todd Chrisley threatened, intimidated, and unlawfully influenced his daughter, Lindsie Chrisley.

The obstruction enhancement is appropriate where the defendant "threatened, intimidated, or otherwise unlawfully influenced a co-defendant, witness, or juror, directly or indirectly, or attempted to do so." *United States v. Boyd*, 574 F. App'x 878, 879 (11th Cir. 2014) (quoting U.S.S.G. § 3C1.1, cmt., n.4(A)) (alterations adopted). It is not necessary for the defendant to directly

communicate with the witness who he is attempting to influence or threaten.
*United States v. Bradford*, 277 F.3d 1311, 1315 (11th Cir. 2002) (holding that because
§ 3C1.1 applies to attempts to obstruct justice, it is not essential that the threat be
communicated to the target).

This enhancement routinely applies when a defendant directs his obstructive
conduct towards his own family members. For example, in *United States v.
Hesser*, 800 F.3d 1310, 1331 (11th Cir. 2015), the Eleventh Circuit affirmed the
application of the obstruction enhancement where, in the weeks leading up to
trial, the defendant asked his wife to "'go over the story line' of her upcoming
testimony" for the government. When the wife declined, Hesser responded, "If
you don't want to help, I'll know whose head to lop off." *Id.* A few weeks later,
"Hesser took the couple's two eldest children into a bedroom and told them that
their mother was betraying him by working with the Government." *Id.* The wife
ultimately testified at trial for the government, including about Hesser's efforts
to intimate and influence her testimony. *Id.* The district court rejected Hesser's
argument at sentencing that "the events were merely an intra-family dispute and
tug-of-war for the children." *Id.* (quotations omitted).

Similarly, in *United States v. Ward*, 722 F. App'x 953, 967 (11th Cir. 2018), the
obstruction enhancement applied where the defendant urged his brother his
invoke his Fifth Amendment right if questioned and offered his brother $2,000
for his cooperation. *See also United States v. Amedeo*, 370 F.3d 1305, 1319 (11th Cir.
2004) (finding that, at a minimum, the defendant's urging a potential witness to
lie constituted "unlawfully influencing" a witness under § 3C1.1); *United States v.*

*Garcia*, 13 F.3d 1464, 1471 (11th Cir. 1994) (no error in district court's finding that the defendant obstructed justice by asking a witness not to speak to law enforcement).

In this case, Todd Chrisley not only tried to "unlawfully influence" his daughter, Lindsie Chrisley; he succeeded. After reporting to the FBI and U.S. Probation that her father was harassing, intimidating, and attempting to extort her, Lindsie took the stand at trial and testified for her father and stepmother. But on cross examination, she admitted to the events that led to her appearance in court—crucially, these facts were all documented in the FBI interview report that had been disclosed to the Chrisleys in discovery. (Sent. Ex. 14) (302 of Lindsie Chrisley interview). From 2017 to 2019, Lindsie Chrisley was estranged from her father. Two months before he was indicted, Todd asked Linsdie to meet him in Chattanooga. Lindsie agreed to meet and drove to Chattanooga, believing that her father was going to apologize for their estrangement for the past two years. When she arrived at the restaurant where they met, Todd insisted that Lindsie leave her cell phone in the car. Once they were inside, Todd told Lindsie that he was about to be indicted and questioned Lindsie's involvement in the investigation. Todd continued to press Lindsie about her involvement, and Lindsie told him that she was sick of him and Chase Chrisley putting out threatening tweets directed at her. Todd told Lindsie that she needed to be careful with Chase because he had a sex tape of Lindsie from an indoor security camera. Todd insisted the sex tape was real and told Lindsie she needed to "be careful." A few weeks later, in July 2019, Lindsie called the FBI National Threat

Operations Center and reported that her father was attempting to blackmail her with a supposed sex tape of her because he thought that she the reason he was under investigation. The FBI case agents subsequently met with Linsdie, where she reported the information above. She also said that in the days leading up to that meeting, Todd had told her sister-in-law that Lindsie was "behind all this stuff" and that Lindsie was a snake, manipulative, and was going to be sued.

The following month, the grand jury returned an indictment, (Doc. 1), and Lindsie Chrisley was on the witness list that the United States provided to the Chrisleys and their pretrial services officer. Thereafter, Lindsie continued contacting the FBI. (Sent. Ex. 15). In December 2020, she emailed the FBI that she was "still victim of Todd Chrisley's harassment." (*Id*.). She reported that she was told that Todd and Chase Chrisley were having her followed. (*Id*.).

Lo and behold, at trial, Lindsie took the stand and provided favorable testimony for her parents. Like the sentencing court in *Hesser*, this court should reject the notion that these events "were merely an intra-family dispute." *Hesser*, 800 F.3d at 1331. In *Hesser*, the obstruction enhancement was warranted where the defendant tried and failed to influence his wife's testimony. *Id.* Here, Todd Chrisley succeeded in manipulating his estranged daughter, bringing her back into the family fold, and putting her on the stand at trial.

### III.   RESTITUTION

### 1.   The Court should order the Chrisleys to pay restitution to the victims of the bank fraud conspiracy.

The Mandatory Victim Restitution Act ("MVRA") requires district courts to order "that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). Under the MVRA, the victim banks or the successive entities were victims of the Chrisleys' bank fraud, entitling them to recover their actual loss in the form of restitution.

