# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Criminal Indictment No. |
| TODD CHRISLEY a/k/a MICHAEL | : | |
| TODD CHRISLEY, et al. | : | |
| | : | 1:19-CR-297-ELR-JSA |
| Defendants | : | |
| | : | |
| | : | |

## DEFENDANT TODD CHRISLEY'S MEMORANDUM IN SUPPORT OF A BELOW GUIDELINE SENTENCE

**COMES NOW**, defendant Todd Chrisley, by and through his undersigned counsel, and respectfully submits his Memorandum in Support of a Below Guideline Sentence to this Honorable Court for consideration of the legal arguments and circumstances set forth herein, and in support thereof states as follows:

I.  **INITIAL ADVISORY GUIDELINE CALCULATION**

The Presentence Report (PSR) calculates Mr. Chrisley's sentencing guidelines at a Total Offense Level 42. Should the Court accept the PSR analysis, Mr. Chrisley's Offense Level of 42 would yield a corresponding sentencing range of 360 months to life imprisonment. The Government in its sentencing

1

memorandum places the Total Offense Level at 37, with custody guideline range of 210 – 262 months.

However, as detailed in Mr. Chrisley's Corrections and Objections to the Presentence Report, the correct guidelines and sentencing range is much lower. Under U.S.S.G. §2B1.1, the Base Offense Level for the bank fraud offenses is level 7. Pursuant to §2B1.1(b)(1)(J), an additional eighteen levels is added. Coupled with a two-point increase for role in the offense pursuant to U.S.S.G §3B1.1, and a two-point increase for $1,000,000.00 from financial institutions under U.S.S.G §2B1.1(6)(17)(K), the Adjusted Offense Level for the bank fraud offenses totals 29.

Regarding the tax offenses, the Base Offense Level for violations of 18 U.S.C. §371 and 26 U.S.C. §7201 is U.S.S.G. §2T1.1, §2T1.9 and §2T4.1, is 20. The advisory guideline range for Offense Level 29, with criminal history category I results in a Custody Guideline Range of 97 – 108 months.

## II.     THE PURPOSE OF SENTENCING

The purpose of the Sentencing Guidelines is to provide guidance to the courts in fashioning a sentence that achieves an appropriate measure of punishment using uniform metrics. But the Guidelines range is only one factor for the Court to consider, and ultimately the Court is free "to reject (after due consideration) the

advice of the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 113 (2007) (Scalia, J. concurring). Ultimately, the Guidelines should inform the court that a reasonable sentence should be within a certain range, though unique characteristics of the defendant or the circumstances of the offense are blended into the final decision after the Guideline range is set. The goal, of course, is for the court to arrive at a sentence that is sufficient, but not greater than necessary, to achieve the legitimate goals of sentencing; that is, a just result.

The Guidelines calculation contained in the PSR and offered by the Government in this case defeats that very mission. Not only does the calculation result in a sentence range that equates the defendant to murderers or international terrorists, it is also based on a methodology that is fundamentally flawed, rooted in speculation, contrary to objective empirical evidence, and inherently unreliable.

## III.   LEGAL STANDARD

When a defendant "objects to a fact contained in the PSR, the Government bears the burden of proving that disputed fact by a preponderance of the evidence." *United States v. Martinez*, 584 F.3d 1022, 1027 (11th Cir. 2009) (citing *United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005)). The Eleventh Circuit has mandated that "the preponderance standard is not toothless. It is the district court's duty to ensure that the Government carries this burden by presenting

reliable and specific evidence." *United States v. Bernardine,* 73 F.3d 1078, 1080 (11th Cir. 1996).

If the Court finds the Government has presented proper evidence, the Court must then either: "(1) make an explicit factual finding as to the allegation; or (2) determine that no such finding is necessary because the matter controverted will not be taken into account in sentencing the defendant." *United States v. Lawrence,* 47 F.3d 1559, 1566 (11th Cir. 1995).

## IV.   THE GOVERNMENT FAILS TO SHOW THAT THE GUIDELINES ENHANCEMENTS IT SEEKS ARE APPROPRIATE.

### A. The Offense Did Not Cause Victims to Suffer A Loss of More Than $9,500,000.00.

In all economic crime cases, the court must determine the amount of "loss" associated with the offense which, according to the Guidelines' general definition, is "the greater of actual loss or intended loss." U.S.S.G. §2B1.1; *United States v. Stein,* 846 F.3d 1135 (11th Cir. 2017); *United States v. Cobb*, 842 F.3d 1213 (11th Cir. 2016); *United States v. Massam*, 751 F.3d 1229 (11th Cir. 2014). Although the district court may estimate the amount of loss, it cannot "speculate about the existence of facts and must base its estimate on reliable and specific evidence."

*United States v. Ford,* 784 F.3d 1386, 1396 (11th Cir. 2015; *accord United States v. Sepulveda*, 115 F.3d 882, 890-91 (11th Cir. 1997).