A "victim" under the MVRA is any "person directly and proximately harmed as a result of the commission of an offense." § 3663A(a)(2). The phrase "directly and proximately" is not an overly exacting standard. It requires but-for causation and only that "'the causal connection between the conduct and the loss is not too attenuated (either factually or temporally).'" *United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007) (citation omitted). The defendant's conduct does not need to be the "'sole cause of the loss,'" so long as "'any subsequent action that contributes to the loss, such as an intervening cause, [is] directly related to the defendant's conduct.'" *Id.* (quoting *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 928 (9th Cir. 2001)). "'The causal chain may not extend so far, in terms of the facts or the time span, as to become unreasonable.'" *Id.* (quoting *Gamma Tech*, 265 F.3d at 928).

The victim banks or the entities that have subsequently purchased the fraudulent loans qualify as "victims" under these standards, because the Chrisleys' bank fraud proximately caused them to suffer actual losses. As

46

detailed above, the Chrisleys engaged in an extensive bank fraud scheme that caused victims to suffer approximately $20 million in losses. Their fraud was the but-for cause of the loss: the victims would not have lost any money if the Chrisleys had not obtained the fraudulent loans. And the fraud "proximately" caused the loss, insofar as the causal chain between the two was "'not too attenuated (either factually or temporally)'" but rather closely connected to the fraudulent conduct. *Robertson*, 493 F.3d at 1334 (citation omitted).

Moreover, the MVRA provides that, "[i]f a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation." 18 U.S.C. § 3664(j)(1). Under this provision, a subsequent purchaser who buys the fraudulent loan should be entitled to recover the amount of money they spent on the fraudulent loan. *See generally United States v. Mancini*, 624 F.3d 879, 881-82 (8th Cir. 2010) (compensation from an insurance provider).

As for the appropriate amount of restitution, § 3664 requires the district court to "order restitution to each victim in the full amount of each victim's losses." 18 U.S.C. § 3664(f)(1)(A). The "restitution award 'must be based on the amount of loss *actually* caused by the defendant's conduct.'" *United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010) (citation omitted). The goal of restitution is to make the victim whole. *Id.* at 1249.

Here, the victims lost $20,041,817.67, of which $17,270,741.57 should be ordered in restitution. (Sent. Ex. 3). The Chrisleys are not entitled to an offset loss

amount under the theory that the victim banks were negligent when they issued these loans; the law places no such burden on crime victims to mitigate their damages. *See United States v. Hairston*, 888 F.2d 1349, 1354 (11th Cir. 1989) (upholding restitution award despite argument that bank failed to take steps that could have reduced its loss); *United States v. Rice*, 38 F.3d 1536, 1542 (9th Cir. 1994) (rejecting argument that restitution should be reduced based on victim's conduct and stating that "[a] crime victim is not required to mitigate damages"). The statutory framework governing restitution "does not include any provision allowing the court to attribute fault for loss to a victim and reduce the amount of restitution on that basis." *United States v. Guy*, 335 F. App'x 898, 900 (11th Cir. 2009). Negligence on the part of the victim is simply "not a valid basis on which to reduce the restitution amount." *Id.*[13] As noted, restitution is measured by the amount the victim actually lost, not some amount reduced based on the victim's negligence or failure to mitigate. *Hairston*, 888 F.2d at 1354. In sum, even if the victims were negligent, it would not provide a valid basis for reducing the restitution owed.

Similarly, it is irrelevant that the Chrisleys reached a settlement regarding these fraudulent loans in separate proceedings because nothing in the restitution

---

[13] *See also United States v. Holland*, 394 F. App'x 766, 768 (2d Cir. 2010) (unpublished) (victim's alleged negligence and failure to mitigate were irrelevant to order of restitution); *United States v. Zafar*, 291 F. App'x 425, 429 (2d Cir. 2008) (unpublished) (contributory negligence was not a basis for reducing restitution); *United States v. Rosby*, 454 F.3d 670, 677 (7th Cir. 2006) (victims' carelessness would not reduce restitution).

statutes provides that a victim loses its right to criminal restitution when it has received a civil judgment. Indeed, the existence of a civil judgment does not bar criminal restitution and "provides no basis for reduction in the restitution award." *United States v. Bramson*, 107 F.3d 868, 1997 WL 76048, at *2 (4th Cir. 1997). The mere existence of a civil judgment does not mean that the victim will receive anything, and without actual compensation to the victim, there is no basis for reducing criminal restitution. *Id.* There is also added utility in having a criminal restitution judgment because, in comparison to a private litigant, probation officials may better monitor a defendant's financial status in working to collect the restitution. *Id.* at *2 n.2.