Under the Guidelines, "[a]ctual loss… is defined as the 'reasonably foreseeable pecuniary harm ***that resulted from the offense*.'" *United States v. Campell*, 765 F.3d 1291, 1302 (11th Cir. 2014) (quoting U.S.S.G. §2B1.1 cmt. N.3(A)(i)). This definition "incorporates [a] causation standard that, at a minimum, requires factual causation (often called 'but for' causation) and provides a rule for legal causation (i.e., guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination)." U.S.S.G App. C, Vol. II at 178, Amend. 617 (Nov. 1, 2001).

The Supreme Court has explained that statutory phrases like "resulted from" require ***at least*** a showing of but-for causation, particularly in the context of enhancing a defendant's sentence for harm allegedly resulting from the offense. *Burrage v. United States*, 571 U.S. 204, 134 S. Ct. 881, 887-891 (2014). The Eleventh Circuit has also stated that the imposition of a loss enhancement at sentencing, "require[s] a calculation of the greater of actual or intended loss ***defendant caused***." *United States v. Willis,* 560 F.3d 1246, 1248 (11th Cir. 2009) (emphasis added).

Because of the importance in this case of the principles of causation that must be applied, it bears repeating: the Guidelines require the Court to determine

loss under two causation standards: "but for" causation and "proximate cause." *United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005). *See, e.g., United States v. Hicks*, 217 F.3d 1038, 1048-49 (9th Cir. 2000); *United States v. Ednie*, 707 F. App'x 366 (6th Cir. 2017); *United States v. Marlatt*, 24 F.3d 1005, 1007 (7th Cir. 1994) ("[there is a] difference between 'but for' causation and the causation – for which the presence of but-for causation is ordinarily a ***necessary condition*** but rarely a sufficient one—that imposes legal liability. The distinction runs throughout the law. Criminal law is no exception") (emphasis added)). A but-for cause of a hard is one without which the harm would not have happened. *United States v. George*, 949 F.3d 1181, 1187 (9th Cir. 2020).

District courts must take a "realistic, economic approach to determine what losses the defendant truly caused or intended to cause." *United States v. West Coast Aluminum Heat Treating Co.,* 265 F. 3d 986, 991 (9th Cir. 2011).

Though the Government's argument ignores this principle, it is basic fundamental law that "courts must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines." *Sepulveda*, 115 F.3d at 890 (internal citation and quotation marks omitted). The loss suffered as a result of the bank loss does not exceed $9,000,000.00. Exact numbers will be presented at the sentencing hearing.

**B. The Evidence has failed to show the bank fraud scheme involved ten**
**or more victims for the enhancement to apply.**

The Sentencing Guidelines provide for a two-level enhancement if the
offense involved ten or more victims. The Government has conceded that there
should be no enhancement under U.S.S.G. §2B1.1(6)(2)(A). The PSR argument is
insufficient to support the enhancement for several reasons. First, the information
is in summary form and omits any verifiable data in support of its conclusions.
Second, it is presented without opportunity for cross examination or challenge for
accuracy. Third, the PSR appears to include at least two (2) financial institutions
that the Government admits suffered no loss related to the defendant's loans.
Fourth, the Government has presented no evidence that the defendant purposefully
intended to defraud any of these banks, as is required under *United States v.*
*Ridling*, 21-10777, 2022 WL 4134423 (11th Cir. Sept. 13, 2022). For all of these
reasons, the two-level enhancement should not apply. U.S.S.G. §2B1.1 (b)(2)(A).

Key to this enhancement is that the "offense" caused "substantial financial
hardship" to ten or more victims. *United States v. George*, 949 F. 3d 1181, 1187-88
(9th Cir.), *cert. denied,* 141 S. Ct. 605 (2020) ("Section 2B1.1(b)(2) refers to
conduct that 'resulted in' substantial financial hardship, language that we have
interpreted to impose a causation requirement.") (internal citations omitted).  What
is conspicuously absent from the Government's analysis is any reference to this

key causation requirement. Instead, it just refers generally to FDIC sales of Chrisley loans to third parties at discounted amounts, notwithstanding the requirement of proving that the Defendant caused the reduction.

It is well-established that the court must consider whether the financial hardship was "substantial," and determine whether the offense "caused" the hardship. *George,* 949 F.3d at 1187; *United States v. Jones*, 823 F. App'x 837, 842-24 (11th Cir. 2020) ("Among the factors to consider in determining whether the offense caused the victim substantial financial hardship is whether the crime resulted in a victim suffering substantial loss." (internal quotations omitted)); *United States v. Davis*, No. 15CR02471PJSSER, 2017 WL 1423178, at *2-3 (D. Minn. April 21, 2017) (holding that victim nonprofit's entry into receivership was not caused by the money stolen by the defendant and thus substantial financial hardship had not been established.) In *George*, the court established that either but-for or proximate causation would suffice under the express language of the Guidelines. 949 F.3d at 1187. It further articulated that the Government's evidence established the requisite casual link under either theory. First, the defendant's actions were the ***direct cause*** of the substantial financial hardship when the hardship was the loss of a home and the fraud had been the inducement to stop making mortgage payments. *Id.* (emphasis added). Second, the consequences of the actions were ***foreseeable under a theory of proximate cause*** because the

defendant knew he was supplying false information and was instructing victims to stop paying the mortgages. *Id.* at 118 (emphasis added).