For purposes of imposing restitution, the Chrisleys are not entitled to an offset by the value of property forfeited to the government, because both restitution and forfeiture are mandatory, and the separate nature of these two remedies precludes using one to offset the other. *See United States v. Bane*, 720 F.3d 818, 827 n.8 (11th Cir. 2013) (rejecting a defendant's argument that his restitution order should have been offset by the amount forfeited to the government). The goal of restitution is to compensate victims for their losses, while the goal of forfeiture is to punish the defendant by transferring ill-gotten gains to the government. *See e.g., United States v. Joseph,* 743 F.3d 1350 (11th Cir. 2014). Moreover, under the MVRA, the Court must order full restitution "in addition to ... any other penalty authorized by law," as provided in 18 U.S.C. § 3663A(a)(1), and "[i]n no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance *or any other source* be considered in

determining the amount of restitution," *Id*. § 3664(f)(1)(B) (emphasis added). The MVRA permits a reduction in a restitution order only for an "amount later recovered as compensatory damages for the same loss by the victim in" a federal or state civil proceeding. *Id*. § 3664(j)(2).  Consequently, the Chrisleys are not entitled to any credit against restitution for the value of any forfeited property or forfeiture judgment.

It is true that victims are not entitled to a double recovery. *See United States v. Louper-Morris*, 672 F.3d 539, 566 (8th Cir. 2012). The Chrisleys are thus entitled to post-judgment credit against their restitution owed for funds *actually paid* to the victims, whether pursuant to a civil judgment or the criminal restitution order. *See id.* at 566-67; *United States v. Scherer*, No. 01-1088, 2001 WL 1299278, at *2 (6th Cir. 2001) (unpublished) (citing 18 U.S.C. § 3664(j)(2)(B)). In this case, based upon nature of the Chrisleys' criminal actions and the statutory scheme of the MVRA, the Court should order Todd and Julie Chrisley to pay restitution to the victims of the bank fraud conspiracy in the amounts reflected on Agent Ryskoski's summary chart. (Sent. Ex. 3).

## IV.    SECTION 3553(A) ARGUMENT

### 1.  Todd Chrisley and Julie Chrisley should be sentenced to lengthy periods of incarceration.

The Chrisleys have built an empire based on the lie that their wealth came from dedication and hard work. The jury's unanimous verdict sets the record straight: Todd and Julie Chrisley are career swindlers who have made a living by jumping from one fraud scheme to another, lying to banks, stiffing vendors, and

evading taxes at every corner. Their "empire" was built upon the backs of defrauded community banks that collapsed while Todd Chrisley used the stolen money to fly to Los Angeles for bi-weekly haircuts. After their fraud scheme imploded, the Chrisleys managed to shirk responsibility by abusing the bankruptcy system and writing off over $20 million of the fraudulent loans they had burned through living a lavish lifestyle. Undeterred, while they were in bankruptcy, the Chrisleys started a reality television show where they flaunted their wealth and lifestyle to the American public. As they began making money from the show, they hid it and refused to pay the federal income taxes that their viewers pay every year. Even while making millions of dollars, they insisted on defrauding everyone they encountered in the smallest ways imaginable:  the BP Oil Spill Fund out of money intended to help afflicted homeowners, a California homeowner out of rent money, even the network that airs their show for an extra airline ticket. And, believing themselves to be untouchable, Todd and Julie Chrisley tried to obstruct the grand jury investigating their crimes and put up their family members and friends to lie for them at trial.

The sentencing court's "task is to impose a sentence that will adequately (1) 'reflect the seriousness of the offense,' (2) 'promote respect for the law,' (3) 'provide just punishment,' (4) 'afford adequate deterrence,' (5) 'protect the public from further crimes of the defendant,' and (6) provide the defendant with any needed training and treatment in the most effective manner. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1253-54 (11th Cir. 2015) (citing 18 U.S.C. § 3553(a)(2)). "The task is a holistic endeavor that requires the district court to

consider a variety of factors: (1) the nature and circumstances of the offense, (2) the defendant's history and characteristics, (3) the kinds of sentences available, (4) the applicable sentencing guidelines range, (5) pertinent policy statements of the Sentencing Commission, (5) the need to provide restitution to any victims, and (6) the need to avoid unwarranted sentencing disparities." *Rosales-Bruno*, 789 F.3d at 1254 (citing 18 U.S.C. § 3553(a)).

The United States will make a specific sentencing recommendation after the Court determines the appropriate Guidelines range but summarizes here some of the most relevant § 3553(a) factors. As set forth below, Todd and Julie Chrisley are the rarest of white-collar defendants for whom every § 3553(a) factor weighs in favor of a lengthy prison sentence.

## A. Driven by greed, the Chrisleys engaged in a decade-long fraud spree targeting banks, the IRS, the judicial system, and countless third parties.

Most fraud schemes unfold in a familiar manner: A defendant commits one fraud scheme for a period of time, gets caught, and is prosecuted. The Chrisleys are unique given the varied and wide-ranging scope of their fraudulent conduct and the extent to which they engaged in fraud and obstructive behavior for a prolonged period of time. The United States outlines below the enormity of their crimes—many of which are not taken into account by their Guidelines ranges.

### 1. The Chrisleys' loan fraud scheme targeted community banks throughout the metro-Atlanta area.

As set forth above, the Chrisleys obtained tens of millions of dollars in fraudulent loans from community banks located throughout the metro-Atlanta

area. The bank fraud scheme was enormous in its scope and effectiveness. Together with Braddock, the Chrisleys duped small banks into giving them tens of millions of dollars. They treated these bank loans like a shell game, using new loans to pay back old debt, all while living large. As Todd barked orders to Braddock, and Julie drove around Atlanta dropping off checks for delinquent debts, the Chrisleys wore designer clothing, drove luxury cars, and enjoyed vacation homes in South Carolina (a house on Lake Keowee) and Florida (a beach house they named "Julie Got Her Way").