The casual requirement is not a mere formality. Courts can, and should, decline to apply the enhancement where, as is the case here, causation cannot be established from the evidence provided. *See, e.g., United States v. MacCallum*, No. 1:15-CR-00204 EAW, 2018 WL 2999907, at *12 (W.D.N.Y. June 15, 2018), *aff'd and remanded,* 821 F. App'x 11 (2d Cir. 2020) (distinguishing between identified victims whose losses were caused by the defendant's scheme and those where causation could not be found for purposes of analysis under the Guidelines' substantial financial hardship standard); *Davis,* 2017 WL 1423178, at *2 (Government had not proved a substantial financial hardship where defendant "stole a lot of money, but his thievery was not the *direct* cause of the failure of [victim]") (emphasis in original).

The PSR simply omits this fundamental requirement in its legal argument and does not address this critical analysis when referring to banks that failed and were taken over by the FDIC, not as a result of the loans made to the defendant. In essence, the PSR conflates the causation requirement of U.S.S.G. §2B1.1(b)(2)(A) with the non-exhaustive list of hardship factors provided in U.S.S.G. §2B1.1, cmt. n.4(F). It is without dispute that the substantial financial hardship analysis works on a "sliding scale" whereby the standard for "substantial" turns on the

individualized circumstances of the victim rather than on the dollar amount of the loss. *See United States v. Castaneda-Pozo,* 877 F.3d 1249,1253 (11th Cir. 2017).

Application of U.S.S.G. §2B1.1(b)(2)(A) must be supported by a preponderance of the evidence, and the government bears the burden. *United States v. Chukwu,* 842 F. App'x 314, 321 (11th Cir. 2021); *see also United States . Marino,* 492 F. Supp. 3d 920, 922 (D. Neb. 2020) (citing *United States v. Mitchell,*825 F.3d 422, 425 (8th Cir. 2016)). Furthermore, evidence of the loss must be attributable to a victim of the defendant's conduct. *See United States v. Buckman*, No. CR 14-540, 2019 WL 142385, at *6 (E.D. Pa. Jan. 8, 2019), *aff'd* 811 F. App'x 73 (3d Cir. 2020) (refusing to increase the enhancement from two levels to four when the government included both homeowners and lenders in the calculation of victims but only homeowners suffered a hardship).

### B.  The Offense Did Not Involve Sophisticated Means.

Mr. Chrisley objects to application of the 2-level enhancement under U.S.S.G. §2B1.1(b)(10)(C) for purported use of "sophisticated means" in the execution or concealment of the offense conduct. Because the Government has failed to meet its burden to show that either the execution or the alleged concealment of the offense was sufficiently complex or intricate, the Court should decline to impose this enhancement.

The Guidelines provide for a two-level enhancement if the offense involved "sophisticated means." U.S.S.G. §2B1.1(b)(10)(C). "Sophisticated means" refers to "***especially complex*** or ***especially intricate*** conduct pertaining to the execution or concealment of an offense." U.S.S.G. §2B1.1 cmt. n.9(b) (emphasis added). In the Eleventh Circuit, "especially complex" or "especially intricate" schemes are characterized by conduct far beyond the offense conduct here. The hallmarks on an offense for which the sophisticated means enhancement applies involve "conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010) (citing §2B1.1 cmt. n.9(b) (alteration omitted)); *see also United States v. Zamora*, 484 F. App'x 414, 415 (11th Cir. 2012) (affirming "sophisticated means" enhancement where "the scheme involved a shell company, used a nominee as president to shield the true owners, created fictitious patient files using the identities of real people, and required use of intricate Medicare lien and reimbursement processes"); *United States v. Dinnall,* 313 F. App'x 241, 245 (11th Cir. 2009) (enhancement applied where defendant, an accountant, used specialized knowledge gained to misuse Social Security numbers to deceive multiple loan underwriters); *United States v. Robertson*, 493 F.3d 1322, 1332 (11th Cir. 2007) (enhancement was appropriate where defendant perpetrated fraud by using fake names and addresses to conceal his identity). The enhancement

also has been applied "where defendants have engaged in concealment of their crimes in a variety of ways not expressly stated in the Application Note." *United States v. Feaster*, 798 F.3d 1374, 1378 (11th Cir. 2015). But "the enhancement is proper when the *execution*, not just the concealment, of the offense is intricate." *United States v. Fowler*, 213 F. App'x 788, 791 (11th Cir. 2007) (citing U.S.S.G. §2B1.1(b)(8) cmt. n.6) (emphasis in original).

Here, the offense conduct was not sophisticated: it consisted merely of the submission of inflated financial statements or inflated bank statements to financial institutions by Mark Braddock. Each financial statement was virtually the same, overstating the value of Todd Chrisley's brokerage account. That would not rise to the level of conduct sufficient to warrant a sophisticated-means enhancement.

Critically, the offense conduct here did not involve any of the indicators of the "sophisticated" scheme, such as "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Ghertler,* 605 F.3d at 1267.

## V.    <u>REQUEST FOR A BELOW GUIDELINE SENTENCE</u>

Whatever the final Guideline is determined to be, 18 U.S.C. §3553(a) factors support a sentence below the Guideline range.