The Chrisleys obtained or renewed these loans during the heart of the financial collapse, when Georgia was significantly impacted by banking failures.[14] Between 2008 and 2013, more than one third of the nation's bank failures occurred in the Federal Reserve's Sixth District (encompassing Georgia, Florida, Alabama, and portions of Louisiana, Mississippi, and Tennessee). A total of 87 banks failed in the state of Georgia.[15] The Government Accountability Office ("GAO") found that from 2008 to 2011 alone, a total of 74 Georgia banks

---

[14] Ironically, the legitimate money that the Chrisleys earned from CAM came from managing foreclosed properties following the Great Recession.

[15] *See* "Lessons Learned from the Bank Failure Epidemic in the Sixth District: 2008–2013" by Michael Johnson, Senior Vice President, Federal Reserve Bank of Atlanta (available at https://communitybankingconnections.org/articles/2014/q3-q4/view-from-the-district (last visited November 14, 2022)).

failed, dwarfing the number of bank failures in larger states like California and Florida[16]:



To be clear, the Chrisleys are not solely responsible for the banking failures described above. However, their actions had serious consequences. In its study, GAO found that

> [t]he failures of the smaller banks (those with less than $1 billion in assets) in these states were largely driven by credit losses on commercial real estate (CRE) loans. The failed banks also had often pursued aggressive growth strategies using nontraditional, riskier funding sources and exhibited weak underwriting and credit administration practices.[17]

---

[16] Government Accountability Office, "Financial Institutions: Causes and Consequences of Recent Bank Failures," January 2013, https://www.gao.gov/assets/gao-13-71.pdf (last visited November 14, 2022).

[17] Government Accountability Office, "Financial Institutions: Causes and Consequences of Recent Bank Failures," January 2013, https://www.gao.gov/assets/gao-13-71.pdf (last visited November 14, 2022).

That is precisely what occurred here. Small banks during this timeframe acted recklessly by lending to the likes of the Chrisleys based on inflated PFSs and sham tax returns. But fraudsters like the Chrisleys targeted those banks, knowing that they could swindle them out of millions. Scores of economists, bankers, and government officials have analyzed the causes of the banking collapse that besieged the country in 2008. To find one reason why community banks had financial difficulties during this timeframe, one need look no further than the Chrisleys.

### 2. The Chrisleys orchestrated an extensive tax evasion scheme while earning millions from their television show and other ventures.

The bank fraud scheme was only the beginning of the story. When they could no longer afford to keep their fraud going, the Chrisleys refused to take responsibility for their actions and used the court system to escape unscathed. In this case, they severed ties with Braddock, blamed him for the fraud, and used Todd's bankruptcy filing to walk away from tens of millions of dollars owed to a long list of creditors, including the community banks they defrauded. After they struck gold by getting their reality television show on the air, they refocused their efforts on hiding their new money from the IRS. As proven at trial, the Chrisleys earned millions of dollars from their reality television show and other media ventures from 2013 to 2017, which they hid from the IRS:

| Summary of Earnings Todd & Julie Chrisley 2013-2017 | | | | | | |
|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
| **Todd Chrisley:** | | | | | | |
| Entertainment Partners - Checks | 25,120.01 | 68,750.43 | 440,068.00 | 781,771.85 | 1,425,521.28 | 2,741,231.57 |
| Express Smile Atlanta - 7C's | - | - | 20,000.00 | 54,000.00 | 41,500.00 | 115,500.00 |
| Express Smile Atlanta - FEC | - | - | - | - | 28,500.00 | 28,500.00 |
| Bright Road Productions - Wires* | - | - | 347,600.00 | 408,000.00 | - | 755,600.00 |
| Central Entertainment - Wire - 7C's | - | - | - | 36,000.00 | 9,000.00 | 45,000.00 |
| Central Entertainment - Wire - FEC | - | - | - | - | 218,624.99 | 218,624.99 |
| Total | 25,120.01 | 68,750.43 | 807,668.00 | 1,279,771.85 | 1,723,146.27 | 3,904,456.56 |
| **Julie Chrisley:** | | | | | | |
| Entertainment Partners - Checks | 25,000.01 | 67,726.43 | 399,968.00 | 473,484.80 | 1,209,844.68 | 2,176,023.92 |
| Bright Road Productions - Wires* | - | - | 120,000.00 | - | - | 120,000.00 |
| Central Entertainment - Wire - 7C's | - | - | - | - | 4,950.00 | 4,950.00 |
| Central Entertainment - Wire - FEC | - | - | - | - | 37,800.00 | 37,800.00 |
| Total | 25,000.01 | 67,726.43 | 519,968.00 | 473,484.80 | 1,252,594.68 | 2,338,773.92 |
| Grand Total | 50,120.02 | 136,476.86 | 1,327,636.00 | 1,753,256.65 | 2,975,740.95 | 6,243,230.48 |

(Gov. Ex. 1202).