A sentencing court is to sentence a defendant to a reasonable sentence. In order to be reasonable, a sentence must achieve the purposes of sentencing as

stated in 18 U.S.C. §3553(a). *United States v. Talley,* 431 F.3d 784, 788 (11th Cir. 2005). The sentence must be "sufficient but not greater than necessary." A district court shall fashion a reasonable individualized sentence based on §3553(a) factors. *See, United States v. Gall,* 128 S.C.t 586 (2007); *United States v. Williams,* 435 F.3d 1350, 1354 (11th Cir. 2006).

Under §3553(a), the Court considers a number of factors in determining the appropriate sentence, including "the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence 'to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;' the need to deter criminal conduct and 'protect the public;' the sentencing range provided for in the Guidelines; and the 'need to avoid unwarranted sentence disparities.'" These factors, particularly those set forth in §3553(a)(2)(6) and (7) are pertinent in this case.

A. <u>Under 18 U.S.C. §3553(a)(2), the law requires the Court to consider the need for the sentence imposed:</u>

(a) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(b) To afford adequate deterrence to criminal conduct;

(c) To protect the public from further crimes of the defendant; and

(d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

After consideration of these factors, the defendant respectfully submits that a sentence of limited incarceration combined with supervised release to follow is appropriate.

(a) <u>To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.</u>

(b) <u>To afford adequate deterrence to criminal conduct.</u>

The crimes of which the defendant was convicted are serious offenses. The sentence must reflect that seriousness, but must take into consideration all of the circumstances. Recognition of the seriousness and the need for deterrence is satisfied by a below Guideline sentence in view of the age of the offenses. The bank fraud offenses of conviction occurred at least ten (10) years ago, some as long as sixteen (16) years. [1] The tax offenses, which are based on the failure to file timely returns and submit concurrent tax payments date back to 2010. At present, no taxes are owed for the additional years included in the indictment. The offenses of conviction, although serious, were committed long ago, and their age should be

---

[1] Count 1 charges a bank fraud conspiracy running from 2006-2012. Counts 2-6 charge substantive bank fraud offenses occurring in 2009 and 2010.

considered as a factor that mitigates the need for punishment. And the need to impose a lengthy sentence of incarceration is not necessary to deter criminal conduct by the defendant as the offenses are historical.

    (c) <u>To protect the public from further crimes of the defendant.</u>

The Supreme Court has recognized the likelihood that a defendant will engage in future criminal conduct is a central factor to be assessed when imposing sentence. *Pepper v. United States*, 131 S.Ct. 1229, 1242 (2011).

Todd Chrisley is fifty-four (54) years old. Given the defendant's age, lack of serious criminal history and the time that has passed since the offending conduct, a lengthy prison sentence is not needed to protect the public from the defendant.

    (d) <u>To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.</u>

The defendant does not require the services of the Bureau of Prisons for educational or vocational training, medical care, or other correctional treatment. A sentence of limited incarceration would allow him to qualify for placement by the Bureau of Prisons to a facility of minimum or low security consistent with his needs and low security risk.

    B.    <u>Need to Avoid Unwarranted Sentence Disparities</u>

§3553(a)(6) directs the Court to consider in imposing a sentence the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. While not directly addressed in (a)(6), the Court is asked to nonetheless consider that unindicted co-conspirator Mark Braddock has not and will not receive any punishment for his orchestration of the bank fraud conspiracy and substantive offenses. Remarkably, Braddock has not even been required to forfeit the proceeds of his theft, which has allowed him to not only be the driving force behind the prosecution in this case but also get away with the proceeds he embezzled from the Chrisleys or the banks that provided the loans in this case. Trial testimony and evidence made clear that Braddock prepared each and every false financial statement and bank statement; personally submitted all fraudulent documents to the financial institutions; communicated on behalf of himself and Todd Chrisley with the banks; personally prepared each and every loan application; and shared in the proceeds of each loan. Unlike the defendant, Braddock will not be charged with any offenses, will not be required to repay any of the loan proceeds as restitution, and will suffer no forfeiture of funds or property. In addition, Braddock will not be prosecuted for federal offenses he committed without the defendant, including bank fraud, tax fraud, perjury and BP Oil fund fraud. Consideration of this factor, as a need to avoid unwarranted

disparities favors a downward variance from defendant Chrisley's advisory Guidelines.

C. <u>Need to Provide Restitution</u>

§3553(a)(7) directs the Court to consider, when fashioning a reasonable sentence, the "need to provide restitution to any victims of the offense." While the exact amount of restitution is still in question, it is clear that the defendant will be responsible for the payment of millions of dollars in restitution. A lengthy sentence of incarceration would delay any opportunity to continue to earn income to pay restitution, and could even result in the total inability to obtain work following a lengthy prison sentence. In the interest of making restitution, a below Guideline sentence is respectfully requested.