Despite amassing this fortune, they took significant and calculated steps to evade paying Todd's 2009 taxes and did not bother filing or paying anything for the 2013, 2014, 2015, and 2016 tax years. They first funneled money into their loan-out shell company, 7C's, in hopes of keeping Todd's name off any bank accounts. When the IRS started asking too many questions, they changed tactics and transferred the shell company to Todd's mother and opened a new 7C's bank account with Todd's mother as the sole signer. In a coordinated effort, Julie took Todd's mother to Bank of America, and Todd notified the production company to stop depositing their income into the existing account:

```
From:       Michael Chrisley
Subject:
To:         paul@cegtalent.com; Ryan Clover; Julie Chrisley
Sent:       March 7, 2017 11:53 PM (UTC-05:00)

Good evening ,
Please refrain from sending any deposits to the account you have on file as that
account has been compromised , we will be sending you another NEW account number
tomorrow or Thursday morning .

Sent from my iPhone
```

(Gov. Ex. 119). Even after receiving IRS materials like a pamphlet titled "Why Do I Have To Pay Taxes?", the Chrisleys refused to comply with the tax laws that apply to all Americans. (Gov. Ex. 77).

The Chrisleys may believe their tax evasion was a victimless crime, but the consequences are felt by all taxpaying Americans. The full amount of money lost due to tax cheaters, known as the "tax gap," is impossible to calculate. One scholar has argued that "[i]ndividual tax evasion costs the government over $250 billion in lost revenue per year, before taking into account revenue lost by corporate tax shelters or legal tax loopholes."[18] When traditional wage earners and W-2 employees are paid, their income is automatically reported to the IRS by the employer. By contrast, the Chrisleys were paid as independent contractors through their "loan-out company," which they used to evade detection by the IRS. If the IRS had known that All3Media was paying Todd Chrisley millions of dollars for appearing on *Chrisley Know Best*, the Revenue Officers assigned to collect the hundreds of thousands of dollars he owed for 2009 could have levied the 7C's bank account. Instead, the Chrisleys sheltered Todd's income and didn't report the millions of dollars they were earning as public figures and influencers. This is, unfortunately, a common problem. One study found that while only one percent of wage and salary income was not reported in the 2001 tax year, a

---

[18] Delaney, Kathleen, THE PHYSIC COST OF TAX EVASION, 56 B.C. L. Rev. 617, 617 (2015) (citing Tax Gap for Tax Year 2006, IRS, 2 (Jan. 6, 2012), http://www.irs.gov/pub/newsroom/overview_tax_gap_2006.pdf, archived at http://perma.cc/5D2W-DCGV (estimating that individuals underreported $235 billion in income taxes and $57 billion in self-employment taxes in 2006)).

whopping 57 percent of nonfarm proprietor income—or $68 billion—was not reported to the IRS that same year.[19] While the Chrisleys' income was funneled through their shell company as opposed to a sole proprietorship, the effect was the same—part of the way they were able to evade detection was by abusing the non-wage income reporting system. A message must be sent to the Chrisleys and others that tax evasion is a serious offense, and that wealthy tax cheats who use personal companies to avoid paying taxes will face a substantial prison sentence.

Finally, Todd and Julie Chrisley's arrogance merits special consideration. Most tax cheaters try to keep a low profile while avoiding detection from the IRS. Not the Chrisleys. In 2013, while Todd was in the midst of bankruptcy proceedings, the Chrisleys filmed a promotional video for their new reality show about their extravagant lifestyle. In the video, Todd boasted that he "make[s] millions of dollars a year," and in another shot where he is standing in his walk-in closet in his expansive house, he bragged that "in a year, we probably spend over $300,000, sometimes more, just on clothing." (Sent. Ex. 16) (*Chrisley Knows Best* promotional video). As Annie Kate Pons testified at trial, no one had scripted the show or told Todd what to say. (Tr. at 967-68). He was just being himself. (*Id.*). Yet when an IRS Revenue Officer sought to collect the taxes he had owed on his 2009 tax return, Todd curtly told Tarantino "can you check with the

---

[19] Slemrod, Joel, CHEATING OURSELVES: THE ECONOMICS OF TAX EVASION, 1 Journal of Economic Perspectives 25 (2007), available at https://pubs.aeaweb.org/doi/pdfplus/10.1257/jep.21.1.25. Nonfarm proprietors' income represents the portion of the total income earned from current production that is accounted for by unincorporated nonfarm businesses in the United States.

IRS bitch to make sure she has adjusted the payoff from my 500k number to reflect the 98k number please?" (Sent. Ex. 17).[20] As the show's success took off, Todd continued to peddle public lies about his taxes. Knowing that he owed significant sums of money to the IRS, Todd went onto a national radio program and boastfully lied, claiming, "Obviously, the federal government likes my tax returns because I pay 750,000 to 1 million dollars just about every year, so the federal government doesn't have a problem with my taxes." (Gov. Ex. 1123A). This was, obviously, a lie as he hadn't bothered to file tax returns in years.

### 3. The Chrisleys' crime spree consisted of much more than what was charged in the indictment.

The charged bank fraud and tax offenses were only two of the frauds committed by Todd and Julie Chrisley over the years. They have wrongly stiffed countless people and companies, including three of their own witnesses at trial. The jury heard evidence about their additional criminal conduct and repeated efforts to avoid paying even the smallest of bills.