D. <u>The Defendant's Age Supports A Below Guidelines Sentence Under 18 U.S.C. §3553.</u>

The Federal Sentencing Guidelines, as originally promulgated in 1987, provided that an individual's age, health or mental health was "not ordinarily relevant" in determining whether a sentence should be outside the applicable guideline range. The Supreme Court effectively ended these limitations in *United States v. Booker*, 543 US 220 (2005) and the Guidelines were amended as of November 1, 2010 to provide that age, physical condition and mental health may

17

be relevant. *See* U.S.S.G. §5H1.1 (age), 5H1.3 (mental and emotional conditions), 5H1.4 (physical condition) (November 1, 2012).

The National Institute of Corrections defines prisoners fifty and older as "elderly" and "aging." *See* Dr. Joann B. Morton, *An Administrative Overview of the Older Inmate,* U.S. Department of Justice, National Institute of Corrections, 4(1992). *See* also *United States v. White*, 506 Fd.3rd 635, 640 (8th Cir. 2007) (a defendant's age at 51 can and should be considered in sentencing.) Because incarceration can be substantially more punitive for an older defendant than the "heartland" offender, sentencing leniency based on older age promotes the penal goals of imposing sufficient punishment and avoiding unwarranted sentencing disparities under 18U.S.C §3553. Older prisoners, even if they are not suffering illness, can find the ordinary rigors of prison particularly difficult because of a general decline in physical and often mental functioning which effects how they live in their environments and what they need to be healthy, safe, and have a sense of wellbeing. *See* Human Rights Watch, *Old Behind Bars – the Aging Prison Population in the United States*, at 7 (January 2012).

Justification for considering age is that prison facilities rules and routines were not created with older inmates in mind. As a result, ordinary incidents of prison life may challenge those who are only middle-aged in the community at large. These include climbing stairs to high tier cell blocks, getting into a top bunk

with a low ceiling, walking long distances for meals and other services, standing in lengthy lines for meals or pills, sleeping on thin mattresses, and enduring cold or hot temperatures.

Ordinary incidents of aging present special health risks to older prisoners. Among other things, older inmates are more vulnerable to contagious diseases, face increased risk of falls, require more frequent access to toilet facilities, and require more prescription medications. *See An Administrative Overview* at 1-10. They are also particularly vulnerable to the effects of over or under medicating, and suffer disproportionately from a poor diet and limited exercise. *Id.*

Even if the Bureau of Prisons could provide adequate care for an aged defendant, this "misses the mark" when it comes to sentencing because the issue under §3553 is the need to provide medical care "in the most effective manner." *United States v. Wadena*, 470 Fd.3rd 735, 739 (8th Cir. 2006).

Any prison term is a larger portion of an older defendant's remaining years than it is of the "heartland" offender's. Therefore, an older defendant's shorter life expectancy supports leniency based on the sentencing goals of proportionality and avoiding unwarranted sentencing disparities.

A lower rate of recidivism for older offenders is well-established and supports leniency because it allows the sentencing purposes of deterrence and protection of the public to be satisfied by a lesser term. *See* US Sentencing

Commission Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines 12 (May 2014) (noting that recidivism declines relatively consistently as age increases). There is overwhelming evidence that prisoners age fifty and older are far less likely to return to prison for new crimes than their younger cohorts.

Todd Chrisley is fifty-four years old. He has suffered with fibromyalgia since 2012. He takes several prescription medications to treat various symptoms of the disease. In addition, he has been diagnosed with anxiety and is treated with prescribed medication. Todd's father died of complications from liver disease and his younger brother Randy Chrisley is disabled due to crippling scoliosis and is currently battling throat cancer. Todd's mother, Elizabeth Faye Chrisley, age seventy-seven, is battling bladder cancer. It is, therefore, predictable based upon family history, that Todd will develop a life-shortening medical condition in the near future.

Todd's medical condition, his age and health needs, whether the Bureau of Prisons might be able to accommodate them or not, certainly support sentencing leniency as he is not within the "heartland" of offenders. His age and medical conditions would make imprisonment disproportionately harsh.

## VI.    THE COMBINATION OF FACTORS SUPPORTS A BELOW GUIDELINE SENTENCE

In fashioning a sentence in this case, this Court must look at Todd Chrisley individually and consider the factors set forth in 18 U.S.C. §3553 in determining a reasonable sentence for him.

Consideration of all §3553(a) factors favors the imposition of a reasonable custodial sentence in this case. A conviction in and of itself with the loss of the right to vote, loss of employment and loss of reputation are significant punishment and deterrence. Limited incarceration with supervised release and restitution will reflect the seriousness of the offenses, promote respect for the law, provide just punishment and afford deterrence. It will also provide the opportunity for meaningful restitution. Such a sentence is sufficient but not greater than necessary to comply with the purposes set forth in §3553(a).

Todd Chrisley has no significant criminal history. There is little if any concern that he will re-offend. The letters submitted by friends and business associates evidence a history of good deeds and striving to help others. He is charitable and giving. He is a good husband and father. He is a good son.

As evidenced in the many letters of support submitted by folks from all walks of life, (*See* Exhibit A) Todd Chrisley is greatly respected. A sample of these comments are included below:

Devotion To Family and Friends

- "Todd is passionate about his family and his faith. Over the years I have witnessed Todd put others before himself. Whether it was with a witty joke, a hug or just words of encouragement, he is determined to bring light in any difficult situation.