While getting tens of millions of dollars in fraudulent loans, the Chrisleys also defrauded the BP Oil Spill Fund by falsely claiming that their Florida vacation home had lost rental income from the oil spill, despite the fact that "Julie Got Her Way" had never been a rental property. (Gov. Exs. 1205-07). The jury also heard

---

[20] This email was admitted at trial in redacted format. (Gov. Ex. 579).The United States tenders the unredacted email for sentencing as it bears on Todd Chrisley's view of IRS employees who were trying to get him to pay delinquent taxes that he had owed for eight years.

that Todd falsely claimed to be a Florida resident when he lived in Roswell, Georgia to avoid paying Georgia state income taxes. (Tr. at 1850-51).

Even after parting ways with Braddock and blaming him for the entire bank fraud scheme, the Chrisleys continued sending false statements to banks and mortgage brokers whenever they wanted something:

- In one email to a mortgage broker, Todd deleted the reference to where money came from when trying to satisfy an IRS tax lien in an effort to hide the source of the funds. (Gov. Exs. 947, 949). In reality, the money had come from their minor child's bank account. To be clear, this was money paid for the services of their child that the Chrisleys then siphoned off to satisfy their own tax lien (a fact that they hid from the lender).

- Julie falsely told a bank employee that Todd had $4 million in marketable securities. (Gov. Ex. 669). As previously stated, this was the same lie they and Braddock told banks during their bank fraud conspiracy.

- Todd and Julie sent the same cashier's checks to two different lenders as proof of available cash on hand. (Gov. Exs. 944, 957, 959). Of note, when Todd realized his wife had mistakenly included the fact that the checks had been deposited in their daughter's bank account, he immediately chastised her:

| | |
|---|---|
| **From:** | Michael Chrisley |
| **Subject:** | Re: |
| **To:** | julie chrisley |
| **Sent:** | April 10, 2017 10:19 PM (UTC-04:00) |

This isn't what I asked you to do. Why would I want to show that the money went into savannahs account ? Think about it , how stupid is that ? I merely asked for copies of the damn cashiers checks to show we had the money

(Gov. Ex. 958).

As the jury heard during trial, the Chrisleys even tried to swindle the production company that produced their show and NBC through nickel-and-dime fraud schemes:

- They sent a fabricated invoice to their production company from "Pineapple House" requesting reimbursement for $7,200. (Gov. Ex. 931). A representative from Pineapple House confirmed this invoice was fabricated. (Tr. at 1416-24).

- They sent a fabricated invoice to their production company from "Ken Knight Interiors, Inc." requesting reimbursement for $9,863.97. (Gov. Ex. 943). Ken Knight testified at trial that this invoice was completely fabricated. (Tr. at 2163-71).

- They also falsely claimed that a Delta ticket cost $2,300. (Gov. Ex. 940). Agent Ryskoski testified that this too was a lie: They had purchased two first class tickets to Los Angeles and wanted their production company to foot the bill for both tickets. (Tr. at 2256-61).

The last item bears emphasis. Todd Chrisley tried to scam NBC—the network that aired his reality television show through USA Network—out of $1,300 because the network told him they would pay for only one airline ticket. Despite being told this, Todd went on to falsely tell his agent, "we paid 2300 for that ticket" after he had bought two. (Gov. Ex. 940). The fact that they earned over $1 million that year alone wasn't enough for these two fraudsters because they decided to try to bilk the network airing their show out of an additional $1,300.

Witnesses called by the Chrisleys testified that, despite earning millions as public figures and celebrities, the Chrisleys routinely stiffed service workers and professionals who they owed money. For example:

- Bill Abbott testified on cross examination about a number of contractors and subcontractors who had done work on a new house who the Chrisleys refused to pay. (Tr. at 2778-90). One contractor desperately emailed, "We want to continue this project, but it's hard to when there's a lack of payment and drawings to implement construction. We have tried multiple times to text, e-mail and call with, no return response. Please respond so we can continue the advancement of this project." (Gov. Ex. 1504). An architecture firm similarly emailed, "When we can expect payment of $30,413 so we can expedite your concerns?" (Gov. Ex. 1505).

- In January 2016, a web developer emailed Todd about a $28,000 balance owed from months beforehand for completed services that the Chrisleys refused to pay. (Gov. Ex. 1503). The vendor sent Todd several emails that he ignored. (*Id.*).

- The Chrisleys' own attorney, Robert Furr, testified that at one point the Chrisleys owed him $200,000. (Tr. at 3068-69). Of course, they paid their overdue bills before he testified for them at trial. (*Id.*).

- The Chrisleys' other attorney, Leron Rogers, who helped set up 7C's Productions, testified that he stopped working for the Chrisleys because they refused to pay their bills. (Tr. at 2658-60). Ultimately, his law firm had to sue the Chrisleys to get paid the $50,000 for his legal services. (*Id.*).