  I have known Todd for almost ten years while working on the show. Todd made it a point to redirect the makeup of the show when his biracial granddaughter Chloe was born. He made it more diverse so that Chloe could see women of color in management and power roles.

  Todd is a blessing to all who have had the opportunity to meet him. His welcoming, non-judgmental spirit makes being in his company even better." – Aisha Jones

- "The Chrisleys are as close to genuine family as is possible. Their relationship is unlike anything I've experienced in my sixteen years in this career as a television agent. In Hollywood, it is an unwritten rule to never blur the lines between business and personal relationships with clients. That is not the case with Todd and Julie.

  Simply put, the world is a better place because of the selflessness and love that Todd and Julie show to anyone that comes into their lives. That is the Todd and Julie Chrisley that I know. The version of Todd and Julie that was painted by the prosecution is totally antithetical to the people that we know and love." – Lee White

- "I have known Mr. Chrisley for fourteen years, which is more than half of my life. I met Mr. Chrisley after his son, Chase, and I became best friends while at Greater Atlanta Christian School. Mr. Chrisley has been amazing to me and my family for all fourteen years that we have known the Chrisley family. He is someone that I consider to be a father figure for me. He has truly helped me become the man I am today with his love and support. I thank God every day that he blessed me with the opportunity to have Mr. Chrisley to be part of my life.

In 2010, my father was deemed 100% disabled due to dementia. At that point in my life, this was an extremely challenging obstacle for me to comprehend and figure out how to handle. Mr. Chrisley poured his love and encouragement into me during this time as if I was one of his own children. He was the father figure that I needed to help shape me into the man I needed to be in order to get through this challenging time for my family. I had to become the man of the house and I couldn't have done that without Mr. Chrisley's love and support for me.

I am shocked that these charges have been brought against Mr. Chrisley and it breaks my heart to hear the proposed sentencing for such an amazing man that has been such a crucial person in my life. He is a roll model for myself and loving father to his children and faithful husband to his wife. Mr. Chrisley is not a threat to society and does not deserve to go to jail. It is my sincere desire that the court takes this letter into consideration at this time of sentencing." – Tyler Cooksey

- "When I look at Todd, I see a person who loves harder than anyone I know. I see a true family man. I see the most loyal, caring, hardworking, selfless, thoughtful, kind, genuine, and honest person that I have ever come to know. I have seen this man take his shirt off his back for someone both figuratively and literally. He has always given to others and been so generous to those in need and those that he valued their work ethic. It's very rare to find someone who lives such a public life, and also gives so much of his private time to others and that's a testament to how much he cares for people and how much he wants to truly help others.

Without his counsel around and most importantly his help, I don't think I would be alive today. I am hereby respectfully requesting that you offer him a lesser sentence so that he can continue helping me and many other people around the world, something that he has always been doing. I strongly believe that a lesser sentence is most appropriate in this situation." – Nic Kerdiles

- "Todd and I have known each other since we were in grade school, so that spans the last 40 years plus. From my earliest memories of Todd and our friendship from childhood throughout teenage years and adulthood, Todd has always been the type of friend that has stood up for those that couldn't or wouldn't stand for kindness or what was right and fair. Todd has always stood up for the underdog and stood for kindness.

   When I gave birth to my first daughter, he was actually in the delivery room with me. This was during one of the hardest times of my life, being a single mother of a biracial child, and he never once wavered on his feelings and love for me as well as my daughter, who is, by the way, his goddaughter. Todd has always loved everyone and always strives for fairness and inclusion. One of the many things I admire.

   Todd has had his own family struggles with his oldest son, Kyle, who was on drugs. Todd would drive the streets of Atlanta by himself searching days on end for Kyle, and placed him in rehab after rehab as well as a wilderness program, where Todd actually went and stayed with Kyle in the woods to get him clean. Todd stepped in when Kyle couldn't care for his own daughter, Chloe, who happens to be biracial. Todd adopted his own granddaughter without any thought or hesitation, and only to be ridiculed and called the most horrible names on the internet and publicly because Chloe is biracial. Again, Todd showed nothing but grace, and carried on with nothing short of love for his family and Chloe.

   I tell you these things so you will get a good idea of who you are sentencing. Todd has always taken care of those closest to him and loves and adores his family." – Stephanie Grooms

- "I am the personal assistant/house manager for the Chrisley family, and have known Todd for over six years, having first started my employment with their family in 2016 as a housekeeper. In addition to my housekeeping responsibilities, I've filled in as an interim nanny for the minor Chrisley children, and helped manage the

homes of the older Chrisley children, Todd's mother, and Todd's in-laws.

Being with the family so much of the time has put me in a position where I have been witness to countless interactions between Todd and others as well as personal interactions with him, that I feel are poignant in relation to Todd's character, and I'd like to share some of those with you. He senses another person's struggle and while many people wouldn't be bothered, Todd doesn't look the other way. He steps in.