- At one point, the Chrisleys hired a professional appraiser to inventory and value a warehouse full of furniture. When the appraiser asked Tarantino for payment for her completed work, Todd instructed Tarantino not to pay her, telling him:

  **From:** Michael Chrisley [mailto:mchrisley1@gmail.com]
  **Sent:** Tuesday, August 29, 2017 1:02 PM
  **To:** Peter Tarantino <peter@cpatarantino.com>
  **Subject:** Re: appraiser

  Scare the fuck out of her and let her know that from what you hear the Chrisley's are going after her insurance for damages

  (Sent. Ex. 18).

62

- Even Annie Kate Pons, who introduced the Chrisleys to the producer who created *Chrisley Knows Best*, was stiffed $10,000. (Tr. at 961-62). Every time she asked Todd about the money she was owed, he would lie, claiming that "the check is in the mail" or "I'm getting someone to process it." (*Id.*). The Chrisleys' one-time close friend who made them famous never got her check. (*Id.*).

The Chrisleys didn't just stiff vendors and employees; they also freeloaded benefits that they weren't entitled to. For example, Todd Chrisley applied for a mortgage hardship application for their South Carolina lake house the same year that he and his wife earned over $1.3 million from entertainment ventures. (Gov. Ex. 419). These mortgage hardship applications were designed to protect the types of homeowners whose homes were foreclosed on years earlier and managed by companies like CAM, not wealthy celebrities who didn't want to pay their bills. In all, the charged criminal conduct that the Chrisleys were convicted of is just one part of this lengthy fraud story.

### 4. The Chrisleys' criminal conduct was driven by greed, not necessity.

Unlike many white-collar criminals, the Chrisleys did not need a dime from their fraud and tax evasion schemes. They were already wealthy. At its peak, the Chrisleys earned at least $600,000 a month through CAM, (Tr. at 1502), and they later began earning millions from their reality show. No necessity or hardship existed that justifies or explains the money they stole from banks or the income they hid from the IRS. Neither can credibly say that they had to commit fraud to put bread on their family's table.

As Braddock testified, Todd Chrisley's spending habits required him to spend half a million dollars a month just to stay afloat. (Tr. at 1492). And while the fraud scheme continued, Todd and Julie spent a mindboggling amount of money. Both Braddock and Alina Clerie testified that Todd used CAM like his personal piggybank, even when it meant bills and CAM employees could not be paid. At one point, when Todd demanded that Clerie give him more money even though she reported CAM didn't have sufficient funds, he screamed at her, "You will give me that fucking money you stupid fucking Russian bitch." (Tr. at 1937-38). Todd Chrisley was the same in emails. When Clerie desperately reported that CAM didn't have enough money to pay  agents, Todd made clear to Braddock that his bills were to take priority, even if it meant CAM's agents would go unpaid:

**From:** mchrisley1@aol.com [mailto: mchrisley1@aol.com ]
**Sent:** Friday, June 25, 2010 12:01 PM
**To:** Mark Braddock
**Subject:** Fwd: Bodker Ramsey Payment

I am sick of getting these fucking emails, pay the fucking bodker Ramsey and skip payroll... No other agent is to be paid until the shit I have ask to get paid is paid an if they are then we will have less to cover in payroll

Sent from my iPhone

(Gov. Ex. 1112). The financial records further confirm that the Chrisleys drained CAM while the company struggled to pay bills. From June through December 2010, the Chrisleys transferred more than $800,000 from CAM into a Chrisley and Company bank account, much of which they used for their own personal

benefit. (Gov. Exs. 1003, 1004, Doc. 130 ¶ 48). Meanwhile, Todd failed to pay any of the $701,249 he initially reported as due and owing when he filed his 2009 tax return in October 2010.

The Chrisleys' lavish spending did not change after CAM folded and Todd filed for bankruptcy in 2012. Annie Kate Pons testified about the Chrisleys' lifestyle while they were hiding money from the IRS: Todd stated on the show's promotional video that they spent $300,000 a year on clothing, and Ms. Pons confirmed that Todd wore designer clothing and bragged about purchasing his children a Range Rover and having wallpaper flown in from France. (Tr. at 968-70). In June 2017 alone, entertainment and production companies wired over $300,000 into the 7C's Productions bank account. (Gov. Ex. 104(b); Doc. 130 ¶ 49). That same month, the Chrisleys spent $7,000 at an electronics store, $2,000 at a luxury retail store, and thousands of dollars at department and clothing stores. (Gov. Ex. 104(b)). At that point, the Chrisleys had not yet bothered to file their 2013, 2014, 2015, or 2016 tax returns, and even had Tarantino tell the IRS that Todd couldn't afford to pay his long overdue 2009 tax liability.

The Chrisleys' greed was astounding. They were paid $600,000 a month for running CAM, while the average monthly income in the state of Georgia in 2009 was $47,600.[21] But $600,000 a month wasn't enough, so they orchestrated a multi-million-dollar bank fraud scheme targeting community banks. In 2017, they

---

[21] *See* National Center for Education Statistics,  Median household income, by state: Selected years, 1990 through 2009, available at https://nces.ed.gov/programs/digest/d10/tables/dt10_025.asp.

earned more than $2.9 million, while the median household income for the state of Tennessee where they lived was $54,833.[22] Instead of filing and paying income taxes like other Americans, they hid the money in their shell corporation and transferred assets and accounts to Todd's mother when the IRS was on their heels.