Right from the start of my employment in 2016, Todd was very invested in my role as a single parent who had recently escaped a long-term abusive relationship. He would sit down at the kitchen counter as I was doing dishes and ask how my children and I were doing, or if there was anything that we needed that he could help with. When Todd found out that my son was at risk of not being able to enroll and attend his next semester at college due to a tuition balance I couldn't pay, he stepped in to be sure it was paid so he could continue with his education, with no questions asked and no expectations of repayment.

I've experienced times when Todd felt I was being shown disrespect by others as "just a housekeeper," and immediately reprimanded them, insisting that I be held in the highest regard and given the respect I deserve. Those moments were instrumental in my emotional and mental growth and helped validate my self-worth. He has shown me true compassion and support when he had nothing to gain from it, no publicity, no "look what I did" on social media.

Most people don't get the opportunity to see and know the Todd that I do. They don't know of the kindness he has extended to myself, my family, and others. They don't see him leading his family in prayer at the dinner table each night, they don't see him shed tears of compassion for others that he sees in pain.

I know the wrongdoings that Todd has been convicted of, yet despite that, I feel compelled to share what I know of him, and that is a kind, generous, compassionate man, and an innately good person." – Jill Palilla

- "I've always known him to be a caring friend and devoted advocate for everyone. You can see the love he has for his family, but the admirable role that he took on as a caregiver for his granddaughter Chloe represents the essence of who he is outside of the stern but comical persona that people see. As a black woman and as his friend, it has upset me over the years to see some of the racist comments that he has been subjected to for being a white man raising a bi-racial child. Mr. Chrisley doesn't allow those people to get to him. He publicly speaks out against racism. Which makes me love and appreciate him more as my friend." – Candi Burruss-Tucker

- "Since I've known Todd Chrisley he has been a loving husband to Julie, very committed to raising his children and grandchildren and providing for them. I hope you will consider that in this day where many men leave their families, he has been steadfast in his commitment to his family; he is present for them." – Rhonda Polhill

- "I am writing to you on behalf of my childhood and lifelong friend, Todd Chrisley. In 2017 my son, who was twenty-eight at the time, had a massive stroke. His life hung in the balance for over two weeks and he had to be put on a ventilator. I will never forget Todd reaching out to me, offering his help, his love and prayers. It was the most stressful time of my life and I was so thankful that Todd was available for me to talk to or text every day to give him updates of Brewer's condition even though he had a demanding schedule. He was the same Todd I knew before fame—warm, caring and all about what he could do to help me through the nightmare.
  Todd is a man who sees and is quick to help people who don't feel seen—the underprivileged and people who have been marginalized." – Sherry Bradshaw

- "I first met Todd fifteen years ago, as I was in school with his son Chase. Todd leads his family through his faith, the two most important things in his life. He cares deeply for each of his six children and would do anything to give each of them a happy, healthy, and purposeful life. The sacrifices I have seen Todd make for his children has been eye-opening. He is a powerful father figure and example for each of them.

   During my adult years, I have come to respect Todd more and more each moment we spend together. He is the hardest working, and most diligent person I know. Throughout his television career, Todd has remained humble, yet has never stopped striving for greatness.

   Todd has spent over thirty years being a father to his children, and I cannot imagine a day that he will not be able to be there for his six. They depend on him just as Todd depends on them. I know the thought of not being able to call them, let alone see them is truly crushing Todd's soul. They are quite literally the closest family I have ever experienced. Their relationship is truly touching to witness, as there is so much love." – Madison Brainard

- "I have known Mr. Chrisley for over fourteen years. I have admired the way he has navigated life and continued to raise his two oldest children even though their mother abandoned them at a young age. Similarly, I admire the fact that he stepped in to adopt his son's bi-racial daughter without hesitation, knowing that his son was not capable of raising her due to his own personal problems.

   Having known Todd to be such an honorable man, the fraud case against him came as quite a shock.

   In 2010, my husband was deemed 100% disabled due to dementia possibly caused by CTE. It was a tumultuous time for our family, and I had three young sons to support. While many of our friends turned their backs on us during that distressing time, Todd stepped up and supported us in any way he could. He especially made a great different in the life of my middle son throughout that rocky time, and I doubt that my son would be the successful man he is today had it not been for Todd Chrisley filling the gap when my husband

could not. I am forever grateful that our son has a father figure like Todd in his life.

Another example of Todd's character that stands out was when he and his son showed up at my mother in-law's funeral in a town far from our home. We didn't expect to see any of our friends there but Todd made the trip out of sympathy and compassion for our family, and it meant so much to all of us. There have been countless other ways Todd has displayed his kindness to us over the years, and I know he shows the same kind of care to many others in his broad sphere of influence. The fame from their TV show has not changed his heart for helping others.

Despite the case against him, I believe that Todd is an honorable man who lives up to high principles and is a valuable member of our community." – Cynthia A. Cookse

- "I have had the privilege and honor to have known Todd and his beautiful family since 1998. I have witnessed him raise his two children from his first marriage, who visited frequently, along with his three children with his wife Julie. He also embraced and lovingly raised his granddaughter Chloe as his own. I have witnessed his close relationship with all of his children throughout the many facets of life and the struggles in raising a grandchild who has endured trauma and experiences, anxiety and depression.