> **5. The Chrisleys' criminal conduct continued through the grand jury's investigation and trial.**

Todd and Julie Chrisley's crime spree culminated in their attempts to obstruct the grand jury's investigation and putting up witnesses to lie for them at trial, including Todd's mother and his oldest daughter from his first marriage. Lindsie falsely testified that Braddock used her father's AOL account (Tr. at 2346-47), and both she and Faye falsely testified that Julie had merely hoped to add Faye as a "signer" to the 7C's bank account. (Tr. at 2359-60). Tragically, the Chrisleys chose to pull their family members into their criminal conduct, from helping them hide money from the IRS to taking the stand and lying at trial. While the defendants should receive the two-level obstruction enhancement, the ultimate sentence imposed by the Court should take into account the manner in which the Chrisleys repeatedly obstructed the investigation and prosecution of this case.

---

[22] *See* United States Census Data on Tennessee, available at https://www.census.gov/quickfacts/TN (last visited November 14, 2022).

### B. Every § 3553(a) factor calls for a lengthy term of incarceration for Todd and Julie Chrisley.

This sentencing will be the first time that Todd and Julie Chrisley are held accountable for their fifteen-year fraud spree. Every factor that Congress has enumerated under § 3553(a) calls for both defendants to be sentenced to lengthy periods of incarceration.

The Eleventh Circuit has repeatedly emphasized the need for white collar sentences to reflect the seriousness of the crime, promote respect for the law, and provide just punishment. *See United States v. Martin*, 1227, 1240 (11th Cir. 2006). The prison sentences in this case must take into account the seriousness of the Chrisleys' crimes without affording a so-called white-collar "discount." The Eleventh Circuit has explicitly instructed sentencing judges not to give what it called a "sentencing discount" because of a white-collar professional's economic or social status. *See United States v. Kuhlman*, 711 F.3d 1321 (11th Cir. 2013) As the Eleventh Circuit instructed in *Kuhlman*, "we encourage our district court colleagues to keep in mind that

> [b]usiness criminals are not to be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. *Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.*

711 F.3d 1321 (11th Cir. 2013) (citing *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (internal citation omitted) (emphasis added); *see also United States*

*v. Ruff*, 535 F.3d 999, 1007 (9th Cir. 2008) (Gould, J., dissenting) ("[D]istrict courts sentencing white collar criminals can more often identify with the criminal . . . . but, socioeconomic comfort with a criminal convict is not a sufficient reason to show such extreme leniency . . . .").[23]

The seriousness of the Chrisleys' crimes cannot be understated. After they defrauded community banks out of tens of millions of dollars, they hid millions of dollars from the IRS, all while going on television to boast about how much they spend on designer clothes. And when they learned that they were under investigation for those crimes, they involved their own family members and friends to obstruct justice. The seriousness of their actions is further underscored by the fact that neither defendant has expressed remorse for their crimes, instead continuing to blame others for their own criminal conduct. Given the seriousness of the Chrisleys' crimes, a lengthy period of incarceration is warranted. *Cf. Kuhlman*, 711 F.3d 1321 ("He stole nearly $3 million and 'did not receive so much as a slap on the wrist—it was more like a soft pat.'") (citing *United States v. Crisp*, 454 F.3d 1285, 1291 (11th Cir. 2006)).

As a final matter, general deterrence must be a key consideration here. "Because economic and fraud-based crimes are 'more rational, cool, and

---

[23] And as the Eleventh Circuit has held, the Chrisleys' lack of criminal history is already taken into account in their Criminal History Category. *See Martin*, 455 F.3d at 1239 ("While the district court emphasized Martin's lack of a criminal record and viewed his fraudulent conduct as an 'aberration' in his otherwise outstanding life, Martin's criminal history category of I already takes into account his lack of a criminal record.").

calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" *Martin*, 455 F.3d at 1240 (citing Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After *Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)); *see also United States v. Gorodetsky*, 288 F.R.D. 248, 249 (E.D.N.Y. 2013). ("Most income tax evasion is undiscovered. To be effective as general deterrence, punishments should lead entrepreneurs considering tax evasion to calculate that they will be punished by incarceration and suffer substantial financial penalties if their cheating is discovered."). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Martin*, 455 F.3d at 1240. "As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *Id.* (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259). "Congress was especially concerned that prior to the Sentencing Guidelines, '[m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.'" *Id.* (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259).

## V.   CONCLUSION

The jury in this case rendered a true and just verdict: the Chrisleys' fame and fortune do not put them above the law. For the reasons stated in this Memorandum, the United States respectfully requests that the Court find that the above-listed Guidelines enhancements apply and that the Court consider these arguments and evidence when imposing a fair and reasonable sentence under 18 U.S.C. § 3553(a).

Respectfully submitted,

RYAN K. BUCHANAN
*United States Attorney*

/s/THOMAS J. KREPP
*Assistant United States Attorney*
Georgia Bar No. 346781
thomas.krepp@usdoj.gov

/s/ANNALISE K. PETERS
*Assistant United States Attorney*
Georgia Bar No. 550845
annalise.peters@usdoj.gov

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Counsel for Todd Chrisley

Counsel for Julie Chrisley

Counsel for Peter Tarantino

November 14, 2022

/s/ THOMAS J. KREPP

THOMAS J. KREPP

*Assistant United States Attorney*