Todd was a great source of strength through my divorce at the time and was there for my children and I for many different reasons." – Isabel Pasqualone

- "He works to take care of his family, but also helps countless others. It may be a gift of a tank of gas for someone he sees at the gas station, or food for someone in line at the grocery store, but he is always aware of those in need.

I have seen him grow in his faith over the last five years. He places his life and the lives of his family in the hands of the One who controls all.

His family is extremely important to him and he supports them unconditionally. His love for his family is evident in all he does.

Todd is also a good man. His heart is kind and caring. I trust him and find him to be a rock-solid friend." – Vera Carter

- "For seventeen years, we have been and will always be family. Our families were woven together by common threads—values, faith, parenting, love, loyalty, honesty, and most crucial, transparency. I can remember vividly calling Todd on the phone. The school we shared was the first time I felt racism towards my children and me. I was immersed in tears, hurt beyond belief, once I heard Todd's calming voice saying Mauri, do not worry. We will take care of this. We will take care of those babies. Todd said, you know I love those children. From that day forth, I knew and respected the character of this man. Not only did he stand by his word given to a single mother of three children. He has been there for us throughout the years. He would say, darling, you know you and those children will always have a place with Julie and me. Seventeen years of a pure, honest friendship. Not one time throughout the years did I ever have to question his trust or loyalty.

  I remember him shedding a tear, knowing he was at risk of losing his family. My heart is broken because my rock, my friend, began crumbling.

  My dear friends are amazing people. People who take time to help other people. They are concerned with factors that change the world and the communities we live in.

  Todd has taught his children to have an amazing work ethic since I have known him for seventeen years.

  These are wonderful people with the purest of hearts. The world needs more people like the Chrisleys." – Mauri Goens

- "I've had the privilege to call Todd Chrisley a friend for about six years now. We initially connected through some not-great circumstances and the "fraternity" that we were both a part of, supporting a spouse that was battling breast cancer. Todd was a

constant encouragement in my life during this season and continues to be so today. He made a decision to love our family, in the good and the bad, and I've watched him do that for so many others as well.

Todd just shows up for people. He does so not looking for anything in return. I can honestly say that he is one of the best and most genuine men I know. He loves people well, right where they are and I'm blessed to get to have him as a friend." – Brandon Janous

- "I've seen Todd go through tough and challenging times over the years. Regardless of the circumstance, he would always find the time to encourage someone else that may be going through something more difficult. At times, he would put his problems to the side and focus on how to help another person see a blessing in their situation.

Todd is a good father, grandfather and even more, an awesome son to his mother. He is devoted to being the very best person he can for his family. He makes a great effort to making sure they also treat people with kindness and being overall grateful." – Angel Johnson

- "There isn't a family that loves and supports one another more than the Chrisleys do. It is not manufactured. They are all genuinely kind, good hearted, God fearing people, a rare commodity in this day and age. I say this because I see it in the heart of who Todd is. There hasn't ever been a time that I've needed him that he hasn't been there. Through the loss of my father-in-law, the loss of my father, career changes and uncertainty, he has helped me navigate it all. He is a man of the highest character and moral integrity.

I have rarely seen a person who works harder to provide and care for those he loves and cares about. The evidence is all of the people that love him back so dearly and are devoted to him. There isn't anything I would not trust Todd, or his family with. I love him dearly and consider him a very close friend. He is loved and respected in our community and those that truly know him, love him and have nothing but the highest praise for how he treats those around him, and more importantly, how he conducts his business with the upmost integrity." – Jay DeMarcus

## VII.   **CONCLUSION**

Many people rely on Todd Chrisley and will be severely and negatively impacted when he is sentenced to imprisonment. His mother is one such person. The concern for her is serious and real based upon her age, infirmities and health. Likewise, the scores of people who are employed in the production and filming of the Chrisley television shows will be harmed when he is incarcerated. All of these considerations are appropriate when determining a reasonable sentence for Todd Chrisley.

The combination of factors set forth above permits a sentence for Todd Chrisley that both recognizes the severity of his offenses and respects the reality of his circumstances. He has fully accounted for all income— filed corrected and amended tax returns; paid the additional taxes, interest and penalties. A below Guideline sentence with accompanying conditions is warranted.

WHEREFORE, for all of the reasons stated above, it is respectfully requested that the Court exercise its discretion and downwardly depart from the advisory Guideline sentence range and impose a combined sentence of limited incarceration, supervised release and restitution.

Respectfully submitted,

*/s/ Bruce H. Morris*
Bruce H. Morris

Suite 2540, Tower Place
3340 Peachtree Road, NE
Atlanta, Georgia 30326
(404) 262-2500
bmorris@fmattorneys.com

CERTIFICATE OF SERVICE


I hereby certify that I have this day filed the foregoing "DEFENDANT TODD CHRISLEY'S MEMORANDUM IN SUPPORT OF A BELOW GUIDELINE SENTENCE" through this District's ECF system, which will automatically serve all counsel of record.

This 15th day of November, 2022.


/s/ Bruce H. Morris
Bruce H. Morris

Suite 2540, Tower Place
3340 Peachtree Road, NE
Atlanta, Georgia 30326
(404) 262-2500
bmorris@fmattorneys.com